# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| *In re* **Application of KARAM SALAH AL DIN AWNI AL SADEQ and STOKOE PARTNERSHIP SOLICITORS for an Order Under 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings.** | Misc. Civil Action No. |

## MEMORANDUM OF LAW IN SUPPORT OF
## *EX PARTE* APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782
## TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS

### PRELIMINARY STATEMENT

The applicants Karam Salah Al Din Awni Al Sadeq ("Mr. Al Sadeq") and Stokoe Partnership Solicitors ("Stokoe" and, together with Mr. Al Sadeq, the "Applicants"), respectfully file this *ex parte*[1] application (the "Application") for an order under 28 U.S.C. § 1782 to conduct discovery for use in foreign proceedings.

The requested relief is for the purpose of obtaining limited, but necessary, discovery in aid of civil proceedings initiated by the Applicants and currently pending in the High Court of Justice of England and Wales, Queen's Bench Division

---

[1] This Court has discretion to grant applications pursuant to Section 1782 on an *ex parte* basis. *See In re Merck & Co., Inc.*, 197 F.R.D. 267, 270 (M.D.N.C. 2000); *see In re Qwest Commc'ns Int'l, Inc.*, No. 3:08mc93, 2008 WL 2741111, at *5 (W.D.N.C. July 10, 2008) ("[T]he issuance of a subpoena based on an ex parte application will not prejudice the rights of the subpoenaed party . . . . Issuance of the subpoena is but a first step in this process, and allows for the subpoenaed party to challenge the subpoena under Rule 45, Federal Rules of Civil Procedure, or appeal this Order to the district court upon a showing that its issuance was clearly erroneous or contrary to law.").

captioned: *Karam Salah Al Din Awni Al Sadeq v. Dechert, LLP, Neil Gerrard, David Hughes, and Caroline Black*, Claim No. QB-2020-000322 (the "Al Sadeq Litigation"), and *Stokoe Partnership Solicitors v. Mr. Patrick Tristram Finucane Grayson, Grayson + Co Limited, Mr. Stuart Robert Page, and Page Corporate Investigations Limited*, Claim No., QB-2020-002492 (the "Grayson Proceeding" which together with the "Al Sadeq Litigation," the "Foreign Proceedings"). Stokoe was also the claimant in concluded High Court proceedings captioned *Stokoe Partnership Solicitors v. Mr. Paul Robinson, Company Documents Limited, and Mr. Oliver Moon*, Claim No. QB-2020-002218 (the "Robinson Proceeding" which, together with the Grayson Proceeding are referred to as the "Hacking Claims").

In the Al Sadeq Litigation, Mr. Al Sadeq alleges that the defendants Dechert, LLP ("Dechert UK"), Neil Gerrard ("Gerrard"), David Hughes ("Hughes"), and Caroline Black ("Black), committed serious wrongs against him in the course of an investigation undertaken by them, into alleged fraud committed by Dr. Khater Massaad ("Dr. Massaad"), Mr. Farhad Azima ("Azima") and others, including Mr. Al. Sadeq, against their former employer, the RAK Investment Authority ("RAKIA"). Al Sadeq has brought claims against the defendants in the Al Sadeq Litigation for breaches of United Arab Emirates (the "UAE") criminal law and procedure, the UAE Constitution, and breach of his human rights as a matter of UAE and international law, and has sought damages stemming from, *inter*

*alia*, his severe psychological and physical harm, pain and suffering, financial losses, and damage to reputation.

Following the initiation of the Al Sadeq Litigation, Mr. Al Sadeq's legal team, which includes Stokoe Partnership Solicitors (a firm of UK based solicitors) and 4 Stone Buildings (a UK based barristers' chambers) and others assisting the legal team such as Maltin Litigation Support Group (a legal public relations and litigation support group) and Detained in Dubai (a human rights advocacy organization) (collectively "Mr. Al Sadeq's Legal and Support Team"), has become the target of an online hacking campaign. As is relevant to this Application, Mr. Al Sadeq's Legal and Support Team has been the victim of a hacking campaign, which has included the use of spear-phishing emails and text messages and a sophisticated cyber-attack of Stokoe's IT system.

In order to ascertain the identity of the individuals behind the hacking attempts and to put a stop to their unlawful conduct, Stokoe initiated the Hacking Claims. The individuals named as defendants in the Hacking Claims are engaged in the business of corporate intelligence gathering and were instructed to obtain confidential information, including financial records and banking information, regarding Mr. Al Sadeq's Legal and Support Team.

The Applicants have reason to believe that the defendants in the Hacking Claims were acting on behalf of RAKIA and/or the defendants in connection with the Al Sadeq Litigation. This belief is premised on the fact that the timing of the hacking attempts correlates with the timeline of the Al Sadeq Litigation and are targeted at Mr. Al Sadeq's

Legal and Support Team.  Additionally, the Applicants have reason to believe that the defendants in the Al Sadeq Litigation have engaged in similar unlawful information gathering in related investigations undertaken by them on behalf of RAKIA.  The Applicants further believe that these unlawful attempts to gather confidential information from Mr. Al Sadeq's Legal and Support Team are consistent with the pattern of human rights abuses Mr. Al Sadeq alleges in his Claim and are further attempts to interfere with Mr. Al Sadeq's access to legal representation.

