THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| *In re* Application of KARAM SALAH AL DIN AWNI AL SADEQ and STOKOE PARTNERSHIP SOLICITORS for an Order Under 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings. | Misc. Civil Action No. |

# DECLARATION OF HARALAMBOS TSIATTALOU

I, **HARALAMBOS TSIATTALOU**, do hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

## Introduction

1. I am admitted to practice before the Courts of England and Wales, and I am a partner at the UK-based law firm of Stokoe Partnership Solicitors ("Stokoe") which is the Claimant in civil proceedings pending in the High Court of Justice of England and Wales, Queen's Bench Division captioned: *Stokoe Partnership Solicitors v. Mr. Patrick Tristram Finucane Grayson, Grayson + Co Limited, Mr. Stuart Robert Page, and Page Corporate Investigations Limited*, Claim No., QB-2020-002492 (the "Grayson Proceeding.") I am also the Solicitor to the applicant Karam Salah Al Din Awni Al Sadeq ("Mr. Al Sadeq") in civil proceedings pending in the High Court of Justice of England and Wales, Queen's Bench Division captioned *Karam Salah Al Din Awni Al Sadeq v. Dechert, LLP, Neil Gerrard, David Hughes, and Caroline Black*, Claim No. QB-2020-000322 (the "Al Sadeq Litigation," and, together with the Grayson Proceeding, the "Foreign

Proceedings"). Stokoe was also the claimant in concluded High Court proceedings captioned: *Stokoe Partnership Solicitors v. Mr. Paul Robinson, Company Documents Limited, and Mr. Oliver Moon*, Claim No. QB-2020-002218 (the "Robinson Proceeding" which, together with the Grayson Proceeding are referred to as the "Hacking Claims").

2. I respectfully submit this Declaration in support of Mr. Al Sadeq and Stokoe's (collectively, the "Applicants") application for an order under 28 U.S.C. § 1782 to conduct discovery for use in the Foreign Proceedings. As detailed below, the Al Sadeq Litigation is brought against the UK-based law firm of Dechert LLP ("Dechert UK") and three of its current/former partners, who it is claimed committed various acts of wrongdoing in breach of UAE civil and criminal laws.

3. As set forth below, the Hacking Claims were brought against individuals who have engaged in unlawfully obtaining confidential information from Stokoe and others associated with Mr. Al Sadeq's legal representation in the Al Sadeq Litigation through means of a hacking and surveillance campaign. The discovery sought here, information, documents, and material related to the hacking campaign targeting Stokoe, Detained in Dubai, 4 Stone Buildings, and Maltin Litigation Support Group (collectively, "Mr. Al Sadeq's Legal and Support Team"), will shed further light on the Al Sadeq Litigation defendants' pattern of human rights abuses, their efforts to conceal their unlawful conduct, and their attempts to intervene with Mr. Al Sadeq's legal representation.

2

**The Al Sadeq Litigation**

4. The Al Sadeq Litigation concerns misconduct and human rights abuses committed against Mr. Al Sadeq by Neil Gerrard ("Gerrard"), a solicitor and partner in Dechert UK, and the other defendants in connection with their investigation of fraud allegedly perpetrated against the RAK Investment Authority ("RAKIA"). A copy of the claim (hereinafter, the "Al Sadeq Claim"), filed by Mr. Al Sadeq is annexed as **Exhibit A** hereto.

5. The nature of the allegations in the Al Sadeq Litigation are detailed in paragraph 9 of the Al Sadeq Claim. In summary, Mr. Al Sadeq's claims include allegations that the defendants were implicated in:

   a. The kidnap and extraordinary rendition of Mr. Al Sadeq from Dubai to RAK (see paragraphs 40 to 47 of the Al Sadeq Claim);

   b. Mr. Al Sadeq's unlawful detention without arrest or charge, including a period of detention in solitary confinement, under a false name, with no access to legal representation (see paragraphs 105 to 109 of the Al Sadeq Claim);

   c. The interrogation of Mr. Al Sadeq. In particular, Mr. Al Sadeq contends that during the first of his interrogations by Mr. Gerrard, he was blindfolded with his hands tied behind his back and had no lawyer present (see paragraph 64 of the Al Sadeq Claim);

3

d. Threats and unlawful pressure made to Mr. Al Sadeq, his wife, and children, including a promise by Mr. Gerrard and Ms. Black that Mr. Al Sadeq's prison conditions could be improved if he "cooperated" with them (see paragraphs 65 to 67, 89 to 98, and 120 to 130 of the Al Sadeq Claim); and

e. The procurement of false confessions signed by Mr. Al Sadeq, but drafted by Mr. Gerrard and Mr. Hughes, in circumstances where Mr. Al Sadeq was detained in the above conditions, did not have access to legal representation, and had made it clear that the confessions were untrue (see paragraphs 183 to 184 of the Al Sadeq Claim).

