# EXHIBIT B

Neutral Citation Number: [2020] EWHC 1327 (Ch)

IN THE HIGH COURT OF JUSTICE          Case No. HC-2016-002798
BUSINESS AND PROPERTY COURTS
OF ENGLAND AND WALES
BUSINESS LIST (ChD)

Royal Courts of Justice
Rolls Building, Fetter Lane, London EC4A 1NL

Date: 22 May 2020

**Before**:

**ANDREW LENON Q.C. (sitting as a Deputy Judge of the Chancery Division)**

BETWEEN:-

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Claimant**

**- and -**

**FARHAD AZIMA**

**Defendant**

---

**APPROVED JUDGMENT**

---

**Hugh Tomlinson Q.C. and Edward Craven (instructed by Stewarts Law LLP) for the Claimant**
**Tim Lord Q.C. and Hugo Leith (instructed by Burlingtons LLP) for the Defendant**

**Hearing dates: 22nd - 24th January, 27th - 31st January, 3rd - 5th February, 12th - 14th February 2020**
-
Date: 22 May 2020

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

Covid-19 Protocol: This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii. The date and time for hand-down is deemed to be 14.00 am on 22 May 2020.

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 2 of 126

# Contents

Introduction ................................................................................................................3

Factual background .......................................................................................................5

The witnesses ...............................................................................................................13

Documentary evidence ...............................................................................................15

The HeavyLift Investment Misrepresentation Claim ...............................................16

   (1)   Was the quantification in 2008 of HeavyLift's contribution to the joint venture fair and honest? ...........................................................................................................17

   (2)   What was the content of the representations to RAKIA in 2013 to 2015? .............24

   (3)   Which party made the representations? ....................................................................32

   (4)   Was the HeavyLift Investment Representation false? ..............................................34

   (5)   Was Mr Azima aware that the HeavyLift Investment Representation was false? ....35

   (6)   Did RAKIA rely on the HeavyLift Investment Representation? ..............................36

   (7)   Loss ...........................................................................................................................39

   Conclusion on the HeavyLift Misrepresentation Claim ........................................39

The Good Faith Misrepresentation Claim ...............................................................39

   (1)   Does Clause 3.2 of the Settlement Agreement constitute a representation? ............40

   (2)   Has RAKIA proved the alleged wrongful conduct of Mr Azima? ...........................41

     (a)   Did Mr Azima falsely represent to RAKIA that he had introduced the prospective purchasers of the Hotel to RAKIA? ........................................................42

     (b)   Was the Referral Agreement a sham? ................................................................47

     (c)   Was the payment of $500,000 made by Mr Azima to Dr Massaad a bribe? .........53

     (d)   Did Mr Azima wrongfully fail to disclose to RAKIA an intended interest in the Hotel? ........................................................................................................................58

     (e)   Did Mr Azima orchestrate a malicious campaign to damage the reputation, standing and internal stability of the Government of RAK? ...........................................61

     (f)   Did Mr Azima make representations relating to the Proposed ISR JV? ...............65

   (3)   Was the Good Faith Representation false? ...............................................................77

   (4)   Did RAKIA rely on the Good Faith Representation? ...............................................79

   (5)   Loss ...........................................................................................................................79

The Unlawful Means Conspiracy Claim ...................................................................80

Mr Azima's Hacking Claim ........................................................................................80

The Facts ......................................................................................................................86

   (1)   Mr Page and the Project Update ..............................................................................86

   (2)   The April and July 2015 emails ...............................................................................91

   (3)   The spear-phishing emails .......................................................................................94

   (4)   The View from the Window document .....................................................................96

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 3 of 126

(5)     The Settlement Agreement ................................................................99

(6)     The engagement of Digitalis ..................................................101

(7)     The July 2016 meeting ...........................................................102

(8)     The Massaad websites, the blogging websites and the BitTorrents ........................105

(9)     RAKIA's alleged discovery of the hacked material................................106

(10)    RAKIA's deployment of the hacked data ............................................117

(11)    The inability of RAKIA's IT expert to download data ……………………….......120

(12)    "Deliberately withheld documents"……………………………………….......120

(13)    Mr Page's "track record"........................................................121

(14)    Allegations against Mr Gerrard................................................122

(15)    RAKIA's conduct of other litigation.............................................122

Conclusions on the hacking claim .........................................................124

Overall conclusion .............................................................................127

## Introduction

1.     The Claimant, the Ras Al Khaimah Investment Authority ("RAKIA"), is the investment authority of Ras Al Khaimah ("RAK"), one of the seven Emirates making up the United Arab Emirates ("the UAE"). The Defendant, Farhad Azima, is a US businessman based in Kansas City, Missouri who has been involved in the aviation industry for many years.

2.     RAKIA was represented at the trial by Hugh Tomlinson Q.C. and Edward Craven. Mr Azima was represented by Tim Lord Q.C. and Hugo Leith.

3.     Between 2007 and 2016, Mr Azima became involved in various actual and proposed commercial joint ventures with RAKIA and other RAK entities. They included a joint venture between his company HeavyLift International Airlines FZC ("HeavyLift") and RAK Airways for the establishment of a pilot training academy in RAK, the intended sale of a luxury hotel in Georgia owned by one of RAKIA's subsidiaries and a proposed joint venture involving the provision to RAK of aerial intelligence, surveillance and reconnaissance services.

4.     On 2 March 2016 Mr Azima and HeavyLift entered into a settlement agreement with RAKIA in respect of claims made by Mr Azima and HeavyLift against RAKIA in connection with the pilot training academy joint venture ("the Settlement Agreement"). Pursuant to the Settlement Agreement RAKIA paid Mr Azima the sum of $2.6 million.

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 4 of 126

5.      RAKIA advances three claims against Mr Azima in these proceedings. The first is that Mr Azima fraudulently misrepresented the amount of HeavyLift's investment in the training academy joint venture and that this misrepresentation induced RAKIA to enter into the Settlement Agreement and pay Mr Azima $2.6 million ("the HeavyLift Investment Misrepresentation Claim"). RAKIA is claiming part of this sum by way of damages under this head.

6.      RAKIA's second claim is a further claim for fraudulent misrepresentation inducing the Settlement Agreement. It is based on a provision in the Settlement Agreement by which Mr Azima warranted and confirmed that he had at all times acted in good faith and with the utmost professional integrity towards RAKIA, RAK Airways and any other RAK entity and would continue to do so. RAKIA alleges that this provision ("the Good Faith Clause") constituted a representation which Mr Azima knew was false because of his wrongful conduct in connection with various episodes occurring between 2011 and 2015 (the "Good Faith Misrepresentation Claim").

7.      RAKIA is claiming by way of damages for the Good Faith Misrepresentation Claim the whole of the sum of $2.6 million which it paid to Mr Azima under the Settlement Agreement.

8.      RAKIA's third claim is for $1,562,500 by way of damages for an unlawful means conspiracy arising in connection with the intended sale of the luxury hotel in Georgia in 2011 - 2012.

9.      A fourth pleaded claim, for damages for breach of warranty based on the Good Faith Clause in the Settlement Agreement, was not pursued by RAKIA in its closing submissions, RAKIA recognising that, even if breach of warranty were proved, it would only have a claim for nominal damages.

10.     Mr Azima challenges RAKIA's three remaining claims on two main grounds. First, he contends that the claims should be struck out or dismissed on the ground that, in bringing the claims, RAKIA is relying on confidential emails that RAKIA obtained through its unlawful hacking of his email accounts. Mr Azima has brought a counterclaim for damages resulting from what he alleges was RAKIA's hacking of his emails. That counterclaim has been stayed pending the trial of RAKIA's claims against Mr Azima.

11.     Second, Mr Azima denies the claims made against him on their merits. He denies making the alleged representations, denies fraud and denies any reliance by RAKIA on the representations. He contends that the litigation is politically motivated, the culmination of a targeted attack on him, pursued because of his refusal to take RAKIA's side in a bitter fight with Dr Khater Massaad, a former senior government official who RAKIA alleges was guilty of large scale embezzlement.

12.     RAKIA does not dispute that, in bringing the claims, it is relying on hacked emails but it contends that it came across the hacked material innocently on publicly accessible websites where it had been put by anonymous hackers. It contends that, in any event, the hacking allegations provide no defence to RAKIA's claims in this action and that, even if the Court found that the RAKIA was responsible for the hacking, the public

4

interest in the Court reaching the correct decision on the basis of all the available evidence should prevail.

## Factual background

### (1)     Dr Massaad

13.     Dr Massaad was from 2005 until 2012 RAKIA's chief executive officer. Dr Massaad was one of the most senior public officials in RAK and was entrusted with the management and control of RAK's national and international investments. As RAKIA's chief executive officer Dr Massaad had effective control over all of RAKIA's affairs, operations, assets and funds and he was directly involved in certain of the transactions which have given rise to RAKIA's claims in these proceedings. Dr Massaad and Mr Azima were friends.

14.     RAKIA claims that in around late 2012 it discovered that Dr Massaad had perpetrated systematic and wide-ranging frauds against RAKIA and other RAK entities. Subsequent investigations undertaken by the Government of RAK are said to have established that between around 2005 and 2012 Dr Massaad and his associates engaged in an unlawful conspiracy to misappropriate monies and otherwise cause losses exceeding $2 billion. Dr Massaad fled the UAE in 2012 and was subsequently tried and convicted in absentia of an array of fraud, bribery and embezzlement offences.

15.     In 2015 and 2016, Mr Azima acted as Dr Massaad's representative in without prejudice settlement discussions with RAKIA concerning the return of misappropriated assets. Those discussions ultimately came to nothing and no agreement was reached between RAKIA and Dr Massaad.

### (2)     The Training Academy Joint Venture

16.     Mr Azima first met Dr Massaad in around 2006 or 2007 in order to discuss the expansion of RAK's aviation activities. Mr Azima was introduced to RAK Airways. Dr Massaad and Mr Azima had a shared interested in aviation and they became friends. Mr Azima was also introduced to Sheikh Saud, the current ruler of RAK ("the Ruler") who was at that time the Crown Prince. There is a peripheral issue as to the closeness of the relationship between the Ruler and Mr Azima. Mr Azima contends that they were friends, a contention denied by the Ruler. Mr Azima exhibits an email exchange of New Year good wishes. From time to time, Mr Azima gave assistance to the Ruler in the form of effecting introductions to various contacts of his. My impression is that their relationship was one of mutual convenience rather than friendship.

17.     Dr Massaad introduced Mr Azima to the management of RAK Airways, the national airline of RAK and discussions ensued about the possibility of establishing a training academy for pilots in RAK. These discussions led in 2007 to the establishment of a joint venture between HeavyLift, an aviation company established and owned by Mr Azima, and RAK Airways for the creation and operation of a pilot training academy at RAK International Airport (the "Training Academy JV").

5

18. The parties agreed, amongst other things, that HeavyLift would provide and maintain a working DC-8 flight simulator and that RAK Airways would construct an appropriate facility at RAK International Airport to house the simulator. A RAK Free Zone company, RAK-HeavyLift Training Academy FZ-LLC, was incorporated on 11 April 2007 for the purpose of implementing and running the Training Academy JV. The directors of the company were Dr Massaad and Mr Azima.

19. The Training Academy JV was not a success. Although the simulator was eventually certified by several civil aviation authorities and was therefore able to provide some commercial training services, the partners to the joint venture were in conflict on various issues from an early stage.

20. Mr Azima's evidence was that RAK Airways failed to arrange to provide an adequate electrical power supply or air-conditioning (which was necessary for the operation of the simulator), a suitable building with the structural capacity and height needed to accommodate the additional simulators that had been contemplated and that it had made an unwarranted demand for rent which HeavyLift had no option but to pay. The Training Academy JV ceased operations in 2010.

21. The failure of the Training Academy JV later gave rise to the claim for compensation which was the subject of the Settlement Agreement. Mr Azima's evidence was that the Training Academy JV's failure was attributable to RAK Airways. This was not admitted by RAKIA.


**(3)    The Hotel**

22. A Georgian subsidiary of RAKIA, Ras Al Khaimah Investment Authority Georgia LLC ("RAKIA Georgia"), owned a luxury hotel, the Sheraton Metechi Palace Hotel in Tbilisi, Georgia (the "Hotel"). In 2011, RAKIA decided to sell the Hotel. The intended sale transaction is one of the episodes relied on by RAKIA in support of its claim that Mr Azima was guilty of wrongful conduct contrary to the Good Faith Clause in the Settlement Agreement.

23. Mr Azima received two payments of $400,000 and $1,162,500 on 25 October 2011 and 18 January 2012 respectively and, on the day that he received the latter of those payments, Mr Azima made a payment of $500,000 to Dr Massaad. Mr Azima's case is that he was entitled to both payments under a referral agreement with RAKIA ("the Referral Agreement") as commission for introducing to RAKIA three Iranians who were potential buyers of the Hotel ("the Potential Buyers") and that the payment to Dr Massaad was in return for a share in an aircraft owned by Dr Massaad. This version of events is disputed by RAKIA which contends that the Referral Agreement is a sham, that Mr Azima did not introduce the Potential Buyers, that the two payments which he received were misappropriations and that his payment to Dr Massaad was a bribe.

24. There is a further dispute concerning an agreement between the Potential Buyers and

6

Mr Azima under which he was to receive a 10% interest in the Hotel in exchange for a nominal payment of $10 "and other good and valuable consideration". Mr Azima claims that RAKIA and the Ruler were aware of and approved this arrangement. This is disputed by the Ruler and RAKIA.

25.  Following the signing of the Memorandum of Understanding between RAKIA Georgia and Eurasia Hotel Holdings Limited (a company beneficially owned by the Potential Buyers), the sale of the Hotel proceeded to a different company owned by them but was never completed. Mr Azima ceased to be involved in the sale transaction. The timing of, and reasons for, Mr Azima's withdrawal are disputed.

**(4)    HeavyLift's compensation claim**

26.  HeavyLift's claim for compensation from RAKIA arising out of the Training Academy JV was first made on 2 September 2013 when Ray Adams acting on behalf of Mr Azima sent a letter to the then Chief Executive Officer of RAKIA, Jim Stewart, concerning "unresolved" matters regarding the Training Academy JV.

27.  A few months before the claims were first made, Mr Azima and Mr Adams arranged for the drafting of what purported to be a copy of a Joint Venture Agreement dated 12 April 2007 (the "Joint Venture Agreement") including RAKIA as a guarantor of RAK Airways' obligations. The circumstances in which the Joint Venture Agreement was produced is considered further at paragraphs 123 – 128 below.

28.  HeavyLift's claim for compensation was not dealt with in 2013 and Mr Azima did not press the matter for the next 22 months. The claim was resurrected in July 2015. Between July 2015 and March 2016 there were correspondence and discussions regarding potential claims that HeavyLift had against RAKIA arising from the Training Academy JV. During the course of those discussions, it was represented that HeavyLift had invested $2.6m in the assets of the Training Academy JV including expenditure of $1,726,000 on the simulator. This representation is alleged to have been made fraudulently and has given rise to the HeavyLift Investment Misrepresentation Claim. The alleged misrepresentation is also relied on by RAKIA as wrongful conduct on the part of Mr Azima contrary to the Good Faith Clause in the Settlement Agreement.

**(5)    The planned media and PR campaign**

29.  In late 2014 and 2015 plans were made by consultants acting for Dr Massaad to organise a media and public relations campaign which was intended to damage the reputation of RAKIA, RAK and other RAK entities. RAKIA contends that Mr Azima played a leading role in the planned campaign and that the campaign was malicious and intended to spread false stories about human rights violations in RAK. This episode is relied on by RAKIA as giving rise to further wrongful conduct on the part of Mr Azima, contrary to the Good Faith Clause; RAKIA's allegations are disputed by Mr Azima.

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 8 of 126

**(6)     The Project Update and its aftermath**

30.    By late 2014 investigations were under way within RAK into the actions of Dr
Massaad and his associates.

31.    In January 2015 Stuart Page, a private investigator, was engaged by the Ruler to
investigate what the Ruler feared was a plot between a member of his family and Dr
Massaad aimed at destabilising his rulership.

32.    In March 2015 Mr Page provided the Ruler with a report entitled RAK Project Update
("the Project Update") which was mainly concerned with Dr Massaad's activities but
which also described how Mr Azima was managing a team of advisers in the US, hired
by Dr Massaad, who were planning to spread allegations about human rights issues in
RAK; their campaign had not yet been made public. Mr Page's agents who compiled
the report said that they would be able to gather intelligence on the campaign team in
order to monitor their progress and "attempt to contain or ruin their plans".

33.    In around April 2015, the Ruler told Mr Buchanan that he wanted Mr Buchanan and
other assistants to "target" Mr Azima. The Ruler directed his associates to bring
charges against Mr Azima. The Ruler's associates discussed meeting to "coordinate
our attack" on Mr Azima and Dr Massaad but persuaded the Ruler not to pursue this
plan at that time.

34.    In or around July 2015, the Ruler instructed another of his assistants, Naser Al Bustami,
to "go after" Mr Azima. Mr Azima's case is that, just as Henry II's question "Will no
one rid me of this turbulent priest?" led to the murder of Thomas Becket, so the Ruler's
directions to "go after" Mr Azima led in due course to the hacking of Mr Azima's
emails, whether or not this was the Ruler's express instruction.

**(7)     The hacking of Mr Azima's emails**

35.    A 'phishing' email is an email that seeks to trick the recipient into clicking on a
hyperlink taking the user to a webpage that the criminal controls, or into downloading
malicious software. A 'spear-phishing' email is a more targeted and sophisticated form
of a 'phishing' email which indicates that the sender has purposely targeted the
deception at that individual (as shown by the fact that the email has been constructed to
include material pertinent to the recipient, or otherwise to be of more interest to them).
The fact that the spear-phishing email contains material of particular interest to the
targeted recipient makes it more likely to be effective in that the recipient is more likely
to open the deceptive email and any further links it may contain.

36.    It is common ground that in October 2015 Mr Azima received a number of spear-
phishing emails. Mr Azima's case is that these spear-phishing emails led at the time to
the hacking of his confidential email accounts, that the hacking was organised by agents
acting on behalf of RAKIA and that consequently by late 2015 RAKIA had accessed
his confidential emails and the evidence which it now relies on in support of its claims.
RAKIA denies that it had anything to do with the spear-phishing emails and does not
admit that the spear-phishing emails led to the hacking of Mr Azima's email accounts.

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 9 of 126

37. On 29 December 2015 a document called the "View from the Window" was drawn up by Andrew Frank, an employee of Karv Communications, a PR firm engaged by RAK. The document referred to Mr Azima as "having orchestrated, if not fully participated in numerous fraudulent activities" and to "companies being set up with Iranian nationals". Mr Azima contends that this document shows that RAKIA had by this stage obtained access to Mr Azima's confidential emails and data. This is disputed by RAKIA.

**(8)   The Settlement Agreement**

38. On 2 March 2016 RAKIA, HeavyLift and Mr Azima entered into the Settlement Agreement. The Recitals to the Settlement Agreement read as follows:

> "(A) By an agreement dated 12 April 2007, HeavyLift and RAK Airways PJSC ("RAK Airways") entered into a joint venture (the "Joint Venture Agreement") to establish an Aircraft Simulator and Training Facility at Ras Al Khaimah International Airport, located in Ras Al Khaimah, UAE ("RAK");
> (B) RAKIA guaranteed the performance of RAK Airways under the Joint Venture Agreement;
> (C) HeavyLift, acting through Mr Azima, has asserted that RAK Airways owes HeavyLift for investments HeavyLift made in the joint venture pursuant to the Joint Venture Agreement;
> (D) RAKIA does not agree that there is any legal basis for any such claim;
> (E) Mr. Azima has recently provided negotiation assistance to RAKIA on an informal basis which RAKIA recognises and appreciates;
> (F) Each Party has the greatest of respect for the other Parties, and wishes to resolve all outstanding issues relating to the Joint Venture Agreement."

39. Clause 1.1 required RAKIA to pay the sum of $2.6 million in settlement of any claims that Mr Azima or HeavyLift might have had against RAKIA or another RAK entity:

> "RAKIA will pay HeavyLift the sum of $2,600,000 to resolve all claims which Mr Azima or HeavyLift may have against it or any other RAK Entity as further detailed in paragraph 3.1."

40. RAKIA's case is that it was deceived into entering the Settlement Agreement by fraudulent misrepresentations made by and on behalf of Mr Azima regarding the amount of HeavyLift's investment, that the settlement sum of $2.6m was intended to reflect the amount spent by HeavyLift in making its contribution to the Training Academy JV and that the true amount of HeavyLift's investment was significantly smaller than this.

41. In exchange for the payment of $2.6m, Mr Azima and HeavyLift agreed to relinquish

9

any claims they had against RAKIA or any other RAK entity. Clause 3.1 of the Settlement Agreement stated as follows:

> "This Settlement Agreement is in full and final settlement of all claims, in any jurisdiction, whether or not presently known to them or to the law that Mr Azima or HeavyLift or any of its owners has had, shall or may have against RAKIA, RAK Airways or any other RAK Entity."

42. Clause 3.2 of the Settlement Agreement, the Good Faith Clause, provided as follows:

> "Mr Azima and HeavyLift each expressly and separately warrants and confirms to RAKIA that he/it (respectively) has at all times acted in good faith and with the utmost professional integrity and will continue in the future to act in good faith and with the utmost professional integrity towards RAKIA, RAK Airways and any other RAK Entity.
>
> The payment made to HeavyLift pursuant to this Settlement Agreement is made in reliance on this express warranty and confirmation.
>
> For the purposes of this Sub-clause, "acted in good faith" and "act in good faith" each means (1) participating in conduct which meets the standard expected of reasonable business persons in the context and includes acting in ways which were or are, or are likely to be, non-detrimental to the interests of RAKIA or any other RAK Entity, and (2) not encouraging others to participate in the conduct which fails to meet the standard expected of reasonable business persons in the context or acting in ways which were or are likely to be detrimental to the interests of RAKIA or any other RAK Entity and (3) not participating in any illegal activity.
>
> In this Agreement "RAK Entity" shall mean any entity in which RAKIA or the Government of RAK has a shareholding interest (irrespective of where that entity may be incorporated)."

43. Clause 4 provided that the Settlement Agreement did not constitute an admission of liability or wrongdoing by either party. Clause 7 was a governing law and jurisdiction clause:

> "This Settlement Agreement and any dispute or claim arising out of, or in connection with, it or its subject matter or formation (including, without limitation, any contractual or non-contractual disputes, claims or obligations) is governed by and shall be construed in accordance with English law and the Parties submit to the exclusive jurisdiction of the courts of England and Wales."

44. Mr Azima's case is that the Settlement Agreement was a device cynically entered into by RAKIA which insisted on the inclusion of the Good Faith Clause and an English jurisdiction clause, while at the same time harbouring a conviction, informed by surveillance and other covert sources, that he was not acting in good faith. He states that in doing so, RAKIA sought to use Mr Azima in its dispute with Dr Massaad: it believed the Settlement Agreement gave it leverage over Mr Azima, insurance to recover the funds paid (which were modest compared to the $2 billion it was seeking to recover from Dr Massaad), and possibly the means of turning Mr Azima against Dr Massaad.

45. Pursuant to the terms of the Settlement Agreement, on 7 April 2016, RAKIA paid the settlement sum of $2.6m to Mr Azima.

**(9)   The proposed ISR Joint Venture**

46. Alongside the negotiations concerning the Settlement Agreement, in late 2015 and early 2016 RAKIA was also engaged in discussions with Mr Azima and other individuals with whom he was collaborating regarding a proposed joint venture for the provision of aerial intelligence, surveillance and reconnaissance services ("ISR services") ("the Proposed ISR JV"). RAKIA relies on alleged wrongful conduct in connection with the Proposed ISR JV in support of its Good Faith Misrepresentation Claim.

47. The proposed partners for the Proposed ISR JV were RAKIA and Global Defence Services Corporation ("GDS"), a company of which Mr Azima was a director and shareholder. RAKIA alleges that Mr Azima made misrepresentations to RAKIA in the course of the negotiations and failed to correct other false representations made by the individuals with whom he was collaborating. This is disputed by Mr Azima.

48. The negotiations concerning the Proposed ISR JV ultimately came to an end around June 2016 and it did not proceed.

**(10)   The July 2016 meeting**

49. Between the autumn of 2015 and July 2016 Mr Azima represented Dr Massaad in negotiations with RAKIA concerning RAKIA's entitlement to redress. During the course of those negotiations, Mr Azima attended meetings (which took place on a without prejudice basis) with Mr Buchanan and (in some instances) RAKIA's legal representatives at Dechert LLP (including Mr Neil Gerrard) on various dates in 2015 and 2016.

50. On 16 July 2016, a without prejudice meeting took place between Mr Buchanan, Mr Gerrard and Mr Azima. This meeting took an acrimonious turn. There is an issue as to precisely what was said. According to Mr Azima, Mr Gerrard threatened him that if Dr Massaad could not be made to agree to a settlement, then RAKIA would pursue Dr Massaad, and Mr Azima would be rendered "collateral damage". This is disputed by RAKIA.

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 12 of 126

**(11)** **The downloading of the hacked material**

51. The dispute with Dr Massaad was not resolved. RAKIA admits to creating websites attacking Dr Massaad a few days after the July 2016 meeting and shortly after those sites were created, in early August 2016, blogging websites began appearing denigrating Mr Azima as a "fraud" and a "scammer" and linking to websites containing Mr Azima's confidential emails which appeared at around the same time.

52. There is an issue as to how these blogging web sites came to the attention of RAKIA. RAKIA's case is that they were discovered by a journalist, Majdi Halabi, who drew them to the attention of Mr Page, by whom Mr Halabi had been allegedly asked to look out for references to Mr Azima on the internet. Mr Page is alleged to have communicated the information to Mr Gerrard and Mr Buchanan. Mr Azima contends that this version of events is fictitious, that Mr Halabi played no part in the discovery of the blogging web sites and that RAKIA's account of the discovery of the blogging websites is designed to conceal RAKIA's role in the hacking.

53. RAKIA subsequently instructed an independent third party, Northern Technology Inc. ("NTi") to download the material from these links and others which were subsequently discovered and which RAKIA contends had been posted by unknown hackers. The material was downloaded by NTi in August and September 2016.

54. RAKIA's case is that the subsequent analysis of the internet data established that, contrary to the Good Faith Clause, Mr Azima had in fact committed multiple acts of serious wrongdoing towards RAKIA and other RAK entities and that, as a result of that discovery, the present action was commenced on 30 September 2016.

55. On Mr Azima's case, RAKIA already had access to the hacked data by late 2015 so that the downloading process in August/September 2016 was a charade.

56. On the same day as these proceedings were commenced (30 September 2016) Mr Azima brought proceedings against RAKIA in the US District Court for the District of Columbia alleging that RAKIA had hacked his computers. RAKIA challenged the proceedings on jurisdictional grounds. Its challenge failed in the US District Court but on 18 June 2019 the US Court of Appeals allowed RAKIA's appeal and dismissed the US proceedings.

57. Mr Azima amended his defence in these proceedings on 18 July 2018 to allege that RAKIA was responsible for hacking his computers and emails and publishing their contents on the Internet and on 8 August 2019 was given permission to add a Counterclaim for damages and other relief arising out of the alleged hacking which was stayed pending final judgment on RAKIA's claim.

12

**The witnesses**

58. RAKIA served witness statements from twelve witnesses, nine of whom gave oral evidence. The evidence of two of the witnesses, Richard Garcia and Jessica Gray, who were involved in the downloading of data from the BitTorrent sites, was uncontroversial and admitted by Mr Azima without cross-examination.

59. The Ruler of RAK, Sheikh Saud bin Saqr Al Qasimi, provided a witness statement responding to Mr Azima's first witness statement but did not attend the hearing. RAKIA submitted that for the Ruler to attend the hearing or appear by video link would be incompatible with this constitutional role and status as sovereign ruler. It is regrettable that the Ruler chose not to attend the hearing or give evidence by video link as there were a number of issues on which he could have given relevant evidence. As the Ruler's witness statement was not tested by cross-examination, I do not propose to attach significant weight to it.

60. Jamie Buchanan was RAKIA's main witness. Between September 2014 and December 2019 when he took retirement, Mr Buchanan was the chief executive of Ras Al Khaimah Development LLC ("RAK Dev") which holds the assets and liabilities that were previously owned by RAKIA.

61. Counsel for Mr Azima submitted that Mr Buchanan gave dishonest evidence on a number of issues relating to Mr Azima's hacking clam. In relation to one matter, namely Mr Buchanan's claim to have been mistaken, until shortly before the trial, as to the authorship of the Project Update, which I address at paragraph 266 below, I consider that Mr Buchanan's evidence was disingenuous. I was not persuaded that Mr Buchanan's evidence was dishonest in other respects. He struck me as a generally reliable witness who gave his evidence in a measured way and was prepared to concede a number of points adverse to RAKIA's case that were put to him in cross examination.

62. Neil Gerrard is a former policeman and a partner in the firm of Dechert LLP which was instructed to assist with the investigation into Dr Massaad's alleged fraudulent activities which it has continued to work on to the present time. His witness statement dealt with his engagement by RAK, the meeting he had with Mr Azima in July 2016 and the events in August 2016 surrounding the downloading of the hacked material. He was cross-examined about his involvement with the questioning of detainees within RAK, in particular Karam Al Sadeq and Shahab Izadpanah. Allegations that Mr Gerrard had attempted, on behalf of RAK, to extort money from Mr Izadpanah and had offered Mr Izadpanah and Mr Al Sadeq to drop all charges against them if they confessed to charges implicating Dr Massaad were put to Mr Gerrard who denied them in forthright terms. On the basis of the material before me, I am not in a position to make any findings in relation to those allegations or other allegations of misconduct extraneous to the events in issue in these proceedings that were put to Mr Gerrard.

63. Counsel for Mr Azima submitted that Mr Gerrard gave dishonest evidence on key issues. He was also criticised for not referring to Mr Page and the Project Update in his witness statement. In my view, Mr Gerrard's witness statement should have dealt

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 14 of 126

with the Project Update which was a clearly relevant document and one which, as he accepted in cross-examination, was of concern to him when it was produced because it referred to the threat of a press campaign to smear RAK and its Ruler with human rights allegations. I do not, however, regard the omission to deal with the Project Update, or the other criticisms made of his evidence, as leading to the conclusion that I should treat Mr Gerrard as dishonest.

64.     Stuart Page, also a former policeman and now the Chairman and majority shareholder of a business providing security and surveillance services, dealt in his witness statement with his engagement in RAK to assist with the investigations into Dr Massaad and the discovery of the hacked material. Counsel for Mr Azima submitted that Mr Page was a dishonest witness who lied about a number of matters. I consider that Mr Page was an unsatisfactory and unreliable witness. As set out in greater detail in the context of the hacking claim, his witness statement was misleading in relation to two significant matters. First, his witness statement implied that he did not produce written reports for the Ruler on his investigations whereas in fact he did so on a regular basis. Second, his witness statement said that he first came across the name of Mr Azima in early 2016 whereas in it was in fact a year earlier. His evidence in connection with the discovery of the hacked material was both internally inconsistent and at odds with the contemporary documents. I have concluded that it would be unsafe to rely on any evidence from Mr Page that was not corroborated by some other source.

65.     Amir Ali Handjani is on the board of RAK Petroleum and was involved in discussions with Mr Buchanan and Mr Bustami regarding both the money that Mr Azima said was owed to him and matters involving Dr Massaad. Mr Azima criticised him as an evasive witness giving further dishonest evidence. Mr Handjani was criticised for his contention that the Ruler's instruction to "go after" Mr Azima was in part prompted by a demand for payment of $8 million by Mr Azima. I do not regard the evidence on this point to be so clear cut as to justify the inference that he gave deliberately false evidence on it.

66.     Naser Al Bustami sits on the boards of a number of companies owned by the government of RAK and is one of the Ruler's advisers. He was criticised for an email proposing that the Government of Georgia be enlisted to support RAKIA's claims against Dr Massaad. It is not clear from the email what assistance Mr Bustami had in mind and his oral evidence was that the assistance sought would be subject to Dr Massaad being convicted in a fair trial in a court of law. Even accepting that the email was improper, I do not consider that it supports the inference that Mr Bustami was a dishonest witness.

67.     Majdi Halabi gave evidence in relation to the discovery of the hacked material. As set out later in this judgment, I came to the conclusion that his evidence was inherently implausible and not credible.

68.     Stuart Leach ran the specialist litigation division at the public relations agency Bell Pottinger at the relevant time. Dave King is the Chief Executive of Digitalis, an online reputation and digital risk management firm, who were engaged by Bell Pottinger. I consider that they were both reliable witnesses who were seeking to assist the court.

69. Nicholas del Rosso gave evidence as to his involvement in retaining NTi to download the Hacked Material from the BitTorrent sites. His evidence was uncontroversial.

70. For Mr Azima, there were three witnesses. First there was Mr Azima himself. Second there was Mr Adams, a close friend and confidant of Mr Azima who deals with the accounts and paperwork for Mr Azima's business, who provided a short witness statement expressing agreement with Mr Azima's first witness statement. Finally there was Professor Donald Fowler, a friend of Mr Azima, who did not appear at the trial but provided an unchallenged witness statement describing an assignment that he had carried out for the Ruler at Mr Azima's request.

71. Mr Azima is a businessman with more than forty years' experience in all aspects of aviation, the airline industry and logistics. He has served as chairman of various airlines in different parts of the world. I am told that he has never before faced an allegation of fraud. RAKIA submitted that Mr Azima and Mr Adams were dishonest witnesses. After hearing evidence from Mr Azima and Mr Adams, I reached the conclusion that their evidence in opposition to RAKIA's claims was frequently inconsistent with the contemporaneous documents and inherently implausible. One example was their evidence concerning the retrospective drafting of the Joint Venture Agreement, which I deal with at paragraphs 123 to 128 below. I consider that Mr Azima and Mr Adams, in giving evidence, were more concerned to support Mr Azima's case than to assist the court with an honest recollection of the true facts.

72. The two expert witnesses, in the field of Computer Forensics and Investigations, were Christopher Tarbell (for Mr Azima) who is Director of Cyber Security and Investigations in the New York office of BRG, a global consulting firm, and Winston Krone (for RAKIA), who is Global Managing director in the Amsterdam office of Kivu Consulting Inc, a global technology firm. The experts each produced an expert report and together a joint report. The parties agreed that the experts, between whom there was a large measure of agreement, would not be called to give oral evidence.

**Documentary evidence**

73. Mr Azima made wide ranging criticisms of RAKIA's documentary evidence and invited me to draw inferences against RAKIA on the ground that it had destroyed relevant documents.

74. Mr Buchanan's disclosure statement referred to an incident at the Covent Garden Apple store on 16 October 2016 when a substantial number of emails had been inadvertently deleted from his iPhone by an Apple employee. In witness statements filed for the purposes of an interim application before HHJ McCahill QC, it was explained that Mr Buchanan had attended the Apple store because of a problem in sending emails from his phone. On 22 October 2016, six days later, Mr Buchanan was informed of the need to preserve documents, whereupon he informed Dechert of the possible deletion of emails. Steps were then taken to address the situation by restoring the deleted emails but these were only partially successful.

75. It was submitted for Mr Azima that it was "very likely" that Mr Buchanan deliberately

destroyed emails. It was said that Mr Buchanan's account of the loss of his emails was inherently implausible, given that an employee would not have worked on his iPhone without first ensuring that there was a back-up of data. My attention was also drawn to the absence of corroborative evidence from the witness who Mr Buchanan said for the first time in cross-examination was with him at the time of the incident. Furthermore, according to Mr Buchanan's evidence, there were no deletions as a result of the incident on 16 October 2016 from his inbox or its sub folders. It was said that this could not be reconciled with the number of emails (more than 20%) that had disappeared from his inbox. Practically all of Mr Buchanan's "sent" items are unavailable.

