# EXHIBIT C

```
 1                                    Tuesday, 28 January 2020
 2      (10.30 am)
 3      MR LORD:  May it please your Lordship --
 4      JUDGE LENON:  Sorry, before we start, can I just say I'm
 5           sorry that the courtroom is a bit small.  I have made
 6           enquiries about getting a larger courtroom, possibly
 7           tomorrow, so that people don't have to stand up.
 8      MR LORD:  That's very kind, my Lord.  That's very kind,
 9           thank you, my Lord.
10                        MR NEIL GERRARD (continued)
11                   Cross-examination by MR LORD (continued)
12      MR LORD:  Mr Gerrard, before court began this morning,
13           I caught your eye to say "Good morning" and you were
14           looking at a notebook, weren't you?
15      A.   That's correct.
16      Q.   A blue hard-backed notebook?
17      A.   Correct.
18      Q.   Do you keep a notebook or notebooks?
19      A.   I do.
20      Q.   In relation to what?
21      A.   In relation to all my matters.  It's a daybook.
22      Q.   It's a daybook?
23      A.   Yes.
24      Q.   And that would apply, would it, to your professional
25           work?
```

```
 1    A.  Yes, it would.

 2    Q.  And your work as a lawyer in relation to the matters in

 3        dispute before his Lordship today?

 4    A.  Yes, it would.

 5    Q.  And that would be, what, notes of meetings?

 6    A.  Yes, some notes of meetings.

 7    Q.  And there would be notes of telephone calls, would

 8        there?

 9    A.  Yes, there would be.

10    Q.  And there would be notes of exchanges you may have had

11        with third parties in relation to the investigations

12        you're doing?

13    A.  Very much so.

14    Q.  Has there been any disclosure of any of your notes in

15        relation to these proceedings, Mr Gerrard?

16    A.  I've no idea.  These books go back some time.  I've no

17        idea.

18    Q.  Have you been in the habit of keeping a daybook since

19        the beginning of 2015?

20    A.  I would imagine so.

21    Q.  And do you keep those daybooks as a record?  I imagine

22        you do.

23    A.  Yes, I do.

24    Q.  And where are they kept?

25    A.  They're kept in my office.
```

```
 1    Q.  And some of the matters in this dispute here concerning
 2        you, they concern meetings that you've attended, don't
 3        they?
 4    A.  Yes, where there is a note-taker, there will be no notes
 5        in my notebook.  Where I feel there's a need to take
 6        a note of a meeting, I'll take a note.
 7    Q.  Have you made your notebooks available to RAKIA or
 8        RAKIA's advisers in order that they can check whether
 9        there's anything that should be disclosed from those
10        notes?
11    A.  If we were asked, we will have certainly made them
12        available.  I am constantly on the road.  My PA tends to
13        deal with any queries or questions.  I wouldn't know if
14        they've been asked for.
15    Q.  Mr Gerrard, I'd suggest that that can't be right.  You
16        would know if your daybooks had been called for so that
17        someone could see whether any entries that relate to
18        these proceedings ought to be disclosed because they're
19        not protected by some sort of privilege.
20    A.  I wouldn't necessarily know.  My PA has complete access
21        to all documentation.  There are a number of cases going
22        on at the moment where people are asking for information
23        all the time.  I would not necessarily know.
24            In this particular case, I don't necessarily --
25        I don't know.
```

```
1    Q.  Can his Lordship take it that where there isn't a formal
2        note produced or there isn't a formal note-taker
3        present, it's likely that you would have made a note in
4        your daybook --
5    A.  No.
6    Q.  -- of the particular meeting?
7    A.  No, not necessarily.  I made a note when I needed to
8        make a note or felt the need to make a note.
9    Q.  It's right, isn't it, that you're a solicitor, aren't
10       you?
11   A.  It is right I'm a solicitor.
12   Q.  And an officer of the senior courts?
13   A.  I'm an officer of the senior court.
14   Q.  That carries with it, doesn't it, Mr Gerrard, some
15       responsibility to keep records of your professional
16       dealings?
17   A.  Correct.
18   Q.  So can his Lordship take it that if you had any sort of
19       meaningful professional meeting or exchange or telephone
20       call, you would, as a matter of professionalism, make at
21       least some record of it?
22   A.  I will from time to time -- I will make notes.  I can't
23       promise to make a note of every conversation or every
24       meeting.
25   Q.  But you'd want, wouldn't you, to have a record -- if
```

1        you're working for a client and you speak to somebody

2        about a matter of any significance, you're going to want

3        to make a note of that, aren't you, if only for your own

4        protection?

5    A.  On the key meetings, yes, my Lord.

6    Q.  I accept that if you have inconsequential discussions

7        with your client or with others, I accept that, but

8        let's say you're engaged in some sort of investigation

9        of a particular topic and you have a meeting with

10       a particular person, you're likely to make a note of

11       that, aren't you?

12   A.  It depends on the circumstances.

13   Q.  So you may have a material meeting or exchange as part

14       of your professional duties and yet you wouldn't make

15       any note of that event; is that right?

16   A.  It's possible, my Lord.

17   Q.  We know now, Mr Gerrard, that you were privy to the

18       project updating in written form which Mr Page did and

19       which Mr Buchanan spoke about when he gave evidence.

20   A.  That's correct, my Lord.  I'd like to make one

21       clarification from yesterday's cross-examination, if

22       I may.

23   Q.  Go ahead, Mr Gerrard.

24   A.  When you asked me whether or not I only read the reports

25       in the presence of Mr Buchanan, I said I did.  That

```
 1            needs to be clarified.  If I was in Ras Al Khaimah or
 2            Mr Buchanan was in London for several days, I wouldn't
 3            necessarily read that report in his presence.  He would
 4            give it to me and I would give it to him the day back or
 5            whatever.  But I would not keep it for sure, but
 6            I wouldn't read every report in his presence.  It
 7            depends whether it was the full report or just a short
 8            section of it.
 9   Q.   I see.  So there would have been occasions when
10            Mr Buchanan entrusted you with a copy of this report for
11            you to read and then return back to him at some point?
12   A.   "Some point" being within a day or two --
13   Q.   I understand.
14   A.   -- if we were in the same countries, yes.
15   Q.   Now, we've established with Mr Buchanan, I think, and
16            with you, that Mr Page was engaged upon investigations
17            in relation to Dr Massaad and his associates, wasn't he?
18   A.   That is correct.
19   Q.   Seemingly at the instigation of the Ruler of
20            Ras Al Khaimah, according to Mr Buchanan?
21   A.   Well, I don't know what his precise instructions were
22            because he was engaged before I was, but certainly
23            whilst I was involved, all the reports I saw were in
24            respect of Dr Massaad and others.
25   Q.   And we know, don't we, because we've seen the
```

```
 1          26 March 2015 update, that at least some of Mr Page's
 2          work concerned or featured Mr Azima?
 3     A.   I think the only report I saw that featured Mr Azima was
 4          the 20 -- whatever it is -- 26th March 2016.
 5     Q.   What's the basis for your evidence in that regard,
 6          Mr Gerrard?
 7     A.   I'm giving it.
 8     Q.   What's the basis for your recollection that that seems
 9          to be the only -- just to recap, we established I think
10          with Mr Buchanan that Mr Page probably produced
11          somewhere in the region of over 25 written reports in
12          the last four and a half years; all right?  You were in
13          court yesterday, weren't you?
14     A.   Yes, I was.
15     Q.   So you heard that, didn't you?
16     A.   I did.
17     Q.   And you've no basis to challenge that, have you?
18     A.   None.
19     Q.   And you're likely to have been privy to the briefing by
20          Mr Buchanan or Mr Page of most of those reports, aren't
21          you, Mr Gerrard?
22     A.   Most of the 24?
23     Q.   Yes.
24     A.   I doubt it.
25     Q.   How many do you think -- how many of these monthly
```

```
 1          updates from Mr Page on Project RAK do you think were
 2          not -- you were not apprised of, at least in part?
 3     A.   When you say "reports", are you talking about verbal
 4          reports or written reports?
 5     Q.   Well, deal with either.  Deal with either.
 6     A.   I think I must have, in that period of time -- I think
 7          24 would be a fair number.  It wasn't a regular basis.
 8          Matters weren't -- I understand he did reports which
 9          weren't necessarily relevant to me.  There were reports
10          that were relevant to me, parts of reports that weren't
11          relevant to me -- were relevant to me.
12     Q.   And it's right, isn't it, that Mr Page's investigation
13          included matters such as asset tracing, for example, in
14          relation to which you would be particularly interested
15          given your retainer?
16     A.   That's correct.
17     Q.   And therefore it's right, isn't it, that particularly if
18          no one was allowed to take a copy away of Mr Page's
19          updating reports, you would be likely to make some notes
20          of that updating in order that you had some record to
21          use as part of your work?
22     A.   Not every time, but, yes, I would have -- almost
23          certainly.
24     Q.   So can his Lordship take it that it's likely that you
25          were usually made aware one way or the other of
```

```
 1         Mr Page's monthly updating, whether that updating was
 2         oral or in writing?
 3    A.   Sorry, you'll have to repeat the question.  As it
 4         related to me ...?
 5    Q.   Have you worked on this investigation for RAK or RAKIA
 6         since the beginning of 2015, "Yes" or "No"?
 7    A.   Since 2013.
 8    Q.   So the answer is "Yes"?
 9    A.   Yes.
10    Q.   And do you still work on the investigation of Dr Massaad
11         for RAK or RAKIA?
12    A.   Aspects of it.
13    Q.   And therefore -- and for the period I'm talking about --
14         from the beginning of 2015 to let's say up to now --
15         that's a period of nearly five years, isn't it?
16    A.   Correct.
17    Q.   And we know that Mr Page has been providing monthly
18         reports to the Ruler or Mr Buchanan -- monthly
19         reports -- over that time, don't we?
20    A.   Where's that evidence come from, monthly reports?
21    Q.   It comes from Mr Buchanan.
22    A.   Then if that's -- that must be right, then, yes.
23    Q.   So were you checking my source because, if I hadn't got
24         a source for it, you were going to quibble with it?
25         Is that what you were doing, Mr Gerrard?
```

```
 1    A.   No, I didn't know it was necessarily monthly --

 2    Q.   Right.

 3    A.   -- personally know.

 4    Q.   So now you know it's monthly.

 5    A.   Yes.

 6    Q.   But you would know your involvement, wouldn't you, so

 7         why don't you -- go back to the question.  His Lordship

 8         has been told by Mr Buchanan that these were monthly

 9         updates by Mr Page of Mr Buchanan and at least 50% of

10         the time they were in writing; all right, Mr Gerrard?

11         Do you follow that?

12    A.   (Nods)

13    Q.   So, by my calculation, by now we're up to about 30-plus

14         written updates from Mr Page; yes?

15    A.   On your calculation, yes.

16    Q.   I think on any calculation, I think.  I think half of 60

17         is 30.

18    A.   On your calculation.  I don't know whether there were

19         60 reports or 50 reports or 40 reports.

20    Q.   If Mr Page reported monthly over a period of five years,

21         how many monthly updates do you think that would be,

22         Mr Gerrard?

23    A.   I don't know that he necessarily reported monthly.

24         That's what we're told, but I don't know.

25    Q.   Well, let's assume that that's what he did do, how many
```

```
 1            times is he going to have given a report per month?
 2    A.   Yes, I take your point.
 3    Q.   How many?
 4    A.   60.
 5    Q.   And if half of those -- at least half of those -- were
 6            in writing, how many written reports would Mr Page have
 7            produced by way of a project update for Mr Buchanan?
 8    A.   30.
 9    Q.   We've established, Mr Gerrard, that you've been involved
10            working on this investigation over that entire period of
11            five years, haven't you?
12    A.   That is correct.
13    Q.   And you've accepted this morning that Mr Page's work
14            would at least in part be relevant to your professional
15            investigation work as well, haven't you, Mr Gerrard?
16    A.   I have said some of it would be relevant, yes.
17    Q.   And that presumably is why you were privy to Mr Page's
18            monthly updates?
19    A.   Absolutely.
20    Q.   And we know from Mr Buchanan that your involvement on
21            occasion extended to meetings where the Ruler was
22            present as well, don't we?
23    A.   That is correct.
24    Q.   It would be fair to say, wouldn't it, Mr Buchanan,
25            that --
```

1   A.  It's Mr Gerrard, actually.

2   Q.  Mr Gerrard, sorry.  It would be fair to say, Mr Gerrard,

3       wouldn't it, that looking at the way in which the Ruler

4       was involved in Mr Page's work and looking at the

5       frequency and formality of Mr Page's updating, Mr Page's

6       assignment looks to have been quite an important part of

7       the overall RAK or RAKIA investigative project?

8       Would you agree?

9   A.  There were definitely, my Lord, certain areas which were

10      important.  As in the nature of these things, a lot of

11      reports (a) weren't necessarily relevant and, two,

12      I queried.

13  Q.  But do you accept that it looks as if Mr Page's work was

14      an important part of the RAK investigation that was

15      carrying on?

16  A.  I don't think I need to repeat my answer, but I will if

17      you want me to.

18  Q.  Yes, please.  Was it important or not?  What parts of it

19      were important?

20  A.  There were aspects of it that were important, but, as in

21      these cases, there was a significant amount which was

22      not relevant and questionable.

23  Q.  But some of what Mr Page was doing was important and

24      relevant to what you were doing?

25  A.  Some of what he was doing was important, yes.  He gave

1      us --
2   Q.  And relevant to what you were doing?
3   A.  Of course, and some of it gave us leads as to where else
4       to look.
5   Q.  So, Mr Gerrard, we've heard that there was a protocol in
6       place according to Mr Buchanan stipulated by the Ruler
7       of Ras Al Khaimah to the effect that a copy of Mr Page's
8       written report was not to be disseminated and had to be
9       returned to Mr Page within two weeks.  You look a bit
10      puzzled by that.
11  A.  No, no, no, I -- when you said "not to be disseminated",
12      beyond --
13  Q.  Beyond a few people, yes, you're right.
14  A.  I was clearly one of those people, yes.
15  Q.  You were.  So, in your understanding, who were the
16      people --
17  A.  I don't think I -- I'm not sure when I knew that the
18      report was necessarily destroyed, but I knew that it
19      was -- it had to go back to Mr Page.
20  Q.  Right.  And who else, as far as you're aware, got to see
21      a copy of Mr Page's reports?  Who else apart from you
22      and Mr Buchanan?  Who else do you think saw them?
23  A.  I don't know, but I doubt whether they will have been --
24      I doubt whether the report itself would have been widely
25      disseminated, but I don't know.

1    Q.  Given that at least some of Mr Page's updating work was

2        important and relevant to what you were doing, you would

3        presumably, Mr Gerrard, have taken some notes in your

4        daybook of the germane points that you gleaned from

5        these monthly updates?

6    A.  Yes, but not every time.

7        Can I give you an example of when I didn't?

8    Q.  No, can I ask you first about the note-taking, please?

9    A.  Yes.

10   Q.  So there would be records -- there would be, still

11       today, notes in your daybook of updates you had -- well,

12       effectively Mr Page's updates, you will have made at

13       least some notes of that in your various daybooks over

14       time?

15   A.  I will have made some notes over time, yes.

16   Q.  None of those notes have been disclosed, Mr Gerrard, in

17       this case, even in a redacted form.

18   A.  I don't know -- if that's what you tell me -- but are

19       they not legally privileged anyway?

20   Q.  You see, Mr Gerrard, it was only when Mr Buchanan gave

21       evidence last Thursday that the fact that Mr Page was

22       the author of the one surviving project update was

23       actually disclosed on behalf of RAKIA at all.

24   A.  Yes.

25   Q.  Were you aware of that?  Were you here on Thursday or

1          did you learn of what Mr Buchanan said that day?

2     A.   Sorry, can you repeat the question?

3     Q.   On Thursday, for the first time, it was disclosed

4          through Mr Buchanan's evidence in the witness box --

5     A.   Yes, I was there.

6     Q.   You were there, and you heard the exchanges and perhaps

7          you heard my surprise because I hadn't appreciated until

8          then that Mr Page was the author of the project update,

9          and, as far as we understand it, that's the first time

10         that RAKIA in this litigation has revealed to my client

11         and the judge and the court the authorship of that one

12         surviving page project update.  Do you understand that

13         point?

14    A.   Yes, I do.

15    Q.   And therefore -- and his Lordship asked Mr Buchanan --

16         Mr Buchanan's evidence was that he hadn't -- he sort of

17         overlooked the fact that Mr Page had provided all these

18         written monthly updates and he recollected Mr Page's

19         authorship a month ago when he was preparing for trial.

20         That's what Mr Buchanan said.  All right, Mr --

21    MR TOMLINSON:  That's not what Mr Buchanan said.  He said he

22         had not -- he didn't fail to remember that he'd produced

23         monthly updates.  He failed to recollect that that

24         particular one was one that he produced.

25    MR LORD:  And so, Mr Gerrard, his Lordship can take it,

1      can't he, that you would always have known throughout

2      the period when you were giving assistance in relation

3      to this litigation, the current proceedings before

4      his Lordship today -- you would always have known about

5      Mr Page's monthly updating process, wouldn't you?

6   A. I would have always known ... I don't understand the

7      question.

8   Q. You would never have forgotten that Mr Page would have

9      provided regular updates?

10  A. If that's the question, no, I don't forget that he's

11     given regular updates.  If the question is would I --

12     did I recognise that report, that's a different

13     question.  Would you like me to answer that one?

14  Q. Have you told RAKIA -- Mr Gerrard, have you informed

15     RAKIA, the party in this litigation for whom you're

16     giving a witness statement -- have you informed them

17     that you have notes of Mr Page's updating?

18  A. No, my Lord.

19  Q. Why not?

20  A. Why not?  I didn't think it was relevant.

21  Q. Let's go to your witness statement.  Let's go to your

22     witness statement, Mr Gerrard.  It's at {D/7/1}.  Let's

23     pick up where you talk about Mr Page.  It's at

24     paragraph 15 at {D/7/4}.

25        Now, Mr Gerrard, before I take you to that, let's

1           just recap your evidence this morning.

2               You've said on evidence now that you were privy to

3           Mr Page's work, on occasion it was important and

4           relevant to what you were doing, you read certainly some

5           of his written reports and you would have been apprised

6           of the updating if it was only given orally.  Is that

7           a fair summary of your position?

8     A.    Yes, I think it is, my Lord.

9     Q.    And you'd have known, Mr Gerrard, when you gave this

10          witness statement that I'm taking you to now, that one

11          of the important issues in this litigation was the part

12          that Mr Page had played in any relevant events, wouldn't

13          you?

14    A.    I would, my Lord.

15    Q.    And you would be aware, wouldn't you, that Mr Page, as

16          an investigative agent, investigating amongst other

17          things a matter that concerned Mr Azima, would be likely

18          to be something that would be highly relevant to the

19          court's assessment of the hacking dispute here?

20    A.    Correct, my Lord.

21    Q.    So when his Lordship comes to see how you, Mr Gerrard,

22          introduced Mr Page into your evidence in writing in your

23          statement -- could you look at paragraph 15 {D/7/4}?

24          Can you read paragraphs 15 to 17 to yourself, please,

25          Mr Gerrard?  (Pause)

1     A.   Yes.

2     Q.   "At some stage in my relationship with RAK I was

3           introduced to Stuart Page, who I understood did work for

4           RAK.  Stuart Page was not a person I had previously come

5           across."

6              Number 16:

7              "I have never instructed Stuart Page ..."

8              And 17:

9              "I do not remember exactly when, but in early August

10         2016 Jamie Buchanan called me to say he had had a call

11         from Stuart Page ..."

12    A.   Correct.

13    Q.   So the only evidence that you gave, Mr Gerrard, in

14         relation to Mr Page and his part in these events, is

15         what we see starting at paragraph 15, isn't it?

16    A.   That's correct, my Lord.

17    Q.   And you really confined your evidence to the contact you

18         had with Mr Page in August 2016 when RAKIA allegedly

19         first discovered the hacked data, didn't you?

20    A.   That is correct, my Lord.

21    Q.   And you didn't, did you, Mr Gerrard, in your witness

22         statement, really do justice to what you knew about

23         Mr Page's work in relation to the RAK investigation

24         starting around about the beginning of 2015 -- did you,

25         Mr Gerrard?

```
 1    A.  I did what I thought was necessary, my Lord.  You'll see
 2        two other statements or one other statement -- I'm not
 3        sure -- where I provide further information, but at the
 4        time I considered I dealt with the matters of interest.
 5    Q.  Well, you see, Mr Gerrard, I'm going to suggest to you
 6        that you sought to conceal from his Lordship the extent
 7        of Mr Page's work in 2015 and your awareness thereof.
 8    A.  That's not correct.
 9    Q.  And I'm going to ask you, please, to look at -- to keep
10        open, if you don't mind -- could you keep open, please,
11        your witness statement at paragraphs 15, 16 and 17 of
12        your first witness statement, and I wonder if you'd be
13        kind enough to be shown the project update -- sorry, the
14        one surviving project update --
15    A.  Yes, of course.
16    Q.  -- that has not been destroyed in this case.  That's at
17        {H7/299}.
18    A.  I have it in front of me.
19    Q.  You knew, Mr Gerrard, when you gave your first witness
20        statement, didn't you, that one of the issues in this
21        case was Mr Azima's claim that RAKIA -- persons working
22        on behalf of RAKIA had caused or procured the illegal
23        access to his confidential electronic data?
24    A.  Yes, my Lord.
25    Q.  In your witness statement at {D/7/4} you say in
```

```
 1          paragraph 14 that you were never instructed to hack
 2          Mr Azima's emails or computer.  Can you see that?
 3     A.   That's correct, my Lord.
 4     Q.   So you knew the significance of this particular issue,
 5          and I suggest, Mr Gerrard, you would have appreciated
 6          that if there was evidence -- if there was material that
 7          showed that Mr Azima had been the subject of some
 8          investigative work by Mr Page on behalf of RAK or RAKIA,
 9          that would be something that would be relevant to this
10          court's deliberations.  That's right, isn't it,
11          Mr Gerrard?  You'd have been aware of that, wouldn't
12          you, when you gave your first statement?
13     A.   I'm not sure that's true, my Lord, in the same way my
14          statement doesn't cover the two or three reports or
15          feature those reports that mention Farhad Azima.  There
16          were at least three and they're not in my statement
17          either.
18     Q.   But you would have been aware, I suggest, that the fact
19          that Mr Azima had been a person the subject of some
20          investigation would be relevant because -- because,
21          Mr Gerrard -- you'd have realised that you only tend to
22          hack into someone's emails if you want to find out a bit
23          about them, and, therefore, if you're not interested in
24          them, you probably have less of a reason to hack into
25          them.  Do you follow that rather simple point,
```

1          Mr Gerrard?

2     A.   My Lord, we were already looking at the whole of the RAK

3          issue.  It was a huge investigation and, as I said

4          yesterday, Mr Azima came up during that time and there

5          are at least three reports -- not featuring him but

6          mentioning him in some detail.  And I'm happy to talk

7          about those reports.  I didn't include those reports in

8          my statement because I didn't deem them to be relevant,

9          and, anyway, I would have thought they'd have been

10         privileged, but I understand you've taken a different

11         view on that.

12    Q.   Sorry, Mr Gerrard, you've obviously been thinking long

13         and hard about this, have you, over the last few days,

14         this matter?

15    A.   You asked me -- it was clear yesterday that you were

16         going to be asking me about the reports into -- reports

17         or mentions of Farhad Azima, so, yes, I have been

18         looking at those reports or trying to remind myself as

19         to what was said about Farhad Azima, that's correct.

20    Q.   And you've been able to consult the reports themselves?

21    A.   Have I consulted the report?  I have been able to -- not

22         entirely.  I've got notes of them.

23    Q.   And were those notes in one of the blue books that --

24    A.   Yes, yes.

25    Q.   And was that the blue book you were looking at at about

1        10.25 this morning?

2   A.  Yes.

3   Q.  The one that you put in the bag and you took out of the

4        room?

5   A.  Yes, I took my bag out of the room, yes.

6   Q.  And why did you take your bag out of the room with your

7        notebook in?

8   A.  Because I take my bag everywhere.

9   Q.  So at 10.25 you were looking at a notebook in relation

10       to which there were records of reports concerning

11       Mr Azima?

12  A.  There are manuscript notes, my notes, from last night

13       and this morning of summaries from those notes -- from

14       those meetings.

15  Q.  So you made some notes last night --

16  A.  Yes.

17  Q.  -- summarising other notes of yours?

18  A.  No, other notes from the reports.

19  Q.  Sorry, can you tell his Lordship, are there in existence

20       actual reports or extracts thereof concerning Mr Azima?

21  A.  Yes, there are, my Lord.

22  Q.  By whom?

23  A.  By my team, my Lord.  There are three.

24  Q.  Dated when?

25  A.  Dated -- I can't give you the precise month, but 2014,

1           a short summary of our initial view which really doesn't

2           take anyone anywhere, but I'm prepared to go into the

3           detail and, no doubt, if you want to call for a report,

4           assuming privilege has been dealt with, then you can

5           have them.

6               The second report -- we've got to be careful here --

7           was -- yes, the second report was started as a result of

8           the HeavyLift query or demand by Farhad Azima.

9           Initially, you will remember from yesterday's evidence

10          that Mr Buchanan asked for an investigation into it.

11          Dechert undertook an investigation.  I don't know

12          whether that's covered by privilege, but the result from

13          that was, "There's not much information.  We really

14          can't advise you, we suggest further enquiries".

15              A further report came out which again was

16          inconclusive as to the advice of the client as to what

17          to do about the HeavyLift report.  That I won't give you

18          unless I'm asked by the -- by my Lord.

19              Then, off the back of that, as a result of that

20          investigation -- and I think we're now into 2016 and

21          I think we're April, May, June 2016 -- the best report

22          we could do on it, coming out -- what came out of

23          HeavyLift, in summary, was no actual evidence of

24          wrongdoing, queries -- we had a lot more information on

25          the Sheraton by then.  We actually had the documents

1          regarding Eurasia Hotel Holdings, which had come out of

2          Dr Massaad's own secretary, Mr Adams had emailed to

3          Eurasia Hotel Holdings showing both Dr Massaad and

4          Farhad Azima as directors and that they had voted to

5          change the name to "Eurasian Aviation Holdings",

6          I think, but that didn't really take us much further.

7             There was evidence of gun-running, but nothing we

8          could actually prove.  There was evidence of rendition,

9          which we didn't know whether was formal or informal, if

10          you take my drift, and evidence that he had connections

11          with the CIA.

12             There was no evidence that we felt we could act on.

13             From there I sought further advice, legal advice --

14      MR TOMLINSON:  My Lord, I'm not entirely sure what

15          Mr Gerrard is talking about, but obviously he doesn't

16          have authority to waive any privilege on behalf of

17          RAKIA.  It appears that he's talking about privileged

18          documents that have been prepared by Dechert in relation

19          to various matters, but ...

20      JUDGE LENON:  Yes, I understand that, and, Mr Gerrard, you

21          said at one point that you thought that I had ruled

22          against you on privilege.

23      A.  Yes.

24      JUDGE LENON:  I certainly hadn't intended to do that.

25      A.  You had or hadn't?  Sorry, my Lord.

1    JUDGE LENON:  I had not, no.  As far as the discussion

2        yesterday was concerned --

3    A.  Sorry.

4    JUDGE LENON:  -- I was not persuaded that the questions had

5        actually impinged on any privileged matters, which is

6        why I allowed the questions to proceed, but I haven't

7        made any ruling on the question of privilege or waiver.

8    A.  Thank you, my Lord.

9    MR LORD:  So, Mr Gerrard, I was asking you about your notes

10        of Mr Page's update.  We'll come back to these reports

11        you've just been talking about which may or may not be

12        privileged -- we'll come back to those -- but coming

13        back to the -- so it's right, isn't it, that you have

14        been looking into Mr Azima's affairs over 2014, 2015 and

15        2016?

