# EXHIBIT E

```
 1        letter?

 2   MR TOMLINSON:  My Lord, we'll certainly do it before the

 3        short adjournment.

 4   JUDGE LENON:  In that case there shouldn't be a problem.

 5        We'll have our short break now.

 6   (11.47 am)

 7                         (A short break)

 8   (11.55 am)

 9   MR TOMLINSON:  My Lord, I'll call Mr del Rosso.

10            MR NICHOLAS PAUL DEL ROSSO (affirmed)

11            Examination-in-chief by MR TOMLINSON

12   MR TOMLINSON:  Could you give the court your full name and

13        professional address, please?

14   A.  Yes, sir.  Nicholas Paul del Rosso, 1340 Environ Way,

15        Chapel Hill, North Carolina, USA.

16   Q.  Could you take out the file that's in front of you and

17        turn to tab 5, please, {D/5/1}?

18            You should have there a document that begins,

19        "Witness statement of Nicholas del Rosso".

20   A.  Yes, sir.

21   Q.  If you turn to page {D/5/6}, is that your signature?

22   A.  It is, yes.

23   Q.  And is there anything in that statement, Mr del Rosso,

24        that you'd like to correct or clarify?

25   A.  Yes, there are two matters, my Lord, that I'd like to
```

```
1              change.  One is the date when I first received the call
2              from Mr Gerrard, and that is on -- I'd like to change
3              that to Monday, 8 August.
4    JUDGE LENON:  So which paragraph is that?  Paragraph 5, is
5              it?
6    A.  Paragraph 5, yes, {D/5/2}.  And then it goes on --
7    MR TOMLINSON:  Are we talking about the date in paragraph 7?
8    A.  Paragraph 5 through 7, yes, that was 8 August.
9    Q.  And you wanted to change that from what to what,
10             Mr del Rosso?
11   A.  It appears to read as though it's the 9th that
12             I received the call.  It was in fact the 8th, my Lord.
13   Q.  Was there something else?
14   A.  Yes, I'm just searching for the paragraph.
15             It was the date -- and I can't see it in here -- the
16             date that I first delivered a secure drive.  Oh, yes, in
17             paragraph 14, {D/5/4}.
18             "I was flying to London that day ..."
19             It should read "I was flying to New York".
20   Q.  And with those exceptions, Mr del Rosso, are the
21             contents of that witness statement true?
22   A.  Yes, my Lord.
23   Q.  And that's your evidence in this --
24   A.  It is, sir, yes.
25   MR TOMLINSON:  If you could wait there, there will be some
```

1          questions.

2                    Cross-examination by MR LORD

3    MR LORD:  Mr del Rosso, please could you go to paragraph 4

4          of your witness statement at {D/5/2}, where you say:

5               "In August 2014, VMS was engaged by Dechert LLP to

6          investigate assets potentially stolen from the

7          Government of Ras Al Khaimah ..."

8               Can you see that?

9    A.   I do, sir, yes.

10   Q.   And then two lines on you say:

11              "I took my instructions from Dechert LLP and had

12         limited direct contact with Jamie Buchanan and other

13         representatives of the RAK Government.  I had worked

14         previously with other lawyers then at Dechert LLP on

15         unrelated matters involving suspected fraud."

16              Can you see that?

17   A.   I do, yes.

18   Q.   So how far back did your relationship with Dechert LLP

19         go, Mr del Rosso?

20   A.   To the best of my recollection, it was around

21         August 2014.

22   Q.   But you'd worked for Dechert, hadn't you, on -- sorry,

23         maybe I --

24   A.   No, you -- then at Dechert.  I had previously worked

25         with other lawyers, then at Dechert, so they had been

```
 1          elsewhere prior to that.
 2     Q.   I see.  Who would those lawyers be?
 3     A.   Oh, Mr Abousleiman --
 4     Q.   Sorry, I can't hear.
 5     A.   Abousleiman and some of his partners or junior partners.
 6          I truly don't remember right now.
 7     Q.   And when did you first start working for Dechert or
 8          taking instructions from Dechert?
 9     A.   August 2014.
10     Q.   But when did you first work for the gentleman you've
11          just referred to, Mr Abousleiman?
12     A.   Mr Abousleiman, again I don't recall.  I haven't gone
13          back in the files to look at that particular matter.
14     Q.   Roughly -- roughly when?
15     A.   No, that's just speculation, sir.  I can't guess.
16     Q.   You must have some idea whether it was a year before or
17          20 years before?
18     A.   I don't, so no.  My Lord, I don't recall exactly when.
19     Q.   I wasn't asking you exactly when, Mr del Rosso.  I was
20          asking when you first started taking instructions from
21          Mr Abousleiman.  I'm not asking about what they were,
22          just when it was.
23     A.   I can't answer that, my Lord, because I just don't know.
24     JUDGE LENON:  You must have some idea.  Was it a year, was
25          it ten years or ...?
```

```
 1   A.  Somewhere between a year and four years maybe.  I just
 2       can't pinpoint it.
 3   MR LORD:  And what Mr Gerrard?  Had you taken instructions
 4       from Mr Gerrard before August 2014?
 5   A.  I had not, my Lord, no.
 6   Q.  And who did you deal with in relation to this particular
 7       instruction that you describe in paragraph 4 from
 8       Dechert?  Was it Mr Gerrard you dealt with?
 9   A.  Principally, but there were other lawyers involved in
10       that matter.
11   Q.  And who were the other lawyers involved?
12   A.  Mr Hughes.
13   Q.  Anybody else?
14   A.  Those that I can recall -- and there were many -- were
15       Mr Fotherby, William Fotherby --
16   Q.  Yes.
17   A.  -- Matt, Matt Banham.
18   Q.  And roughly how often would you liaise with Dechert
19       during the course of this engagement of you by them over
20       time?
21   A.  What do you mean by "liaise"?
22   Q.  Well, speak to them on the telephone, give them an
23       update -- roughly.  I mean how --
24   A.  On a regular basis.  I'm not going to speculate again on
25       how many times that was a week or a month, but it was on
```

1           a very regular basis.

2    Q.    Right.  In paragraph 5 {D/5/2} you refer to Stuart Page.

3           Can you see that?

4    A.    I do, yes.

5    Q.    You say in that paragraph -- this is the call you've now

6           said was 8 August 2016 with Mr Gerrard.  You said:

7               "During that call, Neil told me that Stuart Page had

8           identified two links on the internet ..."

9               Can you see that?

10   A.    I do, yes, sir.

11   Q.    And the last sentence reads:

12              "I do not know Stuart Page but I had heard of him

13          because he works in a similar industry to me."

14              What is VMS' line of work, Mr del Rosso?

15   A.    I provide fraud consulting work, my Lord.

16   Q.    And what does that involve in practice?

17   A.    Looking at documents generally to identify fraud.

18   Q.    Does it involve trying to track down assets or trace

19          them?

20   A.    That isn't generally where I would specialise, my Lord,

21          no.

