# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No.: 1:21-mc-00006-UA-LPA

---------------------------------------------------------X

*In re* **Application of KARAM SALAH AL
DIN AWNI AL SADEQ and STOKOE
PARTNERSHIP SOLICITORS for an
Order under 28 U.S.C. § 1782 to Conduct
Discovery for Use in Foreign Proceedings**

---------------------------------------------------------X


## MEMORANDUM OF LAW IN OPPOSITION TO NICHOLAS DEL ROSSO
## AND VITAL MANAGEMENT SERVICES, INC.'S
## MOTION TO QUASH OR FOR A PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ................................................................................4

ARGUMENT ....................................................................................................9

    I.    LEGAL STANDARD .........................................................................9

    II.    THE DISCOVERY SOUGHT IS "FOR USE" IN AND IS RELEVANT TO THE FOREIGN PROCEEDINGS........................10

        A.    Section 1782 Standard ...........................................................10

        B.    The Foreign Proceedings Plainly Involve Allegations of Hacking .................................................................................17

    III.    MOVANTS' REQUESTS TO PRECLUDE DEPOSITION TESTIMONY AND TO NARROW THE SUBPOENAS LACK MERIT.................................................................................20

    IV.    MAGISTRATE JUDGE AULD DID NOT EXCEED HIS AUTHORITY IN GRANTING THE APPLICATION ...................22

    V.    AL SADEQ AND STOKOE PROPERLY JOINED THEIR APPLICATIONS...............................................................................25

CONCLUSION ................................................................................................26

CERTIFICATE OF WORD COUNT ................................................................28

## PRELIMINARY STATEMENT

Respondents Karam Salah Al Din Awni Al Sadeq ("Al Sadeq") and Stokoe Partnership Solicitors ("Stokoe") (collectively "Respondents") submit this Memorandum of Law in response to Movants Nicholas Del Rosso's ("Del Rosso") and Vital Management Services, Inc.'s ("Vital Management") (collectively "Movants") motion to quash or for a protective order. As set forth below, the motion should be denied because the information the subpoenas seek from Del Rosso and Vital Management is relevant to and for use in proceedings in the United Kingdom that will aid Al Sadeq and Stokoe in determining whether the defendants in those proceedings are responsible for instructing Del Rosso to unlawfully obtain confidential information from Stokoe and other members of Al Sadeq's legal and support team. In addition, the information sought bears directly on whether the human rights abuses that Al Sadeq suffered in Ras Al Khaimah ("RAK") was the product of political motives on the part of the Ruler of the RAK. As the proceeding initiated by Al Sadeq is scheduled for trial in April 2022, a determination on this motion is requested expeditiously to allow Respondents to obtain the requested discovery reasonably in advance of the trial date.

This Court previously granted Respondents' application for an order under 28 U.S.C. § 1782 to conduct discovery for use in foreign proceedings (the "Application"), finding that Respondents had met the statutory criteria and that the

applicable discretionary factors weighed in favor of granting the Application. The Court granted Respondents leave to serve subpoenas upon Del Rosso and Vital Management to take deposition testimony and obtain documents related to Movants' dealings with a company in India called CyberRoot that is associated with hacking.

The Application was made for the purpose of obtaining limited, but necessary, discovery in aid of civil proceedings initiated by the Respondents and currently pending in the High Court of Justice of England and Wales, Queen's Bench Division captioned: <u>Karam Salah Al Din Awni Al Sadeq v. Dechert, LLP, Neil Gerrard, David Hughes, and Caroline Black</u>, Claim No. QB-2020-000322 (the "Al Sadeq Litigation"); and <u>Stokoe Partnership Solicitors v. Mr Paul Robinson, Company Documents Limited, and Mr Oliver Moon</u>, Claim No. QB-2020-002218; and <u>Stokoe Partnership Solicitors v. Mr Patrick Tristram Finucane Grayson, Grayson + Co Limited, Mr Stuart Robert Page, and Page Corporate Investigations Limited</u>, Claim No. QB-2020-002492 (the "Hacking Claims," and together with the Al Sadeq Litigation, the "Foreign Proceedings"). In the Al Sadeq Litigation, Al Sadeq alleges that the defendants Dechert, LLP ("Dechert UK"), Neil Gerrard ("Gerrard"), David Hughes ("Hughes"), and Caroline Black ("Black"), committed serious wrongs against him during an investigation undertaken by them, at the behest of the Ruler of the RAK, into allegations of fraud by the RAK Investment

2

Authority ("RAKIA") against Dr. Khater Massaad ("Dr. Massaad"), Mr. Farhad Azima ("Azima"), and others, including Al Sadeq. Al Sadeq's claims in the Al Sadeq Litigation are for civil causes of action based on breaches of UAE criminal law and procedure, the UAE Constitution, and breach of his human rights as a matter of UAE and international law, and has sought damages for severe psychological and physical harm, pain and suffering, financial losses, and damage to reputation.

