# EXHIBIT B

Claimant  
P Robinson  
1st  
Exhibit PR-1  
Dated 14 May 2021

**IN THE HIGH COURT OF JUSTICE**  Claim no. QB-2020-002492
**QUEEN'S BENCH DIVISION**

**B E T W E E N : -**

**STOKOE PARTNERSHIP SOLICITORS**

**Claimant**

and

**(1) MR PATRICK TRISTRAM FINUCANE GRAYSON**
**(2) GRAYSON + CO LIMITED**
**(3) MR STUART ROBERT PAGE**
**(4) PAGE CORPORATE INVESTIGATIONS LIMITED**

**Defendants**

---

**FIRST WITNESS STATEMENT OF**
**PAUL ROBINSON**

---

I, **PAUL ROBINSON**, of 6 Belvedere Walk, Haywards Heath, West Sussex, RH16 4TD, **WILL SAY** as follows:

A. **INTRODUCTION**

1. I am a director of a corporate research and investigation firm.

2. The facts and matters set out in this witness statement are either derived from my own knowledge or are derived from other sources or documents that I have seen and which, in all cases, I believe to be true. Where I refer to facts and matters below that are within my own knowledge, they are true. Where I refer to information supplied to me by others, its source is identified and it is true to the best of my knowledge and belief. I do not waive privilege in relation to any information or materials which I reference in my statement.

1

3. There is now produced and shown to me, marked "PR-1", an exhibit containing true copies of paginated documents to which I will refer in this statement. References below to page numbers are to the contents of that exhibit.

4. I make this witness statement further to the affidavit I swore on 6 July 2020 in Claim No. QB-2020-002218 ["**the affidavit**"]. Save where I expressly state otherwise, I intend this witness statement to record the same information I set out in that affidavit. I now exhibit the affidavit at **PR/1-8** and the exhibit to that affidavit at **PR/9-23**. The contents are true save for one correction set out at paragraph 25 below.

5. This witness statement has been prepared on the basis of my own knowledge and records of the relevant events and through consultation with my legal advisers.

## B. BACKGROUND

### (1) Mr Grayson

6. Mr Patrick Grayson is a private investigator and was, until approximately two years ago, a partner in the firm of GPW Investigations. I first met Mr Grayson in person in early 2019 and have previously worked with GPW on other instructions.

7. As I describe in more detail below, between early 2019 and June 2020 I received a series of instructions from Mr Grayson to investigate various individuals and to obtain certain information. In turn I instructed Mr John Gunning, a private investigator, to obtain this information. I communicated with Mr Grayson using Signal private messages, emails and calls. I no longer have a complete record of those communications because, shortly after my meeting with Mr Grayson in January 2020 (described below), Mr Grayson configured the Signal messaging system to delete all text messages exchanged between us automatically after a period of 12 hours.

8. I do, however, still retain screenshots of records of the communication that took place between Mr Grayson and me during the period between June 2019 and June 2020. The screenshots of a small number of text messages that were exchanged between Mr Grayson and me during this period predate when the Signal application was set to delete messages automatically: [PR/11-23].

2

9. I am the account holder and user of the email address duediligence@hushmail.com (the "**Hush Mail Account**"). During the period mentioned in paragraph 8 above, I would on occasion communicate with Mr Grayson, and provide him with the information sought, using the hush mail account; I would, as described below, send information to Mr Grayson's 'Proton Mail' encrypted email account (cloverdock@protonmail.com). However, I deleted the emails that I sent to Mr Grayson from the hush mail account. I did so before I was served with proceedings in claim no. QB-2020-002218 by the Claimant.

10. Although I did not retain records of our communications, I passed all information obtained by Mr Gunning in relation to paragraph 7 above onto Mr Grayson, who would proceed to ask follow-up questions. I did not, myself, study the information and simply passed Mr Grayson's requests onto Mr Gunning directly. To the extent that Mr Grayson's follow-up questions were addressed by Mr Gunning, I passed this on to Mr Grayson.

