**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| In re Application of KARAM SALAH | ) | |
| AL DIN AWNI AL SADEQ and | ) | |
| STOKOE PARTNERSHIP SOLICITORS | ) | |
| for an Order Under | ) | 1:21mc6 |
| 28 U.S.C. § 1782 to Conduct | ) | |
| Discovery for Use in Foreign | ) | |
| Proceedings. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case comes before the Court on "Nicholas Del Rosso and Vital Management Services, Inc.'s Motion to Quash or for a Protective Order" (Docket Entry 14) (the "Motion"). For the reasons that follow, the Court will deny the Motion.

<u>**BACKGROUND**</u>

**I. Procedural Background**

In early 2021, Karam Salah Al Din Awni Al Sadeq ("Al Sadeq") and Stokoe Partnership Solicitors ("Stokoe" and, collectively with Al Sadeq, the "Applicants") moved, "pursuant to 28 U.S.C. § 1782 and Federal Rules of Civil Procedure 26 and 45" (Docket Entry 1 (the "Application") at 1),[1] for leave to serve two subpoenas on Nicholas Del Rosso ("Del Rosso") (Docket Entry 3-1 at 2) and Vital Management Services Inc. ("Vital Management" and, collectively with Del Rosso, the "Movants") (Docket Entry 3-2 at 2) in connection with ongoing litigation in the United Kingdom (at times, the "UK").

_____

1 Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination. Quotations in this Memorandum Opinion use standardized capitalization, but retain any British spelling and punctuation.

(See Docket Entry 1 at 1-6.)[2]  Finding that Applicants satisfied Section 1782's mandatory and discretionary factors, the Court (per the undersigned United States Magistrate Judge) granted the Application, without prejudice to Movants' right to contest the subpoenas.  (See Docket Entry 7 (the "Order") at 1-42.)[3]

In lieu of objecting to the Order, Movants moved to quash or modify the subpoenas.  (See Docket Entries dated Oct. 18, 2021, to present.)  In particular, Movants assert that (i) the undersigned Magistrate Judge lacked authority to grant the Application, (ii) "Applicants improperly filed a joint application arising from separate lawsuits" (Docket Entry 14 at 2), (iii) "the requested discovery is not 'for use' in proceedings pending in England and is unduly burdensome" (id. at 1), and, alternatively, (iv) the Court should narrow the subpoenas.  (See id. at 1-2.)  In support of the Motion, Movants filed the "Amended Particulars of Claim" in Karam Salah Al Din Awni Al Sadeq v. Dechert, LLP, Neil Gerrard, David Hughes, and Caroline Black, Claim No. QB-2020-000322 (Docket Entry 16-1 (the "Amended Al Sadeq Claim") at 2) and the "Re-Amended Particulars of Claim" in Stokoe Partnership Solicitors v. Mr

_____

2  Applicants assert that, "[u]pon information and belief, Del Rosso is the owner and president of Vital Management."  (Docket Entry 2 at 4 n.2; see also Docket Entry 4-4, ¶ 1 (Del Rosso witness statement characterizing Del Rosso as "President and owner of Vital Management").)

3  The Order also determined that the undersigned Magistrate Judge could grant the Application and need not issue a recommendation thereon.  (See id. at 1 n.2.)

Patrick Tristram Finucane Grayson, Grayson + Co Limited, Mr Stuart Robert Page, Page Corporate Investigations Limited, Dechert LLP, and Mr David Neil Gerrard, Claim No. QB-2020-002492 (Docket Entry 16-2 (the "Amended Grayson Claim") at 2). Applicants filed a memorandum in opposition to the Motion (see Docket Entry 17), supported by an affidavit from Paul Robinson (see Docket Entries 18 to 18-9), to which Movants replied (see Docket Entry 19).

**II. Factual Background**

**A. Original Record**

As this Court previously explained (see Docket Entry 7 at 3-29), the record reflects the following:

According to Applicants:

Haralambos Tsiattalou ("Tsiattalou"), "a partner at [Stokoe, a] UK-based law firm," serves as Al Sadeq's lawyer "in civil proceedings pending in the High Court of Justice of England and Wales, Queen's Bench Division captioned *Karam Salah Al Din Awni Al Sadeq v. Dechert, LLP, Neil Gerrard, David Hughes, and Caroline Black*, Claim No. QB-2020-000322 (the 'Al Sadeq Litigation[')]." (Docket Entry 4 [(the "Tsiattalou Declaration")], ¶ 1.) In turn, Stokoe "is the Claimant in civil proceedings pending in the High Court of Justice of England and Wales, Queen's Bench Division captioned: *Stokoe Partnership Solicitors v. Mr. Patrick Tristram Finucane Grayson, Grayson + Co Limited, Mr. Stuart Robert Page, and Page Corporate Investigations Limited*, Claim No.[] QB-2020-002492 (the 'Grayson Proceeding[,]'" and collectively with the Al Sadeq Litigation, the "Foreign Proceedings"). (Id.) "Stokoe was also the claimant in concluded High Court proceedings captioned: *Stokoe Partnership Solicitors v. Mr. Paul Robinson, Company Documents Limited, and Mr. Oliver Moon*, Claim No. QB-2020-002218 (the 'Robinson Proceeding[,'' and collectively] with the Grayson Proceeding[,] . . . the 'Hacking Claims')." (Id.)

3

The Al Sadeq Litigation concerns alleged violations of international and United Arab Emirates (the "UAE") law, as well as of Al Sadeq's human rights, committed "by Neil Gerrard ('Gerrard'), a solicitor and partner in Dechert UK [('Dechert')], and [two other current or former Dechert partners, David Hughes ('Hughes') and Caroline Black ('Black') (collectively with Dechert and Gerrard, the 'Dechert Defendants'),] in connection with their investigation of fraud allegedly perpetrated against the RAK Investment Authority ([the] 'RAKIA')" (id., ¶ 4). (See id., ¶ 2, 4.)[4] Al Sadeq denies involvement in the alleged fraud and "maintains that the charges against him were politically motivated . . . and that he was convicted on the basis of false confessions obtained from him under duress by [Dechert] Defendants." (Docket Entry 4-1, ¶ 1.)

Al Sadeq served as legal adviser, Group Legal Director, and, ultimately, Deputy Chief Executive Officer of RAKIA between 2008 and 2012. (Id., ¶ 35.) In this capacity, he worked with Dr. Khater Massaad ("Dr. Massaad") (see id.), RAKIA's former Chief Executive Officer (the "CEO") (see id., ¶ 8), and also "had regular interactions with," and was well known to (id., ¶ 36), Sheikh Saud Bin Saqr Al-Qasimi, who, beginning in 2003, held the title of "Crown Prince and Deputy Ruler of RAK" (id., ¶ 12; see also id., ¶ 19 (discussing timing of that appointment)), before, "in October 2010, . . . . succeed[ing] his father as Emir of RAK" (id., ¶ 22).[5] From at least 2003 until 2010, "Dr Massaad was the Ruler's close friend and confidant, in his presence on a daily, or almost daily, basis." (Id., ¶ 12.)

In 2005, "RAKIA was established" (id., ¶ 14), and, from that time until approximately 2012, Dr. Massaad served as RAKIA's CEO, controlling the "day to day management of RAKIA" and "developing investment strategies and taking investment decisions with the knowledge, approval, and instructions of the Ruler" (id.,

---

4 "'RAK' signifies Ras Al Khaimah, 'one of the constituent Emirates of the UAE' (Docket Entry 2 at 5). (See id. at 6.)" (Docket Entry 7 at 4 n.4.)

5 "Despite the change in title during the relevant period, for ease of reference, this Memorandum Opinion refers to the above-referenced individual as 'the Ruler.'" (Docket Entry 7 at 5 n.5.)

¶ 15). "[B]y around 2010 RAKIA had, with the full knowledge and approval of the Ruler, very significant investment interests outside RAK, particularly in Georgia . . . ." (Id., ¶ 17.) For various political, familial, and economic reasons beginning around 2008, the Ruler directed that RAKIA should "divest itself of its foreign investments" (id., ¶ 21), a sudden change in investment policy that adversely affected the return on certain RAKIA investments (see id.), after which a rift developed between the Ruler and Dr. Massaad. (See id., ¶¶ 15-25.)

Dr. Massaad "left RAK in around June 2012, on good terms and without any suggestion of wrongdoing," and "returned to the UAE on several occasions thereafter until August 2014, including for meetings with the Ruler." (Id., ¶ 25.) However, in approximately 2014, the Ruler learned that one of his brothers, Sheikh Faisal, whom the Ruler had denied appointment as Crown Prince following the Ruler's succession in October 2010 (id., ¶ 23), "causing animosity between them" (id., ¶ 26), served as an investor in a business that Dr. Massaad founded in Lebanon in 2012. (See id., ¶¶ 26-27.) "As a result, the Ruler became concerned that Dr Massaad was working with Sheikh Faisal and / or Sheikh Khaled[6] in order to destabilise the Ruler, and that Sheikh Faisal and / or Sheikh Khaled were plotting to remove the Ruler with the assistance of Abu Dhabi" (id., ¶ 27), "the most powerful of the Emirates" (id., ¶ 20).

In particular:

Since finding out about Dr Massaad's business relationship with Sheikh Faisal in 2014 and following on from the fall-out between Dr Massaad and the Ruler, and the Ruler's concerns about Dr Massaad's involvement in suspected moves to oust him by Sheikh Khaled and Sheikh Faisal, the Ruler with the assistance of [Dechert] Defendants has pursued a vendetta against Dr Massaad and alleged

---

6  "'Sheikh Khaled was the Crown Prince and Deputy Ruler [of RAK] between around 1958 until around June 2003 when the [Ruler's father] removed [Sheikh Khaled] and replaced him with the Ruler. This was an unpopular move in some quarters leading to street protests in favour of Sheikh Khaled in RAK, and he retained significant support in the Emirate to succeed the [Ruler's father].' (Id., ¶ 19.)" (Docket Entry 7 at 6 n.6.)

co-conspirators such as . . . [Gela] Mikadze[ (at times, "Mikadze")[7]] and [Farhad] Azima [("Azima")[8]] (including by recent proceedings in the English High Court [(the "Azima Litigation")[9]]).

The background set out above . . . is the context in which wrongs have been committed against [Al Sadeq] who has become collateral damage in the vendetta pursued by the Ruler against Dr Massaad, against whom RAKIA allegedly seeks to recover over USD 2 billion. The Ruler's motive in pursuing his vendetta is both to punish Dr Massaad for his supposed disloyalty by destroying his reputation and discrediting him, and also to attempt to conceal the Ruler's own personal knowledge and direction of RAKIA's foreign investments for his own personal and political benefit in the years before his accession. In this regard, it is a matter of public record that Mr Gerrard was appointed by the Ruler in order to investigate and pursue Dr Massaad; and Mr Al Sadeq and his wife were told both by Mr Gerrard and Mr Hughes that the "Big Bastard" Dr Massaad, and his alleged co-conspirators, were the people they were really after, and that they merely wanted Mr Al Sadeq's "cooperation" to help them build that case. Despite several criminal sentences having been

---

7    "Mikadze formerly served as 'General Manager of RAKIA's Georgia operations.' (Id., ¶ 9.5.)"  (Docket Entry 7 at 6 n.7.)

8    "'[A] US-Iranian businessman,' Azima 'had dealings with RAKIA' (id., ¶ 9.5) and has engaged in litigation with RAKIA in the UK courts (see id., ¶ 62)."  (Docket Entry 7 at 6 n.8.)

9    "In the Azima Litigation, RAKIA sued Azima for alleged fraudulent misrepresentation, conspiracy, and breach of warranty (see, e.g., Docket Entry 4-2, ¶¶ 5-10), relating in part to an allegedly sham referral agreement connected to the sale of a Georgian hotel, the creation of which involved Al Sadeq (see, e.g., id., ¶¶ 168-181.6).  In response, Azima 'contend[ed] that the claims should be struck out or dismissed on the ground that, in bringing the claims, RAKIA [wa]s relying on confidential emails that RAKIA obtained through its unlawful hacking of his email accounts.' (Id., ¶ 10.)  Azima also 'counterclaim[ed] for damages resulting from what he allege[d] was RAKIA's hacking of his emails.' (Id.)"  (Docket Entry 7 at 7 n.9.)

pronounced against Dr Massaad by the RAK courts in absentia, Dr Massaad maintains his innocence and presently lives and works in Saudi Arabia, an Interpol notice which had been lodged against him by RAK now having been removed, and an extradition request from RAK having been dismissed by the Saudi court.

(Id., ¶¶ 28-29 (internal paragraph numbering omitted).)

"RAK is regarded by international observers as having a record of human rights abuses including arbitrary detention, forced confessions, unfair trials, and mistreatment in detention." (Id., ¶ 30.) Per the "Particulars of Claim" in the Al Sadeq Litigation (id. at 2) (at times, the "Al Sadeq Claim"):

Al Sadeq's treatment follows a similar pattern to the examples [of human rights violations specified in a 2014 Amnesty International report detailed in the Al Sadeq Claim] in that, *inter alia*, he was kidnapped, arbitrarily detained for over five years, subjected to torture and inhumane treatment while incarcerated in solitary confinement for around 560 days, denied access to legal representation, only occasionally allowed to see his family, his family was denied information about his whereabouts at all material times until April 2016, his family was threatened and he was forced to sign false confessions under duress which were used in order to convict him and to implicate others including Dr Massaad. [Dechert] Defendants were aware of the abuse to which Mr Al Sadeq was subjected, which [as] pleaded [in the Al Sadeq Claim] was orchestrated by Mr Gerrard with the assistance of the other [Dechert] Defendants, at the behest of the Ruler.

(Id., ¶ 33.)

"In summary," according to the Tsiattalou Declaration, the Al Sadeq Claim alleges Dechert Defendants' involvement in:

a. The kidnap and extraordinary rendition of Mr. Al Sadeq from Dubai to RAK (see paragraphs 40 to 47 of the Al Sadeq Claim);

7

b. Mr. Al Sadeq's unlawful detention without arrest or charge, including a period of detention in solitary confinement, under a false name, with no access to legal representation (see paragraphs 105 to 109 of the Al Sadeq Claim);

c. The interrogation of Mr. Al Sadeq. In particular, Mr. Al Sadeq contends that during the first of his interrogations by Mr. Gerrard, he was blindfolded with his hands tied behind his back and had no lawyer present (see paragraph 64 of the Al Sadeq Claim);

d. Threats and unlawful pressure made to Mr. Al Sadeq, his wife, and children, including a promise by Mr. Gerrard and Ms. Black that Mr. Al Sadeq's prison conditions could be improved if he "cooperated" with them (see paragraphs 65 to 67, 89 to 98, and 120 to 130 of the Al Sadeq Claim);

and

e. The procurement of false confessions signed by Mr. Al Sadeq, but drafted by Mr. Gerrard and Mr. Hughes, in circumstances where Mr. Al Sadeq was detained in the above conditions, did not have access to legal representation, and had made it clear that the confessions were untrue (see paragraphs 183 to 184 of the Al Sadeq Claim).

(Docket Entry 4, ¶ 5.)

Given the "extremely serious nature" of Al Sadeq's allegations "against senior lawyers and a global law firm of international repute[,] . . . . the Al Sadeq Litigation has generated a significant degree of publicity in the UK." (Id., ¶ 6.)

"Stokoe was first retained to act in the Al Sadeq Litigation in October 2019. Since that time, there has been a correlation between the progress of the Al Sadeq Litigation and attempts to obtain confidential information from Stokoe and others in relation to those proceedings." (Id., ¶ 7.) On January 28, 2020, "[t]he Claim Form in the Al Sadeq Litigation was issued" and, although Stokoe did not serve it at that time, its "allegations were made public in a press release published by Detained in Dubai on the date of issue."

8

(<u>Id.</u>, ¶ 8.)[10]  "The Claim Form, which was made available
online, was much more detailed than the amended version
ultimately served with the Particulars of Claim and
contained details of Mr. Al Sadeq's claim and the nature
of the allegations made against the Al Sadeq Litigation
defendants."  (<u>Id.</u>)[11]  The Claim Form also disclosed that
"Stokoe was acting on behalf of Mr. Al Sadeq."  (<u>Id.</u>)

     In February and March 2020, Tsiattalou and other
members of "Al Sadeq's Legal and Support Team" (<u>id.</u>,
¶ 3)[12] traveled to Dubai to meet with Al Sadeq's local
counsel and Al Sadeq, although they ultimately did not
receive permission to visit Al Sadeq (who remained
incarcerated in the RAK Central Prison as of March 31,
2020 (<u>see</u> Docket Entry 4-1, ¶ 214; <u>see also id.</u> at 65)).
(Docket Entry 4, ¶ 10.)  During these trips, Tsiattalou
and other members of Al Sadeq's Legal and Support Team

     were the subject of surveillance activities,
     including an apparent break-in to [Tsiattalou's]
     hotel room, the presence of surveillance agents at
     [Tsiattalou's] hotel (where [Tsiattalou] attended
     privileged meetings in relation to the conduct of
     the Al Sadeq Litigation), and an attempt to follow
     [Tsiattalou] to a privileged meeting at a different
     location.  [Tsiattalou] believe[s] these matters
     were also connected to the Al Sadeq [L]itigation
     and that they were intended to disrupt [his]
     ability to obtain instructions (as they in fact
     did).

_____

     10  "An employee of 'the London-based human rights advocacy
organization "Detained in Dubai,"' Radha Stirling, has assisted Al
Sadeq.  (<u>Id.</u>, ¶ 14.)"  (Docket Entry 7 at 9 n.10.)

     11  "'Al Sadeq's Amended Claim Form and Particulars of Claim
were served on March 31, 2020 and April 1, 2020.'  (<u>Id.</u>, ¶ 9.)  The
Amended Claim Form details 'various ways' that Stokoe's 'ability to
take instructions from Mr. Al Sadeq has been impeded . . . since
the Al Sadeq Litigation was issued.'  (<u>Id.</u>)"  (Docket Entry 7 at 10
n.11.)

     12  "Stokoe, 4 Stone Buildings (another UK law firm), Detained
in Dubai, and Maltin Litigation Support Group collectively comprise
'Al Sadeq's Legal and Support Team.'  (<u>Id.</u>)"  (Docket Entry 7 at 10
n.12.)

(Id.; see also Docket Entry 4-1, ¶¶ 215-215.10 (detailing surveillance and interference allegations).)  During a visit in March 2020, Tsiattalou and his colleagues "were subject to intimidation and surveillance" and "an obviously frightened hotel employee" warned Tsiattalou:

> "You're being followed/watched by security services.  They are very serious people.  Nobody can stand in their way."

(Docket Entry 4, ¶ 11.)  Tsiattalou believes that Mr. Stuart Page (at times, "Page"), who Tsiattalou "personally witnessed" on March 6, 2020, "whilst staying at the One and Only on the Palm Hotel in Dubai" (id., ¶ 21), and who admitted his presence at Tsiattalou's Dubai hotel on that date, conducted this surveillance, along with other individuals.  (Id., ¶ 12.)

According to the opinion of Judge Lenon, "sitting as a Deputy Judge of the Chancery Division" (Docket Entry 4-2 (the "Azima Judgment") at 2 (emphasis omitted)), issued in the Azima Litigation, "[i]n January 2015 Stuart Page, a private investigator, was engaged by the Ruler to investigate what the Ruler feared was a plot between a member of his family and Dr Massaad aimed at destabilising his rulership."  (Id., ¶ 31.)[13]

The Azima Judgment further explained:

> In March 2015 Mr Page provided the Ruler with a report entitled RAK Project Update ("the Project Update") which was mainly concerned with Dr Massaad's activities but which also described how Mr Azima was managing a team of advisers in the US, hired by Dr Massaad, who were planning to spread allegations about human rights issues in RAK;[14]

---

13  "'Mr Page's initial engagement in RAK was between 2008 and 2010 when he undertook surveillance work on the behalf of the Ruler who was at the time the Crown Prince.  His remit was to try to ascertain through surveillance what plans Sheikh Khalid, the Ruler's brother, had to try to destabilise the Crown Prince's position.'  (Id., ¶ 260.)"  (Docket Entry 7 at 12 n.13.)

14  "These stories involved the alleged mistreatment of Al Sadeq and his wife, including the involvement of Dechert and/or Gerrard in Al Sadeq's interrogations and detention.  (See, e.g.,
(continued...)

