UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:21-MC-6-WO-LPA

| | |
|---|---|
| In re Application of KARAM SALAH AL DIN AWNI AL SADEQ and STOKOE PARTNERSHIP SOLICITORS for an Order Under § 1782 to Conduct Discovery for Use in Foreign Proceedings. | **REPLY IN SUPPORT OF MOTION TO RECONSIDER OR MODIFY** |

This Reply Memorandum is submitted in support of Respondents Vital Management Services, Inc. ("VMS") and Nicholas Del Rosso's ("Del Rosso") (together, "Respondents") Motion to Reconsider or Modify (D.E. 25) (the "Motion") and in response to Karam Al Din Awni Al Sadeq ("Al Sadeq") and Stokoe Partnership Solicitors' ("Stokoe") (together, "Applicants") opposition to that Motion (D.E. 33) (the "Response").

## INTRODUCTION

In their Motion, Respondents sought relief from the Court based on two recent developments.

First, Respondents recently obtained payment records in discovery linking Applicants' co-conspirator, Farhad Azima, to the unlawful acquisition of CyberRoot Risk Advisory Private Ltd.'s ("CyberRoot") bank statements used by Applicants to seek approval of the 28 U.S.C. § 1782 Application. Whereas Applicants represented that they had obtained CyberRoot's bank statements from a "whistleblower who is employed by CyberRoot and who has legitimate

1

access to the company's bank account[,]" (D.E. 4, ¶ 32), the bank records were obtained through bribes paid by Azima's agents to employees of the *bank* in return for the bank statements cited by Applicants. In reaching its ruling, the Magistrate Judge relied upon Applicants' false and prejudicial insinuation that a CyberRoot employee blew the whistle and that Applicants lawfully obtained CyberRoot's bank records.

Second, while the Application purports to seek evidence for use in a foreign proceeding, the High Court in the U.K. has recently ruled that evidence related to Dechert LLP's ("Dechert") investigatory work on behalf of Ras Al Khaimah ("RAK") is privileged. A reassessment of the scope of the foreign discovery, which was unavailable to the Magistrate Judge, would better protect important privileges, and Respondents' due process rights to be free from oppressive and undue discovery.

While Applicants' Response attempts to minimize the importance of these developments, missing from their arguments is:

- any denial that Tsiattalou falsely reported to this Court how he came into possession of CyberRoot's bank statements;
- any response to the evidence (which the Standard Chartered Bank records substantiate) that Applicants brought this proceeding as part of their concerted efforts with the Eurasian Natural Resources Corporation ("ENRC"), Farhad Azima, and others to falsely implicate

2

Respondents in order to acquire information about Respondents' work for Dechert and its client, RAK; and,

- any indication that Applicants have leave of the English court in the *Al Sadeq v. Dechert LLP, et al.*, Claim No. QB-2020-000322 ("Underlying Lawsuit") to pursue discovery into matters which that court found to be privileged—*i.e.*, Dechert's investigatory work (to which Respondents contributed) in furtherance of Dechert's representation of RAK and its related entities, including the RAK Investment Authority ("RAKIA").

Instead, Applicants focus their arguments on whether the Court should even consider this evidence, arguing that this is not *new* evidence, and that it is neither relevant nor material to the Court's consideration of the Application. Respondents address these arguments below.

## ARGUMENT

### I. RESPONDENTS' EVIDENCE MEETS THE STANDARDS FOR RECONSIDERATION

As Applicants acknowledge in their Response, a Rule 59(e) motion for reconsideration may be granted to, amongst other things, account for new evidence or prevent manifest injustice. (*See* D.E. 33, at p.5 (citing *Donalds v. Ethicon, Inc.*, 2023 WL 2446703, at *5 (4th Cir. Mar. 10, 2023))). The evidence that the CyberRoot bank statements were acquired via a bribe to Kotak

Mahinda Bank employees—not from a CyberRoot employee "whistleblower" as represented to the Magistrate Judge ruling on the Application—meets these standards. Because such evidence shows that the Application was introduced under false pretenses and made in bad faith to create a lawful pretext for Azima's immediate re-use of the stolen records in other cases, the Motion for Reconsideration should be granted. *See Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101 n.6 (2d Cir. 1995) ("Of course, if the district court determines that a party's discovery application under section 1782 is made in bad faith, . . . the court is free to deny the application in toto, just as it can if discovery was sought in bad faith in domestic litigation.").