Accordingly, Mr. Al Sadeq and Stokoe respectfully request leave of the Court to subpoena Nicholas Del Rosso ("Del Rosso") (an investigator who was engaged by one of the defendants in the Al Sadeq litigation) and Vital Management Services Inc. ("Vital Management"),[2] in accordance with 28 U.S.C. § 1782 to obtain discovery for use in the Foreign Proceedings.

This Application meets the statutory requirements and discretionary factors applicable to applications for discovery under 28 U.S.C. § 1782.  As to the statutory requirements, Mr. Al Sadeq and Stokoe seek discovery 1) from Del Rosso and Vital Management which are both found within this District, 2) for use in proceedings (the Foreign Proceedings), 3) that are pending in a foreign tribunal the (High Court of Justice of England and Wales, Queen's Bench Division), in which 4) Mr. Al Sadeq and Stokoe are the claimants, and thus, interested parties.

---

[2] Upon information and belief, Del Rosso is the owner and president of Vital Management.

Additionally, as set forth in more detail below, the Application also satisfies each of the discretionary factors the Supreme Court articulated in *Intel Corp. v. Advanced Micro Devices, Inc.* in that 1) Del Rosso and Vital Management are not parties to the Foreign Proceedings, 2) U.K. Courts are receptive discovery under Section 1782, 3) the Application is not an attempt to circumvent the High Court of Justice of England and Wales, Queen's Bench Division's proof-gathering requirements, and 4) the requested discovery is neither unduly burdensome nor overly intrusive. Accordingly, as set forth in the proposed Order, the discovery sought is limited in time and is narrowly tailored. The discovery requested by Applicants will aid in proving their Claims in the Foreign Proceedings.

As such, based on the foregoing and as set forth more fully below, Mr. Al Sadeq and Stokoe respectfully submit that their Application for discovery under Section 1782 should be granted.

## FACTUAL BACKGROUND

The factual background of the disputes underlying the Foreign Proceedings is set forth in detail in the Claims annexed to the Declaration of Haralambos Tsiattalou ("Tsiattalou Decl.") as Exhibit A, Exhibit H, Exhibit K, and Exhibit L. Those acts are summarized below, as well as the need for the requested discovery.

### The Al Sadeq Litigation

Mr. Al Sadeq is a lawyer and Jordanian citizen who is a resident of the United Arab Emirates. For the past six years, he has been incarcerated in RAK, one of the constituent Emirates of the UAE, for alleged involvement in fraudulent transactions allegedly

committed against his former employer, RAKIA. (Tsiattalou Decl. Ex. A, ¶ 1.). Mr. Al Sadeq was employed by RAKIA from November 2008 and 2012, first as a legal advisor, then Group Legal Director, and then Deputy Chief Executive Officer of RAKIA, reporting to RAKIA's then-CEO, Dr. Massaad. (Tsiattalou Decl. Ex. A, ¶ 35). Mr. Al Sadeq denies any involvement in wrongdoing and maintains that the charges against him were politically motivated on the part of the Ruler of Ras Al Khaimah ("RAK") in an attempt to conceal the Ruler's own close involvement in RAKIA's activities, and that he was convicted on the basis of false confessions obtained from him under duress by the defendants in the Al Sadeq Litigation. (Tsiattalou Decl. Ex. A, ¶ 1).

Defendant Gerrard was at all material times a partner at the UK-based law firm Dechert UK, where he is global co-head of Dechert's white collar and securities litigation practice. (Tsiattalou Decl. Ex. A, ¶ 4). Defendant Hughes was, at all material times, a partner at Dechert UK, who worked closely with Gerrard. (Tsiattalou Decl. Ex. A, ¶ 5). Defendant Black is and was at all material times, a Partner at Dechert UK specializing in corporate investigations, working closely with Mr. Gerrard. (Tsiattalou Decl. Ex. A, ¶ 6).

Mr. Gerrard was appointed to lead an investigation into alleged fraud committed by Dr. Massaad against RAKIA. (Tsiattalou Decl. Ex. A, ¶¶ 8, 29). In the Claim, Mr. Al Sadeq alleges that serious wrongs were committed against him by Mr. Gerrard, Mr. Hughes, Ms. Black, and Dechert UK in relation to that investigation. (Tsiattalou Decl. Ex. A, ¶ 8). In September 2014, Mr. Al Sadeq was abducted from outside of his family home in Dubai and forcibly transported to RAK by men claiming to be from the RAK State