6. The allegations made by Mr. Al Sadeq are of an extremely serious nature. That is all the more so in circumstances where they are made against senior lawyers and a global law firm of international repute. As a consequence, the Al Sadeq Litigation has generated a significant degree of publicity in the UK.

**The Involvement of Stokoe Partnership Solicitors in the Al Sadeq Litigation**

7. Stokoe was first retained to act in the Al Sadeq Litigation in October 2019. Since that time, there has been a correlation between the progress of the Al Sadeq Litigation and attempts to obtain confidential information from Stokoe and others in relation to those proceedings.

8. The Claim Form in the Al Sadeq Litigation was issued on January 28, 2020. Although it was not served at that time, the allegations were made public in a press release

published by Detained in Dubai on the date of issue. The Claim Form, which was made available online, was much more detailed than the amended version ultimately served with the Particulars of Claim and contained details of Mr. Al Sadeq's claim and the nature of the allegations made against the Al Sadeq Litigation defendants. It also, of course, stated that Stokoe was acting on behalf of Mr. Al Sadeq.

9. Mr. Al Sadeq's Amended Claim Form and Particulars of Claim were served on March 31, 2020 and April 1, 2020. As set out at paragraph 215 of the Al Sadeq Claim, my firm's ability to take instructions from Mr. Al Sadeq has been impeded in various ways since the Al Sadeq Litigation was issued.

10. Between February and March 2020, I travelled to Dubai with other members of Mr. Al Sadeq's Legal Team to meet with Dr. Al Haddad, Mr. Al Sadeq's local counsel, to meet with Mr. Al Sadeq in prison. We were not, however, permitted to visit Mr. Al Sadeq on those occasions. During these trips, my colleagues and I were the subject of surveillance activities, including an apparent break-in to my hotel room, the presence of surveillance agents at my hotel (where I attended privileged meetings in relation to the conduct of the Al Sadeq Litigation), and an attempt to follow me to a privileged meeting at a different location. I believe these matters were also connected to the Al Sadeq litigation and that they were intended to disrupt my ability to obtain instructions (as they in fact did).

11. During one of the visits that took place in March 2020, I was accompanied by Mr. Arthur Maltin of Maltin Litigation Support Group, a legal public relations firm working in connection with the Al Sadeq Litigation, and Alastair Tomson, junior counsel

5

instructed in the Al Sadeq Litigation. During this visit we were subject to intimidation and surveillance. The fact of the surveillance was confirmed to me by an obviously frightened hotel employee who told me:

> "You're being followed/watched by security services. They are very serious people. Nobody can stand in their way."

12. One of the persons I believe conducted this surveillance is Mr. Stuart Page. Mr. Page has denied this (although he accepts that he was in the same hotel as myself and my party in Dubai on March 6, 2020). Mr. Page's evidence was the subject of heavily adverse comment by Judge Lenon QC in a related proceeding which I detail further below.

**Stokoe Learns It Is the Subject of Attempted Hacking**

13. In late March 2020, Mr. Oliver Moon, a private investigator, turned whistle-blower, informed Mr. Alexander Sawyer (who works in corporate intelligence via a company called Quaestio), that he had been instructed by a "Source A2", as he was described in the Robinson Proceeding (and who was later revealed to be a Mr. John Gunning), to make attempts to gain access to Stokoe's confidential information. These instructions continued throughout April 2020 and included hacking Stokoe's bank accounts, including its client account. It was subsequently discovered that Source A2's instructions had in turn derived from a Mr. Paul Robinson, another private investigator. Mr. Moon had previously been instructed by Mr. Sawyer to undertake work for Stokoe (although this was unknown to Stokoe), which is presumably why he turned to Mr. Sawyer, motivated no doubt by moral compunction about carrying out what he had been instructed to do.