76.    Mr Buchanan was cross-examined about the emails missing from his inbox as well as about correspondence with his solicitors in August 2017 when he was asked about his emails and failed to mention the Apple shop episode. Mr Buchanan was adamant that he had not used the Apple shop episode as cover for prior deletions of potentially damaging material. I accept Mr Buchanan's evidence on this point and conclude that he had not deliberately destroyed any emails.

77.    It was submitted on behalf of Mr Azima that there were other "huge gaps" in the documentary evidence. I have addressed certain specific criticisms of RAKIA's documentation later in this Judgment. I was not persuaded that RAKIA had adopted a policy of deliberately destroying documents or withholding documents that should have been disclosed.

## The HeavyLift Investment Misrepresentation Claim

78.    RAKIA's case, shortly stated, is as follows.

78.1    In order to induce RAKIA to pay him compensation, Mr Azima repeatedly represented that HeavyLift had spent a total of $2,685,000 in making its contribution to the Training Academy JV, including expenditure of approximately $1,726,000 in respect of the flight simulator ("the HeavyLift Investment Representation").

78.2    This was untrue. HeavyLift's actual expenditure on the Training Academy JV was very much less – between $850,000 and $1.2 million.

78.3    Mr Azima knew that the HeavyLift Investment Representation was untrue and that the amount invested by HeavyLift was substantially lower than the sum represented.

78.4    RAKIA suffered loss as a result of entering into the Settlement Agreement.

79.    Mr Azima's response to this claim was, in summary, as follows.

79.1    In 2008 HeavyLift quantified the contribution it had made to the joint venture on a fair and honest basis that was well understood both by its joint venture partner and its auditors. The same figures were presented in 2013. This is incompatible with RAKIA's fraud case.

16

79.2    Read in context, the representations in 2013 and 2015 complained of by RAKIA do not have the meaning attributed to them. The communications identified the estimated value of the land and building at the airport which RAK Airways was obliged to contribute to the joint venture (title to which it failed to transfer) and the value of the investments contributed by HeavyLift to the joint venture, which included the value of the flight simulator, once installed and in operation, as well as other assets on which HeavyLift incurred costs.

79.3    The representations were made by HeavyLift, not by Mr Azima personally.

79.4    RAKIA has failed to prove that the representations were false, i.e. that the out of pocket costs actually incurred by HeavyLift on the simulator and training aids were less than represented.

79.5    There was no fraudulent intent.

79.6    There was no reliance by RAKIA.

79.7    RAKIA is only entitled to damages representing the difference between the costs actually incurred by HeavyLift and the level of costs that the Court finds were represented as having been incurred.

80.    RAKIA's claim therefore gives rise to the following main issues:

80.1    Was the quantification in 2008 of HeavyLift's contribution to the joint venture fair and honest?

80.2    What was the content of the representations to RAKIA in 2013 to 2015?

80.3    Which party made the representations?

80.4    Was the HeavyLift Investment Representation false?

80.5    Was Mr Azima aware that the HeavyLift Investment Representation was false?

80.6    Did RAKIA rely on the HeavyLift Investment Representation?

80.7    What loss has been suffered?

## (1)    Was the quantification in 2008 of HeavyLift's contribution to the joint venture fair and honest?

### The HeavyLift management accounts

81.    From early 2008, HeavyLift had sought to prepare a set of joint financial accounts with RAK Airways, for submission to HeavyLift's auditors, PriceWaterhouseCoopers ('PwC'), and informed RAK Airways of this. In February 2008 it submitted to RAK Airways a proposed balance sheet contained in preliminary management accounts,

showing HeavyLift's contribution.

82.     The balance sheet showed total assets contributed by HeavyLift of $2,281,883 including an amount of $1,725,959 in respect of "Simulator (includes delivery, installation & certification)" and an entry for $450,000 in respect of "Training Aids".

83.     At around the same time, a more detailed spreadsheet was prepared by Mr Adams. That spreadsheet (which was not sent to RAKIA or RAK Airways) contained a tab (entitled "Simulator") in respect of the costs associated with the acquisition, storage, installation and certification of the simulator. This showed how the entry of $1,725,959 in the preliminary balance sheet had been calculated. According to the spreadsheet:

83.1    HeavyLift had spent a total of $725,959 in respect of "Simulator Freight & Storage Charges" and "Simulator Installation Cost" (which included "Outside Contractors", "Salaries & Benefits", "Travel & Accommodation Charges", "Legal & Administration Charges", "License & Permits", "Parts & Supplies" and "Supervision"). This total included $186,445 in respect of "Administration Charges HL".

83.2    The "Simulator Cost" was recorded as $1 million. This comprised the actual purchase price of $167,500 paid by HeavyLift to MK Airlines plus a further unspecified "Investment" by HeavyLift of $832,500. No further details regarding the nature of that "Investment" were recorded, although it is clear from the spreadsheet that it did not relate to the costs of storing, installing and certifying the simulator (which costs were in the $725,959 described above).

84.     Mr Azima and Mr Adams gave differing and unsatisfactory explanations regarding the "Investment" of $832,500. Mr Azima stated that it represented "time, material, equipment, money." When it was pointed out to him that all of those expenses were recorded separately elsewhere in the spreadsheet, Mr Azima said that he could not address the numbers and that the numbers were produced under the supervision of Mr Adams. Mr Adams initially stated that the investment reflected the fact that Mr Azima had issued an invoice for this amount:

> "Q. So what does it mean by "investment"?
> A. It means that Mr Azima owned 100% of HeavyLift and he contributed that value to HeavyLift.
> Q. In what sense did he contribute it, Mr Adams?
> A. He wrote a bill of sale, he gave an invoice."

85.     When it was pointed out to Mr Adams that at this point in time Mr Azima had not produced any invoice for the simulator, he asserted that the $832,500 was an "agreed value".

**The alleged $1m agreed valuation**

86.     Mr Azima's evidence was that a $1 million valuation of the simulator had been discussed and agreed between HeavyLift and Dr Massaad on behalf of RAKIA, after the

18

simulator was purchased but before it was installed.

87. There are no contemporaneous documents that support the existence of this alleged agreement. There are no references to such an agreement in any of the communications between HeavyLift and RAK Airways during the lifetime of the Training Academy JV, including communications specifically concerning the value of the simulator. There was no reference to the alleged agreement in the discussions with RAKIA in 2015 culminating in the conclusion of the Settlement Agreement. The only document to contain any reference to this alleged agreement is a draft letter to Dr Massaad dated 24 January 2008 but there is no evidence that this letter was ever actually signed by Mr Azima and no documentary evidence that it was actually sent to Dr Massaad or to any other employee of RAK Airways or RAKIA.

88. When asked during cross-examination why none of the contemporaneous communications with RAK Airways contained any mention of an agreement that the simulator would be valued at $1 million for the purposes of valuing HeavyLift's contribution, Mr Azima claimed that Dr Massaad had told him "don't discuss that with anybody" and had said that "if there's a problem, come and see me". Mr Azima also claimed that, "There's an email to that effect" although no such email had been disclosed. Mr Azima did not explain why Dr Massaad would have instructed him not to talk to anyone at RAK Airways about what was (on Mr Azima's case) a perfectly valid and straightforward agreement between the two joint venture partners.

89. Taking this evidence into account, I am not persuaded that there was any agreement with RAK Airways or RAKIA that the simulator would be valued at $1 million. I consider that the draft letter was probably created by Mr Adams to support the entry in the accounts but which did not accord with the true position.

**Backdated documents**

90. Following Mr Adams' submission of the preliminary balance sheet, on 19 March 2008 Mr P.B. Hegde, an employee in the Finance Department of RAK Airways, emailed Mr Adams requesting the provision of further documents concerning HeavyLift's investment in the training academy, including "Copy of the Agreement and Invoice for the purchase of Simulator from MK Airlines" and "Copy of the Agreement and Invoice for the purchase of Training Aids".

91. Mr Adams forwarded Mr Hegde's email to Mr Azima and stated: "Here is the email from Hegde. We need to have a clear strategy on this."

92. This request for documents prompted Mr Adams and Mr Azima to produce a number of backdated documents designed to provide support for the figures shown in the balance sheet in respect of the simulator and the training aids.

   92.1 On 27 February 2008, Mr Adams sent an email to Mr Azima attaching several backdated documents. Mr Adams stated that the documents "requir[e] your signature" and he requested "color scans of each" once Mr Azima had signed them. The email made it clear that the documents were intended to be

backdated.

92.2 The backdated documents which Mr Azima was requested to sign included a "Bill of Sale from you to HeavyLift for the DC8 Training Aids." Mr Adams asked Mr Azima to "Please date this 31 December 2007 when you execute it". The "Bill of Sale" purported to show that Mr Azima had sold "DC8 training aids" to HeavyLift for "$10 and other good and valuable consideration" on 31 December 2007. In fact Mr Azima had not sold any training aids to HeavyLift on 31 December 2007.

92.3 On 27 February 2008, Mr Adams also drafted a letter from Mr Azima to Amir Anway (HeavyLift's Financial Controller) which was backdated to 31 October 2007 and which stated:

> "I hereby confirm that additional consideration totalling $832,500 from me was part of the total consideration for the acquisition of the Singer Link DC8 Simulator from MK Airlines."

92.4 Mr Adams asked Mr Azima to sign and return the backdated letter. Two weeks later, on 11 March 2008, Mr Adams re-sent the letter to Mr Azima stating: "You may have already signed this but I did not get a copy of it. Hegde has asked to review all of the costs we have booked and I really don't want to be without some basis for booking the sim at $1,000,000 when he goes through the books. Please sign and give the original to Amir and send me a copy."

93. I accept RAKIA's contention that the backdated letter was a misleading document. It was not written (or sent) on the date shown on its face and Mr Azima did not provide "additional consideration" of $832,500 (or any additional consideration) for the purchase of the simulator. Mr Adams accepted during cross-examination that this letter was backdated although he insisted that the document was not misleading, on the basis that it was perfectly acceptable to backdate accounting documents for an audit. Mr Azima made a similar statement in his evidence.

94. Mr Adams was asked to explain why, if Mr Azima and RAK Airways had agreed that the simulator would be valued at $1 million, Mr Adams did not simply inform RAK Airways of this, rather than creating a backdated letter regarding the payment of "additional consideration". Mr Adams could not answer this, merely stating, "I don't know".

95. Also on 22 March 2008, Mr Adams produced a backdated invoice which purported to show that Mr Azima had "SOLD" the simulator to HeavyLift on 31 October 2007 for a "UNIT PRICE" of $1 million and that HeavyLift had "advanced" the amount of $167,500 to Mr Azima with the result that HeavyLift owed $832,500 to Mr Azima. None of this information was true.

96. Although none of these points are disputed by Mr Azima, he nevertheless asserts that the invoice was not misleading. In his witness statement, Mr Azima says that there "was nothing improper about this invoice" which "was intended to reflect the substantial value that had been added to the simulator (which was not operational at the

time it was acquired) by HeavyLift, my wholly owned company". It was submitted on behalf of Mr Azima that it was legitimate for Mr Azima to produce the invoice and book the $1 million value as this reflected the work and expertise contributed by Mr Azima.

97. I disagree. If it was true that HeavyLift had done work which enhanced the simulator's value, the honest way of reflecting that increase in value would not involve the creation of a backdated invoice purporting to record a sale of the simulator from Mr Azima to HeavyLift that never took place.

**The valuation report**

98. On 3 March 2008 Mr Adams sent an email to Mr Azima stating: "I think we will get our $1MM capital value on the DC8 sim approved by the auditors but we will need a desktop valuation from Jeremy to confirm. Please can you arrange." Jeremy Leggett was an old friend of Mr Azima. Mr Azima replied a short while later copying in Mr Leggett, the owner of Aerospace Management Capital Limited ("AMCL") and stating: "Dear Jeremy, In your court!". Mr Leggett replied seven minutes later stating: "Fine just have ray advice [sic] what he needs exactly".

99. Two days after that initial exchange, Mr Adams emailed Mr Leggett stating, "I think the installed and certified value should be in the $1.75MM-$2.0MM range. Need ASAP." Mr Leggett responded by copying in his son, Rupert Leggett, and asking him to "go on the internet and find out something about the simulator" because "we need to do a valuation for him and I need some story line".

100. On 10 March 2008, Mr Adams emailed Mr Azima stressing that, "The valuation on the sim is going to be critical for the audit and also to give us fuel with Hegde. I am not sure he is our friend". Mr Adams' evidence was that the "fuel with Hegde" meant "To give him a basis on which we booked it".

101. On 18 March 2008, Rupert Leggett emailed Mr Adams asking "what the revenues are like" for the simulator and adding that he hoped "to draw up something to a level which you are satisfied with". Mr Adams responded by providing revenue projections which bore no relation to the revenue actually generated by the simulator. On 19 March 2008, numerous alternative drafts of the simulator valuation were sent to Mr Azima and Mr Adams. The final valuation stated that the "Total Asset Value" of the simulator was $1,475,000.

102. Mr Hegde's reaction was that the AMCL valuation was "quite unreasonable considering the age (exactly 40 years old) of the simulator, its condition and utilization in the next 6 years, Current market value of the same should not be more than $100,000 to $150,000, provided it is in a good condition, serviceable for another 6 years. Therefore, we would like to get this simulator re-assessed by some professional and reputable firms."

103. It was submitted on behalf of Mr Azima that the appraisal provided by AMCL was independent and reliable, on the basis that:

21

103.1 The valuation given ($1.475 million) was materially lower than the range of values ($1.75-$2 million) that had been tentatively suggested by Mr Adams, confirming that the valuer exercised an independent judgment.

103.2 The valuer had regard to information provided about the simulator and to information on demand factors, including the substantial worldwide fleet of DC-8 aircraft.

103.3 It is unremarkable for a value to be estimated through an exchange of information between the valuer and the customer. As Mr Adams explained, appraisals of this nature are very common in the aviation industry.

103.4 The document on its face described itself as a "desktop valuation" so RAKIA's protracted cross-examination to the effect that there was something clandestine and suspicious about such an assessment was misconceived.

103.5 RAKIA has adduced no valuation evidence of its own to support a contention that a valuation of $1 million is exaggerated or unreasonable, still less that it was so artificial as to be a badge of fraud.

104. Mr Adams relied on the valuation as the basis for a statement to PwC that the "simulator transferred during the year to the subsidiary in the revalued amount of USD 1,000,000 is valid and supported by the valuation report done by an independent assessor".

105. In my judgment, the AMCL valuation was not independent or a reliable appraisal of the simulator's value. Jeremy Leggett was a friend and AMCL unquestioningly adopted Mr Adams' projections regarding the projected revenues and costs of the simulator. Mr Azima and Mr Adams were extensively involved in reviewing and proposing changes to drafts of the valuation.

**Training Aids Invoices**

106. In support of the entry for $450,000 in respect of "Training Aids" in the 2008 accounts, Mr Adams produced a further backdated invoice which purported to show that Mr Azima had sold DC8 Training Aids to HeavyLift on 31 December 2007 for that amount.

107. Mr Adams sent the draft invoice to Mr Azima, who responded with various suggested changes which appear to have been intended to make the invoice look as authentic and plausible as possible. Mr Adams made the requested changes later the same day.

108. Mr Adams also created third party invoices which purported to show that HeavyLift had paid $450,000 to purchase training aids from Blosser Consulting on 31 December 2007. On 24 March 2008, Mr Adams sent an email to George Blosser stating: "Per your discussion with Farhad, here are 2 more invoices that he would like from you in order to clarify things. Please send marked "Paid" at your earliest convenience."

22

109. Mr Azima and Mr Adams did not refer to the training aid invoices in their witness statement. In his oral evidence Mr Azima admitted that, contrary to the terms of the backdated invoices, neither he nor HeavyLift had made a specific payment of $450,000 to acquire training aids from Blosser Consulting but he claimed for the first time that training aids had been acquired as part of a larger transaction or package and that an unidentified person had evaluated the package and come up with a number which they inputted. When pressed on whom the alleged "package" had been purchased from, Mr Azima said that he could not remember but shortly afterwards, he claimed that he could now recall that the transaction was with Mr Blosser.

110. Mr Azima acknowledged that on 31 March 2008 he drafted an email to a Mr Lopez enquiring about the possibility of purchasing training aids for the Training Academy JV. He was unable to explain why he had done this in circumstances where (on his case) HeavyLift had already purchased training aids from Blosser Consulting some three months earlier.

111. Mr Adams, for his part, stated that, he knew nothing about an independent valuation of the training aids. Instead, he said that the figure of $450,000 "came off the invoice from George Blosser" i.e. the invoice that Mr Adams had requested Mr Blosser to produce and approve. In the light of this, Mr Adams was forced to concede that, insofar as HeavyLift's audited accounts were based on the representation that the training aids had been independently valued at $450,000, the accounts were based on a false premise.

112. It was submitted on behalf of Mr Azima that Blosser's allocation of $450,000 was fair and reasonable and that RAKIA has failed to adduce any evidence to show that the training aids did not have a value of some $450,000 so it cannot make out a case based on the difference between cost and value.

113. I do not accept that submission. RAKIA's case was that the accounts were misleading in so far as they represented that HeavyLift had actually paid $450,000 for the training aids when they had not in fact done so. It was not necessary for RAKIA to go on to establish that the value of the training aids was less than the represented cost.

114. Following his request in the email of 24 March 2008 for a re-assessment of the value of the simulator by a professional and reputable firm, and further details of the training aids, to which there had been no response, Mr Hegde sent a further email as follows:

> "In the absence of any response to my below e-mail, we believe, you have no further clarification to our queries. This matter was referred to our Managing Director - Dr. Khater Massaad and he was apprised of the present condition of the Simulator. In view of the above, we do not wish to continue our partnership in this simulator."

**The PwC audit**

115. There is an issue between the parties as to whether PwC audited the Training Academy JV as well as HeavyLift. An email dated 2 July 2015 from Ms Afsaneh Azadeh, a

longstanding close associate and senior employee of Mr Azima, records that, according to HeavyLift's auditor Mr Kadiri, there was no record of an audit of the joint venture ever having been carried out. However the audit document produced by PwC states in terms that the audit was conducted of the Training Academy JV for the year ended 31 December 2008, as well as of HeavyLift. I proceed on the basis that there was an audit of the Training Academy JV.

116.  It was contended on behalf of Mr Azima that PwC were made aware of, and were content with, the basis on which it was alleged that the simulator and the training aids had been supplied to the joint venture; that is, at a value that was agreed and then reflected in invoices rather than at the value of an acquisition cost paid out to third parties in arms' length transactions. This was said to be obvious from the fact that the PwC audit booked the value of the simulator and the training aids as arising from related party transactions.

117.  I do not accept this submission. The fact that PwC booked the value of the simulator and training aids in the consolidated accounts for the year ended 31 December 2008 as arising from related party transactions does not mean that PwC was aware or agreed that those assets would be valued on a false basis. I am not satisfied that there was any agreement on the part of RAKIA or RAK Airways that the simulator would be valued at $1 million. The way in which Mr Azima and Mr Adams produced invoices for the simulator and training aids, which did not reflect the terms of an actual transaction, and the way in which the valuation report was presented as an independent report were not fair or reasonable, in my view.

118.  The fact that Mr Azima and Mr Adams had not behaved honestly towards RAK Airways and PwC is further confirmed by an exchange of emails concerning certain entries in the management accounts for the Training Academy JV. Mr Adams informed Mr Azima that paying $250,000 for generator rent and diesel was "a reasonable compromise if all of our financial engineering on the academy is accepted which it appears to have been". Mr Azima replied that he had no recollection of agreeing to this, to which Mr Adams responded: "We will agree to disagree. When you start believing our financial engineering we are in trouble. I think you need to change writers."

119.  In my view, RAKIA are justified in treating this exchange as an acknowledgment that Mr Azima and Mr Adams had presented false and misleading financial information about the Training Academy to RAK Airways.

**Conclusion**

120.  I consider that the way in which Mr Adams and Mr Azima accounted for HeavyLift's contribution to the joint venture, including the cost of the simulator and the training aids, in 2008 was not reasonable or honest.

**(2)  What was the content of the representations to RAKIA in 2013 to 2015?**

24

121. RAKIA's case is that, through communications sent to RAKIA between September 2013 and November 2015, Mr Azima repeatedly represented that HeavyLift had invested a total of $2,685,000 into the Training Academy JV, which included expenditure of approximately $1,726,000 in respect of the flight simulator as described in the documents provided to RAKIA.

122. It was submitted for Mr Azima as follows.

122.1 The interpretation of an alleged misrepresentation will depend on the context in which the statement is made. In *IFE Fund v Goldman Sachs International* [2006] 2 CLC 1043, Toulson J held (para 50): "In determining whether there has been an express representation, and to what effect, the court has to consider what a reasonable person would have understood from the words used in the context in which they were used. In determining what, if any, implied representation has been made, the court has to perform a similar task, except that it has to consider what a reasonable person would have inferred was being implicitly represented by the representor's words and conduct in their context."

122.2 The communications relied on by RAKIA set out the basis on which it was said that HeavyLift was entitled to be compensated for the termination of the Training Academy JV which had two aspects. The first aspect was RAK Airways' breaches of the Joint Venture Agreement. The second was HeavyLift's contributions to the joint venture which were not limited to the particular sums outlaid but reflected the total value of the various assets making up the training academy once installed and commissioned, including certain costs, and were understood as such at the time.

122.3 In the particular context of this negotiation, it would make no commercial sense for HeavyLift to limit its claim only to the amounts actually spent in relation to the JV. A party in HeavyLift's position would seek to be compensated for the value it had created and of which it had been wrongfully deprived by the other JV partner's breach, not simply for the amounts it had actually outlaid. This is particularly so given that RAKIA indicated that it would be too complicated to provide HeavyLift with its half share of the land and buildings that RAK Airways failed to contribute (Mr Buchanan's email of 14 November 2015).

122.4 The May 2015 Statement of Account enclosed with Mr Azima's email of 11 November 2015 referred to various items contributed by HeavyLift including the simulator, training aids, and other assets under the heading "Fixed Asset Investment". By contrast, other parts of HeavyLift's claim were explicitly labelled in this document as costs: "Staff & Related Costs from US Company".

122.5 Mr Buchanan understood the communications as referring to this concept of "value", not restricted to specific expenditures or costs as made clear in his email to Mr Azima of 14 November 2015. Moreover, it was clear to RAKIA from the communications in question that a substantial portion of the value attributed to the simulator and the training aids arose from related party transactions, as made clear in the HeavyLift accounts.

**The backdating of the Joint Venture Agreement**

123.    Before considering the correspondence, it is necessary to refer to the production in 2013 by Mr Adams and Mr Azima of the backdated Joint Venture Agreement, shortly before HeavyLift launched its compensation claim. RAKIA does not contend that this document misstated the parties' legal obligations (including RAKIA's guarantee of RAK Airways' obligations). I infer that RAKIA has not been able to find an original joint venture agreement. RAKIA nevertheless submits that the fact that Mr Azima and Mr Adams created the document more than 6 years later and then gave untrue evidence about its genesis is relevant to an assessment of their credibility as witnesses.

124.    The sequence of events was as follows:

124.1   On 23 May 2013 Mr Adams emailed Mr Azima an unsigned version of the Joint Venture Agreement which did not contain any reference to RAKIA having guaranteed RAK Airways' obligations. This was followed by two further versions emailed by Mr Adams on 27 May 2013 which likewise did not contain any reference to a guarantee. The third version was described by Mr Adams as the "Final clean copy" of the agreement.

124.2   On 10 June 2013, Mr Adams sent a revised (unsigned) version of the Joint Venture Agreement to Burlingtons LLP (Mr Azima's current solicitors) stating that Mr Azima "will call you…to discuss". This version of the Joint Venture Agreement did include a sentence that RAKIA consented to and guaranteed RAK Airways' performance.

124.3   On 14 July 2013, Mr Adams sent an email to Mr Azima attaching the version of the Training Academy Joint Venture Agreement which included the RAKIA guarantee.

124.4   On 24 August 2013, Mr Azima emailed Mr Adams: "Please email me RAK HL contract. My friend is here to……" . Dr Massaad, who by this time was no longer employed by RAKIA, was visiting Mr Azima's yacht in the South of France at the time.

124.5   On the following day Mr Adams re-sent the email of 14 July 2013 (and attachments) to Mr Azima.

124.6   Later that day, Mr Adams received an email from Kris Sabev, the Captain of Mr Azima's yacht, stating: "Dear Ray, attached is the Joint Venture Agreement signed by both sides." Attached to the email was a copy of the Training Academy JVA which contained the signatures of Mr Azima and Dr Massaad (who purportedly signed the document both on behalf of RAK Airways and on behalf of RAKIA).

125.    In cross-examination Mr Azima and Mr Adams denied retrospectively drafting, amending and backdating the Joint Venture Agreement in 2013. Instead, they

26

claimed that Mr Azima was always in possession of a copy of the agreement that was signed on 12 April 2007, and that between May and August 2013 he had been asking Mr Adams to send him a series of drafts of the agreement so that he could make sure that what he had was consistent with this, in order to ensure that the signed copy he had was "the same one and there's no others in existence".

126. According to Mr Adams, the revisions sent in 2013 had all occurred in 2007, rather than in 2013. He claimed that he was only in possession of "drafts" of the agreement, and that Mr Azima had asked him to send the drafts. He was unable to explain what conceivable purpose Mr Azima would have had in asking him to send several non-final and superseded drafts of an agreement of which (according to both men) Mr Azima already had a signed final version. When asked why he had described the version sent on 27 May as the "final clean copy" but had subsequently sent Mr Azima further amended versions of the agreement several weeks later (all of which Mr Adams claimed had been produced in 2007) Mr Adams replied unconvincingly that: "I was obviously in error".

127. I consider that the explanations given by Mr Azima and Mr Adams of these communications made no sense and were untruthful. If Mr Azima had simply asked Mr Adams to send him "all" previous drafts of the agreement in his possession (as Mr Adams claimed), which is inherently unlikely, they would not have been sent over a period of nearly two months in an evolving sequence. Moreover if the drafts were really prepared in 2007 one would also expect to see them and emails exchanging them in 2007 in Mr Azima's disclosure. None of these documents were disclosed other than as attachments to emails in 2013.

128. I agree with RAKIA's submission that the overwhelming inference from the documentary evidence is that Mr Azima and Mr Adams retrospectively drafted the Joint Venture Agreement in the summer of 2013. Mr Azima and Dr Massaad (who by then had no authority to enter agreements on behalf of RAKIA) then signed that retrospectively drafted and backdated document on board Mr Azima's yacht on 25 August 2013 and thereafter misrepresented to RAKIA that this document was the original document that had been signed on 12 April 2007.

**The correspondence**

129. The relevant correspondence concerning HeavyLift's claim for compensation is as follows:

129.1 On 2 September 2013, Mr Adams sent a letter to RAKIA's then chief executive, Jim Stewart, claiming that RAKIA was contractually obligated to reimburse the substantial expenses that HeavyLift had incurred in performing its obligations in relation to the joint venture. Mr Adams stated as follows:

"A substantial investment was undertaken by HeavyLift on behalf of the joint venture. That investment includes, among other things:

1. Cash, training materials, and equipment of approximately $2,260,000 USD.
2. Staff and management time and related costs contributed by our US

27

company. [...]

> … [D]ue to the failure of RAK Airways to provide its share of the joint venture investment, the amount HeavyLift has already disbursed needs to be repaid."

129.2 Mr Stewart replied the same day explaining that he was "not familiar with the agreement" and asking, "when the agreement was originally signed". Mr Adams replied by attaching a copy of what he claimed was "a copy of the 2007 Joint Venture Agreement" which had been produced and signed the previous week.

129.3 On 2 October 2013, Mr Azima sent an email to the Ruler concerning the Training Academy JV. The email began: "I am not sure how to bring an unresolved business matter to your Highness as I never have before". This statement contradicts Mr Azima's claim that he spoke with the Ruler about the joint venture in 2010 and supports the Ruler's denial that any such conversation took place. The email made no reference to an alleged agreement with RAK Airways regarding the value of HeavyLift's investment in the Training Academy joint venture.

129.4 In June 2015 Mr Azima introduced Ms Azadeh to RAKIA to present his position on HeavyLift's claim for compensation. On 13 June 2015, Mr Buchanan met with Ms Azadeh and made it clear that RAKIA was willing to investigate HeavyLift's claim to ensure a fair outcome.

129.5 According to Mr Adams' witness statement, following that meeting, he was asked by Mr. Azima to provide additional information and documentation requested by Mr. Buchanan on behalf of RAKIA to assist them with quantifying the amount which they would be "reimbursing" HeavyLift for its involvement in the joint venture.

129.6 By an email sent on 14 June 2015, Mr Buchanan requested detailed information and records concerning the project including various "Financial records, asset register and reports". In particular, he requested amongst other things (a) "financial records that back up the Statement of Account and show all investments made by HeavyLift into or on behalf of the JV, including date, account details etc"; and (b) "details of the assets owned or held/used by the Training Academy JV to the extent not already forming part of the financial data". Mr Buchanan also asked: "More generally, what (if any) information can you provide about RAK's actual contribution [to] the joint venture in financial terms?".

129.7 On 6 July 2015, Ms Azadeh sent a letter from Mr Adams to Mr Buchanan which stated that prior to the termination of the Training Academy JV "HeavyLift had already invested $2.5 million." The letter further stated that while hard copies of the Training Academy JV's audited accounts for 2007 and 2008 were not available, an extract from the "Director's Report and Balance Sheet Signature page" showed that as of 31 December 2008 the "Total Investment by

28

HeavyLift" in the Training Academy Joint Venture was $2,582,881, which included a "Capital Contribution" of $1,000,000, "Share Capital" of $40,000 plus a further investment of $1,542,881 "Due to Related Parties ".

129.8    The letter enclosed HeavyLift's audited accounts for 2008. The notes to the accounts explained in relation to "Property, plant and equipment" that: "Property, plant and equipment are stated at cost less accumulated depreciation. The cost of property, plant and equipment represents the purchase cost together with any incidental expenses of acquisition". The notes also stated that a total of $1,282,500 attributable to the value of the simulator and the training aids arose from related party transactions on prices agreed between the parties.

129.9    On 9 August 2015, Mr Buchanan sent an email to Ms Azadeh which explained that, "we need to identify relevant records, such as emails, documents and financial information" in order to "consider your points properly". He added that it would be helpful "if you set out your claims against RAK Airways in greater detail and provided evidence to support those claims".

129.10  On 9 October 2015, Mr Azima sent an email to Mr Buchanan (copied to Ms Azadeh) regarding HeavyLift's claim. In that email he stated, "Our costs were $2.6MM which we have documented for RAK more than once".

129.11  On 21 and 27 October 2015, Mr Buchanan sent further emails to Ms Azadeh in which he explained that he was compiling various "questions" regarding HeavyLift's contribution to the Training Academy JV which were intended to identify "what may be due" and to "assess the value of amounts owing, if any" to HeavyLift arising from the termination of the Training Academy JV.

129.12  On 29 October 2015, Mr Buchanan sent an email to Mr Azima which contained a timeline of events concerning the Training Academy JV and referred to Mr Azima's previous statements that HeavyLift was entitled to approximately $2.5m. Mr Buchanan asked Mr Azima to identify the basis of the claims with reference to the Joint Venture Agreement, including details of the particular provisions of the Joint Venture Agreement which were said to have been breached and the losses caused by those breaches.

129.13  On 10 November 2015, Mr Buchanan emailed Mr Azima seeking clarification of "the basis on which you calculate the compensation due to you". He added:

        "It might be easier for me to work on a compensation package if I had details of the monies actually spent by HeavyLift Airline on the training academy project. This would need to be evidenced so that our lawyers/ internal audit could look at it (apologies for that - you know what lawyers are like!). If that is not too inconvenient perhaps you could let me know."

129.14  On the same day (10 November 2015), Mr Azima forwarded to Mr Buchanan an email from Mr Adams attaching a number of documents referring to an investment of $2,260,000 by HeavyLift under the Joint Venture Agreement and attaching various documents purportedly evidencing that investment

including a statement of account dated 31 May 2015 to the effect that HeavyLift had made a total fixed asset investment of $2,260,000 of which $1,726,000 had been paid in respect of "Simulator (including installation & certification)", training aids in the sum of $450,000 and a further investment of $425,000 in the form of "Staff & Related Costs from US Company".

129.15 On 11 November 2015, Mr Azima sent an email to Mr Buchanan which contained several references to the amount of money that HeavyLift had invested in the Training Academy JV. The email stated: "Total Loss per Statement of Account = $2,260,000 + $425,000 = $2,685,000". A number of documents were attached to the email purportedly supporting these figures.

129.16 On 14 November 2015, Mr Buchanan emailed Mr Azima again in the following terms, stating that he had reviewed Mr Adams' email and was authorised to verify the various valuations referred to in the email. "My team is working on this as a matter of priority, but it would help me greatly if you could confirm what you believe to be the $ value of HLI's claim. This will ensure I am targeting the right number In relation to valuations, and given your extensive experience in the aviation sector, I would be grateful for your thoughts on the current value of the simulator. I understand this was the largest single asset that HLI contributed to the training academy. Is there a market for these simulators? If so, we would like to enlist your help in finding a suitable buyer."

129.17 Mr Buchanan went on to address the claim for compensation for loss of the Academy building. He noted that he was having difficulty justifying this claim internally, adding that any failure to contribute the land was the basis for considering compensation to HeavyLift for the amounts it contributed to the joint venture, including the additional management time cost/expense noted in Mr Adams' email but that including the building would introduce additional complexity and delay and there was no material to support the $5 million value attributed to the building by Mr Adams.

129.18 Mr Azima replied the same day expressing his disappointment at Mr Buchanan's email. Later that day Mr Buchanan replied by email explaining that his objective was to seek a settlement of this matter after reviewing the legal and moral position and then quantifying the claim:

> "I am sure you appreciate that I need to be able to formally justify the value which you place on your claims? It will assist me greatly if you can place a $ value on your claim, let me know how you arrive at your figure and provide the evidence and justification for it. I need your estimate of loss - what you have suffered. Without this how can I know I am targeting the right number? This should not be a time consuming process. I am looking to progress the matter in a timely manner and in the spirit we discussed but will need your help."

129.19 On 15 November 2015 Mr Azima sent an email stating as follows:

> "I couldn't help but laugh when I read your last sentence! Timely matter!

30

You set the deadline in September. 53 days later the optimism lives on! I have stated clearly, this is not a legal issue to be disputed, facts are sitting at RAK airport. The claim in 2 parts, first is based on what has been spend to create the training academy. Second the unfulfilled commitment of RAK. First part is clear, you have the records. The Building, it is there.... We can talk about it."

129.20   On the same date, Mr Adams sent an email to Mr Buchanan which stated that the clam was in two parts, as follows:

"1. Part 1 of the claim is for 50% of the value of the land and building at the airport. We have estimated the value because we do not know the cost or the current market value.

2. Part 2 is for our net investment in the assets of the Academy due to the failed performance on the part of RAK Airways. We have not added on any intangibles such as loss of profit. We have previously provided documentation for this portion of the claim totalling USD $2,685,000."

**Conclusion**

130.   The central issue is whether the communications sent to RAKIA in the period 2013 to 2015 concerning HeavyLift's claim for compensation are to be construed as representations as to the amounts actually expended by HeavyLift or whether they should be construed more loosely as referring to valuations of HeavyLift's contribution to the joint venture.

131.   I have come to the conclusion that the communications did amount to a representation that HeavyLift had actually spent a total of $2.685 million in making its contribution to the Training Academy, including expenditure of approximately $1.726 million in respect of the flight simulator.