16    A.  From time to time, as a result of our investigation,

17        Mr Azima's name came up and we did look at those areas,

18        yes.

19    Q.  I was asking you about the project update at {H7/299} --

20        sorry, given that you were looking at Mr Azima in the

21        ways in which you've described in 2014, you would,

22        wouldn't you, be likely to have made a note of what

23        Mr Page was doing so far as it pertained to Mr Azima?

24        Confine yourself to that.  Don't go beyond that to other

25        matters, but just look at Mr Azima for now.

```
 1    A.   The only time Mr Azima came up in the notes or reports
 2         or verbal briefings from Mr Page was that 26 March 2015
 3         report.
 4    Q.   How do you know that?
 5    A.   I do know it.  It's as clear as day.
 6    Q.   Have you gone back through all your notes to check that?
 7    A.   No, no.  Okay, from memory -- and the reason why that
 8         report in March 2015 --
 9    Q.   Yes.
10    A.   -- sticks out is that final bit about "Mr Azima may be
11         helping Farhad" and in particular the mention of
12         Mr Goodley.
13    Q.   And you think that the March report is the only report
14         that would have referred to Mr Azima?
15    A.   Yes, because I don't think Mr Page was ever asked to
16         look at Farhad Azima.  It's not -- I saw some of those
17         reports.  I had discussions with Mr Buchanan.
18         I don't -- I personally do not believe Mr Page was ever
19         asked to look at Farhad Azima.  I was about to say
20         Dr Massaad, but that would be wrong.
21    Q.   Well, let's look at the report at {H7/299}.
22    A.   What's H7/299?
23    Q.   It's the March project update, Mr Gerrard.
24    A.   Oh yes, thank you.
25    Q.   It's {H7/299}.  I think you were in it just then.
```

1    A.  Yes.

2    Q.  Can you see the front:

3            "RAK Project Update.

4            "Executive summary."

5            Then if you go please to the second page {H7/299/2}:

6            "In the US, KM's hired a team of advisors managed by

7        Farhad Azima ..."

8    A.  Yes.

9    Q.  I'll come back to that.  Can you go to page {H7/299/2},

10        please, the heading "KM efforts against the client":

11            "FA and the US Advisory Team."

12   A.  Yes.

13   Q.  "In continuation of our previous report, we were

14        informed by several new sources that FA is managing KM's

15        efforts in the US and perhaps even paying their bills."

16   A.  Yes.

17   Q.  So it looks from this as if the previous report of

18        Mr Page may well have concerned Mr Azima, at least in

19        part, doesn't it?

20   A.  You'll have to ask Mr Page, but my -- from my discussion

21        with Mr Page, this was, as far as he was concerned,

22        a piece of luck that this informant happened to -- as

23        I understand it, it was a complete chance.

24   Q.  What's your basis for saying that, Mr Gerrard?

25   A.  From my discussions with him.

```
 1    Q.  With Mr Page?

 2    A.  Yes.

 3    Q.  Did he tell you who the informant was?

 4    A.  I asked and he wouldn't give it to me.

 5    Q.  You see, if we go to {H7/299/16} -- we're going to spend

 6        a bit of time on this report.

 7    A.  Sorry, what page is that?

 8    Q.  Page 16, Mr Gerrard.

 9    A.  Yes.

10    Q.  "As we reported above, KM's US team has a certain plan

11        to smear RAK and its Ruler with human right allegations.

12        As far as we know, at this point they do not have any

13        evidence to back up these allegations, but they started

14        gathering information for a campaign, based on hearsay

15        and testimonies, and started searching for a platform to

16        make it public."

17            Now, this is the important bit:

18            "The campaign is not public yet, so we will be able

19        to gather intelligence on their progress in order to

20        monitor their activities and attempt to contain or ruin

21        their plans."

22            Can you see that, Mr Gerrard?

23    A.  Yes, I can, my Lord.

24    Q.  Now it's right, isn't it, Mr Gerrard, as Mr Buchanan

25        accepted, that the reference to "KM's US team" there
```

```
 1            includes Farhad Azima, doesn't it?

 2    A.   Correct, my Lord, yes.

 3    Q.   And this report, at least in part, shows that Mr Page

 4         was working to try to contain or ruin the plans of the

 5         US team, wasn't he?

 6    A.   Sorry, did you say Mr Page?

 7    Q.   Yes.

 8    A.   Oh, sorry, Mr Page was working?

 9    Q.   He was.

10    A.   I don't think he was, no.

11    Q.   "The campaign is not public yet, so we ..."

12            That must be RAKIA --

13    A.   Oh, "... will be able to gather intelligence on ..." --

14         yes.

15    Q.   Yes, that's right, isn't it?

16    A.   Well, that's what he was suggesting.  When I met Mr Page

17         and Mr Buchanan, I asked -- I was very keen for more

18         information on this --

19    Q.   Right.

20    A.   -- and I did ask what they were going to be doing, and

21         I was told that the -- it had -- they no longer could go

22         down that line of action.

23    Q.   When was this conversation?

24    A.   I can't remember when, but as I said I think yesterday,

25         it will have been about April/May-ish.  I can't remember
```

1           precisely when.

2      Q.   Let's go back and go through this report in sequence.

3      A.   Yes.

4      Q.   Go back to page 2 {H7/299/2}.  Mr Page reported in this

5           way -- and this is a report that you accept you would

6           have read, isn't it, Mr Gerrard?

7      A.   I don't remember it, but what I remember is the

8           photograph of Mr Goodley, so I must have read it, yes.

9           The reason why I say I must have read it is because, if

10          I'd had a verbal report on it, it was the Mr Goodley

11          photograph that reminded me.

12     Q.   You see, if you look at what Mr Page is here reporting

13          on, he's reporting that Mr Azima is managing

14          Dr Massaad's activities in the US, isn't he?

15     A.   That's what it says.

16     Q.   Now, that would be quite a significant development,

17          wouldn't it, in your interest in Dr Massaad that

18          Mr Azima was managing or handling all his activities in

19          the USA?

20     A.   Yes, but I don't think it was surprising.  They were

21          great friends and they'd been working for many years in

22          RAK.  What was more surprising to me -- and I think to

23          the client -- was that there was a press campaign,

24          commonly called the "blitzkrieg", being mounted, and

25          that was the worry.

```
 1    Q.   If we go to page {H7/299/3}:

 2              "KM efforts against the client.

 3              "FA and the US Advisory Team.

 4              "In continuation to our previous report, we were

 5         informed by several new sources that FA is managing KM's

 6         efforts in the US and perhaps even paying their bills."

 7              Do you want to read the next paragraph which refers

 8         to you, Mr Gerrard?

 9    A.   Where is that?  Oh, right.

10    Q.   "At the moment ...", it begins.

11    A.   Where my name is spelt wrongly:

12              "According to KM, the main figure assisting our

13         client to cover this alleged activity is Niel Gerard,

14         a partner in Dechert ..."

15              Yes.

16    Q.   Was it right that at this time you were assisting RAK or

17         RAKIA to cover this alleged activity by Dr Massaad in

18         the US?

19    A.   Sorry, I don't understand what you're talking about.

20    Q.   It says:

21              "According to ..." --

22    A.   "This alleged activity", the alleged activity is the

23         criminal -- the way I read it, the criminal allegations

24         into Dr Massaad.  It's the investigation.  And

25         I certainly was running a global investigation into
```

1          $2 billion worth of monies going missing.

2    Q.    It's saying:

3          "At the moment, KM's strategy in the US is to spread

4          human rights violations allegations against the client."

5          So that's Dr Massaad's strategy.

6    A.    Yes.

7    Q.    "In particular the allegations [those of Dr Massaad]

8          focus on the notion that RAK uses a dedicated facility

9          in RAK where it imprisons and [tortures] political

10         opponents.  According to [Dr Massaad], the main figure

11         assisting our client to cover this alleged activity is

12         Niel Gerard, a partner in Dechert ..."

13         So do you understand Mr Page there to be saying that

14         you are assisting the client with handling this alleged

15         strategy of Dr Massaad's or with some alleged

16         involvement in what Dr Massaad was complaining about?

17         Do you see what I mean?

18   A.    Well, I do, but I can't -- what -- we didn't know or

19         I don't believe we knew of this press campaign until

20         this report.

21         At or around this time, when you read these sorts of

22         things, my Lord, you're always somewhat sceptical as to

23         how accurate they are.  The reason why this report leapt

24         out at me was -- when I saw the Simon Goodley -- was

25         that literally at or around this time, either just

1       before or just after -- I can't remember when -- it

2       became clear that Mr Goodley had taken a significant

3       interest and had been phoning witnesses and actually

4       members of my own team about RAK and ultimately wanted

5       to talk to me about human rights issues.

6           Now, with the greatest of respect, this report was

7       on 26 March, Goodley was at or around this time.

8       I wasn't looking at -- from recollection of five years

9       ago, I wasn't looking at human rights issues.  I didn't

10      necessarily know that there were human rights issues.

11  Q.  In your last answer you said that Mr Goodley was phoning

12      witnesses.  Is there anything wrong with somebody

13      phoning up a witness?  Is there any property in

14      a witness?

15  A.  I think the way he was doing it and the way subsequently

16      Mr Kirby Behre was following it up -- and I'll

17      explain -- was inappropriate.  Of course there is no

18      property in a witness and, if the witness wants to talk

19      about human right abuses or indeed anything else at all,

20      that is perfectly proper.

21           However, in this case, Mr Goodley was phoning

22      witnesses, attempting to suggest to them that they'd

23      been abused and that -- asking for information about

24      human rights breaches.

25           What was more worrying was how he knew who to speak

```
 1              to because they were witnesses.

 2              Secondly --

 3    Q.   Witnesses to what?  What were they alleged to be

 4         witnesses --

 5    A.   They were witnesses to our investigation into

 6         Dr Massaad.  More worrying --

 7    Q.   And just stopping there, so you didn't like the fact

 8         that a journalist was phoning up witnesses to your

 9         investigation?

10    A.   I was concerned that Mr Goodley, who's an excellent

11         reporter, would even know about who my witnesses may or

12         may not have been.  Please let me continue because this

13         is very important.  This is why I was very concerned

14         when I saw this.

15              After that, my Lord, the gentleman -- the witness

16         concerned -- indeed two witnesses -- said, "No thank you

17         very much, we don't want to talk to you", shortly

18         followed a call by Kirby Behre.  Kirby Behre apparently

19         spoke to the witness and said, "You really ought to

20         speak about all of this and indeed I can tell you that

21         a London law firm is going to be reporting Dechert to

22         the authorities for intimidation", etc.

23              After that, two of my junior lawyers were then

24         contacted by Mr Goodley.  How he knew they were involved

25         in the matter I do not know, which gave me cause for
```

1      concern again, and he wanted to talk to them

2      confidentially about the RAK matter.  That was obviously

3      denied and those matters were referred to you -- to me,

4      and then subsequently Mr Goodley contacted me, asking to

5      speak to me.

6   Q.  So it sounds, Mr Gerrard, as if this was really quite

7      a significant development as far as you were concerned

8      at this time?

9   A.  Well, the --

10  Q.  The involvement of some journalist sniffing around for

11      human rights matters was obviously something that sounds

12      like it exercised you considerably.

13  A.  Well, certainly, which is why I'm trying to put this

14      into context.  For me, reading that report, you know,

15      it's Dr Massaad very grumpy about all these allegations

16      and, as usual in these sorts of cases, trying to attack

17      the people making the allegations, and that's normal

18      run-of-the-mill stuff.

19          The fact that Farhad Azima was helping a friend

20      wasn't a surprise.  I don't think anyone was -- they

21      were probably grumpy about it, but I don't think there

22      was a particular issue in my mind.

23          For me what was disturbing was the fact that quite

24      confidential issues -- people's names, part of our

25      enquiry, my own legal team were being contacted and the

1       fact that Mr Goodley clearly was aware, had been told --
2       I'm not sure -- sorry, let me strike that.
3       Mr Kirby Behre was aware that we were about to be
4       reported.  Yes, that was a concern, and he knew about it
5       before I did.  And then of course subsequently I was
6       reported to the SRA.
7   Q.  Were you, at that time, assisting any UAE entity in
8       relation to any criminal or prosecution or those sort of
9       matters, any sort of criminal investigations?
10  A.  We were -- was I assisting them?  Only in the sense that
11      my client was a complainant and we were providing
12      information on the complaint.  So, yes, we were feeding
13      in in any way to a prosecutor and providing them with
14      information.
15  Q.  Did you conduct any interviews or interrogations in
16      relation to any of those matters on behalf of any UAE or
17      RAK entity?
18  A.  No, but I did carry out my own interviews and asked --
19      and it was agreed by both the detainee and the
20      authorities -- to interview the detainees.
21  Q.  So you interviewed detainees who had been detained at
22      the hands of RAK, did you?
23  A.  Yes, with their agreement and the agreement of their
24      lawyers.
25  Q.  And where were they being held, these people?

```
 1    A.   They were being held in a prison in RAK.  I can't give
 2         you the precise -- or the detainees were, in RAK.
 3    Q.   Where was the prison?
 4    A.   In RAK.
 5    Q.   You're bound to know.
 6    A.   Well, it's --
 7    Q.   Somewhere in RAK, a prison somewhere in RAK?
 8    A.   It's in Ras Al Khaimah, the actual -- on the outskirts
 9         of the main town.
10    Q.   And you went there to interview prisoners?
11    A.   I went there with Al Tamimi, the local law firm, to meet
12         prisoners at their agreement and the agreement of their
13         lawyers.
14    Q.   And who did you interview at that prison?
15    A.   Primarily Karam Al Sadeq.
16    Q.   And who else?
17    A.   I don't think we did interview many more and I can't
18         remember.  Some of my team will have done it.
19    Q.   You will have a note in your daybook, won't you, on
20         that, Mr Gerrard?
21    A.   No, because -- I might have a note in the daybook, but
22         the interview will have been written down so there will
23         be a note of the interview.
24    Q.   And have any of those notes been disclosed as far as
25         you're aware in this litigation?
```

1   A.   I would have thought they were legally privileged.

2        I have no idea whether those -- I don't even know that

3        they're relevant, are they?  But, anyway, that's not

4        a matter for me.  That's a matter for the lawyers and

5        the court.

6   Q.   Well, one of the issues -- one of RAKIA's claims in this

7        case, Mr Gerrard, is that Mr Azima has acted in

8        bad faith in involving himself and allegedly campaigning

9        in relation to human rights abuses in RAK; all right?

10       That's one of RAKIA's complaints against Mr Azima raised

11       by RAKIA as an issue for his Lordship; all right?  So

12       it's an issue in the case; all right?  And RAKIA has

13       said that Mr Azima has spread false stories about what

14       RAKIA gets up to and that's an issue in the case,

15       Mr Gerrard.

16  A.   I think that's -- there is no doubt --

17  Q.   Do you follow that?

18  A.   -- there is no doubt about it that RAKIA's complaint

19       about Farhad Azima is that he was attempting to peddle

20       false stories about human rights abuses in RAKIA, yes --

21       RAK.

22  Q.   And it sounds like you have notes concerning meetings or

23       interviews in relation to detainees within RAK which

24       have featured within this litigation as part of the

25       resolution of those issues; is that right?

```
 1    A.   Correct, my Lord.

 2    Q.   And that material has not been disclosed, has it,

 3         Mr Gerrard?

 4    A.   I've no idea whether it's been disclosed or not.  My --

 5         the lawyers have had complete access to all our

 6         material.  I don't know what was relevant or what was

 7         not.  Frankly, I cannot see how an interview following

 8         PACE, which we insisted on, whereby the detainee had

 9         agreed to be interviewed --

10    Q.   Would it have been recorded, then, Mr --

11    A.   No, it wasn't recorded.  It was written down.

12         Furthermore, furthermore, there will be signed notes,

13         certificates, by Karam Al Sadeq, agreeing to be

14         interviewed.  His lawyer that was present, he would sign

15         it.  On a number of occasions, a few occasions, his

16         lawyer didn't want to turn up.  We refused to continue

17         with the interview until the lawyer signed, saying,

18         "It's okay for you to interview him", and

19         Mr Karam Al Sadeq accepting to be interviewed.

20         I followed PACE to the letter and indeed cautioned him

21         at the start of it.

22             There will be a written note of the interview and

23         there is a pro forma that we were using on detainee

24         interviews which was as good as PACE as we could make

25         it, breaks, everything.
```

 1    Q.   So if you -- from that last evidence, if you cautioned
 2         the interviewee, that sounds like it's in the context of
 3         some sort of criminal interview.
 4    A.   We told --
 5    Q.   Sorry, can I just finish?  You wouldn't caution somebody
 6         if you were just interviewing them about a civil claim,
 7         would you?
 8    A.   Of course you would.  I think you would -- you caution
 9         anyone if you are going to use that in evidence, and
10         Mr Karam Al Sadeq was told that anything he told us was
11         likely it would be used if it was relevant in evidence
12         against him.
13    Q.   Did you supply copies of the record of the interview to
14         the interviewees or their lawyers?
15    A.   I can't remember, but I would have thought so.
16    Q.   And there would be a record of that, won't there,
17         Mr Gerrard?
18    A.   I would hope so, yes.
19    Q.   There would be a record on your Dechert files, won't
20         there?
21    A.   I would hope so, yes.
22    Q.   And that can be checked, can't it?
23    A.   Yes, it can, my Lord.
24    Q.   And therefore, if that's happened, you can actually
25         produce the records that show that?

1    A.   If what's happened?

2    Q.   If in fact notes of these interviews have been furnished

3         to the interviewee or detainee, you will have a record

4         of that, won't you?

5    A.   The notes were certainly signed, I think -- I'm pretty

6         sure they were signed, but the answer is there should be

7         a record of it, yes.

8    Q.   And where would that be kept?

9    A.   It will be kept in Dechert.  My Lord --

10   Q.   Why was there no audio recording of that?

11   A.   I am 99% sure there was no audio recording.  I may be

12        proven to be wrong.  I can't really remember.  I only

13        did one of the interviews myself.  Why was there no

14        audio recording?  I don't think there were the

15        facilities there for audio recording and it was written

16        down in longhand from memory.

17   Q.   And did any of these interviews that you conducted take

18        place in the Palace in RAK?

19   A.   None at all.

20   Q.   Can we go back, please, to {H7/299}?

21   A.   What's H7/299?

22   Q.   It's the project update.  Can you see that?

23   A.   Yes.

24   Q.   And --

25   A.   What page are we on?

```
 1    Q.   Page {H7/299/3}.

 2    A.   Yes.

 3    Q.   We've established the reference in here to "KM's

 4         strategy" and you have given your evidence as to your

 5         concern about aspects of that.

 6              Can we go over, please, to page {H7/299/4}?  The

 7         story runs on.

 8    A.   Yes.

 9    Q.   Can you see under the picture of Simon Goodley, Mr Page

10         records this:

11              "Goodly showed interest in the subject, although the

12         story does not have at this point any evidence but only

13         hearsay and testimonies.  One of the main testimonies

14         they rely upon was given by the wife of a person who is

15         allegedly jailed in RAK, named Karam (it is probably

16         Karam Al Sadeq, who was RAKIA's in-house counsel and is

17         in for almost a year)."

18    A.   Yes.

19    Q.   Does "in for almost a year" -- would you have understood

20         that to mean in prison -- had been in prison for almost

21         a year?

22    A.   Yes.

23    Q.   And is this the Karam Al Sadeq whom you say you

24         interviewed on at least one occasion, Mr Gerrard?

25    A.   That's correct, my Lord.
```

```
 1    Q.  When he was in prison?

 2    A.  That's correct, my Lord.

 3    Q.  And had he been charged by that time with anything

 4        formally?

 5    A.  There is a different process over there.

 6    Q.  "Yes" or "No"?

 7    A.  I don't remember.  I don't think so.  I don't think I'd

 8        have interviewed him before charge.

 9    Q.  And why was he being detained without charge, do you

10        know, Mr Gerrard?

11    A.  That's the process.  The charge only takes place once

12        they've decided to charge.

13    Q.  I see.  So the process in RAK is they imprison somebody

14        and then they decide what they're going to charge them

15        with; is that the approach?

16    A.  The approach is that they charge them once they have

17        collected -- first of all, the person is arrested if

18        they're suspected of a crime --

19    Q.  Yes.

20    A.  -- in the same situation as the UK.

21    Q.  Yes.

22    A.  They are then detained until the crime -- sometimes

23        they're bailed -- it depends on the seriousness of the

24        case -- and they are detained until charges are brought.

25    Q.  Yes, but in this country, Mr Gerrard, as you know, the
```

1    authorities have to bring charges within a short period

2    of time, failing which they have to release a suspect,

3    don't they -- don't they -- Mr Gerrard?

4  A. They do, my Lord.

5  Q. What they can't do is to imprison somebody here for

6    a year whilst they decide whether to charge them or not,

7    can they, Mr Gerrard?

8  A. That is correct, my Lord.

9  Q. It looks from this -- it looks from what you've said and

10    what Mr Page was saying that Mr Al Sadeq was imprisoned

11    for almost a year by this point in time without being

12    charged --

13  A. Based on this report, yes, but I think -- I've no idea

14    how long he was detained for.  I have no idea.  I don't

15    think it was for a year, but I don't know either.  But

16    there is a -- my Lord, it's a different process.  From

17    the process I saw, I don't -- it was different.  They

18    got legal advice.  They had independent judges.  The

19    jails were more modern than the ones I've seen.  It's

20    a different process, but it doesn't make it necessarily

21    unfair.

22  Q. It doesn't make it necessarily unfair.  So can

23    his Lordship take it that in your view, Mr Gerrard, it's

24    appropriate or acceptable to imprison somebody for up to

25    a year without having charged them of any criminal

1          offence?

2     A.   I'm sorry, this is in a report.  I have no idea how long

3          he was detained for.

4     Q.   Can his Lordship take it, Mr Gerrard, that you consider

5          it appropriate for you to go and interview a person who

6          has been imprisoned in the manner that we've just seen,

7          in other words locked up without charge, and you come in

8          to interview them in relation to some claims or

9          whatever?  Is that appropriate, Mr Gerrard?

10    A.   In these circumstances, my Lord, yes, it was, because

11         there was a substantial evidence against him.  He was

12         the general counsel of RAKIA.  There were great

13         concerns -- much wider concerns than just frauds with

14         Dr Massaad.  There were concerns as to sanctions issues

15         that he'd been involved in.  So it was a very serious

16         matter.

17             Now, I do not believe he was in for a year.  They

18         have a process.  It is not like ours -- many parts of it

19         are -- and he agreed to talk to us whilst he was

20         detained.  We followed the process of PACE when we met

21         him.  He had his own lawyers present who were perfectly

22         happy with the situation.

23    Q.   If you go back to page {H7/299/4}, please, of this

24         report by Mr Page, can you see halfway down it says:

25             "In addition, Christopher Cooper is already in touch

```
 1          with several organisations such as Amnesty and others
 2          that allegedly already showed interest in the subject.
 3          The KM team main angle is that RAK's uses Niel Gerard to
 4          cover up the alleged torture activities.  According to
 5          our sources, Goodly set [up] a meeting with Gerard, but
 6          later cancelled at the last minute."
 7              I'm not sure -- it said "later cancelled at the last
 8          minute".  Can you see that?
 9      A.  Yes, I can.
10      Q.  Was there a meeting set up with Mr Goodley at some
11          stage?
12      A.  There was, my Lord.
13      Q.  And who cancelled it?
14      A.  No one did.
15      Q.  Did it take place?
16      A.  Yes, it did, my Lord.
17      Q.  When was that?
18      A.  I'm not sure, but there are emails where we tried to get
19          together a few times, but eventually met.  Whether we
20          met or had a telephone conversation I can't remember,
21          but there was a -- we talked about this issue --
22      Q.  When was that roughly, Mr Gerrard?
23      A.  It could have been March, it could have been April.
24      Q.  2015?
25      A.  Definitely.
```

1    Q.  And did you let Mr Goodley know about your concerns as

2        to the investigations that were then being carried out

3        by journalists?

4    A.  I -- Mr Goodley asked me about human rights abuses.

5        I told him I didn't see any human rights abuses at all

6        in respect of the matter that I was dealing with him.

7        I told him that I thought he was being manipulated by

8        Dr Massaad and others, who were creating false stories

9        about the RAK investigation in an attempt to take the

10       attention away from them.  Having discussed that, I can

11       only assume he got the drift of what I was saying

12       because, as I understood it -- well, in fact he did not

13       write any reports on this subject at all.

14   Q.  So after you set Mr Goodley straight, he basically

15       stopped his journalistic investigation into the matter;

16       is that a fair summary, Mr Gerrard?

17   A.  I talked through the issues, I explained the systems and

18       processes, I said, "From my perception this is my

19       experience", and I explained that -- what Dr Massaad --

20       I thought he was behind it and this was all an attempt

21       to take the attention away from the actual

22       investigation.

23   Q.  Can you see at the foot of that page it says -- sorry,

24       reading on, it says:

25            "Both FA and KM are concerned regarding several

1          arrests made by the RAK authorities."

2               Can you see that?

3     A.   No.  Where is that?

4     Q.   About a third of the way up from the bottom.

5     A.   Yes, let me just read it, please.  (Pause)   Yes.

6     Q.   Then you can see at the foot of the page it says this:

7               "KM's team suspects that they have an information

8          leak."

9     A.   Yes.

10    Q.   "They are afraid that the client is well aware regarding

11         their activities."

12              Can you see that?

13    A.   Yes.

14    Q.   Did you know anything about whether or not Dr Massaad's

15         team did have an information leak?

16    A.   Well, clearly they did because Mr Page was getting this

17         information.

18    Q.   Thank you.  Could you go, please, to page {H7/299/16}?

19    A.   You don't want to ask me about the Interpol notices.

20    Q.   No, thank you.

21    A.   You wanted me to look at it, but you don't want to ask

22         me about it?