22   Q.    And does it involve any sort of surveillance?

23   A.    It doesn't, my Lord, no.

24   Q.    And does it involve any kind of investigative work?

25   A.    I manage some investigations, sir, yes.

1   Q.  And what sort of investigative work do you manage?

2   A.  Fraud investigations, sir.

3   Q.  And what does that include, Mr -- you know what I'm

4       asking you, Mr del Rosso.  I'm asking you to tell

5       his Lordship in practical terms not what the label is;

6       what does that mean.  You're investigating a fraud.

7       What sort of investigations do you do?

8   A.  Well, I read through documents and identify fraud, and

9       then whoever is instructing me, I would let them know

10      that I've identified something that I consider to be

11      fraudulent --

12  Q.  So you're a sort of document --

13  A.  -- or not as the case may be.

14  Q.  So simply document review; is that right?

15  A.  Well, analysis I would say probably more -- is a more

16      accurate description, yes.

17  Q.  And how do you analyse?  What sort of tools do you use

18      for that analysis?

19  A.  Well, I use my knowledge.  That's it, sir.

20  Q.  So somebody gives you a pile of documents and you just

21      sift through them to see if you can find some fraud; is

22      that your evidence, Mr del Rosso?

23  A.  I think in a nutshell, yes, sir.  There are many

24      different types of cases, yes, but essentially it is

25      research and analysis and identifying patterns and

1          looking for elements of fraud if they exist.

2     Q.   You're president and owner of Vital Management Services,

3          aren't you?

4     A.   Yes, my Lord, yes.

5     Q.   What's your relevant background?  What's your

6          professional background, Mr del Rosso?

7     A.   I've been involved in this type of work for 30 years,

8          sir.  Previously I was a police officer in the

9          Met Police.

10    Q.   When were you in the Metropolitan Police, Mr del Rosso?

11    A.   1978/1979 to 1989.

12    Q.   And did you come across Mr Gerrard at that time?

13    A.   I didn't, sir, no.  I'd never met him before August 2014

14         or that period, yes.

15    Q.   And what rank did you attain when you were in the

16         police force?

17    A.   Well, I rose through the ranks, sir, to detective

18         constable.

19    Q.   And how old were you when you left the police force?

20    A.   I would have been 33 years old.

21    Q.   And have you done fraud investigative work for that

22         entire period since you left the police force or have

23         you done something else as well?

24    A.   Almost entirely, sir, yes.

25    Q.   So what else have you done?

```
 1    A.   I've done property development and some other matters
 2         such as that, yes.  That is what -- property
 3         development.
 4    Q.   And at what point did you move to the USA?
 5    A.   1995 or 1996.
 6    Q.   Was that a professional reason that you moved to the
 7         USA?
 8    A.   My Lord, I acquired a company in the US, yes.
 9    Q.   What company did you enquire [sic]?
10    A.   "Acquire".
11    Q.   "Acquire", yes.
12    A.   It was an investigative company that specialised in
13         intellectual property investigations.
14    Q.   And when did you set up Vital Management Services?
15    A.   I think it was around 2000, sir.
16    Q.   And you are the owner of that business?
17    A.   I am, yes, sir.
18    Q.   Does it employ anybody else?
19    A.   Not now, no.  My wife is a shareholder.  Other than
20         that, it's just me.
21    Q.   And do you use any agents or sub-agents or consultants?
22    A.   I do, yes, my Lord.
23    Q.   Give his Lordship an example of the sorts of agents or
24         sub-agents or consultants that you use or would use on
25         a case like this.
```

```
 1    A.   Well, in this particular matter I used Chris Swecker,
 2         who is a lawyer and represents Vital Management
 3         Services, and an analytical firm called NTi,
 4         Northern Technologies.
 5    Q.   And what other agents or sub-agents or consultants has
 6         your firm, VMS, used?
 7    A.   In relation to this matter?
 8    Q.   Well, in terms of fraud investigation.  What sort --
 9         what --
10    A.   Well, there are other investigators, sir.  Generally
11         or -- on occasions I've been asked to provide, for some
12         of the principals in this case, some security.  I don't
13         do that myself and I subcontract that out.
14    Q.   And do you instruct investigators to gather up
15         information for you as part of your fraud enquiries?
16    A.   That can form part of that, sir, yes.  It can form part
17         of their instruction, yes.
18    Q.   And what investigators have you used, let's say, in the
19         last six -- let's say the last six years -- let's say --
20         seven years?
21    A.   Is that relevant to this?  I've just told you the people
22         I used on this particular matter, so that's
23         Chris Swecker --
24    Q.   You have given an answer that all you do is review
25         documents and I'm asking you to identify other agents to
```

```
 1          see whether, in fact, you do rather more than just
 2          review documents, Mr del Rosso.
 3      A.  In relation to this matter, my Lord, I have only used
 4          Chris Swecker and Northern Technologies.
 5      Q.  And what other analysis did you perform in this case
 6          since 2014?  What did you do?
 7      A.  Well, 2014 was when I was engaged by Dechert on matters
 8          unrelated to Mr Azima.
 9      Q.  And what were you -- I don't want to know about the
10          matters in detail, but what were you engaged in relation
11          to?
12      A.  I was engaged in relation to fraud and the proceeds of
13          fraud and trying to identify where some of those
14          proceeds may have been.
15      Q.  And who was the alleged fraudster or fraudsters?
16      A.  Well certainly Massaad was one of them.  There are some
17          other names in there, including some Indians, and
18          I believe two or three Georgian participants, yes.
19      Q.  And did you instruct any investigative or enquiry agents
20          in relation to this engagement -- anybody to find
21          information on your behalf?
22      A.  I'm sure that I did, sir, but this is unrelated to
23          Mr Azima.  These are matters that are unrelated to
24          Mr Azima.
25      Q.  Who were they?
```

```
 1    A.   These are matters that are unrelated to Mr Azima, sir.

 2    Q.   So you won't answer the question?  I'm simply asking who

 3         they are.

 4    A.   I am not trying to be obstructive at all, sir, but these

 5         aren't necessarily individuals or people who were

 6         involved in matters with Mr Azima.

 7    Q.   Without knowing what they were involved in, we can't

 8         necessarily take your word that there may not be some

 9         relevance to Mr Azima.  But you know, Mr del Rosso,

10         don't you, that there are issues as to RAKIA's

11         investigation in this case and the extent to which their

12         investigations concern not just Dr Massaad, they may

13         have extended to Mr Azima.  You know that, don't you,

14         Mr del Rosso?

15    A.   I'm aware of that, sir, but I was not involved in any

16         investigation of Mr Azima.

17    Q.   So you say, but can you tell his Lordship --

18    A.   No -- well, that is the truth, my Lord.  I wasn't.

19    Q.   Can you tell his Lordship to help with that

20         assessment -- can you tell his Lordship what other

21         investigators you did use in relation to this

22         engagement?

23    A.   At the moment, I wouldn't be able to say that.  I would

24         have to go and check records because I wasn't asked

25         about this at -- you know, during discovery or
```

```
 1            disclosure.

 2    Q.      And what sort of investigative work did these people do

 3            for you?

 4    A.      For the most part they were recovering documents from

 5            public institutions, companies, company-related

 6            documents.  There was a substantial amount of fraud in

 7            India, which is where we ended up focusing, and that was

 8            principally my role.

 9    Q.      So they were doing information or --

10            information-gathering for you basically?  They were

11            intelligence-gathering for you?

12    A.      No, that's not the right word, sir, no.  They were

13            providing information on companies, if we identified

14            a company we needed to know who the shareholders were,

15            so that was really the purpose of engaging with others

16            in different jurisdictions.

17    Q.      So your work involved more than simply reviewing

18            documents, didn't it, Mr del Rosso?

19    A.      Well, I would have reviewed the documents that they

20            brought back to me, yes.

21    Q.      But you also were instrumental in procuring information,

22            weren't you, as part of this retainer?

23    A.      It's a process that one has to go through to get public

24            record information to understand who owns a company and

25            putting together a picture of the involvement of other
```