Following the initiation of the Al Sadeq Litigation, Al Sadeq's legal team, which includes Stokoe (a firm of UK-based solicitors) and 4 Stone Buildings (a UK-based barristers' chambers) and Maltin Litigation Support Group (a legal public relations and litigation support group) and Detained in Dubai (a human rights advocacy organization) (collectively "Al Sadeq's Legal and Support Team"), has been subjected to a campaign to interfere with their ability to represent Al Sadeq and progress the proceedings on his behalf. This has included being the target of an online hacking campaign, having received numerous spear phishing emails and SMS messages, and being subject to intrusive surveillance while seeking to visit Al Sadeq in the UAE. The campaign included attempts to obtain confidential information from Stokoe's bank account and confidential information of others connected with the Foreign Proceedings.

3

Movants' request that this Court quash or, in the alternative, narrow the subpoenas is without merit. As Magistrate Judge Auld determined, the subpoenas seek information from Del Rosso and Vital Management that is clearly relevant to and for use in the Foreign Proceedings because it will aid Al Sadeq and Stokoe in determining whether the defendants in the Foreign Proceedings instructed Del Rosso to unlawfully obtain confidential information from Stokoe and other members of Al Sadeq's Legal and Support Team and whether the investigation into Al Sadeq's alleged fraud was politically motivated.

The discovery sought from Del Rosso and Vital Management does not impose an undue burden. Tellingly, Movants do not assert with any specificity that responding to these subpoenas will cause any undue burden as required on a motion to quash under Rule 45. In addition, Movants' argument that Magistrate Judge Auld lacked authority to issue the order granting the Application has been rejected by the courts, and the argument that Stokoe and Al Sadeq improperly joined their applications is refuted by application of FED. R. CIV. P. 20 and the findings set forth in Magistrate Judge Auld's Order. This Court should deny the instant motion in its entirety.

## STATEMENT OF FACTS

The factual background of the disputes underlying the Foreign Proceedings is set forth in the Declaration of Haralambos Tsiattalou ("Tsiattalou Decl.") (Dkt.

4

No. 4), the Supplemental Declaration of Haralambos Tsiattalou ("Tsiattalou Supplemental Decl.") (Dkt. No. 6) and the exhibits annexed thereto, and this Court's Order granting the Application (Dkt. No. 7). In support of the Response to the Motion to Quash, Respondents have filed the Declaration of Paul Robinson ("Robinson Decl.") and the exhibits annexed thereto, which link Del Rosso and Vital Management to the individuals involved in the conduct that is the subject of the Foreign Proceedings.

**The Application**

On February 5, 2021, Respondents applied for an order under 28 U.S.C. § 1782 to conduct discovery for use in foreign proceedings. Specifically, Respondents sought leave to serve Movants with subpoenas to appear for depositions and to produce certain documents related to Movants' work with CyberRoot. (Dkt. Nos. 1, 3, 4).

In support of that Application, Mr. Tsiattalou averred in his Declaration that since the initiation of the Al Sadeq Litigation, Al Sadeq's Legal and Support Team has been subjected to a hacking and surveillance campaign believed to be by or at the direction of the defendants in the Al Sadeq Litigation. (Dkt. No. 4, ¶¶ 10-14, 41, 43, 44). Al Sadeq's Legal and Support Team has received numerous phishing emails which appear to be targeted attempts to access personal and confidential information. (Dkt. No. 4, ¶¶ 43-44).

5

**The Order**

On October 18, 2021, Magistrate Judge Auld issued a memorandum opinion and order (the "Order") (Dkt. No. 7) granting the Application. The Court first determined it was appropriate to grant the Application *ex parte* because "the subpoena targets [Del Rosso and Vital Management] have known of the Application for an extended period but have not sought to oppose the issuance of the requested subpoenas." (Order, p. 35). The Court found that Respondents "satisfied the Section 1782 statutory requirements and each of the discretionary *Intel* factors weighs in favor of Section 1782 relief." (Order, p. 41). The Court noted that its findings were without prejudice to Movants later contesting the requested discovery by seeking a protective order or other relief. (Order, p. 41 n.25).

**The Robinson Declaration Filed in Support
of This Response to the Motion to Quash**

On December 10, 2021, Paul Robinson ("Robinson") executed a sworn declaration "to provide further details of my dealings with Mr Grayson and details of my dealings with Mr Nicholas Del Rosso and in particular the involvement of Mr Del Rosso in the enquiries that Mr Grayson instructed me to carry out." (Robinson Decl., ¶ 5). As Magistrate Judge Auld recognized in his Order,

6

Robinson, Patrick Grayson ("Grayson"), Stuart Page ("Page"), and Del Rosso are all linked to the conduct at issue in the Foreign Proceedings. Order at 39.