(2) **Mr John Gunning**

11. Mr Gunning is a private investigator. Although I do not recall exactly, I believe I first met Mr Gunning approximately 5 years ago when he asked me to undertake some research for him. In early 2019, I asked him to assist me in carrying out Mr Grayson's requests for information, as described below.

12. When I communicated with Mr Gunning by email, I would write to him from the Hush Mail account and he would write to me from a proton mail account with the name "fairydust1999" (the "**Fairydust Account**"). I would also communicate with Mr Gunning via WhatsApp and Threema (an encrypted messaging application, similar to WhatsApp and Signal).

(3) **Mr Stuart Page**

13. I have known Mr Stuart Page, the Third Defendant, for about 20 years. I have previously worked with him on several occasions and have also worked with Mr Page from time to time on small pieces of corporate research.

3

Case 1:21-mc-00006-UA-LPA   Document 18-3   Filed 12/14/21   Page 4 of 9

14. Mr Page and I have briefly discussed the possibility of merging some of our business interests, perhaps in a new venture. One of the purposes of that discussion was to allow Mr Page to step back from the day-to-day running of the business.

## C. THIRD PARTY INFORMATION

### (1) Radha Stirling

15. In 2019 (I cannot be precise as I do not recall but believe this to have been in July), Mr Grayson asked me to investigate both Ms Radha Stirling and an organisation called Detained in Dubai. Although I cannot now recall whether any information was obtained in response to these requests, I believe I would have asked Mr Gunning to seek the information in question.

### (2) Maltin PR

16. In, I believe, February or March 2020, Mr Grayson asked me to help obtain financial records and monthly transactional data from Maltin PR's bank account.

17. I then asked Mr Gunning to obtain the information that Mr Grayson sought. Although Mr Gunning then sent me some information regarding this request, I did not look at the detail before forwarding it to Mr Grayson, I believe, by email. I now understand that Mr Gunning provided this information to me by instructing Mr Moon but I only discovered this fact after proceedings in claim no. QB-2020-002218 were served upon me by the Claimant (as described below).

18. Mr Grayson also asked me to obtain Mr Timothy Maltin's phone records. I asked Mr Gunning to obtain this information but, to the best of my recollection, he was unable to do so.

19. Mr Grayson requested further and specific transactional information in respect of Maltin PR's account concerning payments in relation to Radha Stirling and Mr Farhad Azima. He also requested that Ms Stirling and Mr Azima's banking coordinates be obtained. Although I asked Mr Gunning to seek that information, to the best of my recollection, he was unable to do so. I therefore did not pass any information regarding this request to Mr Grayson.

4

### (3) Hogan Lovells

20. Mr Grayson also asked me to identify transactional information from the Maltin PR bank account in relation to Hogan Lovells, the law firm. I therefore asked Mr Gunning to seek three months of corporate banking records.

21. Although I do not now recall, I believe that Mr Gunning sent me a report regarding Hogan Lovells from the Fairy Dust account to the Hush Mail account stating that it was not possible to obtain information concerning transactions involving Hogan Lovells. Although I have no recollection, I believe I would have informed Mr Grayson of this either by Signal or email

### D. THE CLAIMANT'S INFORMATION

### (1) The Goring Hotel meeting

22. In January 2020, Mr Grayson and I met at the Goring Hotel in Belgravia, London. That meeting was arranged by text messages and calls using the "Signal" private messaging system. I refer, in particular, to the messages dated 30 January 2020: [PR1/11].

23. During the meeting, Mr Grayson asked me whether I knew of anyone who was capable of obtaining bank records and other information relating to the Claimant. I told him that I did know of somebody. That person was Mr Gunning. As I have stated, when proceedings in claim QB-2020-00218 were ultimately served upon me by the Claimant, I discovered that Mr Gunning had himself asked Mr Oliver Moon to assist him in obtaining the relevant information described below. I do not know Mr Moon and had not had any prior contact with him.