10

their campaign had not yet been made public. Mr
Page's agents who compiled the report said that
they would be able to gather intelligence on the
campaign team in order to monitor their progress
and "attempt to contain or ruin their plans".

\*\*\*\*\*

Neil Gerrard is a former policeman and a
partner in the firm of Dechert LLP which was
instructed to assist with the investigation into Dr
Massaad's alleged fraudulent activities which it
has continued to work on to the present time. His
witness statement dealt with his engagement by RAK,
the meeting he had with Mr Azima in July 2016 and
the events in August 2016 surrounding the
downloading of [Azima's] hacked material. He was
cross-examined about his involvement with the
questioning of detainees within RAK, in particular
Karam Al Sadeq and Shahab Izadpanah. Allegations
that Mr Gerrard had attempted, on behalf of RAK, to
extort money from Mr Izadpanah and had offered Mr
Izadpanah and Mr Al Sadeq to drop all charges
against them if they confessed to charges
implicating Dr Massaad were put to Mr Gerrard who

---

14(...continued)
Docket Entry 4-2, ¶¶ 197-201.8.) According to Judge Lenon:

In order to make good its case that Mr Azima
procured and promoted false stories in the media, it was
incumbent on RAKIA to establish that the stories which it
was intended to publish about human rights violations
were untrue. It has not done so. It appears that
Project Clay[, which RAKIA described as "a coordinated
programme designed to frustrate RAKIA's attempts to
pursue legal remedies against Dr Massaad by procuring and
promoting the widespread publication of damaging false
stories in the international media" (id., ¶ 198.1),]
intended to draw attention to actual cases of detention
and illegality, not fabricated cases. The 2014 Amnesty
International Report indicates that there were real
grounds for concern about detention procedures in RAK.
None of RAKIA's witnesses were in a position to refute
the findings in that report.

(Id., ¶ 202.)" (Docket Entry 7 at 12 n.14.)

11

denied them in forthright terms. On the basis of
the material before [Judge Lenon, he was] not in a
position to make any findings in relation to those
allegations or other allegations of misconduct
extraneous to the events in issue in these
proceedings that were put to Mr Gerrard.[15]

Counsel for Mr Azima submitted that Mr Gerrard
gave dishonest evidence on key issues. He was also
criticised for not referring to Mr Page and the
Project Update in his witness statement. In [Judge
Lenon's] view, Mr Gerrard's witness statement
should have dealt with the Project Update which was
a clearly relevant document and one which, as he
accepted in cross-examination, was of concern to
him when it was produced because it referred to the
threat of a press campaign to smear RAK and its
Ruler with human rights allegations. [Judge Lenon]
do[es] not, however, regard the omission to deal
with the Project Update, or the other criticisms
made of his evidence, as leading to the conclusion
that [Judge Lenon] should treat Mr Gerrard as
dishonest.

Stuart Page, also a former policeman and now
the Chairman and majority shareholder of a business

_____

15  "Following entry of the Azima Judgement, and prompted by
the Al Sadeq Litigation, Gerrard disclosed that he provided false
testimony in the Azima Litigation regarding the nature and extent
of his interactions with Al Sadeq and his wife.  See generally
Azima, Docket Entry 22-2.  As relevant here, Judge Lenon 'agree[d]
with Mr Azima's submission that the corrected evidence cumulatively
creates a materially different impression of the extent and nature
of Mr Gerrard's dealings with Mr Al Sadeq.'  Id., Docket Entry 22-
2, ¶ 14.  Judge Lenon further rejected 'RAKIA's submission that the
erroneous evidence goes to peripheral matters which were of no
relevance to the substantive issues.  There was a pleaded issue on
RAKIA's own case in the proceedings as to whether the stories about
human rights abuses and Dechert's involvement in those abuses were
false . . . .'  Id., Docket Entry 22-2, ¶ 15 (citing Docket Entry
4-2, ¶¶ 197-198).  However, Judge Lenon declined to reopen the
Azima Judgment because, inter alia, he found that disclosure of
Gerrard's false testimony and his subsequent revisions thereto did
not alter '[Judge Lenon's] conclusions on any of the substantive
issues.'  Id., Docket Entry 22-2, ¶ 22."  (Docket Entry 7 at 13
n.15.)

12

providing security and surveillance services, dealt
in his witness statement with his engagement in RAK
to assist with the investigations into Dr Massaad
and the discovery of the hacked material.  Counsel
for Mr Azima submitted that Mr Page was a dishonest
witness who lied about a number of matters.  [Judge
Lenon]  consider[s]  that  Mr  Page  was  an
unsatisfactory and unreliable witness.  As set out
in  greater  detail  in  the  context  of  the  [Azima]
hacking claim, his witness statement was misleading
in relation to two significant matters.  First, his
witness statement implied that he did not produce
written reports for the Ruler on his investigations
whereas  in  fact  he  did  so  on  a  regular  basis.
Second, his witness statement said that he first
came  across  the  name  of  Mr  Azima  in  early  2016
whereas . . . it was in fact a year earlier.  His
evidence in connection with the discovery of the
hacked  material  was  both  internally  inconsistent
and  at  odds  with  the  contemporary  documents.
[Judge  Lenon]  ha[s]  concluded  that  it  would  be
unsafe to rely on any evidence from Mr Page that
was not corroborated by some other source.

        *****

        [Three  referenced  cases  involving  Page  and
illegally obtained information] highlight the fact
that  Mr  Page  operates  in  a  world  of  covert
surveillance  in  which  agents  acquire  confidential
information  unlawfully  and  that  Mr  Page  has
dealings  with  such  agents.    It  would  be  a
reasonable inference to draw from these incidents
that Mr Page has access to agents with the capacity
to hack emails.  However these other incidents do
not establish that Mr Page ever personally carried
out  or  authorised  the  unlawful  obtaining  of
confidential  information  and  therefore  do  not
affect [Judge Lenon's] assessment of the inherent
likelihood of Mr Page acting unlawfully in this
case.  Mr Azima also relied on the level of Mr
Page's  remuneration  of  between  $100,000  and
$300,000 per month as being "consistent with Mr
Page obtaining information by illicit means and of
seeking a premium for such nefarious activity."  Mr
Page  was  certainly  generously  remunerated  but

13

[Judge Lenon] do[es] not consider that his rate of
remuneration can sensibly be taken as a sign of
illicit activity.

(Id., ¶¶ 32, 62-64, 369 (internal paragraph numbering
omitted).)

    In the Azima Litigation, RAKIA maintained that Page
innocently discovered websites containing Azima's hacked
emails, which Gerrard then enlisted Del Rosso to
download, a task Del Rosso achieved with the help of
Northern Technology Inc. ("NTi"). (See, e.g., id.,
¶¶ 51-53, 336-343.11.)[16] Judge Lenon "conclude[d] from
the unexplained contradictions, inconsistences and
implausible elements that RAKIA's case that Mr Page
discovered the blogging websites linked to the BitTorrent
sites [containing Azima's hacked data] innocently via [an
Israeli journalist] and another unidentified informer is
not true and that the true facts as to how RAKIA came to
know about the hacked material have not been disclosed."
(Id., ¶ 355; see also id., ¶¶ 342-54 (examining evidence
and assertions).) Per Judge Lenon, though, "[i]t does
not of course necessarily follow from this conclusion
that RAKIA was responsible for the hacking." (Id.,
¶ 356.)

    As to Azima's hacking claim, Judge Lenon ultimately

    accept[ed] that the hypothesis advanced on behalf
    of Mr Azima that Mr Page, acting with the express
    or implied authority of the Ruler, arranged for Mr
    Azima's emails to be hacked . . . and that it was
    decided to deploy the hacked material in August
    2016 once [a] ceasefire with Dr Massaad was over,

_____

    16 "In support of this contention, RAKIA submitted a witness
statement from Del Rosso that attributes the discovery of all but
one batch of data to Page and the discovery of the final data batch
to an NTi employee. (See generally Docket Entry 4-4.) Del Rosso's
witness statement further indicates that, in August 2014, Dechert
engaged Vital Management 'to investigate assets potentially stolen
from the Government of [RAK]. Pursuant to its engagement[, Vital
Management] examined potential frauds committed by, amongst others,
[Dr.] Massaad.' (Id., ¶ 4.) Del Rosso 'took [his] instructions
from Dechert LLP, and had limited direct contact with Jamie
Buchanan and other representatives of the RAK government.' (Id.)"
(Docket Entry 7 at 15 n.16.)

14

is not impossible. It would provide an explanation for the fact that the hacked material came to light when it did and for RAKIA's failure to provide a convincing account of its innocent discovery of the hacked material. It is equally not impossible that Mr Page arranged for Mr Azima's emails to be hacked without the knowledge of Mr Gerrard or [James] Buchanan [("Buchanan")[17]] or the Ruler's advisers so that the instigation of these proceedings did not entail a conspiracy between them, even though the witnesses may have harboured suspicions about Mr Page's role.

It is, however, not enough for Mr Azima to advance a case that is not impossible. Based on all of the documentary and witness evidence, [Judge Lenon] was not satisfied on the balance of probabilities that RAKIA was responsible for the hacking of Mr Azima's emails. The facts supporting the inference that RAKIA was responsible for the hacking are far from conclusive and the improbable features of Mr Azima's case can only be explained away on the basis of speculative assumptions for which there is no sufficiently firm evidence.

(Id., ¶¶ 380-381 (internal paragraph numbering omitted).) Accordingly, Judge Lenon denied Azima's hacking counterclaim. (See id., ¶¶ 382-84.)

---

17 "Buchanan served as a representative of RAK and the CEO of Ras Al Khaimah Development LLC (see, e.g., Docket Entry 4-1, ¶ 143; Docket Entry 4-4, ¶ 4), an entity 'which holds and manages assets and liability previously owned by [RAKIA], and is thus intimately tied to the Al Sadeq Litigation' (Docket Entry 6, ¶ 15). Per the Azima Judgment:

In around April 2015, the Ruler told Mr Buchanan that he wanted Mr Buchanan and other assistants to 'target' Mr Azima. The Ruler directed his associates to bring charges against Mr Azima. The Ruler's associates discussed meeting to 'coordinate our attack' on Mr Azima and Dr Massaad but persuaded the Ruler not to pursue this plan at that time.

(Docket Entry 4-2, ¶ 33.)" (Docket Entry 7 at 16 n.17.)

15

On appeal, Azima sought to introduce new evidence relevant to his hacking claims. As the UK appellate court explained:

> A tip-off from Thomson Reuters after the trial led Mr Azima to conclude that he had not been the only victim of spear-phishing[18] emails but that others who had been named in the Project Update had also been targets. Linked with the tip-off was a report by The Citizen Lab released on 9 June 2020 which claimed to have uncovered a "massive hack-for-hire operation" said to be linked to an Indian company called BellTrox.
>
> The information provided by Thomson Reuters consisted of email addresses (both recipients and senders) together with dates and times of sending, beginning in March 2015. The recipients included not only Mr Azima but also others who had been named in the Project Update. Following the information provided by Thomson Reuters Mr Azima's computer expert (who had given evidence at trial) produced a further report in which he said that certain features of the material demonstrated that these emails were spear-phishing emails. This evidence was said to show that Mr Azima had been the target of phishing emails which began at the same time as the Project Update was provided to RAKIA: that is to say in March 2015. RAKIA's computer expert (who had also given evidence at trial) made a number of sustained criticisms of that report. RAKIA also took the point that since one of the allegations at trial was that Mr Azima's emails had been hacked because he was named in the Project Update, it would have been open to him to have asked the others also named in that report to allow access to their email accounts. Indeed,

_____

18    "Tsiattalou explained that phishing and spear-phishing communications 'seek to trick the recipient into clicking on a link to a website which itself contains malicious software which is downloaded onto the recipient's device. Spear-phishing is a more sophisticated form of phishing where the communication contains specific information, targeted at the recipient, which makes it more likely that the recipient will click on the link.' (Docket Entry 4, ¶ 43.)"  (Docket Entry 7 at 17 n.18.)

RAKIA had applied for disclosure from at least three of those individuals, which Mr Azima refused.

Mr Azima subsequently instructed Mr Rey, a security consultant based in Switzerland, to investigate. Mr Rey's investigations into BellTrox led him to another Indian company called CyberRoot. He spoke to a Mr Vikash Kumar Pandey, a former employee of CyberRoot. Mr Pandey told him that he and four of his colleagues had worked on the hack of Mr Azima on the instructions of Mr Del Rosso (who had given evidence for RAKIA at trial,[19] but had not mentioned CyberRoot). Mr Pandey began working on the hack in June or July 2015; that is to say some three to four months after the date of the Project Update. Mr Pandey described the methods that he and his colleagues had used. CyberRoot's efforts to hack Mr Azima's emails were initially unsuccessful; but they gained access to them in March 2016. He also described how CyberRoot had disseminated Mr Azima's information on the internet. CyberRoot had been paid about $1 million for this work.

In response to this evidence Mr Del Rosso made another witness statement. He accepted that he had engaged CyberRoot to carry out work on RAKIA's behalf; and had arranged the payment to CyberRoot of the $1 million. But he said that that was for different work which had nothing to do with Mr Azima.

Whether RAKIA was involved in the hacking is hotly in dispute. Moreover, Mr Panday's account of how the hacking began is at variance both with Mr Azima's case and also with what the first tranche of fresh evidence is said to demonstrate. His evidence is that CyberRoot only gained access to Mr Azima's email accounts in March 2016, whereas Mr Azima's case was that the hacking had taken place

_____

19  "In his witness statement in the Azima Litigation trial, Del Rosso maintained that he 'did not hack Mr Azima's computers, cause him to be hacked or know who hacked him. [Del Rosso] did not upload his data to the internet, cause his data to be uploaded or know who did upload his data.' (Docket Entry 4-4, ¶ 20.)" (Docket Entry 7 at 18 n.19.)

many months earlier. If RAKIA had already obtained
access to Mr Azima's email accounts many months
earlier, it is difficult to see why CyberRoot would
have been instructed to replicate the hacking.
Nevertheless, if Mr Panday's account is true, it
seems to [the appellate court] that it will support
Mr Azima's allegation that RAKIA was responsible
for the hacking (although not the way in which it
was put at trial); and that RAKIA's defence to the
counterclaim was dishonestly advanced. That will
in [the appellate court's] judgment require a
complete re-evaluation of the evidence in support
of the hacking claim.

Azima v. Del Rosso, No. 1:20cv954, Docket Entry 49-1,
¶¶ 130-34 (M.D.N.C. Mar. 12, 2021) (internal paragraph
numbering omitted); see also id., ¶ 134 (describing
"judgment for RAKIA on [Azima's hacking] counterclaim" as
"procured by fraud")).

    Accordingly, on March 12, 2021, see id., Docket
Entry 49-1 at 1, the UK appellate court remanded Azima's
hacking counterclaim for retrial before a different
chancery judge, noting as it did so that "neither the
parties nor the judge who hears the remitted issues will
be bound by any of the findings of fact made by the
[original] judge on the hacking [counter]claim," id.,
Docket Entry 49-1, ¶ 146. See id., Docket Entry 49-1,
¶¶ 145-46. The appellate court further noted that, on
remand, "it would be necessary" for Del Rosso to testify.
Id., Docket Entry 49-1, ¶ 143.

    Against this backdrop, Tsiattalou avers:

    In late March 2020, Mr. Oliver Moon
    [("Moon")], a private investigator, turned
    whistleblower, informed Mr. Alexander Sawyer
    [("Sawyer")] (who works in corporate intelligence
    via a company called Quaestio), that he had been
    instructed by a "Source A2", as he was described in
    the Robinson Proceeding (and who was later revealed
    to be a Mr. John Gunning[ ("Gunning")]), to make
    attempts to gain access to Stokoe's confidential
    information. These instructions continued
    throughout April 2020 and included hacking Stokoe's
    bank accounts, including its client account. It
    was subsequently discovered that Source A2's
    instructions had in turn derived from a Mr. Paul

18

> Robinson[ ("Robinson")], another private
> investigator.

(Docket Entry 4, ¶ 13.)[20]  The Tsiattalou Declaration
continues:

> As he has since confirmed in an affidavit, Mr.
> Moon was also instructed to procure confidential
> information — including accessing their bank
> accounts — about others assisting Mr. Al Sadeq,
> namely, Maltin Litigation Support Group[, a legal
> public relations firm whose employee traveled to
> Dubai with Tsiattalou in March 2020 (id., ¶ 11),
> and Radha Stirling (at times, "Stirling") of
> Detained in Dubai].  The timing and coordination of
> this hacking demonstrates that it is designed to
> interfere with the Al Sadeq Litigation, and to
> undermine the sanctity of the confidential
> relationship between solicitor and client.  For
> instance, just after the claim form and Particulars
> of Claim were served in the Al Sadeq Litigation and
> a couple of weeks before Dechert's solicitors made
> enquiries of Stokoe as to who was funding that
> litigation, Mr. Moon was instructed to obtain
> Stokoe's banking co-ordinates.
>
> On April 21, 2020, Mr. Gunning was instructed
> to ascertain [Tsiattalou's] movements "in and out
> of Dubai — for Feb 2020."  As mentioned above,
> [Tsiattalou] was in Dubai in February 2020
> obtaining instructions in relation to the Al Sadeq
> Litigation, and became aware that [he] was the
> subject of surveillance and an unlawful break in.

(Id., ¶¶ 14-15 (internal paragraph numbering omitted).)

In Tsiattalou's view, "[t]here can be no doubt that
the attempted hacking of Stokoe was motivated by, and
relates to, its retainer by Mr. Al Sadeq."  (Id., ¶ 16.)
Tsiattalou further avers:

> As mentioned above, in late March 2020, Mr. Moon
> informed Mr. Sawyer of Quaestio that he had been

---

20  "Sawyer had previously engaged Moon to conduct work on
Stokoe's behalf, which presumably motivated Moon to disclose this
situation to Sawyer.  (Id.)"  (Docket Entry 7 at 20 n.20.)

instructed to obtain confidential information from Stokoe. Mr. Moon agreed to work with Stoke [sic] and Mr. Sawyer to establish the nature and origin of the requests.

[Tsiattalou] was informed by Quaestio (and Mr. Moon has in an affidavit dated July 2, 2020 confirmed) that, pursuant to the arrangement, Mr. Moon received the following instructions from "Source A2" (an individual Stokoe eventually identified as [Gunning]):

a. On April 2, 2020, Mr Moon was instructed to obtain, amongst other things, the Stokoe's banking coordinates.

b. On April 9, 2020, Mr. Moon was instructed to access Stokoe's trading bank account and transactional data for the business bank account for the last three months. This period broadly coincides with the period that had elapsed since the issue of the Claim Form in the Al Sadeq Litigation.

c. On April 21, 2020, Mr. Moon was instructed to provide information relating to [Tsiattalou's] movements in and out of Dubai in February 2020. This period broadly coincides with the period that [Tsiattalou] attempted to visit Mr. Al Sadeq in the [UAE]. As . . . detailed above, when [Tsiattalou] visited Dubai during this time, [he] was subjected to covert surveillance.

d. On April 22, 2020, Mr. Moon was instructed to provide information relating to Stokoe's client account, including transactional information for the month of March 2020. Mr. Moon was told that it was likely information would also be sought for the period November 2019 to February 2020, a period overlapping almost exactly with the period of Mr. Al Sadeq's retainment of Stokoe.

Mr. Sawyer liaised with Stokoe to provide Mr. Moon with Stokoe's bank account documents in a format which allowed covert tracking, to identify the recipients of those documents. In this way,

20

Quaestio established that Mr. Moon was instructed by [Gunning], who was in tu[rn] instructed by [Robinson]. Quaestio's findings are set out in a report, dated June 27, 2020, which is annexed [to the Tsiattalou Declaration ("the Quaestio Report")[21].

Based on this information, Stokoe initiated the Robinson Proceeding in the High Court of Justice of England and Wales, Queen's Bench Division seeking, *inter alia*, to enjoin, and to obtain affidavits from, Mr. Moon, Mr. Gunning, and Mr. Robinson. . . .

Proceedings against Mr. Robinson were stayed by a consent order sealed by Justice Chamberlain, (the "Chamberlain Order"). . . . Pursuant to the Chamberlain Order, Mr. Robinson undertook to "swear an affidavit stating on oath . . . the identity of any person who has requested" that he "obtain Confidential Information from" Stokoe. Mr. Robinson swore an affidavit wherein he stated that Mr. Patrick Grayson was the source of these instructions. . . .