### A. The Standard Chartered Bank Records Are Newly Discovered

Applicants ignore the core of Respondents' argument for reconsideration: bank records only *recently* obtained during discovery in *Azima v. Del Rosso, et al.*, No. 20-cv-954-WO-JLW (M.D.N.C.) (the "Azima Lawsuit") from Standard Chartered Bank[1] link Azima and his agents to the theft of the CyberRoot bank statements—the same CyberRoot banks statements that Applicants misrepresented to this Court were innocently obtained, and which Applicants

---

[1] Indeed, Applicants have continued to meet and confer with Standard Chartered Bank in a good faith effort to confirm the scope of Standard Chartered Banks' production of responsive information and to obtain its permission to use and disclose documents marked as "Confidential" by Standard Chartered Bank under the protective order in the Azima Lawsuit. Standard Chartered has requested that Applicants issue a modified subpoena, and anticipates that Applicants will be able to supplement the records with relevant bank records under seal in this matter with Standard Chartered Bank's permission.

4

relied on in support of their Application. These improperly acquired CyberRoot bank records formed the very basis for Applicants' claims that Respondents were involved in any hacking.

Standard Chartered Bank produced the records at issue as "Confidential" under the protective order in the Azima Lawsuit on February 24, 2023—roughly 14 months after Respondents filed their motion to quash in this proceeding, and roughly 10 months after the Magistrate Judge's order and opinion denying that motion. Respondents promptly met and conferred with Standard Chartered Bank concerning the scope of its production and sought permission to disclose the records marked as "Confidential" by Standard Chartered Bank. The Azima Lawsuit is currently the only proceeding (of the several that involve or are predicated on the purported hacking of Farhad Azima) where discovery is currently available to Respondents.

Further, Applicants spend the majority of their Response pointing out that the other evidence submitted with Respondents' Motion—*e.g.*, the CyberRoot Complaint, the declarations of Vikash Pandey, etc.—is not new evidence, and therefore should not be considered. But Applicants are not relying solely on that additional evidence in support of this Motion; rather, it is the Standard Chartered Bank records that link Azima, his agents, and Applicants with the theft of the CyberRoot bank statements from Kotak

5

Mahindra Bank.² The other evidence provides important context to what the Standard Chartered bank records substantiate—that the stolen CyberRoot bank statements from Kotak Mahindra Bank were used to create the false story upon which Applicants rely in support of their Application for discovery.

Indeed, while Respondents were suspicious of the timing of Applicants' initial publication of the CyberRoot bank records from Kotak Mahindra Bank in this proceeding in February 2021 (*see, e.g.,* D.E. 28, pp.20–21 (summarizing the timing and apparent coordination regarding the CyberRoot bank records between Applicants and Azima), the newly-produced Standard Chartered Bank reveal payments by Azima's agents that line up with the theft of the bank records (among other misconduct, such as attempted witness bribery), which predate the false cover-story that Jonas Rey offered about *starting* his investigation into BellTroX on July 6, 2020.

Accordingly, contrary to Applicants' assertion, Respondent's Motion is predicated on new evidence in the form of the information from Standard Chartered Bank.

---

² Moreover, Respondents believe that Applicants used this proceeding to effectively "launder" the stolen CyberRoot bank records through the Tsiattalou declaration so that Azima could then rely on those records in support of his appeal of his hacking claims in the United Kingdom with a pretextual lawful explanation for why he had CyberRoot's bank records.