Security Investigations.  (Tsiattalou Decl. Ex. A, ¶¶ 43-45).  Once in RAK, Mr. Al Sadeq was placed in custody in solitary confinement, without having been arrested or told what (if any) charges or allegations were being made against him; he was subjected to torture and inhumane treatment while incarcerated in solitary confinement for around 560 days; he was denied access to legal representation; his family was threatened; and he was forced to sign false confessions under duress which were used in order to convict him and to implicate others including Dr. Massaad.  (Tsiattalou Decl. Ex. A, ¶¶ 33, 48).  These abuses are alleged to have been orchestrated by Gerrard with the assistance of the other defendants. (Tsiattalou Decl. Ex. A, ¶¶ 33, 47).  During his detention, Mr. Al Sadeq was interrogated several times by Gerrard, assisted by the other defendants, in an aggressive fashion, was pressured by threats and false promises to "cooperate" by giving false information to implicate Dr. Massaad, as well as other alleged co-conspirators, including Mr. Jihad Quzmar ("Mr. Quzmar"), Mr. Gela Mikadze ("Mr. Mikadze"), and Mr. Farhad Azima ("Mr. Azima"), with respect to fraud perpetrated in connection with RAKIA, and was coerced to sign false confessions.  (Tsiattalou Decl. Ex. A, ¶¶ 51, 61-67, 98, 114, 118-132, 173-175, 178-184).

As a result of such wrongs alleged to have been perpetrated by the defendants, Mr. Al Sadeq brought claims for breaches of UAE criminal law and procedure, the UAE Constitution, and breach of his human rights as a matter of UAE and international law, and has sought damages stemming from, *inter alia*, his severe psychological and physical harm,

pain and suffering, financial losses, and damage to reputation. (Tsiattalou Decl. Ex. A, ¶¶ 9, 220-229, 294-299).

**The Hacking Proceedings**

Stokoe Partnership Solicitors was retained to represent Mr. Al Sadeq in October 2019. (Tsiattalou Decl. ¶ 7). Although the claim form filed in connection with the Al Sadeq Litigation was not served until March 2020, the fact of its issue and its contents, including Stokoe's representation of Mr. Al Sadeq, were made public by an article published by Detained in Dubai in February 2020. (Tsiattalou Decl. ¶ 9).

As set forth in detail in the accompanying Tsiattalou Decl., following the initiation of the Al Sadeq Litigation, in February and March 2020, Stokoe Solicitor, Haralambos Tsiattalou ("Mr. Tsiattalou") and other individuals associated with Mr. Al Sadeq's Legal and Support Team travelled to Dubai to meet with Mr. Al Sadeq. (Tsiattalou Decl. ¶¶ 10-11). During the course of those visits, members of Mr. Al Sadeq's Legal and Support Team found themselves subjected to intimidation and surveillance by individuals they believed to be involved with RAKIA and the Al Sadeq Litigation defendants, including a Mr. Stuart Page who Mr. Tsiattalou observed in the lobby of his hotel during one of these visits. (Tsiattalou Decl. ¶ 11-12). It is believed that this surveillance was an attempt to intimidate Mr. Al Sadeq's Legal and Support Team and impede Mr. Al Sadeq's access to legal representation.

In late March 2020, Oliver Moon ("Mr. Moon"), a private investigator, approached Alexander Sawyer ("Mr. Sawyer") of Quaestio Intelligence Services Ltd. ("Quaestio"), a

commercial investigation and intelligence gathering agency working on behalf of Stokoe, and informed Mr. Sawyer that he had been instructed to obtain confidential information regarding Stokoe. (Tsiattalou Decl. ¶ 13). Mr. Moon revealed that he received instructions from John Gunning, who it was later uncovered was instructed by Paul Robinson ("Mr. Robinson") on April 2, 2020, to obtain, amongst other items, Stokoe's banking coordinates; on April 9, 2020, to obtain access to Stokoe's business bank account and transactional data for that bank account for the preceding three months; on April 21, 2020, to obtain information as to the movements of Mr. Tsiattalou in and out of Dubai for the period of February 2020; and on April 22, 2020, to provide information relating to Stokoe's client account including transactional information for the month of March 2020. (Tsiattalou Decl. ¶¶ 13, 34). Through Mr. Moon, Stokoe also learned that others working on behalf of Mr. Al Sadeq in the Al Sadeq Litigation, including Maltin Litigation Support Group and Detained in Dubai, were also targets of these information gathering efforts. (*See* Tsiattalou Decl. ¶¶ 14, 44). Based on this information, Stokoe initiated a civil proceeding on June 30, 2020, in the High Court of Justice of England and Wales, Queen's Bench Division, captioned *Stokoe Partnership Solicitors v. Paul Robinson, Company Documents Ltd, and Oliver Moon*, Claim No. QB-2020-00218 (the "Robinson Proceeding").

As part of a Consent Order issued in the Robinson Proceeding, Mr. Moon and Mr. Robinson issued sworn affidavits admitting that they were instructed to access, and did access, Stokoe's banking information and transactional data as well as confidential information relating to others involved in the Al Sadeq Litigation. (*See* Tsiattalou Decl. ¶

37, Ex. J).  In Mr. Robinson's affidavit, he stated that Patrick Grayson instructed him to obtain confidential information from Mr. Al Sadeq's Legal and Support Team.  (Tsiattalou Decl. ¶ 37, Ex. K ¶ 8).