6

14. As he has since confirmed in an affidavit, Mr. Moon was also instructed to procure confidential information—including accessing their bank accounts—about others assisting Mr. Al Sadeq, namely, Maltin Litigation Support Group and Ms. Radha Stirling ("Stirling") (who works for the London-based human rights advocacy organization "Detained in Dubai"). The timing and coordination of this hacking demonstrates that it is designed to interfere with the Al Sadeq Litigation, and to undermine the sanctity of the confidential relationship between solicitor and client. For instance, just after the claim form and Particulars of Claim were served in the Al Sadeq Litigation and a couple of weeks before Dechert's solicitors made enquiries of Stokoe as to who was funding that litigation, Mr. Moon was instructed to obtain Stokoe's banking co-ordinates.

15. On April 21, 2020, Mr. Gunning was instructed to ascertain my movements "in and out of Dubai—for Feb 2020." As mentioned above, I was in Dubai in February 2020 obtaining instructions in relation to the Al Sadeq Litigation, and became aware that I was the subject of surveillance and an unlawful break in.

16. There can be no doubt that the attempted hacking of Stokoe was motivated by, and relates to, its retainer by Mr. Al Sadeq.

**The Azima Litigation**

17. There were also incidents of hacking in connection with a related litigation captioned *Ras Al Khaimah Investment Authority v. Azima* (the "Azima Litigation"), in which judgment was handed down by Judge Andrew Lenon QC on May 22, 2020. A copy of the Judgment in the Azima Litigation is annexed as **Exhibit B** hereto.

7

18. The Azima Litigation concerned claims brought by RAKIA against Mr. Farhad Azima, a US businessman involved in the aviation industry who had been party to a number of business ventures with RAKIA and other RAK entities between 2007 and 2016.

19. As recorded at paragraphs 2 and 30 of the judgment in the Azima Litigation, part of the factual background to that case involved an investigation conducted by RAKIA from around late 2014 into RAKIA's former Chief Executive Officer, Dr Massaad. This background overlaps with the investigations that are in issue in the Al Sadeq Litigation. In particular, the question of whether human rights abuses had been committed against Mr. Al Sadeq also, became an issue in the Azima Litigation. See Ex. B, ¶¶ 201.1-201.8

20. In the course of the Azima Litigation, it became clear that in January 2015 the Ruler of RAK had engaged a private investigator, Mr. Stuart Page, to investigate the activities of Dr. Massaad. See Ex. B, ¶¶ 261, 262. So far as I am aware, Mr. Page has a strong presence in Dubai and also has connections to companies incorporated in the UK.

21. On March 6, 2020, I personally witnessed Mr. Page whilst staying at the One and Only on the Palm Hotel in Dubai. I believe that this encounter was connected to acts of surveillance that I describe above.

22. An issue that arose in the Azima Litigation was whether RAKIA's case against Mr. Azima was based on evidence obtained as a result of hacking Mr. Azima's email account, including by the device of a spear-phishing email. See Ex. B, ¶ 294. In particular, Mr. Azima asked the Court to find that RAKIA was responsible for that hacking,

8

and that RAKIA's claim should therefore be struck out as an abuse of process. See Ex. B, ¶ 384.

23. During a hearing in the Azima Litigation, Mr. Page testified that in the course of his investigation into collusion between Dr. Massaad and members of the Ruler's family, he utilized the services of Insight, an Israeli company, who "were specialists at obtaining information from confidential sources" engaged in gathering electronic data which included "using the dark web, open source information on the internet." Ex. B, ¶ 269.

24. Gerrard also testified that the information, which formed the basis of the fraud accusations RAKIA brought against Mr. Azima, was obtained through hacking into Mr. Azima's personal accounts. A copy of the transcript of Day 5 of the hearing, which took place on January 28, 2020, and is annexed hereto as **Exhibit C**. See Ex. C, p. 69-70.

25. Nicholas Del Rosso ("Del Rosso"), owner and president of Vital Management Services Inc. ("Vital Management"), provided a witness statement and testimony in the same proceeding whereby he set forth evidence that Gerrard contacted him in early August 2016 and informed Del Rosso that Mr. Page had identified two links on the internet which contained data relating to Mr. Azima. A copy of Del Rosso's witness statement, dated June 21, 2019, and a copy of the transcript of Day 7 of the hearing, which took place on January 30, 2020, are annexed hereto as **Exhibit D** and **Exhibit E** respectively.