132.   This is for the following reasons:

132.1   The communications from Mr Azima, Ms Azadeh and Mr Adams consistently refer to investments by HeavyLift in the sense of money actually spent by HeavyLift. For example:

(a)   The first letter in the sequence dated 2 September 2013 stated that HeavyLift was seeking to be compensated for its "investment" including $2,260,000 on cash training materials and equipment. The ordinary meaning of "investment" in an asset is the spending of money to purchase the asset. This construction is reinforced by the later reference to the need to repay the amount "disbursed" by HeavyLift.

(b)   Similarly the letter dated 6 July 2015 from Ms Asadeh refers to an "investment" by HeavyLift of $2.5 million in the Training Academy.

31

The enclosed audited accounts for 2008 stated that the property, plant and equipment were stated at cost less accumulated depreciation. The explanation in the notes about related party transactions made clear that the prices were agreed. It did not suggest that the prices had not been paid.

(c) Mr Azima's email of 9 October 2015 referring to "our costs of $2.6 million" is a clear representation that the sum of $2.6 million had been spent by HeavyLift.

(d) Mr Azima's email of 15 November 2015 referring to the claim in respect of the amounts "spent" on the Training Academy JV.

(e) Mr Adams' email of the same date referring to HeavyLift's "net investment" in the assets of the Training Academy JV "totalling USD $2,685,000."

132.2 The fact that the May 2015 Statement of Account enclosed with Mr Azima's email of 11 November 2015 referred to various items contributed by HeavyLift including the simulator, training aids, and other assets under the heading "Fixed Asset Investment", in contrast to another head of claim being "Staff & Related Costs from US Company" does not assist Mr Azima. The reference to "costs" does not displace the ordinary meaning of "investment".

132.3 Mr Buchanan's emails read as a whole make clear that RAKIA was interested in determining the amount actually spent by HeavyLift, for example his email of 10 November 2015 in which he asked for details of the "monies actually spent". The references by Mr Buchanan to "value" or "valuation" do not affect this conclusion. Whilst a claim for compensation could have been advanced on the basis of value, that was not how the claim was in fact advanced or how it was requested.

132.4 The fact that the compensation claim was advanced on two fronts (by reference to compensation for wrongful termination as well as in respect of HeavyLift's outlay or investment) did not entitle HeavyLift to misstate the amount of its investment or to displace the clear meaning of the statements as to the amount invested.

133. In short, the relevant statements expressly referred to the amount of HeavyLift's "investment", "substantial investment", "total investment" and "net investment" in terms that were clearly a representation about the total costs that HeavyLift had incurred through its contribution to the Training Academy JV, not the value of its contribution.

**(3) Which party made the representations?**

134. RAKIA's case is that the HeavyLift Investment Representation was made by Mr Azima (and individuals acting on his behalf). Although only one of the communications pleaded by RAKIA was actually sent by Mr Azima (namely, the

32

email dated 10 November 2015 referred to at paragraph 129.14 above) RAKIA contends that the pleaded communications collectively constituted a single representation made by Mr Azima. In support of this case, RAKIA contends as follows:

134.1 Mr Adams and Ms Azadeh are longstanding close associates of Mr Azima who were clearly acting on his behalf at the relevant time. In particular Mr Adams confirms in his witness statement that following the meeting on 13 June 2015, "I was asked by Mr Azima to provide additional information and documents requested by Mr Buchanan" and that he subsequently did so "[i]n accordance with this request."

134.2 During the course of the exchanges summarised above, Ms Azadeh and Mr Adams sent emails from their personal and/or Aviation Leasing Group email addresses, rather than from HeavyLift email addresses.

134.3 The communications were made in the course of settlement negotiations with RAKIA that were intended to, and which did in fact, result in the conclusion of a Settlement Agreement expressly recording that HeavyLift's claim was advanced "through Mr Azima", which resolved "all claims which Mr Azima" may have against RAKIA or any other RAK Entity, contained an express warranty and representation concerning Mr Azima's conduct towards RAKIA and which was signed by Mr Azima both on behalf of HeavyLift and on his own behalf as a party.

135. In response, Mr Azima contends as follows:

135.1 RAKIA's case that the communications were sent "on behalf of" Mr Azima is at odds with the content of the communications themselves which indicate that they were sent on behalf of HeavyLift. All the communications (including the one sent by Mr Azima) concern a claim by HeavyLift not Mr Azima. The claim relates to a joint venture to which HeavyLift (and not Mr Azima) was a party and the Settlement Agreement entailed a payment by RAKIA which was described by the Settlement Agreement as being a payment to HeavyLift (not to Mr Azima).

135.2 The communications which initiated the claim were not sent by Mr Azima and were explicitly made on behalf of HeavyLift, not Mr Azima:

(a) The first communication is a September 2013 letter on HeavyLift letterhead, signed by Mr Adams in his capacity as the CFO of HeavyLift over his HeavyLift email address. It refers to HeavyLift's investment and HeavyLift's conduct during the Joint Venture. That letter also makes clear that the claim was being made in light of the need to wind up HeavyLift's affairs.

(b) The second communication is, again, a letter of July 2015 on HeavyLift letterhead (emailed by Ms Azadeh), signed again by Mr Adams as the former CFO of HeavyLift, describing HeavyLift's investments.

33

(c)   The remaining communications then continued in the same vein.

135.3   Whether Mr Adams and Ms Azadeh were associates of Mr Azima is beside the point. Their communications were on their face sent by and for HeavyLift, for which both those individuals worked.

135.4   Reference to the range of corporate and personal email addresses used does not establish that either individual was acting for Mr Azima. Moreover, Mr Adams also used his HeavyLift email address in the first communication, and his title as HeavyLift's CFO in both of the letters he sent.

135.5   The identity of the parties to the ultimate Settlement Agreement does not bear on the identity of the party on whose behalf the communications were sent. HeavyLift was in any event also a party to the Settlement Agreement.

135.6   Mr Buchanan, with whom the negotiations were conducted, rightly characterised the representations made to him as being by and on behalf of HeavyLift, not Mr Azima.

136.   In my judgment, Mr Azima's contention that the HeavyLift Investment Representation was made by HeavyLift and not by him personally is artificial and lacking in substance.

136.1   It is clear that Mr Azima was the driving force behind the claim for compensation. The communications made by Mr Adams and Ms Azadeh were made with his knowledge, authorisation and approval.

136.2   The Settlement Agreement itself records that the claim that RAK Airways was liable to pay compensation was advanced "through Mr Azima", thereby underscoring Mr Azima's responsibility for the communications made in connection with the compensation claim and reflecting his role as its proponent. The original draft of the Settlement Agreement did not even include HeavyLift as a party since, as Mr Buchanan explained in his evidence, HeavyLift no longer existed, having been struck off the register of Sharjah free zone companies in April 2013.

136.3   Mr Azima's evidence was that HeavyLift ceased operations in 2011 and it was an uncontested fact that HeavyLift was struck off the register of Sharjah free zone companies in April 2013. In a later email dated 29 October 2015, Mr Adams was asked what effect, if any, HeavyLift being non-operational had on the claim. Mr Adams' replied on 5 November 2015 that Mr Azima was entitled to claim compensation under clause 6 of the Joint Venture Agreement on the basis that he was a shareholder, successor or assignee of HeavyLift. This answer is inconsistent with Mr Azima's case that the representation was made by HeavyLift, rather than him.

136.4   Mr Azima had been the sole shareholder of HeavyLift. During his oral evidence Mr Azima emphasised that he and HeavyLift were effectively synonymous for

34

the purposes of dealings with the Training Academy JV, ("It's said by HeavyLift, but I am HeavyLift").

137. I conclude that the HeavyLift Investment Representation was made on behalf of Mr Azima.

### (4)   Was the HeavyLift Investment Representation false?

138. RAKIA's case is that, contrary to Mr Azima's representations to RAKIA in 2015 that the simulator had cost HeavyLift upwards of $1 million, HeavyLift in fact acquired the flight simulator in 2006 for just $167,500 as evidenced by the signed sale agreement with MK Airlines dated 7 August 2006 and the email from amir@HeavyLift.com to Mr Azima dated 10 June 2007 which contained a table stating that the "Cost of DC8 Simulator (MK Airlines)" was "[$]167,500".

139. Mr Azima contends that it would then be necessary for RAKIA also to prove that the out of pocket costs actually incurred by HeavyLift on the simulator and training aids were less than represented.

140. I disagree. The communications regarding the simulator were clearly referring to the cost of the simulator itself, rather than the costs of the simulator plus ancillary services or equipment. In any event, the costs in respect of equipment and services provided in connection with the installation of the flight simulator fail to support a claim that the costs of acquiring and installing the simulator were more than $1.7 million. For example, according to an email sent to Mr Azima on 10 June 2007, in addition to the "Cost of DC8 Simulator (MK Airlines)" of "$167,500.00" HeavyLift had incurred total costs (including the cost of acquiring the simulator) in the sum of $291,788.78. In contrast, according to HeavyLift's preliminary accounts for the year ended 31 December 2007, HeavyLift had spent a total of $725,959 in respect of all simulator freight and storage charges, outside contractors, salaries and benefits, travel and accommodation charges, legal and administrative charges (more than $185,000 of which was charged by HeavyLift itself in respect of its management time), licences and permits, simulator parts and supplies and supervision. On this basis, HeavyLift spent a maximum of $893,459 on the simulator, about half the amount represented to RAKIA.

141. Accordingly, even taking into account the costs of ancillary services and equipment, the total costs incurred in relation to the installation of the flight simulator were nowhere near the amount represented to RAKIA by Mr Azima.

142. Furthermore, it is now common ground that HeavyLift did not make a payment of $450,000 in respect of training aids. There is in fact no evidence that HeavyLift incurred any expenditure on this.

### (5)   Was Mr Azima aware that the HeavyLift Investment Representation was false?

143. Mr Azima must have been aware that the HeavyLift Investment Representation was false. Mr Azima had at all material times been a director of both HeavyLift and RAK-HeavyLift Training Academy FZ-LLC. In his evidence he confirmed that throughout the operation of the Training Academy "Mr Adams…always…sen[t] me a copy of everything". As a result, he knew what expenditure HeavyLift had incurred through its investment in the Training Academy JV. Mr Azima therefore knew that HeavyLift's expenditure on the joint venture was nothing like the amounts represented to RAKIA in 2015 and 2016.

144. Mr Azima knew in particular that the simulator had been purchased by HeavyLift from MK Airlines for just $167,500 and that he had not personally paid anything towards the cost of its acquisition. He therefore knew that the simulator had not cost $1 million to acquire and was aware that the total costs of acquiring, installing and certifying the simulator were nowhere near $1.726 million.

145. Third, Mr Azima knew that the invoices from him in the sum of $1 million for the simulator and $450,000 for the training aids had been backdated and did not reflect actual purchases. It is noteworthy that none of these invoices were supplied to RAKIA during the 2015 negotiations.

## (6) Did RAKIA rely on the HeavyLift Investment Representation?

146. In order to succeed with its claim for misrepresentation, RAKIA must establish that it relied on the relevant representation.

147. RAKIA's case on reliance is as follows:

147.1 It agreed to pay $2.6 million to HeavyLift on the basis that RAKIA had an obligation to compensate Mr Azima and HeavyLift for the amount of money they had spent in contributing to the Training Academy JV.

147.2 As a result of the representations made by and on behalf of Mr Azima, Mr Buchanan believed HeavyLift's financial statements to be true and that it had spent a total of approximately $2.6 million on its contribution to the Training Academy JV. As a result, he formed the view that RAKIA should enter the Settlement Agreement and pay the settlement sum in that amount. Mr Buchanan confirms that, "in making the payment to HeavyLift, RAKIA was seeking to compensate HeavyLift for the amount RAKIA understood had actually been spent on the Training Academy JV".

147.3 RAKIA's reliance on the truth of the information provided by Mr Azima regarding the amount of HeavyLift's investment in the Training Academy JV was also reflected in the contemporaneous correspondence. For example:

(a) In an email to Ms Azadeh dated 14 June 2015, Mr Buchanan explained that, "our understanding of the arrangements for the RAK-HeavyLift Training Academy is limited to information provided by you during yesterday's meeting, including a letter dated 2 September 2013 from Ray

36

Adams to Jim Stewart. None of those involved in the original arrangements remain in RAK, and some of the RAK companies that appear to have been involved have been restructured".

(b) On 9 August 2015, Mr Buchanan sent an email to Ms Azadeh which explained that there were significant "difficulties in identifying and assessing information that might enable us to respond properly to the issues you have raised". Given the difficulty in locating relevant records, Mr Buchanan therefore requested Ms Azadeh to "set out your claims against RAK Airways in greater detail and provide evidence to support those claims".

147.4 Mr Azima's assertions that the inducement requirement is not made out because RAKIA entered into the Settlement Agreement "for purposes unconnected to the settlement of the claim" and because it had reached an "internal evaluation…that Mr Azima was acting against RAKIA, and fraudulently" is incorrect.

147.5 If a misrepresentation is of such a nature that it would be likely to play a part in the decision of a reasonable person to enter into a transaction it will be presumed that it did so unless the representor satisfies the court to the contrary; *Dadourian v Simms* [2009] EWCA Civ 169.

148. Mr Azima denies that RAKIA has established reliance. He submits as follows:

148.1 The evidence at trial established that the decision to enter the Settlement Agreement was taken by the Ruler, not by Mr Buchanan or the board of RAK Dev or the board of RAKIA. Mr Buchanan's evidence established that his function was to make a "recommendation" and the actual power to decide rested with the Ruler. His oral evidence confirmed clearly that entry into the Settlement Agreement was the Ruler's personal decision:

"Q. And it's right, isn't it, that the decision to enter into the settlement agreement was taken on behalf of RAKIA by the Ruler? A. That is correct. Q. It wasn't taken by you, was it? A. That is correct."

148.2 Mr Gerrard's evidence was similarly that the Ruler was the "ultimate authority in RAK" and "if RAKIA was to undertake a course of events that he didn't approve of" it "wouldn't necessarily happen."

148.3 Mr Buchanan also confirmed that he did not know the Ruler's reasons for entering into the Settlement Agreement:

"Q. Thank you. You are not in a position, are you, Mr Buchanan, to give evidence as to what the Ruler may have -- what may have influenced the Ruler into entering into the settlement agreement in March 2016? A. No, I'm not."

148.4 There is no evidence that the Ruler had regard to or relied on the alleged representation by Mr Azima as to the contribution made by HeavyLift into the Training Academy. Nor does the Ruler suggest that he relied on Mr

37

Buchanan's consideration of that alleged representation.

148.5 There is no evidence that the Ruler placed any reliance on the alleged representation that HeavyLift had spent certain amounts on the joint venture. There is no reference to this in the Ruler's witness statement and the letter seeking the Ruler's approval also makes no reference to the alleged representations by Mr Azima as to the amount of HeavyLift's investment in the joint venture.

148.6 Neither RAK Development nor RAKIA itself approved entry into the Settlement Agreement through a decision of the board of either company.

148.7 RAKIA entered the Settlement Agreement for ulterior motives and in bad faith in order to use it to keep Mr Azima onside in its negotiations with Dr Massaad.

**Conclusion on reliance**

149. In order for RAKIA to succeed with its claim for damages for misrepresentation, it must establish a causal link between the representation and the decision to enter the Settlement Agreement. It is not necessary to prove that the misrepresentation was the sole or even predominant cause of the decision to enter the contract but it is necessary to show that misrepresentation contributed to the decision to contract; *Edgington v Fitzmaurice* (1885) 29 Ch D.

150. The evidence establishes that Mr Buchanan relied on the HeavyLift Investment Representation in deciding that RAKIA should enter the Settlement Agreement. The payment of $2.6 million to resolve all claims which Mr Azima or HeavyLift may have against it or any other RAK entity was calculated by him as the amount of HeavyLift's total investment in the Training Academy JV, as represented by Mr Azima. Mr Buchanan was unable independently to verify what, if anything, was properly owing to Mr Azima, "The fact that Mr Azima was willing to stand behind the figures on which he was basing the claim was reassuring". As a result, Mr Buchanan "believed this payment [of $2.6 million] would fully reimburse HeavyLift and Mr Azima for the amount they had put into the Training Academy JV".

151. Mr Buchanan then recommended to the Ruler that RAKIA should enter the Settlement Agreement. It is a reasonable inference, in my judgment, that in deciding to enter the Settlement Agreement the Ruler was acting on the basis of Mr Buchanan's recommendation. The fact that, as stated in his witness statement, the Ruler wished to enter the Settlement Agreement in order to settle the claims brought by Mr Azima and to obtain assurance from him that he had acted in good faith towards RAKIA and RAK does not mean that he was not also acting on the basis of the recommendation.

152. The fact that the Ruler was not personally aware of the HeavyLift Investment Representation does not negate the reliance placed on the representations by RAKIA via Mr Buchanan. If a misrepresentation is made to an agent who relies on it to make a recommendation to the decision-making principal but does not pass the representation on, the principal will nevertheless be entitled to relief for misrepresentation; see *Chitty on Contracts* 33rd Edition, paragraph 7-032; *Brown v InnovatorOne Plc* [2012] EWHC

38

1321 at paragraph 885; *OMV Petrom v Glencore International AG* [2015] EWHC 666 at paragraph 139.

153. For reasons set out below in relation to the hacking claim, I was not persuaded that RAKIA entered into the Settlement Agreement for ulterior motives, negating reliance on the HeavyLift Investment Representation.

154. In short, the evidence establishes that RAKIA did rely on the HeavyLift Investment Representation.

**(7)    Loss**

155. Mr Azima contends that, to the extent that RAKIA's contention of a misrepresentation is upheld, the damages to which it is entitled should be limited to the difference between the costs that the Court finds HeavyLift did incur, and the level of costs that the Court finds were represented as having been incurred.

156. The victim of a fraudulent misrepresentation is entitled to be put in the position it would have been in had the misrepresentation not been made (*Doyle v Olby (Ironmongers) Limited* [1969] 2 QB 158). On this footing, I consider that RAKIA would be entitled to total damages of $2.6 million. This is on the basis that, had Mr Azima not fraudulently misrepresented the total cost of HeavyLift's investment in the Training Academy JV then RAKIA would not have entered into the Settlement Agreement and paid the sum of $2.6 million to Mr Azima in the erroneous belief that this equated to the costs actually incurred by HeavyLift in making that investment. Even assuming in Mr Azima's favour that damages should be calculated on the different basis he contends for, Mr Azima failed to establish what the actual incurred costs were. However, in its closing submissions RAKIA limited its damages claim to what it says it would have been prepared to pay, had the true position with regard to HeavyLift's expenditure been explained and that it would therefore give credit for the sums of $700,000 and $167,000 in respect of that expenditure. On the basis of this concession, the damages payable are $1,733,000 ($2.6 million less $867,000).

**Conclusion on the HeavyLift Misrepresentation Claim**

157. It was submitted on behalf of Mr Azima that RAKIA had failed to adduce cogent evidence commensurate with the seriousness of the allegation of fraudulent misrepresentation and that, in seeking to prove its case, RAKIA should not be permitted to take advantage of deficiencies in documentation as it failed to ensure that the joint venture's records, which were left at the premises of RAK after the termination of the joint venture, were properly maintained.

158. I am satisfied that the evidence relied on by RAKIA in support of its fraud claim is sufficiently cogent and that RAKIA did not take unfair advantage of a failure to maintain the joint venture's records (assuming in Mr Azima's favour that RAKIA was under a duty to so) in advancing the claim.

159. I therefore conclude that Mr Azima is liable to RAKIA in the sum of $1,733,000 by way of damages for fraudulent misrepresentation in respect of the HeavyLift Investment Misrepresentation.

**The Good Faith Misrepresentation Claim**

160. RAKIA submitted as follows.

160.1 By agreeing to Clause 3.2 of the Settlement Agreement Mr Azima represented to RAKIA, in order to induce it to enter into the Settlement Agreement, that he had at all times acted in good faith and with the utmost professional integrity in his dealings with RAKIA or other RAK Entities ("the Good Faith Representation");

160.2 In entering into the Settlement Agreement, and in paying the settlement sum of $2.6 million to HeavyLift, RAKIA expressly relied upon the Good Faith Representation;

160.3 In fact, by reason of Mr Azima's wrongful conduct, the Good Faith Representation was false;

160.4 The Good Faith Representation was made by Mr Azima knowing that it was false;

160.5 As a result of Mr Azima's fraudulent misrepresentation, RAKIA has suffered loss.

161. Mr Azima's response is, in summary, as follows.

161.1 Clause 3.2 of the Settlement Agreement does not constitute a representation;

161.2 The allegations of wrongdoing are denied;

161.3 Mr Azima's conduct was not contrary to the Good Faith Representation;

161.4 RAKIA did not rely on the Good Faith Representation and so did not suffer loss.

162. The Good Faith Misrepresentation Claim therefore gives rise to the following main issues:

162.1 Does Clause 3.2 of the Settlement Agreement constitute a representation?

162.2 Are the allegations of wrongdoing established?

162.3 Was the alleged wrongdoing contrary to the Good Faith Representation?

162.4 Did RAKIA rely on the Good Faith Representation?

40

**(1)     Does Clause 3.2 of the Settlement Agreement constitute a representation?**

163.    Mr Azima denies that Clause 3.2 is a representation. In particular, he contends that:

163.1   Clause 3.2 of the Settlement Agreement "does not use the words "representation", "represents" etc, which would have been used if it had been intended to constitute a representation".

163.2   Clause 3.2 "purports to apply to Mr Azima's and HeavyLift's future actions, yet a person cannot validly or sensibly make a non-contractual representation about matters which have not yet occurred".

164.    I reject this submission. There is no requirement for a factual statement to expressly utilise the terminology of "representation", "represents" etc. in order to constitute a representation for the purposes of the law of misrepresentation. Clause 3.2 of the Settlement Agreement stated that Mr Azima "expressly…warrants and confirms" and that the payment to HeavyLift was made "in reliance on this express warranty and confirmation".

165.    I accept RAKIA's submission that the addition of the words "and confirms" and "and confirmation" after "warrants" and "warranty" makes it clear that in addition to providing a contractual warranty, Mr Azima was also making a representation of fact regarding his past conduct and his current intention with respect to his future conduct. The existence of a representation is also demonstrated by the statement that the payment to HeavyLift "is made in reliance on" the "warranty and confirmation". If there were only a warranty and no representation, then the words "made in reliance on" would make no sense since "reliance" is relevant only to tortious, rather than contractual, liability. The reference to "reliance" suggests that that Mr Azima had made a representation as well as a contractual warranty.

**(2)     Has RAKIA proved the alleged wrongful conduct of Mr Azima?**

166.    The wrongful conduct alleged by RAKIA is that Mr Azima:

166.1   falsely claimed to have introduced the buyers of the Hotel to RAKIA;

166.2   fraudulently procured RAKIA to pay the sum of $1,562,500 in purported consideration for non-existent referral services by Mr Azima in connection with the sale of the Hotel, and fraudulently created a sham Referral Agreement intended to conceal that misappropriation and the payment of a bribe of half a million dollars to Dr Massaad, in connection with the sale of the Hotel;

166.3   entered into a dishonest secret commission arrangement, which would have enabled Mr Azima to obtain an interest in the Hotel worth more than $6 million in exchange for a nominal payment of ten dollars;

166.4   played a central role in a planned media campaign aimed at maliciously

41

denigrating the Ruler and other entities and persons in RAK;

166.5 made and/or failed to correct various fraudulent misrepresentations in the course of negotiations concerning the Proposed ISR JV, which were designed to enable Mr Azima and his associates to misappropriate approximately $20m from RAKIA;

166.6 made fraudulent misrepresentations regarding the total costs that HeavyLift had incurred through its contribution to the Training Academy JV, which were designed to induce RAKIA to pay a far larger amount in respect of those costs than HeavyLift had actually incurred.

167. I have already addressed the sixth allegation. The remaining five allegations are addressed in turn below.

**(a) Did Mr Azima falsely represent to RAKIA that he had introduced the prospective purchasers of the Hotel to RAKIA?**

168. Mr Azima's account in his witness statement of how he came to introduce the Potential Buyers to the Hotel transaction was as follows:

"79. In or around 2010, after Sheikh Saud became ruler of RAK, Dr Massaad told me that the Sheikh was under pressure to liquidate foreign assets and to invest in RAK to improve RAK's economic situation. This was later confirmed to me by Sheikh Saud himself at a subsequent meeting. Dr Massaad asked if I could assist with the sale of a number of overseas assets owned by RAK, including the Sheraton Metachi Palace Hotel in Tbilisi ("the Hotel") and the Poti Free Zone. I understood this to be the implementation of the Sheikh's wishes.

80. I was told the minimum price that would be accepted for the Hotel ($50,000,000) and asked to introduce potential buyers. Dr Massaad said I would receive a 5% commission from the gross sale price plus 50% of any amount in excess of US $50,000,000.

81. 1 had previously met with three individuals (Houshang Hosseinpour, Pourya Nayebi and Amir Farsoodeh) in Istanbul, Turkey in around August 2011 to discuss the possibility of helping them to establish an airline in Georgia. They had approached me to assist in this regard because of my expertise and reputation in the airline industry. However, this venture did not ultimately proceed because terms could not be agreed.

82. Mr Hosseinpour subsequently contacted me in September 2011 and asked if HeavyLift was for sale. It was around this time that he also introduced me to Houshang Farsoodeh, Amir Farsoodeh's brother. Ultimately, Mr Hosseinpour signed a contract to purchase a portion of RAK Trans Holding FZ LLZ's shares in HeavyLift. However, he defaulted on the share sale agreement and the shares were therefore not transferred.

42

83.  After I was asked to help find buyers for the Hotel, I thought of Mr Hosseinpour, Houshang Farsoodeh and Mr Nayebi ("the Potential Buyers") as candidates. I met with Houshang Farsoodeh and Mr Hosseinpour in Dubai (I met with Mr Nayebi later on as he lived in Georgia). I suggested that they consider buying the Hotel as it would allow natural vertical integration with their intended airline business. They confirmed to me that they were interested. We had several follow-up meetings to discuss various aspects of the sale.

84.  I subsequently introduced Mr. Hosseinpour and Houshang Farsoodeh to Dr Massaad in RAK. I then accompanied them on a trip to Tbilisi, Georgia to show them the Hotel and introduce them to various people there, including Gela `ZaZa' Mikadze, the CEO of Ras Al Khaimah Investment Authority Georgia LLC ("RAKIA Georgia"), the company through which RAKIA owned the Hotel. Mr Mikadze showed us the Hotel and provided the Potential Buyers with financial information in relation to it. Mr Hosseinpour, Houshang Farsoodeh and I stayed at the Hotel for two or three days. Mr Nayebi had a home of his own in Georgia, where he stayed during our trip.

85.  After the trip to Georgia, I returned to Dubai with the Potential Buyers. I then went to RAK and met with Dr Massaad. I told Dr Massaad that the Potential Buyers were interested and that I thought that we could move forward with the transaction. He asked me to proceed and said the Sheikh wanted to complete the sale quickly. We also discussed my commission. Dr Massaad said that he would discuss this with the Sheikh and would have his lawyers send me a written agreement.

86.  Dr Massaad suggested that we meet the Potential Buyers the following day for lunch. Accordingly, Mr Hosseinpour and Mr Farsoodeh came to RAK the next day.

87.  We discussed the final details of the sale over lunch and reached a tentative agreement. Dr Massaad then suggested that I take Mr Hosseinpour and Houshang Farsoodeh to see the Sheikh that afternoon at the palace. I then called the Sheikh and he invited us for tea that afternoon. I accompanied Mr Hosseinpour and Houshang Farsoodeh to the palace, where the Sheikh received us warmly and we discussed the proposed terms of the transaction. Sheikh Saud was pleased with the proposed terms of the sale, and he encouraged the parties to move forward with a speedy purchase process. We also discussed other possible transactions, including the sale of the Poti Free Zone. The Sheikh thanked me for my role."

169.  Mr Azima exhibited photographs taken of a meeting in Istanbul, the metadata for which indicates that four of them were taken on 26 August 2011, and one of them on 28 August 2011.

170.  Mr Azima relied on a number of contemporaneous documents which it was submitted supported his case that he had referred the Potential Buyers to RAKIA, in particular

43

the following:

170.1 An email on 2 October 2011 showed that a meeting was convened between Mr Azima (accompanied by a Mr Mahallati) on 3 October 2011 with two of the Potential Buyers. Mr Mahallati then wrote to the third of the Potential Buyers, Mr Nayebi, to report on the meeting between him, Mr Azima and the "two Hs" (which was a reference to the other Potential Buyers, namely Houshang Hosseinpur and Houshang Farsoodeh): "Just wanted to confirm we had a great meeting with the two H's. Based on what we agreed we are moving forward."

170.2 Emails showing that in the days before the Memorandum of Understanding (the "MOU") was signed (which appears to have taken place on 10 October 2011), Mr Azima obtained passenger information from the Potential Buyers and provided it to RAKIA which used it to create a passenger list for the purposes of travelling with Mr Azima and Dr Massaad on one of RAKIA's private jets.

170.3 Emails sent after the MoU was signed in which the Potential Buyers repeatedly wrote to Mr Azima to stress their appreciation for his work and services and to keep him informed of their meetings regarding both the Hotel, and the possible acquisition of an interest in the Poti free zone, owned by RAKIA Georgia: On 19 October 2011, Mr Hosseinpour wrote as follows: "Hi dear farhad. Ru ok? Where are you? Thanks for your management. Tonight me and houshang with our team traveling to Tbilisi. My team will go poti port directly from airport. for visiting. and they have meeting there with raki a group." On 19 October 2011, Mr Hosseinpour wrote again: "Hi dear farhad. Pls try ur best for our team. U r a part of our life. We are like a puzzle. team working. what is the best for us .we will do that. Take care." On 25 November 2011, Mr Hosseinpour wrote: "We will be in Tbilisi next Thursday closing deal 2nd dec.we push sayed also. We need more information. …You will be for ever our big brother. You have more power. conection. experience but we are business men. young. And your student." It was submitted on Mr Azima's behalf that the Potential Buyers would not express their appreciation for Mr Azima's efforts, and describe him in these terms, unless he had assisted in bringing the parties together and brokering the deal.

170.4 Other emails showed the Potential Buyers keeping Mr Azima informed about their contacts with RAKIA. For example, Mr Farsoodeh shared information with Mr Azima about the Hotel's occupancy and room classifications received from the Hotel's auditors and Mr Hosseinpour emailed Mr Azima to provide him with a copy of the cheques made out by them to RAKIA as a down-payment. It was submitted that these communications would make little sense unless the Potential Buyers understood Mr Azima to play an important role in the transaction.

170.5 After the arrangement between Mr Azima and the Potential Buyers fell through, Mr Azima emailed them on 7 December 2011 to wish them success, and referred to the time spent in seeking to close the deal: "I am sorry that I

44

was not able to stay and see the finish line! For the past nearly 3 month we lived and hoped for the day that the contract gets signed and transaction completed." It was submitted that this contemporaneous email confirmed that Mr Azima had been working with the Potential Buyers on the Hotel transaction since September 2011 which was consistent with Mr Azima's evidence that he was in contact with the Potential Buyers regarding the Hotel from September 2011.

170.6 There were also communications from RAKIA's own lawyers at the time which it was said supported the position that Mr Azima had made the referral. On 11 October 2011 (shortly after the MoU was signed), Mr Renwick of Dewey & Leboeuf emailed Mr Al Sadeq of RAKIA: "I will forward to you separate emails relating to (1) BVI counsel's fee estimate; and (ii) a draft referral agreement in respect of the referral to RAKIA of the proposed transaction." And later on the same day "As referred to in my earlier email, please find attached a very simple form of referral agreement which may be useful as a basis for your agreement with the individual responsible for referring the proposed transaction to RAKIA. It is a short form, generic document and may require a little tailoring to suit your precise requirements."

170.7 Mr Azima prepared invoices shortly after these events (in January 2012) which referred to his role in the referral and introduction of the Potential Buyers. These invoices spelled out the work done by Mr Azima in terms, and sought payment of his commission. The invoices were addressed to the attention of Mr Al Sadeq, the deputy CEO of RAKIA, and were also sent to Dr Massaad.

171. Mr Azima submitted as follows:

171.1 He and Mr Adams were integral to the deal from the very beginning. Mr Adams drafted the MoU. He and Mr Adams took on the task of undertaking the steps needed to complete the deal and acted as an interface between the Potential Buyers and RAKIA and RAKIA's lawyers, Dewey & Leboeuf; this was entirely consistent with Mr Azima having made the introduction and being involved in the deal; it was entirely inconsistent with RAKIA's theory that Mr Azima was some kind of interloper seeking to take credit for the deal long after the fact.

171.2 RAKIA's external lawyers would have a file on the transaction and the individual lawyers would also be in a position to explain the way they understood the transaction to have come about and the fact that RAKIA had chosen not to call them or give any such disclosure supports the inference that this evidence would not have supported its case.

171.3 RAKIA had offered no counter-narrative to identify the other person or means by which the Potential Buyers were introduced to RAKIA. This is despite the fact that other individuals on RAKIA's side were also involved in the transaction, beyond Dr Massaad, Mr Al Sadeq and Mr Mikadze, including Sayed Al- Khawaja, an employee of RAKEEN Development, Georgia, and the manager of the Hotel.

172. In support of its case that Mr Azima did not introduce the Potential Buyers, RAKIA relied essentially on the contents of a memorandum dated 1 March 2016 drafted by Mr Adams ("the Adams Memorandum") which reads as follows (emphasis added).

> "Dear Mr. Azima,
>
> As you will recall, during the summer of 2011, we made a number of trips to Poti and Tbilisi, Georgia to explore new business opportunities. We looked at the Port in Poti, the Airport in Poti, the Free Zone in Poti, the Airport in Tbilisi, the Tbilisi Mall, and a number of existing and prospective hotel properties.
>
> Among the hotel properties we reviewed was the Sheraton Metechi Palace (SMP") in Tbilisi. **We were informed that a group of businessmen from Dubai were already negotiating the purchase of the SMP [the Hotel] and were introduced to them**. Mr. Houshang Hosseinpour, who represented the purchasing group, offered you a minority position in the purchasing group and indicated that an offer needed to be made quickly. I instructed our agents to form a BVI company called Eurasia Hotel Holdings Limited for the purposes of making such an offer and the company was organized on the 11th of October, 2011.
>
> You, Mr. Hosseinpour, and Rd. Hater Massaad (who represented the Sellers of the SMP) were to act as initial directors of EHHL. However, before any activities were undertaken by the company, we determined during our due diligence that Mr. Housseinpour, and his partners, fell below our standards for doing business. Accordingly, we terminated our discussions with them and they proceeded to purchase the SMP without your involvement.
>
> During the same time, we had formed a Georgian airline and had negotiated the purchase of an aircraft to start the airline operations. Since we had initially formed EHHL, the directors were changed, and we had the company renamed as Eurasia Aviation Holdings Limited, specifically to hold the aircraft, and the name change was recorded on the 17th of February."

173. RAKIA further relied on:

173.1 the absence of contemporaneous evidence supporting Mr Azima's claim to have introduced the prospective buyers;

173.2 the inherent improbability of Mr Azima's account of his dealings with the Potential Buyers, according to which the Potential Buyers went from a first introduction to the transaction in September 2011 to signing up to the MOU on 8 October 2011; it was more likely that the Potential Buyers had been introduced to the purchase at an earlier stage;

173.3 the evidence of Sheikh Saud who denied that he ever told Dr Massaad or anyone else to play any role in the sale of the Hotel or any other assets owned

46

by any RAK entity.

**Conclusion**

174. Discerning the role of Mr Azima in relation to the intended Hotel transaction is not straightforward. There were no independent witnesses. None of RAKIA's witnesses was in a position to give first-hand evidence of the relevant events apart from the Ruler, who did not attend the trial and whose evidence therefore carries limited weight. RAKIA did not produce any contemporaneous documents relating to the planned sale of the Hotel and the documents relied on by Mr Azima were inconclusive. The photographs and the emails showed that that Mr Azima certainly had meetings with the Potential Buyers and was actively involved in facilitating the possible purchase. But they fall short of establishing that Mr Azima was instrumental in actually introducing the Potential Buyers to the transaction. The fact that RAKIA's lawyers appear to have been under the impression that there was an introduction is also inconclusive as they may have been misinformed.