23    Q.   That's exactly right.

24    A.   Okay.  Sorry, what page?

25    Q.   Page {H7/299/16}, which I do want you to look at and

```
 1          I will ask you something.
 2    A.    Thank you.  I'm there.
 3    Q.    We read this paragraph before.  This paragraph records
 4          Mr Page reporting that:
 5              "The campaign is not public yet, so we will be able
 6          to gather intelligence on their progress in order to
 7          monitor their activities ..."
 8              All right?
 9    A.    Yes.
10    Q.    Now, it's right, isn't it, that this would have been
11          a serious matter as far as RAK was concerned at this
12          time, this alleged campaign?
13    A.    Yes.  The client and I -- because I think earlier I was
14          going to be targeted -- were concerned, absolutely.
15    Q.    And this report states that intelligence can be gathered
16          on the progress of the alleged plotters, doesn't it?
17    A.    That was Mr Page's initial view, but when I asked him
18          whether that -- we could continue on that, apparently --
19          I can't remember the precise reason now, but they were
20          unable to.  So, from memory, this is the last of the
21          information we got on this.
22    Q.    Well, I suggest, Mr Gerrard, that that's a convenient
23          thing for you to say now because you --
24    A.    Why is that?
25    Q.    Because -- because -- you know that the case against RAK
```

1          is that hacking took place and it may well have taken
2          place through Mr Page's work.  You know that, don't you,
3          Mr Gerrard?
4     A.   I know that's your allegation, but I can only -- I was
5          there at the time and all I can say is I'd have been
6          very interested in getting more information as to what
7          they were going to do next.  As it happens, we did get
8          more information, but not through Mr Page.
9     Q.   Will there be a record in your daybook or some other
10         notes that will show his Lordship when, if you like, the
11         Page intelligence-gathering drew a blank?
12    A.   No.
13    Q.   Why is that?
14    A.   Because I wouldn't have made a note of someone saying,
15         "I don't think we're going to be able to go down that
16         line".
17    Q.   I put it to you, Mr Gerrard, that you're not telling the
18         truth to his Lordship and that what you're doing is
19         trying to truncate this line of questioning about the
20         intelligence-gathering and monitoring activities which
21         Mr Page was promising to carry out on 26 March 2015.
22         That's what I put to you, Mr Gerrard, that you're not
23         telling his Lordship the truth.
24    A.   That is completely wrong.  I asked for more information.
25         You'll have to take it up with Mr Page.  This was the

```
 1          last that Mr Page was able to provide us in respect of
 2          Farhad Azima, from memory.
 3      Q.  What sort of intelligence-gathering -- let's take this
 4          in stages.  Did you agree that this
 5          intelligence-gathering looks to apply to KM's US team's
 6          plans on the face of it?
 7      A.  Yes.
 8      Q.  And that would include Mr Azima, wouldn't it, because he
 9          was alleging managing the US team?
10      A.  Well, I don't know where the informant was.
11      Q.  That wasn't the question.
12      A.  Well, it's my answer.  I didn't know where the informant
13          was.  Was he in KM's team or Farhad Azima's team?
14      Q.  I'll ask it again, Mr Gerrard.  You're on oath.  On the
15          face of this report from Mr Page, he is there presaging
16          gathering intelligence on their progress.  Can you see
17          those words?
18      A.  Correct.
19      Q.  When he's talking about "their progress", he is talking
20          about the progress of KM's US team, isn't he?
21      A.  Correct.
22      Q.  KM's US team for these purposes was believed to include
23          Mr Azima, wasn't it?
24      A.  Correct.
25      Q.  So on the face of it Mr Page is saying that he will be
```

```
 1            able to gather intelligence on, amongst other people,

 2            Mr Azima.  Do you agree?

 3    A.      I agree that whoever his source is and where he is, we

 4            are going to get more information in respect of what

 5            this team are up to.

 6    Q.      Including Mr Azima?

 7    A.      If Mr Azima was involved and designing it, then maybe

 8            that will come out as well, yes.

 9    Q.      But Mr Azima is plainly thought to be part of the team,

10            isn't he?

11    A.      Well, it says "KM's US team".  That's what it says.

12            What I have no doubt is that Farhad Azima was assisting

13            in some way.  I've no doubt about that.  And there's

14            also a suggestion in here that he may have been paying

15            for it.

16    Q.      We know from this report, don't we, that Mr Page has

17            identified Mr Azima as managing the US team for

18            Dr Massaad -- managing it.

19    A.      Where does it say that?

20    Q.      Page 2 {H7/299/2} at the top, the first two lines and

21            then the fifth line.

22    A.      Yes, you're right:

23                "... KM's hired a team of advisers managed by Farhad

24            ...", yes.

25    Q.      "... in order to spread allegations ..."
```

1    A.   Yes.

2    Q.   So Mr Azima, on this view, is going to be of central

3         interest in terms of intelligence-gathering, isn't he,

4         Mr Gerrard?

5    A.   On this report's view, Mr Farhad Azima will certainly be

6         of interest, yes.

7    Q.   Of central interest in terms of his handling of the

8         US activities?

9    A.   Well, I don't think -- yes, whether he's central or --

10        he's certainly important, yes.

11   MR LORD:  Would that be a convenient moment, my Lord?

12   JUDGE LENON:  Yes.

13   (11.49 am)

14                        (A short break)

15   (11.57 am)

16   MR TOMLINSON:  My Lord, before my friend resumes, can I just

17        ask through you a question about timing?

18             On his version of the timetable Mr Gerrard is due to

19        conclude at lunchtime today and I just wanted to

20        ascertain whether that was likely because I have -- the

21        next two witnesses are now here and I wanted to know

22        whether it's likely we're going to reach either one or

23        both of them today because obviously, if not, then they

24        can be released to do other things.

25   MR LORD:  My Lord, I think I may be most of the day with

```
 1            Mr Gerrard in view of the material that's come out in
 2            this trial, I'm afraid.
 3    JUDGE LENON:  I'm obviously concerned about that because
 4            we've got to stick to the timetable essentially.
 5            I mean, there is a bit of room for slippage, but ...
 6    MR LORD:  There is, my Lord.  I would expect that I will be
 7            shorter with the later witnesses.  It's plain that
 8            Mr Buchanan covered the whole story.  Mr Gerrard is
 9            obviously an important witness.  I would expect I will
10            be quicker with other witnesses.
11             There is an issue as to Friday.  Your Lordship will
12            see that we have always sought to use Friday on the
13            basis of the amount of witnesses we had to
14            cross-examine, but my learned friend thinks that we
15            shouldn't have any or much of Friday.  I think that's
16            how matters stand at the moment.  We would certainly
17            finish our cross-examination this week by Friday.
18    MR TOMLINSON:  Well, my Lord, I'm very pleased to hear that.
19            I said advisedly that on my friend's version of the
20            timetable he was due to finish this lunchtime.  On his
21            version he's supposed to be starting Mr Halabi this
22            afternoon, not on my version, so that would suggest that
23            he's half a day or perhaps a little more behind, which
24            would suggest that Mr Handjani won't be finished on
25            Friday.  But if he is sure that Mr Handjani will be
```

1        finished on Friday, then at least we'll stick to his

2        version of the timetable.

3  MR LORD:  And it's right, my Lord -- I accept that, but it's

4        right to note that the revelation that the project

5        update is Mr Page's has had a profound effect on my

6        questioning.  I've had to recalibrate -- that is an

7        important piece of information which your Lordship will

8        hear in my closing submission and that has an effect

9        throughout the questioning by me.  It affects all the

10       witnesses.  Until Thursday I didn't know that Mr Page

11       was the author of that important document.

12  MR TOMLINSON:  My Lord, this is a document that's not even

13       mentioned in the pleadings.  It's not actually relied on

14       in my friend's defence at all.  He constantly repeats

15       it's an important document, but it's only very recently

16       he's noticed that it is.

17  JUDGE LENON:  All right.  Well, I don't want to take up time

18       arguing about why there's slippage.  You've heard what's

19       said and let's try and stick to that.

20  MR LORD:  Yes, my Lord, I will.

21       Mr Gerrard, if you go, please, to -- I was asking

22       you about page {H7/299/16} of the project update, and

23       you agreed -- you agree that Mr Azima would be an

24       important person for intelligence-gathering in the light

25       of what was said in this report of Mr Page's, didn't

1         you, just before we broke today?

2    A.   Yes, he will be an important person.

3    Q.   And the intelligence-gathering -- and therefore

4         his Lordship can expect, can't he -- it's likely,

5         isn't it, Mr Gerrard, that there will be

6         intelligence-gathering after 26 March 2015 that pertains

7         to Mr Azima?

8    A.   None that I am aware of.  As I've said to the court --

9    Q.   That wasn't the question.  The question was whether it

10        was likely, on the face of this, that there would be

11        intelligence-gathering in relation to Mr Azima.  I'll

12        ask about what you know about it in a minute.  Is it

13        likely, on the face of this report, that there will be

14        intelligence-gathering in relation to Mr Azima --

15   A.   I think that was certainly Mr Page's intention and I've

16        no doubt -- yes, the answer's "Yes".

17   Q.   And it's likely, isn't it, that there will be monitoring

18        of Mr Azima's activities if Mr Page could achieve it

19        after 26 March 2015, given this report?

20   A.   Yes.

21   Q.   What sort of intelligence-gathering did you discuss with

22        Mr Page or Mr Buchanan -- when you were involved in the

23        update back at the time --

24   A.   Yes.

25   Q.   -- what sort of intelligence-gathering, if any, did you

1           discuss with Mr Page or Mr Buchanan?

2      A.   Actually, I didn't.  I discussed with --

3      Q.   That's what I asked you.  Then the answer is that you

4           didn't.

5      A.   No, I'd like to finish the question, if I may.  I've

6           actually already answered this question, but I don't

7           want to stop there.  I'd like to repeat my answer, if

8           I may, my Lord.

9      JUDGE LENON:  Yes.

10     A.   I reminded -- I discussed this with Mr Page and

11          Mr Buchanan.  I think we were all together.  I can't

12          remember.  I asked Mr Page whether we could get more

13          information from this source and he didn't think that

14          was likely.

15              He may or may not have come back to me at some stage

16          or other, but as far as I'm aware that is where it ended

17          and I've no doubt Mr Page will be able to tell you more.

18          But I don't believe that after this date I received any

19          more information, certainly from Mr Page, where he was

20          never even instructed, as far as I'm aware, as regards

21          to Mr Azima.  I didn't see any more information coming

22          out of Mr Page or indeed anyone else, other than my own

23          legal team.

24     Q.   And what did you understand by "attempt to contain or

25          ruin their plans" would comprise?

```
 1    A.   I didn't.  I had no doubt that he'd got a plan, but it
 2         was going to require more information from the source.
 3    Q.   But how did you understand that the plotters' plans
 4         could be contained or ruined?  How did you understand
 5         that phrase?  You've got plotters, they're planning to
 6         smear RAK and they're going to be contained or ruined --
 7         their plans are.  So how did you take that phrase?  How
 8         did you understand it, Mr Gerrard?
 9    A.   How did I understand it?  This is Mr Page's language.
10         We never got on to his plans.  I'm afraid you'll have to
11         ask him.  I wanted to know what more information could
12         we get and that's as far as we got.
13              So I can tell you what the client did after this and
14         what plans the client made to try to manage or head off
15         this, but I can't tell you what Mr Page's plans were
16         because we never got that far because it was clear to me
17         he was not going to be able to go any further at all.
18    Q.   So when you had your subsequent meetings with Mr Page in
19         2015 and you discussed the intelligence-gathering, is
20         your evidence that he said to you to the effect -- words
21         to the effect of, "My one source has dried up so I've
22         got no information on Mr Azima"?  Is that your evidence,
23         Mr --
24    A.   That's my evidence, my Lord.
25    Q.   Did you have a discussion with him along those lines?
```

```
 1    A.  I asked -- yes.

 2    Q.  And, what, he sort of shrugged and said, "Well, my one

 3        informant's gone.  I suppose that's it.  I won't gather

 4        any more intelligence.  Sorry, Mr Gerrard"?  Is that

 5        what he said?

 6    A.  Well, as I understood it, the source that he had he

 7        could no longer use.  Now, if he came back to me and

 8        said "I've got another source", then I would have been

 9        interested, but I think this was a one-off, as he

10        explained it to me, sheer happenstance luck, and that

11        they couldn't take it any further.

12    Q.  I see.  So if you go to {H7/299/3}, please, at the top

13        of --

14    A.  What page is that?

15    Q.  {H7/299/3} of this document in front of you.

16    A.  What page is that?

17    Q.  Page 3.

18    A.  Sorry.

19    Q.  At the top of the page, can you see Mr Page said this --

20    A.  Hang on.  I'm not there yet.  Yes.

21    Q.  "In continuation to our previous report, we were

22        informed by several new sources ..."

23    A.  Yes.

24    Q.  Have you got that, Mr --

25    A.  I have.
```

1    Q.   "Several new sources".

2    A.   Yes.

3    Q.   Not one existing source, but several new sources.

4    A.   Yes.

5    Q.   Now, did you discuss with Mr Page or Mr Buchanan -- as

6         part of this updating process, did you discuss the

7         several new sources?

8    A.   No.

9    Q.   So it looks, doesn't it, as if Mr Page had more than the

10        one source available to him, doesn't it?

11   A.   I have no doubt.

12   Q.   So why did you suggest earlier today that you thought

13        Mr Page just had the one source?  I thought that's what

14        you said.

15   A.   No, because -- my Lord, I didn't know where the other

16        sources -- who they related to.  When I asked, "Okay, we

17        have a problem, let's see -- what can we do?  Can we get

18        any more information?", I was told as clear as day that

19        he was not going to be able to proceed with the current

20        source that related to information that Mr Azima was

21        managing this issue.  So whether the other sources

22        related to KM, I have no idea.

23   Q.   It's likely, isn't it, Mr Gerrard, that if one source of

24        Mr Page had dried up for some reason, he would look to

25        find other sources, wouldn't he, Mr Gerrard?

| | | |
|---|---|---|
| 1 | A. | My Lord, this is a question that Mr Page will have to |
| 2 | | answer.  All I was told was he didn't think he could |
| 3 | | pursue that particular line of enquiry. |
| 4 | Q. | And did you understand that source to refer to some |
| 5 | | insider, somebody working as some sort of informant? |
| 6 | | Is that how you understood the source? |
| 7 | A. | That's how I understood it. |
| 8 | Q. | So somebody who was likely to owe a duty of confidence |
| 9 | | but was breaching it in order to reveal matters to |
| 10 | | Mr Page? |
| 11 | A. | Very possibly. |
| 12 | Q. | Possibly or likely? |
| 13 | A. | Very possibly.  I don't know -- I didn't know who the |
| 14 | | source was. |
| 15 | Q. | Could you go in your witness statement, please, to |
| 16 | | {D/7/2} to paragraph 8 -- |
| 17 | A. | Yes. |
| 18 | Q. | -- where you say: |
| 19 | | "I recall we investigated HeavyLift and various |
| 20 | | other entities/investments as part of the wider |
| 21 | | privileged investigation into Dr Massaad's frauds based |
| 22 | | on what documents we had available at the time. |
| 23 | | Farhad Azima was not the target of the investigation." |
| 24 | A. | Correct. |
| 25 | Q. | I thought you said this morning that your team carried |

```
 1          out an investigation into HeavyLift in relation to --

 2          you said there were three reports concerning Mr Azima

 3          and I thought you said that one of them was in relation

 4          to HeavyLift.

 5     A.   Yes, when I said the investigation was not targeted,

 6          I was talking about the global investigation.  When

 7          we -- in 2003, when we pulled the first report together,

 8          without breaching any privilege, it was a 33-page

 9          scoping exercise, over 20 witnesses identified, lots and

10          lots of companies, and Mr Farhad Azima did not feature

11          in that, nor did HeavyLift.

12              The only reason HeavyLift became of interest, when

13          Farhad Azima raised HeavyLift, and it was this that

14          caused us to focus on HeavyLift, essentially the claim,

15          but thereafter issues regarding some -- the bizarre

16          activities of Farhad Azima.

17     Q.   Yes, but if you read your paragraph 8, if you read that

18          paragraph, you're giving the reader the impression,

19          aren't you, that the HeavyLift investigation did not

20          concern Mr Azima.  That's the burden of paragraph 8 of

21          your evidence, isn't it?

22     A.   No, I disagree.  We were investigating HeavyLift because

23          of the claim made by Farhad Azima.  By definition, when

24          you're looking at HeavyLift, you're going to be looking

25          at Farhad Azima.  Farhad Azima wasn't the target;
```

```
 1            HeavyLift was the target.
 2       Q.   So why didn't you say in paragraph 8, "Farhad Azima was
 3            not the target of the global investigation, but we did
 4            look into him in three respects"?  Why didn't you say
 5            that, Mr Gerrard, because that would have been more
 6            truthful, wouldn't it?
 7       A.   I could have expressed it differently.  I don't regard
 8            in any way, shape or form that the way I've expressed
 9            this is lacking in truth.
10       Q.   Could you be shown, please, {H7/266}?  It's likely,
11            isn't it -- Mr Gerrard, if you attended meetings at the
12            Palace with the Ruler, it's likely that those would be
13            recorded in your daybook, wouldn't they?
14       A.   Not -- no, not necessarily.  They weren't those sorts of
15            meetings.  They were very formal and not at a desk.  You
16            tend not to take notes when you're with the Ruler.
17       Q.   Not with the Ruler, but afterwards I would suggest you'd
18            have made a note that you'd seen the Ruler of RAK,
19            wouldn't you?
20       A.   There will be a note that I was seeing the Ruler, but
21            I'm not sure how much detail would have been in it.
22       Q.   Sorry, it's {H7/268}.  It's my fault.  Two pages on.
23            These are emails in early April 2015, Mr Gerrard.  Have
24            you seen this document before?
25       A.   No.
```

1    Q.  Not even when you were preparing for giving evidence?

2    A.  No, no.

3    Q.  It's right, isn't it, that you saw Mr Buchanan as

4        certainly the -- if not one of your clients or

5        effectively the representative for one or more clients

6        of yours?

7    A.  At this stage I can't -- I think -- initially it was

8        Naser Bustami and then gradually Jamie Buchanan took

9        over, so I've got two potential clients here, but at

10       either stage one of them was my client, yes.

11   Q.  And there came a stage when Mr Buchanan has given

12       evidence that -- there came a stage when he basically

13       took over --

14   A.  Correct.

15   Q.  -- leading this --

16   A.  Correct, absolutely.

17   Q.  And that happened certainly by April 2015, didn't it?

18   A.  Yes, I would have thought so.

19   Q.  Can his Lordship take it that you were likely to have

20       liaised quite closely with Mr Buchanan from that point

21       in relation to the investigations?

22   A.  Yes, of course.

23   Q.  You can see in these emails that Mr Buchanan -- at the

24       foot of the page he sent an email to Mr Handjani:

25           "Good afternoon.  HHSS had wanted us to target FA --

1           on what basis would we do this?"

2               Then there's a series of exchanges.  Mr Bustami

3           features a bit.  Then if we go, please, to {H7/273}, you

4           can see Mr Bustami sends an email to Mr Handjani and

5           Mr Buchanan on 4 April.  Could you read that to

6           yourself, please, Mr Gerrard -- just to yourself.

7           (Pause)

8    A.  Yes.

9    Q.  Can you see that it looks as if in early April 2015

10       the Ruler was stipulating or was directing that he

11       wanted Mr Azima to be targeted?  Can you see that?

12       There's a reference in the previous email to "targeting

13       FA".

14   A.  Where is that?

15   Q.  Page {H7/268}, the bottom email that I just took you to.

16   A.  Well, you'd got me on another email.

17       My Lord, I wasn't copied in on these.  I wasn't

18       aware of any of these conversations.  I thought I was

19       a witness of fact.  I don't really see how much more

20       I can do to help the court in respect of these emails.

21   Q.  Right, but you have read the email, have you, now,

22       Mr Gerrard?

23   A.  I --

24   Q.  I'm going to ask you some questions.

25   A.  Which email are we on now?

```
 1    Q.  Well, the point for you to gauge is that Mr Buchanan,
 2        who we've established is probably your client or the
 3        instructing representative for your client at this
 4        point --
 5    A.  Yes, yes, my Lord.
 6    Q.  -- is recording that the Ruler of RAK wanted Mr Azima
 7        targeted; all right?  That's what's recorded here.  I'm
 8        not asking you whether it's true or not.  I'm just
 9        asking you just to clock that; all right?
10    A.  I've clocked it, my Lord.
11    Q.  Well done.  Then if we go, please, to {H7/273}, you can
12        see --
13    A.  Where's 273?
14    Q.  {H7/273}, the second page I took you to, I asked you to
15        read --
16    A.  Right.
17    Q.  -- which you've read.
18    A.  Well, I'm going to read it again.  We're darting about
19        all over the place.  These are emails that I have not
20        seen before.  I would like to take the time to read
21        them, if I may, my Lord.  Thank you.  (Pause)
22            Thank you, my Lord.  I've read this email.
23    Q.  You can see that in the email that you're now looking
24        at, Mr Bustami records this for the benefit of
25        Mr Handjani and Mr Buchanan:
```

```
 1              "I have had few discussions with boss about FA and
 2         he is adamant that we bring charges against him."
 3              Can you see that?
 4    A.   I can see that, my Lord.
 5    Q.   A bit further on:
 6              "He wants me to get you on the case to file some
 7         sort of charges against Farhad."
 8              Can you see that, Mr Gerrard?
 9    A.   I can see that, my Lord.
10    Q.   And then two lines on:
11              "When are you next in town so that me you and Jamie
12         could hook up and coordinate our attack."
13              Can you see that?
14    A.   I do see that.
15    Q.   So it looks from these emails as if the Ruler was
16         letting it be known to Mr Buchanan or Mr Buchanan had
17         understood that the Ruler wanted to target Mr Azima and
18         bring charges.  Can you see that, Mr Gerrard?
19    A.   I -- where's the word "target"?  I see -- I see that the
20         boss, His Highness, is clearly upset about something and
21         he's "adamant that we bring charges against him".  So
22         that's what I see.  I don't see the word "target" and
23         please bring it to me.  Is there a "target" on another
24         email?
25    Q.   I just asked you to read it, Mr Gerrard.
```

```
 1    A.   No, no -- I have read it, and then you say --

 2    Q.   268 --

 3    A.   You asked me was he targeting him.  Does that come in

 4         the email or is that your view?

 5    Q.   Mr Gerrard, I simply asked you to look at two quite

 6         short emails.  You have run a global investigation for

 7         decades.

 8    A.   Yes, I have.

 9    Q.   I assumed you could absorb four or five lines of text

10         where there is one central point in there that I could

11         then put to you.

12    A.   But I don't see the word "target".

13    Q.   The word "target" was in the previous email.

14    A.   All right, but we're on this email.  So what I see from

15         this email --

16    JUDGE LENON:  I think you've said what you see -- we know

17         what's in the email.

18    A.   Thank you.

19    JUDGE LENON:  Can you get on with it?

20    MR LORD:  Ask the question?  Yes.

21    A.   I have answered the question.

22    Q.   Given that you were working for Mr Buchanan at this time

23         and given what appears to be the importance of taking

24         steps in relation to Mr Azima --

25    A.   Certainly charging Mr Azima would be an important step,
```

```
 1          yes, my Lord.
 2     Q.   And I suggest that you would have been made aware at
 3          this time or about this time that these were the Ruler's
 4          wishes.
 5     A.   Absolutely not, and my question would have been, as
 6          indeed I think the others are saying, "With what?"
 7     Q.   Is it your evidence to his Lordship that Mr Buchanan did
 8          not discuss with you at around this time what appears to
 9          be the Ruler's wish for Mr Azima to be targeted and
10          charged?
11     A.   Absolutely.  This looks like someone getting annoyed and
12          reacting.  There was no evidence at all -- what,
13          2015? -- no evidence at all -- indeed right the way up
14          to before the details, there was no evidence that we
15          could bring at all against Dr -- sorry -- yes, against
16          Dr Massaad, let alone Farhad Azima -- sorry, evidence
17          against Dr Massaad; no evidence against Farhad Azima.
18          Apologies.
19     Q.   And when you said until the details, you mean the hacked
20          data?
21     A.   Yes, until the hacked data.
22     Q.   Until the hacked data?
23     A.   Yes.
24     Q.   So until the hacked data there was no basis at all --
25     A.   I outlined wrongly the various reports, the last one
```

| 1  |    | being in April/May 2016, where we had no evidence other |
|----|----|---------------------------------------------------------|

```
 1         being in April/May 2016, where we had no evidence other

 2         than -- significant suspicions, but no evidence to take

 3         action against Farhad Azima.

 4   Q.    So as Mr Buchanan gave evidence, the only time that

 5         RAKIA appreciated that it had a basis to accuse Mr Azima

 6         of fraud was as a result of the material in the hacked

 7         data?

 8   A.    I'm not sure that's 100% right -- civil, criminal fraud,

 9         that -- one of the reasons why I took legal advice,

10         further legal advice, from another jurisdiction in 2016,

11         and they subsequently agreed that there was no action,

12         but that's as far as we got.

13   Q.    Could we go, please, to {H7/464}?  This is the email of

14         20 July -- or 19 and 20 July 2015.  Again, Mr Gerrard,

15         have you seen this email before?

16   A.    I'm sorry, the screen for me is blurred because of my

17         glasses, but --

18   Q.    I think we have a hard copy for you, I think.  (Handed)

19   A.    (Pause)  Yes, I've read it.  Thank you.

20   Q.    Have you seen this document before?

21   A.    No, I haven't.

22   Q.    You can see that it looks on its face as if in July 2015

23         Mr Buchanan and Mr Handjani are having an email

24         conversation in which it is recorded that the "boss",

25         who is the Ruler, wants to go after "FA", which is
```

1          Mr Azima.  Can you see that?

2     A.   My Lord, I'm a witness of fact.  I haven't seen this

3          email.  Surely counsel is better served -- the court is

4          better served by asking the people in this email.

5     JUDGE LENON:  Well, you've been asked the question.  Can you

6          answer it?

7     A.   Okay, my Lord.

8     MR LORD:  Out of fairness to you, Mr Gerrard -- because I'm

9          going to submit that you are not telling the truth and

10         I'm giving you some of the reference points that will

11         ground my submission, and I'm showing you that again

12         in July 2015 the Ruler of RAK seems to be directing that

13         Mr Azima is gone after, and we've established that

14         Mr Buchanan is somebody -- is a client of yours in the

15         sense that he represents one of your clients, we've

16         established that you and he will work closely together,

17         and, therefore, I will submit to his Lordship, it is

18         overwhelmingly likely that you and he would have

19         discussed this sort of direction from the Ruler.

20    A.   I understand that.

21    Q.   In fairness to you, Mr Gerrard, I thought I should let

22         you see why.

23    A.   Fire away.

24    Q.   Are you happy now for me to --

25    A.   Fire away.

1    Q.   I'm grateful.  Can I suggest to you, Mr Gerrard, that
2         you would have discussed with Mr Buchanan, around about
3         the time of these emails, what appears to be the Ruler
4         of RAK's direction or command in relation to Mr Azima?
5    A.   Okay, I'll repeat my previous answer.  I haven't seen
6         these emails before, nor did I discuss with Mr Buchanan
7         or indeed anyone else the irritation that His Highness
8         seems to have explored.  But what surprises me from this
9         note is the penultimate sentence:
10             "NB says the Boss wants criminal stuff taken out of
11        a letter [well, I don't know what letter we're talking
12        about] and go after FA -- subject to guidance from AF."
13             Well, I think they're talking here about PR stuff.
14        Andrew Frank was running Karv Communications.  What
15        would Andrew Frank be involved in an email about
16        criminal matters for?
17   Q.   So as far as you were concerned, Mr Frank's involvement
18        was really on the public relations side?
19   A.   He was the strategic adviser for the global
20        investigation, so not being a party to the emails, there
21        was obviously some sort of fuss.  His Highness clearly
22        was upset.  But "subject to guidance from AF" can only
23        be a press strategic PR thing.
24   Q.   Mr Gerrard, we've established, haven't we, that
25        in March 2015 Mr Page does a report aimed at part in

```
 1          ruining --

 2    A.    Absolutely.

 3    Q.    -- the plans?

 4    A.    Absolutely.

 5    Q.    And we've agreed that that relates to Mr Azima at least

 6          in part, haven't we?

 7    A.    Absolutely.  Mr Azima seemed to be helping drive that,

 8          yes.

 9    Q.    And we've seen emails in April and July 2015 where it

10          looks as if, putting it colloquially, the Ruler is still

11          on the warpath as far as Mr Azima is concerned, haven't

12          we?

13    A.    What, the ones we've just seen now?

14    Q.    Yes.

15    A.    Yes, he appears to be on the warpath, absolutely --

16    Q.    And Mr --

17    A.    -- but the previous emails you talked about also talk

18          about 8 million.

19    Q.    Mr Buchanan gave evidence yesterday or maybe the day

20          before -- yesterday, I think -- that one of the prompts

21          for the April emails -- one of the prompts for the

22          Ruler's wish to go after Mr Azima we've seen in

23          the April emails was the March report from Mr Page that

24          revealed the part Mr Azima was playing allegedly in the

25          campaigning.
```

```
 1    A.   I would have imagined His Highness will have been upset

 2         that Dr Massaad, aided and abetted by Farhad Azima, were

 3         creating a press campaign, yes.

 4    Q.   And there's no evidence, is there, that by July 2015

 5         the Ruler's concern had abated -- is there?

 6    A.   Sorry, say that again.

 7    Q.   There's no evidence that by July 2015 the Ruler's

 8         concerns in relation to Mr Azima had abated?

 9    A.   I don't see why they would have done.  I agree.

10    Q.   They continued, didn't they?

11    A.   Well, to the extent that the client, through

12         Andrew Frank, Bell Pottinger and others, started to work

13         on their own press communication strategy, the crisis

14         plan, call it what you like.

15    Q.   In 2016?

16    A.   Yes, so the worry about the press campaign caused the

17         client -- indeed I think I even advised that we instruct

18         Bell Pottinger, as is normal in big investigations,

19         crisis management and all that -- to instruct them.  So,

20         yes, this was something that went on in some sort of

21         preparation for some time.

22    Q.   And is it your evidence that you did not discuss with

23         Mr Buchanan, let's say around July or August or

24         September 2015, this particular concern of the Ruler's,

25         in other words the campaigning, including Mr Azima's
```

 1         part in it?  Did you not discuss it at all with

 2         Mr Buchanan over that time, over the summer?

 3    A.   Yes, of course -- sorry, did I discuss the Ruler's

 4         worries?