1          people, and that's essentially what we were doing.

2          That's what my role was.

3     Q.   And did this information procurement extend to

4          potentially confidential information?

5     A.   I wasn't instructed in that, sir, no.

6     Q.   Well, you weren't instructed to obtain it, but did this

7          information procurement that you've described just now

8          that you were doing -- did that potentially extend to

9          confidential information?

10    A.   Well, explain what you mean by "confidential

11         information".

12    Q.   Information that is impressed with a duty of confidence

13         to somebody.  Bank information, for example.

14    A.   Yes, there may have been some bank information.

15    Q.   That would on its face have been confidential?

16    A.   Not necessarily -- not if it came from public records,

17         no.

18    Q.   But unless you had the consent of the relevant

19         bank-account-holder, there would be an issue potentially

20         as to confidentiality, wouldn't there, Mr del Rosso?

21    A.   Well, I don't know the legal technicalities for that,

22         but in certain parts of the world where -- and

23         especially in India, they -- some of our subjects ran

24         for political office and they had to publish all of

25         their bank account information, holdings, assets, such

1          as that.

2     Q.   Would you go, please, to paragraph 5 of your

3          witness statement at {D/5/2} where you refer to

4          Mr Stuart Page.  Can you see that?

5     A.   I do, sir, yes.

6     Q.   You say, ... he works in a similar industry to me".  So

7          can his Lordship take it -- were you in court when

8          Mr Page gave evidence yesterday?

9     A.   I was not, your Lordship, no.

10    Q.   Have you read a transcript from yesterday, Mr del Rosso?

11    A.   I haven't, sir, no.

12    Q.   Mr Page is involved in investigative work.  Were you

13         aware of that?

14    A.   Yes, I think that's a fair description of what he does.

15    Q.   How did you hear of Mr Page?

16    A.   I heard of him through this particular investigation or

17         project that we were on.  I knew he was working for

18         His Highness on this matter.

19    Q.   So when we see in paragraph 5 {D/5/2} the last sentence

20         where you say this, "I do not know Stuart Page but I had

21         heard of him because he works in a similar industry to

22         me", in fact you hadn't heard of Mr Page simply because

23         he works in a similar industry to you.  You'd heard of

24         Mr Page because you knew he'd worked for RAK or RAKIA

25         like you had done since August 2014?

1    A.  No, I'm not engaged by RAK or RAKIA.  I'm engaged by

2        Dechert.  Stuart Page does work in a similar industry to

3        me and I had heard that during the course of this

4        matter, so, yes.

5    Q.  I think your answer was -- your answer initially was

6        that you'd heard of Mr Page because he was also engaged

7        in relation to this -- to investigations that were being

8        carried out for or on behalf of RAK or RAKIA for the

9        Ruler.

10   A.  Yes, he was engaged in a similar sort of work.  I don't

11       know what he was doing, but he works in a similar

12       industry in that he is investigating whatever it is that

13       he investigates.

14   Q.  And you think that what you do is similar to what

15       Mr Page does, as far as you can tell?

16   A.  Well, in a very general term, sir.  I don't know what he

17       does so I can't really comment on it.  I'm just saying

18       that in a general term we work as investigators.

19   Q.  Yes, but you say "he works in a similar industry to me".

20       You see, it's your words, not mine, Mr del Rosso.  So

21       for you to say that, you must be in a position to assess

22       first what you do and secondly, by definition, what

23       Mr Page does, mustn't you, Mr del Rosso?

24   A.  Well, I know that he works as an investigator.  He's

25       also provided security.  To me that's a fairly similar

```
 1          industry.  You're just splitting hairs now, really.
 2     Q.   So his Lordship can take it that you -- as far as you're
 3          concerned, you do similar sorts of work to Mr Page?
 4     A.   I don't know what he does, sir.  I know that he does
 5          investigation, he provides security.  I can't answer
 6          beyond that.  I have never worked with him.  I don't
 7          know him.
 8     Q.   Had you heard of suggestions that Mr Page on occasion
 9          gathered information through agents using illegal
10          methods?  Had you ever heard that?
11     A.   Not until recently, sir, no.
12     Q.   Had you heard it suggested that confidential emails may
13          have found their way into the press through Mr Page's
14          offices?  Had you ever heard that suggestion?
15     A.   I wasn't aware of that, sir, no.
16     Q.   During the course of your work from August 2014 -- or
17          when did you first learn of Mr Page's existence
18          after August 2014 or did you know about him
19          before August 2014?
20     A.   I don't think I knew of him before maybe end of
21          2015/early 2016.  I don't think so.
22     Q.   And how did you come across Mr Page?
23     A.   I've never met him.  I don't know him, my Lord.
24     Q.   Are you saying you've never actually met Mr Page?
25     A.   I haven't, no.
```

```
1    Q.  Have you spoken to Mr Page on the telephone?

2    A.  I've had no contact with him at all.  Never spoken to

3        him, seen him.  If he walked past me today, I couldn't

4        recognise him, my Lord.

5    Q.  Mr Buchanan gave evidence -- in the course of your work

6        that you described in your witness statement, did you

7        come across Karv Communications, Mr del Rosso?

8    A.  During the course of my work, did I ...?  Sorry,

9        I missed the word you said in between.

10   Q.  Come across Karv Communications.

11   A.  I became aware of them, my Lord, yes.

12   Q.  How and when?

13   A.  I can't remember when, but I was introduced to

14       Andrew Frank at some point during this process.  I don't

15       know when that was exactly now.

16   Q.  You were engaged in relation to investigating potential

17       frauds allegedly committed by Dr Massaad and others

18       against the Government of RAK, weren't you,

19       Mr del Rosso?

20   A.  Yes, initially it was against Dr Massaad.

21   Q.  And then who did it extend to?

22   A.  Actually my role changed and I focused on India and

23       frauds in India at sort of January/February of 2015.  So

24       I wasn't really engaged with Dr Massaad post that

25       period.
```

1    Q.   Mr Page has given evidence that he was also -- he was

2         engaged in investigating wrongdoing by Dr Massaad and

3         the misappropriation of assets; all right?