Robinson is the director of a corporate research and investigation firm, Company Documents Ltd, which performs standard corporate research and worldwide document retrieval. (Robinson Decl., ¶ 1). Company Diligence is a trade name used by Company Documents Ltd in connection with more in-depth investigative research and due diligence enquiries and has a separate US-facing website. (*Id*.).

Robinson first met Del Rosso in or about 2016. (*Id.* ¶ 7). During the next few years, Del Rosso instructed Robinson to carry out several open-source intelligence enquiries. Id. On January 28, 2018, Company Diligence entered into a consulting agreement with Vital Management pursuant to which Vital Management paid Company Diligence the sum of £500 per month. (*Id.*, ¶ 10, Ex. C). These payments continued until June 2020. (*Id.*, ¶ 10.)

Before 2019, any instructions that Robinson received from Del Rosso came directly from Del Rosso. (*Id.* ¶ 7). Beginning in early 2019, Robinson began receiving instructions from Grayson (the "Grayson enquiries"); however, Del Rosso and Vital Management continued to pay Robinson in connection with these matters, notwithstanding that the instructions came through Grayson. (*Id.*, ¶¶ 8, 11, 12). When Robinson spoke to Grayson regarding the Grayson enquiries, Grayson

7

told Robinson that he recently returned from visiting Del Rosso in North Carolina and that Del Rosso would be responsible for paying Robinson for the Grayson enquiries. (*Id.*, ¶ 11). Grayson then paid Robinson £5,000, half of the agreed sum, for obtaining confidential information regarding Stokoe, and Vital Management made the remaining payments to cover the cost of the Grayson enquiries. (*Id.*, ¶ 11).

Robinson also spoke to Del Rosso directly during this time regarding a payment dispute in connection with their engagement, with Del Rosso ultimately settling the invoice in full after initially asserting that the invoice was unrelated to him. (*Id.*, ¶ 12, Ex. D). On March 16, 2020, Company Diligence sent an invoice to Del Rosso billing him £3,500 for research connected to Ms. Stirling, a human rights advocate who had raised the profile of Al Sadeq's plight, for which Robinson received his instructions from Grayson. (*Id.* ¶ 15, Ex. D). Del Rosso paid this invoice within days of its date. (*Id.*, ¶ 14).

After Robinson was served in connection with the Robinson Proceeding on July 1, 2020, Del Rosso told Robinson not to mention his name in relation to the work Robinson had undertaken for him "and to keep his name out of the entire matter." (*Id.*, ¶ 14). Del Rosso told Robinson that "his American lawyer" would contact him and that if Robinson did not mention his name, he would pay Robinson's legal fees. (*Id.*, ¶ 18). Shortly thereafter, Robinson received a call from

8

Brandon Neuman, Del Rosso's attorney, and they subsequently exchanged email correspondence in connection with the matter. (*Id.* ¶ 18, Ex. F). Ultimately, Del Rosso set up a loan agreement to assist with Robinson's legal fees, and Company Documents Ltd entered into that agreement with Vital Management for the sum of $25,000 on July 2, 2020. (*Id.* ¶ 19, Ex. G). The loan was due to be repaid on July 1, 2021; however, it has not been repaid to date, and Robinson has not been asked to repay it notwithstanding that the proceedings against him were settled shortly after he swore the affidavit on July 6, 2020. (*Id.* ¶¶ 19, 20, Ex. A). In early July 2020, Robinson became aware that he was under twenty-four hour overt and covert surveillance. (*Id.*, ¶ 21).

The instructions that Robinson received from Grayson beginning in early 2019 and those that he had previously received from Del Rosso before 2019 both included what Robinson characterizes as "UAE related matters," including open-source research investigations into and concerning Azima. (*Id.*, ¶ 9).

## ARGUMENT

## I. LEGAL STANDARD

Subpoenas issued to non-parties are governed by Rule 45 of the Federal Rules of Civil Procedure. *Sarma v. Wells Fargo & Co.*, 1:15-MC-63, 2016 U.S. Dist. LEXIS 12048, at *15 (M.D.N.C. Feb. 2, 2016). The scope of discovery permitted under Rule 45 tracks Rule 26, which permits discovery of:

9

any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

FED. R. CIV. P. 26(b)(1); *see also Kinetic Concepts, Inc. v. ConvaTec Inc.,* 268 F.R.D. 226, 240 (M.D.N.C. 2010).