24. Mr Grayson did not tell me who was instructing him to seek information and I did not ask him to tell me.

### (2) March 2020 information

25. In my Affidavit at §31, I referred to passing the Claimant's "confidential information" to Mr Grayson in early March 2020. I stated that I passed the information to Mr Grayson via a hard copy print out of the information given to me by Mr Gunning and on a USB stick containing the same. I have now reviewed Mr Tsiattalou's witness statement dated 29 June 2020 (tendered in the QB-2020-002218 proceedings) and

5

believe that I gave the wrong date in my Affidavit at §31. Having reviewed this aforementioned statement, I have no reason to dispute the information contained in paragraphs 62-85 therein and therefore accept that it was more likely that the events I describe in §31 of my affidavit took place in April 2020.

(3) **First request for Claimant's banking information**

26. I confirm that I was requested to obtain the information described at paragraphs 62-85 of the witness statement of Haralambos Tsiattalou dated 29 June 2020 (tendered in claim no. QB-2020-002218). I did not request (or obtain) any other information relating to the Claimant.

E. **PAYMENT**

(1) **Mr Grayson's payment to me**

27. Mr Grayson and I agreed a fee of £10,000 for the investigation into the Claimant. Mr Grayson paid me £5,000 in cash in or around June 2020 outside the Goring Hotel.

28. Mr Grayson has not paid me the remaining £5,000.

(2) **My payments to Mr Gunning**

29. As I regularly asked Mr Gunning to carry out work on a number of different client matters, payments made to him at the time would have routinely been made in relation to more than one instruction. Although some of these gross payments would have included sums in relation to the work done at Mr Grayson's request, I do not now recall the precise amounts although they would have been paid on production of an invoice. To the best of my recollection, some payments were made to Mr Gunning in cash, at his request.

F. **SUBSEQUENT INFORMATION**

(1) **Service of the Claimant's claim**

30. On 1 July 2020, I received a letter from the Claimant enclosing, among other matters, a claim form, an application notice seeking what I understand to be termed *Norwich*

6

*Pharmacal* relief against me, and the supporting witness statement of Mr Tsiattalou dated 29 June 2020: [PR1/24-81].

31. Following discussions with the Claimant, I agreed to give the relief sought by consent and a consent order was duly agreed and sealed by the court on 8 July 2020. I swore the Affidavit on 6 July 2020.

### (2) Communication with Mr Gunning

32. I spoke to Mr Gunning on the phone following my receipt of the claim form. Although I can't recall exactly what was said, I remember that Mr Gunning called me and explained that, due pressure placed on him, Mr Moon had to tell the claimant that he was instructed by Mr Gunning. I also briefly spoke to Mr Moon at this time, as he was in the car with Mr Gunning. I understand that they were both on their way to the claimant's London office to provide affidavits in response to claim no. QB-2020-002218.

### (3) Communication with Mr Grayson

33. On 1 July 2020, I called Mr Grayson and informed him that I had been served with proceedings by the Claimant and the nature of these proceedings. Mr Grayson simply said, "Please don't call me again" and ended the call.

34. I have not communicated with Mr Grayson since.

### (4) Communication with Mr Page

35. On seeing Mr Page's name in the documents the Claimant served on me, I called Mr Page on or around 1 July 2020 and informed him that he was mentioned in Mr Tsiattalou's witness statement. I sent the first few pages to him electronically, using my phone, but cannot remember exactly how many pages.

36. Mr Page called me back on, I believe, 3 July 2020. He suggested to me that I could fight this case and offered to provide me with a "top lawyer" to do so. He also stated that, if funding was likely to be a problem, he could assist me with this. I did not accept Mr Page's offer, as by that stage I had obtained legal representation.

7

37. Mr Page and I are business associates and I did tell him that I provided an affidavit and agreed a consent order in the claim. Other than that, I do not recall discussing the proceedings any further with him.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed  ............................................

Paul Robinson

Dated     14 May 2021