By letter dated November 30, 2020, Mr. Page's attorney, Stephenson Harwood, sent a letter to Stokoe with invoices for the corporate research undertaken by Company Documents Limited, Mr. Robinson's company, on behalf of Page Corporate Investigations Limited (London) and Page Group ME JLT (Dubai). One of the invoices from March 19, 2020, showed that the subject of an investigation was the Brendale Group, a group of companies associated to Mr. David Haigh who has been closely associated to Radha Stirling and who are both named in a press release attributing to their associations and linked companies. Another invoice from October 4, 2017, shows that a group of companies that were involved in RAKIA's case

---

21 "As relevant here, the Quaestio Report indicates that, 'in addition to requests relating to Stokoe, a number of other targets have been identified by Mr Robinson including: Maltin PR, Mr Tim Maltin and, to lesser extent, Hogan Lovells International LLP, [Azima], and [Stirling].' (Docket Entry 4-8, ¶ 3.)" (Docket Entry 7 at 22 n.21.)

21

against Mr. Mikadze were the subject of an investigation by Mr. Robinson's company as instructed by Mr. Page. The companies under investigation were all connected to Gela Mikadze who was another individual investigated by Gerrard and RAKIA in connection with Dr. Massaad.

Stokoe therefore brought further proceedings against Mr. Grayson (amongst others) by Claim Form dated July 16, 2020. . . . Those proceedings were brought, *inter alia*, to compel Mr. Grayson and Mr. Grayson's associated company, Grayson + Co Ltd, to reveal the source of their instructions, any further wrongdoing, and to obtain injunctive relief to prevent them from further wrongdoing.

The application against Mr. Grayson and Grayson + Co Ltd resulted in a consent order made by Justice Tipples, (the "Tipples Order"). . . . Pursuant to the Tipples Order, Mr. Grayson and Grayson[ ]+ Co Ltd undertook to "swear an affidavit stating on oath . . . the identity of any person who has requested that he "obtain Confidential Information from" Stokoe.

Mr. Grayson's affidavit (the "Grayson Affidavit") was notably brief. He stated that: "Nobody requested me to obtain Confidential Information from or pertaining to [Stokoe], directly or indirectly."

(Id., ¶¶ 33-41 (heading, citations, internal paragraph numbering, and certain parentheticals omitted) (certain ellipses and brackets in original).) The Grayson Affidavit further states that Grayson "never asked Mr Robinson to obtain Confidential Information relating to [Stokoe]." (Docket Entry 4-15, ¶ 5.)

However, approximately eight months after submitting the Grayson Affidavit, Grayson provided further information in the Grayson Proceeding that undermine the assertions in his affidavit. In particular, Grayson admitted that, on January 30, 2020, he informed "Robinson that he would be interested in any general information as to how Mr Al Sadeq was funding the Al Sadeq [L]itigation," although he maintains that, during this conversation, he "did not ask Mr Robinson to obtain confidential information about [Stokoe]." (Docket Entry

22

6-3 at 3-4.) Grayson also acknowledged that, around the beginning of April 2020, he asked Robinson if "it was still possible to find out in Dubai if an individual had entered or left Dubai" and that, in response to Robinson's query whether "Grayson was interested in the travels of anyone in particular," he "mentioned Mr Tsiattalou, the senior partner of [Stokoe], as a potential person of interest" and subsequently sent Robinson an email containing Tsiattalou's identifying information. (Id. at 4.)[22]

Grayson further admitted that his "interest in how Mr Al Sadeq might be funding his litigation was prompted by a general question raised with him in a telephone call on or shortly after 28 January 2020 with Mr Nicholas del Rosso of Vital Management," with whom Grayson "had a general consulting arrangement . . . (which was not contained in any written agreement) to provide general business intelligence services and advice." (Id. at 5; see also Docket Entry 6-4 (containing three-year nondisclosure agreement, dated August 30, 2018, between Vital Management and Grayson).) Thereafter, in approximately "late March/early April 2020," Grayson and Del Rosso had another telephone conversation in which Del Rosso asked "whether it was possible to find out if someone had travelled into and out of Dubai" and, in response to Grayson's query whether "[D]el Rosso was potentially interested in the movements of anyone in particular," he "named Mr Tsiattalou and said he was the senior partner at [Stokoe]. Shortly after and as a result of that request, Mr Grayson had the conversation with Mr Robinson in or around the beginning of April 2020" described above. (Docket Entry 6-3 at 5.)

In addition, on March 22, 2021, Page disclosed in the Grayson Proceeding a letter, "dated September 16, 2020, from Allen & Overy LLP (a firm representing the Ruler and Government of [RAK]) to Stephenson Harwood LLP (the firm representing defendant Page in the Grayson

---

22 "Nevertheless, Grayson maintains that he 'did not provide any instruction to Mr Robinson to investigate Mr Tsiattalou or his movements; nor did he ask Mr Robinson to obtain confidential information about [Stokoe] or to obtain information unlawfully,' and he also 'never asked Mr Robinson to provide information about when Mr Tsiattalou entered or left Dubai.' (Id.)" (Docket Entry 7 at 24 n.22.)

23

Proceeding), wherein a number of statements purportedly made by defendant Page are referenced." (Docket Entry 6, ¶ 15.)  As relevant here, the letter states:

1.  We understand from Mr Jamie Buchanan that your client, Mr Stuart Page, has made a number of statements in communications that he had with Mr Buchanan in August and September 2020 that appear to refer to our clients, the Ruler and the Government of [RAK].

    * * * * *

3.  Our clients are concerned to understand what information your client intended to relay by his statements to Mr Buchanan.  In particular, we should be grateful if your client would provide us with his explanation for the following statements:

    (a)  your client referred to English High Court proceedings that have been commenced against him by Stokoe Partnership Solicitors and said: "*if I have to implicate Nick / Patrick, Decherts, Neil and the boss to get me out of this I will.*"  We understand that your client's reference to "the boss" is intended to be a reference to the Ruler.

         Please can your client explain what information, facts or evidence your client had in mind and how he believes this implicates or otherwise relates to the Ruler.

         * * * * *

    (c)  your client said:  "*what with the boss refusing to cover my costs I wish quite frankly I took the ENRC offer*".

         * * * * *

24

(e)    your client made a number of statements as to his intended future conduct including:

*\*\*\*\**

(ii)    "*regrettably Jamie I would have to say you know Nick and Patrick and that Nick was retained long before me and reported to at least in part to Neil.*"; and

(iii)    "*I will stand my ground if I am supported I will not if I am quite frankly treated this way*".

Please can you [sic] client confirm whether any of the above statements were intended to relate to the Ruler or the Government of [RAK]; and, if 'yes', please can your client explain what his intended actions were/are in respect of each relevant statement.

4. We note that some of your client's messages to Mr Buchanan appear to refer to our communications in respect of your client's request that our clients fund his legal costs. As we have discussed previously (e.g. in the telephone calls between Mr Francis of our office and Mr Fordham of your office on 15 and 17 July 2020): our clients rejected your client's request and noted that the legal proceedings against your client have nothing to do with our clients; and, your client has confirmed that he has never been instructed by our clients to do any work in relation to Karam Al Sadeq, nor his lawyers, nor the proceedings that have been brought against Neil Gerrard and Dechert (amongst others).

(Docket Entry 6-6 at 2-3 (emphasis in original).)

Finally, Tsiattalou avers:

Since the issue of proceedings in the Al Sadeq Litigation, [Tsiattalou], along with others involved in the Al Sadeq Litigation, have received

25

numerous emails and text messages which appear to be targeted attempts to access personal data. [Tsiattalou] believe[s] that these attempts amount to phishing or spear-phishing; i.e. communications which seek to trick the recipient into clicking on a link to a website which itself contains malicious software which is downloaded onto the recipient's device. Spear-phishing is a more sophisticated form of phishing where the communication contains specific information, targeted at the recipient, which makes it more likely that the recipient will click on the link.

In particular, Stirling, who has published articles about the Al Sadeq Litigation and has aided Mr. Al Sadeq in raising awareness amongst human rights activists and non-governmental organizations about his case, received a phishing email from a Google Inc. ("Google") account, dutrouxjustine@gmail.com. That same email address sent a phishing email containing Android Package files ("APK files") to Detained in Dubai. An analysis conducted of those APK files showed that the APKs communicated with a number of Ngrok server addresses. Stirling was also the subject of approximately four (4) phishing attempts using content hosted on Dropbox Inc. ("Dropbox") sent to her email address radha@radhastirling.com. Approximately twenty-six (26) phishing attempts were sent to the email addresses of [certain lawyers involved in the Al Sadeq Litigation] and Stirling from domains hosted by Cloudflare Inc. ("Cloudflare"). In addition, Google Firebase accounts were used in approximately twenty (20) phishing attempts targeting the email accounts of [those lawyers], Stirling, and Tim Maltin, of Maltin Litigation Support Group. It is believed that these hacking attempts were perpetuated by individuals associated with the defendants in the Al Sadeq Litigation as part of an attempt to interfere with Mr. Al Sadeq's legal representation.

At approximately 5:45 a.m. on November 5, 2020, just days before a hearing in the High Court was scheduled in the Robinson and Grayson Proceedings, hackers broke into Stokoe's cloud-based IT system which the firm uses to

26

conduct its day-to-day business. By approximately 8:45 a.m., Stokoe's IT provider was able to take measures to protect Stokoe's data and that of ten other law firms potentially affected. Consequently, Stokoe was unable to gain access to their IT system until November 9, 2020. During the time that the IT system was down, Stokoe faced significant impediments in carrying out their day-to-day business activities, including the inability to receive emails on their work addresses. Stokoe was informed by its IT provider that after evaluating the password used to orchestrate the hacking, it determined that the hacking was linked specifically to Stokoe (rather than any of the ten other law firms affected) and that Stokoe's financial material and banking data were accessed.

Stokoe has been operating since 1994. As a firm, [Stokoe] ha[s] never before 2020 been affected by such cyberattacks. [Tsiattalou] believe[s] that these various attempts to access Stokoe's confidential information are linked to its representation of Mr. Al Sadeq. Beyond the confidential information that was sought from Stokoe as described above, in Mr. Robinson's affidavit, he stated that he received the following requests for information:

a. Information about Ms. Stirling's whereabouts, telephone numbers, and banking information; and

b. Financial records and monthly transactional data from the bank account of Maltin PR.

Mr. Al Sadeq's Legal and Support Team has been, and remains, a target of a complicated and coordinated campaign by unknown perpetrators, within the context of their involvement in the ongoing Al Sadeq Litigation.

Accordingly, upon information and belief, Del Rosso and Vital Management have information, documents, and material which would provide evidence necessary to establish the identity of the ultimate perpetrators behind the hacking campaign targeted against Mr. Al Sadeq's [l]egal [t]eam, and

27

in turn, aid Mr. Al Sadeq in proving the defendants' ongoing pattern of human rights abuses, their efforts to interfere with Mr. Al Sadeq's access to legal representation, and their willingness to go to extreme lengths to conceal their unlawful conduct.

(Docket Entry 4, ¶¶ 43-48 (headings and internal paragraph numbering omitted).) Thus, Applicants seek to depose Del Rosso and Vital Management. (See Docket Entries 3-1, 3-2.) In connection with those depositions, Applicants seek certain documents concerning Del Rosso's and Vital Management's interactions with CyberRoot. (See id.)

(Docket Entry 7 at 3-29 (emphasis, ellipses, and all but third set

of brackets in original).)

The Order further noted:

[I]n October 2020, Azima sued [Movants] in this Court for allegedly conspiring with, inter alia, Gerrard, Page, and Buchanan to hack Azima's computer data, including emails (the "Azima/Del Rosso Litigation"). See generally Azima, Docket Entry 1 (the "Azima Complaint"). In particular, the Azima Complaint asserts that Gerrard and Dechert hired [Movants] on RAKIA's behalf to hack Azima's data, which [Movants] accomplished through CyberRoot Risk Advisory Private Limited ("CyberRoot"), a company in "India that engages in illegal hacking." Id., Docket Entry 1, ¶ 2. On February 12, 2021, Azima (publically) disclosed the existence of the instant litigation to [Movants]. See, e.g., id., Docket Entry 45, ¶¶ 7-13. On March 5, 2021, [Movants] responded to this disclosure by stating, in the Azima/Del Rosso Litigation, the following:

On February 5, a former RAK official filed a new discovery application under 28 U.S.C. § 1782 in this District (the "Al Sadeq 1782 Application"), which, like Azima's pending discovery motion, seeks discovery from [Movants] related to the alleged hack of Azima's data. Although the underlying foreign proceeding does not appear to have any relation to [Vital Management], CyberRoot, or allegations of hacking, in support of that application, the petitioners there submitted a set

28

> of photographed copies of purported Kotak Mahindra
> Bank statements (the "Statements"). The Statements
> show payments from [Vital Management] to CyberRoot
> totaling an amount already alleged in the [Azima]
> Complaint.

> Id., Docket Entry 47 at 4.

(Docket Entry 7 at 31-32 (certain brackets in original).) "Despite the Application's public disclosure, no one — including Dechert Defendants, [Movants], or RAKIA — . . . sought to oppose the Application" prior to issuance of the Order. (Id. at 32 (citing Docket Entries dated Feb. 5, 2021, to Oct. 18, 2021).)

## B. "For Use" Determination

After granting Applicants' request to proceed ex parte (see id. at 34-35), the Order analyzed Applicants' Section 1782 request (see id. at 35-41), stating, as relevant here:

> [I]t bears noting that the "for use" factor imposes only
> a "*de minimis*" burden upon a Section 1782 applicant. In
> re Veiga, 746 F. Supp. 2d [8,] 18 [(D.D.C. 2010)]
> (collecting cases). Here, Applicants assert that "Del
> Rosso and Vital Management are in possession of relevant
> documents, materials, and information which will aid in
> determining the identity of the perpetrators behind the
> hacking campaign targeting Mr. Al Sadeq's Legal and
> Support Team and lend support to Mr. Al Sadeq's claims of
> human rights abuses against the defendants." (Docket
> Entry 2 at 20.) As support for that contention, the
> record reflects that, on Del Rosso's own admission,
> Dechert hired Del Rosso and Vital Management in 2014 "to
> investigate assets potentially stolen from [RAK's]
> Government," a task that included examining "potential
> frauds committed by, amongst others, [Dr.] Massaad"
> (Docket Entry 4-4, ¶ 4), at the direction of Dechert,
> Gerrard, Buchanan, and other RAK governmental

representatives. (See, e.g., id. at ¶¶ 4-8.)[23] The record further reflects that, per RAKIA's claims in the Azima Litigation, Al Sadeq participated in these alleged frauds with Dr. Massaad and Azima. (See, e.g., Docket Entry 4-2, ¶¶ 8, 168-183.) RAKIA's evidence in the Azima Litigation regarding this alleged fraud rested on Azima's confidential emails, obtained through hacking. (See, e.g., id., ¶ 384.)

RAKIA, Gerrard, and Del Rosso asserted that Page located Azima's hacked emails on the Internet, which material Gerrard then engaged Del Rosso and Vital Management to download. (See, e.g., id., ¶¶ 51-53, 336-343.11; Docket Entry 4-4, ¶¶ 5-18.) In the Azima Litigation, Del Rosso further maintained that he "did not hack Mr Azima's computers, cause him to be hacked or know who hacked him" and also "did not upload his data to the internet, cause his data to be uploaded or know who did upload his data." (Docket Entry 4-4, ¶ 20.) However, subsequently discovered evidence in the Azima Litigation indicated that Del Rosso allegedly instructed an Indian company, CyberRoot, to hack Azima's data beginning in June or July of 2015. See Azima, Docket Entry 49-1, ¶¶ 130, 132. Del Rosso responded to this evidence by admitting "that he had engaged CyberRoot to carry out work on RAKIA's behalf; and had arranged the payment to CyberRoot of the $1 million. But he said that that was for different work which had nothing to do with Mr Azima." Id., Docket Entry 49-1, ¶ 133.

Like Azima, members of Al Sadeq's Legal and Support Team have received multiple spear-phishing and phishing emails since disclosure of their involvement in the Al Sadeq Litigation. (See, e.g., Docket Entry 4, ¶¶ 43-44; Docket Entry 4-2, ¶¶ 295-300.) Around the same time, private investigators received instructions to, inter alia, obtain these individuals' confidential information, including bank account information, and track at least some of their travel to Dubai — travel associated with the Al Sadeq Litigation. (See, e.g., Docket Entry 4, ¶¶ 14-15, 33-38, 46.) Notably, the financial information

_____

23 "In his trial testimony in the Azima Litigation, Del Rosso indicated that his participation in RAK's fraud investigation remained ongoing. (See Docket Entry 4-5 at 27 ('[S]ince 2014, August 2014, I've been involved somewhere in this massive investigation.').)" (Docket Entry 7 at 36 n.24.)

sought from Stokoe overlaps with its engagement in the Al
Sadeq Litigation and addresses information that Dechert
Defendants have sought in the Al Sadeq Litigation, namely
"who was funding that litigation" (id., ¶ 14). (See id.,
¶ 34.) Moreover, Grayson admitted that his inquiries to
Robinson regarding Tsiattalou's travel to Dubai and the
funding source for the Al Sadeq Litigation originated
with Del Rosso (see Docket Entry 6-3 at 3-5), with whom
Grayson had an ongoing "general consulting arrangement
. . . to provide general business intelligence services
and advice" (id. at 5; see also Docket Entry 6-4
(nondisclosure agreement between Vital Management and
Grayson)). Page has similarly implicated Del Rosso (as
well as Dechert, Gerrard, the Ruler, and Grayson) in the
disputed conduct in the Grayson Proceeding. (See Docket
Entry 6-6 at 2-3.)

Applicants seek production of documents related to
Del Rosso's and Vital Management's work with CyberRoot
for the period from July 1, 2015, through September 30,
2017. (Docket Entry 3-1 at 7-8; Docket Entry 3-2 at 7-
8.) This time frame closely correlates to the period in
which Vital Management paid CyberRoot $1 million (see,
e.g., Docket Entry 4-7 at 2-10) for either hacking
Azima's confidential information, see Azima, Docket Entry
49-1, ¶ 132, or undertaking some other efforts on RAKIA's
behalf, see id., Docket Entry 49-1, ¶ 133, during Del
Rosso's investigation into fraudulent activities
allegedly involving Al Sadeq, an investigation that
continued through at least the initiation of the Al Sadeq
Litigation (see Docket Entry 4, ¶ 25; Docket Entry 4-5 at
27). Applicants further seek to depose Del Rosso and
Vital Management, focusing on their work with CyberRoot
for "the period from January 1, 2015 to the date of [the]
deposition." (Docket Entry 3-1 at 5; Docket Entry 3-2 at
5.)

Information regarding Del Rosso's and Vital
Management's interactions with CyberRoot during this
period bears relevance to Applicants' claims in the
Foreign Proceedings. For example, the timing and method
by which RAKIA obtained Azima's confidential emails,
which allegedly implicated Al Sadeq in the asserted
fraud, appear relevant to Al Sadeq's contention that
RAKIA's claims stem from political motives. Moreover,
the methods employed in RAK's "massive investigation"
(Docket Entry 4-5 at 27) into Dr. Massaad, Azima,
Mikadze, and Al Sadeq relate to both Al Sadeq's claims in

31

the Al Sadeq Litigation and to Stokoe's Hacking Claims, particularly because Page (to whom Del Rosso, Gerrard, and RAKIA attribute the discovery of Azima's hacked materials online) has suggested that Del Rosso, Gerrard, and the Ruler bear responsibility for at least some of the conduct at issue in the Grayson Proceeding. Further, given both the direct and circumstantial evidence linking Del Rosso and the Al Sadeq Litigation with the hacking attempts, cyberattacks, and illicit investigations regarding Stokoe and associated individuals, ascertaining whether Del Rosso and Vital Management enlisted CyberRoot to hack individuals involved in scrutinizing alleged human rights violations by RAK and its Ruler — violations involving both Azima's alleged co-conspirator and, as in the Azima Litigation, Dechert Defendants — qualifies as relevant to both the Al Sadeq Litigation and Grayson Proceeding. Accordingly, the Court finds that Applicants have satisfied their burden of establishing that the requested discovery satisfies the "for use" requirement of Section 1782(a).