## B. The Standard Chartered Bank Records Warrant This Court's Reconsideration And Are Material To This Court's Decision

As set out in Respondents' opening brief, the Standard Chartered Bank records substantiate that CyberRoot's bank records were obtained unlawfully in furtherance of Azima and his agents' efforts to create the false story that Respondents hired CyberRoot to hack Azima. More importantly, these Standard Chartered Bank records confirm that Tsiattalou's representations to this Court about how he came into possession of these CyberRoot bank records were, at best, wholly inaccurate. Thus, it is extremely material to this Court that the bank records forming the basis for this Application were submitted under false pretenses, because it not only implicates the veracity of Tsiattalou's declaration but also because the Magistrate Judge's order and opinion largely recited and adopted its contents. Had the Magistrate Judge been aware of this conduct in weighing the evidence in support of and in opposition to the Application, the scales—in Respondents' view—would have tipped in favor of declining or limiting the discovery sought. Indeed, Respondents do not believe the Magistrate Judge intended to set precedent that 28 U.S.C. § 1782 applicants could obtain discovery based on bank statements which were unlawfully obtained via a bribe in a foreign country.

In their Response, Applicants do not attempt to provide an explanation for how Tsiattalou lawfully came into possession of CyberRoot's bank

7

statements from Kotak Mahindra Bank and, instead, quibble about what it means to be a "whistleblower" to argue that Tsiattalou did not ***knowingly*** provide false information. (D.E. 33 p.17; *see also id.* at pp.13–14). Applicants' failure to contest the theft of the records is telling in its own right. Applicants' argument fails for at least two reasons.

*First*, Tsiattalou did not simply characterize his source of the stolen bank records as a "whistleblower". Rather, he specifically represented that "[a] whistleblower ***who is employed by CyberRoot and who has legitimate access to the company's bank account has provided copies of what the Applicants believe are CyberRoot's bank account statements with Kotak Mahindra Bank.***" (D.E. 4, ¶ 32 (emphasis added)). As the evidence set forth in Respondents' motion demonstrates, the CyberRoot bank statements did not come from an employee of CyberRoot—current or former—and, therefore, Applicants cannot use semantics to pivot from the falsity of Tsiattalou's sworn representation to this Court.

*Second*, claiming to have obtained the stolen bank statements from a "whistleblower" within CyberRoot was clearly a deliberate attempt to buttress the credibility of Tsiattalou's possession of the records. Moreover, using the term "whistleblower" suggests that the source was revealing wrongdoing

within CyberRoot,[3] which Applicants argued in their initial filings to this Court, and which Azima has also argued in his litigation in this Court and elsewhere.

The fact that the CyberRoot bank records were stolen from CyberRoot's bank in India via a bribe undermines all of Applicants' representations on this point, and should be considered by this Court.

Applicants' entire basis for their Application is that Respondents are alleged to have hacked Azima, and therefore Respondents must have information that will help "determin[e] the identity of those behind the hacking campaign targeting Mr. Al Sadeq's Legal and Support Team" in 2020. (D.E. 2, at p.18). In other words, Applicants theory is "you hacked him, so you must have hacked me." In coming to its decision, the Magistrate Judge largely adopted Applicants' version of the facts, including that Applicants seek discovery "related to [Respondents'] work with CyberRoot", whose relevance relies on stolen bank records. Thus, the evidence set forth by Respondents in the Motion refutes the very basis for the Application, which can hardly be considered irrelevant to this Court's consideration.

---

[3] Merriam-Webster defines a "whistleblower" "one who reveals something covert or who informs against another" such as where "an employee brings wrongdoing . . . to the attention of a government or law enforcement agency." *Whistleblower*, Merriam-Webster, https://www.merriam-webster.com/dictionary/whistleblower (last visited June 12, 2023).

Lastly, Applicants simply state that this is merely impeachment evidence of Applicants and argue that those issues should be resolved in foreign litigation. (D.E. 33 pp.12–13). Respondents, however, are not parties to the Underlying Lawsuit. While Respondents are litigating these same overlapping issues in the several other cases relating to the purported hacking of Azima, Respondents have no other avenue in a § 1782 proceeding other than to set forth the evidence demonstrating the false basis for the Application.

In sum, the Court's decision to grant the Application was based on the representations that the CyberRoot bank statements were acquired by a "whistleblower who is employed by CyberRoot and who has legitimate access to the company's bank account[.]" The new evidence from Standard Chartered Bank, when viewed along with the other information cited in Respondents' Motion, shows that those representations were false. The Court's grant of the Application based both on those false representations and the stolen bank records is akin to a defendant's conviction based on the fruit of the poisonous tree. Reconsideration is appropriate and necessary here to evaluate whether Applicants are still entitled to the discovery they seek in light of how CyberRoot's bank records were actually obtained.