Based on the information Mr. Robinson provided in his affidavit, Stokoe initiated a second civil proceeding on July 17, 2020, in the High Court of Justice of England and Wales, Queen's Bench Division, captioned *Stokoe Partnership Solicitors v. Mr. Patrick Tristram Finucane Grayson, Grayson + Co. Limited, Mr. Stuart Robert Page, and Page Corporate Investigations Limited*, Claim No. QB-2020-002492 (the "Grayson Proceeding").  In the Grayson Proceeding, Stokoe sought, *inter alia*, an order to compel Mr. Grayson and his company to reveal the source of their instructions, any further wrongdoing, and to obtain injunctive relief to prevent them from further wrongdoing. (Tsiattalou Decl. ¶ 39).  Pursuant to the Court's order, Mr. Grayson submitted an affidavit wherein he denied ever obtaining confidential information regarding Stokoe and denied ever instructing Mr. Robinson to obtain such confidential information—assertions that were in stark contradiction to the facts set forth in Mr. Robinson's affidavit.  (Tsiattalou Decl. ¶¶ 41-42, Ex. O, ¶ 4.1).

Through the initiation of the Hacking Claims, Stokoe is attempting to ascertain the identity of the individuals who are orchestrating the hacking campaign against Mr. Al Sadeq's Legal and Support Team.  While Stokoe has identified some of the individuals who were involved, the identity of the ultimate perpetrators remains unknown.  Thus, Mr. Al Sadeq's Legal and Support Team remains a target of this coordinated hacking campaign

which has continued throughout the pendency of the Foreign Proceedings and threatens to undermine the fair conduct of the Al Sadeq Litigation, as well as the confidentiality and relationship between Mr. Al Sadeq and his legal team and to further impinge upon the rights of Mr. Al Sadeq.

The threat posed to Mr. Al Sadeq's Legal and Support Team by the hacking campaign is ongoing and continues to threaten their ability to effectively represent Mr. Al Sadeq. For example, at approximately 5:45 a.m. on November 5, 2020, just days before a hearing in the High Court was scheduled in the Robinson and Grayson Proceedings, hackers broke into Stokoe's cloud-based IT system which the firm uses to conduct its day-to-day business. (Tsiattalou Decl. ¶ 45). By approximately 8:45 a.m., Stokoe's IT provider was able to take measures to protect Stokoe's data and that of ten other law firms potentially affected. (Tsiattalou Decl. ¶ 45). Consequently, Stokoe was unable to gain access to their IT system until November 9, 2020. (Tsiattalou Decl. ¶ 45). During the time that the IT system was down, Stokoe faced significant impediments in carrying out their day-to-day business activities, including the inability to receive emails on their work addresses. (Tsiattalou Decl. ¶ 45). Stokoe was informed by its IT provider that after evaluating the password used to orchestrate the hacking, it determined that the hacking was linked specifically to Stokoe (rather than any of the ten other law firms affected), and that Stokoe's financial material and banking data were accessed. (Tsiattalou Decl. ¶ 45).

Given the ongoing nature of the hacking attempts and spear-phishing emails, it is essential that the ultimate perpetrators are identified in order for Stokoe to protect its clients, including Mr. Al Sadeq.

**The Discovery Sought**

The Foreign Proceedings are ongoing, and Mr. Al Sadeq and Stokoe are engaged in the process of seeking information and documents to support their Claims. The parties from whom discovery is sought are Del Rosso and Vital Management, both of which are found in the United States.

As set forth in detail in the accompanying Tsiattalou Declaration and above, since the initiation of the Al Sadeq Litigation, Mr. Al Sadeq's Legal and Support Team has been the subject of a hacking and surveillance campaign believed to be by or at the direction of the defendants in the Al Sadeq Litigation. (Tsiattalou Decl. ¶¶ 10-14, 41, 43, 44). Mr. Al Sadeq's Legal and Support Team has received numerous phishing emails which appear to be targeted attempts to access personal and confidential information. (Tsiattalou Decl. ¶¶ 43-44). The Applicants have reason to believe that the defendants in the Al Sadeq Litigation are behind this hacking campaign as the timeline of these attempts align with the initiation of the Al Sadeq Litigation, and the individuals targeted are all connected to the Al Sadeq Litigation.

Upon information and belief, the defendants have engaged in the same improper information gathering in connection with other investigations they conducted on behalf of RAKIA. Specifically, Gerrard worked with Stuart Page, a private investigator, who was

12

accused of engaging in unlawful hacking in related proceedings involving Mr. Azima before the High Court of Justice Business and Property Courts of England and Wales Business List (ChD) entitled *Ras Al Khaimah Investment Authority v. Farhad Azima*, Case No. HC-2016-002798 (the "Azima Proceeding"). (*See* Tsiattalou Decl. ¶¶ 20, 31). During a hearing in that proceeding, Mr. Page testified that in the course of his investigation into collusion between Dr. Massaad and members of the Ruler's family, he utilized the services of Insight, an Israeli company who "were specialists at obtaining information from confidential sources" engaged in gathering electronic data which included "using the dark web, open source information on the internet." (Tsiattalou Decl. Ex. B, ¶ 269). Of note was Gerrard's testimony that the information, which formed the basis of the fraud accusations RAKIA brought against Mr. Azima, was obtained through hacking into Mr. Azima's personal accounts. (Tsiattalou Decl. Ex. C, p. 69-70).