26. Del Rosso claimed that Gerrard simply asked him to download the data from those two links, and in following those instructions, he contacted Richard Garcia of

9

Northern Technology Inc. ("NTi"), a U.S. based firm, to download the content from the two internet links. Ex. D, ¶¶ 5-7, 9.

27. Del Rosso further asserted that sometime in early September 2016 he learned of two additional links that could have possibly contained data concerning Mr. Azima and that he instructed NTi to download the data contained on those links as well. Ex. D, ¶¶ 15-16.

28. Del Rosso further stated that from early August 2016 through September 2016, NTi downloaded the data from the identified links. Ex. D, ¶¶ 13-19.

29. Through his witness statement and the testimony he proffered, Del Rosso maintained that he was not involved in the investigation into Mr. Azima and denied having any knowledge that the information found on the internet links was unlawfully obtained. Ex. D, ¶ 20; Ex. E, pp. 64, 93-94.

30. The Judge did not accept Mr. Azima's submission that RAKIA was responsible for the hacking of his emails. Ex. B, ¶ 381. Nor did the Judge make any finding of wrongdoing on the part of Mr. Page, although he did make findings as to the world in which Mr. Page operated. Ex. B, ¶ 369.

31. In particular, the Judge found that:

> These cases highlight the fact that Mr Page operates in a world of covert surveillance in which agents acquire confidential information unlawfully and that Mr Page has dealings with such agents. It would be a reasonable inference to draw from these incidents that Mr Page has access to agents with the capacity to hack emails . . . these other incidents do not establish that Mr Page ever personally carried out or authorised the unlawful obtaining of confidential information and

> therefore do not affect my assessment of the likelihood of Mr Page acting unlawfully in this case.

Ex. B, ¶ 369.

32. On October 15, 2020, Mr. Azima filed a complaint in this District against Del Rosso and Vital Management, alleging, *inter alia*, that Del Rosso through Vital Management oversaw and directed the hacking of Mr. Azima's personal information by utilizing the services of CyberRoot Risk Advisory Private Limited ("CyberRoot") and BellTroX Info Tech Services ("BellTroX") which are well known hack-for-hire organizations located in India. A copy of the complaint, filed by Mr. Azima, is annexed as **Exhibit F** hereto. Mr. Azima alleges that Del Rosso paid CyberRoot more than $1 million to hack Mr. Azima's personal and confidential information and post that information online. Ex. F, p. 7-9. A whistleblower who is employed by CyberRoot and who has legitimate access to the company's bank account has provided copies of what the Applicants believe are CyberRoot's bank account statements with Kotak Mahindra Bank. A copy of CyberRoot's bank account statements reflecting payments made by Vital Management to CyberRoot is annexed as **Exhibit G** hereto in redacted form to eliminate references to entities other than Vital Management and to eliminate account numbers.

**The Robinson Proceeding**

33. As mentioned above, in late March 2020, Mr. Moon informed Mr. Sawyer of Quaestio that he had been instructed to obtain confidential information from Stokoe. Mr. Moon agreed to work with Stoke and Mr. Sawyer to establish the nature and origin of the requests.

34. I was informed by Quaestio (and Mr. Moon has in an affidavit dated July 2, 2020 confirmed) that, pursuant to the arrangement, Mr. Moon received the following instructions from "Source A2" (an individual Stokoe eventually identified as Mr. John Gunning):

    a. On April 2, 2020, Mr Moon was instructed to obtain, amongst other things, the Stokoe's banking coordinates.

    b. On April 9, 2020, Mr. Moon was instructed to access Stokoe's trading bank account and transactional data for the business bank account for the last three months. This period broadly coincides with the period that had elapsed since the issue of the Claim Form in the Al Sadeq Litigation.

    c. On April 21, 2020, Mr. Moon was instructed to provide information relating to my movements in and out of Dubai in February 2020. This period broadly coincides with the period that I attempted to visit Mr. Al Sadeq in the United Arab Emirates. As I have detailed above, when I visited Dubai during this time, I was subjected to covert surveillance.

    d. On April 22, 2020, Mr. Moon was instructed to provide information relating to Stokoe's client account, including transactional information for the month of March 2020. Mr. Moon was told that it was likely information would also be sought for the period November 2019 to February 2020, a period overlapping almost exactly with the period of Mr. Al Sadeq's retainment of Stokoe.