175. Contrary to RAKIA's case, the short interval between the date of the alleged introduction and the signing of the MoU does not, in my judgment, preclude the possibility that Mr Azima's effected the introduction.

176. In my judgment, however, the Adams Memorandum fatally undermines Mr Azima's case that he introduced the Potential Buyers. The Adams Memorandum was evidently intended to constitute a formal and accurate record of events for likely future use by Mr Azima's lawyers concerning Mr Azima's involvement in the intended sale of the Hotel. The Adams Memorandum was a short document (just four paragraphs running to one page). It was sent to Mr Azima on 1 March 2016. Mr Azima never requested any corrections or changes to be made to the Adams document (as he frequently did in respect of other documents produced by Mr Adams). Mr Adams struck me as a careful draftsman who would not have described the circumstances of Mr Azima's involvement with the Potential Buyers without the instructions and approval of Mr Azima.

177. I do not consider that the explanations for what was, on Mr Azima's case, a glaring error in the Adams Memorandum, namely the time lag between the events in question and the preparation of the memorandum and the irrelevance of the introduction to the purpose for which the memorandum are convincing. In my view, the memorandum is more reliable evidence than the self-serving evidence of Mr Azima and Mr Adams. I therefore conclude that, whilst Mr Azima was involved in the transaction and may well have had some expectation of a fee for his services, he did not effect the introduction of the Potential Purchasers.

**(b)     Was the Referral Agreement a sham?**

178. Mr Azima's case concerning the Referral Agreement and the payment which he contends was made pursuant to the Referral Agreement was, in summary, as follows:

178.1 He initially agreed with Dr Massaad to introduce buyers to the Hotel

47

transaction in return for a commission of 5% from the gross sale price plus 50% of any amount in excess of $50 million;

178.2 After the signing of the MoU, he received a telephone call from the US Embassy in Georgia during which he was "advised that I should not do business with the Potential Buyers [and] told…that the Potential Buyers were not 'clean' and that they were acting as a front for undesirable elements in Iran".

178.3 As a result of this call, Mr Azima became concerned about the Potential Buyers' true intent in establishing a presence in Georgia, and the possible contravention of US sanctions against Iran and accordingly, changed his mind about acquiring an interest in the Hotel and declined to participate further in the transaction.

178.4 A short while later he informed Dr Massaad and the Ruler that he felt that the Potential Buyers had another agenda; he mentioned his concerns about the potential contravention of US sanctions and advised them not to go ahead with the sale.

178.5 Dr Massaad told him after that conversation that the Ruler and Dr Massaad wanted him to step out of the purchase process and accept a 2.5% commission instead of the 5% originally agreed, and to forego his entitlement to 50% of the excess above $50 million.

178.6 On 25 October 2011 he received $400,000 from RAKIA. In January 2012 he received a further $1,162,000 making a total of $1,562,000 which was 2.5% of the purchase price of $62,500,000.

179. It was further submitted on behalf of Mr Azima as follows:

179.1 RAKIA's case concerning the allegedly fraudulent commission agreement should be dismissed *in limine* on the basis that RAKIA failed to challenge Mr Azima in cross examination with regard to the assertion that the Ruler was aware that Mr Azima was to be paid commission and approved him receiving it.

179.2 RAKIA had also failed to put elements of its case to Mr Adams in cross-examination, even though RAKIA's case is that Mr Azima was a party to a conspiracy with Mr Adams, Mr Al Sadeq and Dr Massaad to "obtain from RAKIA substantial payments to which Mr Azima was not entitled". Moreover, RAKIA did not challenge Mr Adams' evidence that the Referral Agreement he created was, "a written version of the agreement that had already been reached in relation to the payment of Mr Azima's commission." His evidence to that effect should therefore be accepted by the Court.

179.3 RAKIA's case that the document was a sham for services that were not actually provided cannot be reconciled with the evidence of Mr Azima's active role in connection with the transaction, the recognition shown to him by the

48

Potential Buyers, the understanding of the external lawyers that a referral had been made and Mr Azima's invoicing for his work at the time.

179.4 There was a clear commercial basis for the payment of a commission to Mr Azima in that the Potential Buyers went on to conclude an agreement with RAKIA and paid a $20 million deposit, which RAKIA retained despite failing to transfer the Hotel to them.

179.5 Mr Azima did not seek to have Dr Massaad (or anyone else on RAKIA's side) sign the Referral Agreement document. It was only signed by Mr Azima. If RAKIA's case of conspiracy was correct, it would be expected that Dr Massaad or Mr Al Sadeq would also have signed the document, purporting to do so on behalf of RAKIA.

179.6 The Referral Agreement was prepared well after Mr Azima had already received the referral fee in full (and long after RAKIA had entered into its advantageous contract with the Potential Buyers). The document was not used to make a claim for any payment. It therefore cannot sensibly be said that Mr Azima created the document in order to procure payment.

179.7 The Referral Agreement included a commission of 5% which was the amount of commission that had in fact been agreed at that stage, as reflected in the invoice initially sent to RAKIA on 11 January 2012. The amount of the commission was then reduced to 2.5%. However, when submitting the document to RAKIA in August 2012, Mr Azima made no suggestion that he was owed the difference. The intention was simply to provide a document summarising the understanding that had been reached in October 2011.

179.8 The emailing of the document to Mr Al Sadeq at his non-work Gmail address is not evidence of impropriety. Mr Adams had already earlier emailed a version of the Referral Agreement (also providing for a 5% commission) to Mr Al Sadeq at his RAKIA email address. This is inconsistent with the case put by RAKIA in cross-examination that Mr Adams "wanted to make sure that this document didn't go into the RAKIA system until it was finalised".

179.9 As Mr Adams and Mr Azima explained, the document was sent to Mr Al Sadeq at his Gmail address because Mr Al Sadeq was at that time (mid-August) on holiday in Europe and so was away from work. Other RAKIA individuals (including Mr Buchanan and Mr Bustami) have also on occasion used private non-RAK/RAKIA email accounts for their work, as well as RAK email accounts at other times.

180. RAKIA contends that the Referral Agreement was a sham. In support of this case it submits as follows:

180.1 The terms of the original Referral Agreement for which Mr Azima contends, namely that in return for introducing potential buyers he would receive a 5% commission from the gross sale price plus 50% of any amount in excess of US $50,000,000, are implausibly generous, given that, on Mr Azima's own case,

49

the Ruler was under pressure to liquidate foreign assets and to invest in RAK to improve RAK's economic situation. Had such an agreement existed, Mr Azima would have been entitled to total commission of $9,375,000 on a sale of the Hotel for $62,500,000.

180.2 The terms of this alleged agreement were not recorded in any written contract. Nor were they referenced in any contemporaneous email or document or referred to anywhere in Mr Azima's pleaded case.

180.3 On Mr Azima's case, he was told to forego that entitlement to more than $9.3 million, and instead to accept a payment of just $1.56 million, despite having fully performed his side of the agreement. Mr Azima claims that he accepted that huge reduction for the sake of his relationship with the Ruler. This case is inherently implausible and unsupported by documentary evidence.

180.4 Mr Azima's evidence concerning his alleged withdrawal from the sale is internally contradictory. If (as Mr Azima claims) he had told Dr Massaad and the Ruler that he was withdrawing from the transaction and urged them not to proceed with the sale, then there would be no reason for Dr Massaad to subsequently tell him to "step out of the purchase process" since by definition Mr Azima had already "stepped out" of the transaction of his own accord and had already informed Dr Massaad and the Ruler about this.

180.5 The contemporaneous documents show that any concern Mr Azima had regarding possible breaches of US sanctions resulted in him attempting to conceal the Iranian nationality of the Potential Buyers, rather than withdrawing from the transaction. For example, the documents show that in October and November 2011 Mr Azima helped Mr Farsoodeh apply for St Kitts citizenship.

180.6 The documents demonstrate that Mr Azima did not withdraw from the Hotel transaction as he claims. On the contrary, he and Mr Adams remained actively involved in the transaction all the way through to (and indeed beyond) the closing of the sale to the Potential Buyers. For example, on 8 December 2011 he signed the Share Purchase Agreement as witness for Merchant Savings and Loan Limited, another company owned by the Potential Buyers.

180.7 On 19 November 2012, Mr Azima sent an email to Mr Stewart, RAKIA's then CEO, in which he stated: "I was requested to assist in sale of certain RAKIA assets in Georgia. Including Sheraton Hotel and Poti Free Zone. However, I was sidelined! Up on signing the SPA contract and my help "no longer was required"". The content of this email is inconsistent with Mr Azima's claim that he withdrew from the transaction of his own accord well before the SPA was signed.

180.8 The process by which the Referral Agreement was drafted was suspicious. That process (which is not disputed) began with Mr Al Sadeq sending an unsigned template "commission agreement" to Mr Azima on 16 November 2011. Almost eight months later on 9 July 2012, Mr Al Sadeq sent an email to

50

Mr Adams requesting a copy of the "master agreement for the commission made against the Sheraton sales". In response Mr Adams emailed an amended version of the template to Mr Azima with various changes including a provision for payment of a "referral fee" of 5% of the gross proceeds of sale of the Hotel, a statement that Mr Azima had referred the Potential Buyers, a statement that RAKIA was liable for Mr Azima's past and future expenses in relation to the sale of the Hotel (including first class air travel and hotel accommodation) and for Mr Adams' business class air travel and hotel accommodation and a $600 daily charge.

180.9 A further amended version was produced by Mr Adams and forwarded with attachments to Mr Al Sadeq's private email address, stating: "as discussed, please note the invoice and the master agreement has been modified…If it is OK, I will send it to your RAK email. Any news on American Bank payment?" On the same day, Mr Adams also sent an amended draft of the template to Mr Al Sadeq's private email address.

180.10 On 15 August 2012, Mr Azima emailed Mr Adams confirming that there were no further changes to the draft of the Referral Agreement and stating, "please send it". Mr Adams replied: "To his RAK email?" A short while later, Mr Adams sent the amended draft to Mr Al Sadeq's private email address stating: "Please advise if I should now send these to your RAK email address?"

180.11 Mr Azima's contention that the Referral Agreement was produced because RAKIA wanted "an executed version of the agreement" which was "to record the terms of the agreement already reached" was untenable. The Referral Agreement did not contain any reference to Eurasia Hotel Holdings Limited (which was the proposed buyer of the Hotel as at 25 October 2011 when the Referral Agreement was allegedly made). The Referral Agreement referred instead to Merchant Savings and Loan Limited as one of the parties introduced by Mr Azima which did not become a proposed buyer until 29 November 2011, more than a month after the date when the Referral Agreement purportedly came into effect.

180.12 The fact that extensive changes were made to the content of the draft Referral Agreement between November 2011 and October 2012 is inconsistent with Mr Azima's claim that the Referral Agreement was merely intended to enshrine in writing an agreement which had already been concluded by the parties in October 2011 and which had been fully consummated by early January 2012. For example, the Referral Agreement provided that RAKIA was liable for Mr Adams' expenses. In cross-examination, Mr Adams conceded that there was no agreement in October 2011 that RAKIA would reimburse his expenses. He also conceded that the expenses which he invoiced RAKIA for in October 2012 pursuant to the backdated Referral Agreement were the same as the expenses he had previously invoiced the Potential Buyers for in December 2011.

180.13 The Referral Agreement stated that Mr Azima was entitled to commission at the rate of 5% of the gross sale price of the Hotel. However even on Mr

Azima's case he was never entitled to commission at this level. The alleged initial agreement was that he would receive 5% of the sale value plus 50% of everything over $50 million, and the later agreement was that he would receive just 2.5% of the sale price. On his evidence, there was no "intermediate" agreement between these two positions.

180.14 The use of Mr Al Sadeq's private Gmail address was not adequately explained by Mr Azima and Mr Adams. Their explanation that Mr Al Sadeq was "travelling with his family" and they "wanted to make sure" that he received the documents was not mentioned in any of the emails. When pressed on how he would have known that Mr Al Sadeq was abroad, Mr Adams claimed (for the first time) that, "I saw him on the boat…Mr Azima's boat". When asked when this alleged undocumented meeting on Mr Azima's boat occurred, he suffered a convenient memory lapse.

180.15 Neither Mr Azima nor Mr Adams sought to explain why, nine months after the agreement was supposedly entered into, there was suddenly such an urgent need for an "executed" copy of that agreement to be produced that it was necessary for them to repeatedly email Mr Al Sadeq about it during his family holiday.

180.16 Mr Adams was also unable credibly to explain why he had sent documents to Mr Al Sadeq's Gmail address together with a message asking: "Please advise if I should now send these to your RAK email address". In particular, it was pointed out to Mr Adams that there was no need for Mr Adams to ask this question, since Mr Al Sadeq was clearly capable of forwarding any documents he received at his Gmail address to his RAK email address. When this was put to Mr Adams, he merely responded: "you can speculate however you want".

180.17 Mr Adams also claimed that he could not recall why he had changed draft invoices to RAKIA by removing references to services provided for the buyers instead inserting a reference to "services requested by K Massaad". In the circumstances, the clear inference is that Mr Adams made these changes in order to give the deliberately false impression that the services he was invoicing RAKIA for (and for which he had previously invoiced the Potential Buyers) were provided at the request of Dr Massaad.

## Conclusion

181. I have concluded that the Referral Agreement did not reflect a genuine agreement with RAKIA and that it was a sham intended to conceal misappropriation of funds by Mr Azima. I reach this conclusion for the following reasons.

181.1 I accept RAKIA's submission that the undocumented agreement with RAKIA alleged by Mr Azima according to which he was to be paid 5% of the gross sale price plus 50% of any amount in excess of US $50,000,000 is implausibly generous. I do not believe that any such agreement was entered into.

52

181.2 I consider that the alleged revised agreement, also undocumented, whereby Mr Azima's commission was to be cut by 50%, even though he had, on his case, performed his side of the bargain, is also wholly implausible and was not in fact entered into.

181.3 For reasons set out elsewhere in this Judgment, I believe that Mr Azima did not effect any introduction of the Potential Buyers and that he was therefore not entitled to any commission. The fact that Mr Azima was actively involved in the sale process is explicable on the basis that he hoped to be rewarded by the Potential Buyers.

181.4 Mr Azima's case that the Referral Agreement enshrined an agreement that had been made in October 2011 is not sustainable. For example, in cross-examination, Mr Adams conceded that there was no agreement in October 2011 that RAKIA would reimburse his expenses. Mr Adams also conceded that the expenses which he invoiced RAKIA for in October 2012 pursuant to the backdated Referral Agreement were the same as the expenses he had previously invoiced the Potential Buyers for in December 2011.

181.5 The way in which the Referral Agreement was drafted was also suspicious. The use of Mr Al Sadeq's private gmail address and the request for permission to use the RAKIA email address indicates that Mr Azima and Mr Adams wanted to conceal the Referral Agreement from RAKIA. I do not accept that there was any plausible explanation for the use of the private gmail address. There is no contemporaneous evidence that Mr Al Sadeq was on holiday. Even if he was, there was no need to ask for permission to use Mr Al Sadeq's usual work address.

181.6 The omission on the part of RAKIA's Counsel to challenge Mr Azima in relation to the alleged agreement of the Ruler to the payment of commission and to put certain elements of RAKIA's case to Mr Adams does not require me to reject that case. It was put to Mr Azima in cross examination that he was not entitled to any commission and that the Referral Agreement was a sham. Mr Adams had the opportunity to respond to RAKIA's case in his witness statement.

(c)     **Was the payment of $500,000 made by Mr Azima to Dr Massaad a bribe?**

182.    The bribery allegation forms part of RAKIA's case that the Referral Agreement was a sham.

183.    It is common ground that on 18 January 2012 (the same day as the payment of $1,162,500 referred to at paragraph 23 above) Mr Azima made a payment of $500,000 to Dr Massaad. RAKIA contends that this payment was a bribe. Mr Azima denies this. He claims the payment was for the attempted acquisition of a 25% interest in an aircraft owned by Dr Massaad.

184.    In support of its case that the payment was a bribe, RAKIA advances the following

53

contentions.

184.1 Contrary to Mr Azima's claims that Dr Massaad had a 50% interest in a Hawker 800A aircraft, the contemporaneous documents show that the Hawker 800A was wholly owned by the Ruler. None of the contemporaneous documents contains any suggestion that Dr Massaad had any legal or beneficial interest in the aircraft. For example:

(a) The UAE General Civil Aviation Authority Certificate of Registration dated 25 March 2005 lists the Ruler as the owner of the aircraft and identifies the sole operator of the aircraft as Dana Executive Jets LLC ("Dana Jets").

(b) A Certificate of Insurance/Reinsurance dated 14 January 2011 (which was sent by Dr Massaad to Mr Azima on 7 March 2012) shows that the Hawker 800A aircraft was insured in favour of the Ruler, Dana Jets, RAK Airways and the Government of RAK. The certificate contains no reference at all to Dr Massaad.

(c) A detailed schedule of Dr Massaad's assets attached to an email from Mr Adams to Mr Azima dated 29 November 2013 contains no reference to Dr Massaad owning any interest in a Hawker 800A aircraft.

184.2 Mr Azima conceded in cross-examination that he does not recall seeing documentation showing that the Ruler was the legal owner of the aircraft, but claims that he "would have assumed that Dr Massaad's 50% interest was a beneficial interest". On Mr Azima's own case therefore, he paid half a million dollars for an interest in an aircraft without knowing the nature of the interest he was acquiring and without having seen any documentary proof of the existence of that interest.

184.3 Mr Azima has adduced no evidence to support his claim that, the hull value of the Hawker 800A was approximately $2,000,000. When asked in cross-examination whether he had taken any steps to have the alleged beneficial interest valued before paying $500,000 to Dr Massaad for it, Mr Azima claimed that: "I took his word for face value". This was implausible.

184.4 There are no documents evidencing any planned or attempted transfer of an interest in a Hawker 800A aircraft from Dr Massaad to Mr Azima. Mr Azima's claim that he paid the purchase price to Dr Massaad in the expectation that the paperwork for the sale would be dealt with "later on" is both inherently implausible and inconsistent with how Mr Azima conducted his aviation business.

184.5 The Hawker 800A was included as a "company asset" in a "Sale of Company Agreement" between Dana Executive Air and Captain Joachim Bergunde under which Dana Jets was to be sold for a total price of $50 million The "Sale of Company Agreement" was apparently signed by Dr Massaad on behalf of Dana Executive Air on 15 December 2011 and by Capt. Bergunde on 17 December

2011, more than a month before Mr Azima made the payment of $500,000 to Dr Massaad. It is unlikely that Dr Massaad would have entered an agreement with Mr Azima to sell a share in an aircraft in circumstances where he was aware that the aircraft was likely to be sold to a third party as part of a sale of Dana Jets.

184.6 Five days after Mr Azima paid the $500,000 to Dr Massaad, he sent an email to Dr Massaad discussing arrangements for a lease of that aircraft. The email did not contain any reference to Mr Azima owning a share of the aircraft as would be expected if he had become a 25% owner less than a week earlier.

184.7 Two days later, Mr Adams emailed Mr Azima stating that: "He said he can't firmly commit before next week as they are selling Dana and the Hawker is supposed to be part of the sale". As to this:

(1) Mr Azima was unable to provide a credible explanation of why he would be seeking to negotiate a lease in respect of an aircraft of which he had just become a joint owner.

(2) Neither Mr Azima nor Mr Adams expressed any surprise or concern upon learning that an aircraft of which (on their case) Mr Azima had bought a quarter share was about to be sold to a third party.

184.8 The timing of the payment to Dr Massaad, on the same day that $1,162,500 was paid by RAKIA to Mr Azima, strongly suggests that the payment to Dr Massaad was linked to that payment to Mr Azima, rather than an entirely unrelated (and undocumented) aircraft transaction.

184.9 In late February 2012 Eurasia Aviation Holdings Limited ("Eurasia Aviation") signed an agreement to purchase a Hawker 400XP aircraft for $1.625 million. A total of $750,000 of the purchase price was to be paid by Mr Azima and Dr Massaad (who each owned 50% of the shares in Eurasia Aviation) while the remainder was funded by way of a bank loan. According to Mr Azima, by this date Dr Massaad was obliged to reimburse the $500,000 that Mr Azima had paid to him on 18 January 2012. In those circumstances, it was to be expected that Dr Massaad would pay Mr Azima's $375,000 share of the Hawker 400XP purchase price in partial discharge of the $500,000 debt he owed to Mr Azima. However that is not what happened. Instead, Mr Azima and Dr Massaad each paid $375,000 in cash towards the purchase of the Hawker 400XP. Mr Azima and Mr Adams were unable to provide a convincing explanation for this anomaly.

184.10 Mr Azima claims that, "Soon after, on or around 30 November 2012, Dr Massaad repaid me the $500,000". However, the bank records show that Dr Massaad made two payments totalling a different amount, approximately $575,000, on 30 November and 3 December 2012.

184.11 These payments relate to a share purchase agreement ("SPA") dated 5 November 2012 whereby Mr Azima agreed to sell a 40% shareholding in

55

Eurasia Aviation to Dr Massaad for total consideration of $525,000. Accordingly, rather than reimbursing the payment made by Mr Azima on 18 January 2012, the payments by Dr Massaad in late November and early December were for the purpose of acquiring an entirely different shareholding from Mr Azima.

184.12 Mr Azima denies that the payment of $575,000 related to the SPA on the basis that the payments were not made to the payee account specified in in the SPA. However, that explanation ignores the fact that, as evidenced by the contemporaneous email correspondence, Dr Massaad attempted unsuccessfully to make a payment of $450,000 pursuant to the SPA to the specified account after which he made a replacement payment of that amount to Mr Azima's personal account, followed by a payment of a further $125,000 to the same account a few days later. It follows that the payment of $450,000 (and, logically, the payment of $125,000 made by Dr Massaad to the same account several days later) were made pursuant to the SPA between Mr Azima and Dr Massaad. In other words, those payments did not "reimburse" Mr Azima anything. Rather, they were made in exchange for Mr Azima's shares in Eurasia Aviation.

184.13 It is common ground that in early 2012 Eurasia purchased a Hawker 400XP for approximately $1.63 million. The Eurasia cash flow spreadsheet shows that as at January 2013, Dr Massaad had paid a total of $1,100,866 into Eurasia Aviation. In addition, according to a letter dated 21 January 2020 from Mr Azima's solicitors, between April 2013 and April 2014, Dr Massaad made payments totalling approximately $530,000 to Eurasia Aviation. It follows that by April 2014 (1) Dr Massaad had paid a total of approximately $1.63m into Eurasia Aviation; (2) Eurasia Aviation owned a Hawker 400XP aircraft worth approximately $1.63 million; and (3) Dr Massaad owned all of the shares in Eurasia Aviation. Accordingly, those payments did not have the effect of reimbursing Mr Azima the sum of $500,000.

185. Mr Azima contends that RAKIA's case is flawed for the following main reasons.

185.1 RAKIA's case rests on the premise that Mr Azima had no legitimate basis to receive the referral fee whereas Mr Azima was entitled to a fee as payment for his introduction of the Potential Buyers.

185.2 RAKIA's case presupposes that Mr Azima paid a bribe after the amount of his commission had been halved and to the very person who reduced the commission, which is not credible.

185.3 In any event, the funds paid to Dr Massaad were not a bribe at all, but rather a payment made towards the acquisition of a share in an aircraft. The money was later repaid after that transaction did not proceed and Mr Azima and Dr Massaad purchased a different aircraft.

185.4 The contemporaneous correspondence shows that in 2011 Mr Azima had been undertaking a search for executive jets, including Hawker aircraft.

56

185.5 Mr Azima was considering acquiring an interest in a Hawker 800A operated by Dana Jets in which he understood Dr Massaad to have an interest. He agreed with Dr Massaad to acquire half of Dr Massaad's 50% share, for $500,000, since this was 25% of the hull value of $2,000,000. In parallel, Mr Azima and Mr Adams prepared proposals for the aircraft to be leased to Mr Azima's executive charter airline in Georgia. The purpose of the proposed purchase and lease arrangements was to allow the aircraft to be operated in Georgia.

185.6 Mr Azima recorded the $500,000 payment against Dr Massaad's name in a list (of 28 January 2012) of payments made and received. It would be odd for a person who had paid a bribe to record it in that way.

185.7 Ultimately, the proposals for purchasing the Hawker 800A were not pursued as RAKIA found a buyer interested in purchasing Dana outright. Mr Adams advised Mr Azima on 25 January 2012: "Dear Farhad, Had a very good meeting. He said he can't firmly commit before next week as they are selling Dana and the Hawker is supposed to be part [sic] of the sale."

185.8 As a result, he and Dr Massaad instead acquired a Hawker 400XP. The aircraft was to be held by Eurasia Aviation of which Mr Azima would be the sole shareholder. It was subsequently decided that the shares in Eurasia Aviation were to be allocated 50/50 between Mr Azima and Dr Massaad so Mr Adams shared the specifications for the aircraft with Dr Massaad: "Dear Dr. Massaad, Farhad asked that I forward the attached regarding the Hawker 400: Draft purchase contract, specs, and photos of the Hawker 400 aircraft. The aircraft will be purchased by the BVI company and Farhad has already made the down payment."

185.9 A contract for purchase of the Hawker 400XP by Eurasia Aviation for a price of $1,625,000 was signed on 23 February 2012 and the purchase completed in April 2012. Ultimately, the $500,000 paid by Mr Azima to Dr Massaad was repaid as a result of these transactions. A total of $575,000 was paid by Dr Massaad to Mr Azima in November 2012. That figure is the sum of the $500,000 advanced to Dr Massaad in January 2012 and a further $75,000, to balance out the contributions that had been made towards the purchase of the Hawker 400XP by Dr Massaad and Mr Azima. As an email exchange between them in October 2012 set out, Mr Azima had contributed $150,000 more towards the purchase than Dr Massaad had done. Dr Massaad's payment of $75,000 to Mr Azima therefore left the position square between them.

185.10 Mr Adams explained that various payments were made by Dr Massaad to Mr Azima over this period, for different purposes. There were, as he put it, funds in three buckets, or "pockets" that were owed by Dr Massaad: $375,000 for his share in the Hawker 400XP; $500,000 for the return of the money that was put on the Hawker 800A; and $525,000 pursuant to the SPA. These three amounts were paid appropriately.

185.11 RAKIA's case that the payments made by Dr Massaad, totalling $1.63m,

represented the cost of the Hawker 400XP Aircraft acquired by Eurasia of which he was the sole shareholder, and did not entail any reimbursement to Mr Azima the sum of $500,000, is misconceived since it ignores the fact that the purchase of the Hawker 400XP (which was purchased for $1.625 million) had been funded by a loan of $1,000,000. As at 31 July 2012, the amount outstanding was recorded as around $1.101 million. RAKIA's theory that Dr Massaad's payments to Mr Azima were made in order to acquire 90% ownership of the aircraft therefore makes no sense. Mr Azima only owned half of a minority of the equity in the aircraft; if RAKIA's theory were right, the payments made to Mr Azima would result in him being grossly overpaid and Dr Massaad being left out of pocket.

185.12 Thus, RAKIA's late attempt to rebut Mr Azima's evidence that the $500,000 payment was legitimate and was repaid in any event is simply confused and should be rejected.

**Conclusion**

186. RAKIA's case that the payment of the $500,000 was a bribe paid to Dr Massaad rests essentially on the inference to be drawn from the fact that the payment was made on the date Mr Azima received a fee authorised by Dr Massaad to which he had no entitlement and the absence of any convincing alternative explanation for the payment.

187. In my judgment, the explanation put forward by Mr Azima that the payment was in exchange for a 25% interest in the Hawker 800A aircraft does not stand up to scrutiny in the absence of any documentary evidence showing that Dr Massaad had any interest in the aircraft or documentary evidence of the proposed purchase transaction.

188. The reasons for the various payments subsequently made by Dr Massaad to Mr Azima are unclear. Dr Massaad at no stage made a repayment of the sum of $500,000. He made a payment of $575,000 in November 2012 but again there is no documentary evidence to link this payment with the $500,000 paid by Mr Azima some ten months earlier. On the other hand, RAKIA's attempt to explain the various payments made by Dr Massaad as referable to the acquisition of the Hawk 400XP breaks down because it fails to account for the loan finance of $1 million, as submitted by Mr Azima.

189. The lack of any clear explanation for the subsequent payments made by Dr Massaad does not, however, displace the inference to be drawn from the unexplained payment of $500,000 by Mr Azima which I conclude was a bribe.

**(c)  Did Mr Azima wrongfully fail to disclose to RAKIA an intended interest in the Hotel?**

190. RAKIA's case is as follows:

190.1 Prior to entering into the purported Referral Agreement, Mr Azima had reached an agreement with Mr Hosseinpour that, upon completion of the sale

58

of the Hotel to Eurasia Hotel Holdings Limited he would receive a 10% interest in the Hotel in exchange for a nominal payment of $10 (the "Transfer Agreement").

190.2 If (contrary to RAKIA's primary case) the Referral Agreement was not, in fact, a sham document, but rather (as Mr Azima alleges) a valid agreement, then Mr Azima's actions in entering the Transfer Agreement, and the assistance that he provided to the Potential Buyers, breached Mr Azima's obligations under the Referral Agreement, in particular the obligations of loyalty owed by Mr Azima as RAKIA's agent, reflected in Clause 1, which provided as follows:

"DUTIES OF AZIMA AZIMA warrants that he has: (a) provided to RAKIA all relevant information to date in his possession which relates to the Hotel Transaction…; and (b) acted in good faith and with the utmost professional integrity and in the best interests of RAKIA in any transaction with third parties relating to the Hotel Transaction…".

190.3 Mr Azima's conduct in relation to the Transfer Agreement was inconsistent with that duty. In particular,

(a) the existence of the Transfer Agreement was clearly "relevant information" which relates to the Hotel Transaction which Mr Azima should have disclosed;

(b) by entering into the "Transfer Agreement", Mr Azima deliberately put himself in a position where he was likely to profit significantly from the sale of the Hotel despite owing a fiduciary duty to RAKIA in respect of that sale. He therefore knowingly breached his fiduciary duty to RAKIA under Clause 1 of the Referral Agreement.

190.4 Mr Azima claims that the Ruler knew and approved of the proposal that Mr Azima would acquire a 10% interest in the Hotel. This claim is not corroborated by any documentary evidence and is directly contradicted by the Ruler's witness evidence.

190.5 Mr Azima's claim that Dr Massaad and Gela Mikadze (CEO of RAK Georgia) also knew and approved of his intended 10% interest in the Hotel is similarly unsupported by any documentary evidence. In any event, since both Dr Massaad and Mr Mikadze were engaged in an unlawful conspiracy to defraud RAKIA, even if they knew and approved of this arrangement, their knowledge and approval would not be imputable to RAKIA.

191. Mr Azima's response is, in summary, as follows:

191.1 RAKIA contends that the Transfer Agreement document referring to the 10% share provides only for the payment of nominal consideration whereas it refers to the payment of "other good and valuable

59

consideration". The $10 simply represented an intended contribution to the company's formation capital of $100. If the sale had gone ahead, all shareholders would have made further contributions proportionate to their shareholding and the final, total purchase price. RAKIA did not challenge Mr Azima's position on this point.

191.2  Contemporaneous documents show that Mr Azima's proposed interest was known by various officials at RAKIA (including but not limited to Mr Mikadze, Dr Massaad, and Mr Khawaja), RAKIA's external lawyers and third parties.

**Conclusion**

192.  Given my finding that the Referral Agreement was not a genuine agreement, the question of whether Mr Azima's conduct was in breach of that agreement does not arise.

193.  Had the Referral Agreement been genuine, it would have been necessary to determine whether Mr Azima had provided to RAKIA all relevant information relating to the terms on which he was to acquire an interest in Eurasia Hotel Holdings Limited and acted in good faith and with the utmost professional integrity and in the best interests of RAKIA in any transaction with third parties relating to the Hotel transaction.

194.  The unsigned Transfer Agreement indicates that it was envisaged by Mr Azima and the Potential Buyers that he would acquire a 10% interest in Eurasia Hotel Holdings Limited in return for a nominal payment of $10 together with "other good and valuable consideration". It is unclear what that additional consideration means although emails between Mr Azima and Mr Hosseinpour on 25 November 2011 indicate that the consideration would be funded as to half by cash and half by finance from the other Potential Buyers.

195.  Mr Azima referred to email correspondence with RAKIA's in-house and external counsel in which it was recognised that Mr Azima was to be a principal on the buyers' side. However, there is no evidence of any express disclosure of his intended 10% stake in Eurasia Hotel Holdings Limited or of the terms on which that stake would be acquired. In the absence of documentary evidence, I do not accept Mr Azima's evidence that the Ruler knew and approved of the proposal that Mr Azima would acquire a 10% interest in the Hotel.

196.  In short, if I had found that the Referral Agreement was a genuine agreement, I would have concluded that the failure by Mr Azima to give full disclosure to RAKIA of his intended interest in the Hotel was in breach of Clause 1 of the Referral Agreement.

**(d)    Did Mr Azima orchestrate a malicious campaing to damage the reputation, standing and internal stability of the Governmetn of RAK?**

197.    RAKIA's pleaded case is that Mr Azima played a central role in "instigating and coordinating a wide-ranging media and public relations campaign which sought to denigrate the reputation of the Ruler and the governing authorities in RAK, including by deceiving institutions and companies in RAK into entering commercial transactions and entities with individuals involved in serious criminality."

198.    The alleged misconduct was then said in RAKIA's response to a Part 18 request to have the following aspects:

198.1    the planning and implementation, in 2014 and 2015, of "Project Clay", a coordinated programme designed to frustrate RAKIA's attempts to pursue legal remedies against Dr Massaad by procuring and promoting the widespread publication of damaging false stories in the international media;

198.2    the procuring of the publication of such stories, alleging that individuals were being unlawfully detained in a "Dungeon" operated by the Ruler of RAK and RAKIA's lawyers (Dechert LLP) and that the Ruler of RAK had improperly abdicated judicial, prosecutorial and governmental functions to unlicensed UK lawyers, who were overseeing the operation of a secret prison in RAK; and

198.3    the preparation and, it is to be inferred, implementation of the "Security Assessment" (which is explained further below).

199.    Mr Azima submitted that the "campaign claim" is hopeless for, amongst others, the following reasons:

199.1    RAKIA failed to prove the falsity of the stories that were said to have been procured and promoted by Mr Azima;

199.2    There was no evidence of any media stories having been published;

199.3    The Security Assessment was not implemented and it was not procured by Mr Azima.

200.    RAKIA's case therefore gives rise to the following issues:

200.1    Has RAKIA established that the stories that were allegedly planned and promoted by Mr Azima were false?

200.2    What was Mr Azima's role in relation to the Security Assessment and was it implemented?

61

**Were the stories false?**

201.  Mr Azima submits that:

    201.1  RAKIA failed to adduce any evidence in its witness statements that the stories said to have been procured and promoted by Mr Azima were in fact false;

    201.2  RAKIA attempted to fill this gap through a series of leading questions to Mr Gerrard in re-examination in which Mr Gerrard denied that he had been involved in illegal detentions in RAK or had taken on prosecutorial or judicial roles. Mr Gerrard's answers, elucidated in this way at the end of his evidence, were simply not a sufficient basis for this Court to find that the "falsity" of any alleged media stories is established.

    201.3  This is particularly so in circumstances where there was evidence showing that concern at detentions in RAK was well-founded, and there was also evidence of Mr Gerrard's and/or Dechert's role in those detentions giving rise to legitimate concerns. It was incumbent on RAKIA to address these issues with evidence, which it has not even attempted to do.