 5    Q.   The concern, the concern, that there was a campaign

 6         allegedly being cooked up by Dr Massaad and his US team

 7         to smear RAK?

 8    A.   Yes, yes.  Sorry, and your question is ...?

 9    Q.   Did you not discuss those matters with Mr Buchanan?

10    A.   Yes, of course.

11    Q.   Regularly?

12    A.   No, not necessarily regularly, but it was a concern.

13         Mr Buchanan will have been told -- I think things came

14         to a head particularly with (a) Mr Goodley, which I've

15         already walked through, and subsequently the allegations

16         against Dechert and myself to the SRA, which were

17         investigated and the determination that there was no

18         evidence.

19             So there was no doubt that we were hearing that

20         there was a press campaign coming down the track,

21         my Lord.  We were beginning to see evidence of a press

22         campaign and the client was taking steps, albeit slowly

23         in my opinion, to start to try to counter that.

24    Q.   And that would include gathering confidential

25         information on the alleged campaigners, wouldn't it?

```
 1    A.    Funnily enough, it didn't.  We got -- the information
 2          dried up from Mr Page's report.  Thereafter we got
 3          titbits of information from Bell Pottinger and people
 4          who were hearing in the marketplace who Farhad and his
 5          team -- not Farhad, actually -- it might have been
 6          Farhad -- Khater Massaad, whoever was driving it, were
 7          speaking to various PR agents, and that was the
 8          information that we were getting in the marketplace.
 9          That's as much as I can say on that.
10    Q.    And what was your understanding of what, if any,
11          intelligence-gathering Mr Page was achieving in the
12          second half of 2015, please -- the second half?
13    A.    From March, 26 March, as far as I was aware, Mr Page was
14          back to his day job, looking at Georgia, Khater Massaad,
15          etc.  That's what his focus was.  It will have been
16          wider than that, I've no doubt, but it certainly, as far
17          as I was aware, did not include Farhad Azima.
18    Q.    That wasn't my question.
19    A.    Well, you asked me what Mr Page was doing and I've just
20          told you.
21    Q.    Well, no, Mr Gerrard, we've seen that
22          intelligence-gathering was going to be carried out,
23          including in relation to Mr Azima.  You've just agreed
24          that the concern about the campaigning didn't abate.  In
25          fact you said it got stronger and stronger.  Mr Page's
```

1           remit clearly extends to those matters, and that's why
2           I'm asking you what happened, as far as you're
3           concerned, in the second half of 2015 through Mr Page's
4           work to gather intelligence or monitor the activities of
5           this increasing plot.
6    A.     I apologise, my Lord.  I thought I'd answered this
7           twice.
8                As far as I was aware, Mr Page made it abundantly
9           clear to me and Mr Buchanan that he had either lost his
10          contact or his contact didn't want -- whatever it was,
11          I can't remember.  That line of enquiry was gone.  We
12          did not -- maybe we were wrong -- we did not ask him to
13          carry on looking at Farhad Azima.  In fact he'd never
14          been asked to in the first place.  This came by chance.
15               From that period on, as far as I'm aware, I didn't
16          give him any instructions and I certainly don't think
17          Jamie Buchanan did.  He was looking at this massive
18          investigation and we had a lot to do, as indeed others
19          were looking at it.
20   Q.     Mr Gerrard, by 4 January 2016 you had uncovered no
21          basis, had you, to allege that Mr Azima had been engaged
22          in fraud at the expense of RAK or RAKIA?
23   A.     A little bit later than that -- April, I think it was,
24          2016.
25   Q.     So you can confirm on oath that by 4 January 2016 you

1        had not uncovered any basis for alleging fraud against

2        Mr Azima in relation to RAK or RAKIA or any RAK entity?

3   A.  That's not -- we had suspicions.  Could we go to court

4        with them?  The view was no.

5   Q.  So what were these bases, then?

6   A.  So we had by then -- we had some tip-off on the

7        Panama Papers, but it didn't really take us that far.

8        But that was the first time we realised that -- in fact,

9        I think we may have already had the information from

10       Cynthia Payne, Dr Massaad's secretary, about the Eurasia

11       Hotel Holdings.  That was bizarre on two counts: one,

12       the only directors appeared to be Farhad Azima and

13       Dr Massaad; two, they were then the ones that voted for

14       the change of name.  So we had those emails.  Ray Adams

15       sent those emails to Dr Massaad's secretary, asking

16       Dr Massaad to sign them.

17   Q.  When was that?

18   A.  Sorry?

19   Q.  When was that?  When did you see those emails?

20   A.  I can't remember when we first saw them, but they would

21       be a matter of record.  They've come out of

22       Cynthia Payne's emails.  Cynthia Payne -- I think that's

23       her name -- certainly Cynthia -- was Dr Massaad's

24       private secretary.  We reviewed the emails of

25       RAK Ceramics, we reviewed the emails of Dana Jets, we

1          reviewed what we could from HeavyLift, we reviewed

2          Karam Al Sadeq's emails.  That is where we got the

3          majority of our information from.  By 2019, 12 people

4          had been arrested and charged and, as you'll appreciate,

5          it was a significant operation.

6    Q.   Mr Buchanan gave evidence that as far as he was

7          concerned by January 2016, there was no basis to

8          consider that Mr Azima had engaged in fraudulent

9          activities at the expense of RAK or RAKIA.

10   A.   I wouldn't have gone that far.  I suspected

11         Farhad Azima.  The trouble is I didn't have hard enough

12         evidence.  So he is a bizarre, mercurial character.  You

13         could almost call him "Teflon man".  He was around

14         gun-runners, he was closely connected, if not involved,

15         in rendition.  Was it illegal rendition?  I'm not sure

16         how it can be, but sometimes these things are

17         sanctioned.  It was clear that he was involved in

18         gun-running to us, but could we prove it?  And also

19         right -- yes, so there were a number of things.  To say

20         that he wasn't involved was going too far in my opinion.

21   Q.   You identified earlier today three different reports you

22         claim your team had carried out into Mr Azima.

23   A.   Correct.

24   Q.   Can we have those on the screen, please?  They were

25         I think starting about [draft] page 23.  Can we have

```
 1              those on screen, [draft] page 23.  {Day5/22:1}

 2                  I asked you about the actual reports.  You said

 3              there were three -- [draft] line 23, page 23 for the

 4              transcript.  Can you see, Mr Gerrard?

 5       A.  Yes, I'm on 23.  I can't see where it says "three".

 6       Q.  [Draft] line 23 {Day5/22:23}:

 7                  "By my team, my Lord.  There are three."

 8       A.  Are we looking at the very top page?  I'm sorry.

 9       Q.  I'll ask you.  You gave evidence this morning to

10              his Lordship that there were three reports into

11              Mr Azima.

12       A.  Well, three reports which covered Mr Azima, yes.

13       Q.  Yes, and one of which -- the first one you say was in

14              2014.

15       A.  I think that was right.

16       Q.  And you said it didn't really take anyone anywhere.  Can

17              you see that?

18       A.  Yes.

19       Q.  So that wouldn't be a basis for saying that Mr Azima had

20              been fraudulent, would it?

21       A.  No, but it -- what it did do, he came out as a pretty

22              colourful character.  But you're right, by 2014 we had

23              no hard evidence.  But his track record was interesting

24              and it did tweak our interest.

25       Q.  And the second report you identify of the three,
```

```
 1          starting at [draft] line 6 -- I don't want you to go

 2          into privileged matters --

 3     A.   Where are we now?  On the second page?

 4     Q.   [Draft] page 24, line 6, {Day5/23:6}.

 5     A.   Okay, I'm getting the hang of this now.  6, yes:

 6               "The second report -- we've got to be careful

 7          here -- was -- yes, the second report was started as

 8          a result of ..."

 9               Yes, that's right, yes.  HeavyLift, correct.

10     Q.   And you said that the result from that was that there's

11          not much information.  Can you see that?

12     A.   Yes, that's -- yes.  So when I say there's not much

13          information, to base our views as to whether or not he

14          had a claim.

15     Q.   Yes, and then the third report you identify is at

16          [draft] page 24, line 18 {Day5/23:19}.

17     A.   [Draft] page 24, line 18?

18     Q.   You say:

19               "Then, off the back of that, as a result of that

20          investigation -- and I think we're now into 2016 and

21          I think we're April, May, June 2016 -- the best report

22          we could do ..."

23               And so it runs on.

24     A.   Yes.

25     Q.   So those are the total of your alleged investigations
```

```
 1          into Mr Azima, aren't they?
 2     A.   My alleged investigations?  I did carry out
 3          investigations.
 4     Q.   Right.  And the Panama Papers didn't come out until
 5          April 2016, did they?
 6     A.   Correct, there were two lots of Panama Papers.
 7     Q.   But they didn't emerge until April 2016, did they?
 8     A.   There were two lots.  The first lot bizarrely included
 9          Farhad Azima.
10     Q.   When did they first emerge, Mr Gerrard?
11     A.   I can't remember the date.
12     Q.   Around about April 2016?
13     A.   If that's -- yes, if that's the right date, yes.
14     Q.   So by January 2016 there were no Panama Papers, were
15          there?
16     A.   No.
17     Q.   So can we go, please, to the document at {H9/105},
18          please?  Can you see that, Mr Gerrard?
19     A.   I haven't got there yet.
20     Q.   If you're looking at it on screen, have you seen that
21          before?
22     A.   I can't remember it.  Oh right.  So -- okay.  Sorry,
23          I thought we were still on the reports.
24     Q.   {H9/105} and I see you've turned over to the attachment,
25          but {H9/105} is an email from Mr Frank to you on
```

```
 1           4 January 2016.
 2    A.    Yes.
 3    Q.    Have you seen this document before?
 4    A.    Yes -- have I seen it before?  Yes, I didn't remember
 5          it, but, yes, I've now seen it.
 6    Q.    When is the last time you think you looked at this
 7          before today?
 8    A.    I would have thought within the week.
 9    Q.    So you looked at it for the purposes of giving evidence
10          today?
11    A.    Yes, I have.
12    Q.    And it's been drawn to your attention, has it?
13    A.    Yes.
14    Q.    Now taking this in stages --
15    A.    Yes.
16    Q.    -- can his Lordship take it that you did receive this
17          email from Mr Frank in this way?
18    A.    Yes, I would imagine so.  I can't see any reason why --
19          if it's been sent to me, it will be -- I'll have
20          received it.
21    Q.    Mr Frank worked for Karv Communications, didn't he?
22    A.    He does.  He was the global strategic adviser and
23          I instructed him in 2014.
24    Q.    And he deals with the US aspects of --
25    A.    No.  I've already said he is global.  We needed a global
```

```
 1            overview, we have a global investigation.  We were in
 2            six/seven countries.  It was my advice that we needed
 3            a global strategic plan.  His Highness -- I've never met
 4            Mr Frank before -- His Highness had used him previously.
 5            Maybe he's on some sort of standing instruction.
 6            I don't know.  I met him and I instructed him.
 7       Q.   Because Mr Buchanan gave evidence that
 8            Karv Communications, Mr Frank's role, would come into
 9            play when there was a US angle -- I think was the burden
10            of Mr Buchanan's evidence.  It sounds as if you don't
11            agree with that.
12       A.   I certainly don't.  Yes, of course he might be more --
13            he would be interested in the US issues, but his role
14            was global.  He advised on Georgia, he advised on UAE,
15            he took a global overview, but did obviously communicate
16            and deal with the PR advisers on the ground.  So
17            Bell Pottinger, for example, was really just UK.
18            I think we had some separate people in the US.  We had
19            separate people in Georgia and the global overview was
20            Mr Frank.
21       Q.   And he sent you a document, didn't he?
22       A.   Yes, he did.
23       Q.   And he asked you to confirm receipt and he said:
24                 "Best, A."
25                 Can you see that at the bottom of the email?
```

```
 1    A.   "Best" -- yes, sorry, I thought we were on to --
 2    Q.   By signing off with the letter "A", would it be right
 3         that you and Mr Frank were on quite familiar terms by
 4         that point?
 5    A.   Familiar?  Yes, yes, I probably had known him now for
 6         nearly two years.
 7    Q.   And Mr Frank said to you, didn't he, "Please confirm
 8         receipt"?  Can you see that?
 9    A.   Yes, yes.
10    Q.   Now, on the face of it, it looks as if Mr Frank
11         therefore wanted to know that you had actually received
12         this email and attachment, doesn't it?
13    A.   Yes.
14    Q.   We haven't had disclosure of any email back from you in
15         response to this email from Mr Frank.  Can you explain
16         that?
17    A.   I -- almost certainly I would have telephoned him.
18    Q.   Can you go, please, to the attachment at {H9/106}?
19    A.   Yes, I'm there.
20    Q.   Can you tell his Lordship what this document comprises?
21    A.   When he sent me the document, it was a bit out of the
22         blue so I wasn't quite sure what it was about.  When
23         I talked to him -- we'd been talking previously, I think
24         in the US, about the global -- about the campaign, and
25         this was the beginnings of how RAK would respond to the
```

```
 1              press campaign that was coming down the track.  That was
 2              my understanding of what this was about.
 3         Q.   So your evidence is that Mr Frank produced this
 4              document; is that right?
 5         A.   Yes, yes.  That's my understanding, yes.
 6         Q.   And he appears to be summarising here, doesn't he, the
 7              state of play on investigations by RAK or RAKIA over the
 8              previous two years, doesn't he?
 9         A.   Yes, I think what he was trying to achieve was -- and of
10              course, apart from the attacks on RAK and whatever, what
11              he was trying to do was address the imbalance that we
12              thought was going to come down the track.  And so this
13              was, you know, a "View from the window".  It's very
14              Andrew.  He was going to put RAK's case to the market.
15              So it was his -- I describe it as "ramblings", which is
16              a little unfair, but that's the way it looked to me.
17         Q.   Well, Mr Gerrard, Mr Frank doesn't -- so you're saying
18              that the very first time --
19         A.   This is the very first time I received anything from
20              Mr Frank.  You know, it was his -- I think we'd had
21              a meeting previously, I think it was in the US, where we
22              were worrying about how we were going to manage the
23              "blitzkrieg", as it's been called.
24         Q.   Well, that makes more sense, Mr Gerrard; in other words
25              this hadn't really come quite out of the blue, had it,
```

```
 1             because there had been a meeting where in fact some sort
 2             of summary of the position had been discussed with you,
 3             hadn't it?
 4     A.     Yes, absolutely.  When I say it came out of the blue,
 5             I didn't know why he was writing to me.  That's what
 6             I meant.
 7     Q.     Who should he have been writing to, then?
 8     A.     He was the strategic press guy.  I would have expected
 9             him to be doing it and then circulating it elsewhere.
10             But here -- this was a bit thin on the ground, but
11             anyway.
12     Q.     And when was this meeting, do you think?
13     A.     It will have been a couple of weeks before we sent it
14             or -- I can't remember.  It will be in my diary.
15     Q.     That will be to do with this alleged countering of the
16             PR campaign, will it?
17     A.     Yes.
18     Q.     So it wouldn't be to do with litigation?
19     A.     No.
20     Q.     And would there be a record of that in your daybooks?
21     A.     I don't know.
22     Q.     There's likely to be a record, isn't there, of a meeting
23             in the US?
24     A.     No, there's not likely to be a record.  If we're talking
25             about PR, I don't think I would have been making
```

```
 1          a record on PR.
 2     Q.   And so I think your evidence is that this was Mr Frank's
 3          first stab at --
 4     A.   That's my interpretation of this, yes.  I hadn't
 5          received anything else before this.
 6     Q.   Because there aren't any other emails we've seen where
 7          Mr Frank discusses it with you or says, "How about this
 8          for a first draft" or --
 9     A.   No, that's why I say I think it's his first stab --
10          I mean, he will have had other discussions, but this is
11          the first time he sent me anything.
12     Q.   And Karv Communications still work for RAK or RAKIA,
13          don't they?
14     A.   Yes, I think they do.
15     Q.   And there's no reason why Mr Frank couldn't have given
16          evidence in this case, is there, as far as you --
17     A.   I have no idea, my Lord.
18     Q.   Do you know any reason why he can't give evidence?
19     A.   I didn't know that he wasn't going to until very
20          recently.
21     Q.   Who was at this meeting that you've just described?
22     A.   I would -- definitely Mr Buchanan, there will have been
23          me, obviously Mr Frank.  I'm not sure who else.  I doubt
24          whether there would have been anyone else.  Mr Handjani
25          might have been.  He floated in and out.  But I don't
```

1      know.

2   Q.  And so it would be fair, would it, for his Lordship to

3      understand that what Mr Frank was purporting to do in

4      this attachment at {H9/106} was to summarise what he

5      understood to be the state of play in relation to the

6      investigations into the alleged massive fraud affecting

7      Ras Al Khaimah?

8   A.  Yes, my Lord, that's what he was attempting to do in my

9      view.

10   Q.  And he was doing that, wasn't he, based upon what he'd

11      been led to understand was that state of play by you at

12      a meeting a week or two before 4 January 2016?

13   A.  Yes, I think so.  That's a fair assessment.

14   Q.  And in October and November 2015 Mr Azima's emails were

15      the subject of a spear-phishing attack, Mr Gerrard --

16      were you aware of that?

17   A.  No.

18   Q.  -- which potentially allowed the hacker to access

19      Mr Azima's confidential email data.

20   A.  And what date do you say that was?

21   Q.  In October and November 2015, so shortly before the

22      meeting you had with Mr Frank and Mr Buchanan in the US.

23          Can you see what this document records?

24   A.  Yes.

25   Q.  "The window has opened on Ras Al Khaimah through

1          a series of investigations that have unearthed a massive

2          fraud ..."

3            You were in overall charge of the global

4          investigation for Dechert, weren't you, at that time?

5   A.  That's correct, my Lord.

6   Q.  You can see what it says in the top hole-punch:

7            "A number of things have been exposed as fact over

8          the past twenty-four months:"

9            Can you see that?

10  A.  I do.

11  Q.  Can you see about halfway down it says:

12          "- FA, a US citizen, appears to have orchestrated,

13         if not (fully) participated in numerous fraudulent

14         activities."

15          Do you see that?

16  A.  I do.

17  Q.  Mr Buchanan gave evidence that as far as he was

18         concerned RAKIA had never had any basis to allege

19         Mr Azima had been fraudulent, still less participated in

20         numerous frauds, until the hacked data had been

21         analysed.

22  A.  Correct.

23  Q.  And that's right, isn't it?  RAKIA didn't have any basis

24         to think that Mr Azima had been guilty of any sort of

25         serious fraud until it saw the hacked data?

```
 1    A.   Certainly not guilty, but we certainly suspected him of
 2         wrongdoing.
 3    Q.   And by 4 January 2016 we've seen that, of your three
 4         reports, the first one in 2014 didn't really go
 5         anywhere.  We can forget that.
 6    A.   Correct.
 7    Q.   The second one was into the Mr Azima's HeavyLift
 8         Training Academy claim, wasn't it?
 9    A.   Correct.
10    Q.   And the third one in 2016 postdated this document,
11         didn't it?
12    A.   Correct.
13    Q.   It's right, isn't it, Mr -- so can his Lordship take it
14         that you and/or --
15    A.   Gerrard.
16    Q.   Mr Gerrard, can his Lordship take it that it's likely
17         that Mr Frank would have got this information about
18         Mr Azima's role from you or Mr Buchanan at that meeting
19         a couple of weeks earlier?
20    A.   No, he will have got what we knew about Farhad Azima (a)
21         coming out of the 26 March Page report.  He will have
22         got --
23    Q.   Stop there, stop there.
24    A.   Yes.
25    Q.   That didn't concern fraud, did it, by Mr Azima?  That
```

1          was about campaigning.

2   A.  No, I'm telling you what Mr Frank would have known.  So

3          Mr Frank would have been aware -- it was campaigning and

4          it was relevant for Mr Frank.

5   Q.  So how would Mr Frank have known about the March report

6          of Mr Page?

7   A.  I'm not sure he knew about the report, but he certainly

8          knew about the issues from the report, ie --

9   Q.  Stop there, stop there.

10  A.  Yes.

11  Q.  How can you give evidence of that?  What's the basis for

12         your saying --

13  A.  Because I was there when I briefed him about the

14         Farhad Azima/Dr Massaad report.  Why else --

15  Q.  When was that?  When was that?

16  A.  I can't remember, but he's the strategic global PR

17         adviser.  He was told this was coming down the track --

18         this is as much as -- I don't know that he was told it's

19         the Page report, but we were -- I also discussed the

20         Goodley thing with him, "We've got Mr Goodley trying to

21         interview me.  What do you think?", and between us we

22         decided, "Neil, go and talk to him".

23         So of course Mr Frank knew about the blitzkrieg

24         issue.  He also knew regular briefings on the case

25         generally and in particular the concerns that we had

```
1              regarding rendition, regarding gun-running, regarding
2              all of those other issues, but he also knew -- well, he
3              knew our concerns on that.
4                   So when I saw this, I said, "I'm sorry, that
5              particular section isn't going to work because you ask
6              for how much to add here and all we can add is
7              suspicions", so he didn't have any evidence for that
8              bullet point.
9         Q.   Where is the evidence of your response to this email and
10             attachment?
11        A.   My evidence is what I've just given you, which is
12             I phoned him and discussed this with him.
13        Q.   Well, where's the revised draft?  Where's the next
14             version of this?
15        A.   Well, there isn't one.  There's no version -- well, if
16             there is, I haven't seen it.
17        Q.   I suggest, Mr Gerrard, that what you've just said is not
18             truthful and I suggest that the reason that Mr Frank put
19             this line in about Mr Azima is because, at that meeting
20             that you had with him and Mr Buchanan a week or two
21             before, you had led Mr Frank to understand that you had
22             exposed as fact that Mr Azima had participated in
23             numerous fraudulent activities.
24        A.   And how would I do that?
25        Q.   You would do that because by that stage, I suggest,
```

```
 1          Mr Gerrard, you were aware of the confidential material
 2          that had been procured illegally from within Mr Azima's
 3          email records in October/November 2015 and one way or
 4          another you thought you were on to something.  You
 5          started to think that you could -- that you had some
 6          material to allege fraud.  That's what I put to you.
 7     A.   So I'd like to deny that, my Lord.  It's preposterous.
 8          But I'd also like to explore that question because what
 9          you're suggesting is I had a secret little stash of
10          Mr Azima's documents which I could select at will to
11          identify frauds.  I mean, how would I do that?  How do
12          I pull this stuff down?  How do I search for it?
13     Q.   His Lordship has your answers, Mr Gerrard.  I'm going to
14          move on.
15              I suggest to you further that by January 2016 you
16          would have been aware of Mr Page's ongoing
17          intelligence-gathering work.
18     A.   Yes, I was, but not into Farhad Azima.
19     Q.   In relation to Farhad Azima?
20     A.   There was no ongoing intelligence work that I was aware.
21     Q.   And you would have been aware that Mr Page had been
22          successful in gathering intelligence from within
23          Mr Azima's confidential email archive?
24     A.   I beg your pardon?
25     Q.   You would have --
```

```
 1    A.   Is this your supposition now?

 2    Q.   It's what I'm putting to you.

 3    A.   Okay.  Sorry.

 4    Q.   I'm putting that to you.

 5    A.   Right.  No, I wasn't aware.

 6    Q.   And that that is the only explanation for why Mr Frank

 7         has recorded, based upon what you and Mr Buchanan must

 8         have told him, the idea that Mr Azima had been involved

 9         in numerous fraudulent activities.

10    A.   My Lord, that's ridiculous.  Mr Frank is a clever man,

11         but he's not a lawyer.  He will have heard on a regular

12         basis concerns as to gun-running, fraud, etc, etc.  What

13         he will not have grasped that we did not have sufficient

14         evidence to proceed.  On everything else we had stacks

15         of evidence against -- let's take the first bullet

16         point, Dr Massaad.  We had evidence.  Indeed he was

17         prosecuted.  We had evidence against Mikadze.  He was

18         prosecuted.  We had evidence of other crimes inside RAK,

19         including the Ruler's chief adviser and the general

20         counsel.  They were prosecuted.

21              Let me ditch Farhad Azima for the moment.  We had

22         dummy corporations set up in the RAK, UK, Georgia,

23         Cayman Islands, etc.  We could have put those in, and so

24         on.  Fraudulent bank accounts, possible gun-running,

25         that's the bit down there.
```

1          What we did not have -- we had grave suspicions, we

2          had very interesting emails about rendition, wing to

3          wing in Belgium Airport, but we did not have any

4          evidence that we could have proceeded against of actual

5          fraud against Farhad Azima.  That is just plainly wrong

6          and that's what I told Andrew Frank.

7     MR LORD:  Would that be a convenient point, my Lord?

8     JUDGE LENON:  Yes.

9     MR TOMLINSON:  As you know, Mr Gerrard, you remain in

10         purdah.

11    (1.00 pm)

12                    (The luncheon adjournment)

13    (2.00 pm)

14    JUDGE LENON:  Before you start, Mr Lord, I understand that

15         from tomorrow the court will be sitting in court

16         number 12, which has more seating for the public.

17    MR LORD:  Thank you, my Lord.  That's very kind.

18    MR TOMLINSON:  My Lord, I understand.  I don't know about

19         the practicalities.  It takes quite a long time to set

20         up.  I don't know whether it's going to be possible to

21         set it up for 10.30 or not.  We'll obviously have to

22         make enquiries.

23    JUDGE LENON:  All right.  Well, if it's not going to be

24         possible, somebody needs to tell listing office.