4    A.   I don't know what his role was, sir, no.

5    Q.   He has given evidence that that's what he did.

6    A.   Well, I can't comment on that.  I don't know that --

7    Q.   You don't know what I'm going to ask you yet.

8    A.   No, you posed it as a sort of a question or -- if it's

9         just a statement, then we'll leave it there.

10   Q.   Let's look at {D/3/4} so you can see what Mr Page has

11        said, Mr del Rosso.  This is Mr Page's evidence.  Can

12        you look at what he says in the top five or six lines in

13        paragraph 12, please?

14   A.   Okay.

15   Q.   On the face of it, it looks as if there was some -- at

16        least some overlap between what Mr Page was allegedly

17        investigating in reference to Dr Massaad and what you

18        were investigating, at least to the extent of looking

19        into the alleged misappropriation of assets.  Do you

20        agree?

21   A.   When was this?  What date does this refer to?

22   Q.   This is from the beginning of 2015.

23   A.   In that case there was no overlap, no.  I had stopped

24        investigating or being involved in Massaad's activities.

25   Q.   By when?

1    A.   As I said, sort of January/February time of 2015.

2         I was -- I had been moved on to working on other

3         matters.

4    Q.   What, unconnected to Dr Massaad?

5    A.   Unconnected to Dr Massaad personally, but certainly

6         connected to some of his activities that had taken place

7         in India, some of them.

8    Q.   So you were still working on investigating frauds

9         allegedly involving in some way Dr Massaad, weren't you?

10   A.   In a very broad sense, sir.  I was actually

11        investigating other individuals in India and their

12        involvement in certain transactions that had taken place

13        over there.

14   Q.   But also because there was also potentially the

15        involvement of Dr Massaad in those matters, wasn't

16        there?

17   A.   I think pretty much all of this has some touch of

18        Dr Massaad about it somewhere, sir.

19   Q.   Yes, so, Mr del Rosso, there was a -- RAK or RAKIA were

20        investigating what they thought was some sort of major

21        fraud or frauds by Dr Massaad, weren't they?

22   A.   And others, yes.

23   Q.   Yes, and there was effectively -- Mr Buchanan gave

24        evidence of a global investigation, Mr del Rosso.  I'm

25        sure you were aware of that, weren't you?

```
 1    A.   I'm aware there was a very substantial investigation and
 2         I am aware of my role in that, yes.
 3    Q.   And it stretched across several countries across the
 4         globe, didn't it?
 5    A.   Mine or the RAKIA --
 6    Q.   The RAKIA investigation.
 7    A.   Yes, I understand that to be the case, my Lord.  There
 8         was a --
 9    Q.   I understand your evidence, that you were looking at
10         particular aspects of that fraud --
11    A.   Right.
12    Q.   -- but it was part -- it was still part -- what you were
13         doing was part of the overall RAK or RAKIA
14         investigation, wasn't it, Mr del Rosso?
15    A.   It was a part of whatever Dechert were being tasked to
16         do and I was doing a part of that, yes -- involved in
17         a part of that, rather than saying "doing it".  I was
18         involved in a part of that.
19    Q.   And therefore it's not right for you to say that from
20         early 2015 your investigative work as it might have
21         concerned Massaad matters had finished.  That wasn't
22         right, was it?  That was untrue?
23    A.   Yes, I was no longer investigating anything to do with
24         his personal finances or anything else like that, sir,
25         yes.
```

```
 1    Q.   But you were investigating frauds allegedly committed in
 2         India and other places in which Dr Massaad may have
 3         played a part, weren't you?
 4    A.   He had played a part.  I was investigating other
 5         individuals connected to those frauds.
 6    Q.   Because I suggest to you, Mr del Rosso, that there was
 7         at least some overlap between what you were
 8         investigating and what Mr Page was apparently
 9         investigating in 2015.
10    A.   I don't know what Mr Page was investigating or when.
11         I didn't know then.
12    Q.   And it seems a bit puzzling that you seem to have had no
13         contact at all with Mr Page, notwithstanding what I'm
14         putting to you, that there looks on the face of it to be
15         at least some potential overlap between the
16         investigative work that you're each doing.  And
17         can I explain what I mean by that?  If Mr Page comes
18         across something juicy in what he's investigating by way
19         of Massaad wrongdoing and you're trying to investigate
20         stuff that's frauds that Massaad may have played a part
21         in, because money can flow around the world now quite
22         easily, it's likely, isn't it, Mr del Rosso, that you'd
23         be interested in possibly information from Page and
24         vice versa?  There would be a sort of pooling, wouldn't
25         there, of that information or was it all kept very
```

1          separate?

2     A.   Well, I reported to the law firm Dechert, and if they

3          had information that came from some other source that

4          they wished to share with me, they would do so.

5     Q.   And your evidence is that you didn't speak to Mr Page at

6          all during 2015; is that right?

7     A.   I've never spoken to him, sir.  That was my evidence.

8     Q.   Never in your life?

9     A.   Never, no.

10    Q.   And you have no idea of what work he performed therefore

11         at all?

12    A.   Frankly, none of my business.  It's his.

13    Q.   So is the answer that you have no idea on oath -- you

14         have no idea sitting there on oath -- what Mr Page

15         performed in 2015 in relation to the Ruler or RAK or

16         RAKIA?

17    A.   My Lord, I realise I'm on oath.  I did not know what

18         Mr Page was doing in 2015, no.

19    Q.   At that time?

20    A.   At that time, yes.

21    Q.   And do you now know what he was doing?

22    A.   Not really, sir.  I haven't read his statement.  It

23         wasn't made available to me.  I haven't read it.

24    Q.   So if we go to {H7/299}, you can see that there's

25         something called a "RAK Project Update".  Do you see

```
 1          that?

 2    A.    I do, yes.

 3    Q.    Have you seen this document before, Mr del Rosso?

 4    A.    I have not, sir, no.

 5    Q.    Never in your life?

 6    A.    I haven't, sir, no.

 7    Q.    Not even preparing to give evidence today?

 8    A.    It doesn't look as though it's anything to do --

 9          I didn't produce this document, sir, no.

10    Q.    No.  There's been evidence that this is a project update

11          which Mr Page or his firm produced as part of his work;

12          all right?  Do you see that?  If you go to {H7/299/2},

13          can you see it starts, "In the US ..."?

14    A.    Right.

15    Q.    "In the US, KM's hired a team of advisers managed by

16          Farhad Azima ... in order to spread allegations against

17          our client."

18              Can you see that?

19    A.    I can, sir, yes.

20    Q.    And you were based in 2015 in the US, weren't you,

21          Mr del Rosso?

22    A.    I was, sir, yes.

23    Q.    Are you aware of any other investigators retained by or

24          on behalf of RAK, RAKIA or the Ruler in 2015, whether

25          through Dechert or any other agent or whether retained
```

```
 1         directly, who operated in the US apart from your firm,
 2         Mr del Rosso?
 3    A.   I wouldn't know, sir, no.
 4    Q.   Are you aware of any others apart from your firm,
 5         Mr del Rosso?
 6    A.   I'm not aware.  I wouldn't know if they had or hadn't,
 7         sir.
 8    Q.   So you are not aware of any other investigative firms in
 9         the US working for the Ruler, RAK or RAKIA in 2015 apart
10         from you?
11    A.   I think I've made it quite plain, sir.  I wasn't aware
12         of anyone else and I wouldn't know.  They wouldn't share
13         that with me if they had.
14    Q.   Is that the same in 2016 as well?
15    A.   2016 ... Yes, I didn't know -- I don't think I knew
16         anyone else who was working, no.
17    Q.   And did you have any cause to have any dealing with
18         Karv Communications in 2015?  Did you deal with them?
19    A.   With Karv Communications?  Not on a professional basis.
20         I might have had -- met with Mr Frank on -- but
21         I haven't -- I don't know -- I mean, I don't think
22         I did, but ...
23    Q.   Why would you meet Mr Frank socially or personally,
24         rather than professionally?  Is he a friend of yours?
25    A.   He's not a friend -- well, he's become a friend,
```