Rule 45 provides in relevant part that a court must "quash or modify a subpoena that . . . subjects a person to undue burden." FED. R. CIV. P. 45(d)(3)(A)(iv). Thus, in ruling on a motion to quash under Rule 45, a court must balance "relevance, need, confidentiality and harm," and discovery should be permitted where the evidence is relevant unless there is no need shown, compliance would be unduly burdensome, or the potential harm that would be caused by the disclosure outweighs the benefit. *See Sarma*, 2016 U.S. Dist. LEXIS 12048, at *16 (quoting *Insulate Am. v. Masco Corp.*, 227 F.R.D. 427, 432 (W.D.N.C. 2005)).

## II. THE DISCOVERY SOUGHT IS "FOR USE" IN AND IS RELEVANT TO THE FOREIGN PROCEEDINGS

### A. Section 1782 Standard

Section 1782(a) provides, "The district court of the district in which a person resides or is found may order him to . . . produce a document or other thing for use

in a proceeding in a foreign or international tribunal . . . ." Courts have interpreted Section 1782 as containing three requirements: (1) the person from whom discovery sought resides or is found in the district of the district court where the application is made; (2) the discovery is for use in a proceeding in a foreign or international tribunal; and (3) the application is made by a foreign or international tribunal or any interested person. *See In re Merck & Co.,* 197 F.R.D. 267, 270 (M.D.N.C. 2000) (citing *Application of Esses*, 101 F.3d 873, 875 (2d Cir. 1996)).

An applicant seeking to obtain information under Section 1782 "need only make a de minimis showing that the requested discovery is 'for use' in the proceeding." *In re Application of the Children's Inv. Fund Found.*, 363 F. Supp. 3d 361, 371 (S.D.N.Y. 2019); *In re Veiga*, F. Supp. 2d 8, 18 (D.D.C. 2010). The information sought must be relevant, but as under Rule 26(b), relevance is "broadly construed and encompasses any material that bears on, or that reasonably leads to other matters that could bear on, any issue that is or may be in the case." *Veiga*, F. Supp. 2d at 19 (quoting *Alexander v. F.B.I.*, 194 F.R.D. 316, 325 (D.D.C. 2000)); *In re Bayer AG*, 173 F.3d 188, 190-191 (3d Cir. 1999). There is no requirement that the information sought be admissible or even discoverable in the foreign proceeding. *In re Request for Judicial Assistance from Seoul Dist. Criminal Court*, 555 F.2d 720, 723 (9th Cir. 1977); *Advanced Micro Devices, Inc. v. Intel Corp.*, 292 F.3d 664, 668-69 (9th Cir. 2002), *aff'd* 542 U.S. 241. A district

11

court's gatekeeping function under Section 1782's "for use" requirement is limited solely to ensuring some procedural mechanism exists to introduce the requested discovery. *See In re Qualcomm Inc.*, 18-mc-801-34-NC, 2018 U.S. Dist. LEXIS 213919, at *4-6 (N.D. Cal. Dec. 19, 2018) (citing *Certain Funds, Accts. and/or Inv. Vehicles Managed By Affiliates of Fortress Inv. Grp. L.L.C. v. KPMG, L.L.P.*, 798 F.3d 113, 122 n.11 (2d Cir. 2015)). Thus, it is sufficient "use" under section 1782 if the applicant will present the evidence sought to the foreign tribunal with a request that it be considered. *Id.*

When there is any doubt as to relevance under Section 1782, the district court should be permissive and err on the side of permitting discovery. *Veiga*, F. Supp. 2d at 19. "[I]n enacting § 1782(a), Congress did not intend for district courts to assess the weight of individual pieces of evidence in excruciating detail, and then attempt to discern the precise nexus between such evidence and the claims and defenses raised in the foreign proceeding." *Id.* at 18. District courts are advised that "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *In re Application of Euromepa, S.A.*, 51 F.3d 1095, 1101 (2d Cir. 1995).

Where the requirements of Section 1782 are met, a court must then decide whether to permit the requested discovery as a matter of discretion. *See Intel*

12

*Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004). The four *Intel* factors are (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, character of the proceedings underway abroad, and receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the application contains unduly intrusive or burdensome discovery requests. *Id.*

Contrary to Movants' contentions, the information sought by the subpoenas to Del Rosso and Vital Management is plainly "for use" in the Foreign Proceedings under the applicable standard, and is relevant to the claims and defenses in both the Al Sadeq Litigation and the Grayson Proceeding. Del Rosso has admitted that in 2014, Dechert hired him and Vital Management to investigate assets potentially stolen from RAK's Government, and that in the context of that investigation, at the direction of Dechert, Gerrard, Jamie Buchanan, and other RAK governmental representatives, he was required to examine potential frauds committed by, among others, Dr. Massaad. (Order at 38; Dkt. No. 4-4, ¶¶ 4-8). It is clear from RAKIA's claims in the Azima Litigation that Al Sadeq is alleged by RAKIA to have participated in these alleged frauds with Dr. Massaad and Azima. (Dkt. No. 4-2, ¶¶

13

8, 168-183). RAKIA's evidence in the Azima Litigation concerning this purported fraud included Azima's confidential emails, which were obtained through hacking. *Id.* ¶ 384. Del Rosso, Gerrard, and RAKIA initially claimed that Page located Azima's hacked emails on the internet and that Gerrard then hired Del Rosso and Vital Management to download these materials. (Dkt. No. 4-2, ¶¶ 51-53, 336-343.11; Dkt. No. 4-4, ¶¶ 5-18). Del Rosso maintained that he did not know who hacked Azima's computers or who uploaded his data to the internet. (Dkt. No. 4-4, ¶ 20).