(Docket Entry 7 at 35-40 (ellipsis and certain brackets in original).)

## C. Supplemental Record

After the Court issued the Order, the parties submitted additional materials in connection with the Motion. (See Docket Entries 16 to 16-2, 18 to 18-9.) In relevant part, this supplemental record reflects:

Dated January 29, 2021 (see Docket Entry 16-1 at 2), the Amended Al Sadeq Claim includes additional allegations of attempts to obtain confidential information regarding Stokoe (see, e.g., id., ¶ 215A). In this regard, the Amended Al Sadeq Claim alleges:

215A. Attempts have been made by persons connected to one or more of [Dechert] Defendants to unlawfully obtain confidential and/or privileged information from Mr Al Sadeq's solicitors, [Stokoe], in connection with its

32

representation of Mr Al Sadeq in these proceedings.  In particular:

215A.1 In June 2020, Stokoe commenced a claim with Claim No. QB-2020-002218 against Oliver Moon, Paul Robinson and Company Documents Ltd seeking (*inter alia*) Norwich Pharmacal relief,[24] alleging that those persons had been involved in unlawful attempts to obtain confidential banking information from Stokoe in connection with these proceedings. Although [Dechert] Defendants were not party to those proceedings, nonetheless their solicitors, Enyo Law, attended a remote hearing on 7 July 2020 in those proceedings.  It is to be inferred that Enyo Law became aware of those proceedings (which at that stage had not been publicised) through one or more of [Dechert] Defendants, who in turn became aware of them through a pre-existing connection with one or more of the [d]efendants to those proceedings (i.e. the persons alleged to have sought to obtain the confidential information).

215A.2 On 16 July 2020, Stokoe commenced proceedings with Claim No. QB-2020-002492 against Mr Patrick Grayson, Grayson & Co, Stuart Page and Page Corporate Investigations Ltd.  In those proceedings, Stokoe alleges that the defendants, each of whom are private investigators and the corporate entities through which they carry out investigative work, were involved in attempts to obtain confidential information in connection with Stokoe's instruction by Mr Al Sadeq.

216. It is apparent that all of the steps taken against Mr Al Sadeq as pleaded at paragraphs 215 and 215A were taken in order to impede the preparation of this claim

---

24  "[A] *Norwich Pharmacal* proceeding [i]s a vehicle by which [litigants may] . . . obtain[] an order in the English High Court of Justice[] requiring [certain persons or entities] to disclose documents . . . ." <u>First Union Nat'l Bank v. Paribas</u>, 135 F. Supp. 2d 443, 449 n.17 (S.D.N.Y. 2001), <u>aff'd sub nom.</u>, <u>First Union Nat'l Bank v. ARAB African Int'l Bank</u>, 48 F. App'x 801 (2d Cir. 2002); <u>see also</u> <u>In re Application of Braga</u>, 789 F. Supp. 2d 1294, 1306 (S.D. Fla. 2011) (discussing "orders under the *Norwich Pharmacal* doctrine applicable in British practice" and citing <u>Norwich Pharmacal Co. v. Customs & Excise Comm'rs</u>, [1974] AC 133 (Eng.)).

33

against, and (it is to be inferred) with the knowledge
and / or at the request of one or more of [Dechert]
Defendants.

(Docket Entry 16-1, ¶¶ 215A-216 (track-changes formatting
omitted).)

The Amended Al Sadeq Claim further asserts that "[t]he harm
caused to Mr Al Sadeq was the result of a single campaign of
unlawful acts in respect of which each of the [Dechert] Defendants
worked together to bring about and contribute to that harm.
Accordingly, [Dechert] Defendants are jointly and severally
responsible for that harm under Article 291 of the Civil Code."
(Id., ¶ 228B (track-changes formatting omitted).) Per the Amended
Al Sadeq Claim, Al Sadeq suffered severe physical, psychological,
moral, and financial harm, including the loss of assets valued at
more than AED 75 million, from Dechert Defendants' actions. (See,
e.g., id., ¶¶ 294-298.)

Dated September 9, 2021, the Amended Grayson Claim adds
Dechert and Gerrard as defendants in the Grayson Proceeding. (See,
e.g., Docket Entry 16-2 at 2; id., ¶¶ 5A-5C.) According to the
Amended Grayson Claim, the confidential information regarding
Stokoe that "was obtained by, through or at the instigation of
[Grayson, Grayson's company, Page, and/or Page's company] was
obtained at the request of and/or passed on to [Gerrard and/or
Dechert]." (Id., ¶ 15A (track-changes formatting omitted).) In
this regard, the Amended Grayson Claim alleges, inter alia:

34

6. From about January 2020, [Grayson] instructed Mr Paul Robinson to investigate [Stokoe] and to obtain information about [Stokoe] which (as explained below) was plainly confidential to [Stokoe], for reward. Mr Robinson has explained this in his affidavit dated 6 July 2020. In particular:

(1) The first such instructions were given in or about January 2020 at a meeting at the Goring Hotel in Belgravia, London. At that meeting, [Grayson] asked Mr Robinson whether he knew anyone who was able to investigate [Stokoe] and obtain banking information.

(2) [Grayson] asked Mr Robinson a number of follow-up questions from time to time based on the information that Mr Robinson obtained, in particular by encrypted text messages sent using the Signal system which [Grayson] set to be automatically deleted.

7. Mr Robinson in turn requested Mr John Gunning to obtain such information about [Stokoe]. Mr Gunning and Mr Robinson have confirmed this in affidavits dated respectively 2 and 6 July 2020. Mr Gunning in turn made requests of Mr Oliver Moon, as Mr Moon has confirmed in an affidavit dated 2 July 2020. In particular:

(1) On or about 2 April 2020, Mr Robinson requested Mr Gunning to obtain the banking co-ordinates of [Stokoe].

(2) On or about 9 April 2020, Mr Robinson requested Mr Gunning to access [Stokoe's] main bank account and to obtain transactional data for the past three months.

(3) On or about 21 April 2020, Mr Robinson requested Mr Gunning to obtain information as to the "*movements in and out of Dubai – for Feb 2020*" of [Tsiattalou].

(together, the "**Example Requests**").

8. The subjects of each of the Example Requests coincided with the Al Sadeq Litigation in that:

35

(1) As to the first: Around 2 April 2020, enquiries were being made in the course of the Al Sadeq Litigation concerning the source of funding in those proceedings.

(2) As to the second: The Claim Form in the Al Sadeq Litigation was filed on 28 January 2020.

(3) As to the third: Mr Tsiattalou is the partner of [Stokoe] with conduct of the Al Sadeq Litigation. He visited Dubai for the purposes of that litigation in February 2020.

9. The link with the Al Sadeq Litigation and parties thereto is supported by the following facts, namely that:

(1) On or about 22 April 2020, [Grayson] also requested Mr Robinson to obtain information relating to [Stokoe's] client account, including transactional information for March 2020, which request was passed on by Mr Robinson to Mr Gunning. According to Mr Gunning in his said affidavit, he was told by Mr Robinson that it was likely that transactional information of [Stokoe] would also be sought for the period November 2019 to February 2020. It is to be inferred that this latter information came to Mr Robinson from [Grayson]. The period in question overlaps with the period of [Stokoe's] instruction by Mr Al Sadeq.

(2) [Grayson] also requested Mr Robinson to obtain information from other persons connected to the Al Sadeq Litigation. In particular:

(a) In or about October to December 2019, [Grayson] requested the obtaining of confidential information about Ms Radha Stirling of Detained in Dubai, which is a human rights advocacy organisation assisting Mr Al Sadeq.

(b) In or about February and March 2020, [Grayson] requested and obtained financial records and monthly transactional data from a bank account held by Maltin PR, which is a public relations and litigation support entity assisting [Stokoe] with the Al Sadeq Litigation.

36

(2A) On 12 March 2020, [Grayson] sent an email from finucane03@gmail.com to cloverdock@protonmail.com. The email attached a chart which was described in the said email as "*B-A-E-D Relationship Chart*" (the "**Chart**") with a large dramatis personae and alleged links between the individuals and entities depicted. Those depicted include many connected to the Al Sadeq Litigation. It is to be inferred that [Grayson's] investigation of [Stokoe] was part of a wider campaign, linked in part to the Al Sadeq Litigation.

(3) In or about April 2020, [Grayson] requested the obtaining of three months of corporate banking transactions of Hogan Lovells, an international firm of solicitors. Hogan Lovells have no role in the Al Sadeq Litigation. However, Hogan Lovells act on behalf of Eurasian Natural Resources Corporation ("ENRC") in court proceedings commenced by ENRC against Dechert and Mr Gerrard. Dechert and Mr Gerrard are defendants in the Al Sadeq Litigation.

9A. The Chart states that Maltin PR "*paid RS for raising profile of KAS*". That information was confidential and could only have been added by someone party to a breach of confidence. The Chart's metadata suggest that it was created on 24 February 2020 and modified on 11 March 2020. It is to be inferred that [Grayson] and/or an associate modified the Chart following receipt of Maltin PR's confidential information as a result of [Grayson's] requests to Mr Robinson to investigate Maltin PR.

10. The information which was the subject of the Example Requests was plainly confidential in that:

(1) A solicitors' firm's bank details and transactional data are not generally available. A solicitors' firm would not wish such information to be generally available.

(2) The movements of a solicitor while acting for a client engaged in litigation are not generally in the public domain. A solicitor would not wish such information to be generally available, in particular because it is likely to reveal privileged information.

37

(3) Those considerations would have been obvious to the reasonable recipient. They were emphasised by the surreptitious way in which the information was gathered and conveyed.

11. [Stokoe] cannot be sure if the Example Requests are the only instances on which its confidential information was requested and/or obtained, and reserves its right to supplement the[ Amended Grayson] Claim to the extent that further instances are discovered.

11A. In particular, in a period between about March 2020 and September 2020, [Stokoe] and others working on the Al Sadeq Litigation received a heightened number of spear-phishing emails. [Stokoe] does not presently know if any of these were successful and reserves the right to supplement the[ Amended Grayson] Claim to the extent that further information is uncovered.

## Confidential information obtained by [Grayson and Grayson's company]

12. Mr Robinson provided the confidential information, including that obtained from the Example Requests, to [Grayson]. In particular:

(1) In or about April 2020, Mr Robinson met [Grayson] in Sloane Square, London. Mr Robinson provided him with a hard copy print out of the information, and a USB stick containing the same information electronically.

(2) On other occasions, Mr Robinson sent the information using a Proton Mail encrypted email account to the address cloverdock@protonmail.com.

13. [Stokoe] believes that, in requesting and/or receiving the information, [Grayson] was acting through [Grayson's company] (being the company through which he appears to provide investigation services).

## Confidential information obtained by [Page and Page's company]

14. [Stokoe] believes and avers that [Page and/or his company] have accessed some or all of, and have misused, its confidential information, including that obtained

38

from the Example Requests.  [Stokoe] relies in particular on the following facts and matters:

(1) [Page] is an investigation agent who has admitted being instructed by the Ruler of the Emirate in which [Stokoe's] client Mr Al Sadeq is detained, meeting the Ruler regularly (sometimes monthly) and alone.  [Page] made such admission in the course of giving evidence on behalf of [RAKIA] in High Court proceedings between RAKIA and Mr Farhad Azima (the "**Azima [Litigation]**") tried in January-February 2020 before Mr Andrew Lenon QC (sitting as a Deputy Judge of the High Court).

(2) In his judgment in the Azima [Litigation] – *Ras Al Khaimah Investment Authority v. Azima* [2020] EWHC 1327 (Ch) (the "**Azima Judgment**") – at paragraph 369 the Judge held that "*Mr Page operates in a world of covert surveillance in which agents acquire confidential information unlawfully and that Mr Page has dealings with such agents.*"  He further found that "*it would be a reasonable inference . . . that Mr Page has access to agents with the capacity to hack emails.*"

(3) In the Azima Judgment, it was found that [Page] was instructed by the Ruler to arrange covert surveillance monitoring and investigation of persons whom the Ruler viewed as adverse to him and/or RAK and/or RAKIA, and towards whom the Ruler felt hostile, including Mr Azima (see in particular paragraph 377 of the Azima Judgment).  [Page] briefed the Ruler on such projects by way of "*Project Updates*", which briefings were also provided to Mr Neil Gerrard of the law firm Dechert (see in particular paragraphs 32, 266 and 273 of the Azima Judgment).  Mr Gerrard and Dechert are both defendants in the Al Sadeq Litigation, having carried out work in relation to Mr Al Sadeq on behalf of the Ruler and/or RAK and/or RAKIA in respect of which Mr Al Sadeq claims redress.

(4) [Stokoe] believes that the unlawful accessing of its confidential information has been caused or procured by those interested in and/or associated with the defence of the Al Sadeq Litigation.  The Azima Judgment shows the way in which [Page] has provided his investigation and monitoring services

39

for or on behalf of persons whom [Stokoe] avers
have an interest in defeating the Al Sadeq claims
or those acting for and/or associated with them.

(5) A public Internet Protocol address used to
access [Stokoe's] confidential information has been
geolocated to an address in the vicinity of the
premises at 5-8 Sanctuary, London SW1P 3JS which
were at material times the address of both [Page
and his company].

(6) [Page's company] is a company providing
investigation services of which [Page] is a
director.

(7) [Stokoe's] lawyers saw [Page] at close quarters
at their hotel in Dubai when they were working on
the Al Sadeq Litigation. They believe that [Page]
and/or his associates were at the time surveilling
them.

(8) According to information provided by [Page]
through solicitors instructed by him (Stephenson
Harwood) in a letter to [Stokoe] dated 28 July
2020, Mr Robinson has worked with [Page] on a
number of investigations and they have allegedly
discussed merging their businesses. It is thereby
to be inferred that Mr Page knows of and approves
of Mr Robinson's business and methods, and vice
versa. Mr Robinson's said business and methods
include the wrongful accessing of [Stokoe's]
confidential information, to which Mr Robinson has
admitted in his affidavit, as set out above.

(9) Mr Robinson contacted [Page] when Mr Robinson
was served with an application for *Norwich
Pharmacal* relief and an injunction arising out of
the Example Requests (claim number QB-2020-002218).

(10) [Page] offered to assist Mr Robinson with
funding a lawyer in connection with defending such
claim.

(11) Although, in a short affidavit sworn by [Page]
on 27 July 2020, [Page and his company] appear to
deny obtaining confidential information from
[Stokoe], [Page] has previously failed to give a
true account of his discovery of information in

40

High Court litigation, this being the finding in
the Azima Judgment at paragraphs 355 to 356.

\*\*\*\*\*\*

(13) It is to be inferred that Mr Robinson
contacted [Page] as alleged above because they had
a mutual interest in the proceedings concerning the
Example Requests since [Page] (and through him,
[Page's company]) was/were involved with, party to
or otherwise complicit in the wrongdoing comprised
within the Example Requests.

15. As providers of investigation services, it is to be
assumed that each of [Grayson, Page, and their companies]
typically obtain information on the instructions of
others, to whom they pass it on, rather than for their
own use.

(Docket Entry 16-2, ¶¶ 6-15 (hyperlinks, track-changes formatting,

and deletions omitted) (emphasis, italicization, and first ellipsis

in original).) Per the Amended Grayson Claim, "[i]t is to be

inferred from the facts and matters set out in paragraphs 19B and

19C below that such confidential information of [Stokoe] as was

obtained by, through or at the instigation of [Grayson, Page,

and/or their companies] was obtained at the request of and/or

passed on to [Gerrard and/or Dechert]." (Id., ¶ 15A (track-changes

formatting omitted).)

The Amended Grayson Claim further alleges:

[**Page and Page's company**]

19A. It is to be inferred that [Page and/or his company]
were party to the underlying conspiracy. This is to be
inferred from:

(1) The matters alleged in paragraph 14 above.

41

(2) On 16 September 2020, Allen & Overy LLP sent a letter by email to Stephenson Harwood LLP (the "**Allen & Overy Letter**"). Allen & Overy LLP state: "*We understand from Mr Jamie Buchanan that your client, Mr Stuart Page* [the Third Defendant], *has made a number of statements in communications that he had with Mr Buchanan in August and September 2020 that appear to refer to our clients, the Ruler and the Government of [RAK]*". Mr Jamie Buchanan, to whom [Page] is said to have conveyed this message, is the former Chief Executive Officer of Ras Al Khaimah Development LLC, which holds and manages assets and liabilities previously owned by [RAKIA] (an investment entity of RAK). The Allen & Overy Letter states:

"*your client* [sc. Mr Stuart Page, the Third Defendant] *referred to English High Court proceedings that have been commenced against him by Stokoe Partnership Solicitors and said: "if I have to implicate Nick / Patrick, Decherts, Neil and the boss to get me out of this I will." We understand that your client's reference to "the boss" is intended to be a reference to the Ruler.*"

(3) It is to be inferred that:

   (a) "*Nick*" is Mr Del Rosso;

   (b) "*Patrick*" is the First Defendant;

   (c) "*Decherts*" is the Fifth Defendant;

   (d) "*Neil*" is the Sixth Defendant;

   (e) The Ruler of RAK is (as Allen & Overy LLP surmise) "*the boss*". Mr Al Sadeq alleges in the Al Sadeq Litigation that charges brought against him were politically motivated on the part of the Ruler.

(4) The Allen & Overy Letter demonstrates that [Page] has knowledge of the underlying wrongdoing against [Stokoe], sufficient to enable him to implicate various individuals as wrongdoers. It is to be inferred that [Page] obtained this information through his (and/or [his company's])

42

participation in the underlying conspiracy to injure [Stokoe] by unlawful means.

(5) By a WhatsApp message sent on 29 July 2020 at 1.50pm, [Page] wrote to his colleague Caroline Timberlake: "*Grayson is protecting NDR*". [Page] thereby demonstrated his knowledge of the background facts and in particular that [Grayson's] activities in this matter were connected with Nicholas Del Rosso. [Grayson] did not refer to Mr Del Rosso in these proceedings until his Part 18 response dated 19 March 2021. [Page and therefore his company] were thus privy to the covert wrongdoing of [Grayson and/or Grayson's company] and/or Mr Del Rosso.

[***Dechert and Gerrard***]

19B. [Grayson] made the Example Requests, and the wider enquires pleaded at paragraph 9, as part of his work for Mr Nicholas Del Rosso of [Vital Management]. This is apparent from the following facts:

(1) [Grayson] was retained by Vital [Management] from about 2018. Pursuant to that retainer, he signed a non-disclosure agreement made on and effective 30 August 2018 (the **"NDA"**) for a term of 36 months. The term spans the matters in question in these proceedings.

(2) [Grayson] has stated in response to a Part 18 Request (and confirmed in his witness statement dated 14 May 2021) that he was interested in [Stokoe's] affairs due to an enquiry from Mr Del Rosso.

19C. Mr Del Rosso's instruction of [Grayson] was made pursuant to an instruction from Dechert and/or Mr Gerrard. This is to be inferred from the following facts:

(1) Mr Del Rosso provides consulting services through Vital[ Management]. His enquiry is, for that reason, likely to have been on behalf of a client.

(2) Vital [Management] was retained by Dechert and instructed by Mr Gerrard from at least 2014. Mr

43

Del Rosso admits to having paid $1 million to an Indian company, CyberRoot. An employee of CyberRoot admits to having hacked Mr Farhad Azima to obtain evidence for a civil claim which Dechert's client, RAKIA, subsequently brought against Mr Azima (the Azima [Litigation]). Dechert and Mr Gerrard therefore have the means and propensity to order such wrongdoing and rely upon Mr Del Rosso to carry it out.

(3) Mr Gerrard and Dechert are defendants to the Al Sadeq Litigation. Information sought was associated with and/or relevant to the Al Sadeq Litigation.

(4) Mr Gerrard gave false evidence in the Azima [Litigation] about his involvement with Mr Al Sadeq, suggesting that he was involved in clandestine and improper activity regarding Mr Al Sadeq.

(5) Dechert and Mr Gerrard were, at the time [Grayson] was actively seeking the information, interested in the funding of the Al Sadeq Litigation. Solicitors acting for Mr Gerrard and Dechert wrote to [Stokoe] asking a series of questions about the same on 16 April 2020.

(6) Parallel attempts were made to access the private affairs of Radha Stirling, Maltin PR and Hogan Lovells. Dechert and Mr Gerrard have direct interest in and links to the group targeted and the wider group in the Chart. Dechert and Mr Gerrard also have motive and means to investigate that group's private affairs. Paragraphs 9(2A) and 9A above are repeated.