### C. Reconsideration Is Also Proper To Prevent Manifest Injustice

Applicants ask the Court not to reconsider the veracity of their declarations in the light of new evidence. That is flatly contrary to cases

10

Case 1:21-mc-00006-WO-LPA   Document 34   Filed 06/16/23   Page 10 of 16

Lastly, Applicants simply state that this is merely impeachment evidence of Applicants and argue that those issues should be resolved in foreign litigation. (D.E. 33 pp.12–13). Respondents, however, are not parties to the Underlying Lawsuit. While Respondents are litigating these same overlapping issues in the several other cases relating to the purported hacking of Azima, Respondents have no other avenue in a § 1782 proceeding other than to set forth the evidence demonstrating the false basis for the Application.

In sum, the Court's decision to grant the Application was based on the representations that the CyberRoot bank statements were acquired by a "whistleblower who is employed by CyberRoot and who has legitimate access to the company's bank account[.]" The new evidence from Standard Chartered Bank, when viewed along with the other information cited in Respondents' Motion, shows that those representations were false. The Court's grant of the Application based both on those false representations and the stolen bank records is akin to a defendant's conviction based on the fruit of the poisonous tree. Reconsideration is appropriate and necessary here to evaluate whether Applicants are still entitled to the discovery they seek in light of how CyberRoot's bank records were actually obtained.

### C. Reconsideration Is Also Proper To Prevent Manifest Injustice

Applicants ask the Court not to reconsider the veracity of their declarations in the light of new evidence. That is flatly contrary to cases

construing § 1782, which allows courts to consider whether the application is made in bad faith.  *See Euromepa, supra.*  Congress did not intend the wide discretion available to a court in a § 1782 to be exploited by an applicant's mischaracterizations and half-truths.  Here, the Court has considerable discretion in the extent to which a § 1782 application is granted and the discovery permitted thereunder. *In re Merck & Co., Inc.,* 197 F.R.D. 267, 270 (M.D.N.C. 2000) ("Case law supports the view that not only does the Court have wide discretion to determine whether to grant discovery, but it possesses equally wide discretion to tailor such discovery to avoid attended problems.").

In light of the false statements in Tsiattalou's declaration, in addition to the evidence of the concerted efforts by Applicants, Azima, and the ENRC to frame Respondents in order to seek information on Neil Gerrard and Dechert (*see* D.E. 28, pp.6–14), it would be manifestly unjust for this Court to allow Applicants to exploit this § 1782 process.  Respondents ask that this Court use its inherent power to alter or amend its decision affirming the Magistrate Judge's order and opinion.  In the alternative, Respondents request that the Court use its discretion to remand Respondents' motion to quash to the Magistrate Judge, where he may reconsider the motion in light of the additional evidence and arguments set forth in this Motion.

11

## II. THE ENGLISH COURT'S DECISION IN THE UNDERLYING LAWSUIT ON PRIVILEGE IS SIGNIFICANT AND WARRANTS RECONSIDERATION.

Applicants miss the point in arguing that the recent decision of the U.K. High Court regarding privilege does not merit reconsideration because it is not "controlling law." Applicants cannot seriously argue that they have a right to seek evidence for use in a foreign proceeding when the foreign court has rejected arguments that such evidence is discoverable. *See Intel v. Advanced Micro Device*, 542 U.S. 241, 265 (2004) (holding that a court may consider whether a § 1782 Application seeks to circumvent foreign proof-gathering restrictions or other policies of a foreign country).