Del Rosso submitted a witness statement in connection with the Azima Proceeding, wherein he stated that in early August 2016, he received a phone call from Gerrard informing him that Stuart Page had identified two internet links containing data related to Mr. Azima. (Tsiattalou Decl. Ex. D, ¶ 5). Del Rosso stated that he was familiar with Gerrard because in 2014, he was engaged by Dechert LLP "to investigate assets potentially stolen from the Government of" RAK by Dr. Massaad and others. (Tsiattalou Decl. Ex. D, ¶ 4). Del Rosso further claimed that Gerrard simply asked him to download the data from those two links. (Tsiattalou Decl. Ex. D, ¶ 6). Following the call with Gerrard, Del

13

Rosso contacted Richard Garcia of Northern Technology, Inc. ("NTi"),[3] and over the course of the next few weeks NTi downloaded the material. (Tsiattalou Decl. Ex. D, ¶¶ 5-7, 9). Del Rosso maintained that he played no other role in the investigation into Mr. Azima, stating: "I did not hack Mr. Azima's computers, cause him to be hacked or know who hacked him. I did not upload his data to the internet, cause his data to be uploaded or know who did upload his data." (Tsiattalou Decl. Ex. D, ¶ 20). In his testimony, Del Rosso maintained that he had no knowledge that Mr. Azima's data found on the websites was illegally obtained. (Tsiattalou Decl. Ex. E, pp. 93-94).

On October 15, 2020, Mr. Azima filed a complaint against Del Rosso and Vital Management in this Court, alleging, *inter alia*, that Del Rosso through Vital Management oversaw and directed the hacking of Mr. Azima's personal information. (Tsiattalou Decl. Ex. F, p. 1); *see Farhad Azima v. Nicholas Del Rosso and Vital Management Services Inc.*, No. 20-cv-954 (M.D.N.C. Oct. 15, 2020) (the "Del Rosso Lawsuit"). Mr. Azima further alleges that after Gerrard engaged Del Rosso, Del Rosso hired CyberRoot Risk Advisory Private Limited ("CyberRoot") to provide the necessary technical support to carry out the hack against Mr. Azima. (Tsiattalou Decl. Ex. F, pp. 1-2). The complaint further alleges

---

[3] According to their website, NTi "was founded in an effort to maximize the exploitation of modern data to include, communication records, social media, deep/dark web, etc. NTi has developed and implemented specialized investigative and analytical techniques on hundreds of criminal and civil cases." Who is NTi?, NTI, http://ntilawenforcement.org/about/ (last visited Jan. 19, 2021).

that CyberRoot utilized the services of BellTroX Info Tech Services ("BellTroX")[4] to assist in hacking Mr. Azima's personal accounts. (Tsiattalou Decl. Ex. F, p. 2). Lastly, Mr. Azima asserts that Del Rosso paid CyberRoot over $1 million for its services. (Tsiattalou Decl. Ex. F, p. 9).

A whistleblower who is employed by CyberRoot and who has legitimate access to the company's bank account has provided copies of what the Applicants believe are CyberRoot's bank account statements with Kotak Mahindra Bank. (See Tsiattalou Decl. ¶ 32; Ex. G). These bank statements evidence approximately 31 payments made by Vital Management to CyberRoot between the years 2015 through 2017. (Tsiattalou Decl. Ex. G). Of significance is that in August and September 2016, the time during which Mr. Azima's data was leaked online, Vital Management paid CyberRoot nearly $150,000. (Tsiattalou Decl. Ex. G). The Applicants have reason to believe that these significant payments suggest that Del Rosso hired CyberRoot to access Azima's confidential information.

---

[4] BellTroX is a hack-for-hire organization based in India which has been linked to the hacking of thousands of targets through the use of hacking techniques, such as, phishing emails. John Scott-Railton et al., Dark Basin: Uncovering a Massive Hack-For-Hire Operation, THE CITIZEN LAB (June 9, 2020), https://citizenlab.ca/2020/06/dark-basin-uncovering-a-massive-hack-for-hire-operation/; see Jack Stubbs et al., Exclusive: Obscure Indian Cyber Firm Spied on Politicians, Investors Worldwide, REUTERS (June 9, 2020), https://www.reuters.com/article/us-india-cyber-mercenaries-exclusive/exclusive-obscure-indian-cyber-firm-spied-on-politicians-investors-worldwide-idUSKBN23G1GQ.

Thus, contrary to Del Rosso's testimony and witness statement, the Applicants believe that Del Rosso, at the direction of the defendants in the Al Sadeq Litigation, utilized the services of "hack-for-hire" organizations to hack Mr. Azima's personal accounts and obtain his personal information. It is believed that Mr. Al Sadeq's Legal and Support Team are being subjected to the same improper information gathering techniques that the defendants employed in their investigations of Mr. Azima, including the use of hack-for-hire companies. (*See* Tsiattalou Decl. ¶¶ 17, 22, 24, 32).