35. Mr. Sawyer liaised with Stokoe to provide Mr. Moon with Stokoe's bank account documents in a format which allowed covert tracking, to identify the recipients of those documents. In this way, Quaestio established that Mr. Moon was instructed by Mr. John Gunning, who was in turn instructed by Mr. Paul Robinson. Quaestio's findings are set out in a report, dated June 27, 2020, which is annexed hereto as **Exhibit H**.

36. Based on this information, Stokoe initiated the Robinson Proceeding in the High Court of Justice of England and Wales, Queen's Bench Division seeking, *inter alia*, to enjoin, and to obtain affidavits from, Mr. Moon, Mr. Gunning, and Mr. Robinson. A copy of the form of claim filed by Stokoe Partnership Solicitors is annexed as **Exhibit I** hereto.

37. Proceedings against Mr. Robinson were stayed by a consent order sealed by Justice Chamberlain, (the "Chamberlain Order"). A copy of the Chamberlain Order is annexed as **Exhibit J** hereto. Pursuant to the Chamberlain Order, Mr. Robinson undertook to "swear an affidavit stating on oath . . . the identity of any person who has requested" that he "obtain Confidential Information from" Stokoe. Ex. J, ¶¶ 1, 1.1. Mr. Robinson swore an affidavit (the "Robinson Affidavit") wherein he stated that Mr. Patrick Grayson was the source of these instructions. A copy of the Robinson Affidavit is annexed as **Exhibit K** hereto. Ex. K, ¶ 8.

38. By letter dated November 30, 2020, Mr. Page's attorney, Stephenson Harwood, sent a letter to Stokoe with invoices for the corporate research undertaken by Company Documents Limited, Mr. Robinson's company, on behalf of Page Corporate

Investigations Limited (London) and Page Group ME JLT (Dubai). One of the invoices from March 19, 2020, showed that the subject of an investigation was the Brendale Group, a group of companies associated to Mr. David Haigh who has been closely associated to Radha Stirling and who are both named in a press release attributing to their associations and linked companies. Another invoice from October 4, 2017, shows that a group of companies that were involved in RAKIA's case against Mr. Mikadze were the subject of an investigation by Mr. Robinson's company as instructed by Mr. Page. The companies under investigation were all connected to Gela Mikadze who was another individual investigated by Gerrard and RAKIA in connection with Dr. Massaad.

**The Grayson Proceeding**

39. Stokoe therefore brought further proceedings against Mr. Grayson (amongst others) by Claim Form dated July 16, 2020. Copies of the form of claim and Particulars of Claim filed by Stokoe are annexed as **Exhibit L** and **Exhibit M** hereto. Those proceedings were brought, *inter alia*, to compel Mr. Grayson and Mr. Grayson's associated company, Grayson + Co Ltd, to reveal the source of their instructions, any further wrongdoing, and to obtain injunctive relief to prevent them from further wrongdoing.

40. The application against Mr. Grayson and Grayson + Co Ltd resulted in a consent order made by Justice Tipples, (the "Tipples Order"). A copy of the Tipples Order is annexed as **Exhibit N** hereto. Pursuant to the Tipples Order, Mr. Grayson and Grayson+ Co Ltd undertook to "swear an affidavit stating on oath . . . the identity of any person who has requested that he "obtain Confidential Information from" Stokoe. Ex. N, ¶¶ A.4, 4.1.

41. Mr. Grayson's affidavit (the "Grayson Affidavit") was notably brief. He stated that: "Nobody requested me to obtain Confidential Information from or pertaining to [Stokoe], directly or indirectly." A copy of the Grayson Affidavit is annexed as **Exhibit O** hereto. Ex. O. ¶ 4.1.

42. Mr. Grayson's affidavit was in stark contradiction to Mr. Robinson's affidavit which set forth that Mr. Robinson received instructions from Mr. Grayson to obtain confidential information from Stokoe. See Ex. K, ¶ 8.