    201.4  Mr Azima referred to a November 2014 Amnesty International report referring to several cases in which individuals had in fact been detained for long periods in the Ruler's palace or in other undisclosed locations. None of RAKIA's witnesses were in a position to refute its findings.

    201.5  Reports had been provided to Mr Azima about Mr Gerrard conducting (on behalf of the Ruler and/or RAKIA) highly aggressive and unlawful interrogations of prisoners including Mr Al Sadeq; and aggressively threatening Mr Al Sadeq's wife and threatening one of RAKIA's opponents (Mr Izadpanah) with prison unless he agreed to pay $7.5 million to RAK, and offering clemency in exchange.

    201.6  Under cross-examination, Mr Gerrard accepted that he had in fact interviewed Mr Al Sadeq and other individuals while in prison in RAK. He also admitted investigating and interviewing Mr Izadpanah in RAK.

    201.7  If RAKIA was to sustain its case that complaints about these practices in RAK were false, disclosure should have been given of these incidents including of the records of interview that Mr Gerrard said would exist. This is particularly so given that Mr Gerrard's own account of Mr Al Sadeq's interview in detention itself raised concerns. Mr Gerrard claimed that the interview had been conducted strictly pursuant to the standards in the Police and Criminal Evidence Act 1984 although it became clear in Mr Gerrard's evidence that this was not true. No audio recording of the interview was made and he was unsure whether a record of the interview had been provided to Mr Al Sadeq's lawyers. Mr Al Sadeq was detained in RAK without charge for at least a year. Mr Gerrard accepted that he interviewed Mr Al Sadeq at some point during that detention, before he was charged.

201.8 Mr Gerrard saw no problem with an individual being detained for a prolonged period without charge and being interrogated in that period: "They have a process. It is not like ours -- many parts of it are -- and he agreed to talk to us whilst he was detained. We followed the process of PACE when we met him." As noted, the claim that PACE was followed was not correct, on Mr Gerrard's own evidence.

**Conclusion**

202. In order to make good its case that Mr Azima procured and promoted false stories in the media, it was incumbent on RAKIA to establish that the stories which it was intended to publish about human rights violations were untrue. It has not done so. It appears that Project Clay intended to draw attention to actual cases of detention and illegality, not fabricated cases. The 2014 Amnesty International Report indicates that there were real grounds for concern about detention procedures in RAK. None of RAKIA's witnesses were in a position to refute the findings in that report.

**Mr Azima's role in relation to the Security Assessment**

203. The facts relating to the Security Assessment as they appear from the documents before the Court were as follows:

203.1 In late 2014 Mr Azima was engaged by Mr Kirby Behre, a lawyer at Miller & Chevalier, lawyers who acted for Dr Massaad (and later Mr Azima) to act as a consultant to assist with a PR campaign involving the investigation of human rights abuses in RAK for the benefit of Dr Massaad who had fled RAK and was in dispute with RAKIA and the government of RAK.

203.2 Mr Azima introduced former CIA operative Scott Modell to Dr Massaad and Miller & Chevalier and commissioned him to produce the Security Assessment and was responsible for arranging Mr Modell's remuneration for producing it.

203.3 The Security Assessment consisted of a review of the security issues affecting Dr Massaad including a detailed series of "Recommendations" which included "aggressive tools" and "offensive media operations" to "display the critical weak points of the RAK", using media teams to "denigrate the reputation of Sheikh Saud and the RAK as a place of doing business", and a campaign going beyond negative stories and including: "Organized protests and other forms of manufactured dissent, sustained over an extended period of time".

203.4 The Security Assessment also included a recommendation for "orchestrating business deals in RAK with disreputable individuals from other parts of the world" setting out how the RAK Government, the ruling family and RAK-owned banks and businesses could be deceptively lured into entering

63

transactions with serious criminals (including "Latin American drug cartel figures") and deliberately exposed to "Scams, fraud and deceptive partnerships", with the aim of causing the RAK authorities and, in particular, Crown Prince Mohammad to lose large sums of money and of leading to exposure which would serve as a lasting source of shame.

204. Mr Azima accepted in cross-examination that he made comments on this document. In his witness statement, Mr Azima described the portion of the Security Assessment report that appeared to be a proposal for future work as "naïve and ill-conceived". There is no evidence that he criticised the assessment at the time it was being prepared. In cross-examination he also claimed (for the first time) that he told Mr Modell to "take…out" all the suggestions of illegal and deceptive activity from the Security Assessment. There is no indication in the contemporaneous correspondence that he gave any such instruction. He sent the final version of the report – including what he now claims is objectionable material – to Mr Behre for use by Dr Massaad.

205. Mr Azima sought to justify his involvement in these matters on the basis that Mr Modell was retained to "investigate allegations of RAK's substantial human rights abuses which Dr Massaad was concerned about, particularly absentee trials which he wanted to avoid happening to him". This description of Mr Modell's work is not borne out by the Security Assessment which did not propose an investigation into human rights abuses but advocated a media campaign highlighting the absence of fundamental legal rights in RAK as a means of embarrassing the RAK authorities and compelling the UAE authorities "to rein in RAK aggression against the Client."

206. There is moreover no evidence that Mr Azima actually carried out any investigation into human rights abuses. Although he claims to have spoken to Mr Al Sadeq when he was in prison and to his wife, Mr Azima does not claim to have investigated whether Mr Al Sadeq's claims were true or to have commissioned anyone else to do so.

207. When the allegation of involvement in the campaign was added to the Particulars of Claim by amendment in July 2018 Mr Azima did not seek to defend his role on the basis that he was "investigating human rights" but, rather, denied that he had "any role" in such a campaign.

208. Mr Azima also engaged in discussions with Mr Modell about using other possible "high risk, high impact" tactics against the "enemy" including possible "Black Bag" methods. Mr Azima admitted during cross-examination that this was a reference to the use of "Illegal operation[s]".

209. Mr Azima's evidence, which I accept, was that the media campaign proposed in the Security Assessment was never put into effect and that no adverse publicity resulted from it. RAKIA has not attempted to prove that there actually was any media campaign or stories (false or otherwise) in the media at all. As Mr Azima said in cross-examination:

64

"A. That was not my intent. Nothing happened. There's -- no propaganda was made; no article was written to the best of my knowledge. Nothing happened. The campaign never got started."

210.   In summary, Mr Azima oversaw the commissioning of and payment for the Security Assessment report drafted by Mr Modell which included a plan for drawing attention to human rights' abuses in RAK as a means of inflicting significant financial and reputational damage against various RAK institutions and companies. Mr Azima provided comments on the Security Assessment but did not object to any of the proposals which it contained. The Security Assessment was not in the event implemented.

**(d)   Did Mr Azima make representations relating to the Proposed ISR JV?**

211.   In late 2015 and early 2016 RAKIA engaged in discussions with Mr Azima and other individuals with whom he was collaborating regarding a proposed joint venture for the provision of ISR services. The proposed partners for the proposed ISR were RAKIA and Global Defence Services Corporation ("GDS"). GDS was specifically formed for the purpose of the Proposed ISR JV. Mr Azima was a major shareholder and director of GDS which operated from the same office address in Kansas City as Mr Azima's company ALG Transportation.

212.   RAKIA alleges that Mr Azima was aware that the joint venture proposal submitted by GDS to RAKIA grossly overstated the value of the aircraft that would be acquired by the joint venture SPV, and that, if RAKIA had participated in the joint venture on the terms proposed by Mr Azima, it would have contributed approximately $20 million more than would have been fair to acquire its interest in the joint venture. It alleges that during the course of the discussions and negotiations concerning the Proposed ISR JV in late 2015 and early 2016 Mr Azima made five deliberate false representations to RAKIA and failed to correct other false representations made by the individuals with whom he was collaborating.

213.   Mr Azima submits that:

213.1  RAKIA's case in respect of the Proposed ISR JV serves only to highlight the "highly artificial" nature of its claims overall and to provide confirmation of the vendetta pursued by RAKIA to vex Mr Azima and damage his reputation.

213.2  RAKIA's case that Mr Azima had sought to deceive was implausible given that any deception would have come to light at the stage of the due diligence stage performed by RAKIA's experienced advisers who included KPMG and Air Vice Marshall Hobart;

213.3  Mr Azima was happy to deal with RAKIA's experienced counsel;

213.4 Mr Azima's side comprised experienced ex-military officers including Major General John Holmes. RAKIA's case would necessarily be that those individuals were also party to the alleged dishonesty which was inherently unlikely.

## (1) Alleged misrepresentations as to the value of the aircraft

214. RAKIA's case is that Mr Azima misrepresented the value of the aircraft that were to be acquired by the Proposed ISR JV knowing that the valuation was substantially misleading.

215. The facts are as follows:

215.1 On 28 December 2015, Mr Azima sent an email to Mr Buchanan which attached the written proposal "for the formation of a Joint Venture Company in the Middle East for commercial ISR and defence related services". The proposal was drafted by Mr Adams, reviewed by Mr Azima and circulated by Mr Azima to the participants on the GDS side before being sent to Mr Buchanan.

215.2 The written proposal stated that the proposed joint venture vehicle would acquire two King Air and two Falcon aircraft from GDS for a total of $52,665,252. On that basis, it proposed that RAKIA should "pay GDS US $21,066,100 for 40.00% of the two (2) King Air ISR Assets and the two (2) Falcon ISR Assets."

215.3 The written proposal described the proposed joint venture as follows:

(a) A special purpose vehicle would be formed, to be called GDS Middle East, and to be held, as to 60% by GDS, and as to 40% by RAKIA.

(b) The assets to be placed into the SPV by GDS would include two King Air aircraft valued for the purposes of the proposal at $17 million each, and two Falcon aircraft valued for the purposes of the proposal at $9,332,626 each, giving the assets of the Proposed ISR JV a total value of $52,665,252.

(c) For its 40% stake in the proposed joint venture, RAKIA would contribute the sum of $21,066,100, being 40% of the purported value of the aircraft to be acquired.

(d) In addition, RAKIA would contribute working capital of $2 million, being 40% of the working capital purportedly required by the joint venture.

(e) Following payment of the said sums, GDS would transfer the aircraft to the SPV free of liens and encumbrances.

66

216. Attached to the written proposals were detailed technical specifications for the King Air ISR aircraft and Falcon aircraft. Those specifications showed that all four aircraft were already equipped with ISR technology and systems. The specifications also stated that the "Price/Unit Cost" of each of the King Air aircraft was "$17 million (aircraft + communications equipment modifications)" and that the "Original Unit Acquisition Cost" and "Total Acquisition Cost" of each of the two Falcon aircraft was $9,332,626.

217. RAKIA's case is that these references to the "Price/Unit Cost" and "Acquisition Cost" were unambiguous statements concerning the amount that GDS would actually pay to acquire the aircraft, and not (as Mr Azima asserted in his oral evidence) "budgetary number, generic numbers". RAKIA alleges that the true value of the aircraft was in fact just $6m. It relies on various documents not shown to RAKIA at the time, for example:

    217.1 On 9 October 2015, Mr Lepper sent an email to Mr Azima which stated: "F, just spoke with AGD systems. Here is what we can do: If AGD stays in the sale and operating deal with us at 50/50 profit share he will sell us the aircrafts at his cost… The Falcon and the King airs are around 1.5M…"

    217.2 A draft "Letter of Intent" from Mr Lepper dated 8 January 2016 stated in respect of the two King Air aircraft that: "Buyer will purchase the Aircraft as is, where is" for One Million Five Hundred Thousand U.S. Dollars ($1,500,000 USD) each, hereafter the "Purchase Price" for a total Purchase Price of Three Million U.S. dollars ($3,000,000) USD."

    217.3 On 21 January 2016, Mr Lepper sent an email to Mr Azima and Mr Adams which stated (amongst other things) that: "I have just sent the email out confirming that the 4 ISR aircraft were secured (and can prove ownership) …I had to personally sign 4 promissory notes for 1.5M for each aircraft for a 6 month control period."

    217.4 On 14 February 2016, Mr Lepper sent an email to Mr Azima and Mr Jacobs (copying Mr Adams) stating (amongst other things) that: "We all agree that all four aircraft will be a part of the GDS package 2 ISR king airs and 2 ISR falcons at 1.5 each, not just the two king airs… Each aircraft will be bought at $1.5m each. Total 6M".

218. Accordingly, rather than being worth a total of $52.6 million, the four King Air and Falcon aircraft were in fact worth a total of just $6 million – about a tenth of what was represented by Mr Azima to RAKIA in the written proposal. At no point during the negotiations did Mr Azima disclose to RAKIA that GDS was planning to acquire the aircraft for just $6 million.

219. Mr Azima contends, in summary as follows.

219.1 RAKIA's case on the December proposal has been presented in different (and contradictory) ways in its pleadings and witness statements, at different stages alleging a misrepresentation as to the cost of the aircraft to be provided, and at others as to their value. RAKIA's skeleton argument now indicates that the case it pursues is that a misrepresentation was made as to the value of the aircraft. RAKIA's case is therefore that Mr Azima made a false representation that the aircraft the subject of the proposal were "worth more than $52.6m".

219.2 The December proposal provided an estimated value of a fully equipped ISR project, which comprises not simply the aircraft but an array of highly sophisticated and expensive military equipment, operated by a trained crew, with official authorisation. The value of a fully equipped aircraft is not comparable to the acquisition cost of aircraft without any ISR equipment, crew or authorisations.

219.3 The December proposal also made clear that the contribution from GDS's side was not simply the aircraft, but rather a fully operational ISR service: "Operational Business Plan. GDS Middle East will offer all four (4) ISR Aircraft (2 x King Air and 2 x Falcons as part of a fully managed operational and manned ISR service (including flight personnel, engineering staff, and ISR expertise, both on the aircraft and on the ground)".

219.4 Mr Azima's evidence was that the figures indicated in the December proposal were simply indicative. Moreover, as Mr Azima explained, the nature of those figures as only indicative was obvious, because the range of equipment used (and hence the cost and value) would depend both on the customer's requirements, and on the government approvals that could be obtained. A reasonable and knowledgeable person would understand that defence articles are subject to approval of United States Government.

220. In my judgment, the December proposal was clearly representing to RAKIA that the values ascribed to the four aircraft were the acquisition costs and not the value of the aircraft once ISR equipped and operated by SR professionals. Mr Azima's case that the amounts specified in the December proposal included the cost of ISR equipping is contradicted by contemporaneous documents.

220.1 On 16 October 2015 Mr Azima sent an email to Mr Buchanan attaching the specifications for the two Falcon aircraft. This email stated that the "Total Acquisition Cost" of each aircraft was $9,332,626 which is exactly the same value specified in the written proposal. In his email, Mr Azima stated: "Please note price included is the aircraft only. Modifications and Electronics are not mentioned."

220.2 The detailed technical information concerning the two Falcon aircraft in the written proposal stated that $9,332,626 is the "Original Unit Acquisition Cost" and the "Total Acquisition Costs" of the aircraft. Those expressions clearly indicate that $9,332,626 was the amount that the joint venture would need to pay in order to acquire ownership of the aircraft (i.e. the cost price), rather than

a figure that also sought to factor in other operational and support services that would be provided under the joint venture.

220.3 This is reinforced by the fact that the amount of $9,332,626 is a specific figure, rather than a round number (which would be expected if it was intended to represent a notional projection/estimate of future value based on an array of as yet un-quantified costs and services). If, as Mr Azima stated in his witness statement, the cost of equipping the aircraft with ISR technology was unknown and would have been difficult to estimate at that stage, since the parties had not yet agreed on the particular ISR services and the required equipment that the joint venture would offer, the figure communicated to RAKIA is unlikely to have included any such unknown and incalculable component with such seeming precision.

220.4 The aircraft were already ISR-equipped at the time of the negotiations so that to that extent it would not be necessary for further amounts to be spent on the ISR equipment over and above the acquisition cost. The written proposal contains detailed descriptions of their existing ISR equipment and capabilities. For example: The description of the two King Air aircraft explained that the aircraft "hosts a number of Army Intelligence, Surveillance and Reconnaissance/Reconnaissance Surveillance and Target Acquisition (ISR/RSTA) sensor systems". The description of the two Falcon aircraft also referred to the existence of "APS-143B multi-mode radar"; "EO/IR and tactical work station"; "side-looking airborne radar"; "the F-16's APG-66 multi-mode pulse-doppler radar"; "incremental upgrades to its FLOT turret"; and "360' scanning AN/APS- 143BV3 inverse synthetic aperture radar (ISAR)".

220.5 The contemporaneous emails show Mr Azima and his associates were aware that the values represented to RAKIA in the written proposal were inflated and that if RAKIA entered into the Proposed ISR JV on the basis of those valuations then Mr Azima and his associates would receive a significant windfall. In an email sent by Mr Adams to Mr Daniels on 26 January 2016, Mr Adams referred to the upfront cash contribution of $22 million from RAKIA, leaving $10 million to distribute to the partners in GDS, describing the deal as "terrific". On the same date, Mr Adams sent a further email to Mr Jacobs, Mr Azima, Mr Lepper and Mr Daniels which stated: "The economics of the deal are exceptional and are as good or better than anything I have seen in my 35 years in the aviation business because the upfront risk is mitigated". Mr Lepper replied to this email on the same date stating: "I know everyone is working very hard to get this deal done. As we all know this would be a tremendous payday. In speaking for myself, this would be a truly life changing event as I am currently in a very unstable financial position." Mr Lepper then sent out six "recommendations", the last of which was: "Distribute the 10M, have a cocktail and laugh about this".

220.6 Mr Azima's case that the discussions regarding the Proposed ISR JV were "preliminary commercial discussions" and that, by their very nature, the

positions of RAKIA and its counterparties "would be opposed and adversarial" on a large number of issues does not properly reflect the nature of the discussions which concerned a proposed joint venture in which it was to be expected that the parties would cooperate and have a greater regard for each other's interests that in an ordinary commercial relationship. Moreover, I accept RAKIA's submission that, even if two parties have "opposed and adversarial" interests in the context of ongoing commercial discussions, this does not entitle either party to mislead the other as to the value of assets which it is contributing. A party acting in "good faith" and with the utmost professional integrity would disclose the true position in relation to the assets they were contributing.

**(2)      Alleged representation that GDS was licensed**

221.    On 25 January 2016, Mr Lepper sent an email to Mr Buchanan which stated as follows:

>"Please do not take my directness as disrespect, apologies if it was taken as such. I understand you are under controls of protocol and due diligence. As you will read below and was firmly explained to me, we are as well. We are a licensed weapons dealer with many restrictions and oversight controls. The attachment document officially outlines the required course of action for the TAA and legal guidelines which we must follow. […]"

222.    RAKIA contends as follows.

222.1  The email constituted a clear and express representation that GDS was licensed to sell weapons by the relevant US regulatory authorities and that, contrary to the assertion in that email, GDS was not a licensed weapons dealer and was not registered under the International Traffic in Arms Regulations ("ITAR").

222.2  Mr Azima's pleaded case and witness evidence concedes that GDS was not registered under ITAR.

222.3  Despite being copied to Mr Lepper's email, and despite knowing that GDS was not a licensed weapons dealer and that RAKIA was likely to rely on the false representation that it was, Mr Azima failed to correct Mr Lepper's false representation.

223.    Mr Azima's case is in summary as follows:

223.1  He denies that Mr Lepper was making any representation on his behalf. Mr Lepper's email was not on its face representing Mr Azima's position. It was sent from Mr Lepper's JFJ International email address, it was explaining the position of AGD (whose email on the subject of arms controls Mr Lepper was forwarding), and it did not refer to GDS at all in any way.

70

223.2 Mr Azima understood the email to refer to AGD's position and he believed AGD to have been registered under the ITAR.

223.3 In any event, it was subsequently made clear to Mr Buchanan that GDS was not registered under the ITAR.

223.4 RAKIA has offered no evidence to dispute Mr Azima's evidence that Mr Buchanan was informed that GDS was not a weapons dealer. Mr Azima's account in this regard is supported by a later note taken by Dechert of a meeting attended by Mr Buchanan, at which it was noted that there were different options for structuring the joint venture, which would include the need to obtain ITAR authorisations: "Option 2 was for FA to take the lead through ACG0 or GDS and get the necessary ITAR authorizations."

224. In my judgment, RAKIA's case in relation to this alleged misrepresentation is lacking in substance. For the reasons advanced by Mr Azima, I am not satisfied that the statement in the email of 26 January 2016 that "we are a licensed weapons dealer" was made on behalf of Mr Azima, or that it was referring to GDS. I also accept the unchallenged evidence of Mr Azima that it was made clear to Mr Buchanan that it would be necessary for GDS to obtain the necessary authorisiations.

**(3)    Alleged representation that the Technical Assistance Agreement was produced or approved by the US State Department**

225. Mr Lepper's email dated 25 January 2016 attached a document which purported on its face to be issued by the Directorate of Trade Controls at the US Department of State ("the TAA Document"). In particular:

225.1 The written title of the TAA Document was "U.S. Department of State – Directorate of Defense Trade Controls".

225.2  The electronic title of the TAA Document (shown in the covering email) was "U.S. DEPT OF STATE – GUIDELINE – TECHNICAL ASSISTANCE AGREEMENT".

225.3 The TAA Document bore the official crest of the US State Department.

225.4 The TAA Document contained explanatory text (in bold) which stated: "The Department of State is responsible for the export and temporary import of defense articles and services governed by 22 U.S.C. 2778 of the Arms Export Control Act…and Executive Order 13637." Further: "The following points are intended to provide an understanding of a Technical Assistance Agreement (TAA) defined by the International Traffic in Arms Regulations (ITAR). Of course, these do not replace the regulations defined by the ITAR. The ITAR is controlled and executed by Defense Trade Controls (DTC) which is a directorate under the State Department."

71

225.5 Mr Lepper's covering email stated: "The attached document officially outlines the required course of action for the TAA and legal guidelines which we must follow".

226. RAKIA's case is as follows:

226.1 These documents, in particular the use of the word "officially" were clearly intended to convey the false impression that the TAA Document was an official State Department publication.

226.2 Contrary to the impression conveyed by the TAA Document and Mr Lepper's email, the document was not, in fact, produced by the US Department of State.

226.3 Mr Azima does not dispute this. Rather, he asserts that he "does not know why the document in question contains the State Department logo" and that he "did not add the logo to the document".

226.4 Mr Azima was copied the email from Mr Lepper to Mr Buchanan and received the false document attached to it. Despite this, he took no steps to correct the false representation that the TAA Document was an official US State Department document.

227. Mr Azima's response is as follows:

227.1 There is no evidence to suggest that Mr Lepper (still less Mr Azima) added the seal of the US Department of State to the document; Mr Daniels of AGD had sent a document to Mr Lepper, which Mr Lepper appears then to have forwarded to Mr Buchanan.

227.2 In any event, it is very difficult to see where this complaint would lead even if it had any substance. RAKIA makes no suggestion that the contents of the document were in any way incorrect. Moreover, the requirements of the ITAR were later discussed in detail between the parties, both of which were represented by counsel. It was made clear by Timothy O'Toole (Miller & Chevalier) that RAK would need to through the ITAR approval process before the project could move forward. This approval would need to be obtained by RAK at the Federal level i.e. the approval would need to be provided by the US Government (State Department) to the UAE.

228. In my judgment, this complaint lacks substance. The provenance of the TAA Document is unclear but there is no evidence that Mr Azima had any hand in the authoring of that document or the covering email from Mr Lepper. It is not established that Mr Azima was aware that the designation of the TAA Document as official was incorrect. Moreover, given that it is not suggested that the contents of the TAA Document were incorrect, the misrepresentation, such as it was, was in sufficiently material to found a claim pursuant to Clause 3.2 of the Settlement Agreement.

72

**(4)**    **Alleged representation that Mr Lepper was working to obtain the approval of the US Government for GDS' participation in the Proposed ISR JV**

229.    On 11 February 2016, Mr Lepper sent an email to Mr Buchanan in which he stated as follows: "Thank you for your passport documents and I will forward accordingly. In reference to the meeting agenda, I was just informed of the meeting a few days ago myself. I am still working the approval processes from the USG. As you know working with any government entity it may take some time and I will keep you informed of the process."

230.    RAKIA contends as follows:

230.1   This statement was a clear representation that Mr Lepper had initiated the process of seeking the US Government's approval of the Proposed ISR JV and that he was actively engaging with the US Government department to progress that process.

230.2   Contrary to Mr Lepper's representation, no steps had been taken to obtain the US Government's approval of the Proposed ISR JV.

230.3   Mr Azima did not contest this in his witness statement or oral testimony. Instead, he claims that he subsequently "made it clear that, so far as GDS and its potential partners were concerned, the proposed joint venture partners had not yet "initiated" an application for an appropriate licence under ITAR".

230.4   However, while there was subsequent discussion of "the numerous regulatory steps that had to be completed before the joint venture could proceed", at no point did Mr Azima (or anyone else acting on behalf of GDS) inform Mr Buchanan that Mr Lepper had not actually initiated the process of seeking US Government approval on or before 12 February 2016.

230.5   Mr Azima wrongly failed to correct Mr Lepper's misrepresentation. Mr Azima's oral evidence was that Mr Lepper was acting with his approval when he sent the email in question.

230.6   Further, contemporaneous emails show that Mr Azima tasked Mr Lepper with providing information in connection with "Government approvals" concerning the proposed joint venture.

230.7   Mr Azima was copied to Mr Lepper's email, which was itself a reply to an email from Mr Buchanan to which Mr Azima was also copied. Mr Buchanan's email stressed that he required certain information "so we can fully brief the Investment Committee on my return to RAK". Mr Azima was therefore aware that Mr Buchanan intended to rely on information provided by Mr Lepper in response to that request.

231. Mr Azima's response was as follows:

231.1  Mr Lepper's email is expressed in non-specific terms;

231.2  In any event, the contention that Mr Azima left the position unclear is baseless. Mr Azima repeatedly explained to RAKIA that US government approval would be required, in terms making it clear that it had not been sought:

(a)  It was made clear to RAKIA that the approval of the US government in the form of a Technical Assistance Agreement would first require an initial agreement to be in place. The email sent to Mr Buchanan on 25 January 2016 said this in terms: "it is critical to have an initial agreement in place for justification and then to develop and submit the TAA to DTC".

(b)  In an email to Mr Buchanan on 17 February 2016, Mr Azima indicated the steps that would need to be taken in the future, without suggesting that they had been initiated: "I would like to summarize our discussion and as I have state [sic] previously the ISR aircraft are defense articles and as such ITAR controlled articles; technical data and services cannot be exported/shared to a foreign person without State Department approval. In our meeting on the 26th we can discuss the path forward with regards to a DSP 5 or DSP 73. These licenses will need to be considered for both the marketing and the permanent or temporary export plan. After our meeting we will be in a position to initiate/select together a path forward with the State Department."

231.3  The requirement for government approval and the steps that the parties would need to take prospectively before the Proposed ISR JV could proceed were also discussed in detail between the parties, with their counsel present, as recorded in RAKIA's own note of a meeting on 16 March 2016.

231.4  RAKIA failed to deal with any of these contemporaneous documents in cross-examination.

232. In my judgment, the representation made by Mr Lepper was incorrect and may well have been intended to give a misleading impression to RAKIA of the steps taken towards obtaining US Government approval. However, given that those acting on Mr Azima's side of the negotiations appear to have made clear soon after the email was sent that the process of seeking authorisation had not yet started, I regard the misrepresentation as insufficiently material to found a claim under Clause 3.2 of the Settlement Agreement.

## (5)  Alleged representations that the Proposed ISR JV had the backing of the US Government

233. RAKIA alleges that Mr Azima repeatedly represented to RAKIA that the US Government was supportive of the Proposed ISR JV and was interested in becoming a customer of its services.

233.1 For example, at a meeting on 26 February 2016, Mr Azima represented that the US Government, Central Intelligence Agency and US Special Operations were all intended clients and customers of the Proposed ISR JV. This representation was recorded in an attendance note produced by RAKIA's lawyers, which states: "FA noted that the project would be supported by the US Government "if you know what I'm saying". Further: "[Mr Azima] and WC said that they have talked to many potential clients - the "Northern Client" is interested, though the "Southern Client" would be more interested once the company has been set up. After the meeting, Mr Azima told Mr Buchanan that the "Northern Client" was the US Central Intelligence Agency, while the "Southern Client" was US Special Ops in Jacksonville, Florida…" Further: "WC said that they would go back to the potential customer – and FA interrupted to say "both customers, including the US Government customer" – to get a sense of their timeline. WC said that the US Government would be a launch customer."

233.2 Other contemporaneous documents demonstrate that Mr Azima had clearly led Mr Buchanan to believe that the US Government supported, and would be the initial customer of, the Proposed ISR JV. For example:

(a) On 23 January 2016, Mr Buchanan sent an email to Mr Azima which stated, "You indicated that the US Government is supporting this project" and requesting sight of any approval provided by the US Government.

(b) On 30 March 2016, Mr Buchanan sent an email to Mr Azima in which he expressed concern that a draft of the Memorandum of Understanding sent to him by Mr Azima "makes no reference to USG as a client". In his evidence Mr Buchanan explained that he sent this email because "I felt the MOU was incomplete and didn't fairly reflect the discussions which had taken place".

(c) Mr Buchanan's email dated 30 March 2016 also stated that, "we discussed exit and you said that would be difficult for us – this I understand with the proposed US client base". This clearly reflected Mr Buchanan's understanding at the time – based on Mr Azima's statements to him – that the US Government would be a client of the Proposed ISR JV.

233.3 In his evidence Mr Buchanan explained how Mr Azima had made it clear that "firm interest had been expressed by the US Government in being a client of the services that would be provided by the ISR JV" and "represented on multiple occasions that the US Government was both supportive of, and interested in, the services being provided by the ISR JV". He also stated, "Throughout the discussions with Mr Azima it was…clear that the US Government was expected to be the founding client".

75

233.4 The representation that the US Government supported the Proposed ISR JV was very important to RAKIA. Mr Buchanan's evidence was that if the US Government was not going to be a very early client, "the financials of the whole project would be …in material question".

233.5 The contemporaneous documentary evidence demonstrates that the US Government had not expressed any formal support for the Proposed ISR JV, nor had it expressed formal interest in becoming a customer. Mr Azima states that he "certainly hoped that the US Government would become a customer" but claims that he "made it clear" to Mr Buchanan that "it had not committed to doing so". The communications described above, however, demonstrate that this was not "made…clear" to Mr Buchanan. On the contrary, Mr Buchanan was deliberately led to believe that the US Government firmly supported the Proposed ISR JV and would be (or at least was very likely to be) its principal initial customer. Those statements were not accurate, as Mr Azima well knew.

234. Mr Azima's response is, in summary, as follows:

234.1 RAKIA distorts the content of Mr Azima's statements regarding the interest of the US Government. Mr Azima explained that, unsurprisingly, he hoped the US Government would become a customer and that he expected them to be supportive, as and when the ISR project had become operational.

234.2 The possibility of the US Government being a customer was obviously discussed, as was the possibility of other possible clients. For example, at the meeting on 26 February 2016, Mr Buchanan referred to both possibilities: "[JB] also said that if the US Government is a founding client then the project would be easy, but if it is another client such as Djibouti then it could take up to three years to establish the framework."

234.3 However, it would not have been possible for the government to commit to doing so before the project had been approved. The parties were well aware of this given the complex approvals required (as discussed as that same meeting).

234.4 Mr Azima's evidence was that he believed the US Government would be clients once the project had become operational: "A. US Government would have been our clients -- various part of US Government would have been clients once we are operational." This understanding was, as he explained, based on confidential discussions with officials.

234.5 There is a clear difference between a statement that, after the project becomes operational, the US Government would be supportive, and a statement that the US Government already actively backed the project and would be a founding client. This distinction was made clear in the meeting held in February 2016. Dechert's note of that meeting records Mr Azima (and a Mr Carmona (WC)) saying as follows: "JB said that in David's mind, having the US Government as a client was a difference maker. David does not believe that regional customers can generate the level of projected returns discussed to date. FA

76

responded that he had never said that the US Government was a client, and that came from Mark. WC said that he could not assure JB that if the deal happens, the US Government would be a customer."

234.6 Mr Azima's account is supported by other contemporaneous documents. Neither of the written proposals submitted to RAKIA from GDS's/Mr Azima's side identified the US government as a client. The later proposal was prepared by counsel and indeed it defined the likely client base in narrower terms: "The purpose of this MOU is to set forth certain understandings of the parties in relation to the terms and conditions to be agreed between ALG and RAKDL for the formation of a joint venture to provide ISR services to governmental clients in the UAE and the region, subject to and in full compliance with applicable laws in the US and in the UAE."

234.7 Mr Buchanan in fact understood this definition of the client base as excluding the US government as a possible client. The involvement of counsel and the drafting of these agreements are plainly inconsistent with the contention that Mr Azima set out to deceive RAKIA in the manner alleged.

235. In my judgment, RAKIA has failed to establish that Mr Azima misled it, or permitted it to be misled, with regard to the status of the US Government as a potential client. Some of Mr Azima's comments may have overstated the level of commitment but the note of the meeting on 16 February 2016 made clear that the US Government was not committed to being a customer.

**(3)     Was the Good Faith Representation false?**

236. RAKIA's case is that by virtue of the six instances of Mr Azima's misconduct summarised at paragraph 166 above the Good Faith Representation in the Settlement Agreement was false, in that Mr Azima had not at all times acted in good faith and with the utmost professional integrity in his dealings with RAKIA or other RAK entities and that Mr Azima must have known about his own misconduct.

237. Based on my conclusion that, of the six instances of misconduct, four have been proved as alleged, I am satisfied that the Good Faith Representation was false to Mr Azima's knowledge.

238. The remaining two allegations, concerning the planning media campaign and the negotiations for the Proposed ISR JV, were proved in part. Mr Azima contends that his conduct in relation to those two matters, even if proved as alleged, would not have constituted misconduct such as to falsify the Good Faith Representation. Though not necessary for the purposes of my decision, I address these contentions briefly below.

239. With regard to the media campaign, Mr Azima contends as follows:

239.1  conduct directed at RAK or the Ruler would not be contrary to the representation that Mr Azima had acted in good faith and with professional integrity towards RAKIA, RAK Airways, and other "RAK entities". Even on RAKIA's case, the media campaign would only affect the standing of RAK and the Ruler, and the reputation of its lawyers, Dechert;

239.2  efforts to investigate and expose unlawful detention practices should not be regarded as misconduct contrary to a duty of good faith unless those efforts are carried out without any basis for believing that there were grounds for concern in that regard.

240.  I do not accept these contentions. It seems to me that the media campaign, although not aimed primarily at RAKIA or any RAK entity, would, if successful, have been likely to deter foreigners from doing business in RAK and thereby harmed the interests of RAK commercial entities. The activities contemplated by the Security Assessment are not fairly characterised as "efforts to investigate and expose unlawful detention practices." The activities included the use of "Scams, fraud and deceptive partnerships", and to "ensconc[e] known criminals…such as Latin American drug cartel figures, in official RAK development or business deals", in order to "lead RAK authorities to lose large sums of money", and by plotting to "Orchestrat[e] business deals with disreputable individuals" in order to provide a factual basis for stories about "money laundering in the RAK, tax evasion and even terrorist financing". Mr Azima's involvement in the Security Assessment was such that, as he must have known, he had not acted in good faith.

241.  Mr Azima contends that the conduct alleged as regards the ISR JV, even if proved, was not contrary to the Good Faith Representation on the ground that it is common for misunderstandings, ambiguities or inaccuracies to arise in the course of the discussions which later fall away as the discussions continue. In my view, Mr Azima's misconduct cannot be excused on this basis. The misrepresentations which I have found were made were not in good faith and were intended to result in GDS making a dishonest profit.

242.  I therefore conclude that RAKIA has established that, as Mr Azima must have known, the Good Faith Representation was false.