25    MR TOMLINSON:  I think I was just warned earlier that if we

```
1            were moving court, we needed to have plenty of notice so
2            that we could -- everything could be set up because
3            there's quite a lot of equipment.  Let's hope it can be
4            done.
5    JUDGE LENON:  Yes.  Okay.  Well, let's see how we get on.
6    MR LORD:  Mr Gerrard, I'm going to ask you about the meeting
7            on 16 July 2016 now, if I may, please.  There's
8            a Dechert note of that meeting, most of which is
9            redacted, but an excerpt of which is not, at {H10/226}.
10           I'd like you to go, please, to {H10/226/2}.
11   A.   Yes, thank you, my Lord.  I've got it.
12   Q.   Would you have made a note or any notes of this meeting
13           in your daybook or some other place?
14   A.   No, I wouldn't.
15   Q.   Do you see in paragraph 10 --
16   A.   I do.
17   Q.   -- there is a record of what "NG", which I think must be
18           you, is meant to have said at this meeting?
19   A.   Yes.
20   Q.   Do you see that?
21   A.   Yes.
22   Q.   Do you see what you say in the third line?
23           "NG noted that HHSS was now engaging with Abu Dhabi
24           and the risk was that, the further this went, the more
25           likely collateral damage would occur.  It would be
```

```
 1          difficult to keep the scope of RAK's actions within
 2          a narrow compass."
 3              Can you see that?
 4     A.   I can.
 5     Q.   I asked Mr Buchanan about this on Day 3 and he accepted
 6          that the impetus behind the enlargement of RAK's actions
 7          in this regard would come from RAK and RAKIA as the
 8          complainant or sort of driving force, as it were.  Do
 9          you agree with that?
10     A.   Not entirely.  I'm not sure this note accurately records
11          what I said here.  I think I said -- because I don't
12          think we were engaging, and when I say "we", I mean the
13          RAK prosecutor or the client.  The client hadn't
14          reported, as far as I'm aware, to Abu Dhabi.  It was
15          certainly either in the process of reporting or had
16          already reported to the RAK prosecutor.  Dependent on
17          the sorts of charges, my Lord, it would be for the RAK
18          prosecutor to refer to Abu Dhabi if it was regarded
19          a federal offence.
20     Q.   Yes, but leaving aside the fact that there may be an
21          issue of whether ultimately the matter was taken up at
22          the RAK level or the federal level or the UAE level, the
23          way in which matters could escalate in this way into
24          criminal investigations and prosecutions would be if RAK
25          or RAKIA continued to push that process along.  That's
```

```
 1              right, isn't it, Mr Gerrard?
 2    A.   You say "push along".  I don't quite know what you mean.
 3         If you mean that RAK in reporting crimes to the
 4         prosecutor as pushing along, then yes.  The evidence as
 5         it was mounting was clearly going to move, we
 6         anticipated, from fraud to more federal-type offences
 7         and that wouldn't be for us to determine.  That was
 8         a RAK prosecution determination or would have been.
 9    Q.   In other words, I put it to you, Mr Gerrard, that your
10         clients -- ie RAK/RAKIA, in other words, RAK Government
11         entities and the like -- they could in effect cause the
12         criminal matters to escalate as you were suggesting they
13         might.
14    A.   No, that's not true.  Any company here in the UK can
15         decide to report crimes to the police.  Once it goes to
16         the police, the police determine -- pass it to the CPS
17         and so on.  That's what was happening here.  So I don't
18         quite understand -- it's absolutely no different.
19    Q.   No different, the process of investigating crime and
20         prosecuting within the UAE, to the UK?
21    A.   No, no difference in reporting a crime to the
22         authorities.
23    Q.   And is that your truthful answer, that the prosecution
24         here -- that the expansion of the prosecution's interest
25         would be independent of the impetus lent to that process
```

1           by RAK or RAK entities?  Is that your evidence?

2    A.   The code in RAK, my Honour, is that the judiciary are

3           separate from the Ruler.  Now, that's my -- that's my

4           evidence, that's my truthful evidence.  Whether --

5           counsel seems to be suggesting they're not.  I have no

6           idea whether they are or not independent.

7    Q.   Could you --

8    JUDGE LENON:  Sorry, what do you mean by "the code"?

9    A.   The law.  They have a process which sets out certain key

10          areas.  You're presumed innocent until found guilty.

11          Legal advice, the judiciary is independent.  I call it

12          a "code"; it's probably the law of the UAE.

13   MR LORD:  And where would we find a copy of that, Mr --

14   A.   I've no idea, but if you go on the internet, I'm sure

15          you'll find it.

16   Q.   So you're talking about a code or law about which you

17          have no idea; is that right?

18   A.   I read it some time ago and I can't remember, but I was

19          advised on this (a) from the internet and (b) from

20          Al Tamimi, the lawyers.

21   Q.   You're giving evidence on oath to his Lordship about the

22          code or the law, so help his Lordship.  What does that

23          comprise?  Where would we find it?  What does it look

24          like?  What are the statutes or when did they come in?

25          You must have some idea.

1    A.   I can't remember.

2    Q.   You're just making it up as you go along, Mr Gerrard,

3         aren't you?

4    A.   If you would like, I am sure by close of business today

5         that material can be drawn down from the internet and we

6         can provide that information to you if that would help

7         the court.

8    Q.   And that's what should happen in theory, is it, or does

9         it happen in practice as well?

10   A.   I've already given evidence that I -- we researched the

11        issue, both on the internet and counsel, Al Tamimi --

12        and in fact another law firm I can't remember now, and

13        that was our understanding.

14   Q.   And will that code you refer to or the codification --

15   A.   The code or the law, yes.

16   Q.   Yes, the code or the law, will that deal with the rules

17        as to detaining suspects?

18   A.   Yes.  Detaining suspects ... Yes, there is set out

19        a process as to when people are entitled to legal

20        advice, when charges are supposed to be made.  There is

21        a process.

22   Q.   And it will deal with the basis upon which somebody

23        could be kept in prison pending charge, will it?

24   A.   I didn't research that, but I'm sure it will do, very

25        much like our own laws do.

```
1    Q.  Could you go, please, to paragraph 11 of your witness
2        statement at {D/7/3}?
3    A.  We're on 16 July?
4    Q.  Yes.
5    A.  Yes.
6    Q.  You refer halfway through paragraph 11 to an attendance
7        note of yours -- can you see? -- which I've just taken
8        you to.
9    A.  Yes, yes.
10   Q.  You say there:
11           "... to the best of my recollection is an accurate
12        note of what was discussed ..."
13   A.  Yes.
14   Q.  I think you have just said to his Lordship that you
15        don't think it was entirely accurate, haven't you?
16   A.  To the best of my recollection, but that particular
17        I don't think is entirely accurate, no.
18   Q.  If we go back to your meeting note, please, at {H10/226}
19        --
20   A.  Yes.
21   Q.  -- when you are referring to "collateral damage" --
22   A.  Yes.
23   Q.  -- and the difficulty of keeping the scope of RAK's
24        actions within a narrow compass, you were there
25        threatening Dr Massaad via Mr Azima, weren't you?
```

1    A.   No, I was not, my Lord.

2    Q.   You were effectively saying to Dr Massaad via Mr Azima,

3         "If you don't cooperate with our investigation into your

4         alleged wrongdoing, RAK, my clients, are effectively

5         going to escalate the criminal cases that they've got

6         against you".  Isn't that what you were saying?

7    A.   My Lord, this needs to be put into context.  We had been

8         trying to speak to Dr Massaad about the whole -- the

9         issue.  Dr Massaad, as far as I know even today, still

10        is completely unaware of the allegations and concerns

11        that we had, and we wanted to talk to him about it (a)

12        because there may have been an innocent explanation and

13        (b) I don't think His Highness had much desire to

14        actually report him to the authorities.

15             The closest we ever came to Dr Massaad being

16        informed was a meeting I think in -- I'm going to

17        say April 2014, but I may be wrong, where I met with

18        Kirby Behre, where we walked through many pages of

19        concerns, and unfortunately my understanding is

20        Dr Massaad refused to talk to his lawyer and that lawyer

21        was subsequently sacked.

22             So what we were trying to do here was, through

23        Farhad Azima, inform Dr Massaad that the investigations

24        were mounting, the issues were getting serious and we'd

25        very much like to sit down and talk to him, failing

1       which the matter would be reported and it would go the

2       way all prosecutions go.  That was what I was trying to

3       convey.

4    Q. Could you go to your witness statement, please, at

5       {D/7/3}?

6    A. Yes.

7    Q. Look at paragraph 13.  Go over the page to {D/7/4}.  You

8       say this:

9          "In raising the point again on 16 July 2016 ..." --

10   A. Sorry, where is this?

11   Q. The top of {D/7/4}, reading on in paragraph 13 of your

12      witness statement.

13   A. "Behre had previously ...", that paragraph?

14   Q. I'll read out the beginning of the paragraph for you.

15   A. Yes.

16   Q. "In raising the point again on 16 July 2016 ..."

17   A. Sorry, I haven't got it.  I'm not there.

18   Q. {D/7/4}, the top of the page.  It's a continuation of

19      paragraph 13 --

20   A. Yes.

21   Q. -- and it's two lines down, second line at the end of

22      the line.

23   A. Yes, sorry.  I'm there now.

24   Q. That's all right.  That's all right:

25          "In raising the point again on 16 July 2016,

1           I wanted to convey to Farhad Azima that His Highness was

2           already engaging with the criminal authorities in the

3           UAE and that, once criminal proceedings were started,

4           there was a greater risk of collateral damage for

5           Dr Massaad and any of his associates.  I meant that once

6           litigation is started or a prosecutor takes over, these

7           things get a life of their own."

8   A.   Correct.

9   Q.   So it's right, isn't it, Mr Gerrard, that you were

10          saying to Mr Azima for his benefit and that of

11          Dr Massaad that it wasn't too late to get RAK to call

12          off the dogs?  That was essentially the message you were

13          relaying there, wasn't it, Mr Gerrard?

14   A.   No, I don't think I was.  The proceedings -- I can't

15          remember where the proceedings were, but the reports had

16          already started, yes.

17   Q.   But you're saying to him -- you're saying -- this is

18          your evidence, and I put it to you a few moments ago

19          that the impetus for further criminal attention to

20          Dr Massaad and Mr Azima would come from your client, and

21          you said, "No, no, no, there's a code.  It's all

22          independent.  That wasn't what we were doing there.  It

23          wasn't really in RAK's hands anymore".  When we come to

24          your witness statement, you in fact say the opposite.

25          In your witness statement you're saying that you were

1        effectively saying to Dr Massaad and Mr Azima, "This is

2        your last chance to avoid terrible, terrible criminal

3        and prosecution consequences".  That's what you were

4        telling them, weren't you?

5  A.  What I was telling him is that, if he refused to engage,

6        the matter was only going to get worse.  It was bad

7        enough as it was.  The matter had been reported to the

8        prosecutor.  At that time the prosecutor only had RAK

9        matters and the way we could see it going was federal,

10       and that's a much more serious issue.

11  Q.  The way you would see it going?  The way that your

12       client would have directed operations, Mr Gerrard.

13       That's right, isn't it?

14  A.  No.  My client, like any client, has -- assuming, of

15       course, the authorities don't seize the material -- had

16       the ability to -- or the right to give whatever the

17       authorities -- whatever he wanted to give to the

18       authorities.  So he didn't have to give all the evidence

19       over.  He could have stopped it at the allegations he

20       was making.

21  Q.  Who could have stopped it?  Your client could have

22       stopped it?

23  A.  He didn't have -- yes.

24  Q.  Who's that?  The Ruler?

25  A.  RAKIA -- RAKIA, the Ruler.

```
 1    Q.   But who's "he"?  You said "he".  It's the Ruler then,
 2         is it?
 3    A.   It's RAKIA.
 4    Q.   Why do you say "he"?
 5    A.   Well, okay, Jamie Buchanan.
 6    Q.   I see.  So Mr Buchanan was really -- he was instrumental
 7         in the driving forward of the criminal process, was he,
 8         at this time on behalf of the authorities, was he?
 9    A.   Yes, he was my point of contact.  If you're suggesting
10         that His Highness had no involvement in it, then that's
11         clearly not right.  His Highness would have been
12         involved and no doubt approved of the process.
13    Q.   And what was His Highness' involvement in this process
14         that you're describing in paragraph 13?
15    A.   Well, I -- other than confirming what we were doing,
16         I don't know.  I didn't ever attend a meeting where
17         His Highness said, "This man must be prosecuted".  He
18         was aware of what was going on.  I was getting my
19         instructions through Mr Buchanan.  I was aware that
20         His Highness would have liked to have settled the matter
21         if that was humanly possible.
22    Q.   You see, reading out your evidence for a moment, you
23         said this {D/7/4}:
24             "I wanted to convey to Farhad Azima that
25         His Highness was already engaging with the criminal
```

```
 1          authorities in the UAE and that, once criminal

 2          proceedings were started, there was a greater risk of

 3          collateral damage for Dr Massaad and any of his

 4          associates."

 5    A.    Yes.

 6    Q.    Now stopping there, Mr Gerrard, you are there giving

 7          evidence about some collateral effects that will be felt

 8          by Dr Massaad and his associates --

 9    A.    Yes.

10    Q.    -- beyond the criminal proceedings, aren't you,

11          Mr Gerrard?

12    A.    No, I'm not.  I'm talking about greater criminal -- this

13          was -- RAK is an Emirate within the UAE and more serious

14          crimes are dealt with at federal level.  That is what

15          I was trying to get across.

16    Q.    And is the punishment more severe for those federal

17          crimes?

18    A.    Yes, yes.

19    Q.    What would it include?

20    A.    I don't know.

21    Q.    I'm sure you do know, Mr Gerrard.

22    A.    I genuinely don't know.

23    Q.    Might it include capital punishment?

24    A.    I don't think so, not in -- I don't think so in the UAE,

25          no.  Let me go back to my first answer.  I don't know.
```

```
 1    Q.  So you were in fact threatening Dr Massaad and his
 2        associates -- in other words, Mr Azima, as you thought
 3        it -- you were essentially threatening them with much
 4        more serious criminal consequences, weren't you?
 5    A.  It was going to escalate to federal level, yes.
 6    Q.  The answer is "Yes", isn't it?
 7    A.  The answer is "Yes".
 8    Q.  Thank you.  And you were doing that, weren't you, in
 9        order to try to extract from Dr Massaad some settlement
10        that was satisfactory to your client?
11    A.  I was trying to get him to engage with us to see whether
12        or not he could assist us in that settlement, that he
13        provide us with information and -- I mean, the criminal
14        process had started so he couldn't stopped the RAK
15        process.
16    Q.  Do you think it's appropriate, Mr Gerrard, to threaten
17        somebody with serious criminal consequences in order to
18        get them to assist with some investigation or claim for
19        money or asset tracing, for example?
20    A.  I'm sorry, I don't agree I was threatening anyone.
21        I was --
22    Q.  Do you agree in principle?  Do you agree --
23    A.  I was warning him, I was warning him that things were
24        going to naturally get worse and I was asking
25        Farhad Azima to pass that on to Dr Massaad and his
```

```
 1          lawyer.

 2     Q.   You were warning?

 3     A.   I was asking Farhad Azima to pass that on --

 4          Farhad Azima knows perfectly well because he's the

 5          person that's had grave difficulties in getting the

 6          message across.  We had been trying for ages.

 7          Farhad Azima himself was frustrated.  It was -- I was

 8          trying to get across the severity, the -- of this was

 9          going to get worse, there would be collateral damage

10          coming out of Dr Massaad's action to refuse to engage.

11     Q.   What sort of collateral damage were you talking about,

12          then?  Give his Lordship some examples.

13     A.   Well, that it would widen -- the case would widen.  So

14          the case was almost certainly going to widen into, as we

15          saw it then, gun-running, my Lord, sanctions busting,

16          people trafficking.  These were serious issues and

17          that's where -- if we'd carried on, that's where it

18          looked like -- and, by the way, Hezbollah terrorist

19          funding.  It was about as bad as it could possibly be

20          and, for reasons which ought to be obvious, His Highness

21          would have preferred to have settled that, rather than

22          that explode.

23               So it seemed utterly reasonable to me to sit down

24          with Farhad Azima, who had tried repeatedly to bring the

25          parties to the table, and say, "Look, Farhad, this is
```

1          getting very serious.  We've got more evidence now.

2          This is heading into a dark place.  Please warn your

3          client and get him to engage with a lawyer".  That's

4          what I was trying to get across.

5     Q.   Mr Buchanan --

6     A.   It's Mr Gerrard.

7     Q.   Sorry, Mr Gerrard.  So you were warning, were you -- you

8          were warning Dr Massaad and his associates that they

9          were going to be pursued in relation to gun-running if

10         they didn't cooperate with your investigation?  Is that

11         right?  Think very carefully before you answer that,

12         Mr Gerrard.

13    A.   I was warning him that the matters were serious and that

14         he ought to engage.

15    Q.   I'll put it to you again.  On oath for his Lordship,

16         were you warning Dr Massaad and his associates at this

17         time that, if they didn't engage with your

18         investigation, they could face criminal sanctions and

19         collateral damage in relation to gun-running

20         allegations?  Is that right?

21    A.   I was informing Dr Massaad via Farhad Azima that matters

22         were getting considerably more serious.

23    Q.   Could you answer the question, please?

24    A.   I did answer the question.

25    Q.   You didn't answer the question.  Answer the question.

```
 1            You keep giving a speech about rendition and gun-running

 2            and all sorts of extravagant complaints, many of which

 3            haven't featured before until today in this litigation,

 4            which you raise for the first time to justify your

 5            evidence.

 6                 Now, for his Lordship on oath, did you warn

 7            Dr Massaad and his associates at any time that if they

 8            didn't cooperate with your investigation, they would

 9            face sanctions in relation to alleged gun-running?

10            "Yes" or "No"?

11       A.   I informed Mr Kirby on -- in April when we first met

12            that there were allegations -- well, there were concerns

13            at that stage and his client should sit down and talk to

14            us.

15       Q.   What's the answer to my question, Mr Gerrard?  What's

16            the answer?

17       A.   Can you repeat it again?

18       Q.   Did you warn Dr Massaad --

19       A.   I can't remember whether in the note that was actually

20            raised, but that's the -- I'm sure I did, yes.

21       Q.   And did you warn Dr Massaad and his associates that they

22            could face --

23       A.   I didn't warn any associates.  I warned -- I asked

24            Farhad Azima to inform Dr Massaad and his lawyer that

25            they needed to understand this was getting grave.
```

```
 1    Q.   Did you warn Dr Massaad, Mr Azima, anybody like that,
 2         that if they didn't cooperate with your investigation,
 3         they were going to face sanctions or investigations in
 4         relation to rendition?  Did you warn people about that
 5         at this time?
 6    A.   I certainly didn't mention rendition.
 7    Q.   You did not mention rendition?
 8    A.   I don't think I mentioned rendition.
 9    Q.   So why did you mention it earlier today?
10    A.   Because rendition is -- has been identified in our
11         investigation.
12    Q.   To besmirch Mr Azima.  That's why you mentioned it
13         today, didn't you, Mr Gerrard?
14    A.   No, to besmirch Mr -- rendition is a finding of ours as
15         far as Farhad Azima is concerned, yes.
16    Q.   None of these matters -- these matters about gun-running
17         and rendition, you've never taken them up in earnest
18         with Mr Azima, have you?  You've never seriously pursued
19         them and said, "Mr Azima, have you done this and let's
20         sort this out".  You've never raised them in that way,
21         have you?
22    A.   I -- in one meeting I did raise with Farhad Azima, but
23         that's a without prejudice note.
24    Q.   Well I suggest, Mr Gerrard, what this shows, what you've
25         revealed today, is that you were adopting a deliberately
```

1          menacing and threatening approach in this meeting in

2          order to try to bring Dr Massaad to book.

3     A.   My Lord, I don't agree.  Can I just point out to the

4          court that this aggressive threat, as you put it, is at

5          page 2 {H10/226/2} and, of course, Mr Azima then later

6          complained about it, but it goes on -- the meeting goes

7          on for another seven pages.  I don't think Mr Azima took

8          it particularly -- took it in that way.

9     Q.   Can you go to {D/8/2}, please, which is your second

10         witness statement.

11    A.   Yes.  What paragraph?

12    Q.   Paragraphs 5 and 6.

13    A.   Yes.

14    Q.   See what you say there.  (Pause)   Can you see that?

15    A.   Yes, I do.

16    Q.   Mr Azima's evidence is that when you appreciated that

17         Mr Azima was not going to in effect betray Dr Massaad

18         and deliver him into your clutches, you lost your temper

19         and became angry; is that right?

20    A.   That's not true, my Lord.

21    Q.   That is the context for these threatening exchanges

22         which we've just been looking at.

23    A.   That's not true, my Lord.  As I pointed out, if that

24         were the case, why did the -- this is on page 2

25         {H10/226/2} of the meeting.  The meeting barely started.

1    The meeting goes on for another seven pages.  If

2    Mr Azima had taken such offence, I can't believe he was

3    still there -- whenever it was -- later.

4  Q. And Mr Azima said something to you along the lines of

5    that he wasn't the sort of person to throw somebody

6    under a bus, which is what he understood you wanted him

7    to do in relation to Dr Massaad.

8  A. I did not want Farhad Azima to throw anyone under the

9    bus.  This was -- as I tried to put into context

10    earlier, my Lord, we couldn't get to meet with him.

11    Even his own lawyers wouldn't -- couldn't meet him.

12    Dr Massaad was just in this bubble, unaware of what was

13    going on, and Farhad Azima, frankly, in my view, was our

14    best chance of getting Dr Massaad to engage, and, as

15    Mr Azima will tell you no doubt when he's here, he tried

16    and ultimately we all failed.

17  Q. Can you go, please, to --

18  A. Can I just make -- answer your question?

19  Q. By all means.

20  A. At no stage did I ask Farhad Azima -- I think you said

21    change sides or whatever it was.  That would be faintly

22    ridiculous.  He told us many times it was difficult

23    enough talking to Dr Massaad without thinking he had

24    changed sides for RAKIA.  We recognised he was in

25    Dr Massaad's camp, that's okay, and I think he was

```
 1          trying to mediate on behalf of Dr Massaad, but

 2          unfortunately, as I say, he and we failed.

 3    Q.    And you were threatening Mr Azima by way of this

 4          collateral damage reference because you were saying that

 5          Mr Azima would get caught up with the escalation that

 6          would happen if things didn't resolve as you wanted;

 7          isn't that right?  You were threatening Mr Azima with

 8          collateral consequences.

 9    A.    No, I certainly wasn't threatening him with collateral

10          consequences.  I've made it very clear I was trying to

11          get the message -- I was asking Farhad to convey that

12          message.

13    Q.    Could you please look at paragraph 6 of your witness

14          statement at {D/8/2}, the second witness statement,

15          where you say:

16              "I do not recall whether I referred to my previous

17          roles in the police during this meeting.  I may have

18          mentioned that I used to be a prosecutor in order to

19          emphasise the gravity of the evidence RAKIA had in

20          relation to Dr Massaad."

21              So is that right, that you refer to the fact that

22          you'd been a prosecutor in order to emphasise the

23          gravity of the evidence that RAKIA had?  Wasn't that

24          threatening?

25    A.    Well, I say "I may have mentioned".  I may have
```

```
 1              mentioned I was a prosecutor, but I didn't think that
 2              was threatening.  If anything, I was hoping, if I'd have
 3              mentioned it, that it would have underlined with
 4              Mr Azima how important it was.
 5      Q.  Could you go, please, to {E/3/14}?  It's bundle E.
 6              That's Mr Azima's witness statement, please.
 7      A.  Sure.
 8      Q.  Paragraph 54.  Can you see what Mr Azima says in his
 9              evidence in paragraph 54 about this same meeting?  Have
10              you read this before, Mr Gerrard?
11      A.  Many moons ago.  Do you mind if I take some time to read
12              it now?
13      Q.  Paragraphs 54 and 55, please.  Thank you.
14      A.  Thank you.  (Pause)   Yes, I've read it.
15      Q.  It's right, isn't it, Mr Gerrard, that you did become
16              angry and belligerent during the meeting?
17      A.  No, it's not right, my Lord.
18      Q.  And that you took over the meeting?
19      A.  No, it's not right, my Lord.
20      Q.  And you told Mr Azima to stop acting as a mediator,
21              didn't you?
22      A.  No, I did not, my Lord.
23      Q.  And you told him instead to work for RAKIA, didn't you?
24      A.  That would be pointless, my Lord, and no, I didn't.
25      Q.  It's right, isn't it, that Mr Azima refused to change
```

```
 1            sides like that, didn't he?

 2      A.   It never came up, my Lord.

 3      Q.   And it's right that you went on to -- in effect to

 4            parade what you thought would be relevant credentials,

 5            such as your past as a policeman, detective, prosecutor

 6            and lawyer; isn't that right, Mr Gerrard?

 7      A.   And apparently being able to pop into the UK

 8            Prime Minister's office to boot.

 9      Q.   That's right, isn't it, Mr Gerrard, that you did boast

10            that you had connections with Number 10 in that meeting,

11            didn't you?

12      A.   That is completely ridiculous.  Completely ridiculous.

13      Q.   And that Mr Azima asked you whether you were threatening

14            him and you said to him, "It wasn't a threat, but

15            a promise"?  That sounds like the sort of words you

16            might use, Mr Gerrard, doesn't it?

17      A.   No.

18      Q.   Are you sure?

19      A.   I am very sure.

20      Q.   Do you agree, if you had said that, that would have been

21            a threatening thing to say?

22      A.   Well --

23      Q.   "I promise you that there will be these consequences",

24            do you think that would be a threat?

25      A.   Yes, it would be, if it was true.
```

```
 1    Q.   Yes.  Can you go, please, to {H10/229}, which is an
 2         email exchange which Mr Buchanan had with Mr Azima about
 3         a week after this meeting.
 4    A.   Yes.
 5    Q.   Again, Mr Gerrard, have you seen this fairly recently,
 6         this document?
 7    A.   No, I haven't, but I have seen it before.
 8    Q.   Right.
 9    A.   Can I read it, please?  Where does it start?  Over the
10         page?
11    Q.   There's an email from Mr Buchanan on 23 July setting out
12         some sort of proposal, which then elicits the response
13         from Mr Azima at the foot of {H10/229}, to which
14         Mr Buchanan responds in the top two-thirds of that page.
15    A.   (Pause)  Yes, I've read it.  Thank you.
16    Q.   So you can see that Mr Azima complained around the time
17         of this meeting, a few days afterwards maybe -- he
18         complained about what had happened at the meeting.  You
19         can see that that's the upshot of these emails,
20         isn't it?
21    A.   Yes.
22    Q.   And in the interim, between the meeting and 23 July,
23         Mr Azima had been pressing Mr Buchanan for a note of the
24         meeting.  I'm not suggesting that you were necessarily
25         aware of that --
```

```
 1    A.   No.
 2    Q.   -- but there are documents we've seen with Mr Buchanan
 3         in evidence that show Mr Azima pressing for notes of the
 4         meeting which in the end Mr Buchanan did not supply him
 5         with.
 6    A.   Correct.
 7    Q.   Were you aware that Mr Buchanan had not, in the event,
 8         supplied Mr Azima with any notes of that meeting on
 9         16 July?
10    A.   Yes, I was.
11    Q.   And did you -- well, I won't ask that.
12         You can see that it looks as if Mr Buchanan thinks
13         that what's being alleged is extortion and blackmail as
14         a result of what you said at the meeting.  Can you see
15         that?
16    A.   Yes, I can.
17    Q.   And then Mr Buchanan responds with some -- what he
18         thinks was the definition of these offences.  But can
19         you see the paragraph that begins {H10/229/1} "To be
20         absolutely clear ..."?  Can you see that, Mr Gerrard?
21    A.   Sorry, say that again.
22    Q.   Halfway down the page:
23              "To be absolutely clear ..."
24              It's in smaller typeface.  Can you see?
25    A.   No -- oh yes, sorry.  Yes.
```

1    Q.  "To be absolutely clear, Neil did not demand money nor

2        anything else from you in return for anything

3        whatsoever.  Neil has previously challenged you as to

4        whether you have always acted in the best interests of

5        HH.  He did so again at our last meeting.  I personally

6        don't see the problem.  You have signed an agreement

7        confirming that you have never acted against the

8        interests of HH.  All he did was [raise] questions as to

9        HeavyLift.  In a previous meeting he asked you about

10       Eurasia Hotel Holdings."

11         It's right, isn't it, Mr Gerrard, that you had, by

12       this point in time, challenged Mr Azima as to whether

13       he'd been acting in bad faith in relation to HeavyLift,

14       hadn't you?

15    A.  Yes, in a previous meeting.

16    Q.  And you'd effectively accused him of bad faith; is that

17        right?

18    A.  I asked him whether or not he'd acted properly in

19        HeavyLift and Eurasia Hotel Holdings and he didn't say

20        "Yes" and he didn't say "No", and he said if I wanted to

21        raise this, he should -- I should contact my lawyers,

22        which is fair enough.