1          actually, over the course of this thing, this process,

2          but I don't recall having met with him.

3   Q.  Where does Mr Frank live?  Where is he based?

4   A.  I think he's in New York.

5   Q.  You say that "over the course of this thing" he had

6          become a friend.  What's the "thing"?

7   A.  Well, since 2014, August 2014, I've been involved

8          somewhere in this massive investigation.  My role was

9          directed by Dechert and, during the course of that,

10         I know that I've met Mr Frank.  I couldn't tell you the

11         dates.

12  Q.  And is there anybody else -- any other agents or

13         entities that you've come across in relation to this

14         retainer of yours other than Dechert and Mr Frank, let's

15         say, in 2015 or 2016, anybody else?

16  A.  I'm pretty sure I would have met Mr Handjani at some

17         point as well.

18  Q.  When was that, do you think?

19  A.  I don't know.  I really don't know, sir.  I couldn't

20         even hazard a guess at that.

21  Q.  And where do you think you met Mr Handjani?  Which

22         country did you meet him in?

23  A.  I'm going to have to say it was probably in New York

24         because I don't think I met him elsewhere other than the

25         fact that he's in court.

```
 1    Q.   And why did you have cause, do you think, to meet with
 2         Mr Handjani?
 3    A.   He was involved in this matter somehow.  I'm not
 4         entirely sure of his role, but he's an adviser to
 5         His Highness and so I would have met with him.  That's
 6         part of what I consider client development of business.
 7    Q.   Did you ever meet the Ruler?
 8    A.   I have met the Ruler, yes, sir.
 9    Q.   When?
10    A.   Again dates ... probably not until 2017/2018.
11    Q.   So not in 2015?
12    A.   I don't believe so, no, sir.
13    Q.   Are you sure about that?
14    A.   I'm not sure of it, but I am fairly comfortable in
15         saying that I didn't -- wouldn't have been introduced to
16         him.  I wasn't really that much of a role-player in this
17         at all.
18    Q.   And what prompted your meeting with the Ruler when that
19         first happened?  What caused that to take place?
20    A.   I believe he had asked through Mr Buchanan or someone to
21         provide security to his daughters or some of his
22         children when they were travelling and I arranged that.
23    Q.   So you provided security for the Ruler's family?
24    A.   Yes.
25    Q.   And do you still do that?
```

```
1    A.  I do not, sir, no.  It was a one-off situation.

2    Q.  And where did you meet the Ruler?  In the Palace?

3    A.  In his palace, yes.

4    Q.  And have you met him on any other occasion?

5    A.  It's possible, sir.  I've been to the Palace and it may

6        well have been that I've met him more than that one

7        time, but no more than one other time.

8    Q.  And why did you meet him on the other occasion?

9    A.  I really don't recall now, sir.

10   Q.  And his Lordship can take it that you have no knowledge,

11       do you, of the matters we see in this project update

12       report that I took you to at {H7/299}?  Can you just

13       flick through that report and see whether any of that

14       rings a bell, whether you remember any of these matters?

15       (Pause)

16           Have you read that, Mr -- or skimmed through it

17       anyway, Mr --

18   A.  Well, there's not very much in there.  It's mostly

19       redacted.

20   Q.  But you can see the stuff that's not redacted?

21   A.  Right.

22   Q.  You've read that?

23   A.  Yes, that hasn't originated from me, sir, no.

24   Q.  And were you aware of this concern about an alleged plan

25       to smear the Ruler?  Were you aware about that back in
```

1       2015, for example?

2  A.  I became aware of it, but I'm not sure when.  I couldn't

3       tell you today what date that was.

4  Q.  And how did you become aware of it?

5  A.  I'm sure I've heard of it.

6  Q.  From whom?

7  A.  I don't remember, my Lord.

8  Q.  I'm going to ask you, please, about the role you played

9       in the discovery.  Can I ask you, please, to go back to

10      your witness statement, starting I think in paragraph 5,

11      please, Mr del Rosso, at {D/5/2}.  You see:

12        "In early August 2016, I received a telephone call

13      from Neil Gerrard of Dechert."

14        You think that's now 8 August, do you?

15  A.  It was, sir, yes.

16  Q.  How do you know it's 8 August?  You seem quite sure

17      about that.  What's the basis for that sureness?

18  A.  I was reviewing my statement before coming to court some

19      time before Christmas, just before Christmas when I had

20      some downtime.  I realised that it seems a little open

21      and I -- what I should have done before I made the

22      statement, I did then, and that was call my lawyer,

23      Chris Swecker, and I asked him when I had called him and

24      when he had referred NTi to me, and he told me it was on

25      8 August.

```
 1   Q.  So that was when -- sorry -- it's when you think you
 2       called Chris Swecker, he referred NTi to you?
 3   A.  Yes, and Neil Gerrard called me, and I called
 4       Chris Swecker, who subsequently referred NTi to me.
 5   Q.  And how long after Mr Gerrard's call did you call
 6       Mr Swecker?
 7   A.  I just don't know.  It was the same day.
 8   Q.  And Mr Swecker has a note of that, does he?
 9   A.  Mr Swecker has a note of that, yes, sir.
10   Q.  Can you be shown {H10/251} please?  Sorry, can we go to
11       {H10/246}.  It's my fault.  Sorry, Mr del Rosso.
12       {H10/246}.
13           Can you see there are some emails there on 9 August
14       2016 --
15   A.  There are, yes.
16   Q.  -- involving you and copying Mr Swecker and NTi.  Can
17       you see that?
18   A.  Yes, sir.
19   Q.  If you go to {H10/248} -- I'm not quite sure what that
20       is -- "Email from Swecker dated 08 ..." -- that's
21       12 August 2016.  Can you see that?  I think it's an
22       extract from an email.  Sorry, Mr del Rosso, if you go
23       back to {H10/246} -- it's my fault.  I got the date and
24       the month the wrong way round -- the first documents
25       that advert to this finding of material on the internet
```

1        concerning Mr Azima seem to be on 9 August 2016.