Upon the discovery of evidence in the Azima Litigation that indicated Del Rosso instructed CyberRoot to hack Azima's data beginning in June or July of 2015, Del Rosso responded by admitting "that he had engaged CyberRoot to carry out work on RAKIA's behalf and had arranged the payment to CyberRoot of the $1 million," but "said that that was for different work which had nothing to do with Mr Azima." (Order at 37; *Azima*, Dkt. No. 49-1, ¶¶ 130, 132-133) (internal quotations omitted). As Magistrate Judge Auld observed, members of Al Sadeq's Legal and Support Team have received numerous spear-phishing and phishing emails since their involvement in the Al Sadeq Litigation became public. (Dkt. No. 4, ¶¶ 43-44; Dkt. No. 4-2, ¶¶ 295-300). Around that same time, private investigators were instructed to obtain confidential information belonging to members of Al Sadeq's Legal and Support Team, including bank account

14

information, and to track their travel to and from Dubai, which was directly related to the Al Sadeq Litigation. (Dkt. No. 4, ¶¶ 14-15, 33-38, 46). Grayson, with whom Del Rosso had an ongoing consulting arrangement, has admitted that Del Rosso was the source of his inquiries to Robinson regarding Tsiattalou's travel to Dubai and the funding for the Al Sadeq Litigation. (Dkt. No. 6-3, pp. 3-5; Dkt. No. 6-4). Page, a private investigator who was revealed in the Azima Litigation to have been retained by the Ruler of RAK, has also implicated Del Rosso in the conduct at issue in the Grayson Proceeding. (Dkt. No. 6-6, pp. 2-3).

Robinson has declared that on March 16, 2020, Company Diligence sent an invoice to Del Rosso billing him £3,500 for research connected to Ms. Stirling, who had garnered publicity for Al Sadeq's cause, for which Robinson received his instructions from Grayson. Robinson Decl., ¶ 15, Ex. D. Del Rosso paid this invoice within days of the invoice date. *Id.*, ¶ 14. This establishes that Movants likely instructed Grayson, who in turn instructed Robinson, to obtain confidential information regarding Stokoe and Al Sadeq's Legal and Support Team.

Movants' relationship with CyberRoot from 2015 to 2017 is also plainly relevant to Respondents' claims in the Foreign Proceedings. The time period July 1, 2015 through September 30, 2017, correlates with the period during which Vital Management paid CyberRoot $1,000,000 to either hack Azima's confidential information or undertake other work on RAKIA's behalf during Del Rosso's

15

investigation into Al Sadeq's alleged fraud. (Dkt. No. 4-7, pp. 2-10; Dkt. No. 4, ¶ 25; Dkt. No. 4-5, ¶ 27; Order at 38). The timing and the methods used by RAKIA to obtain Azima's confidential emails – some of which allegedly implicated Al Sadeq – are relevant to Al Sadeq's allegation that RAKIA's investigation and the allegations against him are politically motivated. (Dkt. No. 7, p. 39). No "leaps of logic" are required to see the admission by Del Rosso that he paid CyberRoot the sum of $1 million to undertake work on RAKIA's behalf in or about 2015 might bear on the allegations in the Al Sadeq Litigation, particularly since Del Rosso has denied that that work was undertaken to obtain Azima's confidential information and asserted that it was for another matter. (Dkt. No. 15, p. 23).

The methods RAK used in its investigation into Azima and Al Sadeq, among others, relate to the claims in the Foreign Proceedings because Page has implicated Del Rosso, Gerrard, and the Ruler in some of the conduct at issue in the Grayson Proceeding. (*Id.*) As Magistrate Judge Auld observed, "given both the direct and circumstantial evidence linking Del Rosso and the Al Sadeq Litigation with the hacking attempts, cyberattacks, and illicit investigations regarding Stokoe and associated individuals, ascertaining whether Del Rosso and Vital Management enlisted CyberRoot to hack individuals involved in scrutinizing alleged human rights violations by RAK and its Ruler – violations involving both Azima's alleged

16

co-conspirator and, as in the Azima Litigation, Dechert Defendants – qualifies as relevant to both the Al Sadeq Litigation and Grayson proceeding." (*Id.* at 39-40).