(7) Matthew Banham is and was at all material times a Partner at Dechert. Mr Banham's areas of practice overlapped with Mr Gerrard's. Mr Banham was personally involved in investigating Radha Stirling. Mr Banham made his investigations via Ms Stirling's former colleague David Haigh up to at least early 2020. Ms Stirling is and was an advocate of the plight of Mr Al Sadeq.

(8) Stuart Leach is a public relations adviser who worked at material times with Dechert. He was also

44

involved in the process of investigating Ms Stirling via Mr Haigh.

(9) Mr Page claims to hold information which would incriminate [Grayson, Dechert, and Gerrard] in [Stokoe's] case.

(10) In their response dated 25 May 2021 to letters before claim dated 10 May 2021, the solicitors to [Dechert and Gerrard] (Enyo Law) declined to admit or deny the matters set out in sub-paragraphs (2) and (5) above, alleging instead that "*they appear to be makeweight points which take matters no further forwards.*"

19D. It is further to be inferred that [Grayson and his company] took the actions detailed above pursuant to an agreement with Mr Del Rosso, [Dechert, and/or Gerrard]. In the premises, [Dechert and Gerrard] have committed the tort of conspiracy.

(Docket Entry 16-2, ¶¶ 19A-19D (track-changes formatting omitted) (emphasis, italicization, and certain sets of brackets in original).)

Finally, Robinson provided an affidavit (Docket Entry 18) (the "Robinson Declaration"), the purpose of which "is to provide further details of [Robinson's] dealings with Mr Grayson and details of [his] dealings with Mr Nicholas Del Rosso and in particular the involvement of Mr Del Rosso in the enquiries that Mr Grayson instructed [Robinson] to carry out." (Id., ¶ 5.) As relevant to the Motion, Robinson avers:

[Robinson is] a director of a corporate research and investigation firm, Company Documents Ltd, which undertakes standard corporate research and worldwide document retrieval. Company Diligence (to which [Robinson] refer[s] below) is a trading name of Company Documents Ltd and undertakes more in-depth investigative

45

research and due diligence enquiries with a separate US-facing website.

\*\*\*\*\*\*

Mr Del Rosso is a private investigator and managing director of [Vital Management], based in North Carolina, USA. [Robinson] was first introduced to [Del Rosso] through another private investigator in around 2016. Over the following years Mr Del Rosso instructed [Robinson] to carry out a number of different open source intelligence enquiries for which [Robinson] received payment. Prior to the instructions [Robinson] received from Mr Grayson between early 2019 and June 2020 ("the Grayson enquiries"), which [Robinson] detail[s] in [his] first witness statement, all instructions [Robinson] received from Mr Del Rosso came directly from Mr Del Rosso and not through Mr Grayson.

The way in which Mr Del Rosso instructed [Robinson] changed in respect of the Grayson enquiries. Whereas prior to Mr Grayson's involvement, Mr Del Rosso had instructed [Robinson] directly, when Mr Grayson became involved, beginning in early 2019, he was the one who instructed [Robinson] on the Grayson enquiries, which [Robinson] believe[s] were made on behalf of Mr Del Rosso as he was paying for them. [Robinson] do[es]n't know why these instructions came through Mr Grayson and can only surmise that it was due to their confidential nature. Whilst Mr Grayson provided the instructions in respect of the Grayson enquiries, with the exception of the £5,000 in cash paid to [Robinson] by [Grayson] and the payment for Project Maxwell (which [Robinson] give[s] further details of below), Mr Del Rosso / [Vital Management] paid [Robinson] for all of the Grayson enquiries.

Whilst the Grayson enquiries centred upon what [Robinson] characterise[s] as "UAE related matters" some of the prior open source research investigations upon which [Robinson] was directly instructed by Mr Del Rosso also concerned UAE matters. An example of this concerns Mr Farhad Azima, who [Robinson is] aware was involved in litigation with [RAK]. Mr Del Rosso instructed [Robinson] to carry out open source research investigations concerning Mr Azima.

On 28 January 2018, Company Diligence, entered into a consultancy agreement with [Vital Management] for which

46

[Vital Management] initially made a payment of £500 per month.  These monthly payments commenced in 2018 and ended in June 2020.  A copy of that consultancy agreement is annexed hereto and labelled as Exhibit C.

When [Robinson] spoke to Mr Grayson in connection with the Grayson enquiries, [Grayson] informed [Robinson] that [Grayson] had only recently returned from visiting Mr Del Rosso in North Carolina.  Mr Grayson also informed [Robinson] that Mr Del Rosso would be responsible for paying [Robinson] for the Grayson enquiries.  Whilst Mr Grayson paid [Robinson] £5,000 (half of the sum agreed) for obtaining certain confidential information in respect of the Stokoe Partnership (as explained in [Robinson's] first witness statement), [Vital Management] made the remaining payments to cover the cost of the Grayson enquiries.

[Robinson] also recall[s] one occasion when Mr Del Rosso contacted [Robinson] by secure message after [Robinson] had sent him an invoice in relation to the Grayson enquiries.  [Del Rosso] queried what the amount was for, saying that it was not related to him and [Robinson] should speak to Mr Grayson regarding this.  [Robinson] believe[s that Robinson] must have spoken to Mr Grayson at the time to try and resolve the matter and assume that [Grayson] would have spoken to Mr Del Rosso to explain any issue, as the invoice was subsequently settled in full by Mr Del Rosso.  [Robinson] can't recall exactly which invoice this query was relating to, but [Robinson] think[s] it was in early 2020.

[Robinson] ha[s] collated a number of invoices which were issued by both Company Diligence and Company Documents Ltd to both Mr Del Rosso and [Vital Management] for work which [Robinson] carried out from January 2016 - April 2020.  These documents include invoices for the work that was carried out as part of the Grayson enquiries.  Copies of these invoices are annexed hereto and labelled as Exhibit D.[25]

_____

25   The exhibit contains thirty invoices, dated between January 2016 and June 2020, addressed to "Nick Del Rosso" and/or "Vital Management Services Inc.," totaling approximately £170,000.  (Docket Entry 18-5 at 2-31.)

Six invoices (dated 1/11/2019, 26/02/2020, 16/03/2020, 2/04/2020, 9/04/2020 and 7/06/2020) are not the original invoices which [Robinson] sent to Mr Del Rosso. When these invoices were first issued, [Robinson] sent them by email to Mr Del Rosso at reverendmack@protonmail.com and they were subsequently paid. Following service of the Claim QB-2020-002218 upon [Robinson] on 1 July 2020, [Robinson] spoke to Mr Del Rosso who told [Robinson] not to mention [Del Rosso's] name in relation to this work and to keep [Del Rosso's] name out of the entire matter. In an effort to distance [Robinson] from Mr Del Rosso, [Robinson] deleted the six invoices. Before [Robinson] deleted the invoices, [Robinson] made a note of the detail set out therein. [Robinson] subsequently used this detail to recreate the six invoices that [he] now exhibit[s]. Whilst the handwritten note is no longer available, [Robinson] ha[s] checked [his] bank statements, and confirm[s] that payment for these invoices entered [his] bank account within days of the invoice date.

Two further points of detail concerning the invoices:

The narrative on the spreadsheet for the invoice dated 16 March 2020 refers to "RS" (Radha Stirling) and to "P" (Patrick Grayson). Ex. D.

The 10 July 2019 invoice contains the following narrative: "*OP Dotty - Adress (sic) Trace - as instructed by PG £250*". The PG referred to is Mr Grayson. Ex. D.

[Robinson] ha[s] collated a number of relevant Company Diligence bank statements for the period November 2018 - June 2020. Copies of these statements are annexed hereto and labelled as Exhibit E. [Robinson] ha[s] redacted a number of entries as they are not relevant to the present matter. The ones that have been left unredacted show that payments were received from [Vital Management]. A proportion of these sums were then paid to John Gunning (whom [Robinson] had instructed to undertake the Grayson enquiries) by [Robinson]/Company Diligence. All of these payments to John Gunning were for work carried out in relation to the Grayson enquiries. The one exception is the £750 payment from Mr Grayson on 23 January 2020. Ex. E. This payment was for an enquiry Mr Grayson instructed [Robinson] to carry out,

48

which was unconnected to these proceedings. The
reference on the bank statement is "Project Maxwell",
this was the name attributed to this particular enquiry.

On 1 July 2020 [Robinson] was served with a letter
from [Stokoe], enclosing among other matters, the claim
form and an application notice seeking *Norwich Pharmacal*
relief against [Robinson].

On the same date [Robinson] called Mr Del Rosso and
explained what had happened. The conversation was brief
and [Del Rosso] told [Robinson] that his American lawyer
would contact [Robinson] and that if [Robinson] did not
mention [Del Rosso's] name [Del Rosso] would pay any
legal fees [Robinson] incurred in relation to the
proceedings. A short time later Brandon Neuman, Mr Del
Rosso's American lawyer, called [Robinson].[26] A number
of emails were exchanged between [Neuman] and [Robinson]
in connection with the matter. This email correspondence
is annexed hereto and labelled as Exhibit F.

In a conversation over Signal, Mr Neuman informed
[Robinson] that as he was based in the USA, he could not
assist [Robinson,] and he advised [Robinson] to contact
a lawyer based in the United Kingdom, which [Robinson]
did. Mr Del Rosso informed [Robinson] that he would
assist with [Robinson's] legal fees and he would set up
a loan agreement, which is what happened. On 2 July 2020
Company Documents Ltd entered into a loan agreement with
[Vital Management] for the sum of $25,000. The money was
due to be repaid on 1 July 2021 and the rate of interest
was 8% per annum. A copy of that loan agreement is
annexed hereto and labelled as Exhibit G.

The loan has not yet been repaid, and [Robinson]
ha[s] not yet been asked to repay it. However, the
proceedings against [Robinson] were settled shortly after
[Robinson] swore the affidavit.

Shortly after 1 July 2020 [Robinson] became aware
that [he] was under 24 hour overt and covert

---

26  Neuman serves as Movants' lawyer in this matter (see,
e.g., Docket Entry 8 at 1), signing and filing the Motion and
supporting materials on Movants' behalf (see, e.g., Docket Entry 14
at 3-4; Docket Entry 15 at 30-32; Docket Entry 16 at 1, 3-4; Docket
Entry 19 at 16-18).

49

surveillance. As [Robinson] felt threatened by the individuals carrying out the surveillance, [Robinson] spoke to another private investigator, Gary Lowe (with whom [Robinson] had a long-standing relationship), as [Robinson] knew [Lowe] offered personal security services. [Robinson] knew that Mr Lowe had previously worked with Mr Del Rosso and [Lowe] told [Robinson] that [Lowe] would speak to Mr Del Rosso about what [Robinson] had told [Lowe]. A short time after this, Mr Lowe reported back to [Robinson] that [Lowe] would offer [Robinson] some security and carry out counter-surveillance on [Robinson's] behalf and that [Robinson] would not have to pay [Lowe] for this. Over the next three weeks or so, under Mr Lowe's directions, a number of individuals carried out 24/7 counter-surveillance upon the people watching [Robinson] and offered security for [Robinson] and [his] family. Although Mr Lowe never told [Robinson] directly, [Robinson] assumed that Mr Del Rosso was paying Mr Lowe for the counter-surveillance, given the circumstances and the fact of Mr Lowe's existing relationship with Mr Del Rosso.

In [Robinson's] first witness statement [he] exhibited a number of Signal messages between Mr Grayson and [Robinson]. These messages mostly covered the period from January 2020 - June 2020. [Robinson] now exhibit[s] a number of additional Signal messages between [Robinson] and Mr Grayson spanning the period June 2019 - January 2020. These Signal messages are annexed hereto and labelled as Exhibit H.

With the exception of a number of messages on 9 October 2019 concerning Project Maxwell, all messages contained in Exhibit H are connected to the Grayson enquiries. So far as [Robinson] was concerned all the relevant enquires referred to within those messages were, in one way or another, connected to investigations in the UAE.

(Id., ¶¶ 1, 7-23 (emphasis, headings, and internal paragraph numbering omitted).)

Exhibit F to Robinson's Declaration contains two email chains, entitled "Re: invoice" and "RE: Details of claim part 1," between

Robinson and Neuman dated between July 1, 2020, and July 3, 2020. (See Docket Entry 18-7 at 2-5.)[27]  The "Re: Details of claim part 1" emails all bear the date of July 1, 2020.  (See id. at 3-4.)  In the first email exchange between Robinson and Neuman in this chain, Robinson states, "Dear Brandon, Please see attached the claim. Regards, Paul" (id. at 4), and Neuman responds, "Dear Paul:  Thank you very much, pleasure to meet you."  (Id.)  Robinson replies, "Dear Brandon, Pleasure to meet you too!  Thank you in advance for your assistance in this unfortunate matter.  I will send details to you.  All the best, Paul" (id. at 3), and Neuman responds, "Paul: Thanks again.  Brandon" (id.).  In the "Re: invoice" emails, Robinson sends a message on July 2, 2020, stating, "Dear Brandon, I've been asked to send an invoice to you to cover this matter and you will make a payment today.  Please can you advise to whom it should be addressed?  Thank you Paul" (id. at 2).[28]  On July 3, 2020, Neuman responds to that email with a message stating, "Paul: Can you please give me a call?  1-919-749-4444."  (Id.)  Exhibit F does not contain any of the email attachments.  (See id. at 1-5.)[29]

---

27  Jeff Kelly, another of Movants' attorneys (see, e.g., Docket Entry 11 at 1), appears in the "CC" line of two of these emails.  (See Docket Entry 18-7 at 3.)

28  Also dated July 2, 2020, the Promissory Note for the $25,000 identifies the borrower as Company Documents Ltd, at a UK address, and the lender as "Vital Management Services, Inc. c/o [Movants' counsel's then-current firm.]"  (Docket Entry 18-8 at 2.)

29  Movants do not address Robinson's assertions and evidence
(continued...)

## DISCUSSION

### I. Relevant Standards

### A. Motion to Quash

Movants filed the Motion pursuant to Rule 45(d)(3) of the Federal Rules of Civil Procedure (at times, the "Rules"). (See Docket Entry 14 at 1.) The scope of discovery under Rule 45 mirrors Rule 26, see Kinetic Concepts, Inc. v. ConvaTec Inc., 268 F.R.D. 226, 240 (M.D.N.C. 2010) (citing Fed. R. Civ. P. 45 Advisory Committee's Note, 1991 Amend., Subdiv. (a)), which permits discovery of

> any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

Under Rule 45, those "responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Further, Rule 45(d)(3) requires the Court to modify or quash a subpoena that "subjects a person to undue burden." Fed. R.

---

29(...continued)
regarding their attorneys' involvement in this matter. (See Docket Entry 19 at 1-18.)

Civ. P. 45(d)(3)(A)(iv).[30]   However, one cannot "refuse discovery simply by making a boilerplate objection that it is not proportional."  Fed. R. Civ. P. 26 Advisory Committee Notes, 2015 Amend.   This principle reflects the reality that "[a] party claiming undue burden or expense ordinarily has far better information — perhaps the only information — with respect to that part of the [proportionality] determination."  Id.

## B. Section 1782

"Section 1782(a) provides that a federal district court 'may order' a person 'resid[ing]' or 'found' in the district to give testimony or produce documents 'for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person.'"  Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 246 (2004) (brackets and ellipsis in original); see also In re Naranjo, 768 F.3d 332, 338 n.4 (4th Cir. 2014) (observing that, under Section 1782, "[a]ny 'interested person' may apply to a district court to obtain documents or testimony from another person 'for use in a proceeding in a foreign or international tribunal'").  "[Section 1782] reflects a long-term — over 150-year — policy of Congress to facilitate cooperation with foreign countries by 'provid[ing] federal-court assistance in gathering evidence for use in foreign tribunals.'"  Servotronics,

---

30 Movants raise no arguments regarding the other grounds for modifying or quashing a subpoena under Rule 45(d)(3).  (See Docket Entry 14 at 1-2.)

Inc. v. Boeing Co., 954 F.3d 209, 212–13 (4th Cir. 2020) (brackets in original) (quoting Intel, 542 U.S. at 247).

As such, "Section 1782 affords the district courts 'wide discretion' in responding to requests for assistance in proceedings before foreign tribunals." Al Fayed v. United States, 210 F.3d 421, 424 (4th Cir. 2000). "In exercising its discretion under § 1782, the district court should be guided by the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." Id. (internal quotation marks omitted). As the United States Court of Appeals for the Fourth Circuit has explained:

> In deciding whether to grant the application and allow a subpoena to issue under the statute, the district court considers several factors identified in *Intel*[,] 542 U.S. [at] 246 . . . . This initial application process often occurs ex parte . . . . *See, e.g.*, *In re Republic of Ecuador*, No. C-10-80225 MISC CRB (EMC), 2010 WL 3702427, at *2 (N.D.Cal. Sept. 15, 2010) (listing cases). Once the application is granted and the subpoena is issued, the subpoena target can move to quash it. *Id.*

In re Naranjo, 768 F.3d at 338 n.4.

In the referenced decision, the United States Supreme Court identified certain "factors that bear consideration in ruling on a § 1782(a) request." Intel, 542 U.S. at 264. Accordingly, once an applicant satisfies the statutory requirements, the Court considers:

54

> (1) whether the person from whom discovery is sought is a participant in the foreign proceedings, or instead, is a nonparty outside the foreign tribunal's jurisdiction whose evidence is presumably more dependent on the [C]ourt's assistance; (2) the nature and character of the foreign proceedings, and the receptivity of the foreign body involved to United States judicial assistance; (3) whether the application attempts to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the requests are unduly intrusive or burdensome [and thus should be "trimmed" or rejected outright, id. at 265].

In re Peruvian Sporting Goods S.A.C., No. 18-mc-91220, 2018 WL 7047645, at *3 (D. Mass. Dec. 7, 2018) (citing Intel, 542 U.S. at 264-65). "Generally speaking, the standards for discovery set out in the [Rules] also apply when discovery is sought under § 1782(a)." In re Veiga, 746 F. Supp. 2d at 19.

## II. Analysis

### A. Authority Challenge

As an initial matter, Movants seek to quash the subpoenas on the grounds that the undersigned Magistrate Judge lacked authority to grant the Application. (See Docket Entry 15 at 26-28; Docket Entry 19 at 10-12.) In this regard, Movants first assert that "28 U.S.C. § 636(b)(1)(A) authorizes magistrate judges to decide only 'pretrial matters,' and Rule 72(a) similarly provides that a magistrate judge may decide only 'a pretrial matter not dispositive of a party's claim or defense.'" (Docket Entry 15 at 27 (quoting Fed. R. Civ. P. 72(a)).)[31] In Movants' view, "[a] Section 1782

_____

31  Contrary to Movants' contentions, Rule 72(a) does not
                                              (continued...)

55

application is a standalone proceeding that results in an order granting or denying ultimate relief, so a decision on whether to grant or deny a Section 1782 application is 'dispositive' within the meaning of Rule 72." (Id.) Movants further contend that, based on the "analogous context of an enforcement proceeding for an administrative search warrant," Section 1782 applications qualify as "'dispositive.'" (Id. (citing *Aluminum Co. of Am., Badin Works, Badin, N.C. v. EPA*, 663 F.2d 499, 502 (4th Cir. 1981) ('*ALCOA*')").) Applicants respond that the undersigned magistrate judge "plainly had the authority to issue the Order under applicable statutory law, the Federal Rules, and Fourth Circuit precedent." (Docket Entry 17 at 27.) Applicants' positions should prevail.

Under 28 U.S.C. § 636, a magistrate judge may "hear and determine any pretrial matter pending before the court, except [for

---

31(...continued)
specify that a magistrate judge can only decide nondispositive pretrial matters. Rather, Rule 72(a) states that "[w]hen a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision." Fed. R. Civ. P. 72(a) (emphasis added). As the Advisory Committee Notes indicate, Rule 72(a) "addresses court-ordered referrals of nondispositive matters under 28 U.S.C. § 636(b)(1)(A)," but "does not restrict experimentation by the district courts under 28 U.S.C. § 636(b)(3) involving references of matters other than pretrial matters." Fed. R. Civ. P. 72, Advisory Committee Notes, 1983 Addition, Subdiv. (a).

eight specified motions],"[32] with any such order subject to review under the "clearly erroneous or contrary to law" standard. 28 U.S.C. § 636(b)(1)(A). Section 636 further authorizes a magistrate judge to issue "proposed findings of fact and recommendations for the disposition, by a [district judge], of any [motion specified in Section 636(b)(1)(A)], of applications for posttrial relief made by individuals convicted of criminal offenses[,] and of prisoner petitions challenging conditions of confinement." 28 U.S.C. § 636(b)(1)(B) (footnote omitted). "[S]uch proposed findings and recommendations" remain subject to de novo review. 28 U.S.C. § 636(b)(1).