Moreover, the ruling from the U.K. High Court bears directly on the use of discovery implicated by the present Application—specifically, Respondents' contracted work (*i.e.*, consulting and fraud examination work) on behalf of Dechert in furtherance of Dechert's legal representation of RAK and its related entities. Respondents acknowledge the lack of case law in this specific context; however, as the Court is aware, there is little developed 28 U.S.C. § 1782 case law, and it would certainly be manifestly unjust if Applicants were permitted to circumvent an order from the U.K. court in the Underlying Lawsuit and seek discovery into matters which constitute Dechert's privileged investigatory work simply because the § 1782 application was pending when the U.K. court ruled that the evidence would not be discoverable. Moreover, there is no

12

indication that Applicants have sought or received input or permission from the U.K. court to seek this discovery through this Application. Thus, this Court should use its discretion to amend its prior orders and preclude discovery into Respondents' privileged work for Dechert in furtherance of Dechert's legal representation of RAK and its related entities.

Also, there are various motions pending before Judge Webster in this Court on this same discoverability issue—*i.e.*, the applicability of privilege to Respondents' work for Dechert in furtherance of Dechert's legal representation of RAK and its related entities. *See, e.g.,* Azima Lawsuit, D.E. 142 (requesting protective order to prevent deposition questions probing privileged information). At the very least, to avoid inconsistent rulings, this Court should foreclose discovery of this information/testimony from Respondents until Judge Webster rules on this issue.

## **CONCLUSION**

For the foregoing reasons, Respondents request that this Court grant their Motion to Reconsider or Modify, reconsider its Order affirming Judge Auld's Orders, overrule Judge Auld's Orders, and either deny the Application or grant Respondent's Motion to Quash in whole or part as laid out in the Motion to Quash.

13

Alternatively, Respondents request that this Court remand the issue to Judge Auld to reconsider the Motion to Quash in light of the additional evidence submitted in support of this Motion.

This the 16th day of June, 2023.

>**NELSON MULLINS RILEY & SCARBOROUGH LLP**
>
>By*:      /s/ Brandon S. Neuman*
>Brandon S. Neuman, NCSB# 33590
>Jeffrey M. Kelly, NCSB# 47269
>Nathaniel J. Pencook,NCSB#52339
>301 Hillsborough Street, Suite 1400
>Raleigh, North Carolina, 27603
>Telephone: (919) 329-3800
>Facsimile: (919) 329-3799
>brandon.neuman@nelsonmullins.com
>jeff.kelly@nelsonmullins.com
>nate.pencook@nelsonmullins.com
>**Counsel for Respondents Nicholas Del Rosso and Vital Management Services, Inc.**

# CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of June, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send electronic notification of filing to the following:

>Mark W. Merritt
>Travis S. Hinman
>Robinson, Bradshaw & Hinson, P.A.
>101 N. Tryon Street, Suite 1900
>Charlotte, NC 28246
>mmerritt@robinsonbradshaw.com
>thinman@robinsonbradshaw.com

>**NELSON MULLINS RILEY & SCARBOROUGH LLP**
>
>By: */s/ Brandon S. Neuman*
>Brandon S. Neuman, NCSB# 33590
>Jeffrey M. Kelly, NCSB# 47269
>Nathaniel J. Pencook, NCSB#52339
>301 Hillsborough Street, Suite 1400
>Raleigh, North Carolina, 27603
>Telephone: (919) 329-3800
>Facsimile: (919) 329-3799
>brandon.neuman@nelsonmullins.com
>jeff.kelly@nelsonmullins.com
>nate.pencook@nelsonmullins.com
>**Counsel for Respondents Nicholas Del Rosso and Vital Management Services, Inc.**

## WORD COUNT CERTIFICATION

Pursuant to Local Rule 7.3(d)(1), I hereby certify, subject to Fed. R. Civ. P. 11, that the foregoing document contains **2,791** words, according to the word count feature of the word processing system used to prepare the brief. Accordingly, the brief does not exceed the word limitation.

Respectfully submitted, this the 16th day of June, 2023.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By*:   /s/ Brandon S. Neuman*
Brandon S. Neuman, NCSB# 33590
Jeffrey M. Kelly, NCSB# 47269
Nathaniel J. Pencook, NCSB#52339
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina, 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
brandon.neuman@nelsonmullins.com
jeff.kelly@nelsonmullins.com
nate.pencook@nelsonmullins.com
**Counsel for Respondents Nicholas Del Rosso and Vital Management Services, Inc.**

4888-0460-8872