Mr. Al Sadeq's Legal and Support Team has been the target of numerous phishing attempts via email, SMS message, and phone calls directed at their email addresses[5] and phone numbers from various online accounts. (Tsiattalou Decl. ¶¶ 43-44). Mr. Al Sadeq and Stokoe have reason to believe that the individuals behind these hacking attempts are associated with the defendants in the Al Sadeq Litigation. This belief is grounded in the fact that these attempts all appear in some way to correspond to the Al Sadeq Litigation. (Tsiattalou Decl. ¶ 45). In particular, the hacking attempts target Mr. Al Sadeq's Legal and

---

[5] The Applicants filed an *ex parte* application pursuant to Section 1782 in the United States District Court Northern District of California on December 22, 2020. *In re Application of Karam Salah Al Din Awni Al Sadeq and Stokoe Partnership Soliticitors for an Order Under 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings*, No. 3:20-mc-80224 (Dec. 22, 2020). In that application, Applicants seek the issuance of subpoenas directed at Google, Cloudflare, Ngrok, and Twilio SendGrid for documents and information concerning the subscriber information and IP information of accounts which were used in various phishing attempts to hack Mr. Al Sadeq's Legal and Support Team's accounts and confidential information. As of the filing of this application, that application remains pending.

16

Support Team, and the attempts began on or about February 2020 when information about the claim of form and Stokoe's representation of Mr. Al Sadeq became public. (*See* Tsiattalou Decl. ¶ 45).

In addition, the hacking attempts are consistent with the manner in which the Al Sadeq Litigation defendants and RAKIA have investigated alleged fraud committed by Dr. Massaad, Mr. Mikadze, and Mr. Azima, and it appears that the same individuals involved in those investigations—Page, Robinson, and Del Rosso—are also involved in the investigation and hacking of Mr. Al Sadeq's Legal and Support Team. This belief is based in part on several invoices that were sent to Stokoe from Mr. Page's attorney in connection with the Hacking Proceedings. (*See* Tsiattalou Decl. ¶ 38). These invoices were from Company Documents Limited, an entity owned by Robinson, and directed to Mr. Page. (Tsiattalou Decl. ¶ 38). One of the invoices showed that in March 2020, when the Al Sadeq Litigation commenced, Robinson sent an invoice for an investigation into the Brendale Group. (Tsiattalou Decl. ¶ 38). The Brendale Group is a group of companies owned by David Haigh who once worked closely with Radha Stirling ("Ms. Stirling") of Detained in Dubai. (Tsiattalou Decl. ¶ 38). Thus, it is believed that this invoice provides proof of Mr. Page's and Mr. Robinson's efforts to gather information regarding Ms. Stirling through one of her associates, Mr. Haigh. (Tsiattalou Decl. ¶ 38). An earlier invoice dated October 4, 2017 shows that Mr. Page instructed Robinson to investigate various companies—all of which were part of a group of companies that were involved in RAKIA's case against Mr. Mikadze. (Tsiattalou Decl. ¶ 38). These companies were all connected to Mr. Mikadze

who was also investigated in connection with Dr. Massaad by Gerrard at the direction of RAKIA. (Tsiattalou Decl. ¶ 38). This invoice shows that Page and Robinson were involved in investigating companies that were part of RAK's investigation into Dr. Massaad. (Tsiattalou Decl. ¶ 38). The invoices and the evidence set forth in the Azima Proceeding, establish a common theme and pattern and provide a strong inference that the same people who were involved in carrying out the investigations into Dr. Massaad, Mr. Azima, and Mr. Mikadze for RAK are the same people involved in the investigation and hacking of Mr. Al Sadeq's Legal and Support Team.

Accordingly, upon information and belief, Del Rosso and Vital Management are in possession of materials, documents, and information which would aid the Applicants in determining the identity of those behind the hacking campaign targeting Mr. Al Sadeq's Legal and Support Team and would show that the testimony provided by Del Rosso and Gerrard in the Azima Proceeding was false and was directed at concealing the true manner in which Mr. Azima's confidential information was obtained. (*See* Tsiattalou Decl. ¶ 32). Such information would shed further light on defendants' continued human rights abuses, their willingness to go to any length to conceal their unlawful conduct, including providing false testimony and evidence, and attempts to interfere with Mr. Al Sadeq's legal representation, which will provide evidence germane to Mr. Al Sadeq's and Stokoe's Claims in the Foreign Proceedings.

Thus, Mr. Al Sadeq and Stokoe seek leave to serve the subpoenas annexed to the Merritt Declaration as Exhibit A and Exhibit B, in which Mr. Al Sadeq and Stokoe seek,

18

*inter alia*, documents and information concerning Del Rosso's and Vital Management's involvement with CyberRoot, BellTroX, and the defendants in the Al Sadeq Litigation as it relates to their investigations of Mr. Azima and Mr. Al Sadeq.

<u>**ARGUMENT**</u>

Mr. Al Sadeq and Stokoe respectfully submit that this Court should grant the Application because: (1) it meets the statutory requirements set forth in Section 1782 (i.e., the person and entity from whom discovery is sought reside in the district to which the application is made, the discovery is for use in proceedings before a foreign tribunal and the applicants are "interested persons"); and (2) the discretionary factors established by controlling case law weigh substantially in its favor (e.g., whether (a) the target of discovery is a participant in the foreign proceedings, (b) the foreign tribunal is receptive to the use of the Requested Discovery, (c) the request is an attempt to circumvent foreign law, and (d) the request is unduly burdensome). Granting the Application will serve Section 1782's "twin aims of providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to [U.S.] courts." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 252 (2004) (internal quotations and citation omitted).