**Receipt of Phishing Emails**

43. Since the issue of proceedings in the Al Sadeq Litigation, I, along with others involved in the Al Sadeq Litigation, have received numerous emails and text messages which appear to be targeted attempts to access personal data. I believe that these attempts amount to phishing or spear-phishing; i.e. communications which seek to trick the recipient into clicking on a link to a website which itself contains malicious software which is downloaded onto the recipient's device. Spear-phishing is a more sophisticated form of phishing where the communication contains specific information, targeted at the recipient, which makes it more likely that the recipient will click on the link.

44. In particular, Stirling, who has published articles about the Al Sadeq Litigation and has aided Mr. Al Sadeq in raising awareness amongst human rights activists and non-governmental organizations about his case, received a phishing email from a Google Inc. ("Google") account, dutrouxjustine@gmail.com. That same email address sent a phishing email containing Android Package files ("APK files") to Detained in Dubai.

15

An analysis conducted of those APK files showed that the APKs communicated with a number of Ngrok server addresses. Stirling was also the subject of approximately four (4) phishing attempts using content hosted on Dropbox Inc. ("Dropbox") sent to her email address radha@radhastirling.com. Approximately twenty-six (26) phishing attempts were sent to the email addresses of Alastair Tomson ("Tomson") of 4 Stone Buildings, Nick Wright ("Wright") of 4 Stone Buildings, and Stirling from domains hosted by Cloudflare Inc. ("Cloudflare"). In addition, Google Firebase accounts were used in approximately twenty (20) phishing attempts targeting the email accounts of Tomson, Wright, Stirling, and Tim Maltin, of Maltin Litigation Support Group. It is believed that these hacking attempts were perpetuated by individuals associated with the defendants in the Al Sadeq Litigation as part of an attempt to interfere with Mr. Al Sadeq's legal representation. It is believed that these hacking attempts were perpetrated by individuals associated with the defendants in the Al Sadeq Litigation as part of an attempt to interfere with Mr. Al Sadeq's legal representation.

**Cyber Attack on Stokoe IT Systems**

45. At approximately 5:45 a.m. on November 5, 2020, just days before a hearing in the High Court was scheduled in the Robinson and Grayson Proceedings, hackers broke into Stokoe's cloud-based IT system which the firm uses to conduct its day-to-day business. By approximately 8:45 a.m., Stokoe's IT provider was able to take measures to protect Stokoe's data and that of ten other law firms potentially affected. Consequently, Stokoe was unable to gain access to their IT system until November 9, 2020. During the

16

Case 1:21-mc-00006-UA-LPA   Document 4   Filed 02/05/21   Page 16 of 19

time that the IT system was down, Stokoe faced significant impediments in carrying out their day-to-day business activities, including the inability to receive emails on their work addresses. Stokoe was informed by its IT provider that after evaluating the password used to orchestrate the hacking, it determined that the hacking was linked specifically to Stokoe (rather than any of the ten other law firms affected) and that Stokoe's financial material and banking data were accessed.

**The Discovery Sought**

46. Stokoe has been operating since 1994. As a firm, we have never before 2020 been affected by such cyberattacks. I believe that these various attempts to access Stokoe's confidential information are linked to its representation of Mr. Al Sadeq. Beyond the confidential information that was sought from Stokoe as described above, in Mr. Robinson's affidavit, he stated that he received the following requests for information:

   a. Information about Ms. Stirling's whereabouts, telephone numbers, and banking information; and

   b. Financial records and monthly transactional data from the bank account of Maltin PR.

Ex. F, ¶¶ 12-15.

47. Mr. Al Sadeq's Legal and Support Team has been, and remains, a target of a complicated and coordinated campaign by unknown perpetrators, within the context of their involvement in the ongoing Al Sadeq Litigation.

48. Accordingly, upon information and belief, Del Rosso and Vital Management have information, documents, and material which would provide evidence necessary to establish the identity of the ultimate perpetrators behind the hacking campaign targeted against Mr. Al Sadeq's Legal Team, and in turn, aid Mr. Al Sadeq in proving the defendants' ongoing pattern of human rights abuses, their efforts to interfere with Mr. Al Sadeq's access to legal representation, and their willingness to go to extreme lengths to conceal their unlawful conduct.

49. For these reasons, it is respectfully requested that this Court grant the Application in its entirety.

[Signature appears on the following page]

Pursuant to 27 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

Dated: February 5, 2021

                                                   Haralambos Tsiattalou