**(4)    Did RAKIA rely on the Good Faith Representation?**

243.  In support of its case that RAKIA relied on the Good Faith Representation, RAKIA submits as follows:

243.1  To establish inducement, it is not necessary to establish that RAKIA had a positive belief that the representation was true. Rather, it is simply necessary to establish that the representation influenced RAKIA to act to its detriment.

243.2  Mr Azima's assertion that the inducement requirement is not made out because RAKIA entered into the Settlement Agreement "for purposes unconnected to

78

the settlement of the claim" and because it had reached an "internal evaluation…that Mr Azima was acting against RAKIA, and fraudulently" is incorrect.

243.3  Clause 3.2 of the Settlement Agreement expressly records that the payment of $2.6 million to Mr Azima was "made in reliance on" the Good Faith Representation. Clause 3.2 therefore provides a contemporaneous record (which Mr Azima acknowledged and endorsed by signing the Settlement Agreement) of RAKIA's reliance upon that representation.

243.4  This is consistent with the evidence of Mr Buchanan, who was responsible for signing the Settlement Agreement on behalf of RAKIA. He explains in his witness statement that: "Prior to the execution of the Settlement Agreement…I was aware of allegations having been made against Mr Azima and concerns expressed about his conduct… However, had I known what I know now insofar as concerns Mr Azima's wrongdoings towards RAKIA, there is no way I would have agreed to recommend that he be paid $2.6 million. However at the time, I was reassured by his willingness ultimately to agree the wording at clause 3.2 of the Settlement Agreement."

244.  The evidence establishes that both Mr Buchanan and the Ruler relied on the Good Faith Representation. Whilst the Ruler and Mr Buchanan may have harboured suspicions about Mr Azima, it does not follow that they did not rely on the Good Faith Representation. The fact that a representee harboured suspicions regarding the honesty of a representor does not negate inducement (see *Zurich Insurance Co plc v Hayward* [2017] AC 142 at [18]-[20] (Lord Clarke) and [67]-[71] (Lord Toulson)).

245.  The Ruler stated that as far he was concerned the purpose of the Settlement Agreement was to settle the claims brought by Mr Azima and to obtain assurance from him that he had acted in good faith towards RAKIA and RAK more generally. It is implicit in this statement that the Ruler relied on the Good Faith Representation. For reasons set out later in this judgment, I reject Mr Azima's case that RAKIA knew about the contents of the hacked material and were inducing Mr Azima to enter the Settlement Agreement as a trap.


## (5)  Loss

246.  The damage sustained by RAKIA as the result of its reliance on the Good Faith Representation is the sum of $2.6 million paid pursuant to the Settlement Agreement.

79

**The Unlawful Means Conspiracy Claim**

247.    RAKIA's case is that Mr Azima's actions in connection with the intended sale of the Hotel gave rise to a further cause of action, namely the tort of unlawful means conspiracy. It contends that:

    247.1    Mr Azima conspired with others including Dr Massaad, Mr Adams, and Mr Al Sadeq, to procure the illicit payments totalling $1,562,500 from RAKIA and to conceal that misappropriation by fraudulently creating the sham Referral Agreement.

    247.2    As a result of that conspiracy, RAKIA was unlawfully deprived of $1,562,500.

    247.3    Mr Azima is liable to RAKIA for the tort of unlawful means conspiracy and is required to compensate RAKIA for the losses it suffered as a result.

248.    Mr Azima's response, apart from denying the alleged misconduct, is that the conspiracy claim fails on the ground that illicit payments preceded the creation of the Referral Agreement. The Referral Agreement was drafted many months after the illicit payments were made but that is not a valid objection to the claim. RAKIA's case is not that the Referral Agreement caused the illicit payments to be made but that it is evidence of the earlier conspiracy which was causative of the illicit payments.

249.    In my view, it is to be inferred from the fact that Dr Massaad received a bribe out of the illicit payments (paragraphs 182 – 185 above), and from the involvement of Mr Sadeq in the retrospective drafting of the Referral Agreement (paragraphs 180.2 to 180.17 above) that Mr Azima had agreed at least with Dr Massaad and probably with Mr Al Sadeq as well that the illicit payments would be made.

250.    It follows that Mr Azima is liable to pay the sum of $1,562,500 to RAKIA by way of damages.


**Mr Azima's Hacking Claim**

251.    There is no dispute that RAKIA's case against Mr Azima is based on evidence obtained as a result of the hacking of Mr Azima's confidential emails. Mr Buchanan said that until September 2016, when the hacked material came to light, he had not thought of Mr Azima as implicated in Dr Massaad's frauds. He then changed his mind after seeing the hacked material. Mr Azima's case is that the hacking was carried out by RAKIA. RAKIA denies any involvement in the hacking and claims to have obtained the data from publicly available sources innocently.

252.    Mr Azima submits that, if the Court concludes that RAKIA hacked Mr Azima's emails, it should strike out RAKIA's claim as an abuse of process on the basis that its process is being used by RAKIA in a manner that would bring the administration of justice into disrepute. In *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529 Lord Diplock held as follows:

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 81 of 126

"This is a case about the inherent power which any court of justice must possess to prevent misuse of its procedure in a way which, although not inconsistent with the literal application of its procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would otherwise bring the administration of justice into disrepute among right-thinking people. The circumstances in which abuse of process can arise are very varied. … It would, in my view, be most unwise if this House were to use this occasion to say anything that might be taken as limiting to fixed categories the kinds of circumstances in which the court has a duty (I disavow the word discretion) to exercise this salutary power."

253.   More recent authority has confirmed that the Court has power to strike out a claim which would be an abuse of the Court's process. In *Summers v Fairclough Homes* [2012] 1 WLR 2004, Lord Clarke held as follows:

"The language of the CPR supports the existence of a jurisdiction to strike a claim out for abuse of process even where to do so would defeat a substantive claim. The express words of CPR r 3.4(2)(b) give the court power to strike out a statement of case on the ground that it is an abuse of the court's process. It is common ground that deliberately to make a false claim and to adduce false evidence is an abuse of process…"

254.   In addition, CPR 32.1 confers on the Court the power to exclude evidence which would otherwise be admissible to be exercised in light of the overriding objective. The exercise of the discretion involves balancing, on the one hand, the public interest in doing justice on the basis of all available evidence and, on the other hand, the public interest in deterring breaches of the law entailed in the collection of the evidence, taking into account all relevant circumstances. As the Court of Appeal explained in *Jones v University of Warwick* [2003] EWCA Civ 151 [2003] 1 WLR 954 in which evidence had been obtained unlawfully and in breach of the claimant's right to privacy (para 28):

"That leaves the issue as to how the court should exercise its discretion in the difficult situation confronting the district judge and Judge Harris. The court must try to give effect to what are here the two conflicting public interests. The weight to be attached to each will vary according to the circumstances. The significance of the evidence will differ as will the gravity of the breach of article 8, according to the facts of the particular case. The decision will depend on all the circumstances."

**Mr Azima's pleaded case**

81

255.   Mr Azima's pleaded case in support of his hacking claim (at paragraph 8J of the Re-Re-Amended Defence and Counterclaim) is as follows.

"(a)   Between autumn 2015 and July 2016 Mr Azima was assisting in the mediation of a dispute between RAKIA and Dr Massaad.

(b)   To the best of Mr Azima's knowledge, on or around 14 October 2015 Mr Azima received several emails containing malicious internet links which were aimed at him specifically so as to induce him to open the emails. The opening of the emails and the links in them enabled those carrying out the hacking to gain unauthorised access to and steal Mr Azima's confidential data.

(c)   RAKIA has targeted Mr Azima in the context of its dispute with Dr Massaad. In particular, in around April 2015, the Ruler told Mr Buchanan that he wanted Mr Buchanan and other assistants to "target" Mr Azima. The Ruler directed his associates to bring "charges" against Mr Azima and also to pursue "other channels" for taking action against Mr Azima. The Ruler's associates discussed meeting to "coordinate our attack" on Mr Azima and Dr Massaad. In or around July 2015, the Ruler instructed another of his assistants, Mr Bustami, to "go after" Mr Azima.  Further, in the context of his role in assisting in the mediation of the dispute between RAKIA and Dr Massaad, Mr Azima had meetings and discussions with RAKIA's representative, Mr Buchanan, and its counsel, Mr Neil Gerrard, of Dechert LLP. At a meeting on or about 23 July 2016, Mr Gerrard told Mr Azima that if Dr Massaad would not agree to a settlement, Mr Azima would be made "collateral damage" in a war that RAKIA would then wage on Dr Massaad. Mr Azima understood this statement to be a threat.

(d)   The dispute between RAKIA and Dr Massaad was not resolved. RAKIA engaged investigators and public relations consultants (including the now defunct firm, Bell Pottinger) to make inquiries into Mr Azima and to disseminate information about him.

(e)   On around 29 July 2016, Mr Azima learned of a website making allegations against Dr Massaad, similar to those which RAKIA had made in the course of the mediation of its dispute with Dr Massaad. Shortly thereafter, Mr Azima learned of two other websites containing similar allegations against him. The websites contained links to BitTorrent internet sites, where certain materials stolen from Mr Azima were available to download with appropriate software and expertise. At this point, Mr Azima apprehended that his emails and data had been stolen, and so changed his passwords and increased his computer security.

(f)   RAKIA has admitted that it and its lawyers, Dechert LLP, hold a substantial quantity of the data stolen from Mr Azima, including an admission made in September 2016 to holding around 30GB of material. RAKIA denies responsibility for the hacking and theft of data or awareness of the persons responsible. Its explanation for holding these materials, given through its solicitor Mr David Hughes, is that the materials were obtained from internet sites. In proceedings brought by Mr Azima against RAKIA in the United States

District Court complaining of the hacking, RAKIA appointed a computing expert. That expert was not able to access the majority of the material hacked from Mr Azima from the internet, and could obtain only a portion of Mr Azima's material, substantially less than 30GB. RAKIA's own computing expert was therefore unable to replicate the process by which RAKIA (through its counsel) claims to have obtained the stolen data.

(g) Mr Azima has through his Counsel alleged RAKIA's responsibility for the hacking of his data and has quoted in support of this allegation the inability of RAKIA's expert in the US proceedings to access the majority of the stolen material. Following Mr Azima making this complaint, further links to materials stolen from Mr Azima (additional to those limited materials that RAKIA's expert had been able to access) appeared on several internet sites.

(h) Mr Azima avers that, to the extent his stolen data has been made available on the internet (and websites and links have been created to facilitate access to those data), this has been done by RAKIA and/or those acting at RAKIA's direction, to cause damage to Mr Azima, to provide a pretext for RAKIA to have possession of the data, or for other improper purposes.

(i) The materials that have more recently been made available as described in paragraph (g) above do not include certain documents that had been among Mr Azima's data. Mr Azima infers that the persons responsible for publishing the materials on the BitTorrent sites decided to withhold these specific materials for their own reasons. The materials withheld are damaging to RAK's reputation. They include:

(i) emails concerning an article originally published in October 2009 on a website, TheSmokingGun.com ("TSG"), which reported on the arrest of the Ruler of RAK for sexual assault in a hotel in Minnesota. On 31 July 2018, TSG reported that a denial of service cyber-attack seeking to overwhelm its servers had been made, targeting this specific article with the apparent purpose of seeking to make it unavailable to legitimate visitors. TSG also reported that representatives of the Ruler had previously requested it to remove the article from its website, which it had declined to do; and

(ii) an article critical of RAK and describing it as a rogue state within the UAE, commissioned by the Ruler's brother, apparently in connection with a power struggle in the RAK ruling family."

256. Thus, Mr Azima's pleaded case in support of his hacking claim relies on the following six main contentions:

256.1 that RAKIA "targeted" him in the context of its dispute with Dr Massaad. Particular reliance is placed on internal emails sent in April and July 2015;

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 84 of 126

256.2 that his data was accessed as a result of his opening "phishing emails" on or around 14 October 2015;

256.3 that in July 2016 Mr Gerrard threatened that Mr Azima would be made "collateral damage" if Dr Massaad would not agree a settlement. A settlement was not agreed;

256.4 shortly afterwards, RAKIA engaged investigators and public relations consultants (including Bell Pottinger) to make inquiries into Mr Azima and disseminate information about him. The consultants engaged by RAKIA created two websites containing publicly available information about Dr Massaad's perfidy which went live just a short while before Mr Azima's hacked documents were published on the internet;

256.5 RAKIA's expert in the US was not able to obtain access to the majority of the material hacked from Mr Azima and was therefore unable to replicate the process by which RAKIA claims to have accessed the material. Following that complaint further links appeared;

256.6 that the materials which have been made available do not contain documents damaging to RAK's reputation.

257. Mr Azima's hacking claim was supplemented in the course of the hearing by the following additional allegations:

257.1 That RAKIA's motivation for pursuing Mr Azima was to seek "retribution for his refusal to join RAKIA's side" in its dispute with Dr Massaad and to "punish him for his involvement in investigating human rights abuses in RAK".

257.2 By March 2015 the Ruler had come to believe that Dr Massaad was working to destabilise his regime. The Project Update (which did not feature anywhere in the statements of case) is said to have led the Ruler to believe that Mr Azima was an accomplice of Dr Massaad heading the "US Team" and involved in a critical press campaign. This enraged the Ruler and led him to demand the targeting of Mr Azima, and the hacking of his emails.

257.3 RAKIA put together a well-armed team with the capability of carrying out the hacking and publication online, including Mr Page who had been repeatedly connected with hacking in other cases and who had connections to Israeli operatives formerly of that country's intelligence services who facilitated the hacking.

257.4 In October and November 2015, acting on the instruction of the Ruler, Mr Page caused or procured the hacking of Mr Azima's emails through spear-phishing attacks on his data.

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 85 of 126

257.5 RAKIA was able to gather information about Mr Azima from the hacked material by December 2015, as evidenced by the View from the Window document;

257.6 Although Mr Azima had (on his case) a genuine entitlement to receive $2.6 million in compensation from RAKIA in respect of the Training Academy JV, the Settlement Agreement was in fact a device which was intended to equip RAKIA with a legal mechanism to bring a claim against Mr Azima on the basis of material which it already had from hacking his emails. The $2.6 million was paid to "lure" Mr Azima into an agreement, to "reel him in and use him in our negotiation with Dr Massaad".

257.7 RAKIA's case as to how it came across the hacked material innocently was untrue and designed to conceal RAKIA's role in the hacking. Contemporaneous emails which show that RAKIA innocently discovered the hacked material were in fact a false "paper trail"created by Mr Buchanan and Mr Gerrard in order to conceal their involvement in the hacking.

257.8 Wrongdoing can be inferred from RAKIA's "highly suspicious" approach to the documentary evidence.

258. RAKIA's position is, in summary, as follows.

258.1 The hacking claim is unfounded. RAKIA had no involvement whatever in the hacking of Mr Azima's emails/devices or in the publication of any hacked documents online. These were documents which were publicly available on the internet which were discovered by individuals who reported them to RAKIA in early August 2016 at about the same time as the documents were discovered by individuals acting on behalf of Mr Azima.

258.2 An allegation that a party engaged in a criminal conspiracy to unlawfully hack into and publish a person's confidential data in pursuit of a malicious vendetta, and then took extensive steps to deliberately and dishonestly conceal that criminal activity from the Court, is an allegation of the utmost seriousness. It is trite law that cogent evidence is required to justify a finding of discreditable conduct and that "the cogency of the evidence relied upon must be commensurate with the seriousness of the conduct alleged".

258.3 These principles required Mr Azima to adduce particularly cogent and persuasive evidence in order to make good his hacking claim. Mr Azima's hacking claim necessarily entails not only a claim that RAKIA dishonestly obtained access to his emails but that its witnesses including Mr Buchanan, the Ruler, Mr Gerrard, Mr Halabi, Mr Bustami and Mr Handjani were parties to a conspiracy to deceive the court by the presentation of a fundamentally false case concerning RAKIA's role in the hacking of Mr Azima's emails.

258.4 In any event, whatever the position about RAKIA's direct or indirect involvement in hacking, the public interest in the fair and just disposal of the

85

action on the basis of the best available evidence prevails and the Court should take these documents into account in any event.

**The Facts**

259. The facts relating to the hacking claim are as follows.

**(1)     Mr Page and the Project Update**

260. Mr Page's initial engagement in RAK was between 2008 and 2010 when he undertook surveillance work on the behalf of the Ruler who was at the time the Crown Prince. His remit was to try to ascertain through surveillance what plans Sheikh Khalid, the Ruler's brother, had to try to destabilise the Crown Prince's position.

261. In January 2015, at the instigation of the Ruler, a meeting took place between Mr Page and Mr Buchanan. This was a "get to know you" meeting and no specific mandate was discussed.

262. A few days later, a meeting took place between the Ruler and Mr Page at which the Ruler asked Mr Page to investigate a rumour that Dr Massaad was working with a member of the royal family to the detriment of the Ruler and the government of RAK.

263. Subsequently, in or about March 2015, a second meeting took place between Mr Buchanan and Mr Page at which Mr Buchanan told Mr Page that he was involved in investigating wrongdoing by Dr Massaad and the misappropriation of assets. He wanted Mr Page's assistance in tracing assets, investigating Dr Massaad's involvement with Iran, his links to Hezbollah and Lebanon and his relationship with Viktor Bout (who was serving a sentence in the US for arms trafficking).

264. Thereafter Mr Page had regular monthly meetings with the Ruler and Mr Buchanan. Sometimes his meetings were with the Ruler alone. Mr Page said that the Ruler "had a habit of compartmentalising things. He would ask me to do certain things, but not involve Jamie Buchanan. So, therefore, I had this Chinese wall between what His Highness wishes me to undertake and what he wishes Mr Buchanan to understand."

265. Mr Page made no reference to any written reports in his witness statement, asserting that he does not keep contemporaneous documents "…and my briefings to clients are invariably oral, especially in the Middle East where this is very normal." The implication that Mr Page did not give written briefings was untrue. In fact, as Mr Page accepted in cross-examination, he regularly provided the Ruler with written update reports to accompany his oral briefings. By the beginning of 2020, Mr Page had provided some thirty update reports, all of which were in the same format. Mr Page was unable satisfactorily to explain his reference to his briefings being "invariably oral" which he accepted was misleading. Mr Page referred to the five

years' lapse of time and to extraordinarily difficult family issues affecting his recollection of dates and events. I do not regard these factors as a satisfactory explanation.

266.    Only one of Mr Page's written reports was in evidence, namely the Project Update dated 26 March 2015. The evidence of Mr Buchanan and Mr Page was that RAKIA did not keep copies of the other reports because of a "protocol" agreed with Mr Page whereby copies of reports would be returned to Mr Page two weeks after they were produced. The reason why a copy of the Project Update is still available is that Mr Buchanan inadvertently breached the protocol by arranging for the Project Update to be emailed from his office to his private MSN email account so that he could read it at home; the email copy has survived. Prior to the hearing Mr Azima was unaware that the Project Update was provided by Mr Page. The fact that it was provided by Mr Page emerged early in Mr Buchanan's cross-examination.

267.    Much of the Project Update was redacted on the ground of irrelevance but it included the following unredacted passages relating to Mr Azima:

"In the US, KM's hired a team of advisors managed by Farhad Azima (FA) in order to spread allegations against our client. The main allegations against the client are on human rights issues and in particular the allegation that RAK uses a dedicated facility in RAK where it imprisons and torture political opponents. FA, who might also be responsible for paying the US team, handles all KM's activities in the US. KM's lawyer in the US, Kirby D. Behre, hired a consultant, who is a former WSJ reporter, named Christopher Cooper, who due to his good contacts. Cooper approached a British reporter named Simon Goodly of The Guardian and briefed him on the RAK torture allegations, in order to raise public opinion against RAK and to harness international civil rights organizations to the subject.

According to our source, FA also hired a private investigator from Northern Virginia name 'Joseph Aboud', an American - Egyptian who seems to have SIGINT capabilities, and probably managed to get access to the client's Email traffic. We couldn't verify until now the identity and capabilities of Aboud, but we are working on it.

Our sources have reported that KM's team suspects that they have an information leak since they noticed some of RAK's actions in the last few months. They believe that the client is having someone monitor their activities either electronically or in other methods.

**KM efforts against the client**
FA and the US Advisory Team
In continuation to our previous report, we were informed by several new sources that FA is managing KM's efforts in the US and perhaps even paying their bills. At the moment, KM's strategy in the US is to spread human rights violations allegations against the client. In particular the allegations focus on the notion that RAK uses a dedicated facility in RAK where it imprisons and torture political opponents. According to KM, the main figure assisting our client to

87

cover this alleged activity is Niel [sic] Gerard, a partner in Dechert LLP (London) law firm.

Additionally, KM claims that the reach of RAK's No. 1 is also away from RAK, claiming that the client recently got a Jon Doe locked up in the Republic of Georgia upon his request.

**Summary. Conclusion and Queries**

As we reported above, KM's US team has a certain plan to smear RAK and its ruler with human rights allegations. As far as we know, at this point, they do not have any evidence to back up these allegations, but they started gathering information for a campaign, based on hearsay and testimonies, and started searching for a platform to make it public. The campaign is not public yet, so we will be able to gather intelligence on their progress in order to monitor their activities and attempt to contain or ruin their plans."

268. The Project Update shows that the activities of Mr Azima, as an associate of Dr Massaad with responsibility for managing a team of US advisors, were being monitored although Mr Azima was not the initial or main target of RAKIA's investigation. Mr Page's evidence was as follows:

"--Farhad Azima's name came out -- completely out of the blue. It was not part of our mandate to look at Farhad Azima. This information came from a confidential source. The confidential source was not even given --because we weren't instructed to look at Farhad Azima He provided what he heard in the marketplace, if that's the expression, my Lord."

269. Mr Page's evidence in cross-examination was that his reports were drawn up by Insight, an Israeli company whose staff are former Israeli intelligence operatives:

"Q. And what do they specialise in?
A. Well, the founder of the company is the former head of the Lebanese desk of Shin Bet and Shin Bet is the Israeli equivalent of MI5.
Q. Right.
A. So they specialise in collating information, particularly in the Middle East. They obviously specialise in collating information on Iran, on Hezbollah, on Lebanon, and they were the – the expression I use, my Lord, is the "think tank".
Q. So would it be fair to say, Mr Page, that in relation to the matters covered by your project updates, you had in fact subcontracted at least some of that work to this Israeli company called Insight?
A. That is correct.
Q. And they were, amongst other things, intelligence-gathering specialists?
A. They were specialists at obtaining information from confidential sources and, my Lord, the important thing was to analyse a significant amount of data being recovered from multiple jurisdictions and cross-referencing it, seeing really how it related to Khater Massaad and his links. So, in answer, my short answer is, yes, they were the conduit to receive all the information from my other subcontractors.
…

88

Q. And they were really -- they were the people, were they, who you enlisted to carry out some of this electronic data-gathering?
A. By which you mean electronic -- I don't understand. By "electronic", you mean open source information on the internet?
Q. I mean of any source.
A. Well, they were -- yes, they were using the dark web, open source information on the internet."

270. Mr Page also explained that whether or not one of his sources breached legal obligations in providing information was "not for [Mr Page] to consider":

"Q. In other words, this aggrieved employee would have told you confidential things that he'd learnt when he was working as a security officer for Sheikh Khalid? A. Yes, and it's not for me to question whether he was in breach of any of his employment obligations.
Q. Or for you to question whether he was breaching any duty ofconfidentiality presumably, Mr Page?
A: It's -- that was not for me to consider."

271. It was submitted on behalf of Mr Azima that RAKIA's witnesses (Mr Buchanan, Mr Gerrard and the Ruler) deliberately minimised Mr Page's involvement and the importance of the Project Update in their witness statements. I consider that there was some substance to this criticism.

272. Mr Buchanan did not mention the Project Update in his witness statement even though he accepted in cross-examination that it was an important document. His explanation for this omission was that when he prepared his witness statement he did not believe that the Project Update had come from Mr Page but had come from some organisation which was introduced to him (Mr Buchanan) briefly but which he advised the Ruler against using. He said that in the month prior to the hearing it became clear to him what the source of the document was, at which point he advised RAKIA's solicitors. This was an unconvincing explanation. It must have been at all times obvious to Mr Buchanan that the Project Update was the work of Mr Page, from its content and format, from the fact that he had briefed the Ruler on it and shown it to Mr Gerrard and from the unusual circumstances in which a copy of it was retained by him in breach of Mr Page's protocol. Mr Buchanan's witness statement said nothing about his dealings with Mr Page in 2015.

273. Mr Gerrard did not mention the Project Update in his witness statement either. His witness statement gives the impression that the first time he came across Mr Page was in August 2016 at the time of the discovery of the hacked material. It transpired in the course of his cross-examination that Mr Gerrard was aware of Mr Page's work in 2015 and that he was shown the Project Update report in March 2015 when he discussed it with Mr Page. The Project Update was of concern to him because it dealt with the involvement of Simon Goodley, the Guardian journalist, who Mr Gerrard knew was taking a significant interest in RAK related human rights issues and phoning witnesses and junior lawyers on the case.

89

274. Mr Azima criticised the assertion in the Ruler's witness statement that he "never saw" the Project Update as being outright false. Based on Mr Page's account of the primarily oral briefings of the Ruler, I consider that it is possible that the Ruler had no recollection of seeing the Project Update. It is, however, notable that the Ruler was less forthcoming about the Project Update than he might have been. Mr Azima had suggested in his first witness statement that the Project Update had led the Ruler to target him, pointing out that the author of the Project Update was "unknown" but that the report had "presumably been produced by or for RAKIA and/or other RAK entities and seen by the Sheikh". When he came to respond to this part of Mr Azima's witness statement, the Ruler must have known who produced the report and on whose instructions, even if he did not recollect seeing it, but he did not provide this information and simply dismissed the paragraph in Mr Azima's witness as erroneous speculation: "This is incorrect. I never saw the report".

275. RAKIA's response to the criticism that the Project Update had not been dealt with more extensively in the witness statements was that it was not a document referred to in Mr Azima's statements of case; the fact that RAKIA had disclosed the Project Document showed that it was not intent on concealing it or Mr Page's involvement in its production which was likely to emerge at the hearing. Had RAKIA or Mr Buchanan set out to conceal the authorship of the document, Mr Buchanan would not have voluntarily divulged its authorship to RAKIA's solicitors or the Court. If Mr Azima's theory of deliberate concealment were correct, there would be no conceivable advantage to RAKIA of divulging this information at trial.

276. I do not regard this as a satisfactory explanation, given what I consider to be the clear relevance of the document to the hacking claim (in that it evidences the fact that Mr Azima was the subject of covert surveillance in 2015 being carried out under the supervision of Mr Page who, on RAKIA's own case, was subsequently responsible for finding the hacked material) and the witnesses' accounts in cross-examination as to the importance of the document. I recognise nevertheless that the failure to deal more fully with the Project Update may simply be explained on the basis that it was an unhelpful document that was not referred to in Mr Azima's statements of case rather than on the basis that it was part of a plot to put forward a false case about RAKIA's role in the hacking. I accept that, if there had been such a plot, it is surprising that the Project Update was disclosed.

277. Mr Azima also criticised the assertion in Mr Page's witness statement (under the heading "Knowledge of Farhad Azima") where he said that he did not come across the name Farhad Azima in 2015 and that the first time he came across his name was in early 2016 at one of his regular catch up meetings with Mr Buchanan. When it was pointed out to him that the Project Update showed that he knew of Mr Azima a year earlier, so that his evidence was plainly wrong, Mr Page's response was that Mr Azima was just a side issue in the report which covered matters across the globe involving many countries and people.

278. Although I accept that Mr Azima was only one of a large number of characters who were the subject of his investigation, the April and July 2015 emails show that,

90

following the Project Update, the Ruler was concerned about Mr Azima and interested in pursuing him. The Ruler said in his witness statement that in early 2015 he wanted information about Dr Massaad's organised criminal scheme and, in particular, as to the role Mr Azima had played. It seems most unlikely that he did not discuss Mr Azima with Mr Page, the investigator with whom he was having monthly meetings, in which case it is hard to believe that Mr Page could have completely forgotten about any mention of Mr Azima prior to his meeting with Mr Buchanan in early 2016.

**(2)      The April and July 2015 emails**

279.    On 4 April 2015, Mr Buchanan emailed Mr Handjani as follows:

"HHSS [i.e. the Ruler] had wanted us to target FA [i.e. Mr Azima] – on what basis would we do this?"

280.    It is unclear precisely what prompted this email. Mr Handjani's evidence, which I accept, was that Mr Azima had called him out of the blue in March 2015 and said that there was a big problem between him and the Ruler in that he was owed $8m by RAK and that, if things were not resolved, they could "get ugly" for everyone. Mr Handjani was also called by Dr Massaad at about this time who asked him to talk to the Ruler and get the Ruler to stop investigating him. Mr Handjani then spoke to the Ruler about both calls.

281.    Mr Buchanan's evidence was that the Ruler's instruction to target Mr Azima in April 2015 was prompted in part by Mr Azima's claim for $8 million, which the Ruler considered to be unfounded, and in part by the information in the Project Update. He said that the reference to "targeting" was a reference to the bringing of criminal charges.

282.    The Ruler's own evidence as to his state of mind was that he wanted information about the extent of the criminal scheme organised by Dr Massaad and, in particular, as to the role Mr Azima had played and, if he was involved in those schemes, to have criminal charges brought against him. He dismissed the suggestion that the emails were prompted by the Project Update.

283.    The email of 4 April 2015 led to the following exchanges on the same day:

(a)    Mr Handjani: "I'm not sure that's possible at the moment. I don't know what basis you would target him. Thoughts?".
(b)    Mr Bustami: "As for Farhad, I would say get AH [Mr Handjani] on the case to check with the boss on what exactly he wants done".
(c)    Mr Buchanan: "AH has no idea how we might go after him"
(d)    Mr Bustami: "I think next week Amir is in town so we can both hook up with him and brain storm it."

284.    Later that day, Mr Bustami wrote to Mr Handjani and Mr Buchanan as follows:

"I have had few discussions with boss about FA [Mr Azima] and he is adamant that we bring charges against him. He was very happy that you told him that FA is no longer asking for the $8 m.

The boss told me that you have checked with your people and confirmed back to him that the boys with the hotel are no issue now and we should not be intimidated by them and that FA may not be orchestrating this.

He wants me to get you on the case to file some sort of charges against Farhad. He also told me today that you have another channel that you are using with khater [Dr Massaad]. When are you next in town so that me you and Jamie [Mr Buchanan] could hook up and coordinate our attack?"

285.    Mr Handjani's evidence, which I accept, was that the reference to "going through another channel" was a reference to attempts that were going on at that time to open a dialogue with Dr Massaad.

286.    On 6 April 2015 Mr Handjani wrote to Mr Bustami and Mr Buchanan as follows:

"Subject: Re Farhad Azima
Dear Naser
Thank you for your email. I spoke to the boss and advised him against both using other channels and pressing charges against Farhad for now. I believe both approaches could undermine the work that you and Jamie are doing. I was very clear with him that we should speak with one voice-and for the moment you and Jamie are that voice.

We have to see how Khatter responds with his lawyer. If we start pressing charges with Farhad it would disrupt this process. My humble opinion is that we should not be fighting multiple fires at one time.

We need to keep this circle of information tight and give full weight and support to you and Jamie.

I have advised boss as much as
well. Best,
AAH"

287.    There is no evidence of any steps being taken against Mr Azima between April and July 2015 and the natural inference from this email is that the Ruler was dissuaded from taking any action for the time being. Mr Buchanan's evidence was that Mr Azima did not feature at all in his discussions with the Ruler in this period.

"Q.  What was going on in relation to investigating Mr Azima between the beginning     of April 2015 and 19 July 2015?
A. Absolutely nothing to my knowledge.
Q. Did you have some monthly meetings with Mr Page over this time?
A. Yes, I would have done.
Q. And would there have been some reports in all likelihood, written reports?
A. Yes, written or verbal, and I can't tell you which they were.
Q. And you would have discussed those with the Ruler?
A. I would have done -- I did.

92

Q. And is it your evidence that Mr Azima didn't feature at all in any further updates from Mr Page between the beginning of April 2015 and 19 July 2015?

A. I have no recollection of Mr Azima's name or his activities coming on to the radar screen in that period."

288. On 19 July 2015, Mr Buchanan wrote to Mr Handjani as follows:

"NB [Naser Bustami] says the Boss wants criminal stuff taken out of letter and to go after FA subject to guidance from AF [Andrew Frank].

Nothing ELSE new from NB - will speak to AF tomorrow and fill you in."

Mr Handjani replied as follows:

"Talking to the boss now. He wants me to respond to the little guy in an email and to coordinate with you."

289. Mr Buchanan's evidence about this exchange in his witness statement was that he had received a message from Mr Bustami to the effect that the Ruler wanted criminal allegations taken out of a letter to be sent to Dr Massaad's lawyers. The reference "to go after FA" was a reference to the prospect of some form of criminal proceedings or criminal charges being brought against Mr Azima which were not in the event pursued although in cross-examination, Mr Buchanan said that he did not know what was meant by "going after FA". "Guidance from AF" was a reference to guidance being sought from Mr Andrew Frank who provided public relations assistance to RAK in the US and whose guidance would be sought in relation to any reputational issues that might arise as a result of criminal charges being brought against Mr Azima as a US citizen. The reference to "the little guy" was a reference to Mr Azima. Mr Buchanan said that the planned coordinating was to do with the HeavyLift claim for compensation about which Mr Azima had emailed Mr Handjani on the same day (19 July 2015). Mr Bustami's and Mr Handjani's evidence was to the same effect. On 28 July 2015 Mr Handjani sent a response to Mr Azima explaining that there was nothing he could do beyond putting him in touch with Mr Buchanan.

290. It is unclear what prompted the Ruler to give the indication or instruction reflected in Mr Buchanan's email of 19 July. Mr Buchanan was unable to explain what prompted the Ruler to want Mr Azima to be "gone after" at this time. What is clear is that the Ruler's desire for action to be taken against Mr Azima had not abated since April. The evidence of Mr Buchanan and Mr Handjani was that this desire was prompted in part by annoyance over what the Ruler perceived was an unmeritorious claim for the $8 million but this seems unlikely given that Mr Handjani's email of 4 April 2015 had made clear that this claim was not being pursued. The Ruler himself does not suggest that the $8 million claim prompted his desire to go after Mr Azima. It is more likely that the Ruler's hostility towards Mr Azima stemmed from his perception, originating in the Project Update, that Mr Azima was an associate of Dr Massaad who was threatening to cause trouble for him.

93

291. There is nothing to indicate that the Ruler was persuaded that it was a bad idea to "go after" Mr Azima or that he changed his mind about doing so. In his witness statement the Ruler does not deal specifically with the July email but says that "as the emails show" he was advised not to consider criminal charges against Mr Azima and accepted that advice. But the emails concerning criminal charges were sent in April, not July. I infer that the Ruler continued to harbour feelings of hostility towards Mr Azima in the period following the July email but it is unclear what, if any, hostile action was taken.

292. There is no evidence about any guidance being sought or obtained from Mr Frank, as mentioned in the email. There are no records of the Ruler's discussions with Mr Page at this time. There is no indication that any consideration was given to the hacking of Mr Azima's email accounts but neither is there any documentary evidence that this was ruled out as a way of "going after" Mr Azima.

**(3)    The spear-phishing emails**

293. There is no specific evidence that RAKIA was planning to take, or took any steps to obtain intelligence about Mr Azima from July 2015 onwards.

294. Mr Azima's case is that in October and November 2015, that is to say, some three to four months after the July emails referred to above, his emails were hacked as a result of his opening or clicking on links contained in spear-phishing emails that he received on or around 14 October 2015. The spear-phishing emails were sophisticated and included a malicious email purporting to be sent from Dr Massaad's personal assistant, Ms Beudjekian.