23    Q.  And as far as Mr Buchanan was concerned when he gave

24        evidence, the only basis for raising any allegations of

25        bad faith against Mr Azima in relation to HeavyLift

```
 1           would have been as a result of what was seen within the

 2           hacked data.

 3    A.   No.

 4    MR TOMLINSON:  My Lord, that's not what he said.

 5    MR LORD:  Sorry, in relation to the training academy.

 6           I think he did say that.  I think that is what he said

 7           at the end, my Lord.  I thought that was what he did

 8           say.

 9    MR TOMLINSON:  He said that there had been investigations

10           into the transfer of shares in HeavyLift.

11    A.   My Lord, I've already given --

12    JUDGE LENON:  Perhaps we'd better look at what he did say.

13    A.   My Lord, he'd had the benefit, by the 23rd of the 7th,

14           of the information from the two reviews by Dechert.

15    MR LORD:  Sorry, my Lord, I'll find it.  (Pause)

16           Yes, if you go to page 175, please, of the

17           transcript {Day3/175:1}, do you see at line 17,

18           Mr Gerrard, the question:

19               "There wouldn't be any relevance ..."

20           Can you see that?

21    A.   Yes.

22    Q.   Can you read down or be shown down to line 12 on

23           page 176 {Day3/176:12}.

24    A.   Sorry, down to ...?

25    Q.   Line 12 on page 176.
```

```
 1    A.   So you want me to start from the top --

 2    Q.   I was corrected -- I was interrupted by counsel for

 3         RAKIA on the basis that I had wrongly summarised what

 4         Mr Buchanan had said in this regard, but I don't think

 5         I did wrongly summarise it.  But I'll show you what

 6         Mr Buchanan said.  If you read the extract, so there can

 7         be no misunderstanding, starting at page 175 at line 11,

 8         down, please, to line 12 on page 176 for the transcript.

 9         Just read it to yourself {Day7/175:12}  (Pause)

10              Have you read that, Mr Gerrard?

11    A.   I'm still reading.

12    Q.   Oh, well, I think -- my Lord, I'm going to put the point

13         because I think I was right.  The first 12 lines of 176

14         involved Mr Buchanan twice confirming the position.

15    A.   The position being ...?

16    Q.   The position being that, as far as Mr Buchanan was

17         concerned, although there had been some investigation

18         into HeavyLift and there had been the training academy

19         claim -- as far as he was concerned, by 23 July there

20         was no basis to allege fraud or bad faith against

21         Mr Azima in relation to HeavyLift, including the

22         training academy, as far as he was concerned because

23         that only came from the hacked data.  Do you understand?

24    A.   No.  What I thought he was referring to here is our

25         HeavyLift investigations review, where the issues that
```

```
 1          we were worried about was HeavyLift -- RAK had a 51%
 2          share in HeavyLift.  We had -- the board didn't consist
 3          of anyone from RAK.  There were board meetings without
 4          anyone from RAK.  Only HeavyLift had access to the bank
 5          signing-wise.  RAK had tried to put -- RAKIA had tried
 6          to put people on the board and they were sacked within
 7          two months.  It was a complete black box.  There was --
 8          there were those sorts of issues.
 9              Now, did we have evidence of fraud?  No.  But we
10          certainly had concerns as to what was going on.
11      Q.  I suggest, Mr Gerrard, that your reference there to
12          "challenging" -- the fact that you felt able to
13          challenge Mr Azima about bad faith in relation to
14          HeavyLift was because by this stage you knew what was in
15          the hacked data?
16      A.  Oh, I see.  Absolutely not.
17      Q.  And the same in relation to Eurasia Hotel Holdings.  By
18          this stage --
19      A.  No, I -- it was very clear to me that there was
20          bad faith there because I'd had the Cynthia -- KM's
21          emails and --
22      Q.  What are those?  Sorry.  What are you talking about?
23      A.  I had the Ray Adams emails -- I've already explained
24          this.  I had the Ray Adams emails to Cynthia Payne --
25      Q.  Dated when?
```

    1    A.   -- on Eurasia Hotel Holdings.

    2    Q.   Saying what?

    3    A.   This was at the time of the Eurasia Hotel Holdings, and

    4         they emailed RAK, RAK Ceramics, saying, "Here are the

    5         Eurasia Hotel Holdings board minutes.  Farhad's signed

    6         them.  Dr Massaad, can you sign them?"  Where were the

    7         three Iranians?  No, just those two, and they, according

    8         to the Panama Papers -- it was the Iranians who moved to

    9         Eurasian Aviation Holdings, but not according to those

   10         documents.  These documents suggested that Farhad Azima

   11         and Dr Massaad had moved the name from one to the other.

   12              So did I have evidence of fraud itself?  No, but

   13         I had some really -- I had significant questions and it

   14         looked very smelly to me.  That's the point I was

   15         making.  And I have -- and if I may say that I have

   16         never -- whilst he's a very -- he's a maverick and

   17         a very likeable man, judging by his track record, seeing

   18         what I could see, he runs with the hares and the hounds

   19         and I didn't trust him.  That's for sure.  And I don't

   20         think our client should have trusted him either.

   21    Q.   It's right, isn't it, that when RAKIA entered into the

   22         settlement agreement with Mr Azima in March 2016, on

   23         your view of things they were entering into a settlement

   24         agreement with somebody who may have committed some

   25         serious frauds?

```
 1    A.   They were entering into someone -- they were entering
 2         into something with someone that we did not -- I did not
 3         trust.
 4    Q.   But you suspected had committed --
 5    A.   I did suspect he had committed --
 6    Q.   -- numerous frauds?
 7    A.   Well, no, I didn't say that.  I suspected he was
 8         involved in gun-running.  What I said was I didn't know
 9         whether that was on behalf of a government or not.
10         There was evidence of rendition.  I don't know whether
11         that was in respect of a government or not.  I was
12         worried about HeavyLift.  I think we had been -- I was
13         going to say defrauded.  I think we'd been had.  So
14         I had numerous concerns.  Unfortunately, I hadn't got
15         hard evidence that I could sue or criminally prosecute
16         on.
17    Q.   It's right, isn't it, that -- did you tell the Ruler
18         prior to the entry into the settlement agreement that
19         you had these concerns?  Presumably you did share them
20         with your client, didn't you?
21    A.   That I would have thought is privileged, my advice to
22         the Ruler.  I'm a little confused as to how far I can go
23         now.  But suffice to say I think you already know
24         Mr Buchanan has let it slip of what my thoughts were.
25    Q.   It's right, isn't it, that RAK/RAKIA was effectively
```

1   setting up Mr Azima through this settlement agreement

2   in March 2016?  It was setting him up, wasn't it, in

3   order that they could come after him subsequently if

4   they saw fit?  It was a set-up, wasn't it, Mr Gerrard?

5 A. It wasn't a set-up.  We had no hard evidence.  I told

6   you that I even took instructions showing the evidence

7   we had at the time to another lawyer.  They too didn't

8   think we had enough.

9    My client was well aware of my concerns.  Their main

10   priority in my view -- because we're talking about

11   Farhad Azima -- was that they wanted to keep him sweet

12   because they wanted him to continue in attempting to

13   bring the two parties together.  That's my view.

14 Q. Yes, so --

15 A. So I do not accept your proposition that this was some

16   sort of trap.

17 Q. So the settlement agreement was designed to keep

18   Mr Azima sweet.  So that was the carrot part of the

19   settlement agreement, wasn't it, Mr Gerrard?  That was

20   the carrot?

21 A. It was, I think, an incentive to keep him in the game.

22 Q. Yes, to keep -- for him to continue assisting RAKIA in

23   its negotiations with Dr Massaad.

24 A. Correct.

25 Q. And the stick I suggest comprised within the settlement

1      agreement was the good faith clause, which would allow
2      RAKIA to beat Mr Azima with that clause subsequently if
3      he did not in fact continue to assist them.  That's
4      right, isn't it?
5   A.  Well, I think it's a little bit more subtle than that.
6      I think it's a case of, "We don't trust you ..." --
7      I mean, it's a very similar clause to the Eurasia Hotel
8      Holdings clause, the Sheraton agreement.  It goes
9      a little further, but that's because we knew an awful
10     lot more about Farhad Azima at that stage or our
11     concerns were heightened by then.  So I don't really see
12     how this is substantially different.
13         We were saying, "Look ..." -- in fact, Mr Buchanan
14     even put it to him had he acted against us and he said
15     "No".
16         So this might very much fit with your claim, but in
17     reality the clause -- Mr Buchanan asked for a similar
18     clause to the Sheraton Hotel -- I didn't draft it, but
19     it's largely similar.  If you think the Sheraton clause
20     is a stick, then I'm afraid I can't help you.
21  Q.  I'm going to ask you about the discovery of the hacked
22     data, if I may now, please, Mr Gerrard.
23  A.  Yes.
24  Q.  The --
25  A.  Can I see my statement?

```
1    Q.  I'm sure you can.

2    A.  Thank you.

3    Q.  RAKIA's alleged discovery of the hacked data took place

4        in August 2016, didn't it, on RAKIA's account of things?

5    A.  Yes, I think so, yes.

6    Q.  Well, you know my client's account, that it had been

7        hacked into the previous year or some time

8        before August --

9    A.  I have only recently heard that, but, yes.

10   Q.  Well, that's the case -- all right? --

11   A.  Yes.

12   Q.  -- that by August 2016, RAKIA had already procured,

13       illegally, access to Mr Emails -- Mr Azima's emails.

14   A.  Yes.

15   Q.  Not "Mr Emails' Azimas".

16   A.  That doesn't quite work.

17   Q.  No, that's not as good.

18   A.  No.

19   Q.  It's right, isn't it, on RAKIA's explanation of how it

20       came into possession of this hacked data -- RAKIA's

21       account in the first instance involves three people.  It

22       involves Mr Page, Mr Buchanan and you, doesn't it?

23   A.  Yes.

24   Q.  And those are the three people who were involved in

25       Mr Page's project update discussion back in March 2015
```

```
1              along with the Ruler, weren't they?

2       A.    Sorry, repeat the question.  Sorry, who are the people

3              involved?  Me, Mr Buchanan --

4       Q.    And Mr Page.

5       A.    -- Mr Page on that immediate discussion.  Others will

6              have been brought in on the --

7       Q.    I want to deal with the immediate discussion.

8       A.    Okay, yes.  That's absolutely right.

9       Q.    The initial discovery concerned Mr Page allegedly

10             discovering it through Mr Halabi --

11      A.    Yes.

12      Q.    -- and then exchanges variously between Page, you and/or

13             Buchanan, in which the matter was then moved forward.

14      A.    That's right, my Lord.

15      Q.    So what I was putting to you was it was -- the three

16             people, if you like, who were initially involved in the

17             discovery of this hacked data of Mr Azima's were in fact

18             the three people who, along with the Ruler, were

19             discussing Mr Page's March 2015 project update --

20      A.    Yes, my Lord.

21      Q.    -- which update included Mr Page signing off in relation

22             to Mr Azima by saying that, "We would be able to gather

23             intelligence and monitor their activities".  Do you

24             remember that?

25      A.    And have a plan.
```

```
1    Q.  Yes.  Do you remember that?

2    A.  I do.

3    Q.  Yes.  Now, it's right, isn't it, that by July and August

4        2016 there were other agents working for RAK or RAKIA

5        apart from Mr Page, you and Mr Buchanan?

6    A.  Yes, that's correct.

7    Q.  Bell Pottinger were working at that time, weren't they?

8    A.  They were.

9    Q.  Can we go, please, to {Day4/172:1}, to the

10       re-examination of Mr Buchanan yesterday by my learned

11       friend.

12   A.  Day 4/172?

13   Q.  Yes, Day 4/172.

14   A.  What line?

15   Q.  Well, it starts at {Day4/172:18}.  Mr Buchanan was asked

16       whether Bell Pottinger were instructed to look for

17       material relating to Mr Azima in August or July

18       and August 2016, and he said:

19           "Answer:  Following my meeting with Mr Azima in

20       the January, I did ask Bell Pottinger to keep an eye out

21       as well."

22           Can you see that?

23   A.  Yes.

24   Q.  Then he was asked about Digitalis:

25           "Question:  And were Digitalis instructed as far as
```

1        you're aware?

2            "Answer:  I asked them the same question."

3            Can you see that?

4    A.  Yes.

5    Q.  So it looks, doesn't it, according to Mr Buchanan, as if

6        Bell Pottinger and Digitalis were both on the look-out

7        for information concerning Mr Azima by August 2016?

8    A.  Yes, I'm not sure that's a fair summary and I'm not sure

9        what --

10   Q.  I'm sure you know where this line of questioning is

11       going, Mr Gerrard.

12   A.  I absolutely know, but --

13   Q.  You're a bright chap.  You know where it's going --

14   A.  I know where it's going, but --

15   Q.  And you're now trying to qualify --

16   A.  No, no, I'm not.

17   Q.  -- what your client has said in order to try to

18       fashion --

19   A.  No, I think Mr Buchanan is talking about Azima in the

20       round because I was present at the Bell Pottinger

21       meetings, I think, and I certainly was present in the

22       meeting with Dechert.  Dechert -- we also reported to

23       Dechert our concerns and it was a much more -- it wasn't

24       about Farhad Azima as such, but when you told a story

25       Azima was involved.  But the focus was, "There is going

1          to be a campaign against the client, Dechert, me", etc.

2          No one focused on Mr Azima, but Mr Azima was part of the

3          story.  That's my -- that's my recollection of those

4          discussions.

5    Q.   And that was the focus also for Mr Page's work as well,

6          as you understood it, was it?

7    A.   I don't think I was there for any discussions with

8          Mr Page, but the way Mr Buchanan was briefing people,

9          including Andrew Frank, was that there was this

10         blitzkrieg coming.  It was going to be driven by

11         Dr Massaad.  No one expected Dr Massaad emails flying

12         around.  They expected emails on Dechert, they expected

13         emails on me, they expected emails on RAK.  That's what

14         people were looking for.  But the briefing that was

15         given was of the wider story.  That's what was there

16         when I had the meeting with Bell Pottinger.  That was

17         the meeting we had with Mr Frank.  I wasn't there for

18         the Page meeting.

19   Q.   What about Digitalis?

20   A.   I wasn't there for the Digitalis meeting.

21   Q.   If you go to page {Day4/173:1}, you will see that the

22         questioning ran on of Mr Buchanan, starting at line 1.

23         "Question:  And what did you ask Mr Page in that

24         regard?"

25   A.   Sorry, where are we now?

```
 1    Q.  At the top, line 1.  The answer was:

 2              "Answer:  I asked him to keep his ear out to see

 3         whether he came across any adverse media or the

 4         beginnings of any adverse media on the internet."

 5    A.  Yes, and that's exactly what I expected --

 6    Q.  And that's what you're describing now, is it?

 7    A.  Yes, exactly, and that is what I understood, and that is

 8         exactly what we reported to the main board of Dechert:

 9         there was a problem coming down the track, there was an

10         adverse media programme aimed at a number of people,

11         including me, and we needed to be ready to deal with it.

12         That was why Andrew Frank and others were preparing to

13         be able to respond to this adverse press campaign.

14    Q.  And the questioning ran on.

15              "Question:  Adverse media relating to ...?"

16         And then Mr Buchanan answered:

17              "Answer:  Adverse media relating to Ras Al Khaimah,

18         the Ruler, Dechert and myself."

19    A.  Precisely.

20    Q.  And then a leading question was asked:

21              "Question:  And was that what you were asking

22         Bell Pottinger to look out for?"

23         And Mr Buchanan said?

24              "Answer:  Yes, it was.

25              "Question:  And Digitalis?"
```

```
 1              And he said:

 2              "Answer:  [Yes] and Digitalis."

 3              Can you see that?

 4    A.   Yes.

 5    Q.   So on that account it looks as if what Mr Page had been

 6         asked to look out for is the same thing as

 7         Bell Pottinger and Digitalis had been asked to look out

 8         for, and that's your evidence, I think, isn't it,

 9         Mr Gerrard?

10    A.   Yes, but I also said --

11    Q.   Thank you.

12    A.   I also said -- am I allowed to answer that?

13    Q.   You said "Yes".  I thought that might be an answer.

14    JUDGE LENON:  Well, he can carry on.

15    MR LORD:  All right.

16    A.   Thank you, my Lord.  I also said that Mr Buchanan has

17         a habit of explaining things in the round, so he will

18         have mentioned -- he will have told the story.  So the

19         end result will have been that there's a media campaign

20         coming down the track, Ras Al Khaimah, Dechert, etc, but

21         he will have put it into context by, if you like, that

22         last bit on the Page report, that Farhad was involved,

23         Dr Massaad was involved.  That was the way -- he had

24         a habit of putting things into context.

25    Q.   But it looks as if, if that account is right, what
```

1          Mr Page had been asked to keep an eye out for was the
2          same or very similar to what Bell Pottinger and
3          Digitalis had also been asked to keep an eye out for.
4     A.   Yes, I would have -- yes.  I have no idea, I wasn't
5          there, but the issue I was taking with the previous --
6          I'm sorry, you've asked me a question.
7     Q.   You give very long answers to every single question.
8          All I asked you was whether or not --
9     A.   I think --
10    Q.   I asked you whether the compass of the work -- from that
11         evidence, from your client, whether or not the scope of
12         the reconnaissance which Mr Page was doing seems to be
13         the same as Bell Pottinger and Digitalis on
14         Mr Buchanan's evidence.
15    A.   I disagree because the reference you initially showed me
16         was about looking out for Farhad Azima.  All I said was
17         that that's not my understanding, and you've now brought
18         me to the correct reference that I understood was the
19         general, "Look out for this".
20    Q.   And so, as you understand it, Mr Page and Digitalis and
21         Bell Pottinger were all looking out for the same thing?
22    A.   Well, I wasn't there for all the briefings, but, as
23         I said to you, Mr Buchanan had a habit of explaining the
24         whole thing, the Page bit, who was involved, but the
25         bottom line was, "Look out for adverse media in respect

```
 1          of His Highness, RAK", etc, etc.  That's what he was

 2          doing.

 3              The transcript you showed me earlier seemed to

 4          suggest, as far as Bell Pottinger was concerned, that

 5          they were to look out for Farhad Azima.  That was what

 6          I was taking issue with, whereas this one is what

 7          I understood to be correct.

 8      Q.  So you're happy with the evidence -- or the description

 9          that's given on page {Day4/174:1}?  Is it 174?  What's

10          the reference?

11      MR TOMLINSON:  My Lord, the witness has already said three

12          or four times that he doesn't know what Stuart Page or

13          Digitalis were told and he's been asked again and again

14          whether he can confirm what they were told.

15      MR LORD:  I don't think that's a fair criticism, my Lord.

16          I've been trying to establish very simply what

17          Mr Buchanan, as the client, said were the retainers of

18          these various people at the time, pointing to

19          Mr Buchanan's own evidence in court.

20      MR TOMLINSON:  That's not something he can cross-examine

21          this witness about.

22      JUDGE LENON:  It seems to me we've covered this point quite

23          thoroughly.

24      MR LORD:  It's right, isn't it, Mr Gerrard, that there's no

25          evidence that Bell Pottinger came across the hacked data
```

1           online before Mr Page did?

2     A.    I don't believe so.

3     Q.    No evidence of them coming across it at the same time at

4           all, is there?

5     A.    No.

6     Q.    The only evidence of any RAK agent or consultant who had

7           come across the hacked data on the web whilst working

8           for RAK or RAKIA is Mr Page, isn't it?

9     A.    I think it was Mr Halabi.

10    Q.    One of Mr Page's contacts?

11    A.    Yes, Mr Halabi.

12    Q.    And none of the other agents or consultants who were

13          working at that time for RAK or RAKIA, like

14          Bell Pottinger or Digitalis, came across the material

15          themselves, did they?

16    A.    I've already said they didn't.

17    Q.    No, and that's despite the fact that, I think on your

18          evidence, they were all looking -- Bell Pottinger,

19          Digitalis and Mr Page were all looking for the same

20          thing, which was news about the campaign rather than

21          material specific to Mr Azima?

22    A.    Well, I don't know what they plugged in.  All I -- I'll

23          repeat again.  When Mr Buchanan, in my presence -- he

24          would tend to tell the overview, if you like the Page

25          sort of summary, and then would say, "So we understand

```
 1            there's this blitzkrieg coming down the track and it's
 2            going to be focused on ..." what you have on page 173
 3            at 6 {Day4/173:6}.
 4                So I have no idea -- so, for example, I've no idea
 5            who was plugging in what, but certainly no one found the
 6            report -- the link other than Mr Halabi.
 7       Q.   And it's right, isn't it, that the websites which led
 8            Mr Page and Mr Halabi to this treasure-trove, they were
 9            in fact boasting about exposing Mr Azima, weren't they?
10       A.   Yes, that's true.
11       Q.   They weren't actually boasting about information in
12            relation to any campaign against RAK or RAKIA, were
13            they?
14       A.   I don't believe they were.
15       Q.   Do you know how the hacked data -- Mr Azima's online
16            data -- was first analysed on behalf of RAK or RAKIA and
17            are you at liberty to give any evidence about that?
18       A.   I think it's already in the witness statements,
19            isn't it?  It's in my witness statement.
20       Q.   I take it that you can be asked about that?
21       A.   Well, it's in my witness statement.
22       Q.   There's no privilege issue; is that right?
23       A.   It's in my witness statement.
24       Q.   Just who did it and when and how?  How did that process
25            unfold?  Who did it?  You?  Did you go somewhere and
```

1           look at an archive?  What happened?

2    A.  Sorry, what's the question?  I thought the question was

3           what process did I undertake to get these things

4           downloaded.

5    Q.  When the hacked data had been downloaded --

6    A.  Oh, when it had been downloaded.  Okay.

7    Q.  After it had been downloaded --

8    A.  Sorry.  You weren't clear.

9    Q.  -- and it had been, if you like, officially brought into

10          RAKIA's possession --

11   A.  Yes, absolutely, yes.

12   Q.  I don't want you to answer something if there's going to

13          be a privilege objection which applies, but are you at

14          liberty to explain to his Lordship the way in which that

15          hacked data was in fact analysed?

16   MR TOMLINSON:  My Lord, the question is ambiguous because if

17          it's -- if the question is, "Can you explain the process

18          by which it's done, the way?", doubtless that's by

19          electronic searches and so on and this witness may or

20          may not be able to answer it.  If it's a question about

21          who then tried to work out what the documents meant and

22          what their legal implications were, then that's

23          obviously privileged.

24   MR LORD:  Mr Gerrard, I think I'll move on in view of that

25          privilege point being taken, and I'd like to ask you,

```
 1          please, about the way in which this material was

 2          downloaded from the internet on behalf of RAKIA, if

 3          I may.

 4              Could you go to {H10/251} please?  You've said in

 5          your witness statement that you I think reached out --

 6          that's your word, I think -- to Mr del Rosso as part of

 7          this downloading process.

 8     A.   Yes, I apologise for that term.  It's working in an

 9          American law firm for too long, my Lord.

10     Q.   It's not a particularly felicitous phrase.

11     A.   No.

12     Q.   But if you go to {D/7/5} at paragraph 19, you say:

13              "After my initial call with Stuart Page, I decided

14          to reach out to Nick del Rosso."

15              Now "reach out" tends to be a bit of a fudged

16          expression, Mr Gerrard, masking a more precise

17          description.  So why did you decide to in effect ask

18          Mr del Rosso to take over this matter?

19     A.   I wasn't asking him to take over.  I considered what our

20          options were and I was worried about the fact that

21          Farhad Azima appeared to have ex -- or was current, I've

22          no idea -- CIA connections.  I'd come across a gentleman

23          called Mr Chris Swecker who was a lawyer -- is

24          a lawyer -- and was the deputy director of the FBI, and

25          I wanted to seek his counsel as to did he know
```

```
 1          appropriate people who were beyond repute and were
 2          capable of undertaking this task.
 3              I discussed that also with Nick del Rosso and the
 4          name -- gosh, I've forgotten the name of the company
 5          that did it.  NTi?  NTi.  The name "NTi" came forward.
 6          So it was speaking to Nick del Rosso as to, "Can I speak
 7          to your lawyer, please?", and that's how it came about.
 8     Q.   It's right, isn't it, that there had been investigations
 9          into Dr Massaad and his activities for at least
10          18 months by now?
11     A.   That's correct.
12     Q.   And there had been quite a lot of monitoring of the
13          internet over that time, hadn't there, on behalf of RAK
14          or RAKIA?
15     A.   Over what time?
16     Q.   Well, let's say during 2016, let's say.
17     A.   I don't -- I wasn't aware of monitoring of the internet.
18     Q.   And this particular piece of information caused -- well,
19          if you go to {H10/251}, which I think I was going to ask
20          you about, and go to {H10/251/2}, you can see that
21          Mr del Rosso gets in touch with Mr Swecker of -- can you
22          see Mr Swecker?
23     A.   No.  Where are we?
24     Q.   "Chris" on August 9, 2016.
25     A.   Yes.
```

1    Q.   You see what's said there.  Have you seen this email

2         before, Mr --

3    A.   No, I haven't.

4    Q.   Do you want to read it then, please?

5    A.   Yes.  (Pause)   Yes, I've read it.

6    Q.   You can see that by 9 August 2016 and presumably as

7         a result of your reaching out to Mr del Rosso,

8         Mr del Rosso was recording here the proposal to retain

9         NTi to carry out this downloading exercise.  Can you

10        see?

11   A.   Yes, well, this isn't my email, but that's what I see.

12   Q.   No, I'm just -- that's not your email.  And it was going

13        to be set up, wasn't it, through VMS -- that's --

14        Mr del Rosso was effectively setting this up for you at

15        this point?

16   A.   Yes, yes, he was certainly -- he was certainly dealing

17        with the -- on a daily basis with NTi and Chris Swecker,

18        yes.

19   Q.   And he was proposing to retain NTi --

20   A.   Correct.

21   Q.   -- to do the downloading?

22   A.   Correct.  That's what we'd agreed.

23   Q.   This was quite a formal and substantial arrangement that

24        was being put in place by RAKIA, wasn't it, in order to

25        download the material that Mr Halabi had apparently

1        found?

2    A.  Well, we had no idea at this stage, my Lord, how

3        substantial it was.  I didn't know whether there were

4        ten emails or 10,000 emails.  So frankly, at this stage,

5        particularly me anyway -- no doubt an expert could have

6        told you immediately -- but at this stage I had no idea

7        as to the extent of the material on the web, no idea at

8        all.

9    Q.  Well, you see, Mr Gerrard, the puzzling thing here is

10       that this degree of arrangement is set in place to

11       download this material seemingly before anyone on the

12       RAKIA side of things has actually accessed the site to

13       see what it in fact contains.

14   A.  Correct.

15   Q.  You see, Mr Gerrard what I suggest to you -- I'll ask

16       you first: had this sort of arrangement been put in

17       place for any other potentially exciting bits of online

18       discovery in relation to Mr Azima or was this the first

19       occasion when this sort of arrangement was put in place?

20   A.  This -- we did try to get involved downloading the

21       Panama Papers, but that was unable -- we couldn't do

22       that and so we had to wait like everyone else, later.

23       This was the first time anything had come up on the

24       internet unannounced, as it were, so I don't really

25       understand why you're surprised about this.

```
 1    Q.  Well, it seems a bit puzzling that Mr Halabi,
 2        a journalist, reports some links to BitTorrent sites and
 3        says he hasn't accessed it and you set in train the
 4        offices of VMS, NTi, to get an ex-FBI internet expert to
 5        do the downloading.  It just seems like a sledgehammer
 6        to crack a nut, Mr --
 7    A.  Actually, I don't think it is.  If I was to go to the
 8        Big Four, that might be a sledgehammer to crack a nut.
 9        But these were people who were American and
10        understood -- were very able and I thought would manage
11        the process on Chris Swecker's view, and I think he was
12        right.
13    Q.  The reason is, Mr Gerrard, I suggest to you, that you
14        knew by the time of this alleged discovery through
15        Mr Page what was actually comprised within the hacked
16        data, didn't you?
17    A.  I didn't, my Lord.
18    Q.  And you knew it contained confidential and privileged
19        material from Mr Azima's email records, didn't you?
20    A.  I certainly assumed that it was going to because it
21        looked like a hack.
22    Q.  And that's why you put in place this significant
23        operation to download the material because you already
24        appreciated its value to RAK and RAKIA, didn't you?
25    A.  I didn't appreciate its value, but I knew it was going
```

1          to involve confidential information for sure.