2  A.  Yes, that's correct, sir, yes.

3  Q.  And you think you spoke to Mr Gerrard on the 8th, do

4        you?

5  A.  Yes, sir.

6  Q.  And you waited until the following day before you got in

7        touch with Mr Swecker; is that right?

8  A.  No, sir.  I got in touch with Mr Swecker on the 8th and

9        he set up a call for me with NTi on the 9th.

10  Q.  Then can we go, please, to H10 -- you see what's on

11       {H10/246}.  There are some exchanges about -- or contact

12       information between you and NTi.  Can you see that?

13  A.  Yes, sir.

14  Q.  Then {H10/251} -- you need to start looking at it at

15       {H10/251/2} -- can you see that you sent an email on

16       9 August 2016?

17  A.  Yes, sir.

18  Q.  You sent an email to Mr Swecker.  Can you see that?

19       I think that's right, isn't it?

20  A.  It is, yes.

21  Q.  Have you seen this email before, Mr del Rosso?

22  A.  Yes, I think we produced that to the client, yes.

23  Q.  If you keep that open, if you don't mind, and if you

24       please go to paragraph 9 of your statement, please, at

25       {D/5/3} -- have them open at the same time -- can you

```
 1          see what you say in paragraphs 9 and 10?
 2     A.   (Pause)   Yes, sir.
 3     Q.   Can his Lordship take it that the first time you spoke
 4          to Mr Gerrard in relation to these matters was 8 August
 5          2016?
 6     A.   Yes, sir.
 7     Q.   And you see what you've said in paragraph 10 of your
 8          witness statement.  You've referred to the email that
 9          I'm showing you at {H10/251/2}, haven't you,
10          Mr del Rosso?
11     A.   Yes.
12     Q.   That's the email you're referring to in paragraphs 9
13          and 10, isn't it?
14     A.   Yes, sir.
15     Q.   And in paragraph 10 you say this, the last sentence
16          of 10 {D/5/3}:
17              "I recall that these statements were reports of
18          information that Neil had told me during our call."
19              Can you see that?
20     A.   I do.
21     Q.   So his Lordship can take it, can he, Mr del Rosso, that
22          what you have included in the email of 9 August 2016 at
23          11.47 am represents a contemporaneous account by you of
24          what Mr Gerrard told you in a call on 8 August 2016?
25     A.   Well, contemporaneous, no, but it was a record of my
```

1      recollection of the conversation from the previous day,

2      yes.

3   Q. Yes, and you're satisfied with the accuracy of your

4      email account there, aren't you, Mr del Rosso?

5   A. I can't recall the specific content of the

6      conversation --

7   Q. No?

8   A. -- but that is certainly my email.

9   Q. Yes.  Well, if we look at the email, you said this:

10     "Chris

11     "I've spoken to Rich Garcia and agreed that you will

12     instruct his company on this matter.

13     "I've told him that as recently as last week -- we

14     were advised by researchers that a deep web search ..."

15     And so it runs on.  Do you see that?

16  A. I do, sir, yes.

17  Q. In the main paragraph you say at the end:

18     " ... there may be further sites with more

19     information."

20     What were you talking about there, as best you can

21     tell, Mr del Rosso?

22  A. I couldn't remember that now, sir, no.

23  Q. Can we then just walk through, please, Mr del Rosso --

24     also, do you know why you'd been involved by Mr Gerrard

25     in this respect?  Do you know why you, in the US,

1          investigating Indian matters and other things -- why

2          he'd asked you to get involved with this?

3     A.   I don't, sir, no.  That's a question for him.

4     Q.   But you can't identify any reason for your being

5          involved?

6     A.   Not on the face of it, sir, no.

7     Q.   Thank you, Mr del Rosso.  I want to go through,

8          please -- I want to go through, if I may, the

9          intervening work that was carried out.

10          You can see this is 9 August and you're speaking to

11         Mr Swecker.  Then if you would be kind enough, please,

12         to go to {H10/251/1}, you can see the further emails.

13         Can you see the further emails there?

14    A.   Yes.

15    Q.   You can see the exchanges.

16    A.   Mm-hmm.

17    Q.   Following on from your email to Mr Swecker, Mr Swecker

18         I think sent an email to you for you to review that he

19         drafted by way of a proposed engagement letter of NTi.

20         Can you see that?

21    A.   I can.

22    Q.   That seems to have been on 11 August, which was

23         a Thursday.  Then you, I think, chased Mr Swecker on

24         12 August to say:

25              "Chris -- did this go out -- it's time critical.

1           Thanks."

2               And he said:

3               "Just sent it Nick.  I will call Rich and ask him to

4           expedite.  Chris."

5               Again on 12 August.  Can you see that?

6       A.  I can, yes.

7       Q.  So can his Lordship take it that Mr Gerrard had led you

8           to understand that this was an urgent task?

9       A.  I can't -- I don't recall the conversation.  My take on

10          this was that this was a potential business opportunity

11          and I didn't want Chris sitting on it too much longer

12          and I chased him.

13      Q.  You were here, weren't you, doing work for -- at the

14          instruction of Mr Gerrard?

15      A.  I was here -- in relation to this matter here?

16      Q.  Yes.  You're effectively assisting Mr Gerrard following

17          the telephone call you had with him on 8 August, aren't

18          you, Mr del Rosso?

19      A.  Yes, sir, yes.

20      Q.  And as part of that you are locating and retaining NTi?

21      A.  Eventually, yes.

22      Q.  Yes.  Did you have to revert to Mr Gerrard, as the

23          source of your instructions for this work, to get

24          approval for the choice of NTi and their retention?