Each *Intel* factor weighs in favor of denying Movants' request to quash the subpoenas. Movants are not parties to the Foreign Proceedings, which weighs in favor of permitting discovery. *Intel*, 542 U.S. at 264; (Order at 40). Nothing in the record suggests that the court in the UK would be unreceptive to the evidence sought, nor is there any indication that Respondents seek to circumvent the proof-gathering restrictions or other policies of the UK court. (Order at 41). As to the final factor, "the requested discovery, which focuses on payments to CyberRoot, communications with CyberRoot, and CyberRoot's work for Del Rosso and Vital Management appears narrowly tailored and reasonable." (Order at 41 (citations omitted)). Thus, the instant motion should be denied.

## B.    The Foreign Proceedings Plainly Involve Allegations of Hacking

Movants contend that the requested discovery is not "for use" in the Foreign Proceedings because the Al Sadeq Litigation is "not about hacking," Al Sadeq "does not allege that he was hacked" and that discovery related to Movants' hacking of Azima's email has nothing to do with Al Sadeq. (Order, p. 11-12). This argument ignores that emails obtained through unauthorized access of Azima's email account implicated Al Sadeq in the alleged fraud. (Order, p. 39). Information concerning the circumstances under which these emails were obtained

17

is relevant to Al Sadeq's contention that RAKIA's claims against him result from political motivations. (Order, p. 39). As Movants acknowledge, Al Sadeq alleges "that he was mistreated in connection with his criminal arrest, detention, and prosecution." (Dkt. No. 15, p. 11). RAKIA's willingness to use unlawful methods to gather evidence against Al Sadeq and others supports a finding that is mistreatment was politically motivated and vindictive.

Similarly, the Stokoe Proceeding involves allegations of hacking. The Re-Amended Particulars of Claim annexed to the Neuman Declaration ("Neuman Decl.") (Dkt. Nos. 16, 16-2) shows that, in the Grayson Proceeding, Stokoe alleges that between March and September 2020, Stokoe and other members of Al Sadeq's Legal and Support Team "received a heightened number of spear-phishing emails." (Dkt. No. 16-2, p. 7). During this period, Company Diligence sent an invoice to Del Rosso billing him £3,500 for research connected to Ms. Stirling, for which Robinson received his instructions from Grayson. (Robinson Decl., ¶ 15 Ex. D; Dkt. No. 16-2, p. 13). Thus, the only inference to be drawn is that the spear-phishing emails directed to Stokoe and other members of Al Sadeq's Legal and Support Team are connected to the instructions Robinson received from Grayson and for which he was paid by Del Rosso.

Movants' argument is semantic: they argue that the subpoenas should be quashed because the claims in the Foreign Proceedings do not use the word

18

"hacking." (Dkt. No. 15, p. 14-15). But Stokoe plainly alleges in the Grayson Proceeding that it was targeted by phishing and spear-phishing attacks and that the defendants unlawfully procured its' confidential information. (Dkt. No. 16-2, pp. 9-10). Indeed, Movants acknowledge that Stokoe alleges in the Grayson Proceeding "that someone obtained unauthorized access to the firm's banking information." (Dkt. No. 15, p. 14). As Movants further point out, "the allegation in the [Grayson Proceeding] is that the confidential material was accessed in the UK, by one of the defendants in those proceedings." (Dkt. No. 15, p. 14). The discovery sought by the requested subpoenas will aid Stokoe in determining whether "one of the defendants in those proceedings" instructed Del Rosso, and whether he in turn instructed CyberRoot, to unlawfully obtain Stokoe's confidential information, as he was alleged to have done previously with respect to Azima; additionally, the requested discovery will help to establish a pattern or practice of unlawful conduct engaged in by Del Rosso.

The depositions sought by the subpoenas will allow the Respondents to ask Del Rosso under oath whether Movants' dealings with CyberRoot or any other entity included retaining CyberRoot to carry out spear-phishing and phishing attacks against Stokoe, and who instructed Del Rosso to do so. This evidence is "for use" in the Foreign Proceedings, which clearly relates to hacking and Del Rosso.

19

### III. MOVANTS' REQUESTS TO PRECLUDE DEPOSITION TESTIMONY AND TO NARROW THE SUBPOENAS LACK MERIT

Movants contend that this Court should not permit deposition testimony at all because it is costly, time-consuming, and not proportional to the needs of the case, and because pre-trial deposition testimony is "not customary in English proceedings."

Movants have established no basis for quashing or narrowing the subpoenas to preclude deposition testimony. Under Rule 45, the relevant inquiry is whether the subpoenas "subjects a person to undue burden." Movants do not articulate how being deposed would subject them to undue burden. (Dkt. No. 15, pp. 23-24).