As the Order noted, "'[c]ourts disagree over whether a Section 1782 proceeding, or a motion thereunder, is a dispositive motion requiring the magistrate judge to issue a report and recommendation.'" (Docket Entry 7 at 1 n.2 (quoting In re Peruvian Sporting Goods, 2018 WL 7047645, at *3).) However, "[t]he great majority of courts to address the issue have found that a magistrate judge has jurisdiction to issue an order on . . . Section 1782 discovery motions." In re: Pons, No. 19-23236-MC, 2020 WL 1860908, at *3, ___ F. Supp. 3d ___, ___ (S.D. Fla. Apr. 13,

---

32 Section 636(b)(1) identifies the exempted motions as "a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action." 28 U.S.C. § 636(b)(1)(A).

2020) (collecting cases), <u>aff'd sub nom.</u> <u>Pons v. AMKE Registered</u>
<u>Agents, LLC</u>, 835 F. App'x 465 (11th Cir. 2020); <u>see also, e.g.</u>, <u>In</u>
<u>re Hulley Enters. Ltd.</u>, 400 F. Supp. 3d 62, 71 (S.D.N.Y. 2019)
("Neither the Supreme Court nor any circuit court appears to have
squarely addressed this issue.  Most lower courts, however, have
found that such rulings are not dispositive and are therefore
subject to review only for clear error.") (collecting cases).

"The Court sees no reason to deviate from this majority view
or to treat this matter differently from other discovery disputes."
<u>Luxshare, LTD. v. ZF Auto. US, Inc.</u>, 547 F. Supp. 3d 682, 687 (E.D.
Mich. 2021), <u>appeal docketed</u>, No. 21-2736 (6th Cir. July 21, 2021).
As the United States Court of Appeals for the Tenth Circuit has
explained:

> [I]n a § 1782 proceeding, there is nothing to be done "on
> the merits."  Section 1782 empowers a district court to
> order a person residing within its district to "give his
> testimony or statement or to produce a document or other
> thing for use in a proceeding in a foreign or
> international tribunal."  28 U.S.C. § 1782.  The only
> issue before the district court is discovery; the
> underlying litigation rests before a foreign tribunal.

<u>Republic of Ecuador v. For Issuance of a Subpoena Under 28 U.S.C.</u>
<u>§ 1782(a)</u>, 735 F.3d 1179, 1182 (10th Cir. 2013).

Thus, "Section 1782 petitions are a special creature in the
law, because they necessarily contemplate that there is or may be
some other proceeding outside the control of the court addressing
the application."  <u>In re Plowiecki</u>, No. CV 21-23, 2021 WL 4973762,
at *5 (D. Minn. Oct. 26, 2021).  "While ruling on a § 1782 subpoena

may resolve the entire action before the court to which the application is addressed, the court's ruling will not resolve the entire litigation because a related civil action is pending or in reasonable contemplation in another country. This renders an administrative subpoena *duces tecum*," <u>id.</u>, as well as an ex parte administrative search warrant such as in ALCOA, <u>see</u> <u>ALCOA</u>, 663 F.2d at 500 & n.1, "distinguishable from a § 1782 subpoena because in the former there is not necessarily a 'related civil action,' while a § 1782 subpoena requires a related proceeding at least 'in reasonable contemplation,'" <u>In re Plowiecki</u>, 2021 WL 4973762, at *5 (citation omitted). As such, "[j]ust like rulings on most discovery matters, a § 1782 subpoena is not dispositive on the claims or defenses of a party. Because a magistrate judge's order on a § 1782 subpoena is nondispositive, it warrants only clear error review like most other nondispositive orders." <u>Id.</u>

Notably, the majority view aligns with the Fourth Circuit's treatment of decisions by magistrate judges authorizing discovery in aid of foreign proceedings. <u>See</u> <u>In re Naranjo</u>, 768 F.3d 332; <u>In re Letter of Request from Amtsgericht Ingolstadt, Fed. Republic of Ger.</u>, 82 F.3d 590 (4th Cir. 1996). As the Order explained:

> [In the former decision, the Fourth Circuit] affirmed, under an abuse of discretion standard, a district court judge's affirmation, under the clearly erroneous or contrary to law standard, of a magistrate judge's grant of a Section 1782 application. <u>See generally</u> <u>In re Naranjo</u>, 768 F.3d 332 . . . (explaining that, in ruling on Section 1782 application, "the magistrate judge ordered [certain individuals] to turn over the documents

59

that they possessed" and, "[o]ver objection, the district court affirmed the magistrate judge's decision in a July 16, 2013 order," id. at 341-42; analyzing substantive challenges to magistrate judge's rulings, see id. at 347-51; and "affirm[ing] the district court's order in the § 1782 proceeding," id. at 351, under "the familiar abuse-of-discretion standard," id. at 347); see also Chevron Corp. v. Page, No. 8:11cv395, Docket Entry 74 at 1 (D. Md. July 16, 2013) (overruling objections to magistrate judge's Section 1782 order, "the [c]ourt concluding that the challenged [o]rder was neither clearly erroneous nor contrary to law"), affirmed In re Naranjo, 768 F.3d at 351; 28 U.S.C. § 636(b)(1) (applying "clearly erroneous or contrary to law" standard to magistrate judge orders on "any pretrial matter" not specifically exempted under Section 636(b)(1)(A), and applying de novo standard to magistrate judge recommendations on eight "motion[s] excepted in subparagraph (A)," none of which involve Section 1782 applications.)

(Docket Entry 7 at 1 n. 2 (certain brackets in original).) In addition, nearly twenty years before In re Naranjo, the Fourth Circuit similarly affirmed, under an abuse of discretion standard, a "district court['s] affirm[ation of a] magistrate's order" that "direct[ed an individual] to provide [a] blood sample [requested for use in a foreign proceeding]." In re Amtsgericht Ingolstadt, 82 F.3d at 592.

"A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law . . . ." Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 572 U.S. 559, 563 n.2 (2014) (internal quotation marks omitted); accord United States ex rel. Drakeford v. Tuomey, 792 F.3d 364, 375 (4th Cir. 2015) ("By definition, a district court abuses its discretion when it makes an error of law." (internal quotation marks omitted)). Such an abuse

60

of discretion would arise if a district court applied an incorrect standard of review to an appeal from a magistrate judge's order. See ALCOA, 663 F.2d at 501-02 (analyzing whether district judge applied "[]correct standard of review to the magistrate's report" and remanding matter where record did not "clearly indicate that [the district judge] afforded the parties a de novo determination" rather than applying "'clearly erroneous or contrary to law' standard of review" on objections to magistrate judge's report). Accordingly, although, as Movants note (see, e.g., Docket Entry 15 at 27 n.9), the Fourth Circuit has not explicitly held that Section 1782 applications qualify as matters which magistrate judges may determine, it has repeatedly acted consistently with the majority view that magistrate judges may determine such matters.

Under the circumstances, Movants' challenge to the undersigned Magistrate Judge's authority to grant the Application does not warrant any relief.

**B. Joinder Challenge**

Movants further assert that the Court should quash the subpoenas "because the Application improperly joined parties" under Rule 20, on the theory that "Al Sadeq's claimed right to relief arises from his litigation, and Stokoe's from its; those are not the same transaction or occurrence." (Docket Entry 15 at 28.) According to Movants, "Applicants do not try to link their claims [as arising from the same transaction or occurrence], and they

cannot, because the requests arise from different litigations, and those litigations arise from different, years-apart events. The Court should not have considered their applications together." (Docket Entry 19 at 14.) As such, Movants assert that "[t]he subpoenas should not have been authorized in a joint proceeding; they should be quashed, the proceedings severed under Rule 21, and new separate applications considered afresh." (Docket Entry 15 at 29.) Applicants respond that they properly joined their Section 1782 requests because "[t]he relief [they] sought in the Application arose out of the same 'series of transactions or occurrences'" (Docket Entry 17 at 28 (quoting Fed. R. Civ. P. 20)). (See id. at 27-28.) Applicants' position possesses merit.

As relevant here, Rule 20 authorizes joinder of parties "as plaintiffs if . . . they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a)(1)(A) (emphasis added).[33] For its part, Rule "21 governs misjoinder of parties[;]" however, "[i]n determining whether parties are misjoined, the joinder standards of Rule 20 apply." Hanley v. First Invs. Corp., 151 F.R.D. 76, 77-78 (E.D. Tex. 1993).

---

33  Movants do not dispute that "a[] question of law or fact common to all plaintiffs will arise in the action," Fed. R. Civ. P. 20(a)(1)(B). (See Docket Entry 15 at 28-29; Docket Entry 19 at 13-14.)

"The joinder provisions of the Federal Rules are very liberal." Kedra v. City of Phila., 454 F. Supp. 652, 661 (E.D. Pa. 1978). As the Supreme Court has explained, "[u]nder the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).[34] "The purpose of [Rule 20] is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits." Mosley v. General Motors Corp., 497 F.2d 1330, 1332 (8th Cir. 1974); see also Kedra, 454 F. Supp. at 661 ("The reason for the liberality [of joinder] is that unification of claims in a single action is more convenient and less expensive and time-consuming for the parties and the court.").

Accordingly, "Rule 20 permits joinder of 'all reasonably related claims for relief by or against different parties.'" Courthouse News Serv. v. Schaefer, 2 F.4th 318, 325 (4th Cir. 2021) (quoting Mosley, 497 F.2d at 1333); see also id. (explaining that "absolute identity of all events is unnecessary for joinder" (brackets and internal quotation marks omitted)). Under this test, "two claims arise from the same transaction — and therefore can be

---

34 Thus, "the scope of the civil action is made a matter for the discretion of the district court, and a determination on the question of joinder of parties will be reversed on appeal only upon a showing of abuse of that discretion." Mosley v. General Motors Corp., 497 F.2d 1330, 1332 (8th Cir. 1974).

joined in the same action — when there is a 'logical relationship' between them." Id.; see also Mosley, 497 F.2d at 1333 ("'"Transaction" is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.'" (quoting Moore v. New York Cotton Exch., 270 U.S. 593, 610 (1926))).

The requisite "logical relationship" exists here. The Al Sadeq Litigation alleges that Gerrard and Dechert conspired with the Ruler and Page (among others) to, inter alia, interfere with Al Sadeq's access to legal representation. (See, e.g., Docket Entry 4, ¶¶ 5, 9-12; Docket Entry 16-1, ¶¶ 60-67, 207-16, 228B, 232-33, 239.) The Amended Al Sadeq Claim specifically alleges that, as part of this conspiracy, those individuals interfered with Stokoe's ability to represent Al Sadeq in the Al Sadeq Litigation, including by overt and covert surveillance of Stokoe and attempts to obtain Stokoe's confidential information. (See Docket Entry 16-1, ¶¶ 215-216 (discussing, inter alia, Stokoe's Hacking Claims).) In turn, the Grayson Proceeding seeks recourse against Page, Gerrard, and Dechert (among others) for this overt and covert surveillance and attempts to obtain Stokoe's confidential information. (See generally Docket Entry 16-2.) Accordingly, a logical relationship exists between Applicants' claims, rendering joinder appropriate. See, e.g., Nor-Tex Agencies, Inc. v. Jones, 482 F.2d 1093, 1094,

1100 (5th Cir. 1973) (upholding joinder of claims by plaintiff Nor-Tek against defendant Jones, by plaintiff Riley against defendants Jones and Owen, and by defendant Owen against defendant Jones, explaining that "Jones's scheme to defraud Nor-Tex was only one chapter in a larger plot to also defraud Riley and Owen"); Kedra, 454 F. Supp. at 662 ("Although the events giving rise to plaintiffs' claims in this case occurred over a lengthy time period, they all are 'reasonably related.'  The complaint sets forth a series of alleged unlawful detentions, searches, beatings and similar occurrences and charges defendants with 'engag(ing) in a systematic pattern of harassment, threats and coercion with the intention of . . . depriving plaintiffs of (their) rights'; each of the incidents set forth is encompassed within the 'systematic pattern.'" (ellipsis in original)).  As such, Movants' joinder-related arguments do not justify quashing the subpoenas.

### C. "For Use" Challenge

Movants additionally contend that "Applicants should not be allowed to compel the discovery they seek here because it is speculative and not relevant to either of the underlying foreign litigations."  (Docket Entry 15 at 10.)  Therefore, Movants maintain, the requested discovery "does not satisfy either Section

65

1782's 'for use' requirement or *Intel*'s burden analysis." (Id.)[35]

Movants' arguments fall short.

As an initial matter, Movants raise a number of evidentiary objections in connection with this challenge to the subpoenas. Movants first assert:

> Applicants' reliance on the English appellate court's description of evidence submitted in unconnected proceedings in Azima's appeal was improper, and that material does not and cannot support granting the discovery that Applicants seek. *Contra* Order at 17-19. The appellate court's description of that declaration is not evidence with respect to Movants. Movants are not parties to that litigation, and the appellate court's (threshold) decision has zero res judicata or collateral estoppel effect as to them. The declaration itself is not before the Court, because Applicants did not submit it. If that declaration had been submitted in connection with a U.S. proceeding (let alone in a U.S. appeal), it would have been rejected because it is the self-serving hearsay statement of a paid investigator for Azima reporting the double-hearsay account of an anonymous source accusing Movants of wrongdoing.

---

35  As to their latter assertion, Movants state that, under the final Intel factor,

> [o]verbreadth and burden are determined by applying the familiar standards of Rule 26, which permits only discovery that is "proportional to the needs of the case." The discovery must be important enough to the claims or defenses at issue in the underlying foreign proceeding that the burden and expense of discovery are justified. A request that is "only marginally relevant" should be denied.

(Id. at 12 (citations omitted); see also id. at 11.)  Movants do not otherwise distinguish between their Section 1782 "for use" and Intel relevance-related arguments.  (See id. at 10-23; Docket Entry 19 at 4-10.)

(Docket Entry 15 at 18-19.) Notably, Movants provide no authority for the proposition that consideration of the UK "court's description of evidence submitted" to that court "was improper" (id. at 18). (See id. at 18-19.) In any event, the cited portion of the Order contains no mention of a declaration involving anonymous sources accusing Movants of anything, let alone a "self-serving hearsay statement of a paid investigator for Azima reporting the double-hearsay account of an anonymous source accusing Movants of wrongdoing" (id. at 19). (See Docket Entry 7 at 17-19.) Accordingly, this evidentiary challenge lacks merit.

Movants next object to the Court's consideration of Page's threat to implicate Del Rosso, as recounted in the Ruler's attorney's letter, in ascertaining whether the requested discovery from Del Rosso bears relevance to Applicants' lawsuit against Page. (See Docket Entry 15 at 20.) However, the Court need not resolve Movants' challenge to consideration of the letter, as the Amended Grayson Claim contains allegations regarding Page's threat to implicate Del Rosso, Gerrard, the Ruler, and Dechert in the Grayson Proceeding (see Docket Entry 16-2, ¶¶ 19A, 19C(9)), and Movants have not suggested that the Court must refrain from considering the Amended Grayson Claim in determining the relevance of the requested discovery to, inter alia, the Grayson Proceeding (see Docket Entry 15 at 20; see also Docket Entry 19 at 6-7). Thus, this evidentiary challenge entitles Movants to no relief.

Movants also challenge the Robinson materials that Applicants submitted in opposition to the Motion. (See Docket Entry 19 at 14-15.) In this regard, Movants first assert that "the new Robinson material submitted is irrelevant because it deals with 2020 events and fails to support Applicants' position that the 2015-2017 material sought is relevant to their proceedings." (Id. at 14.) This assertion depends on a faulty premise underlying many of Movants' arguments, namely that the subpoenas seek only discovery from 2015 to 2017. (See, e.g., Docket Entry 15 at 20-21 (arguing that "even if" Page's threat to implicate Del Rosso "did credibly suggest that Movants had some involvement in the 2020 conduct that Stokoe complains of, it still would not support the 2015-to-2017 discovery Applicants seek here, because Applicants do not seek discovery related to that 2020 conduct," but instead "seek historical information from years ago involving Movants' dealings with CyberRoot").)

The subpoenas command Movants to participate in depositions and produce certain documents. (See generally Docket Entries 3-1, 3-2.) The document requests span the period from "July 1, 2015 through September 30, 2017" (Docket Entry 3-1 at 7; Docket Entry 3-2 at 7) and relate to Movants' interactions with CyberRoot during that period (see Docket Entry 3-1 at 7-8; Docket Entry 3-2 at 7-8). However, the depositions span "the period from January 1, 2015 to the date of [Movants'] deposition" (Docket Entry 3-1 at 5; Docket

68

Entry 3-2 at 5) and, although they focus on Movants' work with CyberRoot, they do not limit permissible deposition subjects solely to such work (see generally Docket Entries 3-1, 3-2). Thus, for instance, Applicants could solicit Del Rosso's testimony "as to who he was receiving his instructions from when he was instructing Robinson through Grayson in 2019 and 2020," as well as regarding "what he paid CyberRoot $1 million for in or about 2015" (Docket Entry 17 at 23). Accordingly, to the extent that Movants' various arguments depend on construing the subpoenas to seek only discovery regarding Movants' interactions with CyberRoot between 2015 and 2017, they fail.[36]

Movants further contend that portions of the Robinson Declaration and supporting exhibits constitute inadmissible hearsay. For instance, they assert that Robinson's "foreign-sworn affidavit" attached as Exhibit A to the Robinson Declaration "is hearsay not within any exception" because "[i]t is not apostilled as required for foreign affidavits to be recognized under the Hague

_____

36 This includes, inter alia, Movants' relevance objection to the Robinson Declaration materials (see Docket Entry 19 at 14) and their contention that Page's alleged threat to implicate Del Rosso does not support the requested discovery (see, e.g., Docket Entry 15 at 21 ("Neither Stuart Page's putative comments, nor any other evidence in any other proceeding, links CyberRoot to any 2020 conduct having to do with Stokoe. So Stuart Page's reported threats do nothing to suggest that the discovery actually sought here could potentially be relevant to the conduct of which Stokoe complains. Without a link between Page's reported comment and the discovery that is sought, that comment does not support the Application.")).

69

Convention Abolishing the Requirement of Legalisation for Foreign Public Documents, and does not otherwise subject the signatory to U.S. perjury penalties as required under 28 U.S.C. § 1746." (Docket Entry 19 at 14.) The referenced Hague Convention addresses procedures for certifying the authenticity of foreign public documents, see T.I.A.S. No. 10072, 33 U.S.T. 883, 1981 WL 375769, and Movants do not challenge the authenticity of Robinson's affidavit (see Docket Entry 19 at 14). Moreover, 28 U.S.C. § 1746 requires only unsworn foreign documents to subject the signatory to U.S. perjury penalties, see 28 U.S.C. § 1746(1), and the affidavit reflects that Robinson made the affidavit under oath (see Docket Entry 18-2 at 2, 9). Accordingly, Movants' hearsay challenges fail to justify exclusion of the Robinson affidavit.[37]

Next, Movants object to certain "out-of-court statements asserted for their truth" in Robinson's Declaration. (Id. at 14.) Specifically, Movants assail as hearsay Robinson's assertion that Grayson informed Robinson "that he had only recently returned from visiting Mr Del Rosso in North Carolina" and "that Mr Del Rosso would be responsible for paying [Robinson] for the Grayson enquiries" (Docket Entry 18, ¶ 11). (See Docket Entry 19 at 14

_____

[37] Movants also assert that the witness statement attached as Exhibit B to the Robinson Declaration (see Docket Entry 18-3) "is unsworn" and does not subject Robinson to penalty of perjury under U.S. law, rendering it "hearsay not within any exception." (Docket Entry 19 at 15.) As this Memorandum Opinion does not cite to that exhibit, the Court need not resolve this hearsay issue.