**I. THE APPLICATION MEETS THE STATUTORY REQUIREMENTS**

Federal courts may grant discovery within the United States for use in a foreign proceeding, under 28 U.S.C. § 1782(a), which requires "(1) the applicant is an interested person, (2) the discovery production is for use in a proceeding, and (3) the person at whom

19

the order is directed resides in the district where the motion was filed." *RF Micro Devices, Inc. v. Xiang*, No. 1:12CV967, 2013 WL 12136502, at *1 (M.D.N.C. Nov. 4, 2013).

To satisfy the first statutory requirement, Applicants must establish that Del Rosso and Vital Management "reside" or are "found" in the Middle District of North Carolina. Del Rosso resides in Chapel Hill, North Carolina, and Vital Management maintains its principal office in Chapel Hill, North Carolina which is in this District. Thus, because Del Rosso resides in this District and Vital Management maintains its principal office and conducts substantial activities that are central to its business in this District, the first statutory requirement is satisfied.

Turning to the second statutory requirement, an applicant must also demonstrate that the requested discovery "is for use in a proceeding in a foreign or international tribunal." 18 U.S.C. § 1782. The Applicants believe that Del Rosso and Vital Management are in possession of relevant documents, materials, and information which will aid in determining the identity of the perpetrators behind the hacking campaign targeting Mr. Al Sadeq's Legal and Support Team and lend support to Mr. Al Sadeq's claims of human rights abuses against the defendants. Thus, the requested discovery will support the Applicants' Claims in the Foreign Proceedings. Accordingly, because the discovery Mr. Al Sadeq and Stokoe seek is for use in the Foreign Proceedings, the Application satisfies the second statutory requirement.

Lastly, Mr. Al Sadeq and Stokoe qualify as "interested persons" under Section 1782 due to their status as litigants (*i.e.*, the Claimants) in the Foreign Proceedings. *See RF*

20

*Micro Devices, Inc.*, 2013 WL 12136502, at *2 (finding that applicant was an "interested party" because it was the "Plaintiff in the parallel Chinese lawsuit"); *In re Merck & Co.*, 197 F.R.D. 267, 270 (M.D.N.C. 2000) ("An interested person includes a party to the foreign litigation, whether directly or indirectly involved."). As the Supreme Court acknowledged in *Intel Corp. v. Advanced Micro Devices, Inc.*, "no doubt litigants are included among, and may be the most common example of, the interested persons who may invoke [Section] 1782." 542 U.S. 241, 256 (2004). Thus, the third statutory requirement is satisfied.

## II. THE DISCRETIONARY FACTORS WEIGH IN FAVOR OF MR. AL SADEQ'S AND STOKOE'S APPLICATION

The discretionary factors set out by the Supreme Court in the seminal *Intel Corp.* decision and its progeny also weigh in favor of granting the Application. These factors include: (1) "whether the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) "whether the request is otherwise unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 264-65.

21

## A.  Del Rosso and Vital Management Are Not Participants in the Foreign Proceeding

Where, as here, discovery is sought from parties not participating in the foreign proceeding, the need for court-ordered discovery is apparent.  "A foreign tribunal has jurisdiction over those appearing before it and can itself order them to produce evidence. In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."  *Intel Corp.*, 542 U.S. at 264 (internal citations omitted).  Accordingly, where the target of discovery is not a party to the underlying litigation, this factor weighs in favor of granting the application.  As such, because Del Rosso and Vital Management are not parties to the Foreign Proceedings, this factor weighs in favor of granting the Application.

## B.  The Foreign Tribunal Is Receptive to U.S. Judicial Assistance

The second discretionary factor identified by the Supreme Court—the nature of the foreign proceeding and the receptivity of the foreign tribunal to federal court assistance— requires courts to consider "how a foreign court 'might respond to § 1782 assistance from a United States court.'"  *Chevron Corp.*, No. 7:10-mc-00067, 2010 WL 4883111, at *3 (W.D. Va. Nov. 24, 2010) (quoting *In re OOO Promnefstroy*, No. M 19-99 (RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009)).  In weighing these factors, courts may only rely on "authoritative proof that [the] foreign tribunal would *reject* evidence obtained with the aid of section 1782."  *Chevron Corp.*, 2010 WL 4883111 at *3 (emphasis added) (quoting

*Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995)).  In fact, district courts have routinely granted applications pursuant to Section 1782 for matters pending in the U.K.  *See Eurasian Natural Res. Corp. v. Simpson*, No. 8:19-mc-00699-PX, 2020 U.S. Dist. LEXIS 1507 (D. Md. Jan. 6, 2020); *In re Blue Oil Trading Ltd.*, No. 3:09MC153-RJC, 2009 WL 3353293 (W.D.N.C. Oct. 15, 2009); *In re Application of Apple Retail UK Ltd.*, No. 20-mc-80109-VKD, 2020 WL 3833392 (N.D. Cal. July 8, 2020) (finding that "[i]n the absence of evidence to the contrary regarding the [U.K.] tribunal's receptivity to U.S. judicial assistance" the second *Intel Corp.* factor weighed in favor of granting the Section 1782 application).   Here, there is no evidence that the discovery sought in this application would be "rejected" by the Courts of England and Wales.  Nor is there any indication that the documents and materials sought would be inadmissible in the Foreign Proceeding.  To the contrary, the documents, materials, and information sought from Del Rosso and Vital Management concern potential evidence that would serve to support Mr. Al Sadeq's claims of misconduct perpetrated by the defendants.  Specifically, it would support Mr. Al Sadeq's claim that the defendants engaged, and continue to engage, in a pattern of human rights abuses, have provided false evidence and testimony in related proceedings to conceal their unlawful conduct, and are actively interfering with Mr. Al Sadeq's right to legal representation.   Given their relevance to the proceedings, the Applicants have good reason to believe that these documents, materials, and information could, and would, be considered.   Thus, this factor weighs in favor of granting the Application.

23

**C.     The Application Does Not Circumvent the Rules of the Foreign Tribunals**

The Application does not "attempt to circumvent" proof-gathering restrictions of the Courts of England and Wales.  *See Intel Corp.*, 542 U.S. at 264-25.  Under this third factor, courts may consider "whether the discovery is being sought in bad faith."  *Chevron Corp.*, 2010 U.S. Dist. LEXIS 125174, at *10 (citing *Minatec Fin. S.A.R.L. v. SI Group. Inc.*, No. 1:08-CV-269 (LEK/RFT), 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008) (finding the third *Intel Corp.* factor satisfied where "nothing [in the] record . . . support[ed] that Minatec [sought] th[e] information with less than a good faith belief that § 1782 discovery would be helpful to the foreign tribunals and itself")).  The third factor also weighs in favor of granting the requested discovery, as this application is made in good faith and not an attempt to circumvent any foreign proof-gathering restrictions and there is no evidence to suggest that the United Kingdom's courts prohibit the type of discovery sought.

**D.     The Application Is Tailored to Avoid Unnecessary Burdens in Accordance with the Federal Rules of Civil Procedure**

Finally, the fourth factor favors granting the requested discovery because the Application is narrowly tailored to include only relevant information and to avoid any undue burden.  In evaluating this factor, a District Court should be guided by the standards set forth in Federal Rule of Civil Procedure 26(b)(1) ("Rule 26(b)(1)").  *See, e.g., German Am. Trade Ass'n v. Waldthausen*, No. 3:13-MC-015-MOC-DCK, 20136843081, at *2 (W.D.N.C. Dec. 27, 2013) (applying Federal Rule of Civil Procedure 26(b)(1) to a

24

motion to compel production of documents pursuant to a Section 1782 application).  Under Rule 26(b)(1), discovery must be "relevant to any party's claim or defense, proportional to what is at issue in a case; and not excessively burdensome or expensive as compared to the likely benefit of obtaining the discovery being sought."  *Synder v. Moag & Co., LLC*, No. ELH-20-2705, 2020WL 7399476, at *2 (D. Md. Dec. 17, 2020).  Where requests are "narrowly tailored to produce information relevant to the issues now pending" in the foreign tribunal, the requests do not impose an undue burden.  *Chevron Corp. v. Camp*, No. 17-mc-80067-HRL, 2017 3418394, at *5 (W.D.N.C. Aug. 30, 2010); *In re Qwest Commc'ns Int'l, Inc.*, No. 3:08mc93, 2008 WL 2741111, at *5 (W.D.N.C. July 10, 2008).

The requested discovery directly bears on Mr. Al Sadeq's and Stokoe's claims that the defendants have engaged in a hacking campaign to gather confidential information regarding Mr. Al Sadeq's Legal and Support Team and that this conduct is part and parcel of the Al Sadeq Litigation defendants' ongoing human rights abuses and attempts to thwart Mr. Al Sadeq's access to legal representation.  Thus, the requested discovery is highly relevant to the Foreign Proceedings.

Furthermore, the requested discovery would not be unduly burdensome for Del Rosso and Vital Management to produce, as the requests are narrowly tailored in scope and should be readily identifiable and accessible.  Because the discovery requests are sufficiently specific to allow Del Rosso and Vital Management to conduct targeted searches to identify and produce the documents, materials, and information, which are relevant to the claims in the Foreign Proceedings, with minimal burden, the Application

25

comports with the Federal Rules of Civil Procedure and this fourth factor weights in favor of granting the Application.

## **CONCLUSION**

Based on the foregoing, the Applicants respectfully request that the Court issue an Order granting the Application and authorizing the Applicants to serve the subpoenas attached as Exhibit A and Exhibit B to the Merritt Declaration upon Del Rosso and Vital Management.

This 5th day of February, 2021.

/s/ Mark W. Merritt
Mark W. Merritt
N.C. Bar No. 12198
mmerritt@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Suite 1900
Charlotte, North Carolina  28246
Telephone:   704.377.2536
Facsimile:    704.378.4000

*Attorneys for Applicant Karam Salah Al Din Awni Al Sadeq and Stokoe Partnership Solicitors*

26