295. The parties' forensic computer experts ("the Experts") agree that Mr Azima received several "spear phishing" emails in October and November 2015. They also agree on the following:

295.1   there is no evidence that Mr Azima opened any of those emails or clicked on the links within them;

295.2   there is no evidence that any of those emails (or any other emails received by Mr Azima) led to Mr Azima's online credentials being stolen or to any unauthorised access to his devices;

295.3   a single spear-phishing email could be an effective means of targeting Mr Azima;

295.4   there is no evidence that identifies the person(s) who sent the emails; based on the information made available to them, it is not possible to determine who was responsible for the unauthorised access to Mr Azima's data and the publication of that data online, how and when the unauthorised access occurred or how much data was obtained as a result;

94

295.5 there were three tranches of data, the first 27.775 GB in size, the second of which became available on or about 30 August 2016 with a size of 10.33MB and the third with a size of 4.43 GB;

295.6 the contents of two of the three tranches of the hacked data appear to emanate from iCloud account(s); Mr Azima appeared to have at least two iCloud accounts and a number of Apple devices including an iPhone but since the iCloud logs identifying contemporary access to Mr Azima's iCloud accounts are not available to the Experts, the Experts agree that it is not possible to confirm whether, and if so when, how and by whom, unauthorised access was gained to Mr Azima's iCloud accounts;

295.7 analysis of the access logs for Mr Azima's fa@fa1.us account and the connection record and recent access change record for his account fa@farhadazima.com do not enable any conclusions to be drawn as to how, and by whom, any unauthorised access to either of those accounts occurred;

295.8 given Mr Azima's statements that the access to his fa@fa1.us account shown by the logs in October 2015 was carried out without his authorisation, the access on those dates appears to be suspicious;

295.9 suspicious activity in October 2015 does not provide determinative evidence of when the fa@fa1.us emails contained in the Internet Data may have been taken from Mr Azima's account.

296. The Experts do not agree as to whether one of the five emails identified in the report of Mr Tarbell (Mr Azima's expert) as a spear-phishing email was a spear-phishing email or a non-targeted phishing email; nor do they agree as to whether the spear phishing emails indicate that Mr Azima was being targeted in a systematic campaign by a single attacker.

297. Whilst it is not possible to say precisely how Mr Azima's emails were accessed without his authorisation, the indications are that it began at around the time the spear-phishing emails were received. Mr Tarbell examined the records of instances when Mr Azima's email account, "fa@fa1.us" was accessed in October 2015. That examination indicated that there were multiple instances between 13 and 15 October 2015 during which time the account was accessed from IP addresses that are unfamiliar to Mr Azima. Mr Krone agrees that the access on these dates appears to be suspicious.

298. Mr Tarbell also found that the emails stored in the "fa@fa1.us" account also included a number of emails in which Mr Azima had recorded passwords for other email accounts. The person who had covertly accessed the "fa@fa1.us" account could therefore have obtained the means of accessing other email accounts used by Mr Azima.

299. The "authorised connection record" for another of Mr Azima's email addresses, "fa@farhadazima.com", indicates that this address was accessed from several

95

countries with which Mr Azima had no connection. Mr Krone accepts that this access appears to be suspicious.

300.     In summary, it is possible that the hacking of Mr Azima's emails is linked to his receipt of spear-phishing emails in October 2015 but this is not firmly corroborated by the evidence. There is no evidence as to who carried out the hacking.

**(4)       The View from the Window document**

301.     Following the alleged hacking in October/November 2015, on 29 December 2015 a document was prepared on RAKIA's side which described a "series of investigations" and labelled Mr Azima as a participant in "fraudulent activities". It was prepared by Andrew Frank, a senior individual at Karv Communications, a PR company working for RAKIA, who had been mentioned in Mr Buchanan's email of 19 July 2015. It was sent to Mr Gerrard on 4 January 2016.

302.     The document reads as follows:

> "View from the window
> The window has opened on Ras Al Khaimah through a series of investigations that have unearthed a massive fraud that has taken place in the Emirate, the UAE, and several other countries including the Republic of Georgia, India, Congo and others.
> A number of things have been exposed as fact over the past twenty-four months:
> -KM was the CEO of RAK Ceramics beginning in 2003, as well as the RK Investment Authority (RAKIA) beginning in 2006 and oversaw a series of investments inside and outside of RAK that are under now intense scrutiny and have exposed wrong-doing
> -Gila Mikadze was head of RAKIA's operations in Georgia and created and oversaw numerous corporations that stole money from the Emirate and was used for his own purposes and to bribe former government officials.
> -Others committed crimes inside RAK, including the Ruler's Chief legal advisor and the legal advisor to RAKIA (they also happen to be cousins(?))
> … -FA, a U.S. citizen, appears to have orchestrated, if not (fully) participated in numerous fraudulent activities.
> … -Companies were set up with Iranian nationals"

303.     Mr Azima's case is that the reference in the document to "FA" (i.e. Mr Azima) appearing "to have orchestrated, if not (fully) participated in numerous fraudulent activities" establishes that RAKIA must by this stage have hacked into Mr Azima's emails because otherwise Mr Frank would not have not known about what RAKIA alleges in these proceedings to be his "fraudulent activities".

304.     In support of this case, Mr Azima submits as follows:

304.1   It is striking that none of RAKIA's witnesses even acknowledged the existence of the View from the Window document. RAKIA failed to call Mr Frank

96

as a witness and failed to identify Karv when ordered by HHJ Kramer QC to identify its public relations consultants, indicating an awareness that his evidence would be damaging to RAKIA.

304.2 The View from the Window document establishes "beyond serious argument" that by the end of December 2015, RAK and RAKIA had obtained access to Mr Azima's confidential emails and data. The author of the document had clearly been informed that RAK and RAKIA had a firm basis for asserting that Mr Azima had orchestrated or participated in "numerous fraudulent activities".

304.3 A belief on RAKIA's part that there was such a basis could only have come from the hacked material. As Mr Buchanan, who was leading RAKIA's investigation, explained, RAKIA only believed that Mr Azima had engaged in any fraud upon reviewing the Hacked Material:

"A. The investigations that had taken place until that point gave me no cause to believe that Mr Azima was involved in any frauds in respect of Dr Massaad.
Q. But you changed your mind when you saw the hacked data; is that right?
A. I changed my mind when I saw the hacked data, that is correct."

304.4 When Mr Buchanan was shown the View from the Window document, he claimed to be able to offer no explanation for its contents and to have been unaware of it until it was put to him in cross-examination.

304.5 Mr Gerrard gave inconsistent explanations for the document, alleging initially that it was "ramblings" of Mr Frank which had come "out of the blue" and later that it was the product of a meeting which had taken place two weeks earlier concerning a "blitzkrieg" of negative publicity. He claimed that he told Mr Frank that the section of the View from the Window concerning Mr Azima "isn't going to work" because all that was known about Mr Azima was "suspicions".

304.6 This account is not credible given the absence of any response by Mr Gerrard to Mr Frank's email attaching the View from the Window document and the inconsistency with the evidence of Mr Buchanan, according to whom the "blitzkrieg" meeting did not take place until January 2016. Moreover, the View from the Window does not purport to describe "suspicions". It states that investigations have "unearthed a massive fraud" and that the matters listed in it (including Mr Azima's involvement in "numerous frauds" "have been established as fact".

305. The View from the Window document shows that in late 2015, a negative PR campaign was being planned against Mr Azima alongside Dr Massaad. Mr Azima had not dropped out of the picture. It also suggests that someone had planted in Mr Frank's mind the idea that Mr Azima had been involved in fraudulent activities. That

97

person was probably Mr Gerrard who had briefed Mr Frank before the document was sent. It was put to Mr Gerrard in cross-examination that, in order to have accused Mr Azima of fraud, Mr Gerrard must have been aware of the contents of Mr Azima's confidential emails:

> "Q. … by that stage, I suggest, Mr Gerrard, you were aware of the confidential material that had been procured illegally from within Mr Azima's email records in October/November 2015 and one way or another you thought you were on to something. You started to think that you could -- that you had some material to allege fraud. That's what I put to you.
> A. So I'd like to deny that, my Lord. It's preposterous. But I'd also like to explore that question because what you're suggesting is I had a secret little stash of Mr Azima's documents which I could select at will to identify frauds. I mean, how would I do that? How do I pull this stuff down? How do I search for it?"

306.    Shortly thereafter, the following exchange took place:

> "Q. And you would have been aware that Mr Page had been successful in gathering intelligence from within Mr Azima's confidential email archive?
>     …
> Q. I'm putting that to you.
> A. Right. No, I wasn't aware.
> Q. And that this is the only explanation for why Mr Frank has recorded, based upon what you and Mr Buchanan must have told him, the idea that Mr Azima had been involved in numerous fraudulent activities.
> A. My Lord, that's ridiculous. Mr Frank is a clever man, but he's not a lawyer. He will have heard on a regular basis concerns as to gun-running, fraud, etc, etc. What he will not have grasped that we did not have sufficient evidence to proceed. On everything else we had stacks of evidence against -- let's take the first bullet point, Dr Massaad. We had evidence. Indeed he was prosecuted. We had evidence against Mikadze. He was prosecuted. We had evidence of other crimes inside RAK, including the Ruler's chief adviser and the general counsel. They were prosecuted. Let me ditch Farhad Azima for the moment. We had dummy corporations set up in the RAK, UK, Georgia, Cayman Islands, etc. We could have put those in, and so on. Fraudulent bank accounts, possible gun-running … we did not have any evidence that we could have proceeded against of actual fraud against Farhad Azima. That is just plainly wrong and that's what I told Andrew Frank"

307.    Mr Gerrard's explanation for the reference in the View from the Window document to Mr Azima's "orchestrating if not participating" in "numerous fraudulent activities" was confused. At one point he referred to the Project Update, although this had not alleged fraud against Mr Azima. He also referred to information provided to Mr Frank at a meeting attended by Mr Buchanan, although this meeting did not take place until later. His evidence was essentially that Mr Frank was told about suspicions concerning Mr Azima but these suspicions had nothing to do with Mr Azima's hacked emails.

308. It is credible, in my view, that suspicions about Mr Azima's involvement in fraud had arisen because of his association with Dr Massaad rather than because access had been obtained to Mr Azima's confidential emails. I do not attach great significance to Mr Buchanan's expression of surprise at the contents of the View from the Window document when it was shown to him in cross-examination accompanied by the suggestion that the document revealed prior knowledge of Mr Azima's confidential emails.

309. In my judgment, the references to Mr Azima's orchestrating, if not participating in, numerous fraudulent activities in the View from the Window document are too vague to establish that RAKIA had obtained access to Mr Azima's confidential emails by the time this document was prepared. Although the document lists Mr Azima's apparent orchestration of or participation in fraud as one of a number of established "facts", I agree with RAKIA's submission that the document reads like a series of points for a press release or article rather than a carefully sourced analysis. I do not consider that any adverse inferences can be drawn against RAKIA from its failure to call Mr Frank as a witness, given that Mr Azima did not refer to the View from the Window document as part of his pleaded case.

**(5)   The Settlement Agreement**

310. On Mr Azima's case, RAKIA cynically entered into the Settlement Agreement as a device to trap him into agreeing a duty of good faith and an English jurisdiction clause, which, with its access to the hacked material, would give RAKIA leverage over Mr Azima. It would enable RAKIA to exact retribution for Mr Azima's failure to take RAKIA's side in its dispute with Dr Massaad and provide RAKIA with the means of turning Mr Azima against Dr Massaad.

311. In support of this case, Mr Azima submits as follows:

311.1   The lack of internal documentation on RAKIA's side to indicate that any detailed review of the HeavyLift claim actually took place suggests that, contrary to Mr Buchanan's assertions, there was no investigation of the HeavyLift claim, no internal review of the claim and no working group in RAK gathering relevant information, auditing financials and speaking with individuals; RAKIA was not interested in ascertaining the specific amounts that HeavyLift had actually invested; there were no documents evidencing such an analysis;

311.2   There is no record of any board meeting to approve the Settlement Agreement;

311.3   The letter sent to the Ruler by Mr Buchanan and Mr Bustami dated 15 February 2016 seeking the Ruler's approval of the Settlement Agreement indicates the importance of the obligation of good faith: "It is on this basis that we have been able to successfully negotiate the inclusion of Clause 3.2 referred to below which we believe is the key clause in this agreement bearing

in mind your wider objectives." Those objectives were to manufacture a basis for bringing an action against Mr Azima in England as part of a campaign to ruin his reputation and good standing;

311.4 Clause 3.2 purports to include an assurance of good faith by Mr Azima not only towards RAKIA but also towards other entities in which the government of RAK had a shareholding, irrespective of the place of incorporation. This is important given that HeavyLift's claim was against RAKIA and concerned a joint venture entered into in 2007 with RAK Airways, which was incorporated in RAK also. There was no need to include this reference to the place of incorporation in clause 3.2 unless RAKIA envisaged that other RAK entities, such as RAKIA Georgia, might be involved in some way.

312. Mr Azima's contention that the entering into of the Settlement Agreement is consistent with RAKIA having hacked his emails some five months previously gives rise to an obvious objection. If, as Mr Azima alleges, RAKIA had by the end of 2015 got access to his confidential emails and discovered evidence of what it now contends were his fraudulent activities, it is, on the face of it, inherently unlikely that RAKIA would have been willing to enter into the Settlement Agreement or to make any payment to Mr Azima in settlement of the HeavyLift claim. The fact that RAKIA paid out $2.6 million to Mr Azima under the Settlement Agreement suggests that RAKIA was unaware of the contents of the hacked material.

313. A possible answer to this objection, advanced by Mr Azima, is that entering into the Settlement Agreement, even at a cost of $2.6 million, made commercial sense for RAKIA because the Good Faith Representation and the jurisdiction clause, coupled with its knowledge of the hacked material, gave RAKIA leverage over Mr Azima, enabling RAKIA to sue, or threaten to sue Mr Azima and thereby maintain pressure on him in the context of RAKIA's dispute with Dr Massaad. Ultimately, if necessary, it could sue Mr Azima to recover the $2.6 million, as it has done.

314. Mr Azima's "leverage" explanation for the Settlement Agreement is not, however, compelling. RAKIA did not need to enter into the Settlement Agreement in order to sue or to threaten to sue Mr Azima on the basis of the hacked emails. It could have sued him or threatened to sue him in relation to the fraudulent misappropriations in connection with the intended hotel sale without Clause 3.2 (though not in an English court). Moreover there is no evidence that RAKIA ever in fact attempted to use the Settlement Agreement or the hacked material to exercise leverage over Mr Azima.

315. I consider that the letter of recommendation dated 15 February 2016 from Messrs Buchanan and Bustami to the Ruler provides some support for Mr Azima's "leverage" explanation. It is striking that Messrs Buchanan and Mr Bustami described Clause 3.2 (rather than the full and final settlement provision) as the key clause in the agreement, bearing in mind the "wider objectives". Mr Azima says that these enigmatic words are a veiled reference to the Ruler's objectives to pursue Mr Azima. It is possible to read the letter in the way contended for by Mr Azima but it is also possible to read "wider objectives" as referring to the Ruler's objectives concerning Dr Massaad and the benefit of getting an assurance from Mr Azima that he was acting in good faith in the discussions with Dr Massaad. The Ruler's evidence was that an assurance from Mr

Azima that he had acted properly served the wider objectives of understanding Dr Massaad's fraud and obtaining recompense.

316. I am not persuaded by the contention advanced on behalf of Mr Azima that there was no meaningful investigation by RAKIA into the HeavyLift compensation claim. Mr Buchanan's witness statement contains an account of the attempts to obtain information from HeavyLift's side and the difficulties arising from the absence of documentation. The evidence of Mr Buchanan and Mr Gerrard was that there was an investigation by Dechert and that the documents produced by Dechert are covered by legal professional privilege, which they would be.

317. I do not regard the absence of formal board approval of the settlement as significant. I accept Mr Buchanan's explanation that the Settlement Agreement went straight to the Ruler for his approval. The scope of Clause 3.2, extending to RAK entities irrespective of their place of incorporation, is in my view explicable as "belt and braces" drafting rather than denoting knowledge of the hacked material.

**(6)    The engagement of Digitalis**

318. In March 2016, RAKIA engaged (through Bell Pottinger) Digitalis to prepare a primarily defensive strategy in order to protect the client's reputation, as set out in Digitalis' engagement letter of 21 March 2016. They were also instructed to create two websites to promote publicly available material relating to Dr Massaad and his involvement in frauds.

319. In his skeleton agreement, Mr Azima identified Digitalis, along with Mr Page and Bell Pottinger, as being part of a team engaged by RAKIA with a view to conducting an aggressive internet and media campaign and with "the capability of obtaining material through hacking". There was, however, no basis in the evidence for the assertion that either Bell Pottinger or Digitalis had any such capacity. The evidence of Mr Leach, who worked for Bell Pottinger, was that Bell Pottinger prepared a media and communications strategy that was sent to RAKIA but not in the event implemented. Mr Azima did not feature at all as he was not someone they were focused on.

320. The evidence of Mr King, the Chief Executive Officer of Digitalis, which I accept, was to the effect that prior to 1 November 2016, when they were asked by Dechert to preserve documents relating to the dispute between Mr Azima and RAKIA, they were unfamiliar with the name of Mr Azima and undertook no work in relation to Mr Azima. Mr Azima did not feature in their plans for an "offensive" online campaign and was not being targeted.

321. Mr Azima submitted that the absence of relevant documents in Digitalis's possession was concerning. Mr King provided a full and clear explanation of his company's document retention policies. There was no evidence of deliberate

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 102 of 126

document destruction, much less of any instruction by RAKIA to destroy relevant documents.

**(7)    The July 2016 meeting**

322.    Following execution of the Settlement Agreement in March 2016, Mr Azima continued to engage with RAKIA with a view to brokering a settlement of its dispute with Dr Massaad.

323.    On 16 July 2016, a meeting was held between Mr Azima and three representatives of RAKIA: Mr Buchanan, Mr Gerrard, and an associate in Mr Gerrard's firm, Dechert, at the Churchill Hotel in London.

324.    Mr Azima's case is that at this meeting Mr Gerrard threatened him that if Dr Massaad would not agree to a settlement, Mr Azima would be made "collateral damage" in a war that RAKIA would then wage on Dr Massaad, a threat that was put into effect a few weeks later.

325.    Mr Azima's evidence was as follows:

325.1    Mr Gerrard told him to stop acting as a mediator, and instead work solely for RAKIA to assist them in their campaign against Dr Massaad.

325.2    He refused and told Mr Gerrard that is not how he operated; this aggravated Mr Gerrard who proceeded to reference his history, stating that he had been a policeman, a detective, a prosecutor and a lawyer, and that he had connections with "Number 10" and that if Mr Azima did not settle the case with Dr Massaad then there would be a war against Dr Massaad and Mr Azima would be "collateral damage".

325.3    Mr Azima asked Mr Gerrard whether he was threatening him. He told Mr Azima that this was not a "threat but a promise."

325.4    At the end of the meeting, he asked Mr Buchanan for a copy of the handwritten notes that Mr Gerrard's colleague had taken. Mr Buchanan informed Mr Azima that he would be sent a copy of the notes after they were transcribed that evening. However, after repeated chasing, Mr Buchanan said that Mr Azima could not have them without Mr Gerrard's permission. He also set out in an email dated 23 July 2016, in response to Mr Azima's complaint that what Mr Gerrard had said to him amounted to "extortion" and "blackmail", a dictionary definition of those terms.

326.    Dechert's note of the relevant part of the meeting reads as follows:

"NG noted that Kirby had referred to "mutually assured destruction" but that KM was delusional if he thought that bringing the criminal and civil actions would destroy HHSS. NG noted that HHSS was now engaging with Abu

102

Dhabi and the risk was that, the further this went, the more likely collateral damage would occur. It would be difficult to keep the scope of RAK's actions within a narrow compass. NG asked FA to inform KM that Dechert has access to the whole of the Dana Jets database, the whole RAK Ceramics database, which included the whole of Sheba Nair's emails. Essentially, Dechert had all of the client's documents and were analysing them."

327. This note suggests that the reference to collateral damage was in response to Mr Azima's lawyer's reference to the possibility of "mutually assured destruction" and to the possibility that the greater the engagement with Abu Dhabi (i.e. the UAE authorities) the more likely it was that collateral damage would occur. In his witness statement, Mr Gerrard confirmed what was recorded in the note, saying that he had wanted to convey to Mr Azima that the Ruler was already engaging with the criminal authorities in the UAE and that, once criminal proceedings were started, there was a greater risk of collateral damage for Dr Massaad and any of his associates. As he put it in cross-examination: "The evidence as it was mounting was clearly going to move, we anticipated, from fraud to more federal-type offences and that wouldn't be for us to determine." He meant that once litigation is started or a prosecutor takes over, these things get a life of their own. He was not thinking about anything other than the usual effects of litigation or criminal proceedings.

328. In his witness statement, Mr Buchanan said as follows: "The meeting was a tense one because it was during a critical stage of the negotiations with Dr Massaad but that Mr Gerrard was firm, focused and professional. Mr Azima raised his voice at times, Mr Gerrard did not. Mr Gerrard did not tell Mr Azima to stop acting as a mediator (which was not Mr Azima's role) and work solely for RAKIA. Instead he impressed on Mr Azima the importance of his role acting as Dr Massaad's representative in the discussions and encouraged Mr Azima to act in Dr Massaad's best interests and do his bit to help resolve the dispute."

329. In their oral evidence, Mr Buchanan and Mr Gerrard denied that any demand was made that Mr Azima "change sides", pointing out that this would, from RAKIA's perspective, have been pointless. As Mr Gerrard put it:

"A. At no stage did I ask Farhad Azima -- I think you said change sides or whatever it was. That would be faintly ridiculous. He told us many times it was difficult enough talking to Dr Massaad without thinking he had changed sides for RAKIA. We recognised he was in Dr Massaad's camp, that's okay, and I think he was trying to mediate on behalf of Dr Massaad, but unfortunately, as I say, he and we failed."

Mr Buchanan made the same point: "We absolutely did not wish Mr Azima to take RAKIA's side, because that would have been disastrous in terms of the negotiations."

330. In my judgment, it is unlikely that Mr Gerrard would have demanded that Mr Azima cease to act as a mediator and "change sides" as this would have been an unrealistic and potentially counter-productive demand. I consider that the note of the meeting is probably accurate and that when referring to "collateral damage" Mr Gerrard was

referring to damage to Dr Massaad and others from legal proceedings, rather than a threat to Mr Azima.

331. I accept that Mr Azima appears to have been troubled by what passed at the meeting and that he told Mr Buchanan that what Mr Gerrard said amounted to extortion and blackmail (as appears from Mr Buchanan's email of 23 July 2016). I can well believe that Mr Gerrard conducted the meeting in a forceful and even aggressive way. At the same time, I bear in mind that, after learning of the BitTorrent sites accessing the hacked material, Mr Azima did not immediately perceive RAKIA and the Ruler to be responsible for the hacking.

332. After denying that there was any extortion or blackmail, Mr Buchanan's email of 23 July 2016 continued as follows:

> "To be absolutely clear, Neil did not demand money nor anything else from you in return for anything whatsoever. Neil has previously challenged you as to whether you have always acted in the best interests of HH. He did so again at our last meeting. I personally don't see the problem. You have signed an agreement confirming that you have never acted against the interests of HH. All he did was raised [sic] questions as to HeavyLift. In a previous meeting he asked you about Eurasia Hotel Holdings."

333. Mr Azima submitted as follows:

333.1 the references in the email to HeavyLift and Eurasia Hotel Holdings support the inference that RAKIA (or at least Mr Gerrard) already had access to at least some information taken from the hacked material;

333.2 Mr Buchanan's explanation for the reference to "HeavyLift" (namely that it was a reference to an inquiry that RAKIA had conducted into the ownership of HeavyLift itself, not to the Training Academy JV) was untrue because there was no documentary evidence to indicate that RAKIA ever raised a concern about the ownership of HeavyLift;

333.3 Mr Gerrard's explanation for the reference to Eurasia Hotel Holdings (namely that RAKIA had become aware through the Panama Papers and through a "tip off" that Mr Azima and Dr Massaad were both listed as directors of Eurasia Hotel Holdings, and that this gave him reason for suspicion) was untrue because there is no complaint in these proceedings that Dr Massaad was a director of Eurasia Hotel Holdings.

334. I do not consider that the references to HeavyLift and Eurasia Hotel Holdings necessarily support the inference that Mr Gerrard knew about the hacked material. As with the View from the Window document, these references are insufficiently specific to denote knowledge of the hacked material and they can be explained by reference to other sources of information, as Mr Gerrard did. Mr Azima expressly confirmed that no one on RAKIA's side had threatened to use the hacked material

104

or the Settlement Agreement to force him to change sides. The note of the meeting on 16 July 2016 makes clear that Mr Gerrard did threaten to use RAKIA's access to emails in the ensuing "war", but these were emails on the Dana Jet and RAK Ceramics databases, not Mr Azima's.

335.    It was put to Mr Buchanan in cross-examination that his failure to hand over the notes of the meeting on 16 July 2016 to Mr Azima was because of concern that the meeting notes evidenced threats. The disclosed meeting notes do not disclose threats and do not support Mr Azima's version of events. I accept Mr Buchanan's evidence that he did not send the notes to Mr Azima when they were first requested because he was busy on other matters and that subsequently he was advised by Mr Gerrard not to send them because it was felt that the negotiations with Dr Massaad had broken down.

**(8)      The Massaad websites, the blogging websites and the BitTorrents**

336.    Following the 16 July 2016 meeting, the next day Mr Buchanan sent an email to Mr Azima saying that he had spoken to the Ruler about a verbal settlement offer from Dr Massaad but that if Dr Massaad failed to put forward a realistic offer in writing and a proposal for reaching a final settlement by the "end of the ceasefire" i.e. 31 July, "we must assume that the ceasefire has now ended". The dispute between RAKIA and Dr Massaad was not resolved by the end of July and at the beginning of August websites appeared making allegations against Dr Massaad. These websites were, it is common ground, set up by Digitalis on RAKIA's and Bell Pottinger's instructions. Mr Azima and Mr Buchanan exchanged friendly emails expressing disappointment at this outcome.

337.    Within days of the websites concerning Dr Massaad appearing, a series of other websites also appeared attacking Mr Azima. One set of websites was activated on 7 and 8 August 2016. These were blogging websites denigrating Mr Azima as a "fraud" and a "scammer". The author of the blogging website with the headline "Farhad Azima Exposed Again" (the "Exposed" blog) was listed by the username of "crimeboard". That individual initially allowed his or her location to be shown, which indicated that he or she was in the UAE. This may have been a blunder; the location reporting was subsequently disabled. The blogging website with the headline "Farhad Azima Scammer" ("the Scammer blog") also referred to Mr Azima's connections with Mr Adams and Dr Massaad: "Click the link to find Azima's involvement with some big personality's [sic] including his close associates like Ray Adams & Dr. Khater Massaad."

338.    The blogging websites provided links to BitTorrent websites on which Mr Azima's personal data had been uploaded and/or cached. A BitTorrent website is a site from which a computer user can access a BitTorrent network, that is to say a group of computers using the BitTorrent protocol which enables them to share anonymously data or "torrents" downloaded simultaneously from different computers in the group. Over the course of August and September 2016, three caches of Mr Azima's data emerged, the first appearing on or about 4 August 2016, the second on or about 30 August 2016 and the third on or about 8 September 2016. The hacked data

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 106 of 126

included email communications up to August 2016 suggesting that the hackers had access to Mr Azima's email accounts throughout the period from October 2015 to August 2016.

339.    Mr Azima contends that the proximity in time between (i) the breakdown in the negotiations with Dr Massaad and RAKIA and the consequential appearance of the websites attacking Dr Massaad (which RAKIA admits to arranging through Digitalis) and (ii) the websites with links to the hacked material, cannot realistically be a coincidence but is a clear indication that the Ruler or RAKIA were behind both attacks.

340.    RAKIA contends that there is no connection between the Massaad websites and the appearance of the blogging websites with links to the hacked material and that it is inherently unlikely that sophisticated hackers (which is what the hackers would be, if Mr Azima's hacking claim were correct) acting on the instructions of RAKIA or the Ruler, would put up the blogging websites so soon after the Massaad websites as this would inevitably give rise to suspicion that both the blog websites and the Massaad websites were part of the same PR campaign and hence that RAKIA had carried out the hacking. On Mr Azima's case, RAKIA had had access to the hacked material since the preceding October 2015 and could have delayed publicising it for several more weeks or months. Mr Azima's answer to this point is that RAKIA may have been sufficiently confident that it had covered its tracks for it not to be concerned about detection.

341.    In my judgment, if the hackers were acting on the instructions of the Ruler or RAKIA, it is unlikely that they would have timed the publication of the hacked material to coincide with the end of the "ceasefire" and the posting of the anti-Dr Massaad websites. It is more probable in my view that the two incidents, while close in time, were not in fact related. The posting of the Massaad websites was a deliberate PR campaign instructed by the RAKIA; the other was the unrelated act of hackers.


**(9)      RAKIA's alleged discovery of the hacked material**

342.    RAKIA has sought to explain how it became aware of the hacked material on the internet. Mr Azima submits that RAKIA's account is false and dishonest and is advanced by RAKIA in order to cover up its own responsibility for the hacking.

343.    RAKIA's pleaded case, and the case it advanced in its witness statements concerning its discovery of the hacked material, is, in summary, as follows:

343.1   Following a meeting in January 2016 with Mr Azima, Mr Buchanan was alarmed by a warning from Mr Azima that, if RAKIA did not resolve matters with Dr Massaad soon, there would be an aggressive and negative public relations campaign directed against the individuals and companies involved and the Emirate of RAK more generally.

343.2   Mr Buchanan discussed this warning with Dechert. It was decided that it would be prudent to take steps on RAK's behalf to prepare for any such

106

campaign, including by actively monitoring what was being published online. As part of that preparation, Mr Buchanan discussed Mr Azima's warning with various advisers including Mr Page.

343.3 In around February/March 2016, Mr Buchanan met with Mr Page and asked him to look out for anything relevant about a possible negative publicity campaign against RAK. Following that meeting, Mr Page contacted Mr Halabi and asked him to keep an eye out for anything interesting and unusual relating to RAK, the Ruler, Dr Massaad and Mr Azima.

343.4 Following Mr Page's request, Mr Halabi carried out Google searches for those names from time to time. During one of those regular Google searches in early August 2016, Mr Halabi discovered the blog sites containing links to a torrent file containing information relating to Mr Azima.

343.5 Mr Halabi therefore contacted Mr Page and sent him the links to the torrent sites. Mr Page then informed Mr Buchanan and Mr Gerrard about the links.

343.6 Mr Gerrard, in turn, contacted Mr del Rosso at Vital Management Services ("VMS") to seek advice on instructing a suitably qualified company to download the materials. Mr del Rosso emailed Chris Swecker, a former Assistant Director of the FBI and VMS's attorney, to ask for recommendations.

343.7 On Mr Swecker's recommendation, VMS then contacted Mr Garcia at NTi and engaged NTi to download the materials and to identify any other websites containing information relevant to Mr Azima.

343.8 On 23 and 24 August 2016, Ms Gray, a senior analyst with NTi, downloaded the contents of the files listed in the torrent file entitled "Farhad Azima of the Aviation Leasing Group Exposed" using BitTorrent software (the "First Tranche of the Internet Data").

343.9 On 1 September 2016, Mr del Rosso sent an email to Mr Swecker, Mr Garcia and Ms Gray informing them that a new dump of data relating to Mr Azima had been discovered online. The following day Mr del Rosso sent a further email with links to the torrent site. When she returned to the office the following week, Ms Gray downloaded the contents of the files that were listed in that torrent file (the "Second Tranche of the Internet Data").

343.10 Ms Gray thereafter continued actively searching for any additional information relating to Mr Azima. During the course of those searches on 9 September 2016 she discovered an additional dump of data relating to Mr Azima. She then proceeded to download the contents of the files listed in that torrent file (the "Third Tranche of the Internet Data").

343.11 NTi provided copies of the First, Second and Third Tranches of the Internet Data to Mr del Rosso. Mr del Rosso then provided those copies to RAKIA's lawyers at Dechert.

344. Mr Page deals in his witness statement with Mr Halabi's involvement as follows:

344.1 Following a conversation with Mr Buchanan in early 2016 in which he had been asked to keep his ears and eyes open for anything he heard about a negative publicity campaign that might be damaging for RAK, Mr Page spoke to a few contacts he uses occasionally in the investigations business, journalism and PR industry and asked them to keep their ear to the ground. One of those was Mr Halabi, whom he believes he met at a round table lunch in 2012. Mr Halabi is an Israeli journalist who specialises in Middle Eastern affairs. They have more of a friendship than a professional relationship.

344.2 At some point later that year, Mr Halabi called him and told him that he had come across something interesting on the internet about Mr Azima. As far as he could recall Mr Halabi sent him the website address where the material could be found in a WhatsApp message. He cannot check because he regularly deletes his WhatsApp messages for security reasons. Mr Halabi also told him that he believed the information came from the UAE. Mr Page did not ask why he thought this.

344.3 When Mr Page received this information from Mr Halabi, he would have picked up the phone to Mr Buchanan although he does not specifically remember doing so. He believes that Mr Buchanan asked him then to contact Neil Gerrard at Dechert and let him know what he had heard but it may have been the other way round.

344.4 A few weeks later, he learned that a second set of data relating to Mr Azima had been put onto the Internet. He cannot recall when or how exactly he learned of this. As he had not discussed the first set with any of his sources other than Mr Halabi, he believes it may have been Mr Halabi that told him about the second set but it is possible that he was told by one of his other sources. He does not recall being told anything about how or when the second set had been discovered. He believes that he would have called Mr Buchanan or Mr Gerrard immediately. He made no attempt to download the data.

344.5 He was never asked to hack or otherwise access Mr Azima's emails or data by RAKIA or anyone else. He does not know who hacked Mr Azima's computers or placed his data online. His involvement in this matter was limited to passing on of information provided by sources to RAKIA.

345. Mr Page's evidence in cross-examination was different from his witness statement in that he claimed that he passed on the information that he had received from Mr Halabi on a single occasion and that was the end of his involvement.

"A… I passed on the information -- as I said, this was not a mandate from Mr Buchanan. This was, "Please have a look". I found it. I passed it on. That was the end of my involvement in that particular exercise, which again was not a mandate. It was just, "Can you do this?"

Q. So after you had passed on this information t Mr Buchanan and MrGerrard for the first time – after you'd initially passed it on -- that was the end of you contacting them in that regard?

A. Other than that I am aware, because I am aware, that they hired a specialist -- computer forensic specialist to download the material. Other than that, I'm not aware of -- and I am aware, my Lord, that Decherts have reviewed, interrogated the information, but other than that, I'm not aware of anything else.

Q. But as far as you're concerned, Mr Halabi gave you the information, the two links, you then passed it on on the phone to Messrs Buchanan and Gerrard or one or both of them; is that right?

A. Yes, that's correct, my Lord.

Q. And you didn't pass on any further links to either those gentlemen subsequently?

A. My Lord, I run at that time a company turning over - I am the chairman of a company turning over £27 million a year. I am running complex contracts in hostile environments. This was a favour for Mr Buchanan. It was not -- I didn't keep -- it was literally, "Can you do it?" I passed the information on and that was it. I don't recall, I could not possibly recall, four years -- nearly four years down the road or something, my Lord -- four years after the event, what exactly was said and what I said and who I said because I run a very big organisation. I'm the chairman of the group."

346. Mr Halabi's evidence in his witness statement was as follows:

346.1 Mr Page called him in March or April 2016 and asked him to keep an eye out for anything interesting and unusual relating to RAK, the Ruler, Dr Massaad and Mr Azima. He sometimes makes requests such as this.

346.2 Following this request, he searched for those names on Google. He saw there were many articles about those individuals already. Every couple of days he would search again to see if there was anything new, interesting or different. He also spoke to a few contacts he was working with in the Gulf to check that he had the right names and to ask them to contact him if they heard or saw anything.