2     JUDGE LENON:  Would that be a convenient moment?

3     MR LORD:  Yes, my Lord.  Sorry.  I apologise.  Yes.

4     (3.19 pm)

5                         (A short break)

6     (3.25 pm)

7     MR TOMLINSON:  My Lord, can I just check on the timetable

8          the position because I have Mr Halabi and Mr Page in

9          court.  Mr Halabi was expecting to catch a flight

10         tomorrow lunchtime, but that looks like it might not be

11         possible now.  Perhaps Mr Lord could just indicate when

12         he thinks he's likely to finish with this witness and

13         then go on to Mr Halabi so I can probably release them

14         both from court today if ...

15    MR LORD:  I think I'll be another 45 minutes with this

16         witness, my Lord, probably about 4.10/4.05.

17    MR TOMLINSON:  My Lord, I think with re-examination that

18         probably means that they can be released today.

19    MR LORD:  I agree.

20    JUDGE LENON:  Yes.

21    MR TOMLINSON:  If we finish by happenchance early, then

22         we'll have to rise early.

23    JUDGE LENON:  What about Mr Halabi?

24    MR LORD:  Sorry?

25    JUDGE LENON:  What about tomorrow?

```
 1    MR LORD:  Tomorrow is Mr Halabi.

 2    JUDGE LENON:  Yes.  How long do you think that's going to

 3        take?

 4    MR LORD:  I think probably about a couple of hours, I would

 5        think.  Maybe an hour and a half.

 6    MR TOMLINSON:  Well, my Lord, we'll factor that into the

 7        flight booking.

 8    JUDGE LENON:  Yes, thank you.

 9    MR LORD:  It won't be more than two hours even on my

10        estimate.

11            May it please your Lordship, Mr Gerrard, I'm going

12        to ask you about your involvement with the actual

13        discovery of the hacked data now, if I may, please.

14            If you go to your witness statement, please, at

15        {D/7/4}, at paragraph 17 you refer to a conversation or

16        conversations with Mr Page.  Can you see that?

17    A.  Paragraph 17?

18    Q.  Paragraph 17, yes, Mr Gerrard.

19    A.  Yes.

20    Q.  You see what you say there?

21    A.  Yes.

22    Q.  And you give evidence that you spoke to Mr Page around

23        that time.

24    A.  Yes.

25    Q.  It looks as if, from that paragraph, you think you may
```

```
 1          have had a second call with Mr Page shortly after the
 2          first one.
 3     A.   No, I think I only had one call.
 4     Q.   With Mr Page, right?
 5     A.   With Mr Page.  I think the way it is -- and forgive me
 6          if the statement isn't clear, my Lord -- I had a call
 7          from -- I'm pretty sure of this -- I had a call from
 8          Mr Buchanan first, who had apparently had a call from
 9          Page, and Buchanan said, "Please call Neil", which he
10          did -- or I called him.  I'm not sure which, but that's
11          when Mr Page and I spoke.
12     Q.   So you think that you probably only had one call with
13          Mr Page?
14     A.   It says there -- sorry -- "... shortly afterwards and
15          then later on we had a second call."  Yes, yes, that's
16          right.  We only had one call that day.  The second call
17          I think was later on.
18     Q.   How much later on?
19     A.   There was a call from Mr Buchanan that said that he'd
20          been speaking to Page who -- he didn't quite understand
21          what was going on or he wasn't very clear, could I give
22          Page a call, which I did, and Mr Page was talking about
23          he thought he knew where the hack had come from, from
24          the UAE.  I said, "How?  Why?"  I wasn't very --
25          I didn't really understand what he was saying, and that
```

```
 1           was it.

 2    Q.    Can you go to paragraph 18, please, of your statement,

 3           at {D/7/5}?

 4    A.    Yes.

 5    Q.    You say this:

 6           "On the first call [that's the first call with

 7           Mr Page] there was discussion of some links (I believe

 8           there were two but I cannot clearly remember) ..."

 9           Can you see that?

10    A.    Correct, yes.

11    Q.    You say:

12           "Stuart Page gave me the details [to] the link(s)."

13           Can you see that?

14    A.    Yes.

15    Q.    So your evidence I think is that in that first

16           conversation with Mr Page he gave you the details of two

17           links; is that right?

18    A.    Link or links, yes.

19    Q.    Well, is it one link or two links?

20    A.    I genuinely can't remember.

21    Q.    Presumably, Mr Gerrard, this is the sort of thing that

22           you'd be likely to jot down in your daybook?

23    A.    Yes, but it -- I don't think it's there because I've

24           looked for it because I've been looking for the link.

25           I've obviously put it down on a piece of paper.  And the
```

1           reason why I think I've written it down is, knowing
2           Mr Page, he's unlikely to be able to send it to me by
3           email because -- I don't think I've ever had an email
4           from Stuart Page.  Texting it would be impossible.  So
5           I assume he must have dictated it to me over the phone
6           and I'll have written it down.
7      Q.   Isn't the daybook the most obvious place for you to
8           record?
9      A.   Yes, it is, and unfortunately it's not always with me,
10          and I don't know where I was when I took the call.  But
11          it's not in my daybook.
12     Q.   Does your daybook record you having a call with Mr Page
13          at or around this time?
14     A.   No, it doesn't.  I won't necessarily put every single
15          call in my daybook.
16     Q.   Could you go to {H10/246} please?  Sorry -- yes,
17          {H10/246}.  You can see that this is 9 August 2016.
18     A.   Yes, I haven't seen this email before.
19     Q.   You can see that things are being put into place by
20          9 August, aren't they, 9 August 2016?
21     A.   Yes, things are being put in place, yes.
22     Q.   If you go to {H10/251}, you can see the way it develops.
23          Go to {H10/251/2}.  You've read this email already
24          today.  Mr del Rosso wrote on 9 August 2016 --
25     A.   I'm not there yet.

1   Q.   You don't have to read it all again because you read
2        it --
3   A.   I might want to.  251, yes?  Which part of the email?
4   Q.   Well, shall I tell you which part and then it will
5        become clear?
6   A.   Yes, please.
7   Q.   Mr del Rosso is writing to Mr Swecker on 9 August 2016.
8   A.   Yes.
9   Q.   He says:
10          "I've spoken to Rich Garcia [he is at NTi] and
11       agreed that you will instruct his company on this
12       matter."
13  A.   No, I'm sorry, I'm not on the right page.  Thank you
14       very much.  Oh, this one, yes.
15  Q.   "I've told him that as recently as last week -- we were
16       advised by researchers that a deep web search indicated
17       that data relating to Farhad Azima was on ... site ...
18       thepiratebay.org/torrent ... and we'd initially like to
19       learn exactly what is there.  In addition, over this
20       past weekend, we were told that another site ...
21       monova ... also held either the same or additional
22       information on Azima and indications that there may be
23       further sites with more information.  I'm not sure if
24       the deep web is the same as the dark web, but I'm sure
25       NTi will know."

1           Can you see that?

2    A.   Yes.

3    Q.   So his Lordship can take it, can't he, Mr Gerrard, that

4         by 9 August 2016 these two sites -- piratebay and

5         monova -- seem to have been identified and the links

6         obtained on the RAKIA side of things?

7    A.   Yes.

8    Q.   Where you see "as recently as last week", "last week",

9         the Friday would be --

10   A.   Yes, I take issue with that because I only got the

11        information on the 9th.  I don't know when Mr Halabi got

12        it, but I would have -- I didn't ask when we found the

13        information so I don't know where Mr del Rosso gets that

14        from.

15   Q.   So you think that you only got this information on

16        the 9th --

17   A.   Well, I know I got the information on the 9th and I know

18        I passed that on.  I don't know when Mr Halabi got it.

19        I didn't ask, "Oh, how long have we had this

20        information?"  I'd assumed that it was fairly promptly

21        after we found it, but -- so -- and I certainly didn't

22        tell Mr del Rosso when we got it.  So I don't know where

23        he's got that date from.

24   Q.   And how do you know that it was 9 August when you spoke

25        to Mr Page?

```
 1    A.   Because I've got an email from him somewhere in my
 2         bundle saying that I spoke to him on the 9th --
 3         referencing that he spoke to me on the 9th.  Yes,
 4         I think so.
 5    Q.   You got an email from Mr Page?
 6    A.   Or there's an email -- I'm pretty sure I've seen an
 7         email --
 8    Q.   There's no email.
 9    A.   Isn't there?  I'll just check.
10    Q.   Just find the document you're thinking about.
11    A.   Where are the ...?  Sorry.
12    Q.   You see, in your witness statement, you say -- you say
13         in your witness statement in paragraph 17 {D/7/4} --
14         we've been to it already this afternoon:
15             "I do not remember exactly when, but in early
16         August 2016 ..."
17             And so it runs on.
18    A.   Okay.
19    Q.   You're not giving a date there.
20    A.   No, I'm not, but I know that it was very early August,
21         as in that week.
22    Q.   Right.  So could it have been as early as 5 August,
23         then?
24    A.   No, I'm pretty sure I will have called him either
25         the 8th or the 9th, looking at the emails.  I can't --
```

```
 1           I can't imagine I'll have called him mid the week before
 2           and he started moving on things.  I regarded this as
 3           urgent and I'm sure I've seen an email which suggests
 4           that he'd just spoken to me, to one of these other
 5           gentlemen.  Anyway ...
 6      Q.   Right, well, his Lordship has your evidence on that.
 7           You think 9 August was when you --
 8      A.   8 or 9 August is when I think I spoke to him.  It could
 9           have been over the weekend, but I doubt it.
10      Q.   Because it looks from this email, doesn't it, as if
11           Mr del Rosso thinks the discovery was perhaps as early
12           as Friday, 5 August, doesn't it?
13      A.   That's certainly what he says.
14      Q.   Yes.  And he describes a two-pronged process, doesn't
15           he, where the first website is found last week and then
16           over the weekend another site has come to light.  That's
17           what he's describing, isn't he?
18      A.   Yes, but I think he's wrong.  I think I gave him one or
19           two links.  I don't remember a second phone call to him
20           until much later.
21      Q.   It was you, wasn't it -- it was you who put Mr del Rosso
22           on to this matter, wasn't it?
23      A.   Yes.
24      Q.   So he's likely, isn't he, to have got his information
25           from you?
```

```
 1    A.   Yes.

 2    Q.   So can you explain why he's described what he has in

 3         that big paragraph at {H10/251}?  Can you give an

 4         explanation for why he describes something happening on

 5         5 August and then something over the weekend, if this

 6         has all come from you?

 7    A.   No.

 8    Q.   Your evidence is that you discovered it on 9 August?

 9    A.   No, my evidence is in early August.  I happen to think

10         it was the 8th or the 9th, but I may be wrong.  But

11         early August is my evidence.  I don't think it was --

12         I don't think I'd have sat on it for over a week or half

13         a week or whatever.

14    Q.   No.  Could you go to {H10/258}, please?

15    A.   Yes.

16    Q.   This is 15 August.

17    A.   Yes.

18    Q.   You said:

19              "I've had another call from Stuart ..."

20    A.   Yes.

21    Q.   But that's after the emails I've just taken you to from

22         Mr del Rosso.

23    A.   That's correct.

24    Q.   You see what that says.  Can you see that?

25              If you go to {H10/257}, you see the full thread.
```

```
 1            You see your email --

 2     A.    Sorry, what number?

 3     Q.    {H10/257}.

 4     A.    Yes.

 5     Q.    You see your email of 15 August 2016 to Mr del Rosso:

 6                 "Nick,

 7                 "I've had another call from Stuart ..."

 8                 That's Stuart Page, is it?

 9     A.    That's correct.

10     Q.    "... who confirms again that there is a website on FA.

11           He seems to think it's been generated from a UAE

12           source."

13     A.    Yes.

14     Q.    "I've asked for details.  He said he would try and get

15           them to me.  Can you undertake a search for it?"

16     A.    Yes.

17     Q.    Did you ask Mr Page for details?

18     A.    I assume so.

19     Q.    There's no evidence of any details being supplied from

20           Mr Page, is there, to you in response to what you've

21           said here?

22     A.    What, to Mr del Rosso?

23     Q.    You said, "I've asked for details".

24     A.    Yes -- no, I appreciate that.

25     Q.    Sorry, I thought you were asking -- I thought this meant
```

```
 1          you had asked Mr Page for details.  I'm sorry.
 2    A.   I thought I was asking for details about the UAE source.
 3    Q.   And would you have jotted down in your daybook the fact
 4          of these further -- any further calls in this matter?
 5    A.   No.
 6    Q.   In other words, if you had another call with somebody or
 7          there was some -- you know, "need details on source",
 8          wouldn't you jot --
 9    A.   No, these were short conversations which I don't think
10          I'd -- I might have done, but I don't think I would have
11          done.
12    Q.   And then you see that Mr del Rosso responds:
13          "Hi Neil.
14          "Okay -- following up on our last conversation
15          regarding Stuart's findings, I instructed NTi to search
16          and recover what may be on them ..."
17    A.   Yes.
18    Q.   "... that's underway and I'm sure they'll try to analyse
19          where the sites came from."
20    A.   Yes.
21    Q.   This is 15 August, isn't it?
22    A.   Yes.
23    Q.   We've seen that the downloading operation was put in
24          place on 9 August, haven't we?
25    A.   Yes.
```

1    Q.  And it was well underway by the time of the 15th,

2         wasn't it?

3    A.  I don't know the ins and outs.  I think it took quite

4         a time to set it up and start the process.  I don't

5         think it was that straightforward.

6    Q.  So it's puzzling, isn't it, that Mr del Rosso is

7         apparently informing you of the fact of this NTi

8         downloading when it's already been going on for several

9         days?

10   A.  Well, I knew it had.  He told me.

11   Q.  If we read on, Mr del Rosso says this:

12        "If Stuart can provide you the site addresses he is

13        finding we may be able to avoid duplicating efforts.

14        How does he know it was set up in the UAE?"

15   A.  Correct.

16   Q.  "I expect we'll get initial results this week."

17        And you responded:

18        "Okay, thanks.  No idea why he says it emanates from

19        the UAE.  I will ask."

20   A.  Yes.

21   Q.  So the way you'd left it with Mr del Rosso on 15 August

22        is that you were going to go and try to obtain answers

23        to various queries that he'd raised.  That's right,

24        isn't it?

25   A.  What it says is I'm going to ask why Stuart says it

```
 1          emanates from the UAE.

 2     Q.   Did you ever do that?

 3     A.   Yes.

 4     Q.   And who did you ask?

 5     A.   Stuart.

 6     Q.   Stuart Page?

 7     A.   Yes.

 8     Q.   Did you phone him up again?

 9     A.   Yes.

10     Q.   You had his number, did you?

11     A.   Yes.

12     Q.   And when was this conversation?

13     A.   I'm -- I don't know.  I'm guessing it would be the same

14          day.

15     Q.   And what did he tell you?

16     A.   I didn't -- well, by the time I asked him, he -- and, by

17          the way, this is round about the same time that

18          Jamie Buchanan called me to say, "I don't understand

19          what's going on".  When I spoke to him, I think he'd

20          changed his mind that it might not be from the UAE and

21          he didn't -- frankly, I'm not very familiar with IT,

22          etc, it didn't make much sense to me and I don't think

23          he fully understood either.

24     Q.   And did you relay this to Mr del Rosso?

25     A.   Yes, I did.
```

```
 1    Q.  How did you relay it?

 2    A.  I'll have phoned him up.

 3    Q.  Can you see your response at the top of page

 4        {H10/257} --

 5    A.  Sorry.  Say that again.

 6    Q.  At {H10/257} you've responded to Mr del Rosso's email on

 7        15 August that says "Hi Neil".

 8    A.  Yes.

 9    Q.  You've said:

10            "Okay, thanks.  No idea why he says it emanates from

11        the UAE.  I will ask."

12    A.  Okay.

13    Q.  I think you've given evidence now that you probably went

14        off and spoke to Mr Page, what, quite shortly after

15        this?

16    A.  I'd have thought so.

17    Q.  And got back to Mr del Rosso that day, in all

18        likelihood?

19    A.  I would have thought so.

20    Q.  So that would have been 15 August, wouldn't it?

21    A.  Yes, I would have thought so.

22    Q.  And then if we go to {H10/263}, you can see that two of

23        the same emails in that last thread are there.  There's

24        your email of 15 August and there's Mr del Rosso's

25        response of 15 August.  Can you see?  Can you see that?
```

```
 1    A.   I am looking.  If you give me a time to read it.

 2         (Pause)   Yes.

 3    Q.   And at the top of that page, {H10/263} -- yes, you're

 4         right to look back because you seem to respond again to

 5         Mr del Rosso's 15 August email, but this time you're

 6         responding on 16 August 2016 and you're responding

 7         slightly differently.

 8    A.   Yes.

 9    Q.   You're now saying, "Okay.  Will ask him for details" --

10    A.   Well, it's the following day.

11    Q.   -- when in the previous response you say:

12         "Okay, thanks.  No idea he says why it emanates from

13         the UAE.  I will ask."

14    A.   But it's also -- isn't it also the following day?

15    Q.   Yes.

16    A.   It's a different email.  So I've got one on the 15th of

17         the 8th saying -- have I? -- I'll chase it up, which

18         is --

19    Q.   No, you've got -- Mr Gerrard, you've got the same email

20         from you on 15 August.

21    A.   So on 15 August I say:

22         "No idea.  I'll ask."

23         And then the following day I say:

24         "Okay.  [I] will ask him for details."

25    Q.   So the point I'm putting to you is there's the same
```

```
 1          email from you to Mr del Rosso and the same email back
 2          from him on these two pages, but on {H10/257}, on the
 3          15th, you say:
 4              "Okay, thanks.  No idea why he says it emanates from
 5          the UAE.  I will ask."
 6    A.    Yes.
 7    Q.    And you've given evidence that you think that shortly
 8          after then, on that day, you'd have spoken to Page and
 9          got back to del Rosso, so that deals with 15 August.
10          And then we get on to {H10/263}, which is the next day,
11          16 August, when you send the response back to
12          Mr del Rosso by email that we see there set out:
13              "Okay.  Will ask him for details."
14    A.    Yes.
15    Q.    Now on your evidence you've already got back to
16          Mr del Rosso by this stage.  You wouldn't have forgotten
17          that by the time you came to write the email at
18          {H10/263}, would you, Mr Gerrard?
19    A.    Well, I don't understand this at all, but I seem to be
20          replying to his 15 August.
21    Q.    What I suggest you're doing here, Mr Gerrard, is you are
22          creating a paper trail at {H10/263}, aren't you?
23    A.    What, "Okay.  Will ask him for details" is the paper
24          trail?
25    Q.    Yes.
```

1    A.   I've no idea what that's about.

2    Q.   Thank you.

3    A.   And, no, I was not creating a paper trail.

4    Q.   But you can give no explanation for why you appear to

5         have sent this response at {H10/263} back in

6         circumstances where you've already responded and had

7         a call --

8    A.   No, I thought I'd already responded -- I said I could --

9         I would have thought I'd have got back to him as quickly

10        as possible.  Quite why I would email again and say,

11        "Okay.  Will ask him for details", I just do not know.

12        Maybe he said, "Where is it?"  I've no idea.  But it

13        doesn't make any sense to me.

14   Q.   And if we go, please, to an email that you received on

15        16 August 2016 at {H10/262}, you got this email from

16        Mr Buchanan on 16 August, didn't you?  So the same day

17        as that rather puzzling email response of yours, you got

18        this email from Mr Buchanan, didn't you, Mr Gerrard?

19   A.   Yes.

20   Q.   And it was sent to Mr Frank and Mr Handjani, copied to

21        you.

22   A.   Yes.

23   Q.   And Mr Buchanan has given evidence that in this email he

24        appears to be breaking the news of the discovery of this

25        hacked material.

```
 1    A.   Yes.

 2    Q.   And he's accepted that he can't fully explain that

 3         because obviously this was 16 August and there's been

 4         a good week to ten days of work on this material before

 5         the date of this email of his.

 6    A.   Well, he's not breaking the news to me.  He's breaking

 7         the news to Andrew Frank and Amir Handjani.

 8    Q.   Yes.  And if we go to paragraph 23 of your first witness

 9         statement at {D/7/6} --

10    A.   Sorry, what paragraph?

11    Q.   {D/7/6}, paragraph 23.

12    A.   Yes.

13    Q.   -- you refer to this email of 16 August from

14         Mr Buchanan, and you say at the end of paragraph 23:

15             "I note that Jamie Buchanan said in that email that

16         he would get the link but I believe I already had it by

17         then."

18    A.   Yes.

19    Q.   You can't explain the way in which Mr Buchanan wrote to

20         you on 16 August, can you?  You can't explain the terms

21         of that email from him.  It seems wrong, doesn't it?

22    A.   I think I've already pointed out that I had a phone call

23         from Jamie Buchanan on the 15th, where he was talking

24         about Stuart Page and Stuart Page was, in his words,

25         rattling on about UAE.  He may or may not have had
```

1        another link.  I don't know.  But that's what he was

2        talking about.

3            I -- he asked me to phone up, I did phone up.  I'm

4        afraid I couldn't make head or tail of why Mr Page

5        thought it was the UAE.  And I will have -- and I think

6        what's happening there is Mr Buchanan probably hasn't

7        told the other two and is now telling them, and I say,

8        "Well, I've already got the link".

9            He actually says, "I have asked Neil to have a team

10       start reviewing" -- we'd already started it -- "as

11       a matter of urgency."  So this is a belated, "Gentlemen,

12       this is going on.  We're onto it" -- is the way

13       I interpreted his email.

14   Q.  You see, Mr Gerrard, I suggest to you that you knew

15       by August 2016 that RAKIA had already procured this

16       confidential internet information on Mr Azima.

17   A.  And if you don't mind me asking, how had we procured

18       that?

19   Q.  And you know -- and therefore you knew by the time of

20       this August discovery that it was in fact a charade

21       designed to bring that hacked data out into the open so

22       that RAKIA could then begin to take advantage of it.

23   A.  That's not true, my Lord.

24   Q.  And that explains why these emails don't actually hang

25       together and why they don't tell a consistent and

```
 1          regular story, isn't it, Mr Buchanan?
 2     A.   It's Mr Gerrard.
 3     Q.   Mr Gerrard.
 4     A.   That's not true, my Lord.
 5     Q.   What's the link that you're referring to in paragraph 23
 6          of your witness statement at {D/7/6}?
 7               "I note that Jamie Buchanan said in that email that
 8          he would get the link but I believe I already had it by
 9          then."
10               What link are you referring to there?
11     A.   Whatever links Mr Page had given me, whether it was the
12          one or two.
13     Q.   I'm going to ask you now about human rights matters,
14          please.
15     A.   Yes.
16     Q.   Final area.  Could you turn up, please, the document at
17          {G/26.3/1}?  Have you seen this Amnesty report before,
18          Mr Gerrard?
19     A.   No, I have not.
20     Q.   Amnesty is a reputable international organisation,
21          isn't it?
22     A.   It certainly is.
23     Q.   And it's concerned with human rights abuses?
24     A.   It is.
25     Q.   And it endeavours to try to remedy those around the
```

1      world?

2   A.   It does.

3   Q.   And are you telling his Lordship that you've never seen

4        this report before?

5   A.   I haven't.

6   Q.   Not even in preparing for this case?

7   A.   Not even in preparing for this case.

8   Q.   Right.  So if I -- you see the heading:

9            "'There is no freedom here'.  Silencing dissent in

10       the United Arab Emirates ..."

11           Can you see that?

12  A.   I can.

13  Q.   If you go to {G/26.3/5}, can you see the introduction?

14       Just read the first paragraph to yourself.

15  A.   20. ...?

16  Q.   {G/26.3/5}.  The quote:

17           "Westerners come here ..."

18  A.   What date is this report?

19  Q.   November 2014.

20  A.   And the quote is 2009, yes.  I read the quote.  I've

21       read the quote.

22  Q.   And you'd understand, wouldn't you -- or do you

23       appreciate that there are real concerns as to human

24       rights within the UAE, including RAK?