25      A.  I'm absolutely sure that I would have, sir, yes.

```
 1    Q.   It's likely, isn't it, you'd have spoken to Mr Gerrard
 2         to say, "I think NTi would be a good firm to use.
 3         Can I use them?  This is what they're going to cost",
 4         all that sort of conversation?
 5    A.   That would sound logical, yes, sir.
 6    Q.   And it's likely, isn't it, that you'd have had that
 7         conversation before you actually retained NTi?
 8    A.   Before I retained ...?
 9    Q.   NTi -- before you actually engaged them formally?
10    A.   Yes, at some point, sir, yes.
11    Q.   But it's likely you'd have checked with Mr Gerrard
12         before you had actually engaged NTi to perform the task
13         we're looking at here?
14    A.   Yes.
15    Q.   If we go to {H10/253}, please, you'll see there's an
16         email on 12 August 2016 from you to Mr Swecker, "Further
17         sites" -- can you see that?
18    A.   Yes, sir.
19    Q.   -- which you sent.  Then at {H10/254} you can see some
20         exchanges on -- some more on the 13th.  You can see that
21         there's some exchanges -- can you see?
22    A.   I can.
23    Q.   What happens on that day, I think, is that Mr Swecker --
24    A.   Are you talking about 254?
25    Q.   Yes, sorry, Mr del Rosso, I'm at 254.  I'm struggling to
```

```
 1          see who is talking to whom, but you're definitely --
 2          it's a sea of squiggles.
 3     A.   Yes.
 4     Q.   It looks like Mr Swecker, on Saturday, August 13th, has
 5          sent on -- has forwarded -- yes, has forwarded to NTi --
 6          that's Rich Garcia -- some further sites which "Nick" --
 7          that must be you -- "has learnt about".  Does that look
 8          right to you?
 9     A.   It does, sir, yes.
10     Q.   Thank you.  You can see at the top there's a request
11          that the rubric "Privileged Attorney Client
12          Communication" be added to all these communications.
13          Can you see that?
14     A.   Yes.  Most of these communications should be privileged.
15     Q.   So work was being undertaken, wasn't it, in relation to
16          these sites, these online sites, for Mr Gerrard on
17          Friday, 12 and Saturday, 13 August?
18     A.   That's what it appears to be, yes.
19     Q.   It looks, doesn't it, as if the downloading operation --
20          if you go to {H10/256}, please, you see an email from
21          Mr Garcia on the 13th, which is the Saturday, to
22          Rich Garcia:
23              "Subject: Re: Nick's case."
24              And "Nick" would be you, wouldn't it, Mr del Rosso?
25     A.   Yes.
```

1    Q.  And he says:

2            "Will do Chris.  We are using a double layer proxy

3            server that is anonymous ..."

4            Can you see?  And then it runs on.

5    A.  Yes.

6    Q.  Then, at the top, Mr Swecker sent this to you on

7        Sunday the 14th for your information.  Can you see that?

8    A.  Yes.

9    Q.  It's likely, isn't it, Mr del Rosso, that you would have

10       told Mr Gerrard by this date the state of the

11       downloading operation as it then was?

12   A.  Again, I don't know that, sir, no.

13   Q.  But it's likely, isn't it, that you'd have kept him

14       apprised of matters?

15   A.  Not until I had some sort of -- something substantive to

16       say to him.  Anyway, I don't recall this -- the

17       conversations during this period, no.

18   Q.  If we go to {H10/257}, please, this is an email exchange

19       on 15 August 2016 between you and Mr Gerrard.  Have you

20       looked at these emails recently, Mr del Rosso?

21   A.  Yes, it appears to be my email chain or come from my

22       email anyway.

23   Q.  Yes.  Have you looked at a copy of these recently?

24   A.  Yes, in preparation.

25   Q.  In preparing for this, yes.  So it's an exchange between

1          you and Mr Gerrard on 15 August, isn't it?

2     A.   Yes.

3     Q.   It is a Monday.

4     A.   Okay.

5     Q.   All right?  And we've established -- you can see the

6          exchange.  Mr Gerrard wrote to you first:

7               "Nick,

8               "I've had another call from Stuart who confirms

9          again that there is a website on FA.  He seems to think

10         it's been generated from a UAE source.  I've asked for

11         details.  He said he would try and get them to me.  Can

12         you undertake a search for it?"

13              And you write back on the same day:

14              "Hi Neil.

15              "Ok -- following up on our last conversation

16         regarding Stewart's findings I instructed NTi to search

17         and recover what may be on them; that's underway and I'm

18         sure they'll try to analyse where the sites came from.

19              "If Stewart can provide you the site addresses he is

20         finding we may be able to avoid duplicating efforts.

21         How does he know it was set up in the UAE?

22              "I expect we'll get initial results this week."

23              Now, you're telling Mr Gerrard this, you're saying,

24         "Following our conversation, I instructed NTi to search

25         and recover what may be on them, that's underway", it's

1    likely, isn't it, that you would have told Mr Gerrard

2    that before 15 August 2016?

3    A.   That they'd been instructed?

4    Q.   Yes.

5    A.   It's possible.  I don't recall that.

6    Q.   But it's likely, isn't it, as we discussed before, that

7    before you actually retained them, you'd have told

8    Mr Gerrard that you were proposing to do that and get

9    his authority to go down that path, wouldn't you?

10   A.   Again, I said I don't recall a specific conversation,

11   but I would imagine I would have got some approval for

12   it, yes.

13   Q.   So he would have known that you had already instructed

14   NTi before this email of 15 August 2016, basically?

15   A.   I don't recall that.

16   Q.   He responds:

17        "Okay, thanks.  No idea why he says it emanates from

18   the UAE.  I will ask."

19   A.   Yes, sir.

20   Q.   Did he ever get back to you in relation to that response

21   of his, in other words --

22   A.   I really don't remember -- unless it's in this email

23   chain, no.

24   Q.   If you go to {H10/263}, you see -- if you keep that open

25   at the same time as {H10/257} you can see that those

1          pages have the same two initial emails on 15 August, one

2          from Mr Gerrard to you and one from you back to him --

3     A.   Right.

4     Q.   -- but they have different responses from Mr Gerrard.

5          The one on {H10/257} comes on 15 August and reads at the

6          top:

7              "Okay, thanks.  No idea why he says it emanates from

8          the UAE.  I will ask."

9              And that at {H10/263} says:

10             "Okay.  Will ask him for details."

11    A.   Yes.

12    Q.   Can you see that?

13    A.   I do, yes.

14    Q.   It's puzzling, isn't it, Mr del Rosso, why Mr Gerrard

15         should send you another short response on 16 August when

16         he seems to have sent you the one he did on the 15th?

17    A.   I've really no idea.  It may be he just sent

18         a duplicate.

19    Q.   Is it right, Mr del Rosso, that by this time you were

20         aware that the information that was being procured from

21         the internet on behalf of RAK or RAKIA had been

22         illegally obtained?