And, as Magistrate Judge Auld previously observed, permitting deposition testimony would not be "in tension with the proof-gathering procedures that govern the UK tribunal overseeing [the] dispute," because "the UK appellate court has already permitted introduction of evidence regarding Del Rosso's interactions with CyberRoot, including a new witness statement from Del Rosso, and noted the need for further testimony from Del Rosso on this issue in the Azima Litigation." (Order at 40-41). Section 1782 expressly authorizes a court, upon issuing an order granting an application under that section, to "direct that the testimony or statement be given . . . before a person appointed by the court." This Court need not resolve "technical questions of foreign law," such as whether the availability of deposition

testimony is customary in civil proceedings in the United Kingdom. *In re Request for Judicial Assistance from the Seoul Dist. Criminal Court*, 555 F.2d 720, 723 (9th Cir. 1977).

Deposing Del Rosso is proportional to the needs of the case because he is the only person who can testify as to who he was receiving his instructions from when he was instructing Robinson through Grayson in 2019 and 2020 and what he paid CyberRoot $1 million for in or about 2015. His testimony will aid Al Sadeq in establishing his claim that the Ruler's investigation into him and his subsequent arrest and detention were the product of political machinations and will aid Stokoe in establishing that the defendants in the Al Sadeq Litigation unlawfully attempted to obtain its confidential information and to impede its representation of Al Sadeq. Section 1782 empowers this court to permit deposition testimony in these circumstances.

There is similarly no basis upon which to limit the responsive time period for all discovery to January through April 2020. Respondents should be able to ask Del Rosso in his deposition any relevant questions related to his involvement in the conduct that is the subject of the Foreign Proceedings. For the reasons articulated above, Respondents' document requests seeking material from 2015 to 2017 plainly target relevant material notwithstanding that this period predated publication of Al Sadeq's claim and Stokoe's learning of phishing and spear-

21

phishing attempts. (Order, pp. 38-40). Respondents' document requests pose no undue burden and are proportional to the needs of the case because they seek information related only to Movants' dealings with a single entity during a two-year period. Del Rosso has admitted that his dealings with CyberRoot during this period were unrelated to Azima and, therefore, a reasonable inference is that these inquiries were related to Al Sadeq. (Order, p. 37; *Azima*, Dkt. No. 49-1, ¶¶ 130, 132-133). Again, Movants do not articulate with any specificity how responding to these document requests subject them to any undue burden as they are required to show under Rule 45. (Dkt. No. 15, pp. 25-26).

## IV. MAGISTRATE JUDGE AULD DID NOT EXCEED HIS AUTHORITY IN GRANTING THE APPLICATION

Contrary to Movants' contention, there is no requirement in the Constitution, statutory law, or the Federal Rules that a Section 1782 application be decided by an Article III judge.

Title 28 U.S.C. § 636(b)(1)(A) permits a District Judge to "designate a magistrate judge to hear and determine any pretrial matter pending before the court," subject to certain exceptions that are not applicable here. District Judges are then empowered to "reconsider any pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *Id.*

22

Rule 72 provides that "[w]hen a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision." Consistent with 28 U.S.C. § 636(b), Rule 72 further provides that "[a] party may serve and file objections to the order within 14 days after being served with a copy," and "may not assign as error a defect in the order not timely objected to." Finally, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."

Middle District of North Carolina Local Rule 72.1 authorizes magistrate judges to "exercise the power and authority to perform the duties enumerated in 28 U.S.C. §§ 636(b)(1) and (2)." Further, magistrate judges are authorized to "[s]upervise proceedings conducted pursuant to letters rogatory, in accordance with 28 U.S.C. § 1782." *Id.*

A decision to grant a section 1782 application is neither dispositive nor final; rather, "[i]ssuance of the subpoena is but a first step in this process." *In re Qwest Commc'ns Int'l Inc.*, No. 3:08mc93, 2008 WL 2741111, at *5 (W.D.N.C. July 10, 2008). "An Order either allowing or refusing to allow the Clerk of this court to issue a subpoena is not a final order, and may be called into question by the subpoenaed party as provided in Rule 45, Federal Rules of Civil Procedure, or may

23

be reviewed by the district court under Section 636(b) upon a showing that the order is clearly erroneous or contrary to law." *Chevron Corp. v. Camp*, 1:10mc27, 1:10mc28, 2010 U.S. Dist. LEXIS 97440, at *6-8 (W.D.N.C. Aug. 28, 2010). And as Magistrate Judge Auld observed in the Order, the Fourth Circuit "has affirmed, under an abuse of discretion standard, a district court judge's affirmation, under the clearly erroneous or contrary to law standard, of a magistrate judge's grant of a Section 1782 application." *See In re Naranjo*, 768 F.3d 332, 341-42, 347-51 (4th Cir. 2014); (Order at 1 n.2). Critically, Magistrate Judge Auld noted that his ruling was without prejudice to Movants later contesting the subpoenas by seeking a protective order or other relief. (Order at 41 n.25).