70

(challenging "Dkt. 18 ¶ 11 (statements by Patrick Grayson)").) They also challenge Robinson's description of the narratives in the July 10, 2019, and March 16, 2020, invoices that Robinson avers he submitted to Del Rosso (see Docket Entry 18, ¶ 15; Docket Entry 19 at 14 (challenging Docket Entry 18, "¶ 15 (reciting hearsay portions of Exhibit D)")), as well as consideration of "the purported invoices dated November 1, 2019 and February 26, March 16, April 2, April 9 and June 7, 2020" in Exhibit D to the Robinson Declaration (see Docket Entry 19 at 15). Finally, Movants assert that the Court cannot consider Lowe's statements to Robinson that Lowe would speak with Del Rosso and would offer Robinson security and conduct counter-surveillance on Robinson's behalf, for which Robinson "would not have to pay" (Docket Entry 18, ¶ 21). (See Docket Entry 19 at 14 (challenging "Mr. Lowe's statements" (citing Docket Entry 18, ¶ 21)).) The Court need not resolve these hearsay challenges, for, as shown below, exclusion of the challenged materials does not impact resolution of the Motion.

Turning to their substantive objections, Movants assert that the requested discovery does not satisfy Section 1782's "for use" requirement and lacks relevance to the Foreign Proceedings. (See Docket Entry 15 at 10-23; Docket Entry 19 at 4-10.) In support of this argument, Movants contend, as relevant here, that (i) "there is zero evidence, and no allegation, that [Movants] were involved in the torts at issue [in the Foreign Proceedings]" (Docket Entry

15 at 12); (ii) "the requested discovery is not 'for use' abroad because the foreign claims do not involve hacking" (id. at 13 (emphasis omitted)); (iii) "Azima's fraud and Azima's emails are irrelevant to Al Sadeq's frauds and imprisonment" (id. at 18); and (iv) "Applicants' claims of a nefarious nexus between Movants and their defendants are too vague" (id. at 21 (emphasis omitted)). Applicants respond that, "[c]ontrary to Movants' contentions, the information sought by the subpoenas to Del Rosso and Vital Management is plainly 'for use' in the Foreign Proceedings under the applicable standard, and is relevant to the claims and defenses in both the Al Sadeq Litigation and the Grayson Proceeding." (Docket Entry 17 at 15.) Applicants' position should prevail.

As noted, Section 1782's "for use" statutory requirement imposes only a "*de minimis*" burden upon an applicant. In re Veiga, 746 F. Supp. 2d at 18 (collecting cases). In turn, Rule 26 governs determination of relevance and burden under Intel's discretionary factors. See, e.g., id. at 19 ("Generally speaking, the standards for discovery set out in the [Rules] also apply when discovery is sought under § 1782(a)").[38] "Relevancy in this context is broadly construed and encompasses any material that bears on, or that reasonably leads to other matters that could bear on, any issue that is or may be in the case." Id. (internal quotation marks

---

38  Indeed, Movants have acknowledged that "[o]verbreadth and burden are determined by applying the familiar standards of Rule 26" (Docket Entry 15 at 12).

omitted); see also In re Application of Sveaas, 249 F.R.D. 96, 103 (S.D.N.Y. 2008) ("[R]elevance is defined extremely broadly for the purpose of determining whether to grant a request for discovery in aid of a foreign proceeding, and a district court should treat requests for discovery in aid of foreign proceedings, under section 1782, permissively, especially where, as here, the discovery is sought from a non-party to the foreign actions.").

Here, the record reflects that, inter alia, Al Sadeq alleges that Gerrard, Dechert, the Ruler, and others violated UAE and international law, including Al Sadeq's human rights, during their investigation "into the affairs of RAKIA and an alleged fraud committed by its former [CEO ]Dr. Massaad" (Docket Entry 16-1, ¶ 8) and other alleged coconspirators, including Al Sadeq, Azima, and Mikadze (id., ¶ 9.5). (See, e.g., Docket Entry 4, ¶¶ 2, 4; Docket Entry 16-1, ¶¶ 1, 8-10; see also Docket Entry 4-2, ¶ 14 ("RAKIA claims that in around late 2012 it discovered that Dr Massaad had perpetrated systematic and wide-ranging frauds against RAKIA and other RAK entities. Subsequent investigations undertaken by the Government of RAK are said to have established that between around 2005 and 2012 Dr Massaad and his associates engaged in an unlawful conspiracy to misappropriate monies and otherwise cause losses exceeding $2 billion.").)[39] More specifically, Al Sadeq alleges

---

39  Al Sadeq, Dr. Massaad, and Mikadze all worked for RAKIA, with Mikadze serving as the "General Manager of RAKIA's Georgia (continued...)

73

that Dechert Defendants violated his "rights, including by using threats and / or mistreatment and / or unlawful methods to force Mr Al Sadeq to give evidence and / or false evidence, as more specifically particularised [in the Amended Al Sadeq Claim], in an attempt to build a case against Dr Massaad and his alleged co-conspirators at the behest of the [R]uler of RAK." (Docket Entry 16-1, ¶ 10.) "Al Sadeq denies any involvement in wrongdoing and maintains that the charges against him were politically motivated on the part of the Ruler of RAK in an attempt to conceal the Ruler's own close involvement in RAKIA's activities and that he was convicted on the basis of false confessions obtained from him under duress by [Dechert] Defendants." (Id., ¶ 1.)

In particular, Al Sadeq has alleged the following:

Although RAKIA "was established" by government decree "in order to promote investment in RAK and to promote various economic sectors in the Emirate" (id., ¶ 14), "by around 2010 RAKIA had, with the full knowledge and approval of the Ruler, very significant investment interests outside RAK, particularly in Georgia" (id., ¶ 17). From 2005 until approximately 2012, Dr. Massaad served as RAKIA's CEO, controlling the "day to day management of RAKIA" and

_____

39(...continued)
operations" (Docket Entry 16-1, ¶ 9.5), Al Sadeq serving as legal adviser, Group Legal Director, and, ultimately, Deputy Chief Executive Officer of RAKIA between 2008 and 2012 (id., ¶ 35), and Dr. Massaad serving as the CEO (id., ¶ 8). Al Sadeq, Dr. Massaad, Mikadze, and Azima all worked on the sale of RAKIA assets in Georgia. (See, e.g., Docket Entry 4-2, ¶¶ 168-171.3.)

74

"developing investment strategies and taking investment decisions with the knowledge, approval, and instructions of the Ruler" (id., ¶ 15). For various political, familial, and economic reasons beginning around 2008, the Ruler directed that RAKIA should "divest itself of its foreign investments" (id., ¶ 21), a sudden change in investment policy that "led to the rushed sale of assets in Georgia at a premature stage with a detrimental effect on the return obtained from them" (id.). During his tenure at RAKIA, "Al Sadeq's responsibility was mainly to finalise deals to sell assets in order to return monies that had been invested outside of RAK to the Emirate, pursuant to th[is] revised strategy required by the Ruler from around 2008 onwards." (Id., ¶ 37.) "At all material times Mr Al Sadeq acted on instructions from Dr Massaad which to the best of his knowledge, in all significant respects, were known to and had been approved or given by the Ruler himself." (Id.) However, the Ruler "denied that he ever told Dr Massaad or anyone else to play any role in the sale of . . . [any] assets owned by any RAK entity." (Docket Entry 4-2, ¶ 173.3.)

Following the Ruler's revision in investment strategy, a rift developed between the Ruler and Dr. Massaad (see Docket Entry 16-1, ¶¶ 15-25), who "left RAK in around June 2012, on good terms and without any suggestion of wrongdoing," and "returned to the UAE on several occasions thereafter until August 2014, including for meetings with the Ruler." (Id., ¶ 25.) In approximately 2014, the

Ruler learned that one of his estranged brothers, Sheikh Faisal, invested in Dr. Massaad's business. (See id., ¶¶ 23, 26-27.) "As a result, the Ruler became concerned that Dr Massaad was working with Sheikh Faisal and / or Sheikh Khaled in order to destabilise the Ruler, and that Sheikh Faisal and / or Sheikh Khaled were plotting to remove the Ruler with the assistance of Abu Dhabi." (Id., ¶ 27.)[40]  Accordingly, in August 2014, Dechert hired Vital Management "to investigate assets potentially stolen from the Government of [RAK].  Pursuant to its engagement[, Vital Management] examined potential frauds committed by, amongst others, [Dr.] Massaad."  (Docket Entry 4-4, ¶ 4.)  "[S]ince 2014, August 2014, [Del Rosso has] been involved somewhere in this massive investigation," in a "role [that] was directed by Dechert" (Docket Entry 4-5 at 27), "[p]rincipally" by Gerrard (id. at 6).  In pursuing this investigation, Del Rosso has primarily taken instruction from Dechert, Gerrard, and, to a lesser extent, Hughes (id. at 6), but has also had direct contact with "Buchanan and other representatives of the RAK government" (Docket Entry 4-4, ¶ 4).  (See, e.g., id., ¶¶ 4-7.)

Around 1 a.m. on September 5, 2014, agents with the RAK State Security Investigations kidnapped Al Sadeq from his home in Dubai

_____

40  Notably, the Ruler first engaged Page to conduct surveillance on Sheikh Khalid between 2008 and 2010 due to the Ruler's concerns that Sheikh Khalid might try to destabilize the Ruler's position as Crown Prince.  (See Docket Entry 4-2, ¶ 260.)

and took him to RAK, where he was initially detained in solitary confinement at the General Headquarters of State Security in RAK without access to a lawyer. (See Docket Entry 16-1, ¶¶ 9.3, 41-50.) "During this initial period of detention immediately after his kidnap from Dubai and rendition to RAK, . . . [Al Sadeq] was questioned by, *inter alios*, Mr Gerrard, in an aggressive fashion and it was made clear to him that the objective of the interrogation was for him to 'cooperate' by giving information falsely to implicate, in particular, Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and their alleged co-conspirators." (Id., ¶ 51.) For months thereafter, Dechert Defendants and others continued their mistreatment of Al Sadeq, including his arbitrary detention in inhumane conditions, interference with his access to lawyers, and abusive interrogations (among other wrongs), attempting to secure his cooperation in the Ruler's vendetta against Dr. Massaad and his alleged coconspirators, including Azima and Mikadze. (See, e.g., id., ¶¶ 52-154.)[41] "The Ruler's motive in pursuing his

---

41   As part of this campaign, Gerrard asked Al Sadeq to provide "false evidence that Mr Azima was manipulating an aviation firm in RAK called RAK HeavyLift in order to use it [as] a gun-running vehicle" (id., ¶ 125.1), as well as "false evidence stating that Dr Massaad, Mr Mikadze and Mr Azima had embezzled money from the Poti Port project and a shopping centre project in Georgia, as a cover to hide the fact that the embezzlement had been carried out by persons known to, and with the knowledge and approval of, the Ruler (and not by Dr Massaad, Mr Mikadze and Mr Azima at all)" (id., ¶ 125.2). (See id., ¶¶ 125-125.2.) RAKIA sued Azima for alleged fraud involving RAK HeavyLift in the Azima Litigation. (See, e.g., Docket Entry 4-2, ¶¶ 3-7, 18-21.)

vendetta is both to punish Dr Massaad for his supposed disloyalty by destroying his reputation and discrediting him, and also to attempt to conceal the Ruler's own personal knowledge and direction of RAKIA's foreign investments for his own personal and political benefit in the years before his accession." (Id., ¶ 29.)

Following Al Sadeq's kidnapping, Dechert Defendants, the Ruler, and others repeatedly warned Al Sadeq's wife "not to involve the press or lawyers in relation to Mr Al Sadeq's situation." (Id., ¶ 60; see also, e.g., id., ¶¶ 72, 101.) However, by March 2015, the Ruler and Dechert Defendants discovered that a journalist had contacted Mrs. Al Sadeq, who continued contact with the journalist despite warnings from the Ruler's assistant and Black. (See id., ¶¶ 142.2-142.3.) The warnings from the Ruler's assistant and Black suggested that they had access to Mrs. Al Sadeq's emails with the journalist, causing Mrs. Al Sadeq to "conclude[] that her email account had been hacked by or on behalf of [Dechert] Defendants," a suspicion confirmed by the Ruler's subsequent discovery that, contrary to her reassurances, "Mrs Al Sadeq had not in fact broken off all contact with [the journalist], a fact that Mrs Al Sadeq considered Dechert and the Ruler could only have known had they had access to her emails." (Id.) Subsequently,

> as a result of the treatment, threats and pressure being applied to him and Mrs Al Sadeq, and as a result of the promises he would be released and pardoned if he cooperated, Mr Al Sadeq had finally agreed in principle by about the third quarter of 2015 that he would "cooperate" by making a false confession and giving false

78

evidence against Dr Massaad and his alleged co-conspirators including Mr Quzmar, Mr Mikadze and Mr Azima so long as he had sufficient binding assurances, in writing, that he would be released and pardoned, and that his family would be allowed to continue their lives as before if he did so.

Mr Al Sadeq had at this time come to accept, as he had been repeatedly told by Mr Gerrard and Mr Hughes, that the only possibility for his release and the safety of his family was to provide them with the "cooperation" they sought by making false confessions and giving the evidence [Dechert] Defendants wanted him to give. It was his intention, once he was released, however, to reveal how he had been treated and forced to confess, and to clear his name.

(Id., ¶¶ 154-155 (internal paragraph numbering omitted).)

On or after August 31, 2015, Buchanan "contacted Mrs Al Sadeq and told her that the Ruler had agreed that Mr Al Sadeq would be released and pardoned, subject to Mr Al Sadeq agreeing to 'cooperate,'" but indicated that this "agreement would only be available orally and could not be put in writing." (Id., ¶ 165.) On September 2, 2015, Buchanan informed Al Sadeq and his wife that the Ruler, at a meeting with Buchanan and Dechert, had agreed that "if Mr Al Sadeq 'cooperated' in whatever ways Dechert required to their satisfaction and signed confession statements, he would be released from prison on bail to a house in RAK in due course, his family being obliged to surrender their passports, although he would not be permitted to leave the country until after he had finished assisting with trials at which point he would be granted a pardon and permitted to leave RAK" (id., ¶ 168). (See id., ¶¶ 167, 169.) Thereafter,

> Al Sadeq began to "cooperate" with [Dechert] Defendants, even in the absence of anything in writing, in the (ultimately vain) hope that he would be released if he did so. Mr Al Sadeq, considering that his life was in danger if he remained at Al Barirat[, the Ruler's private militia camp (id., ¶ 105)], felt that he had been left with no other choice and was no longer able to endure the torments and torture heaped upon him, directly or indirectly, by or on the instructions of [Dechert] Defendants, and Mr Gerrard in particular. In substance, he therefore agreed to the proposal made by Mr Buchanan at the 2 September 2015 Meeting, thereby concluding an agreement on those terms (the "False Confession Agreement") with the Ruler via Mr Buchanan. In doing so Mr Al Sadeq relied upon the promise made by the Ruler and [Dechert] Defendants and Mr Buchanan *inter alia* that he would be released and pardoned.

(Id., ¶ 173 (emphasis omitted).)

The False Confession Agreement required Al Sadeq "to assist Dechert with their enquiries on an ongoing basis, in particular by giving false evidence, which evidence [Dechert] Defendants knew to be false, against Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and alleged co-conspirators and wrongly distancing the Ruler from any knowledge about RAKIA's offshore investment activities, which had always been done with his knowledge or on his instructions, and ultimately for his personal benefit in the years before and after his accession." (Id., ¶ 179.) Consistent with that requirement,

> and following several further months of being pressurised by [Dechert] Defendants for false testimony and without the benefit of legal advice, Mr Al Sadeq eventually signed statements confessing to his involvement in alleged fraud concerning Pioneer Cement Industries LLC, a company part-owned by RAKIA, and Poti Port in Georgia (respectively the "False Confession Statements"), and incriminating, *inter alios*, Dr Massaad and Mr Mikadze. Those statements had been drafted by Mr Hughes and approved by Mr Gerrard. Mr Al Sadeq was not given, or

80

> allowed to read, the statements in their entirety at any point, but parts of the statement were read out to him by Mr Hughes. Additionally, he was asked to sign at least ten blank sheets of paper which, it is to be inferred, was so that those unique signatures could be falsely applied to additional statements and / or documents.

(Id., ¶ 183 (emphasis omitted).)

Versions of these False Confession Statements produced to an Italian Court pursuant to an extradition request for another alleged coconspirator, Shahab Izadpanah, identify these sales as involving "similar fraud[s]" (id., ¶ 183.2; see also id., ¶ 184A (noting, in Italian extradition judgment, that "[t]he Supplement to the extradition request of January 3, 2016 (point 18) provides the unsettling assumption that 'it is expected that Al Sadeq', after having rendered his statements regarding the 'PSP case', 'shall release an equivalent statement with respect to a similar instance of fraud regarding Pioneer Cement' (italicization and track-change formatting omitted))). (See id., ¶¶ 183A-183.4, 184A.)[42]  Notably:

> Al Sadeq had also made clear to, inter alios, Mr Gerrard, Ms. Black, Mr Hughes and Mr Buchanan that the contents of th[e False Confession S]tatements were substantially untrue. As to this, for example, each of the [False] Confession Statements states:

---

42  The Italian Court denied the extradition request and noted both that questions exist regarding "the spontaneity with which Al Sadeq's statement [regarding the Pioneer Cement incident] would be rendered" and that the Supplement's assertion regarding Al Sadeq's release of the False Confession Statement regarding Pioneer Cement casts "doubt on the manner in which evidence was obtained in the case in question."  (Id., ¶ 184A (italicization and track-change formatting omitted).)

that Mr Al Sadeq had had the benefit of legal advice
in relation to the statement. That was untrue and
[Dechert] Defendants knew it to be untrue because they
had refused to allow Mr Al Sadeq's lawyer, Dr Al Shamsi,
to read the False Confession Statements and had refused
him any access to Mr Al Sadeq in relation to the False
Confession Statements; and they had also at various times
forced Mr Al Sadeq against his will to sign statements
waiving the right to legal representation at
interrogations as described [in the Amended Al Sadeq
Claim]; and on one occasion had forced Mr Al Sadeq to
call Dr Al Shamsi and tell him that he did not require
him to attend court or represent him, even though by that
stage Dr Al Shamsi had ceased to act, or in reality to
attempt to act, for Mr Al Sadeq.

[Similarly, the False Confession Statements state]
that the Ruler was unaware of the arrangements and
transactions said to constitute wrongdoing on the part of
Dr Massaad and Mr Al Sadeq. This was untrue, as Mr Al
Sadeq had told Mr Gerrard, Ms Black, Mr Hughes and Mr
Buchanan repeatedly. The Ruler had had contemporaneous
knowledge of all the relevant aspects of the transactions
about which complaint was made and had approved and/or
directed them. That fact would have provided Mr Al Sadeq
(and Dr Massaad) with a defence to the claims brought
against them which, it is to be inferred, is why it was
important to the Ruler and [Dechert] Defendants that Mr
Al Sadeq give false evidence in this respect.

(Id., ¶¶ 184-184.2 (internal paragraph numbering omitted).)

In accord with the False Confession Agreement, in April 20,

2016, "Al Sadeq was transferred to the second floor of a two-storey

villa in Al Hamrah village in RAK (the 'Villa Prison'), where he

was detained until around August 2016. The Villa Prison was

secured with bars on the windows and a security door, and Mr Al

Sadeq was not allowed to leave the Prison Villa." (Id., ¶ 199.)

However, around August 16, 2016, following the publication of the

False Confession Statements, as discussed below, "Al Sadeq was

82

returned to RAK Central Prison, where he has remained ever since."
(Id., ¶¶ 208, 212-213.)  "Since August 2016 Mr Al Sadeq's access to
legal representation has been severely restricted, and he has only
been allowed to meet with Mr Al Haddad[, his local counsel (id.,
¶ 208),] on a handful of occasions."  (Id., ¶ 214.)