346.3 In early August 2016, whilst working in his home office, in one of his regular Google searches, he found links to a torrent containing information relating to Mr Azima. He thought it looked interesting because the title referred to Mr Azima being exposed. He called Mr Page and told him that he had found something that Mr Page might find interesting. He provided Mr Page with two links via Whatsapp. Following his call to Mr Page, they did not discuss the matter again. He was not interested in the data because it was not relevant to his area of work as there was no Israeli connection.

111

347. Mr Halabi's evidence in cross-examination was also to the effect that he spoke to Mr Page on a single occasion:

> "Q. So can his Lordship take it that the only occasion when you spoke to Mr Page to tell him that you had found some interesting information of the sort that he had asked you to look out for was this call in August 2016?
> A. In this matter, yes.
> Q. So you had not spoken to Mr Page about any other interesting material that you'd found before the August 3 call?
> A. No, because I didn't have any interesting material until that time, my Lord.
> Q. Yes, and nor did you speak to Mr Page again after this first call in relation to this matter?
> A. We didn't mention this matter -- he didn't mention it, I didn't mention it, and I think it's over and I don't know what happened there and what happened after that. Now I know because of the court, but at that time it was something that I did to him as a favour and it's over for me, my Lord."

348. RAKIA's case concerning the discovery of the blogging websites raises a number of questions.

348.1 There is no obvious reason why an Israeli journalist should have been asked by Mr Page to conduct the task of looking for references to Mr Azima and others via simple Google searches. There was no suggestion in the witness statements of Mr Page or Mr Halabi that Mr Halabi had been asked to look for references in Arabic. Even if Mr Page was, as he claimed, not able to carry out simple Google searches himself, the other consultants engaged by RAKIA, or, most obviously, Insight or Digitalis, could have done this. RAKIA's pleaded case was that Bell Pottinger and Digitalis were engaged by RAKIA to monitor the press, internet and other media reports for references to individuals including Mr Azima.

348.2 From Mr Halabi's perspective, he had no reason to undertake the work apart from as a favour to a friend (though in his witness statement he did not say that he and Mr Page were friends). He was not paid. His alleged area of expertise is on the "relationship between Israel and Arab countries". Mr Halabi accepted that the material he found had no connection to his work and was of no interest to him.

348.3 The assertion in Mr Halabi's witness statement that he had conducted searches every "couple of days" would mean that Mr Halabi had, from March or April 2016, conducted searches every other day, and continued doing so despite finding nothing of interest until early August 2016 (in other words, at least some 50 times). In his oral evidence Mr Halabi suggested that a "couple of days" should be read as "some days" or "from time to time". Under cross-examination on what he meant by this, Mr Halabi was evasive and eventually claimed a lapse of memory and that he was unable to assist on this important point.

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 111 of 126

"Q: Can you answer that question?

A. I answered, my Lord. I answered the question. I said -- I said that it's from time to time, several times, every -- maybe it's three days, three days, then maybe week, and it's not something that I remember very well how often I do it and which times because I didn't write any documents or comments about it because it was a favour for a friend, my Lord.

Q: So is it right, Mr Halabi, that you can't actually provide any accurate indication to his Lordship as to how often you think, even approximately, you performed these searches?

A: It was, my Lord, a long time ago and I don't remember"

348.4    Mr Halabi said that he never spoke to Mr Page about these matters again after providing him with the links. However, there is no apparent reason why he would or should have considered that the task had come to an end: on his own account, he did not know what the data was for. He does not suggest that Mr Page told him to stop searching; he appears simply to have assumed that "it's over".

349.    RAKIA's case as to the transmission of information from Mr Halabi to Mr Page and from Mr Page to Mr Gerrard and Mr Buchanan is not directly evidenced by any documents (the relevant communications are said to have made by a now deleted WhatsApp message and by phone). There is some contemporaneous documentation consisting of emails emanating from Mr Gerrard, Mr Buchanan and NTi. This is inconsistent with Mr Page's and Mr Halabi's evidence.

349.1    Mr Halabi's evidence was that he found two links in the course of the same Google search and provided them to Mr Page by WhatsApp shortly afterwards, on the same day after he had spoken to Mr Page by phone and that he did not speak to Mr Page about it again. In his witness statement he said that following his call to Mr Page, he and Mr Page "did not discuss the matter again." Mr Halabi was asked about this in cross-examination:

"Q.  So can his Lordship take it that the only occasion when you spoke to Mr Page to tell him that you had found some interesting information of the sort that he had asked you to look out for was this call in August 2016?

A. In this matter, yes."

349.2    Mr Halabi's evidence would suggest that he had come across the Exposed blog and forwarded to Mr Page the two links mentioned on that blog (a "piratebay" link and a "molova" link) (in the course of cross-examination, Mr Halabi said he did not recognise either the Exposed blog or the Scammer blog but no other source for his information about the links was suggested).

349.3    This evidence is inconsistent with the email from Mr del Rosso (who had by this stage been contacted by Mr Gerrard) to Chris Swecker on 9 August 2016. This refers to the "piratebay" link and the "monova" link being discovered and notified on two different days, not on a single occasion, the piratebay

link being "discovered" at some time in the week beginning 1 August 2016, and the monova link on the weekend of 6-7 August 2016. It reads as follows:

> "I've spoken to Rich Garcia and agreed that you will instruct his company on this matter. I've told him that as recently as last week - we were advised by researchers that a deep web search indicated that data relating to Farhad Azima was on a site: https://thepiratebay.Org/torrent/15484452 and we'd initially like to learn exactly what is there. In addition, over this past weekend, we were told that another sitehttps://monova.org/42248895 also held either the same or additional information on Azima and indications that there may be further sites with more information. I'm not sure if the deep web is the same as the dark web but I'm sure NTI will know I'm not able to access the first site (piratebay.org) and it's most likely my ISP or lack of technical prowess, preventing me."

349.4 Mr del Rosso's email also refers to the links being identified with "deep web" searches. This is inconsistent with Mr Halabi's and Mr Page's account in two respects. Mr Halabi was clear that he conducted only simple Google searches. Mr Page and Mr Halabi also maintain in any event that Mr Halabi provided no information to Mr Page about the way the links were "discovered".

349.5 Mr Page said that he only spoke to Mr Gerrard on one occasion (on or about 8 or 9 August 2016). However, Mr Gerrard's email of 15 August 2016 to Mr del Rosso referred to a second call:

> "I've had another call from Stuart who confirms again that there is a website on FA. He seems to think it's been generated from a UAE source. I've asked for details. He said he would try and get them to me. Can you undertake a search for it?"

There is no evidence that Mr Gerrard sought further details from Mr Page.

349.6 It is RAKIA's pleaded case that a link to a second BitTorrent download was found in early September 2016 and that Mr Page was informed of the existence of the link by an unidentified "person who was not engaged by or acting on behalf of RAKIA". Mr Del Rosso's email dated 1 September 2016 reads as follows:

> "The client's 'spotter' in Dubai has reported a new data dump. I can't open the message (no good signal) to give you the link - could you search and if anything exists, download. If not I'll get home tonight and will be able to open the file with the supposed links."

349.7 Mr Del Rosso stated in his witness statement that he had assumed that the "spotter" was Mr Page. However, as noted above, Mr Page's evidence was that, once he had provided the first two links allegedly identified by Mr

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 113 of 126

Halabi to Mr Gerrard and Mr Buchanan on or around 8 or 9 August 2016, he considered the task complete and did not contact Mr Gerrard or Mr Buchanan again. Mr Halabi was also clear that he only spoke to Mr Page on one occasion.

349.8 There is therefore no explanation in the evidence as to how RAKIA found out about the Second Tranche of Data.

350. There are further discrepancies between the evidence of Mr Page and the documents. On 16 August 2016 Mr Buchanan emailed Mr Frank and Mr Handjani, copied to Mr Gerrard, as follows.

> "Good morning. I have been informed by Stuart last night that there is an internet site that is carrying a huge amount of material relating to FA - I will get you the link later. I have asked Neil to have a team start reviewing the material as a matter of urgency. At this time, I have no idea whether this relates to us or whether it is of value in respect of our ongoing dispute with KM. More importantly, I cannot tell you whether there is anything on the site about which we should have any concern. Clearly, it would be very interesting to know who is behind this action - Stuart tells me it is UAE based. We will speak later. Jamie"

351. This email raises further questions.

351.1 The email reads as Mr Buchanan was "breaking the news" regarding the hacked material (as Mr Buchanan accepted in cross-examination) even though, on RAKIA's case, Mr Buchanan had been informed of the Hacked Material by Mr Page over a week before, on 8 or 9 August 2016.

351.2 Mr Page denies contacting either Mr Gerrard or Mr Buchanan after the initial alleged call in which he passed on the two links from Mr Halabi, which is said to have taken place on 8 or 9 August 2016. It follows that Mr Page did not contact Mr Buchanan on 15 August 2016.

351.3 Mr Buchanan's email states that he would "get the link later". There is no evidence that Mr Buchanan ever did get "the link" or any of the recipients of the email followed up to ask for the link. Mr Gerrard's evidence is that he believed that he "already had it by then" but there is no evidence that Mr Gerrard was provided with a link on 15 August 2016 or that he provided a link to anyone else at that time or thereafter. The emails between Mr del Rosso and NTi do not identify any such new link being provided.

351.4 No reply was sent to this email at all, by any of the recipients despite the dramatic nature of the news that Mr Buchanan had 'broken'.

351.5 The email refers to "Stuart", meaning that Mr Buchanan understood his audience – Mr Frank and Mr Handjani – to know who Mr Page was and that he was undertaking some sort of work for RAKIA.

However, Mr Handjani's evidence was that he did not know who Mr Page was until the trial. It would therefore not have made sense for Mr Buchanan to have referred to Mr Page in this way in an email to Mr Handjani.

352. RAKIA's account of how it discovered the hacked material is unsatisfactory.

352.1 There was no convincing explanation for Mr Page's alleged enlisting of an Israeli journalist acquaintance to carry out simple Google searches nor for Mr Halabi's alleged searching, for no remuneration, on a regular basis for month after month.

352.2 The evidence of Mr Page was both internally inconsistent and inconsistent with the contemporaneous documents.

352.3 There was no explanation from RAKIA's side as to how it came across the Second Tranche of Internet Data in September. Even assuming in RAKIA's favour that (as pleaded by RAKIA) Mr Page told RAKIA about the second tranche (and that he had simply forgotten this conversation when giving evidence), there is no explanation as to where Mr Page got his information from. Mr Halabi was consistent that he only spoke to Mr Page on one occasion, in connection with the first set of links, in early August. It follows that someone else must have informed Mr Page about the second tranche but that person has not been identified.

353. RAKIA did not attempt to reconcile all these discrepancies. It accepted that its account of how it discovered the links to the hacked material was "messy and unclear" but contended that the reason it was "messy and unclear" was because it was true; if it had been intent on deception, it would have been relatively straightforward for RAKIA to devise a mechanism, such as a simple Google alert, for "discovering" the links (which were publicly available and discovered more or less at the same time by Mr Azima and his associates). As against this point, it was reasonably submitted on behalf of Mr Azima that an explanation along the lines of a simple Google alert would not have distanced RAKIA from the "discovery" in the way that Mr Page's account, involving Mr Halabi, did. RAKIA also submitted if that, if they were sophisticated plotters, they would not have disclosed, or would have concocted more efficiently, the documents which were said to be inconsistent with the witness evidence, such as Mr Buchanan's email with its erroneous reference to a "call last night".

354. In my judgment, it is not enough for RAKIA to say that, because it is messy and unclear, its evidence as to how it discovered the hacked material should be accepted as true. There is no obvious reason why a truthful account of how it came across the evidence could not have been clear and coherent.

355. I conclude from the unexplained contradictions, inconsistences and implausible elements that RAKIA's case that Mr Page discovered the blogging websites linked to the BitTorrent sites innocently via Mr Halabi and another unidentified informer

is not true and that the true facts as to how RAKIA came to know about the hacked material have not been disclosed.

356.    It does not of course necessarily follow from this conclusion that RAKIA was responsible for the hacking. As RAKIA pointed out, there would be variety of explanations for Mr Page's failure to give a true account of the discovery. He may, for example, have wanted to conceal his sources of information, even though they were not the hackers, for reasons of confidentiality.

**(10)    RAKIA's deployment of the hacked data**

357.    Mr Azima submits that RAKIA's responsibility for the hacking should be inferred from the fact that, apart from RAKIA no other party in any jurisdiction has sought to use any of Mr Azima's stolen material in any proceedings or indicated that it was able to access the stolen data using the BitTorrent sites.

358.    RAKIA's response to that argument is that Mr Azima appears to have been the subject of long term interest by Iran who perceived him as an enemy of the Iranian Government and who actively sought to acquire information and intelligence about him by targeting his communications and the communications of his close associates. In particular:

358.1    On 2 September 2012, for example, Ms Azadeh sent an email to Mr Azima which described how Mr Azima was being spied on by agents of Iran. The email was sent after Ms Azadeh was arrested and detained for more than three months by the Iranian Government and Revolutionary Guards.

358.2    On 24 February 2016, Ms Azadeh emailed Mr Azima a detailed account of her arrest and detention in Iran which made it clear that she and her communications were deliberately targeted by the Iranian state because of her close connection to Mr Azima, whom the Iranians believed was working with the CIA. She went on to explain that, "They had access to my computer and emails" and that she was eventually released after being "made to confess that I was a CIA agent and I was working with Farhad Azima in relation to all anti-Islamic government activities supported by U.S."

358.3    Jay Solomon, a former journalist for the Wall Street Journal, published an article in the Columbia Journalism Review dated 7 March 2018 which stated his belief that the Government of Iran was responsible for the hacking of Mr Azima's emails. The article recounted how emails between him and Mr Azima were hacked and put on the web as a torrent file. This happened just weeks after his first story broke in August 2016 about the Obama administration's secret cash shipments to Iran.

358.4    On 18 July 2016 – two weeks before the First Tranche of the Internet Data was published online – Ms Azadeh filed a lawsuit against the Islamic Republic of Iran and the Islamic Revolutionary Guards Corps before the United States

117

District Court for the District of Columbia. The lawsuit described how Ms Azadeh was detained in Evin Prison, Tehran where she was tortured, drugged and subjected to mock executions, and interrogated "about the cargo airline company at which she had worked since May in 2005 in various corporate roles" (this is a reference to HeavyLift). The US Court subsequently delivered a detailed judgment which found (amongst other things) that during her detention in Iran officials of the Revolutionary Guard "demanded that [Ms Azadeh] give them the passwords to her email and electronic devices" and interrogated her "about her employment with HeavyLift, specifically about the company's contracts with the U.S. Department of Defence". In September 2018, the US Court awarded Ms Azadeh damages of more than $36m against the Republic of Iran and the Revolutionary Guard.

358.5 There is evidence that persons in Iran attempted to gain access to Mr Azima's accounts. In particular, on 1 May 2016 an email was sent to Mr Azima's farhad@farhadazima.com email account from an email address entitled "administration@farhadazima.com". It stated that Mr Azima's account had been disabled and invited him to click on a link "where we'll ask you some questions to verify your identity". The email was bogus and was not a genuine account recovery message. The phishing email was sent from an IP address in Iran – indicating that Mr Azima was being actively targeted by a person or persons within that country.

358.6 In addition to the apparent targeting of Mr Azima's devices and communications by agents of the Iranian state, it is apparent that third parties managed to gain unauthorised access to Mr Azima's email accounts. For example:

(a)    On 5 April 2015, Mr Azima sent a text message to Mr Adams asking if Mr Adams had changed the password on his Gmail account because unusual activity had been detected on the account. Mr Adams replied that he had not changed the password. Mr Azima then replied: "I bet it is hacked".

(b)    On 12 April 2016, Mr Azima sent an email to Ray Adams which showed that a third party had managed to send spam messages from his farhad@farhadazima.com email account. Mr Azima's email stated: "Looks like I am hacked".

(c)    On 10 June 2016, Mr Azima sent another email to Mr Adams which again showed that a third party had managed to send spam messages from his farhad@farhadazima.com email account. Mr Azima stated: "Ray, does this means [sic] my email act [sic] is hacked again?".

(d)    Two days later, Mr Azima sent a further email to Mr Adams which showed another spam message had been sent by a third party from his farhad@farhadazima.com email account. Mr Azima stated: "Hacked again!"

118

358.7 Accordingly, not only has Mr Azima failed to establish that RAKIA was directly or indirectly responsible for hacking his emails, it is apparent that various other third parties had access to Mr Azima's accounts and may have had the means and motivation to access, publish and utilise his electronic data.

358.8 In early August 2016, despite his claim that he was threatened by Mr Gerrard a few weeks earlier, Mr Azima did not suspect RAK or RAKIA had hacked his emails. His suspicion came only when RAKIA brought proceedings based on the hacked data.

359. Mr Azima's response to the theory that the Iranian state may be responsible for the hacking is, in short, as follows.

359.1 The evidence concerning Ms Azadeh's arrest by the Iranian authorities, her apprehension that those authorities were surveilling her and others, and her lawsuit against the Iranian Revolutionary Guard does not come close to establishing that the Iranian authorities may have hacked Mr Azima, still less that they are a more likely culprit than RAKIA. In particular:

   (a) Ms Azadeh's arrest was in May 2012, more than 4 years prior to the publication of the BitTorrent sites.

   (b) Ms Azadeh was released by the Iranian authorities after paying a fine (in lieu of lashes); this is hardly consistent with a theory that those authorities regarded her or Mr Azima as connected with the CIA.

   (c) There is no evidence at all that the Iranian state or its authorities have sought to use the hacked material, to contact Mr Azima in relation to it or to take advantage of it.

   (d) The email to Mr Azima on 1 May 2016 was sent well after access had been obtained to his email accounts. The fact that the apparent IP address registers in Iran does not itself indicate that the sender was actually located in Iran. In the copy of the hacked material that is available in these proceedings, the malicious email appears in a junk email folder. As the email was in a junk email folder, it appears unlikely to have been opened by Mr Azima. The email does not appear in the image taken of Mr Azima's emails after the hacking was discovered.

   (e) The fact that Mr Azima did not immediately perceive RAKIA and the Ruler to be responsible for the hacking upon learning of the BitTorrent sites is of no consequence. He mistakenly believed that he had a good relationship with the Ruler and RAKIA.

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 118 of 126

360. In my judgment, the evidence of the possible involvement of Iran in the hacking, while falling far short of showing that Iran had any responsibility for the hacking, does at least displace any inference that RAKIA must have been responsible for carrying out the hacking because no other party conceivably had the means or the motivation to do so.

**(11)  The inability of RAKIA's IT expert to download all the internet data in April 2017**

361. Mr Azima relies on the fact that in proceedings in the United States brought by Mr Azima, RAKIA appointed an IT expert who "could obtain only a portion of Mr Azima's material" from the internet in April 2017. Mr Azima contends that, "RAKIA's own computing expert was therefore unable to replicate the process by which RAKIA claims…to have obtained the stolen data" and this therefore supports his case that RAKIA was responsible for the hacking.

362. RAKIA submits that there is no merit in this argument on the following grounds:

362.1 RAKIA's US expert attempted to download the hacked data between 31 March and 10 April 2017 – more than seven months after the hacked data first became available. The fact that he was able to download some, but not all, of the hacked data in April 2017 does not provide any insight into the availability of the hacked data some seven or eight months earlier.

362.2 The parties' independent forensic IT Experts agree that "the availability of data shared over a torrent may change over time and that it is not possible to retrace peer to peer activity". Mr Krone, RAKIA's expert, further explains that the availability and ease of download of the torrent files relating to Mr Azima were likely to have varied on a daily or even hourly basis depending on the number of "seeders" (i.e. users uploading data previously downloaded from other users) available at any specific time, the existence of servers keeping track of the location of seeders and their immediate availability and the number of people attempting to download the same shared file.

363. For the reasons advanced by RAKIA, I agree that the inability of RAKIA's computing US expert to download the hacked material does not provide any support for Mr Azima's case that RAKIA was responsible for the hacking.

**(12)  "Deliberately withheld documents"**

364. Mr Azima contends that certain materials that had been within Mr Azima's emails were not included among the hacked materials on the BitTorrent sites. Those include materials that would be damaging to RAK, including the so-called Smoking Gun report about the arrest of the Ruler for sexual assault.

365. The Experts have not been able to confirm whether the materials in question would have been available to the hackers. The evidence of Mr Krone, RAKIA's expert,

120

was that as Mr Azima did not provide him with access to the preserved devices or a contemporaneous copy of the devices/accounts that Mr Azima alleges were compromised, it was impossible for him to confirm what material was stored on those devices/accounts at the time they were hacked and therefore it was impossible to identify any differences between that material and the content of the data on the internet. Mr Tarbell agrees that it is impossible to confirm what material would have been found on or in Mr Azima's devices/accounts at the time they were compromised and thus whether any of that material was withheld from the Internet Data.

366.    RAKIA also points out that on 12 September 2019 RAKIA made a request for further information asking how many documents in total had allegedly been withheld from the hacked data on the BitTorrent sites and whether Mr Azima had taken any steps to identify documents that were allegedly withheld and which were not damaging to the reputation of RAK or RAKIA. Mr Azima refused to answer those questions on the grounds that the information requested was not needed or was privileged. RAKIA submits that it is to be inferred that either Mr Azima has failed to examine whether any documents not damaging to RAKIA/RAK were withheld from the hacked materials on the BitTorrent sites or Mr Azima has examined that issue and has concluded that the category of withheld documents does include documents which are not damaging to RAKIA/RAK.

367.    I accept that Mr Azima's failure to provide clarification as to which documents were withheld from the materials available on the BitTorrent sites means that no weight can be placed on his argument that documents allegedly missing from the hacked material on the BitTorrent sites show that RAKIA must have been responsible for the hacking.


**(13)    Mr Page's "track record"**

368.    It is submitted for Mr Azima that, in assessing the inherent likelihood of Mr Page arranging for committing the hacking, I should take into account what is alleged to be his track record of involvement with other instances of hacking and illegal information gathering, as follows.

368.1    In the case of *Dubai Aluminium v Al Alawi* [1998] EWHC 1202 a sub-agent engaged by Mr Page had obtained confidential information using pretext calls, which Mr Justice Rix found to be illegal (and which Mr Page accepted was illegal). Mr Page said he did not instruct the subagent to act illegally and was unaware of it at the time.

368.2    Following Mr Page's engagement by the Board of Control for Cricket in India to investigate several board members and players, confidential emails passing between individuals (who were the subject of the inquiry) found their way to the media. Page Protective Services was accused of obtaining unauthorised

access to those emails. In his oral evidence Mr Page denied being involved in the illegal obtaining of emails.

368.3 Most recently, Mr Page was associated with the theft of confidential documents by Israeli hackers. Sir Andrew Smith had noted in passing, in the course of a judgment in *JSC BTA Bank v Ablyazov* [2018] EWHC 259 (Comm) that the claimant bank was contacted in early 2016 by Mr Page who claimed to act for unnamed Israeli hackers who had extracted information from a computer belonging to a Mr Aggarwal, an accountant. Mr Page was asked to approach the Bank to find out whether it was interested in obtaining the information which might be useful in relation to claims brought by the bank.

369. These cases highlight the fact that Mr Page operates in a world of covert surveillance in which agents acquire confidential information unlawfully and that Mr Page has dealings with such agents. It would be a reasonable inference to draw from these incidents that Mr Page has access to agents with the capacity to hack emails. However these other incidents do not establish that Mr Page ever personally carried out or authorised the unlawful obtaining of confidential information and therefore do not affect my assessment of the inherent likelihood of Mr Page acting unlawfully in this case. Mr Azima also relied on the level of Mr Page's remuneration of between $100,000 and $300,000 per month as being "consistent with Mr Page obtaining information by illicit means and of seeking a premium for such nefarious activity." Mr Page was certainly generously remunerated but I do not consider that his rate of remuneration can sensibly be taken as a sign of illicit activity.

## (14)   Allegations against Mr Gerrard

370. The serious allegations made against Mr Gerrard in proceedings brought by Eurasian Natural Resources Corporation ("ENRC") against the Serious Fraud Office (the "SFO") in which it is alleged that Mr Gerrard leaked information covered by ENRC's confidentiality and privilege to journalists and to the SFO, in breach of his fiduciary duties and his retainer with ENRC and set to overcharge ENRC, are no more than unproven allegations denied by Mr Gerrard and are similarly of no assistance in the present case.

## (15)   RAKIA's conduct of other litigation

371. For Mr Azima it was alleged that RAKIA's conduct of litigation has been highly improper, showing that RAKIA (and on occasion its lawyers) were willing to break the rules in pursuit of its own ends.

371.1 First, a chain of emails in June 2016 involving Mr Buchanan, and lawyers at Dechert and Pillsbury describes a plan for two former Georgian judges, now employed by Pillsbury, to seek to have certain cases heard by a particular judge as a "personal favour". The emails refer to those individuals demonstrating "influence with the judiciary". Mr Buchanan accepted that this was

122

inappropriate.

371.2 Second, it was alleged that RAKIA Georgia had put improper pressure on Gela Mikadze through the Georgian government. In August 2013 the then CEO of RAKIA Georgia wrote to the then CEO of RAKIA and others in relation to the support that RAKIA could seek to obtain from the Georgian government in its dispute with Mr Mikadze. Mr Buchanan agreed that enlisting the support of a government and threatening imprisonment in order to pressure him into settling a dispute was an improper thing to do.

371.3 Third, it was alleged that in September 2014 RAKIA had lobbied the Georgian government to put pressure on Dr Massaad. Mr Bustami had emailed individuals in the Ruler's office, copying Mr Gerrard, indicating that RAK intended to "target" certain outcomes.

371.4 Fourth, it was alleged that documents confidential to Mr Mikadze, who has been embroiled in litigation with RAKIA in Georgia since 2015, were mailed anonymously to RAKIA's lawyers (Dechert) marked for the attention of Mr Gerrard. It was submitted that RAKIA's receipt of confidential information from anonymous benefactors in two sets of proceedings cannot be coincidental and that a more likely explanation is that RAKIA or an agent acting on its behalf obtained the material illicitly and then sought to 'launder' it by providing it anonymously through the post.

372. The circumstances of these other incidents do not, in my view establish that RAKIA had a highly improper attitude to litigation and do not shed any useful light on the issue of whether RAKIA was responsible for the hacking of Mr Azima's emails in the present case.

372.1 The first incident comprised a proposal by a lawyer working for Pillsbury to speed up the disposal of two cases by persuading a judge to hear them before his retirement.

372.2 The second incident did not involve the individuals concerned in the present proceedings. Moreover, the email about which complaint is made was copied to RAK's lawyers.

372.3 The third incident, involving the suggestion that RAK should enlist the support of the Georgian government in its pursuit of claims against Dr Massaad, was not in itself improper. Mr Bustami was not advocating support inconsistent with Dr Massaad's legal rights.

372.4 As to the fourth incident, I am not in any position to draw any conclusions as to whether documents confidential to Mr Mikadze were obtained illicitly. There is, in any event, no suggestion that the documents were obtained by email hacking.

123

**Conclusions on the hacking claim**

373.   Email hacking, or the gaining of authorised access to a person's email account, is self-evidently a serious wrongdoing, a violation of privacy and a criminal offence under the Computer Misuse Act 1990.

374.   Mr Azima invites me to find, on the balance of probabilities, not only that Mr Page, acting on the instructions or with the connivance of the Ruler, arranged for Mr Azima's emails to be hacked, but also that RAKIA's main witnesses, Mr Buchanan, Mr Gerrard, the Ruler, Mr Page, Mr Halabi, Mr Handjani and Mr Bustami, have conspired to present a false case to the Court concerning RAKIA's lack of involvement in the hacking and have given perjured evidence in support of that false case.

375.   It is trite law that cogent evidence is required to justify a finding of discreditable conduct and that "the cogency of the evidence relied upon must be commensurate with the seriousness of the conduct alleged". This is because of the inherent improbability of people committing serious wrongdoing. Most people are not serious wrongdoers and, even if capable of serious wrongdoing, are likely to be deterred by the fear of detection. Thus as Andrew Smith J stated in *Fiona Trust v Privalov* [2010] EWHC 3199 (Comm) at 1438:

> "It is well established that "cogent evidence is required to justify a finding of fraud or other discreditable conduct": per Moore-Bick LJ in Jafari-Fini v Skillglass Ltd., [2007] EWCA Civ 261 at para.73. This principle reflects the court's conventional perception that it is generally not likely that people will engage in such conduct: "where a claimant seeks to prove a case of dishonesty, its inherent improbability means that, even on the civil burden of proof, the evidence needed to prove it must be all the stronger", per Rix LJ in *Markel v Higgins,* [2009] EWCA 790 at para 50. The question remains one of the balance of probability, although typically, as Ungoed-Thomas J put it in *In re Dellow's Will Trusts,* [1964] 1 WLR 415 , 455 (cited by Lord Nicholls in In re H, [1996] AC 563 at p.586H), "The more serious the allegation the more cogent the evidence required to overcome the unlikelihood of what is alleged and thus to prove it". Associated with the seriousness of the allegation is the seriousness of the consequences, or potential consequences, of the proof of the allegation because of the improbability that a person will risk such consequences: see *R(N) v Mental Health Review Tribunal (Northern Region),* [2005] EWCA 1605 para 62, cited in Re Doherty, [2008] UKHL 33 para 27 per Lord Carswell."

376.   The forensic evidence established that the hacking of Mr Azima's emails could have taken place in October 2015 but it is common ground that it is impossible from the forensic evidence to identify the hackers. Mr Azima's case that Mr Page engaged agents to carry out the hacking therefore depends on inferences to be drawn from a series of pieces of circumstantial evidence, what Counsel for Mr Azima referred to as "a few but very powerful forensic pointers".

377. I consider that the following facts and matters support the inference that the hacking of Mr Azima's emails was carried out by Mr Page acting on the instructions of the Ruler:

377.1 The fact that, as reported in Mr Page's Project Update, in early 2015 Mr Azima was being monitored by sophisticated surveillance specialists engaged by Mr Page who planned to gather intelligence on the progress of the team of advisors managed by Mr Azima in the US to spread allegations against RAK and the Ruler in order to "monitor their activities and attempt to contain or ruin their plans";

377.2 The fact that in 2015 the Ruler felt hostile towards Mr Azima, probably because of the matters reported in the Project Update, leading the Ruler to express the wish in April and again in July 2015 that Mr Azima should be targeted and gone after; he wished to obtain information about the role Mr Azima had played in Dr Massaad's schemes;

377.3 The fact that throughout 2015 the Ruler had regular monthly meetings with Mr Page to discuss the ongoing investigations organised by Mr Page into Dr Massaad's activities, sometimes on a one to one basis without the involvement of Mr Buchanan;

377.4 The fact that in December 2015 plans were being drawn up by RAKIA for a media campaign against Mr Azima, who was suspected of orchestrating and participating in fraudulent activities, alongside Dr Massaad;

377.5 The fact that the blogging sites attacking Dr Massaad and the sites attacking Mr Azima with links to the hacked material appeared within a few days of each other, suggesting that both attacks were coordinated and directed on behalf of RAKIA/the Ruler, (although, as noted above, I recognise that the coincidental timing may also suggest that RAKIA was not involved);

377.6 The implausible nature of the evidence adduced by RAKIA to explain how Mr Page discovered the blogging sites and the second tranche of data, suggesting that Mr Page, whom I considered to be an unreliable witness, was not disclosing all the facts.

378. As against these considerations, there are a number of significant features of Mr Azima's hacking case which are improbable and point away from RAKIA being responsible for the hacking, as follows:

378.1 The inherent improbability of RAKIA, several months after Mr Azima's emails were hacked and at a time when, *ex hypothesi*, it had had time to analyse the contents of the material hacked in October 2015, entering into the Settlement Agreement with Mr Azima and paying Mr Azima $2.6 million; Mr Azima's explanation for the Settlement Agreement as a device to trap him is not compelling;

378.2  The inherent improbability of RAKIA negotiating the ISR joint venture with GDS, of which Mr Azima was a shareholder and director, at a time when it had *ex hypothesi* concluded, on the basis of the hacked material, that Mr Azima was a fraudster;

378.3  The absence in RAKIA's internal communications in the period following October 2015 of any reference to the hacking or information clearly derived from the hacking;

378.4  The fact that from October 2015 onwards RAKIA did not make use of the hacked material other than as the basis for bringing proceedings to recover the settlement sum and did not use the material to exert leverage on Mr Azima in his role as go between with Dr Massaad;

378.5  The inherent improbability of RAKIA's witnesses, including Mr Gerrard as a solicitor, conspiring together to conceal RAKIA's role in the hacking and participating in proceedings which, if successful, would result in a relatively modest award of damages and reputational damage to Mr Azima but which would carry with them a risk of no less serious reputational damage to RAK, RAKIA and themselves, were the hacking to come to light.

379.  I was not persuaded that the View from the Window document or the meeting on 16 July 2016 support Mr Azima's hacking claim. They do not, in my view, show that Mr Gerrard was aware of the contents of the hacked material. I was not persuaded that Mr Buchanan knew about the hacking. More generally, I was not satisfied that there was sufficiently cogent evidence to establish a conspiracy between the RAKIA witnesses to advance a false case in these proceedings.

380.  I accept that the hypothesis advanced on behalf of Mr Azima that Mr Page, acting with the express or implied authority of the Ruler, arranged for Mr Azima's emails to be hacked, that the Settlement Agreement was entered for tactical reasons and that it was decided to deploy the hacked material in August 2016 once the ceasefire with Dr Massaad was over, is not impossible. It would provide an explanation for the fact that the hacked material came to light when it did and for RAKIA's failure to provide a convincing account of its innocent discovery of the hacked material. It is equally not impossible that Mr Page arranged for Mr Azima's emails to be hacked without the knowledge of Mr Gerrard or Mr Buchanan or the Ruler's advisers so that the instigation of these proceedings did not entail a conspiracy between them, even though the witnesses may have harboured suspicions about Mr Page's role.

381.  It is, however, not enough for Mr Azima to advance a case that is not impossible. Based on all of the documentary and witness evidence, I was not satisfied on the balance of probabilities that RAKIA was responsible for the hacking of Mr Azima's emails. The facts supporting the inference that RAKIA was responsible for the hacking are far from conclusive and the improbable features of Mr Azima's case can only be explained away on the basis of speculative assumptions for which there is no sufficiently firm evidence.

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 125 of 126

382.    Given my conclusion, based on all the evidence, that it has not been proved that RAKIA was responsible for the hacking of Mr Azima's emails, the issues which would have arisen upon a finding that RAKIA's case was based on illicitly obtained evidence fall away.

383.    Had I upheld the hacking claim, it would have been necessary to decide whether to admit or exclude the illicitly obtained evidence or to strike out RAKIA's claim entirely as I was invited to do by Mr Azima. As the Court of Appeal noted in *Jones v Warwick¸* the decision would have depended on all the circumstances, including my findings of fact in connection with the hacking.

384.    If I had found that RAKIA had hacked Mr Azima's emails, I would not necessarily have excluded the illicitly obtained evidence as, without it, RAKIA would have been unable to prove its claims and Mr Azima would have been left with the benefit of his seriously fraudulent conduct. If, however, I had found that, as alleged by Mr Azima, not only had RAKIA hacked Mr Azima's emails and used them as the evidential basis of this case, but also that its witnesses had conspired to put forward a fabricated case concerning RAKIA's lack of involvement in the hacking, there would have been strong grounds to strike the proceedings out as an abuse of process, as envisaged in *Summers v Fairclough Homes Ltd*.

## Overall conclusion

385.    Mr Azima is liable to pay RAKIA the sums of $2,600,000 and $1,562,500 making a total of $4,162,500.

386.    I will give directions for the service of submissions on interest and costs.

Case 1:21-mc-00006-WO-LPA   Document 4-2   Filed 02/05/21   Page 126 of 126