25  A.   I think there were definitely concerns with the UAE

```
 1           generally, but recently I think things have improved.
 2           If you read the World Justice Report, which is the
 3           latest report, it ranks the UAE 19 out of 126 countries.
 4           That clearly isn't perfect, but it's certainly a big
 5           improvement.
 6      Q.   Can I ask you, please, about your involvement in
 7           relation to Shahab Izadpanah, please?
 8      A.   Yes.
 9      Q.   Do you know that person?
10      A.   I do.
11      Q.   Can you tell his Lordship who they are?
12      A.   Shahab Izadpanah is a person we were investigating in
13           Ras Al Khaimah.  He was accused -- and in fact has been
14           convicted in absentia -- for bribing government
15           officials; in fact, the head judge of the Ruler's court.
16      Q.   And what's been your involvement in that matter, tell
17           his Lordship, please.
18      A.   I investigated that matter alongside local lawyers.
19      Q.   And when did you do that?
20      A.   A good question.  I can't remember the date, but it was
21           probably 2014/2015.  I'm sorry, I can't remember.
22      Q.   And were these criminal investigations and prosecutions?
23      A.   They were -- well, nothing starts as criminal.  There
24           was the enquiry, which is what I was part of, but it
25           ended up as a criminal one, yes.
```

```
 1   Q.  And what's your sort of qualification or entitlement to
 2       assist with criminal prosecutions or investigations in
 3       Ras Al Khaimah?  What sort of position do you have in,
 4       if you like, the prosecuting or criminal firmament that
 5       allows you to get involved with that?
 6   A.  I have been undertaking criminal law, defending criminal
 7       law, indeed partly prosecuting it in the early DTI days
 8       since my qualification, so in excess of 20-odd years.
 9   Q.  Were you a prosecutor?  Are you an official prosecutor
10       or investigator within the --
11   A.  I am a -- well, you don't have to be an official
12       prosecutor.  At the time I was an agency prosecutor for
13       the DTI --
14   Q.  In RAK?  I'm looking at RAK.
15   A.  No, I will come to -- you asked me what experience I've
16       got.
17   Q.  No, I didn't.  I asked you --
18   A.  You did.
19   Q.  I'm sorry.  It was my fault.
20   A.  Okay.
21   Q.  I don't ask you what your qualifications are
22       historically.  In most countries criminal and
23       prosecuting matters are undertaken by official
24       prosecuting bodies.
25   A.  I see, yes.
```

```
 1    Q.   And you're a partner at Dechert and you're working on
 2         investigations for RAK.
 3    A.   Yes.
 4    Q.   And you're based in London.
 5    A.   Yes.
 6    Q.   And you're not from the UAE.
 7    A.   I'm not.
 8    Q.   So what would entitle you to involve yourself with what
 9         are criminal investigations and then prosecutions and
10         convictions of someone like Shahab Izadpanah?
11    A.   Well, I wasn't involved in the prosecution.  I was
12         involved in the gathering of information and evidence,
13         which we then submitted to the prosecution.
14    Q.   And who were you working for when you were doing that
15         information-gathering?
16    A.   RAKIA.
17    Q.   Could you go, please, to {H7/294.08}?  Have you seen
18         this document before, Mr Gerrard?
19    A.   We're not there yet, I'm afraid.  (Pause)   I don't
20         think I have, no.  May I read it?  How much -- crikey.
21    Q.   Just read paragraph 2, please.
22    A.   Gary Berntsen of DENX.
23    Q.   Yes, do you know who he is?
24    A.   He says he's the CEO of DENX.
25    Q.   And do you know who DENX is?
```

```
 1    A.  I came across emails from Shahab Izadpanah's laptop --
 2        I think it was a laptop -- where DENX offered removal
 3        services or something.
 4    Q.  When did you come across emails -- when did you have
 5        possession of Shahab Izadpanah's laptop and why?
 6    A.  Why ...?  As part of the investigation we asked for it.
 7    Q.  Who asked for it?
 8    A.  The local lawyers.
 9    Q.  Who were they?
10    A.  I've already said it once.  Al Tamimi.
11    Q.  Did they confiscate his laptop?
12    A.  They asked for it.
13    Q.  He just handed it over, did he?
14    A.  Initially, yes.
15    Q.  And did he consent to having his laptop looked at in
16        this way?
17    A.  Yes, I believe so.  I wasn't there.
18    Q.  So you had been looking at Mr Shahab Izadpanah's
19        emails --
20    A.  So I came across --
21    Q.  For the record --
22    A.  Sure.
23    Q.  -- you have had access to Shahab Izadpanah's emails on
24        Shahab Izadpanah's laptop; that's right, isn't it?
25    A.  I believe that's right.  Laptop or computer, I'm not
```

```
 1          sure which.

 2     Q.   Thank you.  And roughly when was that?

 3     A.   No, it might not have been his laptop.  It may have been

 4          his computer in his company which was within RAK --

 5     Q.   Right.

 6     A.   -- so I'm not sure where we got the information.

 7     Q.   You said "laptop".

 8     A.   I did say "laptop", but I'm not sure where we actually

 9          got it from.

10     Q.   And you can see what's said in paragraph 2 in relation

11          to -- it's really your involvement, Mr Gerrard.  Can you

12          focus on what's said there in relation to you?

13     A.   In paragraph 2?

14     Q.   Yes.  I'll read it out to you for the record:

15              "Mr Izadpanah detailed the expropriation of his

16          business by RAK authorities, on behalf of RAK Ruler ...

17          He then provided additional information of a United

18          Kingdom Lawyer Neil Gerrard from the law firm

19          Dechert ..."

20     A.   Sorry, I'm not -- oh, you've moved -- you're down there.

21     Q.   Yes, I'll keep going if I may for the transcript:

22              "... from the law firm Dechert and a former

23          United Kingdom Policeman James Buchanan interviewed then

24          interrogated Mr Izadpanah in Dubai where they attempted

25          to extort $7.5 million from Mr Izadpanah, on behalf of
```

```
 1           the RAK, under the threat of incarceration in the RAK."
 2               All right?  Can you see that?
 3    A.   Yes.
 4    Q.   Is it right that you and Mr Buchanan interviewed and
 5         then interrogated Mr Izadpanah in Dubai?
 6    A.   No, it's wrong, and indeed, as hopefully you've seen,
 7         Mr Buchanan isn't a policeman.  This is wrong on many
 8         accounts.
 9    Q.   Did you in fact interview Mr Izadpanah yourself?
10    A.   I did.  I interviewed him with one of my colleagues and
11         someone from the law firm.
12    Q.   And where did that take place?
13    A.   That actually took place in RAK.
14    Q.   And whereabouts in RAK?  In a prison or the Palace?
15    A.   Dechert's offices.
16    Q.   And what was the purpose of that interview?
17    A.   The purpose of the interview was to ask him about our
18         concerns.  He was invited to attend, he did, and he
19         brought who we thought was his lawyer, but turned out to
20         be a colleague or representative or whatever.
21         Unfortunately that gentleman left after about half an
22         hour/an hour.
23    Q.   And when was this interview?
24    A.   I can't remember, but there's a record of it.
25    Q.   And would there be a record in your daybook?
```

1    A.    No, because I was conducting the interview and asking

2          questions and putting documents to him, so there will

3          not be.  But there's a record of the interview which one

4          of my colleagues will have written down and indeed was

5          viewed subsequently by the SRA --

6    Q.    So there will be a record in there?

7    A.    There's a record of it.  The SRA investigated this and

8          held that there was no ...

9    Q.    Right.  Did Mr Hughes of Dechert interview

10         Shahab Izadpanah on any occasion to your knowledge?

11   A.    I'm not -- I don't know.  I can't remember.

12   Q.    Can you go to {H7/294.08/2}, please?  Can you go over

13         the page, beginning at paragraph 4.

14   A.    Do you mind if we just slow down on the reading bit

15         because this is a document I haven't seen before and

16         I'd like to take time over it if you're going to ask

17         questions.

18   Q.    Thank you for doing that because I missed out

19         paragraph 3, so thank you for doing that.  Go back to

20         paragraph 3 at {H7/294.08/1}, please.  Starting, "Of

21         significant interest ..."  Can you see that?

22   A.    Yes.

23   Q.    Can you read paragraph 3, please?

24   A.    Yes.  (Pause)

25   Q.    Have you read that, Mr Gerrard?

```
 1     A.  I have.

 2     Q.  Is it right, as this memorandum records, that you --

 3         because I think it's you they're referring to there --

 4         offered Mr Izadpanah clemency if he would implicate two

 5         other individuals, Dr Massaad and Karam Al Sadeq, in

 6         this way?

 7     A.  I don't believe we did.

 8     Q.  Might you have done, though?

 9     A.  I think I might have -- I was -- we were certainly

10         asking for information, but I don't think we were in the

11         position to give clemency.

12     Q.  Do you think you might have said, "If you can help us

13         with Dr Massaad and Mr Al Sadeq, it will be easy for you

14         in relation to any collateral damage that might happen

15         in a criminal sphere"?

16     A.  That would be a matter for a prosecutor to determine.

17     Q.  Can go to paragraph 4, please {H7/294.08/2}?

18     A.  Yes.

19     Q.  Can you see what is there said?  Can you see that?

20     A.  I'm reading.  You want me to read paragraph 4?

21     Q.  Yes, please.

22     A.  Lovely.  (Pause)

23             Yes, I've read it.

24     Q.  I think you referred earlier today to you having

25         interviewed Mr Al Sadeq, didn't you, Mr --
```

```
 1    A.  That is correct.

 2    Q.  Do you think you may have interviewed him along the

 3        lines set out in paragraph 4, rather than in accordance

 4        with PACE, or not?

 5    A.  Definitely not, and, as I said, there will be a record

 6        of that.  Furthermore -- let me come to the point ...

 7        (Pause)

 8            I've lost it.  Yes, as far as I'm concerned, I don't

 9        recognise the allegations that she, on behalf of her

10        husband, was making.

11    Q.  Did you interview Mr Al Sadeq's wife as part of your

12        investigation here?

13    A.  I don't think we did, but I do know she attended

14        the Palace to talk to His Highness.

15    Q.  What was that about?

16    A.  About her husband.

17    Q.  Can you go to {H7/248.07} please?  Can you see that

18        email of 15 March 2015?  Can you see that?

19    A.  I'm afraid we're not there yet, my Lord.  (Pause)

20        Thank you.

21    Q.  This was an email from Mr Behre on --

22    A.  So this is an email I haven't seen before so I'll need

23        time to read it if I may.

24            Which -- all of it?

25    Q.  The first three lines.
```

| | | |
|---|---|---|
| 1 | A. | At the top? |
| 2 | Q. | "To give you a bit more context ..."  (Pause) |
| 3 | A. | Yes, I've read it. |
| 4 | Q. | Is it right that you did threaten Mr Al Sadeq's wife -- |
| 5 | A. | That could not be further from the truth, my Lord. |
| 6 | Q. | -- and that you said the things to her that are reported |
| 7 | | here, threatening jail of her husband? |
| 8 | A. | Nothing could be further from the truth, my Lord. |
| 9 | Q. | And will there be a record of any interview you had with |
| 10 | | Mr Al Sadeq's wife? |
| 11 | A. | I -- you said "interview".  I've already said I don't |
| 12 | | think we interviewed her -- |
| 13 | Q. | Right. |
| 14 | A. | -- and there would hardly be a note of discussions with |
| 15 | | His Highness.  She was pleading clemency and -- |
| 16 | | absolutely the right thing to do. |
| 17 | Q. | Do you think, Mr Gerrard, that you have a tendency to |
| 18 | | get a bit carried away when you're investigating matters |
| 19 | | for clients in these sorts of contexts -- |
| 20 | A. | No, I don't believe I have. |
| 21 | Q. | -- and to adopt a rather overly muscular approach to |
| 22 | | your investigations -- |
| 23 | A. | I don't think I do. |
| 24 | Q. | -- that could amount to -- certainly could come across |
| 25 | | as threatening or menacing to the person being |

1    investigated?

2  A. I hope not. I don't believe I do, my Lord.

3  Q. Could you be shown {G/34/109} please? Have you seen

4    this document before, Mr Gerrard?

5  A. No.

6  Q. It's an email of 13 September 2014 from Mr Bustami to

7    a number of people within RAK, but copied to

8    Gavin Watson. He's a partner of yours, isn't he?

9  A. Ex-partner.

10  Q. Ex-partner.

11  A. But he was at the time, yes.

12  Q. He was at Decherts, was he, at this time?

13  A. Yes.

14  Q. And it's copied to you as well. Can you see,

15    "Neil Gerrard"?

16  A. Yes.

17  Q. Do you want to just read it to yourself, please?

18  A. Please. (Pause) Yes, I've read it.

19  Q. Mr Buchanan agreed that enlisting the support of

20    a government and threatening imprisonment in order to

21    pressurise him into settling a dispute was an improper

22    thing to do. Do you agree with that observation of his?

23  A. In relation to -- well, it's not in the email here.

24    I don't understand why I'm being asked to agree with

25    a comment that I've no idea what context it was in.

```
 1   Q.   All right.  Well, I'll move on.  Do you think there's
 2        anything wrong with what's being suggested in this
 3        email?
 4   A.   Well, I didn't write the email, but when I read it,
 5        I didn't see any problems with it.
 6   Q.   Thank you.  Could I ask you, please, to go to
 7        {G/26.27/1}, which is a copy of particulars of claim in
 8        a claim brought by ENRC against the Serious Fraud
 9        Office.  Can you see that?
10   A.   I do, my Lord.
11   Q.   And you can see -- you're familiar with this dispute,
12        aren't you, Mr Gerrard?
13   A.   All too familiar, my Lord.
14   Q.   And you can see what's set out in the introductory
15        pages.  ENRC are complaining, aren't they, that the SFO
16        improperly expanded the scope of its investigation into
17        ENRC, and that came about as a result of your breach of
18        confidence in other breach of fiduciary duty.  That's
19        what's alleged, isn't it?
20   A.   Yes, they're claiming a lot of things.
21   Q.   Can you see who -- at {G/26.27/62} -- who settled this
22        pleading?  Can you see?  It's been settled by five
23        counsel -- can you see that? -- two leading counsel and
24        three junior barristers.
25   A.   Yes.  I also see that the statement of truth is signed
```

1          by one of the suspects who's currently under criminal

2          investigation.

3  Q.  And you know, don't you, Mr Gerrard, that for counsel to

4          settle pleadings alleging fraud or the like, they have

5          to have reasonable credible material, don't they, in

6          front of them -- don't they?  It's a rule of conduct,

7          isn't it?

8  A.  Well, it depends on how you define "reasonable".  At the

9          same time you will see on the defence a plethora of

10         counsel signing that one as well, and if I can just say

11         for the record that the SFO, Dechert and myself

12         vehemently deny these allegations and I, for one, relish

13         the opportunity of defending this in court next year,

14         my Lord.

15  Q.  Would you go to {G/26.27/39} please?  At paragraph 29.1

16         it's alleged that you or Dechert acting by you, "...

17         acting against ENRC's interests, in breach of the

18         Retainer and in breach of fiduciary duty".  Can you see

19         that, Mr Gerrard?

20  A.  Yes, I can.

21  Q.  Then a number of respects are set out, and (a):

22         "Mr Gerrard leaked confidential and privileged

23         material to The Times and took great care to disguise

24         his involvement in this flagrant breach of duty: see

25         paragraph 11.6 above."

```
 1              Can you see that?
 2      A.  See 11.6?
 3      Q.  See 11.6 above.
 4      A.  Yes.
 5      Q.  If we go to 11.6 -- that's at {G/26.27/9} --
 6      A.  27/9?
 7      Q.  It's page 9 of this document.
 8      A.  Yes.
 9      Q.  -- you see what there's alleged against -- that you did.
10      A.  Yes.
11      Q.  What do you have to say about those matters?  Do you
12          deny all of them?
13      A.  I deny all of them.  I would like to make the point that
14          Mr Findlay was an employee of ENRC, and the allegation
15          is that I gave an employee of ENRC material to leak,
16          which I deny.  Mr Findlay -- I won't go any further.
17      Q.  Can you go back to paragraph 29.1 of the pleading, so
18          that's page 39 of this document {G/26.27/39} at 29.1(b):
19              "Mr Gerrard leaked confidential and privileged
20          material to the SFO ..."
21      A.  Denied.
22      Q.  And then (c):
23              "Mr Gerrard conducted himself as aforesaid at the
24          Chelsea Brasserie: see paragraph 11.12 above."
25              Can you see that?
```

```
 1    A.  Yes, denied.

 2    Q.  If we go to 11.12, that's at page --

 3    A.  My diary doesn't even record me as being there, but

 4        anyway, denied.

 5    Q.  Well, yes, I'm sure -- page 12 {G/26.27/12} --

 6    A.  Page 12.

 7    Q.  Is that your desktop, is it, or your diary?  Your diary.

 8        Could you go to 11.12, please, the paragraph.

 9    A.  Sorry, you have to say that again.  We're going too

10        quickly.

11    Q.  Page 12, paragraph 11.12 of this pleading:

12        "In August 2011 ..."

13        Can you see that?

14    A.  Yes.

15    Q.  "Mr Gerrard met Messrs Findlay and Trevelyan at the

16        Chelsea Brasserie on Sloane Square.  As he approached

17        the table, he rubbed his hands and said 'right boys, I'm

18        in rape mode'; he also stated that he was planning to

19        'screw these fuckers ...' for millions of pounds."

20    A.  Yes, I deny it, I wasn't there and my diary confirms

21        I wasn't there, but that's for another day.

22    Q.  So your evidence -- your evidence will be that these

23        gentlemen are making up this allegation?

24    A.  That is my evidence.

25    Q.  Could you go to {G/26.25} please?
```

```
 1   A.   Yes, this is my particular favourite.

 2   Q.   This is an article that appeared in the Lawyer Monthly,

 3        isn't it?

 4   A.   It is.

 5   Q.   You see what's there set out.  There's reference here,

 6        isn't there, to what's said to be an alleged

 7        whistleblower letter -- isn't there?

 8   A.   Correct.

 9   Q.   And that's at {G/26.11/1}.

10   A.   Yes.

11   Q.   I'm sure you've read that letter before.

12   A.   Many times.

13   Q.   And what's your response to that letter?

14   A.   I think it's a remarkable letter.  If it were true, it

15        means that I'm in a conspiracy with the

16        Deputy Prime Minister, two directors of the Serious

17        Fraud Office, several members of the SFO.  It also

18        identifies all these alleged clients, none of which

19        I have ever acted for.  So, in short, this is complete

20        rubbish.

21   Q.   Can you explain why you would have been victimised or

22        persecuted in this way, Mr Gerrard?

23   A.   Yes, I think I can.

24   Q.   Why is that?

25   A.   Well, with the greatest of respect, that's part of my
```

```
 1            defence going forward.

 2    Q.   Right.  Do you think that you're a man who tends to make

 3            enemies along the way?

 4    A.   Well, normally, no, but I've been in practice 20-plus

 5            years and RAK and this matter have certainly blotted

 6            that copy book.

 7    Q.   Could you be shown finally {G/9.2}, please.  {G/9.2/7},

 8            please.

 9               Have you got G/9.2 --

10    A.   No, I haven't.  My Lord, I'm being rushed here.  Sorry,

11            where am I looking?

12    Q.   This is a statement -- the eighth statement of

13            Ms Lucy Ward filed in these proceedings.  Could you just

14            read paragraphs 23 and 24?  Have you not seen this

15            statement before, Mr Gerrard?

16    A.   No.

17    Q.   Could you read paragraph 23 that's set out there,

18            please?

19    A.   Yes.  (Pause)

20               How long do you want me to go on for?  The whole

21            section?

22    Q.   Well, yes, if you like.  (Pause)

23    A.   This is the first time I've seen this email that they're

24            referring to.

25    Q.   If you go to paragraph 26 {G/9.2/9}, you can see what
```

1          Ms Ward says there, please.  These emails apparently

2          arrived in an envelope at Dechert's offices.  Can you

3          see that?

4     A.   Yes.

5     Q.   If you don't know about this, Mr Gerrard, then I won't

6          take it up with you any more.

7     A.   All I know -- I was travelling -- that there was --

8          first of all I had some emails from -- I can't remember

9          who now, I think one of my American colleagues and

10         someone else, that they'd apparently received an

11         envelope -- an anonymous envelope, I'm not sure -- and

12         I emailed my PA to say, "Have I got one?", and she said,

13         "Yes" -- no, she didn't say "Yes".  It had already been

14         identified by one of the team and they'd already

15         isolated it.  So I've never opened the envelope, I've

16         never seen the email.

17    Q.   And in the Mikadze dispute in Georgia, Dechert also

18         received certain documents through the post, anonymously

19         through the post, didn't they?

20    A.   It was addressed to me.

21    Q.   And can you explain how that came about?  Do you have

22         any idea why people were sending you things anonymously

23         in the post?

24    A.   I can explain the circumstances, my Lord.  I had an

25         envelope addressed to me.  In it was -- I can't remember

```
 1            whether it was one or two pages -- what I took to be
 2            Russian.  Obviously I don't read Russian.  I sent it to
 3            our Georgian office and asked him to translate it for
 4            me.  He confirmed it was actually Russian.  It could
 5            have been Kazakh or Russian.
 6                He over the phone said, "Look, it looks like an
 7            internal document from Mr Mikadze's lawyers", and we
 8            concluded it had been sent to me by mistake.  I asked my
 9            Dechert partner to -- in Georgia to call the lawyers,
10            say that we had this document and was it a mistake, and
11            they said it was and so we destroyed the document on our
12            system.
13    Q.     Finally, Mr Gerrard, I think I put this to you, but
14            I put it to you that you knew or you know that RAKIA
15            procured the illegal access to Mr Azima's emails.  I put
16            that to you.
17    A.     That is not true.
18    Q.     And that they did so as part of a campaign to go after
19            and ruin him.
20    A.     That seems like an incredibly elaborate exercise.  It's
21            certainly -- it's just not true, my Lord.
22    MR LORD:  Thank you, Mr Gerrard.
23    MR TOMLINSON:  My friend being two and a half hours over his
24            estimate, I'm now left with five minutes to re-examine
25            Mr Gerrard.
```

```
 1              My Lord, I don't want to have to bring him back
 2         tomorrow, but if I go slightly over the time,
 3         your Lordship will forgive me.
 4    JUDGE LENON:  That's fine.
 5                  Re-examination by MR TOMLINSON
 6    MR TOMLINSON:  Mr Gerrard, you were stopped by Mr Lord when
 7         you were dealing with an SRA complaint that was made
 8         about the conduct of Dechert in -- I think you said that
 9         that concerned the conduct of Dechert in RAK in relation
10         to -- well, who was it in relation to?  Do you remember?
11    A.   Shahab Izadpanah.
12    Q.   Do you remember what the SRA said in response to that
13         complaint?
14    A.   Yes, they said there was no evidence at all to
15         substantiate the claim --
16    Q.   Have you ever --
17    A.   -- having investigated it.
18    Q.   Have you ever taken on the role of prosecutor in RAK, in
19         other words run a prosecution, formulated charges,
20         anything of that sort?
21    A.   No, not at all, my Lord.
22    Q.   Have you ever interfered with the prosecution process in
23         RAK?  Have you put pressure on prosecutors, tried to
24         make them make decisions in particular ways, anything of
25         that sort?
```

```
 1    A.   Not at all, my Lord.

 2    Q.   Have you ever sought to cover up torture activities in

 3         RAK?

 4    A.   My Lord, I've never seen torture in RAK.  Had I seen it,

 5         not only would I have been appalled, but I would have

 6         reported it.

 7    Q.   Were you involved in the orchestration of illegal

 8         detentions in RAK?

 9    A.   Absolutely not, my Lord.

10    Q.   I want you to understand -- I'm not sure whether this

11         was clear, but, Mr Gerrard, when you were being asked

12         about the "View from the window" {H9/106} document

13         which -- do you remember that? -- the document --

14    A.   I do.

15    Q.   -- that Mr Frank sent to you?  And the case was being

16         put to you that what had happened was that some time

17         before January 2016 you had had access to illegally

18         hacked emails of Mr Azima -- do you follow?

19    A.   I do.

20    Q.   -- and on the basis of those emails you had told

21         Mr Frank that Mr Azima was engaged in fraud; yes?  And

22         it was a result of that access to the illegally hacked

23         emails and that conversation that Mr Frank had written

24         that document.  Is there any truth in any of that?

25    A.   Absolutely not, my Lord, and I think if there was any
```

```
 1              truth in that, wouldn't you have seen a lot more
 2              evidence of that illegally obtained material floating
 3              around?  Can you point to one document that suggests
 4              that's the case?
 5     Q.   I now want to ask you about the attendance note at
 6              {H10/226}.  This is the one that you've been taken to --
 7              you were taken to at some length by Mr Lord.  Page
 8              {H10/226/2}, please.  We have there the paragraph,
 9              paragraph 10.
10              I wanted to first ask you about the first line.
11              What were you referring to there?
12     A.   In my meeting with Khater Massaad's lawyer, Kirby Behre,
13              where I think I referred to the lengthy meeting we
14              had -- he was the first lawyer who had agreed to be
15              walked through the substantial material we had at the
16              time -- bizarrely he threatened Mr Buchanan and I -- or
17              really our client, I suppose -- that if we were to
18              pursue this course of events, there would be mutually
19              assured destruction, which I took to mean that both my
20              client and Dr Massaad would be mutually destructed.
21     Q.   And what was your response to that in the meeting?  How
22              did you -- having mentioned that was his view, how did
23              you respond to that to Mr Azima?
24     A.   To Mr Kirby Behre?
25     Q.   No, because I'm talking now about the meeting on --
```

```
 1    A.   Oh, sorry.

 2    Q.   -- of 16 July.  You noted you said to those present,

 3         presumably, that he'd referred to "mutually assured

 4         destruction", but what was your -- how did you explain

 5         what you thought about that?

 6    A.   Well, I just -- I'd explained to Farhad that I didn't

 7         think that sort of comment was going to help at all and

 8         that it was inconsistent with what we were all trying to

 9         achieve.

10    Q.   And what did you say was the likely result if

11         prosecutions went ahead?

12    A.   Well, that nothing was going to affect His Highness, but

13         if prosecutions went ahead there was going to be -- the

14         collateral damage was going to occur.

15    Q.   And what did you mean by that?

16    A.   What I meant was that, once you start the ball rolling,

17         once you start getting the prosecutions involved, these

18         things take a life of their own.

19    Q.   And then I want to ask you about the last two sentences

20         of this paragraph.  What did you mean by the references

21         to the Dana Jets database, the RAK Ceramics database and

22         Sheeba Nair's emails?

23    A.   I was trying to get across to Dr Massaad that, you know,

24         we had or we thought we had a considerable amount of

25         evidence and that this -- you know, this wasn't going
```

1        away.

2            As I tried to explain previously, the frustration

3        was he was completely ignoring the problem, my Lord.  He

4        wouldn't engage.  He wouldn't even allow his lawyers to

5        talk to him about the issues.  He just seemed to think,

6        "I'll ignore it and it will go away".  That was the

7        frustration that we all had, including, I think,

8        Mr Azima.

9            So -- and indeed he sacked Mr Kirby for talking to

10       us and being walked through the issues.  So I was trying

11       to get across that we would -- "There was no point in

12       sitting in your little bubble and ignoring these issues.

13       Please engage with us".  That's the point I'm trying to

14       get across.

15   Q.  At this distance in time, do you remember who

16       Sheeba Nair was?

17   A.  Yes, Sheeba Nair was Kirby -- sorry, Sheeba Nair was the

18       secretary at RAK Ceramics -- private secretary -- of

19       Dr Massaad.

20   Q.  Could you now look at, please, {H10/229}?  You were

21       asked some questions about this email and in particular

22       it's -- I'm looking here at the -- it's about halfway --

23       well, it's the penultimate substantial paragraph of the

24       email from Mr Buchanan to Mr Azima, the one that begins,

25       "To be absolutely clear ..."  Do you see that?

```
 1    A.   Yes.

 2    Q.   And you were asked about the last sentence, which is

 3         referring to you:

 4              "All he [that's you] did was raised questions as to

 5         HeavyLift.  In a previous meeting he asked you about

 6         Eurasia Hotel Holdings."

 7    A.   Yes.

 8    Q.   Can you just look, please, at the transcript of Day 3 --

 9         this is Mr Buchanan's evidence -- page 169.

10         {Day3/169:1}.

11              This is Mr Lord asking Mr Buchanan about this very

12         same email, and at line 13, in relation to the reference

13         to HeavyLift, it's being said that this must come from

14         the hacked materials, and you see his response at

15         line 13.

16    A.   Yes.

17    Q.   Then if we go, please, on to the next page

18         {Day3/170:11}, at line 11, his answer there.

19    A.   Yes.

20    Q.   Were you aware of an investigation concerning the

21         shareholding in HeavyLift and how the transactions had

22         taken place between HeavyLift and RAK Airways and other

23         RAK entities?

24    A.   Yes.

25    Q.   And was that what you were referring to at the meeting
```

```
 1              with Mr Azima on 16 July?
 2      A.      Yes, I think the point I was referring -- it was the
 3              shareholding.  They were -- RAK had the majority
 4              shareholding and yet they played no part at all in
 5              HeavyLift, either its accounts, signing off bank
 6              accounts, board meetings, nothing at all, and those
 7              attempts that were made by RAKIA to -- or Dr Massaad
 8              anyway, to put people in, they were sacked after several
 9              months.  That was the point I was trying to make.
10      Q.      Finally, Mr Gerrard -- I may have covered this already,
11              but perhaps I haven't and it's important to be clear --
12              did you -- I think the allegation is made against you
13              that you exercised some kind of judicial, prosecutorial
14              or governmental functions in RAK when you were working
15              for RAKIA.  Did you exercise any such functions?
16      A.      Zero functions.  It was a similar function to what
17              happens here.  A client -- if they have
18              a whistleblower -- brings in investigative lawyers or
19              accountants.  They review the situation and then advise
20              the client as to what to do about it, either litigate,
21              report to the authorities.  A DPA -- deferred
22              prosecution agreement -- is exactly that, and that's the
23              role that we were playing within RAK, and at all times
24              we were working with local lawyers, my Lord.
25      Q.      Did you have any functions in overseeing prisons or
```

1      dungeons in RAK?

2   A.  Well, I haven't seen a dungeon, but I didn't oversee

3       prisons or dungeons, no.

4   MR TOMLINSON:  My Lord, unless your Lordship has any

5       questions.  I'm sorry I've over-run by five minutes.

6   JUDGE LENON:  Have you finished?

7   MR TOMLINSON:  I have, my Lord, yes.

8   JUDGE LENON:  Thank you, Mr Gerrard.

9   MR TOMLINSON:  And, again, if this witness could be

10      released.

11  JUDGE LENON:  Of course, yes.  So 10.30 tomorrow hopefully.

12  MR TOMLINSON:  Yes.

13  (4.37 pm)

14      (The hearing adjourned until 10.30 am on Wednesday,

15                  29 January 2020)

16

17

18

19

20

21

22

23

24

25

```
1                           INDEX

2                                             PAGE
```

```
3    MR NEIL GERRARD (continued) ..........................1

4        Cross-examination by MR LORD (continued) .........1

5        Re-examination by MR TOMLINSON .................187
```

```
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```