23    A.   At which time?  On August 15?

24    Q.   Yes.

25    A.   I wasn't, no.  I wasn't aware of what the information

```
 1            was on there.
 2     Q.    Were you perhaps turning a blind eye to the provenance
 3            of that material?
 4     A.    No, I couldn't have been aware until NTi had downloaded
 5            it.
 6     Q.    And is that why we see the rather strange email
 7            exchanges on 15 and 16 August 2016 between you and
 8            Mr Gerrard?
 9     A.    Well, that's your description, "strange".  I don't see
10            that there's anything strange in those, no.
11     Q.    But you can't give any reason for why you were otherwise
12            involved in this exercise with Mr Gerrard, can you?
13            You can't give any reason as to why you should have
14            been called up to help with this exercise?
15     A.    No, sir, that's not my place to ask.  I'm just going to
16            take the business, yes.
17     Q.    And is it because you are prepared to -- is it because
18            what was happening here is you were assisting Mr Gerrard
19            in this download operation and you were not asking too
20            many or in fact any questions?
21     A.    That isn't correct, sir.  I took advice from my attorney
22            once we knew what was on the site and we discussed
23            whether this was something that we could proceed with,
24            my Lord.  We didn't know what was on the site until
25            then.
```

```
 1    Q.   And did you ever get the further details in relation to
 2         why this was thought to be a UAE source?
 3    A.   I think from NTi eventually, yes.
 4    Q.   And is there some record of that that you've got on your
 5         files?
 6    A.   No, it's on the NTi -- it's in the NTi documentation,
 7         yes.
 8    Q.   And you've seen that, have you?
 9    A.   I have, yes.
10    Q.   Could I ask you, please, to go to {H10/281}?  It's an
11         email from you on 1 September 2016 to Mr Swecker,
12         Mr Garcia and Ms Gray.  Do you see that?
13    A.   Yes, sir.
14    Q.   You see what it says.  Remind yourself of it.  I'm sure
15         you read it recently.  Can you seen that?
16    A.   Mm-hmm.
17    Q.   Thank you.  There's a reference to, "The client's
18         'spotter' in Dubai has reported a new data dump".
19    A.   Yes, sir.
20    Q.   Who did you think was the client's spotter?
21    A.   I believe the client's spotter was Page.  That's what
22         I had been told before, yes.
23    Q.   It says:
24             "I can't open the message (no good signal) to give
25         you the link -- could you search and if anything exists,
```

```
 1            download.  If not I'll get home tonight and will be able
 2            to open the file with the supposed links."
 3               Do you see that?
 4       A.   I do, yes.
 5       Q.   You're referring here to your messages, aren't you?
 6       A.   To my ...?
 7       Q.   "I can't open the message ..." -- you've received the
 8            message, haven't you?  That you're talking about here?
 9       A.   Yes, that's what it reads, yes, sir.
10       Q.   What kind of message do you think you were referring to
11            there?
12       A.   Really no idea, sir, no.
13       Q.   And you're talking about messages that have been sent to
14            you from Mr Swecker, Mr Garcia and Ms Gray, aren't you?
15       A.   Sent to me by them or I was sending a message to them.
16       Q.   About websites concerning Mr Azima?
17       A.   I sent a message to them, yes.
18       Q.   These messages or the message you're describing, no
19            messages fitting that description have been disclosed,
20            Mr del Rosso.
21       A.   I'm aware of that, sir, yes.
22       Q.   Can you explain why they haven't been disclosed?
23       A.   Because I've been unable to find them.
24       Q.   And where have you looked?
25       A.   I engaged a law firm, independent law firm, to look for
```

1          them.  They were unable to find them as well, sir.

2          They've been through all of my data.

3     Q.   Did they look at your email accounts?

4     A.   They did, yes.

5     Q.   And WhatsApp messages?

6     A.   I don't use WhatsApp, sir, no.

7     Q.   Text messages?

8     A.   If they existed, yes.

9     Q.   It's likely, isn't it, you'd have sent emails to NTi, as

10         we've seen you do earlier in August 2016?

11    A.   Well, this is an email to NTi, yes, sir.

12    Q.   Sorry?

13    A.   This is an email to NTi, yes.

14    Q.   Yes, so can you explain why the rest of this exchange,

15         email exchange, doesn't seem to have shown up in your

16         records?

17    A.   Are you talking about the emails to NTi or the message

18         that came in from Dubai?

19    Q.   The messages -- "Hi saw your messages" at the top.

20         You're saying:

21              "Hi saw your messages but could not get strong

22         enough ... signal ..."

23              What are you talking about there?  What messages are

24         you talking about?  This is to Swecker, Garcia, Ms Gray.

25              "Hi saw your messages ..."

1           And we haven't -- I don't think we've seen --

2     A.   I don't know, sir.  I don't know.  You had asked me

3          about the client spotter.  I thought that's what you

4          were talking about.

5     Q.   So there's likely some other email communications to

6          you, these messages, which we haven't -- which seem now

7          not to be available; is that right?

8     A.   That is correct, sir, yes.

9     Q.   And also on that page, a bit further on down, there's

10         a reference to "I can't open the message" from the

11         "client's 'spotter'".  You think that's a reference to

12         Mr Page, do you?

13    A.   I thought that's what you'd asked, sir, yes.

14    Q.   No, I asked who it was and I think you said you thought

15         it was Mr Page; is that right?

16    A.   That's what I believed, yes.

17    Q.   "I can't open the message ..."

18              What sort of message are you talking about?  Email

19         message there presumably?

20    A.   I wouldn't have received anything from Mr Page, no.  It

21         would have been ...

22    Q.   Right.

23    A.   -- Dechert or Neil Gerrard -- somebody from Dechert or

24         Neil Gerrard.  I wasn't dealing with Mr Page.

25    Q.   I think it was your evidence that the "client's

1          'spotter'" reference was probably to Mr Page, as you saw

2          it.

3     A.   Right, but, "The client's 'spotter' in Dubai has

4          reported a new data dump".  He wasn't reporting it to

5          me.

6     Q.   I see.  And you say:

7              "I can't open the message ..."

8     A.   Yes, I couldn't open the message.  I don't know why it

9          says -- well, it says "no good signal", so I was

10         obviously out or I was travelling and I couldn't open

11         it.

12    Q.   And that message hasn't been disclosed either,

13         Mr del Rosso.  Were you aware of that?

14    A.   I'm aware of it, sir, because I can't find it.

15    MR LORD:  Thank you, Mr del Rosso.

16             I'm sorry, my Lord.  I apologise for running over,

17         but I wanted to try to finish.

18    MR TOMLINSON:  My Lord, I've no re-examination.  Has

19         your Lordship any questions for this witness?

20    JUDGE LENON:  No.  Thank you, Mr del Rosso.

21    MR TOMLINSON:  My Lord, can I hand up the documents that

22         I mentioned when Mr King gave evidence?

23             First of all, there's the -- the coloured one is the

24         whole of the WhatsApp exchange and then the two other

25         documents are the notice about document preservation.

1          Your Lordship will appreciate that in November 2016

2          there was no issue about emails and Digitalis in this

3          action, so this comes from the -- the issue is in the

4          US action.  So this is the litigation hold notice from

5          Dechert in the US, not from Dechert in England.

6              My Lord, Mr King is here but I would obviously like

7          to be able to release him.

8     JUDGE LENON:  Well, I'm giving Mr Lord a moment to look at

9          it to see if he wants to ask any further questions.

10         (Pause)

11    MR LORD:  My Lord, does your Lordship have the litigation

12         hold policy?  If your Lordship looks at the bottom of --

13         addressed to Digitalis, Mr Buchanan -- the bottom of

14         page 1 refers to "... documents reflecting or relating

15         to communications with Mr Azima on or after

16         23 July 2016, including notes regarding negotiations

17         with RAKIA's former chief executive officer during this

18         period are relevant to the litigation".  That appears to

19         be a reference to Dr Massaad.  I don't require this

20         gentleman to be recalled, but that is plainly

21         a reference to Dr Massaad.

22    JUDGE LENON:  On that basis I formally release Mr King.

23    MR TOMLINSON:  My Lord, I'm grateful.

24         (1.05 pm)

25                        (The luncheon adjournment)