Thus, Movants' ability to challenge the issuance of a subpoena under Rule 45 – the very challenge they now make – or to seek review by a District Judge refutes their contention that the Order is final or dispositive of Movants' "claim or defense." *Camp*, 2010 U.S. Dist. LEXIS 97440, at *6-8; *In re Qwest Commc'ns Int'l Inc.*, 2008 WL 2741111, at *5. Moreover, Movants have not sought review by a District Judge under Section 636(b) despite the availability of this relief.

Movants rely on *Aluminum Co. of Am., Badin Works, Badin, N.C. v. EPA*, 663 F.2d 499, 502 (4th Cir. 1981) (*ALCOA*) to contend that Magistrate Judge Auld lacked authority to issue the Order. That case is plainly inapposite. There, the Fourth Circuit held that the District Court was not authorized to refer a purported

24

"motion to quash" to a magistrate under 28 U.S.C. § 636(b)(1)(A) because "although labeled 'motion to quash warrant,' it is clear from the prayer for relief contained in Alcoa's pleading that it was asking for more than for the warrant to be quashed," including seeking various forms of injunctive relief. Title 28 U.S.C. § 636(b)(1)(A) provides that a district judge may not designate a magistrate judge to hear and determine "a motion for injunctive relief." Thus, because the pleading sought injunctive relief in addition to quashing the warrant, the magistrate judge was not authorized to hear and decide the motion. *ALCOA*, 663 F.2d at 502. Here, the Application sought no relief other than an order granting the Application and authorizing Applicants to serve subpoenas upon Movants. (Dkt. No. 1).

Magistrate Judge Auld plainly had the authority to issue the Order under applicable statutory law, the Federal Rules, and Fourth Circuit precedent.

## V. AL SADEQ AND STOKOE PROPERLY JOINED THEIR APPLICATIONS

Movants contend that the subpoenas should be quashed because the Application improperly joined two parties – Al Sadeq and Stokoe – in a manner not permitted by Rule 20 of the Federal Rules of Civil Procedure, and that the proceedings should be severed under Rule 21.

Rule 20 permits joinder of multiple plaintiffs in a single action if "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or

25

arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action."

Movants do not dispute that there are questions of law or fact common to Respondents. The relief Respondents sought in the Application arose out of the same "series of transactions or occurrences." FED. R. CIV. P. 20. As Magistrate Judge Auld recognized in the Order,

> the methods employed in RAK's massive investigation into Dr. Massaad, Azima, Mikadze, and Al Sadeq, relate to both Al Sadeq's claims in the Al Sadeq Litigation and to Stokoe's Hacking Claims, particularly because Page (to whom Del Rosso, Gerrard, and RAKIA attribute the discovery of Azima's hacked materials online) has suggested that Del Rosso, Gerrard, and the Ruler bear responsibility for at least some of the conduct at issue in the Grayson Proceeding. Further, given both the direct and circumstantial evidence linking Del Rosso and the Al Sadeq Litigation with the hacking attempts, cyberattacks, and illicit investigations regarding Stokoe and associated individuals, ascertaining whether Del Rosso and Vital Management enlisted CyberRoot to hack individuals involved in scrutinizing alleged human rights violations by RAK and its Ruler – violations involving both Azima's alleged co-conspirator and, as in the Azima Litigation, Dechert Defendants – qualifies as relevant to both the Al Sadeq Litigation and Grayson Proceeding.

Order at 39.

## CONCLUSION

Based on the foregoing, the Respondents respectfully request that this Court deny Del Rosso and Vital Management's motion to quash or for a protective order.

In light of the April 2022 trial date in the Al Sadeq Litigation, Respondents respectfully submit that this dispute requires a prompt resolution to allow them to obtain the requested discovery in advance of trial.

This 14th day of December, 2021.

/s/ Mark W. Merritt
Mark W. Merritt
N.C. Bar No. 12198
mmerritt@robinsonbradshaw.com

Robinson, Bradshaw & Hinson, P.A.
101 N. Tryon St., Suite 1900
Charlotte, North Carolina 28246
Phone:  704.377.2536
Fax:  704.378.3000

*Attorneys for Applicants Karam Salah Al Din Awni Al Sadeq and Stokoe Partnership Solicitors*

27

## **CERTIFICATE OF WORD COUNT**

I hereby certify that this brief complies with Local Rule 7.3(d) and that this brief does not exceed 6,250 words.

/s/ Mark M. Merritt
Mark M. Merritt