Between the fall of 2015 and July 2016, Azima represented Dr.
Massaad in negotiations with Buchanan, Gerrard, and Dechert acting
on behalf of RAKIA.  (See Docket Entry 4-2, ¶ 49.)  One such
meeting occurred on July 16, 2016, between Buchanan, Gerrard, and
Azima.  (Id., ¶ 50.)  "This meeting took an acrimonious turn,"
although the participants dispute "precisely what was said."  (Id.)
"According to Mr Azima, Mr Gerrard threatened him that if Dr
Massaad could not be made to agree to a settlement, then RAKIA
would pursue Dr Massaad, and Mr Azima would be rendered 'collateral
damage'.  This is disputed by RAKIA."  (Id.)  "[A] few days after
the July 2016 meeting" (id., ¶ 51), at the Ruler and Dechert's
direction, Buchanan solicited the creation of an Anti-Massaad
Website "as propaganda supporting the Ruler's continuing vendetta
against Dr Massaad and efforts to distance himself from the
investment activities of RAKIA in the years during which Dr Massaad
was its CEO despite his own intimate involvement in these" (Docket
Entry 16-1, ¶ 205).  "On around 29 July 2016 the False Confession
Statements were published on the" Anti-Massaad Website, which
"contained serious allegations made against Dr Massaad, which it

83

claimed were corroborated by the False Confession Statements." (Id., ¶ 204.) "The Anti-Massaad Website ceased to be accessible on the internet on around 11 August 2016." (Id., ¶ 206.)

Following publication of the False Confession Statements on the Anti-Massaad Website, "in early August 2016, blogging websites began appearing denigrating Mr Azima as a 'fraud' and a 'scammer' and linking to websites containing Mr Azima's confidential emails which appeared at around the same time." (Docket Entry 4-2, ¶ 51.)[43] These emails were obtained through hacking and implicate Al Sadeq in additional instances of alleged fraud regarding the sale of RAKIA's Georgian assets. (See, e.g., id., ¶¶ 10-12, 168-181.6.) In the Azima Litigation, RAKIA maintained that Page innocently discovered websites containing Azima's hacked emails, which Gerrard enlisted Del Rosso to download in August and September 2016. (See, e.g., id., ¶¶ 51-53, 336-343.11.) Del Rosso admits that, at Gerrard's direction, he worked on securing the downloading of these hacked emails, which he provided to Dechert. (See Docket Entry 4-4, ¶¶ 5-19.) However, Del Rosso maintains that he "did not hack Mr Azima's computers, cause him to be hacked or know who hacked him. [Del Rosso] did not upload his data to the internet, cause his data to be uploaded or know who did upload his data." (Id., ¶ 20.) Yet, a former employee of CyberRoot, an

---

43 At least one of these websites, which called Azima a scammer, emphasized Azima's connections to Dr. Massaad. (Id., ¶ 337.)

Indian hacking company, reported that, in 2015 and 2016, Del Rosso employed CyberRoot to hack Azima and disseminate his emails on the internet, for which work Del Rosso paid CyberRoot $1 million. Azima, Docket Entry 49-1, ¶ 132. In the Azima Litigation, Del Rosso admitted that he engaged CyberRoot on RAKIA's behalf and arranged the $1 million payment to CyberRoot, but maintained "that that was for different work which had nothing to do with Mr Azima," id., Docket Entry 49-1, ¶ 133. (See also Docket Entry 16-2, ¶ 19C(2)).

In approximately 2016, an unidentified private investigator introduced Del Rosso and Robinson, who both work as private investigators. (See Docket Entry 18, ¶¶ 1, 7.) Thereafter, Del Rosso enlisted Robinson in various investigations, including UAE-related matters such as investigations of Azima. (Id., ¶¶ 7, 9.) In January 2018, Robinson's company and Vital Management entered into a consultancy agreement, pursuant to which Vital Management made monthly payments to Robinson's company until June 2020. (Id., ¶ 10.) Del Rosso also "had a general consulting arrangement" with Grayson's company, pursuant to which it "provide[d] general business intelligence services and advice." (Docket Entry 6-3 at 5; see also Docket Entry 6-4 (containing three-year nondisclosure agreement, dated August 30, 2018, between Vital Management and Grayson).)

85

In early 2019, Grayson began enlisting Robinson in various inquiries, for which, with the exception of an initial £5,000 cash payment from Grayson to Robinson, Del Rosso and/or Vital Management paid. (See, e.g., Docket Entry 18, ¶¶ 8, 11.) "Whereas prior to Mr Grayson's involvement, Mr Del Rosso had instructed [Robinson] directly, when Mr Grayson became involved, beginning in early 2019, he was the one who instructed [Robinson] on the Grayson enquiries, which [Robinson] believe[s] were made on behalf of Mr Del Rosso as he was paying for them." (Id., ¶ 8.) These inquiries include ascertaining "how Mr Al Sadeq was funding the Al Sadeq [L]itigation" (Docket Entry 6-3 at 3), in connection with which Grayson asked Robinson whether he knew anyone "capable of obtaining bank records and other information relating to [Stokoe]" (Docket Entry 6-1, ¶ 10), as well as ascertaining Tsiattalou's movements in and out of Dubai (Docket Entry 6-3 at 4-5). Grayson admits that his query about the funding of the Al Sadeq Litigation and Tsiattalou's movements originated with Del Rosso, who identified Tsiattalou "[]as the senior partner at [Stokoe]" (id. at 5). (See id. at 4-5.) The inquiries also involved requests, in approximately July 2019, to investigate Stirling and Detained in Dubai. (Docket Entry 6-1, ¶ 13.)

Since disclosure of their involvement in the Al Sadeq Litigation, Al Sadeq's Litigation and Support Team has been subjected to overt and covert surveillance, numerous phishing and

spear-phishing attacks, and the hacking of Stokoe's IT system, rendering Stokoe's IT system inaccessible for days shortly prior to a hearing on the Hacking Claims. (See, e.g., Docket Entry 4, ¶¶ 10-13, 43-45.) Tsiattalou and other members of Al Sadeq's Litigation and Support Team took multiple trips to Dubai between January 2020 and March 2020 in hopes of visiting Al Sadeq at RAK Central Prison, but RAK officials refused to allow such visits. (See id., ¶¶ 10-11; Docket Entry 16-1, ¶¶ 215.3, 215.5.) During these trips, RAK security officials and individuals with Page's company conducted overt and covert surveillance of Al Sadeq's Litigation and Support Team, including breaking into Tsiattalou's hotel room; Page personally participated in this surveillance. (See Docket Entry 4, ¶¶ 10-12; Docket Entry 16-1, ¶¶ 215.3-215.8.) In January 2015, the Ruler hired Page "to investigate what the Ruler feared was a plot between a member of his family and Dr Massaad aimed at destabilising his rulership." (Docket Entry 4-2, ¶ 31.) That engagement followed similar work that Page had conducted for the Ruler, namely attempting between 2008 and 2010 "to ascertain through surveillance what plans Sheikh Khalid, the Ruler's brother, had to try to destabilise the [Ruler's] position." (Id., ¶ 260.)

When Robinson received the Robinson Claim, he contacted Grayson, Page, and Del Rosso. (See Docket Entry 6-1, ¶ 27, 37; Docket Entry 18, ¶¶ 17-18.) More specifically, shortly after

receiving the claim in the Robinson Proceeding on July 1, 2020, Robinson called Page, whom he has known and worked with for more than 20 years, "and informed [Page] that he had been mentioned in Mr Tsiattalou's witness statement" (Docket Entry 6-1, ¶ 37), the first few pages of which Robinson sent to Page. (Id., ¶¶ 36-37.) On July 3, 2020, Page called Robinson, "offer[ing] to provide [Robinson] with a 'top lawyer'" to fight the Robinson Proceeding and to assist with funding such endeavor, if necessary. (Id., ¶ 38.) Robinson declined that offer, as he had already secured legal representation (id.) funded by Del Rosso (see Docket Entry 18, ¶¶ 18-20).

In this regard, Robinson averred that, when he called Del Rosso upon receiving Stokoe's claim, Del Rosso said that Movants' counsel would contact Robinson and Del Rosso "would pay any legal fees [Robinson] incurred in relation to the proceedings" as long as Robinson "did not mention his name." (Id., ¶ 18.) Shortly thereafter, Movants' counsel called Robinson, and Robinson and Movants' counsel exchanged various emails regarding the matter (id.), including one on July 2, 2020, in which Robinson indicates that he had "been asked to send an invoice to [Movants' lawyer] to cover this matter and [Movants' lawyer] will make a payment today" (Docket Entry 18-7 at 2). That same day, Robinson's company and Vital Management, listed as "c/o" Movants' lawyers' then-current firm, entered into a purported loan agreement for $25,000. (Docket

88

Entry 18-8 at 2.)  Aligning with Del Rosso's promise to Robinson that he would cover the legal fees by establishing a loan agreement, Movants have not requested repayment of the now-overdue loan nor have Robinson and his company repaid the money. (Docket Entry 18, ¶¶ 19-20.)

In addition, shortly after July 1, 2020, Robinson became the subject of 24-hour surveillance, which he found threatening. (Id., ¶ 21.)  Robinson alerted Lowe, whom he knew had previously worked with Del Rosso, to the situation, and Lowe provided 24-hour counter-surveillance and security for Robinson and his family for the next three weeks, without charge to Robinson. (Id.)  Given the circumstances, Robinson believes that Del Rosso paid Lowe for this work. (Id.)

Finally, on July 16, 2020, Stokoe initiated the Grayson Proceeding.  (Docket Entry 4, ¶ 39.)  On July 29, 2020, Grayson issued his original affidavit, in which he denied soliciting any confidential information regarding Stokoe or being asked to obtain any confidential information regarding Stokoe.  (See Docket Entry 4-15 at 2-5.)  That same day, Page advised a colleague that Grayson was protecting Del Rosso.  (Docket Entry 16-2, ¶ 19A(5).)  Unlike Grayson, according to the Amended Grayson Claim, in August and September 2020, Page warned Buchanan that Page would implicate Del Rosso, Grayson, Gerrard, Dechert, and the Ruler if necessary to resolve the Grayson Proceeding against Page.  (Id., ¶¶ 19A(2)-(4).)

For his part, in March 2021, Grayson admitted that, prompted by Del Rosso, he had inquired of Robinson regarding obtaining Stokoe's confidential information. (See Docket Entry 6-3 at 3-5.)

As the foregoing reflects, Movants' contentions that "there is zero evidence, and no allegation, that [Movants] were involved in the torts at issue" in the Foreign Proceedings (Docket Entry 15 at 12) and that Applicants assert only an insufficiently vague "nefarious nexus between Movants and their defendants" (id. at 21 (emphasis omitted)) lack merit. Ample direct and circumstantial evidence ties Movants to the defendants in the Foreign Proceedings and the alleged wrongs against Al Sadeq and Stokoe. For instance, Robinson and Grayson directly connect Del Rosso to the attempts to gain confidential information regarding Stokoe in 2020 that both the Hacking Claims and the Amended Al Sadeq Claim challenge. In turn, a former CyberRoot employee reports that he and his CyberRoot colleagues hacked Azima's emails on Del Rosso's instructions, emails that allegedly implicate Al Sadeq in the fraudulent sale of RAKIA assets in Georgia.

Movants maintain that "discovery related to that alleged incident . . . has no bearing on the truth or falsity of Al Sadeq's claim of official misconduct in his criminal proceedings" (id. at 14) because "Azima's fraud and Azima's emails are irrelevant to Al Sadeq's frauds and imprisonment" (id. at 18). However, as detailed above, according to Al Sadeq, his responsibilities at RAKIA

90

involved finalizing asset sales pursuant to the Ruler's directive to sell RAKIA's foreign assets. Al Sadeq also asserts that the Ruler knew and approved of all of Al Sadeq's (and Dr. Massaad's) actions regarding RAKIA. Further, Al Sadeq alleges that the charges against him, and his associated mistreatment since his September 2014 kidnapping and arbitrary detention, arise from political motivations, including the Ruler's desire to hide the Ruler's involvement in RAKIA's foreign investments by pursuing a vendetta against, inter alia, Dr. Massaad. Per Al Sadeq, this vendetta includes attempts by Dechert Defendants (among others) to force Al Sadeq to falsely implicate Dr. Massaad, Azima, and Mikadze in fraud against RAKIA, attempts that succeeded by late 2015. Accordingly, determining the circumstances by which the Ruler obtained Azima's emails, which implicate Al Sadeq in an alleged fraud regarding the sale of one of RAKIA's Georgian assets, remains relevant to Al Sadeq's claims regarding the Ruler's politically motivated campaign against Al Sadeq, Dr. Massaad, Azima, and Mikadze, regardless of the fact that the False Confession Statements discuss "similar fraud[s]" (Docket Entry 16-1, ¶ 183.2) related to different RAKIA assets in Georgia.

That conclusion would not change even if the Court accepted Del Rosso's assertion that he engaged CyberRoot to conduct work for RAKIA unrelated to the hacking of Azima's emails. In that regard, again as documented in the preceding discussion, since August 2014,

at Dechert's instigation and Gerrard's direction, Del Rosso has participated in a massive investigation of assets potentially stolen from RAK's government, including potential frauds by Dr. Massaad and others. Whatever work Del Rosso enlisted CyberRoot to conduct on RAKIA's behalf in furtherance of this investigation bears relevance to Al Sadeq's claims given Al Sadeq's contentions, inter alia, that the Ruler authorized all of Al Sadeq's and Dr. Massaad's actions regarding RAKIA's assets; that RAK authorities and Dechert Defendants imprisoned and mistreated Al Sadeq to force him to provide false evidence regarding Dr. Massaad and his alleged conspiracy to defraud RAKIA; and that Al Sadeq (and Dr. Massaad) engaged in no wrongdoing.

Movants additionally argue that the requested discovery does not qualify as for use in the Foreign Proceedings "because the Foreign Claims do not involve hacking." (Docket Entry 15 at 13 (emphasis omitted).) As Applicants note, this "argument is semantic," resting as it does on the theory "that the subpoenas should be quashed because the claims in the Foreign Proceedings do not use the word 'hacking.'" (Docket Entry 17 at 20-21.)[44] Movants' argument ignores the Foreign Proceedings' claims of illicit surveillance and attempts to gain access to Al Sadeq's

---

44  It also depends on an overly narrow view of the discovery that Applicants seek. (See, e.g., Docket Entry 15 at 13-18 (failing to acknowledge that requested discovery extends beyond Movants' involvement with CyberRoot in 2015-17).)

Legal and Support Team's confidential information to impede Stokoe's representation of Al Sadeq. Further, to the extent Movants challenge consideration of incidents in the Tsiattalou Declaration that "do[] not appear at all in Stokoe's statement of the particulars of its claim" (Docket Entry 15 at 15), that contention lacks merit. Of note, the Amended Al Sadeq Claim alleges Dechert Defendants' participation in a conspiracy to "unlawfully obtain confidential and/or privileged information from [Al Sadeq's lawyers, Stokoe,] in connection with [Stokoe's] representation of Mr Al Sadeq in the[ Al Sadeq Litigation]" (Docket Entry 16-1, ¶ 215A) and to disrupt Al Sadeq's access to legal counsel generally (see, e.g., id., ¶¶ 214-216). Movants provide support neither for the notion that the pleadings in the Foreign Proceedings need to detail every action in furtherance of this alleged conspiracy nor for the theory that this Court cannot consider a Section 1782 applicant's evidence in support of its foreign claims in determining whether the discovery sought qualifies as relevant to such claims. (See Docket Entry 15 at 15.) Moreover, the evidence before this Court indicates that what comprises relevant documentation for the UK litigation extends beyond the claim form and particulars of claim. (See, e.g., Docket Entry 6-1, ¶¶ 35-37 (discussing Tsiattalou witness statement served with Robinson Proceeding).) Accordingly, Movants' "hacking" argument fails to justify quashing the subpoenas.

93

In sum, Movants' arguments do not alter this Court's previous conclusion that the discovery sought here satisfies Section 1782's "for use" and relevancy requirements. (See Docket Entry 7 at 35-40.) For instance, the evidence sought could help prove whether, inter alia, Gerrard and Dechert helped interfere with Al Sadeq's access to legal counsel (by interfering with Stokoe's ability to represent Al Sadeq), as well as whether the charges and actions against Al Sadeq arose from political motivations, including the Ruler's desire to punish Dr. Massaad and hide the Ruler's involvement in RAKIA's foreign investment activities. The requested discovery could also help prove whether Grayson and his codefendants, including Page, Gerrard, and Dechert, engaged in illicit attempts to obtain Stokoe's confidential information and to disrupt its representation of Al Sadeq. Accordingly, Applicants' discovery requests meet Section 1782's "for use" and relevancy requirements. See, e.g., In re Veiga, 746 F. Supp. 2d at 19; In re Application of Sveaas, 249 F.R.D. at 103.

Accordingly, Movants have not established grounds to quash the subpoenas.

**D. Scope Challenge**

Movants alternatively assert that the Court should limit the subpoenas. (See, e.g., Docket Entry 15 at 23-26.) In this regard, Movants first assert that "[n]o deposition testimony should be allowed" (id. at 23) because "[d]eposition testimony is costly and

94

time-consuming, and should be denied because it is not proportional to the needs of the case" (id. at 24 (internal quotation marks omitted)). However, Movants offer no specifics in support of this generalized contention. (See id. at 23-26.) The Foreign Proceedings involve allegations of, inter alia, serious human rights violations, attempts to obtain lawyers' confidential information and to interfere with their client representation, and loss of millions of dollars worth of assets. Movants' conclusory complaint about the burden of depositions does not suffice under the circumstances. See Fed. R. Civ. P. 26 Advisory Committee Notes, 2015 Amend. (explaining that one cannot "refuse discovery simply by making a boilerplate objection that it is not proportional").

Movants further assert that denial of Applicants' deposition request "is particularly appropriate here because pre-trial deposition testimony is not customary in English proceedings." (Docket Entry 15 at 24; see id. at 24-25.) Section 1782 provides that, "[t]o the extent that the order [authorizing discovery] does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure." 28 U.S.C. § 1782(a). "As such, [Section 1782] clearly contemplates depositions being taken in accordance with the Federal Rules." In re: Application of Servotronics, Inc., No. 2:18-mc-364, 2021 WL 1521931, at *8 (D.S.C.

95

Apr. 16, 2021). Therefore, "[c]ourts frequently permit the issuance of deposition subpoenas when granting § 1782 applications," id., including authorizing depositions in connection with UK proceedings, see, e.g., In re Oak Tr., No. 5:21mc7, 2021 WL 1390014, at *1-2 (M.D. Fla. Apr. 13, 2021) (authorizing subpoenas seeking documents and depositions for use in UK proceeding).

Next, Movants assert that the Court should limit the responsive time period for all discovery "to January through April 2020 — the period after Al Sadeq publicized his claim and in which Stokoe alleges it witnessed phishing attempts." (Docket Entry 15 at 25.) According to Movants, "Applicants' request for material from 2015 to 2017 does not target relevant material." (Id.) Movants also insist that "the Court should limit the subpoenas to [Vital Management's] work with CyberRoot — if any — relating to Stokoe or Al Sadeq." (Id. (challenging specifically document request 5 (compare id. at 25-26, with Docket Entry 3-1 at 8, and Docket Entry 3-2 at 8)).) For the reasons discussed previously, Movants' work with CyberRoot from 2015 to 2017, which Del Rosso admits involved RAKIA, remains relevant to, inter alia, Al Sadeq's claims regarding the politically motivated nature of the actions against him. In addition, no justification exists for the proposed time limitation. The events that the Foreign Proceedings challenge begin long before January 2020, continue after April 2020, and extend beyond phishing attempts targeting Stokoe. (See generally

Docket Entry 16-1 (challenging conduct beginning in 2014 and continuing through issuance of Amended Al Sadeq Claim on January 29, 2021); see also, e.g., Docket Entry 16-2, ¶¶ 11A, 19C(10) (asserting that phisphing attempts continued through September 2020 and detailing conduct on May 25, 2021); Docket Entry 18, ¶¶ 11, 14, 16-19 (asserting that Robinson engaged in work relevant to Robinson Proceeding for which Movants paid through June 2020 and that, in July 2020, Movants funded Robinson's defense to Robinson Proceeding on condition that Robinson not disclose Del Rosso's involvement in challenged conduct).) Under the circumstances, the Court declines to impose the requested limitations on the authorized discovery.

## CONCLUSION

Under Rule 20, Applicants appropriately pursued their Section 1782 requests through a joint Application, which the undersigned Magistrate Judge could grant. In addition, the requested discovery satisfies Section 1782's "for use" requirement and does not impose an undue burden under Intel's discretionary factors.

**IT IS THEREFORE ORDERED** that the Motion (Docket Entry 14) is **DENIED.**

This 18th day of March, 2022.

/s/ L. Patrick Auld
**L. Patrick Auld
United States Magistrate Judge**
